**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, NY 10165
Tel: (212) 697-6484
Fax: (212) 697-7296
Email: peretz@bgandg.com

Counsel for Plaintiff

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JUAN FRANCISCO GONALEZ NIEVES AS TRUSTEE OF THE GONZALEZ CORONADO TRUST, Individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>    v.<br><br>PERFORMANCE SPORTS GROUP LTD., KEVIN DAVIS, MARK VENDETTI, AND AMIR ROSENTHAL,<br><br>        Defendants. | Case No:<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

Plaintiff Juan Francisco Gonzalez Nieves, as Trustee of the Gonzalez Coronado Trust ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's Complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by Performance Sports Group Ltd., ("PSG" or the "Company"), as well as media and analyst reports about the Company. Plaintiff believes that

substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased PSG securities from January 15, 2015 through March 14, 2016, both dates inclusive (the "Class Period"), seeking to recover compensable damages caused by Defendants' violations of federal securities laws and pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §78j (b) and 78t (a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

3.     This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. § 1331.

4.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) as Defendants conducts business in this district and sells its products in this district.

5.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.      Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased PSG securities at artificially inflated prices during the Class Period and has been damaged thereby.

7.      Defendant PSG is a Canadian corporation with its principal executive offices located in Exeter, New Hampshire. PSG securities trade on the New York Stock Exchange ("NYSE") under the ticker symbol "PSG."

8.      Defendant Kevin Davis ("Davis") has served as the Company's Chief Executive Officer ("CEO") and a director throughout the Class Period. Davis departed from PSG on March 22, 2016.

9.      Defendant Mark Vendetti ("Vendetti") has served as the Company's Chief Financial Officer ("CFO") since December 2015.

10.     Defendant Amir Rosenthal ("Rosenthal") served as CFO from the beginning of the Class Period until December 2015 when he was named President of PSG Brands. Defendant Rosenthal oversees each brand within the PSG portfolio and is responsible for all aspects of the brands' businesses. On March 22, 2016, Rosenthal became interim CEO of PSG after Davis' immediate departure.

11.     Defendants Davis, Vendetti, and Rosenthal are sometimes referred to herein as the "Individual Defendants."

12.     Defendant PSG and the Individual Defendants are referred to herein, collectively, as the "Defendants."

13.     Each of the Individual Defendants:

        a.      directly participated in the management of the Company;

3

b.      was directly involved in the day-to-day operations of the Company at the highest levels;

c.      was privy to confidential proprietary information concerning the Company and its business and operations;

d.      was involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

e.      was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and

f.      approved or ratified these statements in violation of the federal securities laws.

14.      As officers, directors, and controlling persons of a publicly-held company whose securities are and were registered with the SEC pursuant to the Exchange Act, and was traded on NYSE and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate accurate and truthful information promptly with respect to the Company's business prospects and operations, and to correct any previously-issued statements that had become materially misleading or untrue to allow the market price of the Company's publicly-traded stock to reflect truthful and accurate information.

15.      PSG is liable for the acts of the Individual Defendants and its employees under the doctrine of respondeat superior and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

16.      The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to PSG under respondeat superior and agency principles.

4

## SUBSTANTIVE ALLEGATIONS

### Background

17.    PSG designs, manufactures, and markets performance sports equipment and related apparel for hockey, baseball, softball, and lacrosse. The Company owns the brands Bauer, Mission, Cascade, Inaria, Combat, and Easton.

18.    PSG's products are sold by sales representatives and independent distributions throughout the world. Many of PSG's products are sold to consumers from sporting good stores or through online retailers.

19.    Team Express Distributing, LLC doing business as Baseball Express, LLC ("Team Express") is an online retailer for sporting goods selling predominately baseball and softball equipment. Team Express is a large customer of PSG.

20.    Team    Express    operates    the    websites    www.teamexpress.com, www.baseballexpress.com,        www.softball.com        www.basketballexpress.com, www.footballamerica.com, www.lacrosseexpress.com, and www.fanatics.com.

