UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JUAN FRANCISCO GONZALEZ NIEVES AS TRUSTEE OF THE GONZALEZ CORONADO TRUST, Individually and on behalf of all others similarly situated,<br><br>　　　　　　　Plaintiff,<br><br>　　-against-<br><br>PERFORMANCE SPORTS GROUP LTD., KEVIN DAVIS, and AMIR ROSENTHAL,<br><br>　　　　　　　Defendants. | Case No. 1:16-cv-03591-GHW |

**CONSOLIDATED MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
JOINT MOTION TO DISMISS THE AMENDED COMPLAINT**

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Leslie Gordon Fagen
Timothy J. Holland
1285 Avenue of the Americas
New York, New York  10019-6064

Justin Anderson
2001 K Street, NW
Washington, D.C. 20006-1047

*Attorneys for Defendants Performance Sports
Group Ltd. and Amir Rosenthal*


WINSTON & STRAWN LLP

David L. Aronoff
Gayle I. Jenkins
Scott J. Fishwick
333 S. Grand Avenue
Los Angeles, California  90071-1543

Seth C. Farber
200 Park Avenue
New York, New York 10166-4193

*Attorneys for Defendant Kevin Davis*

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT..................................................................................................... 1

STATEMENT OF FACTS ........................................................................................................... 3

      A.     The Parties........................................................................................................ 3

      B.     The Amended Complaint ................................................................................. 3

ARGUMENT ............................................................................................................................... 7

I.     The Securities Fraud Claim Should Be Dismissed. ...................................................... 7

      A.     The Fund Has Failed to Identify Any False or Misleading Statements. ............ 7

      B.     Even If the So-Called Channel Stuffing Could Be Considered False or
             Misleading, the Fund Has Failed to Show It Was Material. ........................... 13

            1.     The Fund Must Plead Facts Showing the Materiality of an Allegedly
                   Fraudulent Practice. ........................................................................... 13

            2.     The Fund Has Failed to Plead Facts Showing Materiality.................. 16

      C.     Even If the Fund Could Identify a Materially False or Misleading
             Statement, It Has Failed to Plead Scienter. ...................................................... 20

            1.     Mere Knowledge of Channel Stuffing Practices Fails to Support a
                   Strong Inference of Scienter............................................................... 21

            2.     Unfounded Allegations of Defendants' Knowledge about the Risks
                   of Channel Stuffing Are Insufficient to Support Scienter.................. 25

            3.     Defendant Davis's Departure Is Not Probative of Scienter. ............... 32

            4.     Defendants' Motive to Maintain Corporate Profitability Falls Well
                   Short of Giving Rise to a Strong Inference of Scienter. ...................... 33

            5.     The Financial Performance of PSG's Competitors Fails to Support a
                   Strong Inference of Scienter............................................................... 36

      D.     Events Occurring After the Fund Disposed of Its PSG Stock Are
              Irrelevant to Its Securities Fraud Claim. ........................................................ 39

II.    The Claim of Control Person Liability Should Be Dismissed. .................................... 40

CONCLUSION ......................................................................................................................... 41

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*AIG Global Sec. Lending Corp.* v. *Banc of Am. Sec. LLC*,
   254 F. Supp. 2d 373 (S.D.N.Y. 2003)................................................................15

*ATSI Comme'ns, Inc.* v. *Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007)...................................................................21, 40

*Basic Inc.* v. *Levinson*,
   485 U.S. 224 (1988)................................................................................14

*In re BISYS Sec. Litig.*,
   397 F. Supp. 2d 430 (S.D.N.Y. 2005)................................................................32

*In re Bristol-Myers Squibb Sec. Litig.*,
   312 F. Supp. 2d 549 (S.D.N.Y. 2004)...................................10, 12, 22, 23, 24

*Broudo* v. *Dura Pharms., Inc.*,
   339 F.3d 933 (9th Cir. 2003).......................................................................11

*Campo* v. *Sears Holdings Corp.*,
   371 F. App'x 212 (2d Cir. 2010) ..................................................................30

*Carpenters Pension Trust Fund of St. Louis* v. *Barclays PLC*,
   750 F.3d 227 (2d Cir. 2014).........................................................................7

*C.D.T.S. No. 1 & A.T.U. Local 1321 Pension Plan* v. *UBS AG*,
   No. 12-cv-4924, 2013 WL 6576031 (S.D.N.Y. Dec. 13, 2013) ........................33

*In re Centerline Holdings Co. Sec. Litig.*,
   613 F. Supp. 2d 394 (S.D.N.Y. 2009)...............................................................40

*In re Cerner Corp. Sec. Litig.*,
   425 F.3d 1079 (8th Cir. 2005)......................................................................30

*Chill* v. *Gen. Elec. Co.*,
   101 F.3d 263 (2d Cir. 1996).........................................................................34

*City of Austin Police Ret. Sys.* v. *Kinross Gold Corp.*,
   957 F. Supp. 2d 277 (S.D.N.Y. 2013)...........................................................30, 31

*City of Monroe Emps.' Ret. Sys.* v. *Hartford Fin. Servs. Grp., Inc.*
   No. 10-cv-2835, 2011 WL 4357368 (S.D.N.Y. Sept. 19, 2011) .......................13

*City of Omaha Police and Fire Ret. Sys.* v. *Timberland Co.*,
   No. 11-cv-277, 2013 WL 1314426 (D.N.H. Mar. 28, 2013) .............................15

ii

*Dura Pharms, Inc.* v. *Broudo*,
  544 U.S. 336 (2005) ..........................................................................................39

*ECA and Local 134 IBEW Joint Pension Trust of Chicago* v. *JP Morgan*
  *Chase Co.*,
  553 F.3d 187 (2d Cir. 2009).................................................................13, 20, 21, 34

*In re Elan Corp. Sec. Litig.*,
  543 F. Supp. 2d 187 (S.D.N.Y. 2008).............................................................30

*Emps.' Ret. Sys. of Gov't of the Virgin Islands* v. *Blanford*,
  794 F.3d 297 (2d Cir. 2015).............................................................14, 15, 17

*Feasby* v. *Industri-Matematik Int'l, Corp.*,
  No. 99-cv-8761, 2003 WL 22976327 (S.D.N.Y. Dec. 19, 2003) .....................29

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
  308 F. Supp. 2d 249 (S.D.N.Y. 2004)..............................................................28

*Garfield* v. *NDC Health Corp.*,
  466 F.3d 1255 (11th Cir. 2006)...................................................................11, 22, 23

*Gavish* v. *Revlon, Inc.*,
  No. 00-cv-7291, 2004 WL 2210269 (S.D.N.Y. Sept. 30, 2004) ..........10, 11, 15, 22, 27, 28

*In re GeoPharma, Inc. Sec. Litig.*,
  399 F. Supp. 2d 432 (S.D.N.Y. 2005)..............................................................25

*Gillis* v. *QRX Pharma Ltd.*,
  --- F. Supp. 3d ---, 2016 WL 3685095 (S.D.N.Y. July 6, 2016)......................26, 33

*Glaser* v. *The9, Ltd.*,
  772 F. Supp. 2d 573 (S.D.N.Y. 2011)..............................................................29, 32

*Greebel* v. *FTP Software, Inc.*,
  194 F.3d 185 (1st Cir. 1999) ..........................................................................11

*Gross* v. *Summa Four, Inc.*,
  93 F.3d 987 (1st Cir. 1996) ............................................................................15

*In re Int'l Bus. Machines Corporate Sec. Litig.*,
  163 F.3d 102 (2d Cir. 1998)............................................................................14, 19

*Janbay* v. *Can. Solar, Inc.*,
  No. 10-cv-4430, 2012 WL 1080306 (S.D.N.Y. Mar. 30, 2012).......................40

*Johnson* v. *Tellabs, Inc.*,
  262 F. Supp. 2d 937 (N.D. Ill. 2003) .............................................................16

*Kalnit* v. *Eichler*,
  264 F.3d 131 (2d Cir. 2001)............................................................................21, 34

*Lentell* v. *Merrill Lynch & Co., Inc.*,
  396 F.3d 161 (2d Cir. 2005)..................................................................39

*Local 731 I.B. of T. Excavators & Pavers Pension Trust Fund* v. *Diodes, Inc.*,
  810 F.3d 951 (5th Cir. 2016)..........................................................11, 12

*Local No. 38 Int'l Broth. of Elec. Workers Pension Fund* v. *Am. Express Co.*,
  430 F. App'x 63 (2d Cir. 2011) ..............................................................37

*Makor Issues & Rights, Ltd.* v. *Tellabs Inc.*,
  513 F.3d 702 (7th Cir. 2008)...................................................10, 11, 22

*In re MRU Holdings Sec. Litig.*,
  769 F. Supp. 2d 500 (S.D.N.Y. 2011)...............................................20, 30

*In re Network Assocs., Inc. Sec. Litig.*,
  No. 99-cv-1729, 2000 WL 33376577 (N.D. Cal. Sept. 5, 2000) ......................37

*Novak* v. *Kasaks*,
  216 F.3d 300 (2d Cir. 2000)...................................................25, 28, 33, 34

*In re Oak Tech. Sec. Litig.*,
  No. 96-cv-20552, 1997 WL 448168 (N.D. Cal. Aug. 1, 1997) ........................14

*In re Omnicom Grp., Inc. Sec. Litig.*,
  No. 02-cv-4483, 2005 WL 735937 (S.D.N.Y. Mar. 30, 2005)............................9

*Orton* v. *Parametric Tech. Corp.*,
  344 F. Supp. 2d 290 (D. Mass. 2004) .....................................................16

*Plumbers & Steamfitters Local 773 Pension Fund* v. *Can. Imperial Bank of Commerce*,
  694 F. Supp. 2d 287 (S.D.N.Y. 2010).....................................................27

*Rombach* v. *Chang*,
  355 F.3d 164 (2d Cir. 2004)...................................................................35

*Rothman* v. *Gregor*,
  220 F.3d 81 (2d Cir. 2000)...............................................................21, 35

*In re Salix Pharms., Ltd.*,
  No. 14-cv-8925, 2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016) ...................31, 32

*In re Sanofi Sec. Litig.*,
  155 F. Supp. 3d 386 (S.D.N.Y. 2016).................................................13, 27

*In re Satyam Comp. Servs. Ltd. Sec. Litig.*,
  915 F. Supp. 2d 450 (S.D.N.Y. 2013).....................................................40

*In re Sawtek, Inc. Sec. Litig.*,
  No. 03-cv-294, 2005 WL 2465041 (M.D. Fla. Oct. 6, 2005) .........................16

*In re Scholastic Corp. Sec. Litig.*,
    252 F.3d 63 (2d Cir. 2001) ................................................................................15, 17

*SEC* v. *Espuelas*,
    579 F. Supp. 2d 461 (S.D.N.Y. 2008) ...................................................................32

*Shields* v. *Citytrust Bancorp., Inc.*,
    25 F.3d 1124 (2d Cir. 1994) ..................................................................................25

*In re Sierra Wireless, Inc. Sec. Litig.*,
    482 F. Supp. 2d 365 (S.D.N.Y. 2007) ...................................................................29

*Slayton* v. *Am. Express Co.*,
    604 F.3d 758 (2d Cir. 2010) ..................................................................................21

*Stratte-McClure* v. *Morgan Stanley*,
    776 F.3d 94 (2d Cir. 2015) ....................................................................................19

*Tabak* v. *Can. Solar Inc.*,
    549 F. App'x 24 (2d Cir. 2013) .............................................................................14

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ...............................................................................10, 12, 21, 36

*In re Trex Co., Inc. Sec. Litig.*,
    212 F. Supp. 2d 596 (W.D. Va. 2002) ............................................................16, 22

*In re Wachovia Equity Sec. Litig.*,
    753 F. Supp. 2d 326 (S.D.N.Y. 2011) ...................................................................40

*Wilson* v. *Merrill Lynch & Co., Inc.*,
    671 F.3d 120 (2d Cir. 2011) .................................................................................7, 8

*Zucco Partners, LLC* v. *Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) .................................................................................30

**Statutes**

15 U.S.C. § 78u-4(b)(1) ...................................................................................................7

15 U.S.C. § 78u-4(b)(2)(A) ...........................................................................................21

**Other Authorities**

Edward D. Hess, *The Quest for Organic Growth*, CORP. FIN. REV.,
    2007 WL 8321806 (July/August 2007) ..................................................................9

Defendants Performance Sports Group Ltd. ("PSG" or the "Company"), Amir Rosenthal, and Kevin Davis respectfully submit this memorandum in support of their motion, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss the Amended Complaint for failure to state a claim upon which relief can be granted.