21.    On February 20, 2015, it was reported that The Sports Authority Inc. ("Sports Authority") was in financial risk. CNNMoney published the article, "Sports Authority said to be at 'high' risk of default," which states in relevant part:

> Credit rating analyst Moody's has cut its rating on Sports Authority's debt deeper into junk bond status and warned the chain could be less than a year away from defaulting on a $300 million loan.

"At these operating levels, Sports Authority's capital structure is unsustainable over the longer term, and the risk of a default ... is high," wrote analyst Michael Zuccaro in the note.

Sports Authority has more than 450 stores in 41 states. It is facing increased competition from Dick's Sporting Goods (DKS), which had about 600 stores as of its late last year, after opening nearly 50 in the last year.

Sports Authority is owned by investment firm Leonard Green & Partners, which took it private in 2006. The firm was not immediately available for comment early Friday.

But beyond competition from Dick's, Sports Authority is facing the problem of other brick-and-mortar stores struggling to keep up with online retailers such as Amazon (AMZN, Tech30).

22.     PSG had seven primary hockey customers in the U.S. until mid-2015 when there was a consolidation amongst its customers.

23.     On or around June 24, 2015, Players Bench, Corp., a Denver-based hockey and lacrosse sporting goods retailer, and Total Hockey Inc., a St. Louis-based hockey retailer, announced that Total Hockey Inc. will be acquiring Player Bench, Corp. Both companies were customers of PSG.

24.     On October 2, 2015, Pure Hockey announced that it acquired all assets and ongoing business of SportsGiant, LLC. This included the ice hockey retailer, Hockey Giant. Pure Hockey and Hockey Giant were both PSG customers.

25.     On December 18, 2015, *Bloomberg Business* published the article, "Sports Authority Faces Big Debt Wall After Dick's Pulls Ahead," which detailed the troubles at Sports Authority such as the lack of business growth still at levels from 2006, not keeping up with competition, and its looming bankruptcy. The article states in relevant part:

**Advisers Arrive**

6

Senior lenders to Sports Authority have brought in investment bank PJT Partners Inc. and law firm Brown Rudnick LLP, and the company has hired advisers including Rothschild & Co. to manage its more than $643 million in debt, Bloomberg News reported earlier. The company is also working with Gibson Dunn & Crutcher LLP, according to people familiar with the situation. A spokeswoman at Gibson Dunn declined to comment.

Little is crystal clear about the company's finances, since it doesn't submit publicly available regulatory filings, hold conference calls or release earnings reports. Zuccaro said there's still enough information to conclude Sports Authority is in trouble.

Debt to earnings before interest, taxes, depreciation and amortization ratio jumped to about 6.3 times as of May, he wrote in a July report, from 4.7 two years earlier. EBITDA-to-interest is a measure of how well a company can service its debt, and Zuccaro said the Sports Authority's ratio is "well under" 1, meaning earnings aren't sufficient to cover interest payments. Just two years ago, that ratio was 1.2. "At these levels," Zuccaro said, "refinancing could be a challenge."

26.     On December 2, 2015, *Bloomberg News Enterprise* published the article "Sports Authority Lenders Said to Hire Advisers for Restructuring." The article discusses the financial stress the Sports Authority was in and steps it was taking in preparation for bankruptcy, stating in relevant part:

Lenders to The Sports Authority Inc. have hired advisers to protect their investments as the private equity backed retailer prepares to restructure its debt, according to three people with knowledge of the matter.

A group of senior lenders who hold some of the company's $300 million term loan retained investment bank PJT Partners Inc. and law firm Brown Rudnick LLP as the company tries to get its $643 million of debt under control, said the people, who asked not to be identified because the appointments haven't been made public.

Holders of Sports Authority's junior-ranked debt are scheduled to meet with financial advisers Wednesday to hear proposals on how they'd guide creditors through restructuring negotiations, the people said.