## PRELIMINARY STATEMENT

This securities fraud case is premised on conduct that courts have consistently held to be neither wrongful nor fraudulent. Persuading customers to place large orders, book early, and accept delivery of merchandise ahead of schedule are hallmarks of a thriving enterprise and do not, standing alone, suggest that anything improper—much less fraudulent—is afoot. Yet these sales practices form the centerpiece of the Amended Complaint. Endeavoring to transform innocuous conduct into grounds for a fraud claim, Plaintiff Plumbers & Pipefitters National Pension Fund (the "Fund") invokes the sinister-sounding term "channel stuffing" to describe PSG's sales practices. But that sleight of hand does not obscure the widespread recognition that the practices described as "channel stuffing" can be either legitimate or illegitimate. And for it to be illegitimate, the Fund must plead with specificity that the alleged scheme entailed bogus sales, an unusually high volume of returns, or some other set of facts that would support an inference of deception. There are no such allegations here.

Instead, the Fund attempts to meet its burden by alleging that PSG aggressively pursued sales knowing that the market could not absorb the volume of goods sold and that it was only a matter of time before the lack of demand would result in a decline in revenue. As factual support for this claim, the Fund points to the alleged observations of "confidential witnesses" who are not in a position to know (i) the extent of the practice, (ii) the relative financial impact of

the practice, or (iii) whether anyone at PSG knew or was reckless in not knowing that the practice was both material and unsustainable.

To describe the Fund's allegations is to demonstrate why they cannot support a securities fraud claim.  There is nothing inherently false or misleading about aggressive sales campaigns that yield, as the Fund concedes, only bona fide sales.  For that practice to form the basis of a securities fraud claim, the Fund would have to plead with particularity that the volume of relevant sales was material to a company the size of PSG and that Defendants executed the strategy to intentionally deceive investors.  The Fund's allegations on these two essential elements are woefully inadequate.

Nothing in the Amended Complaint suggests that the narrow experience of one former sales representative and three small retailers—*i.e.*, the numbered but unnamed confidential witnesses—would shed any light on the materiality of the so-called channel stuffing practices that they directly witnessed, relative to the gross sales of a publicly traded company the size of PSG.  These witnesses are even less competent to opine on the knowledge of any of the Defendants, with whom they fail to allege any contact, about the deceptive nature of this practice.  Nor do the allegations of PSG's former chairman cure that deficiency.  Having left PSG in 2012, the former chairman has no basis to opine either on the materiality of any channel stuffing during the putative class period or on the knowledge of any of the Defendants about this sales practice.  The former chairman's primary contribution to the Amended Complaint is his belief that PSG made a poor business decision when it chose to open two retail stores, but that belief, even if correct, is not actionable.  And that allegedly bad business decision provides an independent explanation for the drop in sales.  It does nothing to advance the Fund's cause as it relates to alleged channel stuffing.

2

Lacking any cogent allegations of deception, materiality, or scienter, the Amended Complaint fails to state a securities fraud claim and should be dismissed in its entirety.

## STATEMENT OF FACTS

### A.     The Parties

The Fund held stock in PSG from August 28, 2015 to March 10, 2016.  (Am. Compl. ¶ 20, Schedule A.)

Defendant PSG is a leading manufacturer of sports equipment and related apparel under different brand names, including Bauer Hockey ("Bauer") and Easton Baseball/Softball ("Easton").  (*Id.* ¶¶ 2–3.)  It is a public company with its headquarters located in New Hampshire.  (*Id.* ¶ 21.)  PSG stock is traded on the New York Stock Exchange.  (*Id.* ¶ 4.) Defendant Kevin Davis served as the Company's CEO throughout the putative class period and separated from PSG on March 22, 2016.  (*Id.* ¶¶ 22, 147.)  Defendant Amir Rosenthal held the roles of CFO and President of PSG Brands during the putative class period.  (*Id.* ¶ 23.)

### B.     The Amended Complaint

The Amended Complaint proceeds in two counts.  Count One alleges that all Defendants committed securities fraud in violation of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.  (*Id.* ¶¶ 166–73.) Count Two alleges control person liability against Defendants Davis and Rosenthal (the "Individual Defendants"), pursuant to Section 20(a) of the Exchange Act, for the same fraudulent scheme alleged in Count One.  (*Id.* ¶¶ 174–77.)  The Fund presses these claims on its own behalf and on behalf of a putative class of shareholders who acquired PSG stock between January 15, 2015 and March 14, 2016.  (*Id.* ¶ 1.)

According to the Amended Complaint, PSG misled the investing public by failing to disclose that its revenue growth was fueled by "aggressive" sales practices that would lead to

the Company's "inevitable demise." (*Id.* ¶¶ 1, 5–13.) Those sales practices allegedly included the use of "strong-arm tactics and penalties," such as the loss of price discounts, to coerce customers to purchase product in quantities that exceeded their present need. (*Id.* ¶¶ 5–13, 39.) To support these allegations of what it pejoratively terms "channel stuffing," the Fund relies on one named and four unnamed witnesses who claim to have personal knowledge of the scheme and its impact on PSG's earnings:

- Graeme Roustan served as chairman of PSG's Board of Directors until 2012, when he resigned. (*Id.* ¶¶ 33, 135.) Since his departure, he has been an outspoken critic of the Company, objecting vociferously to its "Own the Moment" ("OTM") initiative to open and operate retail stores. (*Id.* ¶¶ 44, 46). The Fund alleges that in June 2015, Roustan told PSG's Board of Directors, which included Defendant Davis, that the OTM initiative would have a negative impact on customer demand. (*Id.* ¶¶ 46, 150.) The Amended Complaint also contends that Roustan confirmed that PSG engaged in channel stuffing by surveying certain customers who responded that they were asked by PSG to accelerate orders on at least one occasion. (*Id.* ¶¶ 12, 61–64.) Finally, since his departure, Roustan has also "been fighting" with PSG to "try[] to get back on the [Company's] board," but these attempts have been unsuccessful. (*Id.* ¶ 135.)

- CW1[1] served as an independent sales representative of Bauer for 29 years, until his contract was not renewed in February 2016. (*Id.* ¶ 33.) According to CW1, PSG provided incentives for customers to increase their volume of purchases year-over-year, and he recalls instances where PSG asked customers to accept early deliveries of their orders. (*Id.* ¶¶ 37, 49, 51.) He does not allege that either of these practices was uncommon in the industry.

- CW2, a store manager of a retail customer, alleges that Bauer pressed CW2 to increase orders by conditioning certain discounts on increased volume and insisted that orders be placed a year in advance, but does not allege that placing orders well in advance is uncommon in this industry. (*Id.* ¶¶ 33, 47–48, 56.)

- CW3, a co-owner of a retail store that purchases product from Bauer, alleges that in 2013, Edward Kinnaly, a former PSG officer, "warned those in attendance" at a PSG board meeting that "pulling orders forward . . . in order to make their numbers would eventually catch up with PSG" and was fired as a "consequence of speaking out." (*Id.* ¶¶ 33, 55.) CW3 also allegedly expressed to Bauer his discontent with the Company's OTM initiative. (*Id.* ¶ 45.) According to CW3, Bauer (i) warned him that he would lose certain discounts if he did not increase

---

[1] "CW" refers to one of the four confidential witnesses identified by number in the Amended Complaint.

his purchases, even though the market was saturated with product, and (ii) asked him to accept shipments early, so that PSG could meet its quarterly sales targets. (*Id.* ¶¶ 48, 52, 58–59.)

- CW4, a franchise owner of a retailer that does business with Easton, alleges that on one occasion, he/she accepted early shipment of an order after the Easton salesperson offered CW4 free shipping in exchange for doing so.  (*Id.* ¶¶ 33, 53.) CW4 also alleges that Easton ignored his/her request to reduce another order and delivered it more than two months early, while keeping the original payment terms unchanged.  (*Id.* ¶¶ 54, 58.)

The Fund contends that these aggressive sales tactics collapsed under their own weight in the first quarter of 2016, when PSG "ran out of customer orders to pull forward."  (*Id.* ¶ 13.)  On January 13, 2016, PSG reported that quarterly revenues, gross profit, and earnings had declined year-over-year, and it projected that its financial results would continue to underperform for the rest of the fiscal year.  (*Id.* ¶¶ 118–19.)  Two months later, PSG publicly announced that its forecasted results for the fiscal year would be even weaker than previously announced.  (*Id.* ¶ 127.)  Explaining the causes of the decline in revenue, PSG pointed to a number of unfavorable business developments, including (i) the weakening of the Canadian dollar relative to the U.S. dollar; (ii) the December 2015 bankruptcy filing of Team Express, a large Easton customer; (iii) consolidation among significant Bauer customers; (iv) the March 2016 bankruptcy filing of The Sports Authority, one of Easton's largest customers; (v) general weakness in the baseball market; and (vi) financial difficulties at a significant Bauer customer which later filed for bankruptcy, creating significant losses for PSG.  (*Id.* ¶¶ 118, 122–23, 127– 30, 137–38.)

The Fund does not contest the truth of these statements or that they constituted material adverse developments for the Company.  Instead, the Fund contends that it was so-called channel stuffing—not the bankruptcy of major customers, market consolidation, unfavorable exchange rates, and market softening—that was "the true cause" of the Company's

decline in revenue.  (*Id.* ¶¶ 123, 129, 131–32.)  To support this theory, the Fund points to the

experience of a former sales representative, three small retailers, and a vocal critic of the

Company who resigned his Board chairmanship three years before the beginning of the putative

class period and has since fought unsuccessfully to rejoin the Company's Board.  (*Id.* ¶¶ 33, 60,

135.)  As described above, these witnesses claim to have experienced a concerted effort by PSG

to book bona fide sales as early as possible.  In addition, Roustan allegedly conducted a survey

of PSG's ten largest customers in North America that showed that a majority of those customers

were asked to move an order into an earlier quarter sometime in the two years preceding the

survey (*id.* ¶¶ 61–64), but provides no indication of the frequency of such requests, whether

customers complied with them, the volume of product involved, or the revenue tied to the

transactions that were made sooner.  The Fund also contends that other sellers of sporting goods

did not experience a similar sales decline (*id.* ¶¶ 124–25, 138–44), but those retailers actually did

report financial difficulties in this time period.