Sports Authority, which is controlled by Leonard Green & Partners LP and has 467 stores, hired financial adviser Rothschild & Co. in an effort to help manage its debt, people with knowledge of that appointment said last month. The sporting goods chain is dealing with shrinking profits amid intense competition, according to a July 1 report from Moody's Investors Service.

27.     On March 2, 2016, The Sports Authority filed for Chapter 11 Bankruptcy protection.

## Materially False And Misleading Statements

28.     After the market closed on January 14, 2015, the Company issued a press release entitled, "Performance Sports Group Reports Record Fiscal Second Quarter 2015 Results." The press release detailed PSG's financial position for the second quarter of its fiscal 2015, stating in relevant part:

> EXETER, NH - January 14, 2015 - Performance Sports Group Ltd. (NYSE: PSG) (TSX: PSG) ("Performance Sports Group" or the "Company"), a leading developer and manufacturer of high performance sports equipment and apparel, reported financial results for its fiscal second quarter ended November 30, 2014. All figures are in U.S. dollars.
>
> **Fiscal Q2 2015 Financial Highlights vs. Year-Ago Quarter**
> - Revenues up 47% to a record $172.3 million (up 51% in constant currency)
> - Hockey revenues up 9% to a record $113.4 million (up 12% in constant currency)
> - Adjusted Gross Profit up 57% to $62.2 million with Adjusted Gross Profit margin up 230 basis points to 36.1%
> - Adjusted EBITDA up 74% to $24.2 million (up 100% in constant currency)
> - Adjusted Net Income up 49% to $11.2 million or $0.24 per share

29.     After the market closed on April 14, 2015, the Company issued a press release entitled, "Performance Sports Group Reports Record Fiscal Third Quarter 2015 Results." The press release detailed PSG's financial position for the third quarter of its fiscal 2015, stating in relevant part:

> EXETER, NH – April 13, 2015 – Performance Sports Group Ltd. (NYSE: PSG) (TSX: PSG) ("Performance Sports Group" or the "Company"), a leading developer and manufacturer of high performance sports equipment and apparel, reported financial results for its fiscal third quarter and nine months ended February 28, 2015. All figures are in U.S. dollars.

8

**Fiscal Q3 2015 Financial Highlights vs. Year-Ago Quarter**
- Revenues up 121% to a record $137.7 million (up 127% in constant currency)
- Hockey revenues up 9% to a record $53.9 million (up 16% in constant currency)
- Lacrosse revenues up 19%
- Adjusted Gross Profit up 134% to $46.3 million with Adjusted Gross Profit margin up 180 basis points to 33.6%
- Adjusted EBITDA up significantly to $14.4 million from a loss of $3.0 million
- Adjusted Net Income up significantly to $6.2 million or $0.13 per share from a loss of $4.2 million or $(0.11) per share

30.     After the market closed on July 7, 2015, the Company issued a press release entitled, "Performance Sports Group Provides Preliminary Fiscal Fourth Quarter and Full Year 2015 Results." The press release detailed PSG's preliminary financial position for the fourth quarter of its fiscal 2015, stating in relevant part:

*- Currency Neutral Q4 2015 Revenues Expected to Exceed a Record $156 Million and Adjusted EPS of Approximately $0.30 -*

*- Reported Q4 2015 Revenues Expected to Exceed a Record $147 Million with Adjusted EPS of Approximately $0.17*

\*     \*     \*

For the fourth quarter of 2015, the Company expects currency neutral revenues of more than $156.0 million, or an approximate 38% increase from $112.9 million in the same year-ago quarter. Including the impact of changes in foreign currency rates, the Company expects to report record revenues of more than $147.0 million, up approximately 30%.

For fiscal 2015, the Company expects currency neutral revenues of more than $675.0 million, or an approximate 51% increase from $446.2 million in fiscal 2014. Including the impact of changes in foreign currency rates, the Company expects to report record revenues of more than $654.0 million, up approximately 47%.