> To prove Defendants' knowledge that their aggressive sales strategy would impair
future earnings, the Fund relies on CW3's allegation that a senior executive warned PSG's Board
of Directors in 2013 that "pulling orders forward to make its numbers would catch up with it."
(*Id.* ¶¶ 70, 148.)  The Fund also implies that mere knowledge of aggressive sales practices would
establish knowledge of a future decline in sales, but does not explain why that is so.  (*Id.* ¶¶ 148–
49.)  In an even more convoluted logical progression, the Fund contends that the alleged
underperformance of two retail stores that PSG opened provided Defendants with a motive to
conceal the failure of the "retail strategy" by relying on a fraudulent form of channel stuffing.
(*Id.* ¶¶ 150–54.)  The Amended Complaint, however, does not provide the relative financial

impact of the retail stores' alleged underperformance, let alone suggest that it would be sufficiently significant to provide an incentive to engage in securities fraud.

## ARGUMENT

### I.   The Securities Fraud Claim Should Be Dismissed.

#### A.   The Fund Has Failed to Identify Any False or Misleading Statements.

Read in the light most favorable to the Fund, the Amended Complaint has adequately pleaded facts showing that some PSG salespeople engaged in aggressive sales tactics with some PSG customers.  But there is nothing misleading about—much less wrong with— aggressive sales tactics, even when they are labeled "channel stuffing," as the Fund does here, in an effort to make them seem improper.  As the Supreme Court and courts in this District have recognized, so-called channel stuffing is not inherently fraudulent, and it is only deceptive channel stuffing that is the concern of the securities laws.  The Fund's mere invocation of the term "channel stuffing" does not excuse its inability to identify any false or deceptive statement that could give rise to a valid securities fraud claim.

To state a securities fraud claim, the Private Securities Litigation Reform Act ("PSLRA") requires plaintiffs to identify statements that are false or misleading.  *Wilson* v. *Merrill Lynch & Co., Inc.*, 671 F.3d 120, 128–29 (2d Cir. 2011); 15 U.S.C. § 78u-4(b)(1). Plaintiffs must also explain why each identified statement is misleading and must state with particularity all facts on which that belief is formed.  *Merrill Lynch*, 671 F.3d at 128–29; 15 U.S.C. § 78u-4(b)(1).  It is not sufficient for plaintiffs to simply say that statements were false or misleading; rather, plaintiffs "must demonstrate with specificity why and how that is so." *Carpenters Pension Trust Fund of St. Louis* v. *Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014). Where plaintiffs fail to specifically demonstrate "why and how" statements are false or misleading, their claims are routinely dismissed as insufficient to state a claim.  *See, e.g.*, *id.*

(finding plaintiffs' allegation that defendants lacked internal controls for LIBOR submission rates failed to show why defendants' general statements about internal controls, which did not make representations about LIBOR controls, were false); *Merrill Lynch*, 671 F.3d at 132, 134–35 (dismissing plaintiff's allegation that defendants' bid in their own securities auctions in order to fraudulently inflate demand as insufficient to state a claim because the practice was permissible and properly disclosed).

       The Fund's fraud claim is premised on statements Defendants made about the source of PSG's earnings growth that were neither fraudulent nor misleading.  According to the Amended Complaint, Defendants had an obligation to alert the public that PSG's revenue growth was supported by sales practices that were aggressive and unsustainable.  (Am. Compl. ¶¶ 95, 114–16.)  In the absence of such a warning, the Fund contends, investors were misled about PSG's prospects by the statements Defendants actually made.  (*Id.* ¶¶ 60, 68, 74, 80, 85, 95, 110.)  The Fund's theory of liability is mistaken in two fundamental ways.  First, it misunderstands the significance of Defendants' statements, which in no way suggested that only passive sales practices were implemented at PSG.  Second, it relies on the sinister-sounding term "channel stuffing" to create a false contradiction between those statements and the actual practices employed at PSG.

       The Fund's fraud claim is based on statements allegedly suggesting that only passive sales practices were used by the Company.  (*Id.* ¶¶ 5, 10, 65–66, 73, 94–95.)  Most prominently, the Fund repeatedly alleges that it was misleading for Defendants to say that PSG's sales growth was "organic" because that term suggests a natural progression rather than one that was attributable to aggressive sales practices.  (*E.g.*, *id.* ¶¶ 5, 10, 94–95.)  But that argument misunderstands the relevant meaning of the word.  While "organic" might have a passive

connotation in the grocery aisle, it means something quite different in the securities markets.  In

the latter context, which is the only one relevant here, there are two sources of growth for

publicly traded companies.  When growth occurs through mergers and acquisitions, it is

considered "inorganic" growth.  All other growth is considered "organic."  *See* Edward D. Hess,

*The Quest for Organic Growth*, CORP. FIN. REV., 2007 WL 8321806, at *4 (July/August 2007)

("Historically, academics define organic growth as nonacquiring growth."); *see also In re*

*Omnicom Grp., Inc. Sec. Litig.*, No. 02-cv-4483, 2005 WL 735937, at *1 (S.D.N.Y. Mar. 30,

2005) (defining "organic growth" as "a measure of a company's growth from existing

operations").  Any reasonable investor considering the Defendants' statements about "organic"

growth would understand them as references to growth that was not attributable to acquisitions.

Whether that growth was attributable to aggressive sales practices, passive sales practices—or

anything in between—would not have altered this conclusion.  And that observation is

particularly relevant here in light of PSG's recent history of growth through acquisitions.  (Am.

Compl. ¶¶ 3, 94.)  Understood in the proper context, nothing in Defendants' statements created a

misimpression among investors that only passive sales practices—and no aggressive sales

practices—were employed by the Company.

        The Fund attempts to cure that defect by insinuating that PSG's sales practices

were not simply aggressive, but fraudulent, and therefore misleading to investors.  Pejoratively

labeling the practices "channel stuffing," the Fund announces that they amounted to a

"fraudulent practice."  (*Id.* ¶ 7 n.2.)  But the Fund's *ipse dixit* does not transform a neutral

practice into a fraudulent scheme.  Aggressive sales practices, even when labeled "channel

stuffing," are not fraudulent unless they involve an element of deception.  The Supreme Court

recognized just such a distinction between "legitimate" and "illegitimate" channel stuffing in

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.* (hereinafter, "*Tellabs*").  551 U.S. 308, 325 (2007).

There, the Court noted that "offering customers discounts as an incentive to buy" was a

"legitimate kind" of channel stuffing, while "writing orders for products customers had not

requested" was the "illegitimate kind." *Id.*  On remand in that case, the Seventh Circuit held that

a certain amount of channel stuffing "could be innocent and might not even mislead," such as

where a seller sought to "incite" distributors to make "more vigorous" sales efforts.  *Makor*

*Issues & Rights, Ltd.* v. *Tellabs Inc.*, 513 F.3d 702, 709 (7th Cir. 2008) (hereinafter, "*Makor*

*Issues*").

      In this District, courts have found nothing fraudulent about aggressive sales

practices that offered customers incentives for the purpose of meeting sales and earnings goals.

In *In re Bristol-Myers Squibb Securities Litigation*, plaintiffs alleged that defendants improperly

recognized revenue that was attained by offering incentives to customers, such as discounts and

extended payment terms, toward the end of fiscal quarters in order to meet earnings estimates.

312 F. Supp. 2d 549, 566 (S.D.N.Y. 2004).  Judge Loretta A. Preska dismissed those allegations,

holding that there was nothing fraudulent about recognizing the sales as revenue because it was

legitimate for a seller to offer incentives in order to meet sales or earnings goals, which she

described as a "common practice."  *Id.* at 566, 568.

      Likewise in *Gavish* v. *Revlon, Inc.*, the court found that there was "nothing

inherently improper" about similar aggressive sales practices.  No. 00-cv-7291, 2004 WL

2210269, at *17 (S.D.N.Y. Sept. 30, 2004) (quoting *Greebel* v. *FTP Software, Inc.*, 194 F.3d

185, 202 (1st Cir. 1999)).  In *Revlon*, plaintiffs alleged that defendants inflated their revenue

figures through undisclosed channel stuffing practices, such as offering discounts to induce large

orders and shipping products to customers early.  *Id.* at *18.  Judge Sidney H. Stein dismissed

these allegations as "unspecific, innocuous, or both," reasoning that "there may [have been] any number of legitimate reasons" behind the alleged channel stuffing practices. *Id.* at *18–19.

Courts outside of this District have reached similar conclusions.  In *Greebel*, the First Circuit confronted allegations that defendants artificially inflated revenue through channel stuffing practices, such as offering large discounts toward the end of fiscal quarters.  194 F.3d at 189.  The court in *Greebel* reasoned that there was "nothing inherently improper" about channel stuffing because there "may be any number of legitimate reasons for attempting to achieve sales earlier," and held that channel stuffing allegations alone were insufficient to support a strong inference of fraudulent intent.  *Id.* at 202–03.  The Fifth, Ninth, and Eleventh Circuits have reached similar conclusions.  *See Local 731 I.B. of T. Excavators & Pavers Pension Trust Fund* v. *Diodes, Inc.*, 810 F.3d 951, 959–60 (5th Cir. 2016) (holding that shipping orders early is a "legal practice that may be supported by 'any number of legitimate reasons'") (quoting *Greebel*, 194 F.3d at 203); *Broudo* v. *Dura Pharms., Inc.*, 339 F.3d 933, 940 (9th Cir. 2003) (finding "no fault" with district court's reasoning that channel stuffing allegations involving price discounts were not inherently fraudulent due to "other legitimate reasons for attempting to achieve sales earlier"), *rev'd on other grounds*, 544 U.S. 336 (2005); *Garfield* v. *NDC Health Corp.*, 466 F.3d 1255, 1261 (11th Cir. 2006) ("Channel stuffing is not fraudulent *per se*.").

By contrast, illegitimate channel stuffing typically involves an element of deception, such as fictitious sales or guaranteed returns.  In *Makor Issues*, the Seventh Circuit opined that "[c]hannel stuffing becomes a form of fraud only when it is used . . . to book revenues on the basis of goods shipped but not really sold because the buyer can return them." *Makor Issues*, 513 F.3d at 709.  That court reasoned that with a guaranteed right of return, the risk of loss never passes from seller to buyer, and the shipment therefore cannot be properly

11

recorded as revenue.  *Id.*  Similarly, Judge Preska observed in *Bristol-Myers* that, where there is

no guaranteed right of return and "real products were shipped to real customers who paid real

money," there was nothing fraudulent about the alleged channel stuffing practices.