31.     After the market closed on August 26, 2015, the Company issued a press release announcing its guidance for fiscal year ending May 31, 2016, stating in part:

**Performance Sports Group Reports Record Fiscal Fourth Quarter and Full Year 2015 Results**

\*     \*     \*

9

The strengthening U.S. dollar continues to impact the reported results of companies with meaningful business outside the U.S. For our Company, the impact is experienced most particularly in our hockey business, which represents nearly all of our revenues generated outside of the U.S. At today's foreign exchange rates, *we currently expect Adjusted Net Income in fiscal 2016 to fall in a range between $0.70 to $0.73 per share,* primarily due to the impact of foreign exchange on our reported results in the first quarter. Absent the year-over-year impact of foreign exchange, we currently expect our Adjusted Net Income per share for fiscal 2016 to be roughly flat compared to the $1.02 per share reported in fiscal 2015.

(Emphasis added).

32.     On August 27, 2016, the Company filed its annual report on Form 10-K with the SEC for the fiscal year ending May 31, 2015 (the "2015 10-K"). The 2015 10-K was signed by Defendants Davis and Rosenthal. Attached to the 2015 10-K were Sarbanes-Oxley Act of 2002 ("SOX") certifications signed by Defendants Davis and Rosenthal attesting to the accuracy of financial reporting and effectiveness of internal controls.

33.     On October 15, 2015, the Company held a conference call to discuss PSG's first quarter of 2016 earnings results. On the conference call, Defendant Davis stated in relevant part:

There has been a little of consolidation in the U.S. hockey retail market over the past several months with *two of the top three retailers in the U.S. hockey market making acquisitions of two other retailers who are in the top seven. To say it in another the top seven are now the top five.* I think also, there has been some remix of where our lacrosse product is being sold between specialty and mass retailers with [indiscernible] starting to take a little bit more share in the lacrosse base, as they dedicate more and more space to selling that product. But otherwise, we don't see any sort of decline in demand from consumers for those products.

(Emphasis added).

34.     After the market closed on January 13, 2016, the Company issued a press release announcing its financial results for the quarter ended November 30, 2015 and giving an overview of the different segments of PSG's business. The press release also lowered the previously issued guidance for fiscal year ending May 31, 2016. The press release states in part:

10

**Performance Sports Group Reports Fiscal
Second Quarter 2016 Results**

\*       \*       \*

Given the continued weakening of the Canadian dollar since our last stated guidance, ***we are revising our fiscal 2016 guidance and now expect Adjusted Net Income to range between $0.66 and $0.69 per share***. Additionally, we expect Adjusted EPS to range between $0.09 and $0.10 in our fiscal 2016 third quarter and between $0.31 and $0.33 in our fourth quarter. These expectations assume current foreign exchange rates hold in the remainder of our year. In fiscal 2016, we continue to expect that, on a currency-neutral basis, our businesses will outpace the growth of the markets we serve, resulting in revenue gains and increased profitability. Looking to fiscal 2017, at current rates, we expect our results during the first half of the year to be impacted by year-over-year declines in exchange rates, partially offset by the execution of our cost saving initiatives.

\*       \*       \*

Baseball/Softball EBITDA in the second quarter decreased 31% (including and excluding the impact of foreign currency) to $7.9 million, ***which was largely driven by a bad debt write-off related to outstanding receivables for an internet baseball retailer that filed for bankruptcy reorganization,*** as well as the aforementioned product launch timing differences, EASTON product mix, and other SG&A investments in marketing and IT which were partially offset by a reduction in performance-based incentives.

(Emphasis added).

35.     The statements referenced in ¶¶ 28 – 34 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Defendants misdated PSG's earnings by asking clients to move future orders into earlier quarters; (2) Sports Authority's financial woes

11

would impact PSG's financial performance; (3) the baseball and softball markets were in decline; (4) the consolidation of PSG's U.S. Hockey customers would create a smaller demand for hockey equipment; and (5) as a result, Defendants' statements about PSG's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### The Truth Slowly Emerges

36.     On December 16, 2015, Team Express filed for Chapter 11 Bankruptcy protection in the U.S. District Court in the Western District of Texas. According to the bankruptcy petition, Easton Sports – a division of PSG – is Team Express' largest creditor with an unsecured claim of $3,817,032.90.