312 F. Supp. 2d at 566, 568.

        In light of this precedent, the Fund gains no traction from calling PSG's sales

practices "channel stuffing."  Even if that term applied here, it would not cause PSG's sales

practices to be fraudulent, much less cause Defendants' statements about its sales efforts to be

misleading.  The Amended Complaint fails to identify any deceptive practice—such as booking

bogus sales or offering a guaranteed right of return—that would cause PSG's sales practices to

be an illegitimate form of channel stuffing.  The Fund alleges nothing more than that some PSG

sales representatives, possibly in an effort to meet their own personal sales goals, offered certain

customers incentives to buy products in greater quantities or to accept delivery ahead of

schedule.  (*Id.* ¶¶ 48, 51–53.)  But that is the kind of channel stuffing that courts have found to be

legitimate.  *Bristol-Myers*, 312 F. Supp. 2d at 566 ("Offering incentives to meet sales or earnings

goals is a common practice."); *Diodes*, 810 F.3d at 959–960 (finding early shipments of orders

without prior customer authorization was a "legal practice"); *see also Tellabs*, 551 U.S. at 325

(perceiving nothing illegitimate about "offering customers discounts as an incentive to buy").

Having failed to plead any actual deceptive practice, the Fund has failed to show that there was

anything false or misleading about how Defendants presented their sales efforts to the public,

and that alone is reason enough to dismiss the Amended Complaint.[2]

---

[2] While the vast majority of the Fund's fraud claim is premised on Defendants' statements about the Company's
earnings growth, the Fund also alleges that statements made in certifications pursuant to Section 302 of the
Sarbanes-Oxley Act of 2002 ("SOX Certifications") were false and misleading.  (Am. Compl. ¶¶ 11, 100, 105.)
The Fund alleges that, contrary to the representations in the SOX Certifications, PSG lacked the "proper internal
controls to prevent the manipulation of its sales revenues"—*i.e.*, through channel stuffing.  (*Id.* ¶¶ 100, 105.)  This
theory of liability is unavailing for two reasons.  First, the Fund fails to plead why the channel stuffing—a practice
that is not inherently fraudulent—was of the illegitimate, rather than the legitimate sort.  Second, because the Fund

**B.      Even If the So-Called Channel Stuffing Could Be Considered False or Misleading, the Fund Has Failed to Show It Was Material.**

The Fund's allegations about PSG's sales practices—the alleged channel stuffing—fail a second requirement of securities fraud suits: materiality.  Even if there was something misleading about Defendants' public statements about their aggressive sales practices, those statements can give rise to a securities fraud claim only if the practices were material.  But the Fund makes no effort whatsoever to quantify the effect of those sales practices on PSG's revenues or earnings.  Rather than allege the volume of sales or the amount of revenue affected by the so-called channel stuffing, the Fund refers to only a handful of isolated instances of aggressive sales tactics, a survey that quantifies nothing, and the overall decline in value of PSG's stock.  These allegations fall well short of the mark because they provide no insight on the degree to which PSG's revenues might have been inflated by the challenged practices.  The Fund has, therefore, failed to carry its burden on materiality.

**1.      The Fund Must Plead Facts Showing the Materiality of an Allegedly Fraudulent Practice.**

Materiality is an essential element of a securities fraud claim.  To avoid dismissal, a plaintiff must plead facts showing that the alleged misstatement or omission was material.  *See, e.g.*, *ECA and Local 134 IBEW Joint Pension Trust of Chicago* v. *JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009).  In claims involving omissions, the materiality requirement is satisfied if there is a "substantial likelihood that the disclosure of the omitted fact[s] would have been viewed by the reasonable investor as having significantly altered the 'total mix' of

---

has not alleged any facts whatsoever pertaining to the Company's internal structure for financial reporting, its allegations are conclusory assertions without any factual support.  *See, e.g.*, *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 402 (S.D.N.Y. 2016) (dismissing allegations that SOX Certifications regarding internal controls were false and misleading because plaintiffs failed to allege any facts pertaining to the company's internal structure for financial reporting); *City of Monroe Emps.' Ret. Sys.* v. *Hartford Fin. Servs. Grp., Inc.*, No. 10-cv-2835, 2011 WL 4357368, at *22 (S.D.N.Y. Sept. 19, 2011) (same).  Accordingly, this theory can be rejected out of hand.

information made available."  *Basic Inc.* v. *Levinson*, 485 U.S. 224, 231–32 (1988) (quoting *TSC Indus., Inc.* v. *Northway, Inc.*, 426 U.S. 438, 449 (1976)).

Materiality cannot be pleaded in a conclusory manner.  To satisfy the PSLRA and Rule 9(b) of the Federal Rules of Civil Procedure, a complaint must demonstrate materiality by placing the alleged omission within the context of a defendant's "overall financial picture." *Tabak* v. *Can. Solar Inc.,* 549 F. App'x 24, 26–27 (2d Cir. 2013) (citing *Decker* v. *Massey-Ferguson, Ltd.*, 681 F.2d 111, 116 (2d Cir. 1982)).  Statements constituting opinion, puffery, or indefinite expressions of corporate optimism are too indefinite to meet this materiality requirement.  *In re Int'l Bus. Machines Corporate Sec. Litig.*, 163 F.3d 102, 110 (2d Cir. 1998) (hereinafter "*In re IBM*").  In the context of a channel stuffing claim, plaintiffs must provide some measure of the impact of the practice on a corporation's financials, or at least an approximation of the magnitude or degree of the supposedly problematic sales.  *See, e.g.*, *In re Oak Tech. Sec. Litig.*, No. 96-cv-20552, 1997 WL 448168, *8 (N.D. Cal. Aug. 1, 1997) ("To adequately plead financial fraud based on improper revenue recognition, Plaintiffs must allege, at a minimum, some particular transactions where revenues were improperly recorded, including the names of the customers, the terms of specific transactions, when the transactions occurred, and the approximate amount of the fraudulent transactions.").

The Second Circuit has spoken clearly on this issue, providing guidance on the level of detail required to avoid dismissal.  In *Employees' Retirement System of Government of the Virgin Islands* v. *Blanford*, the plaintiffs alleged that the defendants fraudulently concealed the fact that they overproduced their products by, among other things, making phantom shipments to customers. 794 F.3d 297, 301–02 (2d Cir. 2015).  Accepting the allegations as sufficient to establish materiality, the Second Circuit noted that the plaintiffs had specified the

name of a customer who was allegedly shipped phantom orders, the timing and amount of product tied to those orders, and the percentage of the orders that was ultimately returned by the customer.  *Id.* at 302, 307.  In doing so, the plaintiffs provided sufficient detail to allow the court to evaluate the impact of the phantom sales on the defendant company's overall financial picture. That court reached the same conclusion in *In re Scholastic Corp. Securities Litigation*, which involved allegations that the defendants fraudulently concealed adverse figures regarding the number of books that were ultimately returned by customers.  252 F.3d 63, 66–67 (2d Cir. 2001). The plaintiffs in that case satisfied the materiality requirement because they quantified the total amount of product that was returned during certain periods and provided detailed information about the total decline in sales, expressed both as a percentage and in terms of the quantity of product sold.  *Id.* at 70–72.

Where plaintiffs fail to provide this level of specificity, courts routinely reject their claims for failing to establish materiality.  In *Revlon*, for example, the plaintiffs made channel stuffing allegations similar to those at issue here.  2004 WL 2210269, at *2–4.  But those allegations failed to establish materiality because they provided no context for the channel stuffing that would have shown its impact on Revlon's "total financial picture."  *Id.* at *16.  The court found that the plaintiffs did not make any effort to estimate the degree of the allegedly misleading financial statements, as "[n]one of the complaint's allegations of improper sales practices contain a specific allegation of monetary consequence at all, let alone one large enough to have been reflected in Revlon's financial statements."  *Id.*[3]

---

[3] Other courts have reached the same conclusion on similar facts.  *See, e.g.*, *Gross* v. *Summa Four, Inc.*, 93 F.3d 987, 996 (1st Cir. 1996) (affirming dismissal where plaintiff failed to allege amount of earnings inflated through improper accounting methods or net effect on company's earnings); *AIG Global Sec. Lending Corp.* v. *Banc of Am. Sec. LLC*, 254 F. Supp. 2d 373, 385 (S.D.N.Y. 2003) (finding allegations inadequate where plaintiffs "provided no indication of the amount by which the figures were supposedly under or overstated"); *City of Omaha Police and Fire Ret. Sys.* v. *Timberland Co.*, No. 11-cv-277, 2013 WL 1314426, at *13 (D.N.H. Mar. 28, 2013) (confidential witnesses provided no transactional details "from which to infer even a broad approximation of the

### 2.    The Fund Has Failed to Plead Facts Showing Materiality.

The Fund has failed to plead facts demonstrating that the alleged channel stuffing was material.  The Amended Complaint contains no allegations shedding any light on the impact of this practice on PSG's earnings.  There is no estimate of how many sales were made pursuant to these practices or how much revenue was generated.  The Fund does not even offer an estimate of the percentage of revenue attributable to aggressive sales practices.  Instead, the Fund offers three data points: (i) a purported survey of PSG customers; (ii) the alleged anecdotes of four confidential witnesses about a handful of orders; and (iii) the fact that PSG's earnings fell during the putative class period.  None of these allegations is sufficient to establish materiality.

First, the Fund relies on two duplicative and unsubstantiated surveys purportedly conducted by, or at the request of, Roustan.  According to the Amended Complaint, these surveys state that PSG's ten largest customers had received at least *one request* during the previous two years to move orders to an earlier quarter.  (Am. Compl. ¶¶ 61–64.)  Although these customers allegedly, but implausibly, represented 50–55% of PSG's overall business (*id.* ¶ 61), the Fund does not specify, or even attempt to estimate, how much of PSG's business with these customers was attributable to the alleged channel stuffing scheme.  The Fund's allegations that rely on the surveys, therefore, pale in comparison to the allegations found to be material in both *Blanford* and *Scholastic* because the surveys serve as neither an indicator of the scale of PSG's channel stuffing practice nor an estimate of the relative impact of those practices on

---

amount of sales affected by alleged channel stuffing tactics"); *In re Sawtek, Inc. Sec. Litig.*, No. 03-cv-294, 2005 WL 2465041, at *8 (M.D. Fla. Oct. 6, 2005) (dismissing channel stuffing claim where plaintiffs did not allege the approximate amounts of money or inventory at issue); *Orton* v. *Parametric Tech. Corp.*, 344 F. Supp. 2d 290, 308 (D. Mass. 2004) (dismissing channel stuffing claim where plaintiffs failed to provide amount of revenue misstated due to channel stuffing); *Johnson* v. *Tellabs, Inc.*, 262 F. Supp. 2d 937, 949 & n.12 (N.D. Ill. 2003) (dismissing channel stuffing claim where complaint merely alleged channel stuffing-based returns worth "millions" of dollars, which were not material in a company with fourth quarter sales of "more than a billion dollars"); *In re Trex Co., Inc. Sec. Litig.*, 212 F. Supp. 2d 596, 611 (W.D. Va. 2002) (dismissing channel stuffing claims where plaintiffs had not provided the amount or percentage of revenues generated by the allegedly problematic transactions).

PSG's overall financial picture.  *See Blanford*, 794 F.3d at 302, 307; *Scholastic*, 252 F.3d at 70–72.  In fact, neither the surveys nor the Amended Complaint even clarify whether any of the surveyed customers ultimately agreed to accept orders early, as opposed to merely being asked to do so by PSG.  For these reasons, the Fund's allegations that are based on Roustan's surveys lack the particularity required to adequately plead materiality.

Second, the Fund offers the alleged testimony of four confidential witnesses who claim either to have been asked to participate in, or to have been targets of, PSG's alleged channel stuffing scheme.  Yet, those witnesses do not help the Fund establish materiality whatsoever because they, too, fail to offer any level of specificity about the extent or financial consequences of PSG's allegedly improper sales.