37.     On news of Team Express' bankruptcy, share of PSG fell $0.37 per share or approximately 3.6% to close at $9.80 per share on December 17, 2016, damaging investors.

38.     On March 8, 2016, before the market opened, the Company issued a press release revising guidance for the year ending May 31, 2016. The press release states in relevant part:

**Performance Sports Group Revises Fiscal 2016 Outlook and Reports Preliminary Fiscal Third Quarter Results**

- Investor Call Scheduled Today at 8:00 a.m. E.T. –

EXETER, NH - March 8, 2016 - Performance Sports Group Ltd. (NYSE: PSG) (TSX: PSG) ("Performance Sports Group" or the "Company"), a leading developer and manufacturer of high performance sports equipment and apparel, has revised its outlook for its 2016 fiscal year and reported preliminary results for its fiscal third quarter ended February 29, 2016. All figures are in U.S. dollars. Certain metrics, including those expressed on an adjusted and/or constant currency basis, are non-GAAP financial measures (see "Non-GAAP Financial Measures" below). All figures exclude the accounting gain the Company expects to record in the third quarter of fiscal 2016 associated with its acquisition of Easton Hockey in January 2016. *The Company has reduced its fiscal year 2016 Adjusted EPS guidance by approximately $0.55 per diluted share to approximately $0.12 to $0.14 per diluted share as compared to its prior publication of guidance ($0.66 to $0.69 per diluted share), primarily as a result*

12

*of the following three factors: (i) a write down of the receivable balance from a U.S. national sporting goods retailer that has filed under chapter 11 and the related anticipated loss of sales from this retailer ($0.09 per share); (ii) an anticipated reduction in sales, particularly due to weakness in the baseball/softball market ($0.31 per share); and (iii) additional bad debt reserves primarily for certain U.S. hockey customers and the related anticipated loss of sales from such customers ($0.19 per share).*

(Emphasis added).

39.     About an hour after the press release, the Company held a conference call to discuss the revised fiscal year 2016 guidance and the preliminary third quarter of 2016 results.

Defendant Davis stated in relevant part:

The second half of fiscal 2016 has been impacted by ***adverse market conditions and related customer credit issue***s. ***The baseball/softball market is experiencing an unexpected significant downturn in retail sales, including in our important bat category. This weakening of consumer demand, coupled with the chapter 11 filing by one of our largest US national sporting goods retailers, is reducing our sales for baseball and softball products. Additionally, the consolidation of hockey retail in the US has reduced our customers' demand for products more than we previously anticipated as they continue to reduce their inventory levels.***

In light of these events and challenges, including the bankruptcy of an Internet baseball retailer in the second quarter, we decided to increase our bad debt reserves for certain of our US hockey and baseball/softball customers.

(Emphasis added).

40.     On the same conference call, Defendant Vendetti stated in relevant part:

***We have reduced our fiscal year 2016 adjusted EPS guidance by approximately $0.55 per diluted share to approximately $0.12 to $0.14 per diluted share as compared to prior publication of guidance of $0.66 to $0.69 per diluted share.*** On a constant currency basis, 2016 adjusted EPS is expected to range between approximately $0.64 and $0.66 per diluted share.

                               *       *       *

The weakness that we're seeing in baseball is coming not only from sports authority, as you point out. As we said a minute ago, the bankruptcy situation that they are going through caused us to not only write-down their receivable but also take their future sales out of our forecast. There's other weakness in sell-through

13

in the market with other of our customers. There is also, as I noted in the comments that I made during the prepared remarks, there's little bit of a general CSA effect, which is discouraging and impacting orders from other customers, given that there is the possibility of a significant amount of inventory in the marketplace that would be on discounted terms, so it's all of those factors combined. And as I indicated, also there is a possibility that the wetter and colder weather that we've seen in many parts of the country had an impact as well. It's very hard to quantify that.

(Emphasis added).