CW1, who was an independent sales representative of Bauer, purportedly recalls instances where he was asked by PSG to work with customers to ship orders early.  (*Id.* ¶ 51.)  That is the extent of his allegation.  CW1 does not identify, among other things: (i) the customers he was asked to work with for this purpose; (ii) the number of occasions in which he was asked to try to ship orders early; (iii) the number of occasions when he actually shipped orders early; or (iv) the quantity, monetary value, or timing of any orders that he ultimately shipped early.

CW2, a store manager at one of PSG's retail customers, alleges in a similarly vague manner that PSG insisted during the putative class period that orders be placed a year in advance.  (*Id.* ¶ 56.)  Again, there are no additional details to support this allegation.  CW2 does not indicate whether he/she agreed to PSG's request, much less provide any details approximating the quantity or monetary value of the orders he/she was asked to place earlier.

CW3, a co-owner of a PSG retail customer, likewise claims to have received calls from PSG headquarters asking him to accept shipments early to allow PSG to meet its quarterly

targets.  (*Id.* ¶ 52.)  Like CW1 and CW2, CW3 provides no other facts to demonstrate the materiality of these allegedly improper transactions.

CW4, a franchise owner of an Easton retail customer, claims that he/she agreed on one occasion to accept early shipment of a "large order" in return for free shipping.  (*Id.* ¶ 53.) While CW4 at least attempts to describe the magnitude of this one allegedly channel-stuffed order, he/she does so in an entirely vague manner that renders his/her allegation insufficient to establish materiality.  There is no reason to believe that an order considered "large" by the owner of a small retail franchise in Milwaukee, Wisconsin (*id.* ¶ 33), would be considered material, much less "large," to a publicly traded company like PSG.  By excluding the quantity and monetary value of the order, it is impossible to determine the materiality of this one transaction in the context of PSG's overall revenues.

The only other allegation in the Amended Complaint that could even remotely be interpreted to touch on materiality is similarly deficient.  The Fund states that PSG's earnings guidance was revised downward during the relevant period by approximately 80%, and, in entirely conclusory fashion, inexplicably attributes this solely to PSG's alleged channel stuffing practices.  (*Id.* ¶ 15; Pl.'s Pre-Mot. Letter at 2, ECF No. 77.)  In doing so, the Fund ignores all of the other, more plausible, explanations offered by PSG as causes for the decline—the substantial weakening of the Canadian dollar, bankruptcy filings by Team Express and The Sports Authority, the consolidation of Bauer customers, general weakness in the baseball market, and financial difficulties at an important Bauer customer, which later filed for bankruptcy, creating significant losses for PSG.  The Fund sets forth no facts to support the contention that this drop was attributable solely, or even primarily, to channel stuffing, and does not even attempt to identify what percentage *might* be attributable to channel stuffing.  As is the case with the

allegations pertaining to Roustan's surveys and the confidential witnesses, the Fund's

generalized allegation regarding the total decline in PSG's earnings fails to provide any insight

into the degree to which PSG's alleged channel stuffing scheme inflated its revenues.[4]

        Even if the Court were to find PSG's alleged channel stuffing to be material, the

majority of statements that the Fund identifies as fraudulent—consisting primarily of statements

of Defendant Davis at earnings calls or in press releases—are, in fact, nonactionable statements

of corporate optimism.  These statements, reproduced below, are classic examples of corporate

optimism about the Company's results and prospects that investors do not rely upon when

making investment decisions.

- "We experienced another record quarter for PSG, and our Q2 results were driven by the continued strong performance of the EASTON baseball/softball business . . . ."  (Am. Compl. ¶ 66.);

- "We reported another record quarter due to the continued strong performance of Easton . . . . Easton continued to experience solid demand . . . ."  (*Id.* ¶ 73.);

- "[W]e continue to outpace the growth of the markets . . . . We remain very well-positioned to continue our momentum into fiscal 2016 and beyond." (*Id.* ¶¶ 79, 84.);

- "[W]e continue to see solid growth across our brand . . . ."  (*Id.* ¶ 108.);

- "But otherwise, we don't see any sort of decline in demand from consumers for those products."  (*Id.* ¶ 109.).

None of these statements is sufficiently material as a matter of law to give rise to a claim for

securities fraud.  *See In re IBM*, 163 F.3d at 107 (holding that statements regarding future

performance may be actionable "if they are worded as guarantees or are supported by specific

---

[4] The Fund also alleges a "pure omission" theory that is similarly deficient.  The Fund alleges that Defendants are liable for failing to disclose, pursuant to Item 303 of Regulation S-K, the "known trend" of channel stuffing.  (Am. Compl. ¶¶ 112–16.)  This allegation fails because, as stated throughout this brief, the Fund has failed to allege that PSG's channel stuffing was material.  *See Stratte-McClure* v. *Morgan Stanley*, 776 F.3d 94, 103 (2d Cir. 2015) (concluding that "a violation of Item 303's disclosure requirements can only sustain a claim under Section 10(b) and Rule 10b-5 if the allegedly omitted information satisfies *Basic*'s test for materiality").

statements of fact").  Defendant Davis's statements, by contrast, "are too general to cause a

reasonable investor to rely upon them."  *JP Morgan Chase Co.,* 553 F.3d at 206.  Moreover, the

Fund has failed to allege any particularized facts that Defendant Davis did not believe these

statements when made.  *See In re MRU Holdings Sec. Litig.*, 769 F. Supp. 2d 500, 510–11

(S.D.N.Y. 2011) ("Because 'the challenged statements regarding the future . . . were predictions

or opinions, and not guarantees,' and because 'there is no evidence in the record indicating that

[the Individual Defendants] did not genuinely believe' in those predictions, '[P]laintiff[s] ha[ve]

failed to identify any misstatements or omissions of material fact which would support a Section

10(b) or Rule 10b-5 claim.'") (citation omitted) (alterations in original).

## C. Even If the Fund Could Identify a Materially False or Misleading Statement, It Has Failed to Plead Scienter.

The Fund has also failed to plead facts showing that Defendants had any

fraudulent intent in connection with the alleged channel stuffing.  In an effort to meet that

burden, the Fund asks this Court to infer scienter based on Defendants' mere knowledge of

PSG's sales efforts, but knowledge of practices that are not inherently wrongful cannot support

such an inference.  Nor can scienter be inferred from the unsupported allegation that Defendants

knew the alleged channel stuffing would lead to reduced sales in the future.  Equally misguided

is the Fund's assertion that fraudulent intent can be found wherever there is a desire to maintain

the appearance of corporate profitability—a theory that, if accepted, would transform all U.S.

corporations into criminal enterprises.  Finally, the Fund contends that it is fair to infer

Defendants' scienter because competitors did not perform as poorly as PSG did in early 2016.

Even if PSG did underperform its competitors, there is no basis in law to conclude that a

business's poor performance is evidence of fraud.

In securities fraud cases, plaintiffs must plead specific facts that give rise to a "strong inference" of a defendant's fraudulent intent. *Kalnit* v. *Eichler*, 264 F.3d 131, 138 (2d Cir. 2001); 15 U.S.C. § 78u-4(b)(2)(A).  Applying that standard, the Supreme Court has held that an "inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.  Under *Tellabs*, courts "must take into account plausible opposing inferences" of nonfraudulent intent, *ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007), and if a fraudulent inference is not "at least as compelling" as a nonfraudulent one, it must be rejected, even in a "close case." *Slayton* v. *Am. Express Co.*, 604 F.3d 758, 777 (2d Cir. 2010).

A plaintiff may satisfy the scienter requirement by pleading facts (i) showing that a defendant had "motive and opportunity to commit the fraud" or (ii) "constituting strong circumstantial evidence of conscious misbehavior or recklessness." *Shaar*, 493 F.3d at 99.  For conduct to be reckless under this standard, it must have been "highly unreasonable, representing an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Rothman* v. *Gregor*, 220 F.3d 81, 90 (2d Cir. 2000).  While plaintiffs are not required to plead scienter based on a defendant's motive, where motive cannot be shown, the strength of their circumstantial allegations regarding conscious misbehavior or recklessness "must be correspondingly greater." *JP Morgan Chase Co.*, 553 F.3d at 198–99.

### 1.      Mere Knowledge of Channel Stuffing Practices Fails to Support a Strong Inference of Scienter.

Knowledge of so-called channel stuffing, standing alone, does not give rise to a strong inference of scienter.  But the Fund urges this Court to conclude that knowledge of channel stuffing, without more, is probative of scienter.  The Fund contends that scienter can be

inferred from Defendants' mere knowledge of channel stuffing, relying on allegations that Defendant Rosenthal attended sales meetings where channel stuffing was discussed, the Individual Defendants attended a board meeting where channel stuffing was discussed, and others engaged personally in channel stuffing practices.  (*See, e.g.*, Am. Compl. ¶¶ 55, 77, 82, 91, 97, 148.)

No such inference is reasonable because the channel stuffing practices described in the Amended Complaint are not inherently wrongful.[5]  There are legitimate reasons for pursuing aggressive sales tactics, such as meeting earnings goals and presenting distributors with an incentive to sell products more vigorously.  *See, e.g.*, *Bristol-Myers*, 312 F. Supp. 2d at 566; *Makor Issues*, 513 F.3d at 709.  In light of those innocuous motivations, it is unreasonable to infer fraudulent intent from the mere fact that so-called channel stuffing has taken place. Aggressive sales practices, even when derogatorily labeled channel stuffing, cannot give rise to a strong inference of scienter.

That is why courts routinely reject as unfounded inferences of scienter based on nothing more than channel stuffing claims unmoored from any deception.  *See Bristol-Myers*, 312 F. Supp. 2d at 566, 568 (finding that offering incentives to meet sales or earnings goals, without more, was an insufficient basis for scienter); *Revlon*, 2004 WL 2210269, at *17, 19 (finding aggressive sales practices, such as offering discounts and shipping products early, did not by themselves raise a strong inference of scienter); *Garfield*, 466 F.3d at 1265 (finding that promotion of channel stuffing at a series of meetings did not establish scienter); *Trex*, 212 F. Supp. 2d at 608–09 (collecting cases holding that channel stuffing does not support a strong inference of scienter).

---

[5] As described in Section I.A, *supra*, the Fund has failed to allege any deception in connection with the so-called channel stuffing that would cause it to be anything but a legitimate practice.