41.     On the same conference call, Defendant Rosenthal stated in relevant part:

As Kevin mentioned in his remarks, we've seen an unexpected significant downturn in retail sell-through in the baseball/softball category, particularly in bat. Easton's market share in bat is larger than any other category, Easton's market share in bat is larger than any other category, but the slowdown in sell-through for bat was a disproportionate impact on Easton's versus other competitors in the baseball/softball market.

***There were some indications that customer demand was softer than expected coming out of the holiday season, but we did not expect this reduced demand to fall further as it did later in the third quarter.*** It was only toward the end of the third quarter that it became apparent the extent to which demand had fallen and how, in connection with the bankruptcy of a large US national sporting goods retailer that is filed under Chapter 11, this would reduce sales in the second half of fiscal 2016.

At this time, we do not believe that this weakening is related to the upcoming BBCOR standard change for youth bat. It is possible that the unusually cold and wet winter in certain parts of the United States has played a role in the market dynamics that we're experiencing. It is also worth noting that a meaningful amount of our baseball products were sold to retailers on an at-once basis. These customers tend to have more sophisticated point-of-sale analytics than our on hockey customers, who were typically smaller. And that means we receive information about retailers purchasing decision much closer to their actual shipment and without as much advanced notice as we have in our hockey business.

***We believe that the recent bankruptcy filing of a large US national sporting goods retailer may also be affecting other baseball retailers, who have either cancelled orders or are hesitant to place orders*** in anticipation (technical difficulty). ***As we mentioned in our second quarter call, four of our Top 7 retailers in hockey have consolidated in the US over the past several months. This consolidation process reduced our customers' demand for products more than we previously anticipated, as they continue to reduce their inventory levels.***

14

As Kevin mentioned, in light of the challenges we are facing and **recent bankruptcy filings of an online baseball retailer in the second fiscal quarter and a large US national sporting goods retailer in the third fiscal quarter, we have increased our potential bad debt reserve for a limited number of our US customers, primarily in hockey, but also in baseball/softball.**

\*       \*       \*

So, to be clear, we have not seen any bankruptcies among our retailers, which has caused us to take the bad debt reserves that we have. It's not a bankruptcy that is caused it, but other developments with their earnings history and outstanding balances. **The focus of that bad debt reserve is on a variety of customers in our US hockey market.** So, we don't have much more that we can add to the points that we've said so far. **But other than what we've previously talked about in the US market, four of our Top 7 retailers have emerged. And when that happens, it's not unusual to see a period of time where there is redundant inventory from those business combinations. And we experienced the similar situation in the Canadian hockey market several years ago, when three of our Top 5 customers combined over a two-year period. So we'll expect the consolidation in the US market to have a similar effect for us and we have every intention of working closely with those customers that are both impacted by the consolidation that's happening in the US and those who are outside of that group as they navigate through the current situation.**

(Emphasis added).

42.     On this news, shares of PSG fell $5.75 per share or over 66% to close at $2.91 per share on March 8, 2016, damaging investors.

43.     After the market closed on March 14, 2016, *The New York Post* published an article entitled, "Bauer's parent company questioned about misdating earnings." The article raised issues about PSG's manipulation of timing of sales, stating in relevant part:

Performance Sports Group, maker of Bauer hockey sticks, is being questioned **about misdating earnings,** *putting its prominent board at risk,* The Post has learned.

**Customers told former PSG Chair Graeme Roustan that the company had asked them to misdate earnings, a source with direct knowledge of the situation said.**

Roustan, PSG chair from 2008 to 2012, has been fighting his former company, trying to get back on the board.

Last year Roustan commissioned SurveyMonkey — an online survey platform — to **ask PSG customers if they were told to move future orders into an earlier quarter.**

Roustan presented his findings to the PSG board, sources said.

*       *       *

Roustan had first hired Grant Thornton to take a survey of PSG's customers. **PSG persuaded Grant Thornton not to release those findings, including a question about misdating earnings, to Roustan.** Now Roustan is suing Grant Thornton, court documents show. Roustan declined comment.