In *Garfield*, the Eleventh Circuit addressed allegations similar to those against the Individual Defendants—*i.e.*, that channel stuffing was discussed at a series of meetings with company executives—and found such meetings insufficient to give rise to a strong inference of scienter.  466 F.3d at 1264–65.  There, plaintiffs sought to demonstrate scienter by pleading that company officers attended monthly meetings where the company's "aggressive channel stuffing and mounting problems with accounts receivable" were discussed in detail.  *Id.* at 1264.  The complaint further alleged that the officers were aware of the problem with accounts receivable but "decided to continue with aggressive discounting and credit terms because the company had to make its numbers."  *Id.*  The scienter allegations here as to the Individual Defendants are far weaker than those in *Garfield*.  First, Defendant Davis is alleged to have attended a single board meeting where a sales executive raised the issue of channel stuffing, not several meetings on a monthly basis where aggressive channel stuffing was discussed in depth.  Defendant Rosenthal is alleged to have attended semi-annual sales meetings where channel stuffing was discussed, but there are no allegations that either of the Individual Defendants knew that PSG's aggressive sales practices were creating any problems with the Company's accounting or financial statements that might have given them cause to investigate further.  Thus, scienter cannot be inferred from these alleged meetings because the allegations are not inconsistent with innocuous conduct.[6]

Judge Preska's decision in *Bristol-Myers* is also particularly relevant here.  In that case, plaintiffs alleged that scienter could be inferred because (1) management set aggressive targets, (2) incentives were given to customers to buy product before they needed it, (3) this was done in order to meet earnings estimates, and (4) it was known that customer inventories were high.  *Bristol-Myers*, 312 F. Supp. 2d at 568.  Judge Preska rejected these allegations, observing

---

[6] In contrast to *Garfield*, the Fund alleges that Defendant Davis attended only one meeting where channel stuffing was discussed, and only by way of CW3's highly unreliable statement.  (Am. Compl. ¶ 55.)

that "[o]ffering incentives to meet sales or earnings goals is a common practice," the defendant

had recorded sales in accordance with its historical policy of recognizing revenue upon shipment,

and there was an absence of any deceptive practices, such as a guaranteed right of return.  *Id.* at

566, 568.  Judge Preska concluded that these facts constituted an "insufficient basis" from which

to infer scienter.  *Id.* at 566.

       The Amended Complaint seems to have been constructed using the *Bristol-Myers*

allegations as a model, albeit a defective one.  First, the Fund makes the same general allegation

that PSG set "aggressive" sales targets.  (Am. Compl. ¶ 5.)  Second, the Fund points to the fact

that Defendants offered incentives to customers, such as volume discounts and free shipping, to

buy product before they needed it.  (*Id.* ¶¶ 48–53.)  Third, the Fund alleges that these practices

were deployed to meet sales and earnings estimates.  (*Id.* ¶¶ 52, 55.)  Fourth, the Fund claims

that customer inventories were high and Defendants "put more [product] into the market than the

market could handle."  (*Id.* ¶ 59 (alterations in original).)  And, as in *Bristol-Myers*, the

Amended Complaint is devoid of allegations indicating that the alleged channel stuffing was of

the illegitimate variety.  In light of the similarity between these two actions, there is no more

reason to find scienter here than there was in *Bristol-Myers*.  The inference should be rejected as

unsupported by the factual allegations.

       To the extent the Fund seeks an inference of scienter from the alleged existence of

a survey conducted by PSG's former chairman purporting to show that certain of PSG's retail

customers had been asked by PSG to move an order into an earlier quarter, this allegation does

not support an inference of scienter as to the Individual Defendants because the Amended

Complaint alleges no facts tying the survey to Defendant Davis or Defendant Rosenthal.[7]  The

---

[7] The Fund also does not adequately allege that the purported surveys are material.  *See* Section I.B.2, *supra*.

Amended Complaint merely alleges that the survey existed; it does not allege that the Individual

Defendants were made aware of its existence or its purported results, let alone how they were

made aware, at what time, and by whom.  The survey allegations, therefore, do not provide

evidence of scienter as to the Individual Defendants because they are not pleaded with

particularity.  *See Novak* v. *Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000) ("In order to plead scienter,

plaintiffs must state *with particularity* facts giving rise to a strong inference that *the defendant*

acted with the required state of mind.") (emphasis added).

> **2.     Unfounded Allegations of Defendants' Knowledge about the Risks of Channel Stuffing Are Insufficient to Support Scienter.**

The Fund also attempts to establish scienter by claiming that Defendants knew the

so-called channel stuffing would result in lower sales in the future, thereby deceiving investors

about the Company's true prospects.  (Am. Compl. ¶¶ 114–16, 148.)  This claim fails on multiple

levels, starting with logic.  The Fund describes channel stuffing as a practice that is inevitably

doomed to fail because it cannibalizes future sales.  (*Id.* ¶ 13 (characterizing failure of channel

stuffing as "inevitable"); Pl.'s Pre-Mot. Letter at 2, ECF No. 77 (alleging sales in channel

stuffing cases "always" "dr[y] up").)  If the Fund's characterization is correct, it strains credulity

to believe that Defendants would act against their own economic self-interest in pursuing a

failing strategy.  It is implausible for anyone, let alone the leaders of a publicly traded company,

to engage in a scheme that bears no chance of success.  *See Shields* v. *Citytrust Bancorp., Inc.*,

25 F.3d 1124, 1130 (2d Cir. 1994) (finding plaintiff's allegations that defendants inflated their

stock price by concealing adverse facts could not show scienter because the alleged scheme

would have provided only a "short respite" of several months, as adverse facts were uncovered

anyway in the ordinary course of bank business); *In re GeoPharma, Inc. Sec. Litig.*, 399 F. Supp.

2d 432, 449 (S.D.N.Y. 2005) (finding scienter allegations insufficient where the "alleged scheme

could not possibly have succeeded"); *Gillis* v. *QRX Pharma Ltd.*, --- F. Supp. 3d ---, 2016 WL 3685095, at *30–31 (S.D.N.Y. July 6, 2016) (finding scienter allegations insufficient where "as pled, the scheme . . . lacks a coherent rational objective . . . [and] by its nature . . . could not have continued in perpetuity").

    The Amended Complaint simply pleads no facts that provide any reason why the Defendants would pursue a futile strategy.  There are, for example, no allegations that Defendants benefitted in any way from the strategy, such as insider stock sales that took advantage of the strategy's alleged inflationary effect on the Company's stock price.  Indeed, the opposite is true.  Accepting the Fund's version of events, Defendants have all suffered significant harm as a result of pursuing this strategy—Defendant Davis has lost his job and the Company's stock price has fallen significantly.  Absent any allegations as to how the Defendants benefitted from a strategy that was doomed to fail, it is difficult to understand why they would have pursued such a hopeless strategy in the first place.  The predetermined futility of this alleged scheme thus undermines any claim that Defendants adopted sales practices knowing they would ultimately harm the Company, making an inference of scienter far from plausible.  *See QRX Pharma*, 2016 WL 3685095, at *31 (finding that where "there would be no concrete benefit to defendants to justify these risks," "[c]ourts regularly refuse to infer scienter . . . when confronted with such illogical allegations.")

    The inference is also inadequately supported by the factual allegations in the Amended Complaint.  The Fund contends that the Individual Defendants' knowledge of the harmful consequences of the sales practices is established by their "access to [] adverse undisclosed information" about PSG's business as corporate officers.  (Am. Compl. ¶ 27.)  That allegation is insufficient to establish the relevant knowledge.  Not only does it fail to specify

what information the Individual Defendants allegedly learned or its source, but it is also an impermissible means of establishing knowledge as a general matter.  Courts in this District have "long held" that accusations of a defendant's knowledge of adverse information "founded on nothing more than a defendant's corporate position are entitled to no weight."  *Plumbers & Steamfitters Local 773 Pension Fund* v. *Can. Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 300 (S.D.N.Y. 2010).  Scienter cannot be inferred solely from the fact that a defendant, due to his executive position, had access to adverse information.  *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 407 (S.D.N.Y. 2016).  Amounting to little more than a claim that the Individual Defendants "must have known," the Fund's arguments based on the Individual Defendants' status within the Company should be rejected.

Elsewhere in the Amended Complaint, the Fund relies on similarly unsupported allegations regarding the Individual Defendants' alleged knowledge of the harmful consequences of channel stuffing.  (Am. Compl. ¶¶ 59–60.)  The Fund contends that Defendant Davis "knew that the hockey equipment market was saturated," yet "insisted" that retailers increase orders every year.  (*Id.* ¶ 59.)  The Fund further states that "due to PSG's sales practices and the material volume of early shipments . . . Defendants knew that PSG's sales figures, on the back of these tactics, were unsustainable."  (*Id.* ¶ 60.)  These are precisely the types of conclusory, generalized allegations of channel stuffing that courts hold are not probative of scienter.

Judge Stein rejected a similar theory in *Revlon*, where plaintiffs alleged that knowledge of channel stuffing practices in and of themselves created the inference that defendants were "at least reckless to the fact that [the company's] future sales were being sacrificed for short-term sales."  2004 WL 2210269, at *18.  Judge Stein rejected this argument, holding that to infer recklessness on channel stuffing allegations alone would improperly credit

"totally conclusory allegations regarding defendants' omniscient awareness of traffic into and out of the channel." *Id.* at *19. By contrast, the court noted that "detailed allegations as to what defendants knew on a daily, weekly and monthly basis about the retail trade" could show recklessness because that would shed light on what defendants knew about channel inflow relative to channel outflow. *Id.* (quoting *Scholastic*, 252 F.3d at 76). As in *Revlon*, the Amended Complaint does not contain any facts, let alone "detailed allegations," as to what Defendants knew about channel inflow and outflow at any time during the putative class period.

The Fund also claims that Defendants were warned about the risks of the so-called channel stuffing by a former PSG executive. But there are several problems with this claim. The sole source of this allegation is CW3, identified in the Amended Complaint as the co-owner of one of Bauer's retail customers based in Salem, New Hampshire. (Am. Compl. ¶ 33.) According to CW3, Edward Kinnaly, a former PSG officer, told the Individual Defendants at a 2013 meeting of PSG's Board of Directors that the Company's channel stuffing "would eventually catch up with PSG." (*Id.* ¶ 55.) CW3 further alleges that Kinnaly was fired for raising this concern about PSG's sales practices. (*Id.*)

Nothing in the Amended Complaint, however, provides a sound basis to credit CW3's allegation. Importantly, courts are highly skeptical where, as here, confidential witnesses are used to comment on issues of which they have no personal knowledge. Courts in the Second Circuit have held that confidential witness allegations may be considered only if "they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Kasaks*, 216 F.3d at 314; *see also In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 308 F. Supp. 2d 249, 262 (S.D.N.Y. 2004) (discounting confidential witness allegations where "it is not apparent from the

informant's title that he or she would probably possess such information"); *In re Sierra Wireless, Inc. Sec. Litig.*, 482 F. Supp. 2d 365, 376 (S.D.N.Y. 2007) (same).  This requires a plaintiff to describe the confidential witnesses' background "sufficiently to indicate a high likelihood that they actually knew facts underlying their allegations."  *Glaser* v. *The9, Ltd.*, 772 F. Supp. 2d 573, 590 (S.D.N.Y. 2011); *see also Feasby* v. *Industri-Matematik Int'l, Corp.*, No. 99-cv-8761, 2003 WL 22976327, at *4 (S.D.N.Y. Dec. 19, 2003) (discounting confidential witness allegations where the complaint did not "describe the position held by or work assignments of the former employee or consultant sources, or any other information that would support an inference that the sources would possess the information attributable to them").  Alternatively, if the plaintiff pleads "independent [] factual allegations" that corroborate the confidential witness's allegations, the requirement of describing the source's position/job is loosened. *Glaser*, 772 F. Supp. 2d at 590.

Under this precedent, CW3's allegation should be set aside.  The Amended Complaint provides no indication, let alone a "high likelihood," that CW3 would have been privy to Kinnaly's alleged statement at the 2013 PSG board meeting in question.  The Fund does not allege that CW3—who is not described as having ever been a member of PSG's Board or employed by the Company—was present at this board meeting, nor does it indicate that CW3 had a relationship with Kinnaly, or any other basis for CW3 coming to learn of this alleged statement.  Furthermore, the Fund does not otherwise allege a single fact that corroborates CW3's assertion that Kinnaly provided this conclusory opinion.  We are, therefore, left guessing how CW3 learned of this alleged statement, and how many levels of hearsay are involved.

While a confidential witness's relaying of hearsay does not automatically disqualify his statement from consideration in the scienter analysis, the hearsay "may indicate

that a confidential witness' report is not sufficiently reliable." *Zucco Partners, LLC* v. *Digimarc Corp.*, 552 F.3d 981, 997 n.4 (9th Cir. 2009).  Here, where the layers of hearsay are unknowable because of the Fund's failure to substantiate CW3's awareness of this alleged statement, CW3's allegations in this respect are unreliable and cannot support a strong inference of scienter.  *See In re Elan Corp. Sec. Litig.*, 543 F. Supp. 2d 187, 220 (S.D.N.Y. 2008) (rejecting CW's allegation that company's senior management had knowledge because plaintiffs failed to allege any facts indicating that the CW "was in a position to have knowledge regarding communications with [defendant company's] senior management").

Even if the Court does not completely discredit CW3's allegation, the Court should assign it little weight when determining if the Fund has pleaded an inference of scienter that is at least as compelling as any opposing inference.  Courts in this circuit have held that unreliable confidential witness testimony must not be considered "compelling" for the purpose of performing the comparative *Tellabs* scienter analysis.  *See MRU Holdings*, 769 F. Supp. 2d at 516;  *accord Campo* v. *Sears Holdings Corp.*, 371 F. App'x 212, 216 & n.4 (2d Cir. 2010) ("[T]he confidential witness testimony discussed precludes us from concluding that an inference of scienter is 'cogent and at least as compelling as the opposing inference' . . . .") (quoting *Tellabs*, 551 U.S. at 314).

In the event the Court accepts CW3's account as true, Kinnaly's alleged statement is insufficient to show that Defendants knew, or were at least reckless about, the future effects of the alleged channel stuffing.  Courts in this District have held that differences of opinion, "even stark differences, between employees do not reveal scienter."  *City of Austin Police Ret. Sys.* v. *Kinross Gold Corp.*, 957 F. Supp. 2d 277, 299 (S.D.N.Y. 2013); *see also In re Cerner Corp. Sec. Litig.*, 425 F.3d 1079, 1085–86 (8th Cir. 2005) (finding allegation that regional sales manager

believed earnings forecasts were unattainable "sheds no light on the relevant issue of whether the Individual Defendants shared this view, or indeed of whether the forecasts were necessarily unattainable").  Kinnaly's alleged general statement that the channel stuffing practices "would eventually catch up with" the Company is just such a difference of opinion that is insufficient to show that Defendants acted with the requisite fraudulent intent.  (Am. Compl. ¶ 55.)

While courts have observed that allegations that an employee "persuaded" defendants or "notified [defendants] of facts" supporting his opinion may show conscious misbehavior or recklessness, there are no allegations here that Kinnaly was offering anything more than an uninformed lay opinion.  *See Kinross*, 957 F. Supp. 2d at 299.  The Amended Complaint does not allege that Kinnaly presented either of the Individual Defendants with any evidence supporting his conclusion that PSG's sales practices would catch up with it, such as data that PSG's sales channels were in fact oversaturated, or data that the rate of retail sell-through was slower than the rate at which PSG sold and shipped goods to its independent retail customers.  *Cf. In re Salix Pharms., Ltd.*, No. 14-cv-8925, 2016 WL 1629341, at *14 (S.D.N.Y. Apr. 22, 2016) (finding strong inference of scienter because executives had access to specific reports indicating bloated wholesale inventory levels).  In short, the alleged boardroom statement put forth by CW3 provides no evidence at all that the Individual Defendants had an intent to deceive.  It therefore does not support an inference of scienter.

CW3's allegation also does not help the Fund overcome the fundamental problem that infects and pervades the entire Amended Complaint; namely, that the Amended Complaint is completely silent as to how Defendants knew, or were reckless in not knowing, that PSG's alleged channel stuffing was improper and would ultimately result in a sharp revenue decline. CW3's allegation that the Individual Defendants were informed that the sales practice "would

catch up with PSG" does not remedy this fatal flaw because allegations such as CW3's that are

"consistent with innocent conduct are never sufficient for a strong inference [of scienter]." *SEC*

v. *Espuelas*, 579 F. Supp. 2d 461, 474 (S.D.N.Y. 2008).

### 3.    Defendant Davis's Departure Is Not Probative of Scienter.

The Fund's allegations regarding Defendant Davis's departure do not support an

inference of scienter because the Fund does not allege special circumstances surrounding the

departure.  The Fund attempts to show scienter through Defendant Davis's departure in March

2016 after the Company had experienced months of decline.  However, it is well established that

an officer's departure, without more, is not probative of scienter.  Rather, for an officer's

departure to be probative of scienter, it must be "highly unusual and suspicious."  *Glaser*, 772 F.

Supp. 2d at 598.  The Fund has alleged no facts to establish that Defendant Davis's departure

was highly unusual and suspicious so the Court must give it no weight in its scienter analysis.

Courts are cautious to infer scienter from an officer's resignation because

resignations are commonplace among corporate executives and can be based on innumerable

causes.  A court will consider a resignation "highly unusual and suspicious" for purposes of

inferring scienter when "independent facts indicate that the resignation was somehow tied to the

fraud alleged, that the resignation somehow alerted defendants to the fraud, or that defendant's

scienter was otherwise evident."  *Id.*  For example, in *Salix*, the court found officers' resignations

highly unusual and suspicious where the board had exercised the clawback provisions of the

executives' compensation agreements—which required a finding of intentional wrongdoing—

and the company later restated its financial results.  2016 WL 1629341, at *15.  On the other

hand, mere temporal proximity of an officer's resignation to a company's corrective disclosures

is not probative of scienter.  *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 446–47 (S.D.N.Y.

2005) (mere temporal proximity of officer resignations to company's disclosure of improper

accounting and financial statements was not probative of the officer's scienter); *C.D.T.S. No. 1 & A.T.U. Local 1321 Pension Plan* v. *UBS AG*, No. 12-cv-4924, 2013 WL 6576031, at *7 (S.D.N.Y. Dec. 13, 2013) (no strong inference of fraud from resignation where "there are a number of other, more plausible reasons why personnel may have been demoted and resigned"). In addition, a company's overall decline does not constitute a special circumstance that is probative of scienter. *See QRX Pharma*, 2016 WL 3685095, at *35 (citing *Owens* v. *Jastrow*, 789 F.3d 529, 541 n.9 (5th Cir. 2015), and explaining that in *Owens*, the court "not[ed] that [the] district court had rejected scienter allegation[s] on [the] ground that [the] company's overall decline, rather than securities fraud, was likely the impetus for the resignations").

Here, the Fund has alleged no special circumstances surrounding Defendant Davis's departure. The Fund merely alleges that Defendant Davis's departure occurred shortly after PSG's alleged channel stuffing was revealed to the marketplace. As explained above, this temporal proximity is not probative of scienter. The Fund has alleged no independent facts tying Defendant Davis's departure to the alleged fraud. There are a number of plausible independent reasons why Defendant Davis might have left PSG.

### 4. Defendants' Motive to Maintain Corporate Profitability Falls Well Short of Giving Rise to a Strong Inference of Scienter.

The Fund's efforts to establish scienter through Defendants' alleged motive and opportunity to commit fraud are equally unsuccessful. According to the Amended Complaint, Defendants had a motive to ensure that PSG "continue [its] success" as a public company. (Am. Compl. ¶¶ 153–54.) But that motive is insufficient to support a strong inference of fraudulent intent. To infer scienter based on motive, plaintiffs must allege that defendants could realize "concrete and personal" benefits through the alleged fraudulent statements. *Kasaks*, 216 F.3d at 307–08. For example, a motive to raise a company's stock price artificially so that an insider

33

defendant could sell shares at inflated prices might qualify as such a motive because it specifies a concrete and personal benefit that could be realized by the defendant as a result of the fraudulent statement. *Id.*

Here, all that the Fund offers is a generalized motive that could be "imputed to any publicly-owned, for-profit endeavor," such as the "motive to maintain the appearance of corporate profitability"; that allegation is insufficient to show scienter. *Chill* v. *Gen. Elec. Co.*, 101 F.3d 263, 268 (2d Cir. 1996); *see also Kasaks*, 216 F.3d at 307; *Kalnit*, 264 F.3d at 139 (desire to make corporation appear profitable is not probative of scienter); *JP Morgan Chase, Co.*, 553 F.3d at 198 (same). The Second Circuit has reasoned that while such generalized motives naturally entail benefit to the corporation, they do not show the concrete and personal benefits necessary to satisfy the motive requirement. *Chill*, 101 F.3d at 268. This rule is also animated by a practical rationale because otherwise, "virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions." *Id.*; *Kalnit*, 264 F.3d at 139–40. Inferring fraudulent intent from such a commonplace motive, as the Fund proposes, runs counter to well-established precedent and should be rejected.

It is no answer for the Fund to say that the Amended Complaint also contains allegations about Defendants' motive to "conceal" their allegedly failing retail store strategy. (Am. Compl. ¶ 152.) The Fund contends that PSG's retail store strategy depressed customer demand and took a toll on sales, which Defendants hoped to conceal through channel stuffing. (*Id.*) That is a distinction without a difference because it arrives at the same end—to maintain the appearance of profitability.[8] The Second Circuit rejected precisely such a maneuver in

---

[8] The inference of fraudulent intent the Fund would have the Court draw from this allegation is also negated by the Fund's own pleadings. The Fund further alleges that Defendant Davis was in possession of an independent study that concluded that PSG's strategy of opening its own retail stores *increased* the likelihood of consumers visiting local independent retailers. (Am. Compl. ¶ 122.)

*Rombach* v. *Chang*.  355 F.3d 164 (2d Cir. 2004).  In *Chang*, plaintiffs alleged that defendants, who had been experiencing deteriorating finances over the course of several months, were motivated to make a series of corporate acquisitions in order to artificially inflate the price of the defendant's stock.  *Id.* at 168, 177.  The court rejected this motive as insufficient to show scienter, equating it with the same generalized desire to "maintain the appearance of corporate profitability" insufficient to show scienter.  *Id.* at 177.  The same result should follow here.

But even if the Fund's argument were not precluded by precedent, it would fail based on its own lack of specificity.  The Fund does not allege any facts bearing on the degree to which the retail store strategy depressed customer demand and reduced revenues.  (Am. Compl. ¶ 44.)  To the contrary, there is good reason to doubt that the poor performance of retail stores—there were only two in 2015 (*id.*)—would have had any measurable effect on the performance of PSG, a large company that is listed on the New York and Toronto Stock Exchanges and sells its products throughout the world.[9]  It is therefore implausible, at a minimum, to infer that the weak performance of such a minor piece of PSG's business would provide a motive to execute a fraudulent, company-wide channel stuffing scheme.

Finally, the Fund also alleges that PSG's former chairman, Roustan, "made clear" to Defendant Davis that the retail store strategy would depress customer demand.  (Am. Compl. ¶ 150.)  It is surely true that Roustan believed what he said.  But that amounts to little more than disagreement over the merits of pursuing this strategy in the first place.  Even if Roustan had the better of the argument, "poor business judgment is not actionable" under the securities laws, nor does it give rise to a strong inference of fraudulent intent.  *Rothman*, 220 F.3d at 90.  Nothing

---

[9] While it was also known at the time that PSG planned to open an additional six to eight retail stores "over the next several years," it is difficult to see how these future plans would have any impact on customer demand in 2015—which is when the Fund alleges that PSG implemented its channel stuffing scheme in response to Roustan's warning.  (Am. Compl. ¶¶ 44–47.)

about Roustan's opinion on the merits of this strategy provides a sound basis to infer that

Defendants had a motive to engage in fraud.  To the contrary, it provides yet another

nonfraudulent explanation for the decline in sales that is the subject of this lawsuit.

### 5.    The Financial Performance of PSG's Competitors Fails to Support a Strong Inference of Scienter.

The Fund cannot cure its failure to plead facts showing a strong inference of

scienter by arguing that PSG's competitors appeared to better withstand the market factors that

battered the Company in early 2016.  Under the Fund's theory, the perceived strength of PSG's

competitors demonstrates that the reasons PSG provided for its weak performance were mere

pretexts designed to conceal a channel stuffing "scheme."  (Am. Compl. ¶¶ 137–44.)  This leap

of logic amounts to rank speculation, falling well short of the requirement that inferences be

"cogent" and "compelling" in order to establish scienter.  *Tellabs*, 551 U.S. at 324.

Defendants have disclosed several nonfraudulent causes for the Company's

financial struggles, including the bankruptcies of major customers, market consolidation,

unfavorable exchange rates, and market softening.  (Am. Compl. ¶¶ 123, 127–130.)  The Fund

does not contest that these events occurred during the relevant time period.  And it is plain that

any of these events, let alone all of them in concert, would take a toll on any company's

performance.  The Fund, however, urges this Court to believe that the serious headwinds facing

PSG were not the "real" reason for PSG's poor performance; they were simply fig leaves for the

alleged fraudulent channel stuffing.  (Am. Compl. ¶¶ 13–15.)  To support this claim, the Fund

argues that PSG's competitors did not experience similar financial difficulties, so Defendants'

disclosures must have been false.  (*Id.* ¶¶ 138, 144.)  This inference is unsustainable.

A competitor's superior ability to withstand market forces does not suggest that

less fortunate or less able companies were committing fraud.  If it were otherwise, a plaintiff

36

could satisfy the scienter requirement simply by pointing to another company in the same

industry that outperformed the target of the lawsuit.  Recognizing as much, the Second Circuit

has affirmed a district court's conclusion that scienter could not be shown simply because a

defendant's losses were higher than those of its competitors during the collapse of the credit

markets in the late 2000s.  *Local No. 38 Int'l Broth. of Elec. Workers Pension Fund* v. *Am.*

*Express Co.*, 430 F. App'x 63, 65 (2d Cir. 2011).  In this context, rather than a fraudulent

inference, the "more compelling inference" was that the defendants' "aggressive growth strategy

was sideswiped" by factors that afflicted the entire market.  *Id.*  Similarly here, the Fund does not

dispute that multiple negative factors were afflicting the market during the relevant time period.

From *American Express*, it follows that the mere allegation that some competitors outperformed

PSG during this time period is insufficient to transform the inference of scienter into something

at least as compelling as the headwinds bearing on the market.

> The Fund's simplistic approach also ignores that market factors may affect

different companies in different ways.  For example, PSG's significant presence in the Canadian

market made it far more vulnerable to currency fluctuations that disfavored the Canadian dollar

relative to the U.S. dollar.  It is far from clear that any of its competitors shared that level of

vulnerability.  Likewise, there is no reason to believe that PSG and its competitors were equally

harmed by the bankruptcies of customers that PSG considered significant.  Those customers may

have been less significant, or not significant at all, to PSG's competitors.  In light of these

obvious differences, courts have refused to infer fraudulent intent from the mere fact that a

competitor outperforms the target of a securities fraud suit.  *See, e.g.*, *Am. Express*, 430 F. App'x

at 65; *In re Network Assocs., Inc. Sec. Litig.*, No. 99-cv-1729, 2000 WL 33376577, at *13 (N.D.

Cal. Sept. 5, 2000) (finding that although defendant's disclosed market-wide reason for its

financial underperformance "allegedly did not affect [its] competitors," this was insufficient to show scienter).  The Fund's argument here should fare no better.

Even if the Fund could plead scienter by pointing to the success of a PSG competitor at a time when PSG struggled, its allegations should be rejected because they do not present fair and accurate comparisons.  For example, the Fund alleges that during late 2015 and early 2016, Reebok-CCM Hockey "reported an 18% increase in sales" while PSG announced that Bauer's sales were down 19%.  (Am. Compl. ¶ 144.)  This figure, however, applies to Reebok-CCM Hockey's sales for calendar year 2015 only.  (Adidas Grp. Annual Report 2015, Holland Decl. Ex. 1 at 2–3.)  The Fund omits from the Amended Complaint that, during the relevant time period (the first half of 2016), CCM Hockey reported a 14.7% decline in sales year-over-year.  (Adidas Grp. First Half Year Report Jan. – June 2016, Holland Decl. Ex. 2 at 2.)  In addition, the fact that the CEO of Newell Brands (which owns PSG competitor Rawlings) was "extremely pleased" with its Q1 2016 results does not necessarily entail positive performance for its Rawlings division.  (Am. Compl. ¶ 142.)  Newell Brands is a multi-billion dollar company, and Rawlings, which is the only major PSG competitor owned by that conglomerate, accounts for only a portion of its revenues.[10]  (Newell Brands Q2 FY16 Press Release (July 29, 2016), Holland Decl. Ex. 3 at 1, 6.)  And even if some of PSG's competitors were successful during this period, that success could very well have come at PSG's expense.

---

[10] It is difficult to determine the proportion of Rawlings' revenue relative to Newell Brands, but a rough approximation is possible.  Within Newell Brands, Rawlings is housed within a business segment named Outdoor Solutions.  *Newell Brands Outdoor Solutions* (2016), http://www.newellbrands.com/OurBrands/OutdoorSolutions/Pages/OutdoorSolutions.aspx.  In Q2 of FY16, Outdoor Solutions constituted approximately 25% of Newell Brands' net sales.  (Newell Brands Q2 of FY16 Press Release (July 29, 2016), Holland Decl. Ex. 3 at 1, 4.)  Thus, Rawlings accounts for less than approximately 25% of Newell Brands' net sales—and probably significantly less, given that the Outdoor Solutions business segment includes eight additional brands.

The Amended Complaint also omits information about PSG's competitors who experienced similar financial difficulties in the first half of 2016.  Nike, for example, encountered an 11% year-over-year decrease in North America equipment sales for the quarter that ended in February 2016.  (Nike, Inc. Divisional Revenues (Mar. 22, 2016), Holland Decl. Ex. 4 at 1.)  The performance of PSG's competitors, insofar as they are even knowable from the allegations contained in the Amended Complaint, simply do not show a robust, thriving industry; nor do they provide a sound basis to infer that PSG's alleged underperformance is the result of fraud.

### D.  Events Occurring After the Fund Disposed of Its PSG Stock Are Irrelevant to Its Securities Fraud Claim.

The Amended Complaint contains allegations of events that occurred after the Fund had disposed of all its PSG stock.  Those events could not have contributed to any injury the Fund suffered and, therefore, cannot support its securities fraud claim.

According to the Amended Complaint, the Fund no longer held any PSG stock after March 10, 2016.  (Am. Compl. Schedule A.)  The Amended Complaint nevertheless contains allegations about a 10.35% drop in PSG's stock price on March 15, 2016, the day after the *New York Post* published an article entitled "Bauer's Parent Company Questioned About Misdating Earnings."  (*Id.* ¶¶ 16, 135–36.)  Reductions in stock prices that occur after a plaintiff's complete disposition of holdings cannot support a fraud claim.  Addressing just this situation, the Supreme Court noted that when a plaintiff had already sold its shares "before the relevant truth begins to leak out, the misrepresentation will not have led to any loss."  *Dura Pharms, Inc.* v. *Broudo*, 544 U.S. 336, 342 (2005).  "[A]n inflated purchase price will not itself constitute or proximately cause the relevant economic loss," since "at the moment the transaction takes place, the plaintiff has suffered no loss."  *Id.*; *see also Lentell* v. *Merrill Lynch & Co., Inc.*,

396 F.3d 161, 173 (2d Cir. 2005) (holding that loss causation requires "that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security").  Under this precedent, the Fund did not suffer any loss as a result of declines in PSG's share price after March 10, 2016.  Any claim for losses following March 10, 2016 should be dismissed.

## II.     The Claim of Control Person Liability Should Be Dismissed.

To state a claim for "control person" liability under Section 20(a) of the Exchange Act, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud.  *Shaar*, 493 F.3d at 108.  Where a plaintiff fails to state a primary violation under Section 10(b) of the Exchange Act, it cannot establish control person liability under Section 20(a).  *E.g.*, *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 379 (S.D.N.Y. 2011); *In re Centerline Holdings Co. Sec. Litig.*, 613 F. Supp. 2d 394, 404 (S.D.N.Y. 2009).

As described in Part I, the Fund has failed to state a claim for a primary violation of Section 10(b), which means the control person claim must fail as well.  In addition, for the same reasons that the Fund has failed to plead facts giving rise to a strong inference of scienter, the Fund has not alleged culpable participation on the part of any Defendant.  *See, e.g.*, *In re Satyam Comp. Servs. Ltd. Sec. Litig.*, 915 F. Supp. 2d 450, 482–83 (S.D.N.Y. 2013) (finding that for the same reasons that plaintiff failed to allege scienter, plaintiffs also failed to allege that any of the defendants were culpable participants); *Janbay* v. *Can. Solar, Inc.*, No. 10-cv-4430, 2012 WL 1080306, at *17 (S.D.N.Y. Mar. 30, 2012) (same).  Having failed to establish control person liability, Count Two of the Amended Complaint should be dismissed as well.

## <u>CONCLUSION</u>

The Amended Complaint should be dismissed.

Dated:  New York, New York
October 13, 2016

Respectfully submitted,

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

/s/ Leslie Gordon Fagen
Leslie Gordon Fagen
Timothy J. Holland
1285 Avenue of the Americas
New York, New York  10019-6064
Tel.  (212) 373-3000
Fax  (212) 757-3990
lfagen@paulweiss.com
tholland@paulweiss.com

Justin Anderson (*pro hac vice*)
2001 K Street, NW
Washington, D.C. 20006-1047
janderson@paulweiss.com

*Attorneys for Defendants Performance*
*Sports Group Ltd. and Amir Rosenthal*

WINSTON & STRAWN LLP

/s/ David L. Aronoff
David L. Aronoff (*pro hac vice*)
Gayle I. Jenkins (*pro hac vice*)
Scott J. Fishwick (*pro hac vice*)
333 S. Grand Avenue
Los Angeles, California  90071-1543
Tel.  (213) 615-1700
Fax  (213) 615-1750
DAronoff@winston.com
GJenkins@winston.com
SFishwick@winston.com

Seth C. Farber
200 Park Avenue
New York, New York 10166-4193
SFarber@winston.com

*Attorneys for Defendant Kevin Davis*

41