PSG's board includes the Edmonton Oilers top executive Bob Nicholson, who has been on the board since 2011. Former Boston Red Sox Chief Executive Larry Lucchino joined in 2014.

If PSG misdated earnings, the directors under Canadian securities law could potentially be found to be criminally liable.

(Emphasis added).

44.     On this news, shares of PSG fell $0.41 per share or over 10.35% to close at $3.55 per share on March 15, 2016, damaging investors.

45.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

**PLAINTIFF'S CLASS ACTION ALLEGATIONS**

46.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired PSG securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their

16

immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

47.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, PSG securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by PSG or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

48.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

49.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

50.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

•    whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of PSG;

- whether the Individual Defendants caused PSG to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of PSG securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

51.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

52.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- PSG securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold PSG securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

53.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

54.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court *in Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

<u>COUNT I</u>

**Violations of Section 10(b) of The Exchange Act and Rule 10b-5**
**<u>Against All Defendants</u>**

55.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

56.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

57.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of PSG securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire PSG securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

58.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for PSG securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about PSG's disclosure controls and procedures.

59.     By virtue of their positions at PSG, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain

and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

60.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of PSG, the Individual Defendants had knowledge of the details of PSG's internal affairs.

61.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of PSG. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to PSG's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of PSG securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning PSG's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired PSG securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

62.     During the Class Period, PSG securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of PSG securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of PSG securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of PSG securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

63.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

64.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

<u>**COUNT II**</u>

**Violations of Section 20(a) of The Exchange Act**
<u>**Against The Individual Defendants**</u>

22

65.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

66.     During the Class Period, the Individual Defendants participated in the operation and management of PSG, and conducted and participated, directly and indirectly, in the conduct of PSG's business affairs. Because of their senior positions, they knew the adverse non-public information about PSG's operations, current financial position and future business prospects.

67.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to PSG's business practices, and to correct promptly any public statements issued by PSG which had become materially false or misleading.

68.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which PSG disseminated in the marketplace during the Class Period concerning the Company's disclosure controls and procedures. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause PSG to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of PSG within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of PSG securities.

69.     Each of the Individual Defendants, therefore, acted as a controlling person of PSG. By reason of their senior management positions and/or being directors of PSG, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, PSG to engage in the unlawful acts and conduct complained of herein. Each of the Individual

Defendants exercised control over the general operations of PSG and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

70.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by PSG.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as her reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: May 13, 2016

Respectfully submitted,
**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
/s/ Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, NY 10165
Tel: (212) 697-6484
Fax: (212) 697-7296
Email: peretz@bgandg.com
Counsel for Plaintiff

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.   I, Juan Francisco Gonzalez Nieves, as Trustee of the Gonzalez Coronado Trust, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2. I have reviewed a Complaint against Performance Sports Group Ltd. ("PSG" or the "Company") and, authorize the filing of a comparable complaint on my behalf.

3.   I did not purchase or acquire Performance Sports Group Ltd. securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.   I am willing to serve as a representative party on behalf of a Class of investors who purchased or acquired Performance Sports Group Ltd. securities during the class period, including providing testimony at deposition and trial, if necessary. I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5. To the best of my current knowledge, the attached sheet lists all of my transactions in Performance Sports Group Ltd. securities during the Class Period as specified in the Complaint.

6. During the three-year period preceding the date on which this Certification is signed, I have not sought to serve as a representative party on behalf of a class under the federal securities laws.

7.   I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.   I declare under penalty of perjury that the foregoing is true and correct.

Executed _____5 | 13 | 2016_____
                (Date)

_____
(Signature)

Juan Francisco Gonzalez Nieves

(Type or Print Name)

**SUMMARY OF PURCHASES AND SALES**

## SUMMARY OF PURCHASES AND SALES

| DATE | PURCHASE OR SALE | NUMBER OF SHARES | PRICE PER SHARE |
|---|---|---|---|
| 7/21/2015 | + 50,776 $\frac{12}{}$ | 3,000 | 16.804 |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |