**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JUAN FRANCISCO GONZALEZ NIEVES, AS TRUSTEE OF THE GONZALEZ CORONADO TRUST, Individually and on Behalf of All Others Similarly Situated,<br><br>       Plaintiff,<br><br> -v-<br><br>PERFORMANCE SPORTS GROUP LTD., KEVIN DAVIS AND AMIR ROSENTHAL,<br><br>       Defendants. | Case No.: 1:16-CV-3591-GHW<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

# Table of Contents

I.     NATURE OF THE ACTION ................................................................................. 2

II.    JURISDICTION AND VENUE ........................................................................... 9

III.   PARTIES AND RELEVANT NON-PARTIES ................................................. 10

IV.    SUBSTANTIVE ALLEGATIONS .................................................................... 14

   A.   PSG's Growth and Progressive Sales Program ............................................ 15

   B.   PSG Customers Tell PSG's Former Chairman About PSG's Practice of Moving Orders to Earlier Periods ............................................................. 21

   C.   PSG Touts Revenue Growth and Strong Sales Performance ....................... 22

   D.   PSG Violated Item 303 of Regulation S-K ................................................. 42

   E.   PSG's Blind Aggression Catches Up with the Company ............................. 44

   F.   PSG Hides Behind Irrelevant Customer Bankruptcies ................................ 52

   G.   PSG's Competitors Had No Issues with Market Demand or Retailer Bankruptcies in Late 2015 ......................................................................... 52

   H.   Post Class Period Developments.................................................................. 53

V.     THE FACTS GIVE RISE TO A STRONG INFERENCE THAT PSG AND THE DEFENDANTS ACTED WITH SCIENTER ................................................ 56

   A.   Defendant Davis' Abrupt Departure Just Days After the Truth Was Revealed Supports an Inference of Scienter ............................................... 58

VI.    LOSS CAUSATION............................................................................................ 58

VII.   APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE ................................................................................... 60

VIII.  APPLICABILITY OF PRESUMPTION OF RELIANCE – *AFFILIATED UTE* DOCTRINE ................................................................................................... 61

IX.    NO SAFE HARBOR ......................................................................................... 61

X.     CLASS ACTION ALLEGATIONS ................................................................. 62

XI.    CAUSES OF ACTION ...................................................................................... 63

The allegations set forth in this Second Amended Class Action Complaint for Violations of the Federal Securities Laws (the "Complaint") are based on the investigation undertaken by Lead Counsel on behalf of Lead Plaintiff Plumbers & Pipefitters National Pension Fund ("Lead Plaintiff"). Lead Plaintiff brings this Complaint against Kevin Davis ("Davis"), the former Chief Executive Officer ("CEO"), President, and director of Performance Sports Group Ltd. ("PSG" or the "Company"),[1] and Amir Rosenthal ("Rosenthal"), the Company's former Chief Financial Officer ("CFO"). Lead Plaintiff's allegations against PSG and Defendants are based on personal knowledge as to its own acts and on information and belief as to all other matters, such information and belief having been informed by the investigation conducted by and under the supervision of its counsel, which included, among other things: (i) review and analysis of PSG's public filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) review and analysis of the sports equipment industry and analyst reports and other publicly-available materials concerning PSG's business practices and policies; (iii) review and analysis of other publicly-available information concerning PSG and its competitors; (iv) interviews with former PSG employees, Class Period customers of PSG and other persons with knowledge of the matters alleged herein (most of whom have provided information in confidence; these confidential witnesses ("CWs") will be identified herein by number (CW1, CW2, etc.)), including W. Graeme Roustan ("Roustan"), the former Chairman of PSG; and (v) consultations with experts. Lead Plaintiff believes that substantial additional evidentiary support will exist for

---

[1] PSG was previously named as a defendant in the Amended Class Action Complaint for Violations of the Federal Securities Laws (Dkt. No. 62). PSG and seventeen of its affiliates (collectively with PSG, the "Debtors") filed voluntary bankruptcy petitions in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") on October 31, 2016. Accordingly, by operation of the automatic stay under 11 U.S.C. § 362 (the "Automatic Stay"), PSG is no longer named as a defendant in this action. The Automatic Stay in the Debtors' bankruptcy cases does not impact any Defendant other than PSG. Lead Plaintiff reserves the right to name PSG (or any of the other Debtors, as the circumstances may require) as a defendant in this or any other action in the future in the event the Automatic Stay is terminated, lifted, or modified.

its allegations after a reasonable opportunity for discovery. On behalf of itself and the Class it seeks to represent, Lead Plaintiff alleges as follows:

## I.    NATURE OF THE ACTION

1.      Lead Plaintiff brings this federal securities class action on behalf of itself and a proposed class of persons and entities (the "Class") who purchased or acquired PSG common stock on the New York Stock Exchange ("NYSE") during the period from January 15, 2015 through March 14, 2016, inclusive (the "Class Period"). Lead Plaintiff seeks remedies under the Securities Exchange Act of 1934 (the "Exchange Act"). PSG and Defendants made a series of false and misleading statements and/or omissions during the Class Period which artificially inflated and/or maintained the value of PSG's stock. Subsequent disclosures and/or materializations of undisclosed risks caused PSG's stock price to decline, resulting in injury to Lead Plaintiff and the Class.

2.      PSG is a developer and manufacturer of sports equipment and apparel that it sells to independent retailers internationally. Its most recognizable brands include Bauer Hockey ("Bauer") and Easton. For years, PSG stuck to its winning sales formula of providing quality products to independent retailers for sale to consumers.

3.      From 2012 to 2014, PSG witnessed substantial revenue and profit growth based on a series of acquisitions and its strong market position in the hockey, baseball and softball markets. In April 2014, PSG completed its sixth acquisition, acquiring Easton Baseball/Softball from BRG Sports.

4.      On June 20, 2014, PSG, which had previously been called Bauer Performance Sports Ltd. and was publicly trading on the Toronto Stock Exchange since March 10, 2011, held

its initial public offering, issuing more than 7 million shares of stock to the public at a price of $15.50 per share (the "U.S. IPO").[2] Following the IPO, PSG's stock also traded on the NYSE.

      5.      In an effort to sustain the perception of strong growth, PSG began an aggressive push, led by Defendants Rosenthal and Davis, to further increase the Company's revenue and sales figures by any means necessary, including by the coercive, fraudulent sales practices described herein.  Defendants and PSG then led investors to believe that the Company's success during the Class Period was based on sustainable "organic" sales growth while omitting the true reasons for PSG's growth and "record sales" from its public statements. In doing so, PSG and Defendants propped up the value of the Company's stock based on false and misleading information.

      6.      In particular, from the Company's U.S. IPO and throughout the Class Period, PSG and Defendants touted PSG's "record" growth in sales and revenue, which was purportedly the result of PSG's strong product line, high market demand and "organic sales." However, this was not the full picture.

      7.      Indeed, "organic growth," as the term is generally used, refers to growth based on increased output, customer base expansion, or new product development, as opposed to mergers and acquisitions. However, a company's organic growth does not include growth that results from fraudulent or manipulated sales practices aimed at boosting a company's earnings. *See* Edward Hess and Robert Kazanjian, A SEARCH FOR ORGANIC GROWTH, Cambridge University Press, 103-104 (2006). Such earnings are transitory and are not sustainable. As a result, earnings from PSG's fraudulent sales practices, described *infra*, are not part of the Company's core

---

[2] In connection with the U.S. IPO, the Company changed its name from Bauer Performance Sports Ltd. to Performance Sports Group Ltd.

earnings (*i.e.*, earnings from its principal business) or "organic growth," nor would they have been expected by investors to be such.

8.      In reality, PSG employed a progressive sales program that involved threatening customers with the removal of vital discounts and sales terms if they did not increase their orders each year. The offering of discounts and advantageous terms is not uncommon; however, as employed by PSG, this sales program was used in a coercive, strong-arm fashion to effectively force PSG retailers to continuously increase their purchases or risk losing valuable discounts, regardless of actual demand for the product by the retailers. In the words of one PSG retailer, "they did try to jam orders down our throat, to take orders early, to overstock, oversupply, over-inventory us.  They said it would all work out, and then things hit a wall."[3]

9.      That "things hit a wall" for PSG was not surprising.  According to statistics published by USA Hockey, hockey player membership grew by less than 2% during the Class Period, yet PSG insisted that its retailers increase orders by 10-15% every year in order for retailers to keep necessary discounts.

10.      Moreover, the Company further propped up its financial results by shipping its products early to retailers, thereby pulling sales from later fiscal periods into earlier ones. In fact, many of PSG's retailers, as the confidential witnesses set forth herein exemplify, knew that the Company regularly shipped its products early in order to meet its quarterly financial goals. Although shipping early and offering discounts to increase sales may not be inherently fraudulent in and of themselves, these practices were abused by PSG and, as utilized, created a known trend that PSG should have disclosed, but did not. Specifically, PSG's sales were occurring in an already-saturated market; thus it was reasonably likely PSG would not sustain

---

[3] Bob Sanders, *Questions Abound Over Performance Sports Group*, NEW HAMPSHIRE BUSINESS REVIEW, Sept. 1, 2016, http://www.nhbr.com/September-2-2016/Questions-abound-over-Performance-Sports-Group/.

"record growth" and that sales would decrease, which would have a material adverse impact on PSG's financial condition.

11.     Defendants and PSG were well aware of the Company's manipulative sales practices, that such manipulative practices were not sustainable and, given their pervasiveness, were reasonably likely to have a material negative effect on the Company's financial results. Indeed, these practices were developed and overseen by executives at the highest levels of the Company, including Davis and Rosenthal.  Moreover, Defendants and the Company knew that PSG's purportedly "record" figures during the Class Period were being propped up by manipulated and aggressive sales that had no reasonable means of continuing in the long-term but failed to disclose this known trend to the market until the end of the Class Period.

12.     Moreover, PSG aggressively pushed its retailers to place their orders earlier and earlier, in some cases asking customers to order merchandise one year in advance in order to further grow its quarterly sales and revenue figures.

13.     During the Class Period, PSG held sales meetings at least twice per year, which Defendant Rosenthal attended, encouraging its sales representatives to aggressively push PSG customers to buy more and more product earlier and earlier.

14.     Furthermore, beginning in the summer of 2015, as PSG began filing its annual and quarterly reports with the SEC on Forms 10-K and 10-Q, Defendants submitted certifications pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 ("SOX Certifications") attesting to the truthfulness of those filings and the effectiveness of PSG's internal controls.  These filings were misleading because they failed to disclose the true nature of PSG's sales practices and their manipulative effect on the Company's financial results.  PSG subsequently announced, after the filing of Plaintiffs' Amended Complaint in August 2016, that an investigation had been

commenced by PSG's internal Audit Committee, and that the Company was the subject of investigations by the SEC and Canadian regulatory authorities.  According to newspaper accounts, the Canadian regulatory authorities include the Ontario Securities Commission.[4]

15.     PSG's fraudulent conduct was conducted by Defendants or with Defendants' knowledge and/or reckless disregard in order to conceal from the market that the Company's "record" revenues were the result of overly aggressive sales practices and manipulation.  These sales practices were designed to maintain and inflate PSG's stock price by portraying the Company's "record" quarterly revenue and sales figures as sustainable and "organic" even though Defendants knew, or recklessly disregarded, that PSG would soon be faced with a lack of sales in later quarters as PSG ran out of transactions to pull forward and as retailers became over-supplied with inventory that exceeded market demand as a result of PSG's penalties on retailers if they did not increase their orders with PSG.

16.     These sales tactics were not limited to just a handful of PSG sales representatives, or a handful of PSG's small clients, but constituted a systematic, company-wide program with the full knowledge of PSG and Defendants, that was applied to all of PSG's retail customers. These facts have been confirmed by a PSG sales representative who described how the these sales tactics were discussed at full department meetings, and by multiple Easton and Bauer retail customers who have described a pervasive scheme to manipulate the Company's financial results with aggressive sales tactics.  The scheme was also confirmed by PSG's former Chairman, Roustan, who, on two separate occasions – one with the assistance of accounting firm Grant Thornton and the other through the survey website "SurveyMonkey.com" – surveyed the largest

---

[4] PSG became a publicly-traded U.S. company on June 20, 2014 and began filing domestic reports with the SEC, including Forms 10-Q and 10-K, in August 2015. Before August 2015, PSG filed its financial statements with the SEC on Form 6-K as a foreign issuer.

of PSG's customers and found that a majority of them had been asked by PSG to move sales into earlier quarters. Moreover, Defendants and PSG fraudulently withheld from the market the reasonably likely, adverse impact its undisclosed tactics would soon have on PSG's bottom line.

17.     This scheme of withholding the truth behind the Company's "record revenue" met its inevitable demise in early 2016 as PSG ran out of customer orders to pull forward and the risks of PSG's and Defendants' fraudulent scheme began to materialize.

18.     In January 2016, PSG and Defendants released the Company's financial results for the second quarter of PSG's 2016 fiscal year.[5] In those results, Defendants and the Company announced for the first time during the Class Period that PSG had experienced a substantial decrease in all relevant financial metrics, including sales, revenue, profit, and EBITDA. However, in both the Company's SEC filings and in its conference call with industry analysts, Defendants concealed the true cause of the decline and blamed the worsening financial results on market consolidation among PSG's customers and currency exchange rate issues. PSG and Defendants did not disclose that these results were the consequence of manipulative practices – that PSG and Defendants knew were reasonably likely to be detrimental to the Company's financial results – involving pulling sales forward into earlier quarters and penalizing retailers who did not increase their bookings with PSG, without regard for market demand. As a result of this news, PSG's stock price fell more than 23% from $7.71 per share to $5.92 per share on heightened average daily trading volume of 1.29 million shares as the market absorbed this information.

19.     On March 8, 2016, PSG and Defendants, faced with no way to hide the inevitable and foreseeable downturn of sales and demand, was forced to reduce the Company's earnings

---

[5] PSG's fiscal year runs from June 1 to May 31.

7

per share guidance by nearly **80%**, citing an "**unexpected** significant downturn in retail sell-through." (Emphasis added.) On this news, shares of PSG fell $5.75 per share or over 66% to close at $2.91 per share on March 8, 2016, on trading volume of 18.6 million shares.

20.     Shortly thereafter, on March 14, based on the information obtained by Roustan through his two surveys, the *New York Post* revealed to the market that questions had been raised regarding allegations that PSG had been misdating quarterly revenue as part of its fraudulent scheme to conceal the known risks that its aggressive sales tactics had produced. On this news, shares of PSG fell $0.41 per share or over 10.35% to close at $3.55 per share on March 15, 2016, on an average two-day trading volume of approximately 2.29 million shares, damaging investors. Approximately one week after the *New York Post* article and the end of the Class Period, PSG announced the abrupt departure of Defendant Davis.

21.     However, throughout all of the Company's disclosures in early 2016, Defendants tried to blame its newly-disclosed reality wholly on market factors, including bankruptcy filings by two of its customers, Team Express and Sports Authority. But this was not the full picture and only further obscured, hid, and omitted the truth from investors. By way of contrast, while PSG was announcing that Bauer's sales were down 19% at the end of 2015, and revising its 2016 outlook, its rival Reebok-CCM Hockey, on January 13, 2016, reported an 8% increase in global equipment business and an **18% increase** in sales.[6] Similarly, Amer Sports, owners of the Wilson and Louisville Slugger baseball brands, was reporting double digit increases in revenues and sales in its Q4 2015 results and stated that its "pipeline is strong and momentum is good behind Louisville Slugger." Additionally, Newell Brands, owners of the Rawlings baseball brand, told the market that "[w]e are extremely pleased with our growth and financial results this quarter."

---

[6] CCM Hockey Announced Year End Results, BUSINESS WIRE, Jan. 13, 2016

22. The truth has caught up with PSG, and the undisclosed risks materialized. News has continued to emerged that PSG's failings were not exclusively the result of uncontrollable market factors but instead resulted, in large part, from the Company's own coercive and manipulative sales practices that were concealed from the market by Defendants. PSG has now found itself in utter turmoil. On August 15, 2015, the Company failed to file its annual financial report due to an ongoing internal Audit Committee investigation into the "Company's financial statements and the related certification process." Two days later, on August 17, 2016, the Company disclosed that both SEC and Canadian regulatory authorities were conducting their own investigations of PSG. Even after receiving a 60-day extension from creditors to file its Form 10-K, the Company was unable to do so and on October 31, 2016 was forced to file for bankruptcy protection in the U.S. and Canada. PSG also recently announced the departure of Defendant Rosenthal, while the Company is trying to save itself from Defendants' failed and fraudulent conduct through an asset sale and bankruptcy proceedings. As a result of the Company's bankruptcy, PSG's stock has been delisted from the NYSE and now trades on the over-the-counter ("OTC") market.

## II.   JURISDICTION AND VENUE

23. The federal securities claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5]).

24. This Court has jurisdiction over the subject matter of the federal securities claims pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

25. Venue is proper in the Southern District of New York pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b), given that many of the acts and practices complained

of herein occurred in this District as the Company's stock was traded on the NYSE during the Class Period.

### III.      PARTIES AND RELEVANT NON-PARTIES

26.     Lead Plaintiff **Plumbers & Pipefitters National Pension Fund** engaged in the transactions listed in the accompanying certification during the Class Period and was injured as a result of Defendants' false and misleading statements and omissions. Lead Plaintiff is a multi-employer plan that provides benefits to more than 150,000 participants associated with more than 4,600 employers. Lead Plaintiff's primary place of business is 103 Oronoco Street, Alexandria, Virginia 22314.

27.     Bankrupt Non-Defendant **Performance Sports Group Ltd.** ("PSG") is a designer, developer and manufacturer of sports equipment and related apparel. PSG stock traded in an efficient market on the NYSE during the Class Period.  Currently, in connection with PSG's bankruptcy, the Company's stock has been delisted from the NYSE and now trades on the OTC market. PSG headquarters are located at 100 Domain Drive, Exeter, New Hampshire 03833. PSG is liable under the Exchange Act, but is not named as a Defendant herein because on October 31, 2016, PSG petitioned for bankruptcy protection pursuant to Chapter 11 of the U.S. Bankruptcy Code which prohibits the commencement or continuation of an action against a debtor that was or could have been commenced before the commencement of the bankruptcy proceeding. *See* 11 U.S.C. § 362(a)(1). As stated above, Lead Plaintiff reserves the right to name PSG (or any of the other Debtors, as the circumstances may require) as a defendant in this or any other action in the future in the event the Automatic Stay is terminated, lifted, or modified.

28.     During all relevant times, non-debtor defendant **Kevin Davis** ("Davis") served as President, CEO and a director of PSG. Davis was a signatory on each of the Company's publicly

filed documents during the Class Period and was directly responsible for overseeing the revenue recognition policies and progressive sales structure of PSG's business.

29.     From the start of the Class Period through December 14, 2015, non-debtor defendant **Amir Rosenthal** ("Rosenthal") served as CFO and Executive Vice President ("EVP") of Finance and Administration of PSG. On May 28, 2015, Rosenthal was appointed to a newly created position of President, PSG Brands in which he became responsible for overseeing PSG's seven-brand portfolio, including Bauer, Mission, Maverik, Cascade, Inaria, Combat and Easton. Following his appointment as President, PSG Brands, Rosenthal retained the day-to-day responsibilities of CFO, including serving as a signatory on all of PSG's public filings, until December 14, 2015. Rosenthal, as CFO and EVP of Finance, was directly responsible for PSG's sales and revenue oversight and its credit procedures. On October 31, 2016, PSG announced Rosenthal's departure from the Company.

30.     From December 14, 2015 through the present, non-party Mark Vendetti ("Vendetti") has served as CFO of PSG, taking over the duties from Defendant Rosenthal.

31.     Defendants Davis and Rosenthal are collectively referred to as the "Defendants."

32.     Because of the Defendants' positions with the Company, they had access to the adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

33.     It is appropriate to treat the Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other public statements as alleged herein are the collective actions of the narrowly defined group of defendants defined above as the Defendants. Each of the Defendants, as officers of PSG, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements and financial condition, as alleged herein. Davis and Rosenthal were both involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware or recklessly disregarded that false and misleading statements were being issued regarding the Company and approved or ratified these statements, in violation of the federal securities laws.

34.     As officers and controlling persons of a publicly held company whose common stock was and is registered with the SEC pursuant to the Exchange Act, and was traded on the NYSE during the Class Period and is governed by the provisions of the federal securities laws, Defendants Davis and Rosenthal each had a duty to disseminate prompt, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded common stock would be based on truthful and accurate information. Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

35.     Defendants participated in the drafting, preparation and/or approval of the various public, shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with PSG, Davis and Rosenthal had access to the adverse undisclosed information about PSG's sales, financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about PSG and its business issued or adopted by the Company materially false and misleading.

36.     Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Davis and Rosenthal were each provided with copies of the documents alleged herein to be misleading, including the Company's quarterly and annual filings and the prepared remarks for each of the Company's quarterly earnings conference calls prior to or shortly after their issuance and had the ability or opportunity to prevent their issuance or cause them to be corrected. Accordingly, Defendants are responsible for the accuracy of the public reports and releases detailed herein and are therefore primarily liable for the representations contained therein.

37.     Each of the Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of PSG common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme (i) deceived the investing public regarding PSG's business operations and financial health, namely the strength of its revenue figures and the accuracy of its yearly outlook;

(ii) enabled PSG to report purportedly "record" sales and demand growth before and during the Class Period; and (iii) caused Lead Plaintiff and other members of the Class to purchase PSG common stock at artificially inflated and/or maintained prices.

## IV.    SUBSTANTIVE ALLEGATIONS

38.    The sources for Lead Plaintiff's allegations regarding PSG's and Defendants' fraudulent conduct were derived from the investigation of counsel, which includes, among other things, an interview of W. Graeme Roustan ("Roustan"), the former Chairman of Bauer until 2008 and a current shareholder of PSG; review of statements made by Ronald Rugal, president of B&R Sports, a Bauer retailer, published in an article in the *New Hampshire Business Review*; and interviews of former PSG employees who worked at PSG during the Class Period and/or immediately before or after the Class Period and current and former customers of PSG with first-hand knowledge of PSG's sales tactics, including the following:

- **CW1** was a sales representative and independent contractor at Bauer for 29 years until his contract was not renewed on February 1, 2016. CW1 reported to regional sales manager Matt Hayes ("Hayes") who reported to Paul Healey ("Healey"), Bauer's Vice President of Sales, North America. CW1 also reported to Bryan McDermott ("McDermott"), Bauer's Business Director for North America.

- **CW2** is the store manager of a Bauer retail customer located in Summit, New Jersey. CW2's store has purchased products from Bauer since the early 1990's.

- **CW3** is the co-owner of a Bauer retail customer based in Salem, New Hampshire. CW3's company has six additional locations in Massachusetts and New Hampshire.

- **CW4** is a franchise owner of an Easton Baseball/Softball retail customer based in Milwaukee, Wisconsin.

14

A.      **PSG's Growth and Progressive Sales Program**

39.      PSG is a leading developer and manufacturer of ice hockey, roller hockey, lacrosse, baseball and softball sports equipment, as well as related apparel and soccer apparel. According to its own website, the Company considers itself "the global leader in hockey with the strongest and most recognized brand" that "holds the No. 1 North American position in baseball and softball." PSG markets its products under several brand names, including Bauer, Cascade and Easton. The Company's brand names are distributed by sales representatives and independent distributors throughout the world to all types of retailers, from "big-box" retailers like Dicks Sporting Goods to "mom and pop" stores.

40.      PSG brands also use business-to-business portals on their websites that allow retailers to submit orders directly without the use of a PSG-affiliated sales representative.

41.      In general, PSG sales personnel, who worked as either employees or independent contractors, would make initial sales to retailers. Once a sales order was sent to headquarters, the Company's credit department would review the terms of the sale and the credit-worthiness of the customer. PSG was driven by the bottom line and pushed its sales staff to increase its numbers without regard to market demand or customer sentiment.

42.      According to CW1, during his time at PSG, including during the Class Period, the Company employed a progressive sales program designed by PSG executives that was intended to reward and encourage retail customers, regardless of their size. The program was designed and implemented by Healey, the head of PSG's Bauer North American Sales group, together with Defendants and other executives. Sales representatives were not involved in the design of the program. The program was simple; the greater the volume of equipment purchased, the greater the discount.

15

43.    As the Company described it, PSG offered "various cooperative marketing incentive programs to assist our sales channels with the marketing and selling of our products..." 2015 Form 10-K, dated June 14, 2015, at 51.

44.    But under Davis and Rosenthal, PSG's cooperative marketing incentive programs were anything but cooperative incentive programs. Rather, using strong-arm tactics and penalties, PSG threatened customers with the loss of their discounts if they did not increase the size of their orders each year or if they did not agree to accept merchandise shipment early.

45.    As a result of its incentive programs and the acquisitions of market competitors, PSG experienced substantial success from 2010 through 2014, recording positive growth in all relevant areas.

| (in USD Millions) | **2010** | **2011** | **2012** | **2013** | **2014** |
|---|---|---|---|---|---|
| **Net Revenue** | 257.4 | 306.1 | 374.8 | 399.6 | 446.2 |
| **Adjusted EBITDA** | 30.7 | 43.5 | 51.5 | 62.3 | 69 |
| **Gross Profit** | 89.1 | 119.1 | 142.6 | 147.2 | 154.3 |
| Source: PSG Annual Reports 2010-2014. | | | | | |

46.    On April 15, 2014, PSG completed its acquisition of Easton Baseball/Softball from BRG Sports for $330 million. The acquisition, according to the Company, added the number one brand of baseball and softball equipment and apparel to the PSG portfolio.

47.    Shortly thereafter, on June 19, 2014, PSG filed its Amended Registration Statement on Form F-10/A with the SEC. The following day, PSG filed its final Prospectus Supplement for its initial public offering with the SEC.

48.    On June 20, 2014, the Company issued its initial public offering in the United States, offering more than 7 million shares of PSG stock at $15.50 per share.  Thereafter, PSG's stock traded on the NYSE.

16

49.     On January 8, 2015, just prior to the start of the Class Period, PSG announced that it was changing its heretofore successful business strategy to put itself into direct competition with its customers by opening Bauer "Own the Moment" retail locations in 6-8 "key hockey markets" over the next 18-24 months. PSG's press release stated:

**Bauer Hockey to Open First-Ever Retail Experiences**
*'Own The Moment' Consumer Experiences to Debut in Boston and Minneapolis;*
*20,000-Plus Square Foot Premium Stores To Offer Unmatched Fit Expertise and*
*Product Education*

**EXETER, NH** - January 8, 2015 - Bauer Hockey, the world's leading manufacturer of ice hockey equipment and a subsidiary of Performance Sports Group Ltd. (NYSE:PSG) (TSX:PSG), announced today that it will open its first-ever Bauer Hockey retail experiences beginning this summer. A transformative and historic initiative for Bauer Hockey, the premium "Own the Moment" retail experiences will elevate the BAUER brand, deliver an unmatched consumer educational experience and serve as the ultimate BAUER brand and product showcase.

"We've been elevating player performance at every level of the game since 1927, and today we're excited to take this innovation to new heights by giving consumers an in-store BAUER experience that they've never seen before in the industry," said Rich Wuerthele, executive vice president, hockey. "Similar to other premium brands that have entered retail, offering the full depth and breadth of our products in one place allows us to tell our unique stories in a way that only we can and helps strengthen the surrounding hockey retail environment. The Bauer Hockey 'Own The Moment' retail experiences will be living representations of our brand."

Bauer Hockey will open its first "Own The Moment" retail experience in the Boston suburb of Burlington, Mass., in late summer and its second location in the Minneapolis area in the fall. Future phases are currently expected to include the opening of an additional 6-8 BAUER retail experiences over the next several years in key hockey markets across the U.S. and Canada. The company expects its retail operations to grow its overall business and be profitable in the next 18-24 months.

50.     PSG customers immediately made their displeasure with this decision known to PSG's senior management. CW3 met in person with Healey, the head of PSG's Bauer North American Sales group, to express his disagreement with PSG's decision to compete with its

customers while at the same time, pushing customers to increase their orders significantly every year.

51.     Roustan, as further detailed below, also made his concerns known to PSG's Board of Directors at a meeting in June 2015 in which he pleaded with the Board of Directors, including Defendant Davis, to "reverse [its] Bauer retail store strategy" but was ultimately "unable to convince them that retail partners would likely react negatively to the abrupt change in business strategy and reduce their purchase of Bauer, Easton and Cascade products."

52.      In PSG's and Defendants' quest to keep the Company's purportedly "record-setting" growth going, and notwithstanding that demand for PSG products with the Company's retailers would likely ultimately drop as a result of the business decision to compete with them, PSG nevertheless continued to push its sales representatives to pressure retail customers to order larger and larger quantities of PSG-branded merchandise and to do so earlier and earlier in advance or be penalized if they did not. As CW2 recalled, there was strong pressure to go along with PSG's and Defendants' tactics if you wanted to sell Bauer's merchandise.

53.     CW2 remembers being told frequently by Bauer representatives to either increase the size of orders or risk losing the store's wholesale discount. This same "threat" was made to CW3, who, in a meeting with Healey in the summer of 2015, was told that if CW3's store did not increase its retail bookings or purchase orders by at least 15%, CW3's store would lose its existing discount. CW2 knew that even if increasing the store's order was not necessary, it was cheaper to comply than lose the discount on the existing order.

54.     As CW1 put it, "we were 'asked' through sales programs to ask [retail customers] for increased volume from the previous year to maintain current or increased discounts. Dealers

complained about the increase due to larger dealer shelf space already given to Bauer and the fact the dealer's business wasn't growing."

55.    However, PSG and Defendants disregarded these complaints, and pushed ahead throughout the Class Period with the Company's highly aggressive and bullying sales tactics.

56.    Further compounding the issues caused by PSG's increasingly coercive progressive sales program, CW1 recalls instances where he was asked to work with retailers to accept early deliveries. For instance, if a product was scheduled to ship to a retailer in September, PSG would ask the retailer to accept the product in early August.

57.    CW3 also remembers regularly receiving calls during the Class Period from PSG headquarters asking whether CW3 would accept shipments of orders early. CW3 stated that orders were shipped early "to make [PSG's] numbers in a certain quarter."

58.    This was confirmed by Ronald Rugal, president of B&R Sports, a PSG customer based in Detroit with 12 locations in Michigan and greater Chicago, in an interview with *New Hampshire Business Review* regarding PSG's present troubles with what the publication described as "charges of fraud, delayed financial filings, internal and federal investigations in two countries, management turmoil – including Davis' resignation in March – and a stock price that is just one-tenth of what it was at its peak."   Bob Sanders, *Questions Abound Over Performance Sports Group*, NEW HAMPSHIRE BUSINESS REVIEW, Sept. 1, 2016, http://www.nhbr.com/September-2-2016/Questions-abound-over-Performance-Sports-Group/.

59.    Like CW3, Rugal described PSG's practice during the Class Period of "try[ing] to jam orders down our throat, to take orders early, to overstock, oversupply, over-inventory us. They said it would all work out, and then things hit a wall." Rugal, too, stated that this was done to meet quarterly numbers. *Id.*

60. Things were no different for PSG's baseball/softball brand, Easton. As CW4, an Easton retail customer during the Class Period, recalls, CW4 agreed to accept early shipment of a large order in return for free shipping.

61. At one point, in October or November 2015, CW4 attempted to contact CW4's Easton representative to downsize a large baseball equipment order that was placed for 2016. However, the Easton representative ignored CW4's request, and instead the full order was delivered more than two months early.

62. Before the Class Period in or around 2013, according to CW3, executive vice president Edward Kinnaly challenged the Company's executive leadership, including Healy, Davis and Rosenthal, about the Company's sales and booking practices at a meeting of PSG's Board of Directors. As CW3 recalls, Kinnaly warned those in attendance, including Davis, who was a director of PSG at the time, that pulling orders forward or "trade loading" in order to make their numbers would eventually catch up with PSG. Soon after that Board of Directors meeting, according to CW3, Kinnaly was fired from PSG as a consequence of speaking out.

63. But not only did PSG coerce its retailers to order larger quantities or else incur penalties if they did not increase bookings by, for instance, 10 or 15%, it also demanded that stores place their orders earlier and earlier, as CW2 recalls. In recent years, including during the Class Period, Bauer insisted that CW2 place the store's order a full year early which was extremely difficult and unrealistic because CW2 would not know what degree of demand the product would have that far in advance.

64. CW3 corroborated this sales tactic. CW3 had to place the store's order whenever Bauer told him to, even if it was a year early. If CW3's shelves were already fully stocked, it was

Case 1:16-cv-03591-GHW   Document 86   Filed 11/03/16   Page 23 of 73

impossible to forecast what would be needed the next year, but PSG did not care, according to CW3 – it just needed the order.

65.     When product was pushed to retailers prior to its scheduled shipping date, retailers did not have to pay or initiate any scheduled payment plan until the agreed-upon payment date, as both CW3 and CW4 recalled.

66.     As CW3, an experienced veteran hockey-equipment retailer recounted, Healey and Defendant Davis both knew that the hockey equipment market was fully saturated during the Class Period.

67.     Also, according to statistics published by USA Hockey, player membership grew by less than 2% during the Class Period,[7] yet PSG insisted that their retailers increase orders by 10-15% or more every year.

68.     However, none of these coercive and aggressive tactics, which Defendants and PSG knew of and condoned, were ever disclosed to the market, nor was the reasonably likely impact of these tactics on long-term revenue earnings per share ever disclosed. In reality, due to PSG's sales practices and the material volume of early shipments (the degree of which was confirmed by CW1, CW2, CW3, and CW4, and Roustan's surveys described below), Defendants knew that PSG's sales figures, on the back of these tactics, were unsustainable.

**B.      PSG Customers Tell PSG's Former Chairman About PSG's Practice of Moving Orders to Earlier Periods**

69.     Further corroborating the CWs' accounts, during the Class Period in mid-2015, Roustan, the Company's Chairman prior to Defendant Davis' appointment as CEO, hired Grant Thornton to conduct a survey of PSG's 10 largest customers in the U.S. and Canada, which

---

[7] According to USA Hockey, player membership in 2014-2015 was 533,172.  In 2015-2016, that figure grew by just 9,411, or 1.7%, to 542,583.  In fact, between the 2012-2013 and 2013-2014 seasons, the number of hockey players had actually decreased by 899 players.

21

represented 50-55% of PSG's business (the "GT Survey"). The GT Survey was intended to be disclosed to PSG's board and its shareholders.

70.     The GT Survey asked, among other questions, about PSG's accounting practices and whether anyone, in the past two years at PSG, had asked the customers to move an order into an earlier quarter. According to Roustan, a majority of the surveyed customers responded "yes."

71.     Furthermore, after the Company tried to block or delay Grant Thornton from disclosing the results of that survey to Roustan himself, Roustan conducted his own survey of the same customers on the survey website SurveyMonkey.com (the "SurveyMonkey Survey").

72.     The SurveyMonkey Survey polled the same customers and asked the same questions. Again, a majority of the surveyed customers responded that they had been asked by PSG to move an order into an earlier quarter.

## C.     PSG Touts Revenue Growth and Strong Sales Performance

73.     Instead of disclosing this ongoing scheme at any time during the Class Period, PSG and Defendants continued to tout the Company's record growth based on "strong performance" and "organic sales growth."

74.     In general, "organic growth," as used in the corporate and investment context, refers to a company's growth based on increased outputs, customer base expansion, or new product development, as opposed to mergers and acquisitions, which are generally referred to as inorganic growth. However, a company's organic growth does not, and should not, include growth that results from fraudulent or aggressive sales practices aimed at boosting a company's earnings. Such earnings are transitory and not sustainable. As a result, earnings from PSG's fraudulent sales practices should not have been considered part of, or a contributing factor of, the Company's core earnings and purportedly "organic" growth.

75.    As explained in Hess and Kazanjian's "*A Search for Organic Growth*:"

The interest and focus on organic growth in a meaningful way is a recent phenomenon, which grew out of the financial scandals of the late 1990s and early years of the following decade. What the public learned from these scandals was that (1) there are different types of earnings; (2) companies can create earnings in different ways; (3) earnings can be created by accounting recognition, accounting policies, accounting adjustments, accounting elections, and valuations; (4) *earnings can be created by financially engineered transactions, pension fund gains, related party transactions, currency gains, cookie jar reserves, classification of investment transactions, channel stuffing, etc.; (5) earnings management is more widespread than many thought; and (6) yes, earnings management can turn into earnings manipulation.*

\*      \*      \*

Historically, the definition of organic growth has not been the focus of academic or financial analysts. Academic researchers looked at increase in revenues or increase in head-count as evidence of growth. Organic growth was defined as the opposite of acquisitive growth. Almost all academic research counted or evaluated every cent of earnings equally. Academic research into corporate growth has generally focused on absolute sales growth or relative employment growth. Some have looked at market share, assets, and profits…. *I respectfully submit that all earnings are not equal if you are trying to evaluate the strength, sustainability, and predictability of a business's core operations and processes.*

Edward Hess and Robert Kazanjian, A SEARCH FOR ORGANIC GROWTH, Cambridge University Press, 103-04 (2006) (emphasis added.)

76.    Hess and Kazanjian also described the creation of an Organic Growth Index as a method to measure a company's organic growth, stating:

First, we wanted to expand the definition of growth to include not only sales growth but also growth in cash flow from operations (CFFO) because we thought it was harder to manipulate CFFO than sales volume. Secondly, we wanted a way to normalize results across industries, which negated industry bias in growth numbers. *Thirdly, we wanted to include an accounting "shenanigans" test to highlight potential income manipulations and, lastly, we wanted to add a merger and acquisition test to discriminate between serial acquirers who repeatedly or significantly purchased revenues from those companies who grew internally or organically.*

\*      \*      \*

The Organic Growth Index is explained in Table 7.1, while on the basis of our model, Table 7.2 lists the best organic growers in the period 1997-2002 using EVA adjusted by size, sales, and cash flow growth as compared to industry averages and as normalized by industry standard deviations. *On a relative basis,*

23

*these companies did not produce material financial results from non-core earnings, accounting manipulations, aggressive revenue recognition, or serial acquisitions. These companies outperformed their industry competition primarily by growing their businesses organically*.

*Id.*, at 105-06 (emphasis added).

77.     Thus, reasonable investors could not have known, and could not have reasonably expected, that PSG's "organic" growth included growth resulting from manipulative, aggressive, and unsustainable sales tactics.

78.     In any event, on January 14, 2015, PSG published a news release entitled "Performance Sports Group Reports Record Fiscal Second Quarter 2015" in which PSG reported "record" revenues and increases in Adjusted Gross Profit and Net Income.

79.     The following day, on January 15, 2015, during PSG's Q2 2015 earnings conference call, CEO Davis stated, "*We experienced another record quarter for PSG, and our Q2 results were driven by the continued strong performance of the EASTON baseball/softball business and another quarter of more than 10% organic sales growth; significant adjusted gross margin expansion due to the addition of EASTON's product in Q2;* and record adjusted EPS, even in the face of significant and increasing currency headwinds." Q2 2015 PSG Earnings Call Transcript, at 3, Thomson Reuters StreetEvents (January 15, 2015) (emphasis added).

80.     During the same call, CFO Rosenthal explained that "[r]evenues in the second quarter of FY15 increased 47% to $172.3 million compared to the same year ago period, or 51% without the impact of changes in foreign currencies."

81.     PSG's and Defendants' January 2015 public statements were false and misleading because they omitted and failed to disclose that PSG's "record" revenues were the result of PSG's aggressive sales tactics that forced inventory on its retailers in excess and in advance of

retailers' demand, which inflated PSG's earlier quarterly sales and revenue such that it would leave the Company with weaker sales in later quarters.

82.    In particular, as discussed in paragraphs 38 to 72, PSG maintained a practice of (a) pulling orders from later quarters into earlier quarters, as confirmed by Roustan's surveys and Rugal's statements to the *New Hampshire Business Review*; (b) asking customers to accept product before the scheduled ship date, as recalled by CW1, CW3, CW4 and Rugal; (c) penalizing customers by withdrawing their existing discounts if they did not increase the size of their orders in a market that could not sustain such increases; and (d) terminating employees who objected to these aggressive sales tactics, as CW3 remembers.

83.    PSG and Defendants knew or recklessly disregarded the true facts known at the time regarding PSG's alleged "record" revenues because, *inter alia*, (a) CW3 met with Healey, the Company's head of North American Sales for Bauer, who told CW3 that CW3's store had to increase its sales by 15% or risk losing its discounts; (b) CW1 attended yearly sales meetings which Rosenthal attended where sales practices were openly discussed; (c) Davis attended PSG's Board of Directors meetings, as CEO and a PSG director, in 2013 when, according to CW3, Kinnaly told PSG's Board of Directors that the Company's practice of pulling orders forward to make its numbers would catch up with the Company, and was fired shortly thereafter for voicing his views; (d) Roustan had told Defendant Davis and several of PSG's directors at a June 2015 meeting that demand among the Company's retail customers would fall as a result of its decision to open "Own the Moment" stores and compete directly with its customers; and (e) hockey and baseball/softball merchandise sales represented the majority of PSG's revenues and was thus the core of PSG's business.

84.    After the market closed on April 13, 2015, the Company and Defendants issued a

press release entitled, "Performance Sports Group Reports Record Fiscal Third Quarter 2015 Results." The press release detailed PSG's financial position for the third quarter of its fiscal 2015 including record revenues and increases in Adjusted Gross Profit and Net Income.

85.    The following day, on April 14, 2015, PSG filed its Report of Foreign Private Issuer on Form 6-K, attaching PSG's "Management's Discussion and Analysis of Financial Condition and Results of Operations for the three and nine month periods ended February 28, 2015" ("Q3 2015 6-K"). The Q3 2015 6-K repeated the financial results set forth in PSG's Q3 2015 press release. The Q3 2015 6-K further stated:

> **Fiscal Q3 2015 Financial Results**
> Revenues in the fiscal third quarter of 2015 increased 121% to $137.7 million compared to $62.2 million in the same year-ago quarter. On a constant currency basis, revenues were up 127%. The increase was primarily due to the addition of revenues generated by EASTON and solid growth in ice hockey equipment, partially offset by an unfavorable impact from foreign exchange. Excluding the results of EASTON, as well as the impact from foreign exchange, revenues grew organically by 16%.

Q3 2015 6-K, at 3.

86.    On that same day, during PSG's Q3 2015 earnings conference call, CEO Davis again attributed PSG's record success to its strong performance and organic sales that were in reality based on fraudulent and aggressive sales practices that do not properly constitute "organic growth," explaining:

> *We reported another record quarter due to the continued strong performance of Easton, the fifth consecutive quarter of double-digit hockey growth, and an overall 16% organic sales growth net of currency changes.*
>
> *Easton continued to experience solid demand for its products, and our hockey business, which grew 16% on a constant currency basis, benefited from the highly successful launch of our Vapor 1X stick, underscoring our well-defined strategy to grow our stick business, the largest hockey category.* In fact, our stick category grew 92% in constant currency during the quarter and is up 26% year-to-date. Our hockey business also benefited from strong team apparel growth.

> So far in 2015, we experienced an earlier loading of new products, particularly the Mako and Mako Torq bats, for some of our large retailers, resulting in a shift in demand from the third and fourth fiscal quarters of 2015 into the second and third quarters. As a result, we believe Easton will generate its highest sales volume in FY15 during the second and third quarters versus the third and fourth quarters historically, with Q3 being the most significant.

Q3 2015 PSG Earnings Call Transcript, at 2, Fair Disclosure Wire (April 14, 2015) (emphasis added).

87.     However, PSG's and Defendant Davis' April 2015 public statements were false and misleading because they failed to disclose that PSG's "record" revenues were the result of aggressive sales practices and manipulation designed to inflate PSG's stock price by portraying the Company's quarterly revenue and quarterly sales figures as sustainable and "organic" even though the Company knew, or recklessly disregarded, the truth that PSG would soon be faced with a lack of sales in later quarters as the Company ran out of transactions to pull forward.

88.     In fact, PSG's and Defendant Davis' April 2015 statements attributed the Company's "shift in demand" to market forces beyond its control. In reality, this "shift in demand" was the result of an explicit effort by PSG, with the express consent and knowledge of Davis and Rosenthal, to coerce PSG customers into accepting its products earlier shifting revenue to earlier quarters and penalizing retail customers that did not increase their equipment orders without regard to market demand.

89.     In particular, as discussed in paragraphs 38 to 72, PSG and Defendants maintained a practice of (a) pulling orders from later quarters into earlier quarters, as confirmed by Roustan's surveys and Rugal's statements to the *New Hampshire Business Review*; (b) asking customers to accept product before the scheduled ship date, as recalled by CW1, CW3, CW4, and Rugal; (c) penalizing customers by withdrawing their existing discounts if they did not

27

increase the size of their orders in a market that could not sustain such increases; and (d) terminating employees who objected to these aggressive sales tactics, as CW3 remembers.

90.     PSG and the Defendants knew or recklessly disregarded the true facts known at the time regarding the Company's alleged "record" revenues because, *inter alia*, (a) CW3 met with Healey, the Company's head of North American Sales for Bauer, who told CW3 that CW3's store had to increase its sales by 15% or risk losing its discounts; (b) CW1 attended yearly sales meetings which Rosenthal attended where sales practices were openly discussed; (c) Davis attended PSG's Board of Directors meetings, as CEO and a PSG director, in 2013 when, according to CW3, Kinnaly told PSG's Board of Directors that the Company's practice of pulling orders forward to make its numbers would catch up with the Company, and was fired shortly thereafter for voicing his views; (d) Roustan had told Defendant Davis and several of PSG's directors at a June 2015 meeting that demand among the Company's retail customers would fall as a result of the Company's decision to open "Own the Moment" stores and compete directly with its customers; and (e) hockey and baseball/softball merchandise sales represented the majority of PSG's revenues and was thus the core of PSG's business.

91.     Then, after the market closed on July 7, 2015, the Company issued a press release entitled, "Performance Sports Group Provides Preliminary Fiscal Fourth Quarter and Full Year 2015 Results." The press release detailed PSG's preliminary financial position for the fourth quarter of its fiscal 2015.

92.     The following day, on July 8, 2015, the Company again held a conference call with analysts regarding its fourth quarter and full year 2015 financial results. During the conference call, Davis explained:

> As stated in our release last night our anticipated fourth-quarter and full-year
> revenue results are record-setting and expected to contribute to another fantastic

year for PSG delivering record returns for shareholders.

***The key components of this message is that we continue to outpace the growth of the markets in which we participate by growing market share and profitability and we continue to leverage our Performance Sports platform which is improving efficiency and driving constant dollar currency profit growth rates that exceed our revenue growth. While the rapid strengthening of the US dollar will continue to impact our reported results, especially in the first half of 2016, we remain very well-positioned to continue our momentum into 2016 and beyond.***

Preliminary Q4 2015 PSG Earnings Call Transcript, at 3, Thomson Reuters StreetEvents (July 8, 2015) (emphasis added).

93.     Again, PSG and Davis' public statements explicitly omitted any impact that the Company's sales practices had or would be reasonably likely to have on its quarterly and yearly sales figures and financial data. In fact, the "outpaced" growth of PSG was not the result of "growing market share" or "leverag[ing the Company's] Performance Sports platform" but was instead the result of a scheme to coerce its customers to purchase more and more product through the use of penalties and discounts and to accept the shipment of products earlier and earlier so that PSG could move revenue intended for later quarters into earlier quarters in order to claim "record revenues."

94.     In particular, as discussed in paragraphs 38 to 72, PSG and Defendants maintained a practice of (a) pulling orders from later quarters into earlier quarters, as confirmed by Roustan's surveys and Rugal's statements to the *New Hampshire Business Review*; (b) asking customers to accept product before the scheduled ship date, as recalled by CW1, CW3, CW4, and Rugal; (c) penalizing customers by withdrawing their existing discounts if they did not increase the size of their orders in a market that could not sustain such increases; and (d) terminating employees who objected to these aggressive sales tactics, as CW3 remembers.

95.     Defendants and the Company knew or recklessly disregarded the true facts known

29

at the time regarding PSG's alleged "record" revenues because, *inter alia*, (a) CW3 met with Healey, the Company's head of North American Sales for Bauer, who told CW3 that CW3's store had to increase its sales by 15% or risk losing its discounts; (b) CW1 attended yearly sales meetings which Rosenthal attended where sales practices were openly discussed; (c) Davis attended PSG's Board of Directors meetings, as CEO and a PSG director, in 2013 when, according to CW3, Kinnaly told PSG's Board of Directors that the Company's practice of pulling orders forward to make its numbers would catch up with the Company, and was fired shortly thereafter for voicing his views; (d) Roustan had told Defendant Davis and several of PSG's directors at a June 2015 meeting that demand among the Company's retail customers would fall as a result of its decision to open "Own the Moment" stores and compete directly with its customers; and (e) hockey and baseball/softball merchandise sales represented the majority of PSG's revenues and was thus the core of PSG's business.

96.     Continuing this trend, after the market closed on August 26, 2015, the Company issued a press release announcing its fourth quarter and full year 2015 financial results, which it again described as "record setting" ("August 26 Press Release").

97.     Explaining the "record setting" figures, the Management Commentary stated:

"Our fourth quarter and full year revenue results were record-setting and contributed to market share gains in all of the sports we serve," said Kevin Davis, CEO of Performance Sports Group. "In fact, currency neutral hockey revenues grew 13% for the year, improving our estimated global equipment market share from 54% to 56%. Our Maverik Lacrosse revenues grew 28% in fiscal 2015, improving our estimated total equipment market share from 26% to 28%. Our baseball business, led by EASTON, had a record-setting year driven by solid demand for the MAKO family of products."

***"These results reinforce that the fundamental building blocks of our shareholder value are continuing to perform quite strongly. Our Company continues to outpace the growth of the markets in which we participate by growing market share and profitability. We also continue to leverage our performance sports platform, which is driving cost efficiencies and, on a***

*currency neutral basis, profit growth rates that exceed our revenue growth. We remain very well positioned to continue our momentum into fiscal 2016 and beyond."*

98.    PSG and Defendant Davis' statement in the August 26 Press Release were false and misleading because they omitted and failed to disclose that the Company's "record-setting" financial results were the result of an aggressive sales program whereby PSG was (a) pulling orders from later quarters into earlier quarters, as confirmed by Roustan's surveys and Rugal's statements to the *New Hampshire Business Review*; (b) asking customers to accept product before the scheduled ship date, as recalled by CW1, CW3, CW4, and Rugal; (c) penalizing customers by withdrawing their existing discounts if they did not increase the size of their orders in a market that could not sustain such increases; and (d) terminating employees who objected to these aggressive sales tactics, as CW3 remembers.

99.    Defendants and the Company knew or recklessly disregarded the true facts known at the time regarding PSG's alleged "record" revenues because, *inter alia*, (a) CW3 met with Healey, the Company's head of North American Sales for Bauer, who told CW3 that CW3's store had to increase its sales by 15% or risk losing its discounts; (b) CW1 attended sales meetings which Rosenthal attended where sales practices were openly discussed; (c) Davis attended PSG's Board of Directors meetings, as CEO and a PSG director, in 2013 when, according to CW3, Kinnaly told PSG's Board of Directors that the Company's practice of pulling orders forward to make its numbers would catch up with the Company, and was fired shortly thereafter for voicing his views; (d) Roustan had told Defendant Davis and several of PSG's directors at a June 2015 meeting that demand among the Company's retail customers would fall as a result of its decision to open "Own the Moment" stores and compete directly with its customers; and (e) hockey and baseball/softball merchandise sales represented the majority of

31

PSG's revenues and was thus the core of PSG's business.

100.    In fact, Defendants and PSG knew, at the time that these statements were made, that the increasing sales figures were not the result of "growing market share" or "cost efficiencies" but instead the result of front-loaded revenues caused by PSG's scheme, with the Defendants' knowledge and consent, of coercing its customers to accept earlier shipments of merchandise so that PSG could include those sales in earlier quarters and penalizing retailers that did not order additional product from PSG brands without regard for market demand.

101.    The August 26 Press Release also provided guidance for the 2016 fiscal year ending May 31, 2016:

> The strengthening U.S. dollar continues to impact the reported results of companies with meaningful business outside the U.S. For our Company, the impact is experienced most particularly in our hockey business, which represents nearly all of our revenues generated outside of the U.S. At today's foreign exchange rates, we currently expect Adjusted Net Income in fiscal 2016 to fall in a range between $0.70 to $0.73 per share, primarily due to the impact of foreign exchange on our reported results in the first quarter. Absent the year-over-year impact of foreign exchange, we currently expect our Adjusted Net Income per share for fiscal 2016 to be roughly flat compared to the $1.02 per share reported in fiscal 2015.

102.    This statement from the August 26 Press Release reaffirming the Company's expectation that Adjusted Net Income would remain the same for fiscal year 2016 was further false and misleading because the Company knew and/or recklessly disregarded, at the time the statement was made, that its sales practices propping up earnings could not be maintained forever, but fraudulently failed to disclose this known trend to investors.

103.    In particular, as discussed in paragraphs 38 to 72, during the Class Period, PSG and Defendants maintained a practice of (a) pulling orders from later quarters into earlier quarters, as confirmed by Roustan's surveys and Rugal's statements to the *New Hampshire Business Review*; (b) asking customers to accept product before the scheduled ship date, as

recalled by CW1, CW3, CW4, and Rugal; (c) penalizing customers by withdrawing their existing discounts if they did not increase the size of their orders in a market that could not sustain such increases; and (d) terminating employees who objected to these aggressive sales tactics, as CW3 remembers.

104.    Defendants and PSG knew or recklessly disregarded the true facts known at the time regarding PSG's alleged "record" revenues because, *inter alia*, (a) CW3 met with Healey, the Company's head of North American Sales for Bauer, who told CW3 that CW3's store had to increase its sales by 15% or risk losing its discounts; (b) CW1 attended yearly sales meetings which Rosenthal attended where sales practices were openly discussed; (c) Davis attended PSG's Board of Directors meetings, as CEO and a PSG director, in 2013 when, according to CW3, Kinnaly told PSG's Board of Directors that the Company's practice of pulling orders forward to make its numbers would catch up with the Company, and was fired shortly thereafter for voicing his views; (d) Roustan had told Defendant Davis and several of PSG's directors at a June 2015 meeting that demand among the Company's retail customers would fall as a result of its decision to open "Own the Moment" stores and compete directly with its customers; and (e) hockey and baseball/softball merchandise sales represented the majority of PSG's revenues and was thus the core of PSG's business.

105.    Defendants and PSG knew or recklessly disregarded that it was reasonably likely that once customers stopped ordering PSG merchandise, such that there were no more orders that could be moved into earlier quarters, the Company's "record-setting" figures would quickly decline. As a result, the Company withheld from the market the truth that its sales and income in fiscal 2016 would fall by much larger amounts due to more than merely the impact of foreign exchange issues.

106.    The following day, on August 27, 2016, the Company filed its annual report on Form 10-K with the SEC for the fiscal year ending May 31, 2015 (the "2015 10-K"). The 2015 10-K reported PSG's financial highlights as follows:

- ***A 51% increase in revenues on a constant currency basis, generating $675.2 million in revenue in Fiscal 2015, compared to $446.2 million in Fiscal 2014;***
- ***Currency neutral Adjusted Net Income increased by 64.6%, to $61.4 million or $1.32 per diluted share, compared to $37.3 million, or $1.00 per diluted share in Fiscal 2014;***
- ***We continued to outpace the growth of the markets in which we participate by growing market share and profitability and we continue to leverage our performance sports platform, which is improving efficiency and driving constant currency profit growth that exceeds revenue growth;***
- We announced a supply chain initiative that we expect to improve pretax profitability of $30 million by Fiscal 2020;
- We announced a cash flow improvement initiative that is targeting an improvement in net cash flow from working capital of $30 million in Fiscal 2016;
- Our leading hockey market share strengthened, growing from 54% to 56%;
- On a constant currency basis, our total apparel sales grew approximately 36% for the year, driven by a 50% growth in team uniforms and a 50% growth in performance apparel;
- Easton Baseball/Softball continued its dominant share at the NCAA level as 17 EASTON teams competed in the NCAA College World Series;
- Maverik continued to gain momentum, signing High Point University and Penn State as college partners. Maverik sales also increased by approximately 28% for the year; and
- In January 2015, we announced our plans to open 810 Bauer Hockey Own The Moment Hockey Experience retail stores. The first location opened in Burlington, Massachusetts on August 15, 2015.

2015 10-K, at 50-51 (emphasis added).

107.    The 2015 10-K also continued to tout the Company's organic growth:

We have repeatedly used our world-class performance sports product platform to grow our business into new performance equipment and apparel categories and sports markets. Our successful acquisition and integration of seven businesses since 2008 has demonstrated our ability to identify targets and integrate acquired businesses. ***We are continuing to explore a number of potential near-term opportunities to complement our organic growth.*** When evaluating potential targets, we look for the ability to leverage our world-class performance sports platform, existing or potential market leaders, authentic brand equity and heritage and sports that demand high quality, innovative performance products. We are disciplined in our approach and have foregone many acquisition opportunities that

34

did not satisfy our criteria.

2015 10-K, at 20 (emphasis added).

108.   The statements above in the 2015 10-K touting PSG's "organic" and "outpaced" growth were false and misleading because they failed to disclose that PSG and Defendants were attaining these financial results as a result of the Company's aggressive and coercive sales practices pushing customers to accept merchandise deliveries earlier than needed so that PSG could count those sales in earlier quarters and penalizing customers by taking away vital discounts unless they increased their bookings with PSG. These practices, which Defendants knew were not sustainable, created a known trend that should have been disclosed pursuant to Regulation S-K. The statements were also false and misleading because they failed to disclose that the 2015 financial results were not the consequence of "organic" growth or the "leveraging" of PSG's brands, but instead the result of poor financial controls and a fraudulent scheme as described herein.

109.   In particular, as discussed in paragraphs 38 to 72, during the Class Period, PSG and Defendants maintained a practice of (a) pulling orders from later quarters into earlier quarters, as confirmed by Roustan's surveys and Rugal's statements to the *New Hampshire Business Review*; (b) asking customers to accept product before the scheduled ship date, as recalled by CW1, CW3, CW4, and Rugal; (c) penalizing customers by withdrawing their existing discounts if they did not increase the size of their orders in a market that could not sustain such increases; and (d) terminating employees who objected to these aggressive sales tactics, as CW3 remembers.

110.   Defendants and the Company knew or recklessly disregarded the true facts known at the time regarding PSG's alleged "record" revenues because, *inter alia*, (a) CW3 met with

Healey, the Company's head of North American Sales for Bauer, who told CW3 that CW3's

store had to increase its sales by 15% or risk losing its discounts; (b) CW1 attended yearly sales

meetings which Rosenthal attended where sales practices were openly discussed; (c) Davis

attended PSG's Board of Directors meetings, as CEO and a PSG director, in 2013 when,

according to CW3, Kinnaly told PSG's Board of Directors that the Company's practice of

pulling orders forward to make its numbers would catch up with the Company, and was fired

shortly thereafter for voicing his views; (d) Roustan had told Defendant Davis and several of

PSG's directors at a June 2015 meeting that demand among the Company's retail customers

would fall as a result of its decision to open "Own the Moment" stores and compete directly with

its customers; and (e) hockey and baseball/softball merchandise sales represented the majority of

PSG's revenues and was thus the core of PSG's business.

111.    The 2015 10-K was signed by Defendants Davis and Rosenthal. Attached to the

2015 10-K were SOX Certifications signed by Defendants Davis and Rosenthal attesting to the

accuracy of financial reporting and effectiveness of the Company's internal controls.

112.    Rosenthal's and Davis' certifications both stated, in relevant part, that:

I have reviewed this Annual Report on Form 10K of Performance Sports Group
Ltd. (the "registrant");

2. *Based on my knowledge, this report does not contain any untrue statement of
a material fact or omit to state a material fact necessary to make the statements
made, in light of the circumstances under which such statements were made,
not misleading with respect to the period covered by this report;*

3. Based on my knowledge, *the financial statements, and other financial
information included in this report, fairly present in all material respects the
financial condition, results of operations and cash flows of the registrant as of,
and for, the periods presented in this report;*

4. *The registrant's other certifying officer(s) and I are responsible for
establishing and maintaining disclosure controls and procedures* (as defined in

Exchange Act Rules 13a15(e) and 15d15(e) *and internal control over financial reporting* (as defined in Exchange Act Rules 13a15(f) and 15d15(f)) for the registrant and have:

> (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
>
> (b) *Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;*
>
> (c) *Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and*
>
> (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting;

2015 10-K, at Exs. 31.1, 31.2 (emphasis added).

113.   Defendant Davis' and Rosenthal's certifications were false and misleading because in reality, (a) the 2015 10-K failed to disclose that PSG's sales and revenue figures were based on manipulated sales that resulted from PSG's practice of coercing customers to accept merchandise shipments in earlier quarters and penalizing customers that did not continue to increase their orders each year by removing vital and necessary discounts and sales terms regardless of whether market demand could support such increases; and (b) PSG lacked proper internal controls to prevent the manipulation of its sales revenues from occurring.

114.    In particular, as discussed in paragraphs 38 to 72, during the Class Period, PSG maintained a practice of (a) pulling orders from later quarters into earlier quarters, as confirmed by Roustan's surveys and Rugal's statements to the *New Hampshire Business Review*; (b) asking customers to accept product before the scheduled ship date in order to prop up quarterly sales figures, as recalled by CW1, CW3, CW4, and Rugal; (c) penalizing customers by withdrawing their existing discounts if they did not increase the size of their orders in a market that could not sustain such increases; and (d) terminating employees who objected to these aggressive sales tactics, as CW3 remembers.

115.    Defendants and the Company knew or recklessly disregarded the true facts known at the time regarding PSG's alleged "record" revenues because, *inter alia*, (a) CW3 met with Healey, the Company's head of North American Sales for Bauer, who told CW3 that CW3's store had to increase its sales by 15% or risk losing its discounts; (b) CW1 attended yearly sales meetings which Rosenthal attended where sales practices were openly discussed; (c) Davis attended PSG's Board of Directors meetings, as CEO and a PSG director, in 2013 when, according to CW3, Kinnaly told PSG's Board of Directors that the Company's practice of pulling orders forward to make its numbers would catch up with the Company, and was fired shortly thereafter for voicing his views; (d) Roustan had told Defendant Davis and several of PSG's directors at a June 2015 meeting that demand among the Company's retail customers would fall as a result of its decision to open "Own the Moment" stores and compete directly with its customers; and (e) hockey and baseball/softball merchandise sales represented the majority of PSG's revenues and was thus the core of PSG's business.

116.    On October 14, 2015, PSG filed its financial results on Form 10-Q for the first quarter of the 2016 fiscal year ending August 31, 2015 ("Q1 2016 10-Q").

117.    Like the 2015 10-K, the Q1 2016 10-Q was accompanied by SOX Certifications signed by Defendants Davis and Rosenthal which represented that the information included therein was true and correct and that the Company's internal controls were effective, stating in part:

I have reviewed this quarterly report on Form 10-Q of Performance Sports Group Ltd. (the "registrant");

2. ***Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;***

3. Based on my knowledge, ***the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;***

4. ***The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures*** (as defined in Exchange Act Rules 13a15(e) and 15d15(e)) ***and internal control over financial reporting*** (as defined in Exchange Act Rules 13a15(f) and 15d15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) ***Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;***

(c) ***Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and***

39

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting;

Q1 2016 10-Q, at Exs. 31.1 and 32.2 (emphasis added).

118.    Defendant Davis' and Rosenthal's certifications were false and misleading because (a) the Q1 2016 10-Q failed to disclose that PSG's sales and revenue figures were based on manipulated sales that resulted from PSG's practice of coercing customers to accept merchandise shipments in earlier quarters and penalizing customers that did not continue to increase their orders each year by removing vital and necessary discounts and sales terms regardless of whether market demand could support such increases; and (b) PSG lacked proper internal controls to prevent the manipulation of its sales revenues from occurring.

119.    In particular, as discussed in paragraphs 38 to 72, during the Class Period, PSG and Defendants maintained a practice of (a) pulling orders from later quarters into earlier quarters, as confirmed by Roustan's surveys; (b) asking customers to accept product before the scheduled ship date, as recalled by CW1, CW3, CW4 and Rugal; (c) penalizing customers by withdrawing their existing discounts if they did not increase the size of their orders in a market that could not sustain such increases; and (d) terminating employees who objected to these aggressive sales tactics, as CW3 remembers.

120.    Defendants and PSG knew or recklessly disregarded the true facts known at the time regarding PSG's alleged "record" revenues because, *inter alia*, (a) CW3 met with Healey, the Company's head of North American Sales for Bauer, who told CW3 that CW3's store had to increase its sales by 15% or risk losing its discounts; (b) CW1 attended yearly sales meetings which Rosenthal attended where sales practices were openly discussed; (c) Davis attended PSG's

40

Board of Directors meetings, as CEO and a PSG director, in 2013 when, according to CW3, Kinnaly told PSG's Board of Directors that the Company's practice of pulling orders forward to make its numbers would catch up with the Company, and was fired shortly thereafter for voicing his views; (d) Roustan had told Defendant Davis and several of PSG's directors at a June 2015 meeting that demand among the Company's retail customers would fall as a result of its decision to open "Own the Moment" stores and compete directly with its customers; and (e) hockey and baseball/softball merchandise sales represented the majority of PSG's revenues and was thus the core of PSG's business.

121.    On the same day, the Company held a conference call to discuss PSG's first quarter 2016 financial results. On the conference call, Defendant Davis stated in relevant part:

> Despite the ongoing impact of currency on our year-over-year results and the timing of product launches that impact quarterly comparison, ***we continue to see solid growth across our brand,*** including continued market share gains in the recently completed back-to-hockey season, which runs from April to September.

Q1 2016 PSG Earnings Call Transcript, at 2, Seeking Alpha (October 15, 2015) (emphasis added).

122.    Then, during the same call, in response to an analyst's question regarding sales performance, Defendant Davis explained:

> There has been a little of consolidation in the U.S. hockey retail market over the past several months with two of the top three retailers in the U.S. hockey market making acquisitions of two other retailers who are in the top seven. To say it in another [way] the top seven are now the top five. I think also, there has been some remix of where our lacrosse product is being sold between specialty and mass retailers with [indiscernible] starting to take a little bit more share in the lacrosse base, as they dedicate more and more space to selling that product. ***But otherwise, we don't see any sort of decline in demand from consumers for those products.***

*Id*. at 5 (emphasis added).

123.    PSG' and Davis' representations that the Company was still seeing "solid growth" and that it was not affected by "decline in demand from consumers" but instead was the victim

of "a little [] consolidation" in the hockey market were false and misleading because the Company was losing demand and was no longer growing at the same rate, but Defendants concealed those facts by (a) pulling orders from later quarters into earlier quarters, as confirmed by Roustan's surveys; (b) asking customers to accept product before the scheduled ship date, as recalled by CW1, CW3, CW4 and Rugal; (c) penalizing customers by withdrawing their existing discounts if they did not increase the size of their orders in a market that could not sustain such increases; and (d) terminating employees who objected to these aggressive sales tactics, as CW3 remembers.

124.    Defendants and PSG knew or recklessly disregarded the true facts known at the time regarding PSG's alleged "record" revenues because, *inter alia*, (a) CW3 met with Healey, the Company's head of North American Sales for Bauer, who told CW3 that CW3's store had to increase its sales by 15% or risk losing its discounts; (b) CW1 attended yearly sales meetings which Rosenthal attended where sales practices were openly discussed; (c) Davis attended PSG's Board of Directors meetings, as CEO and a PSG director, in 2013 when, according to CW3, Kinnaly told PSG's Board of Directors that the Company's practice of pulling orders forward to make its numbers would catch up with the Company, and was fired shortly thereafter for voicing his views; (d) Roustan had told Defendant Davis and several of PSG's directors at a June 2015 meeting that demand among the Company's retail customers would fall as a result of its decision to open "Own the Moment" stores and compete directly with its customers; and (e) hockey and baseball/softball merchandise sales represented the majority of PSG's revenues and was thus the core of PSG's business.

      **D.**    **PSG Violated Item 303 of Regulation S-K**

125.    Item 303 of Regulation S-K, 17 C.F.R. 229.303, requires public companies, in

their Form 10-K filings, to:

> Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. ***If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments)***, the change in the relationship shall be disclosed.

Emphasis added.

126.   PSG, and its senior executives, Davis and Rosenthal, knew PSG's success was due, at least in part, to PSG's practice of pressuring customers to accept orders before they were needed and place orders earlier and earlier; and penalizing customers that did not increase their PSG bookings by removing existing discounts regardless of whether market demand could support such increases, thereby frontloading and propping up the Company's sales and revenue reported in its financial statements.

127.   PSG and the Defendants knew that the Company's sales practices were not sustainable and that they were reasonably likely to catch up with PSG, especially in light of the fact that its former Chairman (Roustan), an Executive Vice President (Kinnaly), and customers (including CW3) told PSG so in face-to-face meetings resulting in a significant drop in sales and revenue as PSG adjusted its financial outlook to accurately reflect true market demand.

128.   These trends and circumstances were known to PSG and Defendants at the time when PSG filed its Form 10-K during the Class Period which failed to disclose these known trends.

129.   As a result, Defendants caused PSG to violate Item 303 of Regulation S-K by failing to disclose this known trend and uncertainty to the marketplace.

E.      **PSG's Blind Aggression Catches Up with the Company**

130.    It was only a matter of time, however, before PSG's aggressive sales tactics would catch up to it and force the Company to disclose the truth about its sales practices. In fact, by the start of the 2016 calendar year, the risks concealed by PSG's and Defendants' fraudulent scheme were beginning to materialize.

131.    After the market closed on January 13, 2016, the Company issued a press release announcing its financial results for the quarter ended November 30, 2015 and giving an overview of the different segments of PSG's business. The press release also lowered the previously issued guidance for the fiscal year ending May 31, 2016. The press release stated in part:

**Performance Sports Group Reports Fiscal Second Quarter 2016 Results**
* * *
Given the continued weakening of the Canadian dollar since our last stated guidance, we are revising our fiscal 2016 guidance and now expect Adjusted Net Income to range between $0.66 and $0.69 per share. Additionally, we expect Adjusted EPS to range between $0.09 and $0.10 in our fiscal 2016 third quarter and between $0.31 and $0.33 in our fourth quarter. These expectations assume current foreign exchange rates hold in the remainder of our year. In fiscal 2016, we continue to expect that, on a currency-neutral basis, our businesses will outpace the growth of the markets we serve, resulting in revenue gains and increased profitability. Looking to fiscal 2017, at current rates, we expect our results during the first half of the year to be impacted by year-over-year declines in exchange rates, partially offset by the execution of our cost saving initiatives.
* * *
Baseball/Softball EBITDA in the second quarter decreased 31% (including and excluding the impact of foreign currency) to $7.9 million, which was largely driven by a bad debt write-off related to outstanding receivables for an internet baseball retailer that filed for bankruptcy reorganization, as well as the aforementioned product launch timing differences, EASTON product mix, and other SG&A investments in marketing and IT which were partially offset by a reduction in performance-based incentives.

132.    The following day, on January 14, 2016, the Company filed its financial results on Form 10-Q for the second quarter of 2016, ending November 30, 2015 ("Q2 2016 10-Q"). The Company's Q2 2016 10-Q disclosed, for the first time, declines in revenue, declines in gross

profit and declines in adjusted EBITDA.

- Revenues totaled $153.0 million, declining 11.2% (down 5.5% in constant currency)
- Adjusted Gross Profit was $50.6 million, declining 18.6% (down 2.1% in constant currency)
- Adjusted Gross Profit margin was 33.1%, down 300 basis points (up 130 basis points in constant currency)
- Gross profit was $45.7 million, declining 18.3% (down 0.5% in constant currency), and gross profit margin was 29.9%, down 260 basis points (up 160 basis points in constant currency)
- Adjusted EBITDA was $15.3 million, down 36.3% (down 2.1% in constant currency)
- Adjusted Net Income totaled $5.9 million or $0.13 per share, compared to $11.3 million or $0.24 per share (Adjusted Net Income of $11.8 million or $0.25 per share in constant currency)
- Net loss totaled $4.5 million or ($0.10) per share, compared to net income of $1.0 million or $0.02 per share (net loss of $0.5 million or ($0.01) per share in constant currency)

Q2 2016 10-Q, at 16.

133.    The Q2 2016 10-Q was accompanied by SOX Certifications signed by Defendant

Davis and CFO Vendetti, who was appointed as CFO one month earlier on December 14, 2015.

134.    That same day, PSG held a conference call with industry analysts to discuss its

Q2 2016 results. Defendant Davis, speaking first, explained:

In the second quarter, our brands continued to take market share, and demonstrated strong resilience in some very challenging markets. During the quarter, Bauer continued to hold the number one market share, and its brand affinity remains very strong. Our Own the Moment hockey retail initiative, now with two open stores -- one in Massachusetts and the other in Minnesota -- are hitting or exceeding our financial and strategic expectations.

We recently conducted a thorough independent consumer study, which informed us that in these local markets, we are increasing brand awareness, engaging consumers, improving overall Bauer market share, and because of the great shopping experience for hockey gear, we are increasing consumers' likelihood of visiting local hockey retailers after shopping at Own the Moment.

Baseball sales growth was driven by Easton's non-bat categories, which were up 28%, while lacrosse sales, driven by strong growth in the Maverik line of heads and protective gear, were up 9%, leading up to its peak selling season.

We continue to execute on the initiatives put in place to improve our operations, which helps offset the impacts from the weakening Canadian dollar. In fact, our plan to improve working capital by $30 million in FY16 is well on track, as year to date we have already reduced inventory by $13 million. We've also experienced strong results from our supply chain initiatives, and we are increasing our expectations for the benefits from that initiative in FY17 to range from between $8 million and $12 million, compared to the $5 million to $7 million previously disclosed.

January 14, 2016 Earnings Call Transcript, at 2.

135.    Following that, CFO Vendetti, omitting any reference to the Company's manipulation of its sales revenue by coercing customers to take merchandise shipments in earlier quarters than needed or by instituting penalties on customers that did not increase their bookings with PSG, sought to blame the Company's worsening figures on industry consolidation and a weakening currency:

Jumping right into our results for the fiscal second quarter, revenues decreased 11% to $153 million, compared to the same year-ago quarter. On a constant-currency basis, however, revenues were down 6% to $162.9 million. *The 11% reported decline was primarily due to unfavorable impact from foreign exchange, variations in product launch cycles in our hockey segment, as well as retailer consolidation in the US and continued challenging market conditions for our hockey business in Russia and eastern Europe.* Offsetting these revenue declines was a 4% sales growth from Easton and a 9% increase in lacrosse sales.

On a regional basis, revenues in North America were down 9%, while the rest of the world was down 23%. *Again, this was due to the aforementioned factors in hockey.* Despite these results, we remain encouraged about the long-term prospects of our business globally.

Now, moving on to our performance by segment. Hockey revenues decreased 19%, or 11% on a constant-currency basis to $91.9 million, compared to the year-ago quarter, driven by the unfavorable impact from foreign exchange, variations in hockey equipment product launch cycles, the decline in performance apparel retail related to the prior year's launch of a complete line of 37.5 apparel, as well as consolidation among the largest retailers in the US, and lower sales to our Russian and European distributors.

*To be specific, as it relates to the US consolidation, four of our top seven retailers have consolidated over the past several months.* Baseball/softball

46

revenues in the second quarter increased 4% to $50.9 million, compared to the year-ago quarter. As Kevin mentioned, this was due to a 28% sales growth in non-bat categories, partially offset by the launch of only one bat family for Easton, compared to a two-family launch last year. The growth in non-bat revenues is significant, as we have designated the expansion of the Easton brand outside of bats as a key strategic initiative.

*Id*. at 4 (emphasis added).

136.     However, while PSG was announcing at the beginning of calendar year 2016 that Bauer's sales in late 2015 were down 19%, its rival Reebok-CCM Hockey reported an ***18% increase*** in sales for the same time period.  In fact, it was not until much later than PSG that Reebok-CCM Hockey started to report any sort of negative results.

137.     Thus, even though PSG was experiencing worsening sales figures on all fronts, PSG and the Defendants continued to conceal the true reason for PSG's lackluster financial results by offering reasons for the poor financial performance that were purportedly out of their control.

138.     As a result of the Company's Q2 2016 disclosures, PSG's stock price experienced a 4-day fall from its opening price on January 14, 2016 of $7.71 per share to a closing price on January 19, 2016 of $5.92 per share on heightened average trading volume of 1.29 million shares per day. By comparison, on January 13, 2016, PSG's trading volume was approximately 420,000 shares.

139.     Then, on March 8, 2016, before the market opened, the Company issued a press release revising guidance for the fiscal year ending May 31, 2016. The press release, entitled "Performance Sports Group Revises Fiscal 2016 Outlook and Reports Preliminary Fiscal Third Quarter Results," stated in relevant part:

EXETER, NH - March 8, 2016 - Performance Sports Group Ltd. (NYSE: PSG) (TSX: PSG) ("Performance Sports Group" or the "Company"), a leading developer and manufacturer of high performance sports equipment and apparel, has revised

47

its outlook for its 2016 fiscal year and reported preliminary results for its fiscal third quarter ended February 29, 2016. All figures are in U.S. dollars. Certain metrics, including those expressed on an adjusted and/or constant currency basis, are non-GAAP financial measures (see "Non-GAAP Financial Measures" below). All figures exclude the accounting gain the Company expects to record in the third quarter of fiscal 2016 associated with its acquisition of Easton Hockey in January 2016. The Company has reduced its fiscal year 2016 Adjusted EPS guidance by approximately $0.55 per diluted share to approximately $0.12 to $0.14 per diluted share as compared to its prior publication of guidance ($0.66 to $0.69 per diluted share), primarily as a result of the following three factors: (i) a write down of the receivable balance from a U.S. national sporting goods retailer that has filed under chapter 11 and the related anticipated loss of sales from this retailer ($0.09 per share); (ii) an anticipated reduction in sales, particularly due to weakness in the baseball/softball market ($0.31 per share); and (iii) additional bad debt reserves primarily for certain U.S. hockey customers and the related anticipated loss of sales from such customers ($0.19 per share). (Emphasis added).

140.   About an hour after the press release, the Company held a conference call to discuss the revised fiscal year 2016 guidance and the preliminary third quarter 2016 results. Defendant Davis stated in relevant part:

The second half of fiscal 2016 has been **impacted by adverse market conditions and related customer credit issues. The baseball/softball market is experiencing an unexpected significant downturn in retail sales, including in our important bat category. This weakening of consumer demand, coupled with the chapter 11 filing by one of our largest US national sporting goods retailers, is reducing our sales for baseball and softball products. Additionally, the consolidation of hockey retail in the US has reduced our customers' demand for products more than we previously anticipated as they continue to reduce their inventory levels.**

In light of these events and challenges, including the bankruptcy of an Internet baseball retailer in the second quarter, we decided to increase our bad debt reserves for certain of our US hockey and baseball/softball customers. (Emphasis added).

141.   Defendant Davis tried to blame PSG's declining financial results on "weakening of consumer demand," but in reality it was PSG's own manipulation of sales that pushed revenue into earlier quarters and bullying of retailers to increase bookings without regard for the ability of market demand to support those increases that were the true causes of the decline. On the same conference call, CFO Vendetti, speaking on behalf of PSG, stated in relevant part:

*We have reduced our fiscal year 2016 adjusted EPS guidance by approximately $0.55 per diluted share to approximately $0.12 to $0.14 per diluted share as compared to prior publication of guidance of $0.66 to $0.69 per diluted share. On a constant currency basis, 2016 adjusted EPS is expected to range between approximately $0.64 and $0.66 per diluted share.*

\* \* \*

The weakness that we're seeing in baseball is coming not only from Sports Authority, as you point out. As we said a minute ago, the bankruptcy situation that they are going through caused us to not only write-down their receivable but also take their future sales out of our forecast. There's other weakness in sell-through in the market with other of our customers. There is also, as I noted in the comments that I made during the prepared remarks, there's little bit of a general CSA effect, which is discouraging and impacting orders from other customers, given that there is the possibility of a significant amount of inventory in the marketplace that would be on discounted terms, so it's all of those factors combined. And as I indicated, also there is a possibility that the wetter and colder weather that we've seen in many parts of the country had an impact as well. It's very hard to quantify that. (Emphasis added).

142.    Defendant Rosenthal also tried to explain:

As Kevin mentioned in his remarks, *we've seen an unexpected significant downturn in retail sell-through in the baseball/softball category, particularly in bat [sic]. Easton's market share in bat is larger than any other category, but the slowdown in sell-through for bat [sic] was a disproportionate impact on Easton's versus other competitors in the baseball/softball market.*

*There were some indications that customer demand was softer than expected coming out of the holiday season, but we did not expect this reduced demand to fall further as it did later in the third quarter.* It was only toward the end of the third quarter that it became apparent the extent to which demand had fallen and how, in connection with the bankruptcy of a large US national sporting goods retailer that is filed under Chapter 11, this would reduce sales in the second half of fiscal 2016.

At this time, we do not believe that this weakening is related to the upcoming BBCOR standard change for youth bat. It is possible that the unusually cold and wet winter in certain parts of the United States has played a role in the market dynamics that we're experiencing. It is also worth noting that a meaningful amount of our baseball products were sold to retailers on an at-once basis. These customers tend to have more sophisticated point-of-sale analytics than our [] hockey customers, who were typically smaller. And that means we receive information about retailers purchasing decision much closer to their actual shipment and without as much advanced notice as we have in our hockey business.

We believe that the recent bankruptcy filing of a large US national sporting goods

49

retailer may also be affecting other baseball retailers, who have either cancelled orders or are hesitant to place orders in anticipation (technical difficulty). As we mentioned in our second quarter call, four of our Top 7 retailers in hockey have consolidated in the US over the past several months. This consolidation process reduced our customers' demand for products more than we previously anticipated, as they continue to reduce their inventory levels.

As Kevin mentioned, in light of the challenges we are facing and recent bankruptcy filings of an online baseball retailer in the second fiscal quarter and a large US national sporting goods retailer in the third fiscal quarter, we have increased our potential bad debt reserve for a limited number of our US customers, primarily in hockey, but also in baseball/softball.

\* \* \*

***So, to be clear, we have not seen any bankruptcies among our retailers, which has caused us to take the bad debt reserves that we have. It's not a bankruptcy that is [sic] caused it, but other developments with their earnings history and outstanding balances. The focus of that bad debt reserve is on a variety of customers in our US hockey market.*** So, we don't have much more that we can add to the points that we've said so far. But other than what we've previously talked about in the US market, four of our Top 7 retailers have emerged. And when that happens, it's not unusual to see a period of time where there is redundant inventory from those business combinations. And we experienced the similar situation in the Canadian hockey market several years ago, when three of our Top 5 customers combined over a two-year period. So we'll expect the consolidation in the US market to have a similar effect for us and we have every intention of working closely with those customers that are both impacted by the consolidation that's happening in the US and those who are outside of that group as they navigate through the current situation. (Emphasis added).

143.   In sum, PSG's and Defendants' March 8, 2016 statements made clear that the risks concealed by PSG's and Defendants' fraudulent scheme of manipulating the Company's sales revenue were materializing.  PSG and Defendants had known about this trend, which was reasonably likely to materially affect the Company's future financial results, before the start of the 2016 calendar year. Even with this knowledge, or their reckless disregard for the truth, PSG and Defendants promoted and condoned the Company's sales practices anyway. Further, instead of accurately disclosing that the Company had been coercing its customers to accept its products early to shift revenue to earlier quarters and bullying PSG's retailer customers to increase their

orders under threat of the loss of their discounts, PSG attributed its "purportedly" new-found decline to bankruptcies and market demand.

144.    Similarly, PSG and Defendants continued to try to hide the true cause of the Company's downturn by blaming it on "redundant inventory." Again, in reality, they and caused the Company's own demise by oversupplying its retail customers with product and delivering that product earlier than the product was needed.

145.    On this news, shares of PSG fell $5.75 per share or over 66% to close at $2.91 per share on March 8, 2016, on trading volume of 18.6 million shares, thereby damaging investors. By comparison, the trading volume of PSG shares on March 7, 2016 was approximately 142,000 shares.

146.    By this time, analysts were starting to pick up on the problems that PSG was truly facing. On March 14, 2016, analyst Jay Sole at Morgan Stanley downgraded PSG to "Equal Weight" from its previous rating of "Overweight," stating that "the profit warning indicates visibility is much poorer than previously thought." "Performance Sports Group downgraded to Equal Weight at Morgan Stanley," Theflyonthewall.com, March 14, 2016.

147.    On that same day, the *New York Post* published an article under the headline, "Bauer's Parent Company Questioned About Misdating Earnings" in which the nationally circulated newspaper disclosed that PSG had been questioned about manipulating revenue. The article disclosed:

> ***Customers told former PSG Chair Graeme Roustan that the company had asked them to misdate earnings, a source with direct knowledge of the situation said.***
>
> Roustan, PSG chair from 2008 to 2012, has been fighting his former company, trying to get back on the board.
>
> Last year Roustan commissioned SurveyMonkey — an online survey platform —

to ask PSG customers if they were told to move future orders into an earlier quarter. Roustan presented his findings to the PSG board, sources said.

* * *

Roustan had first hired Grant Thornton to take a survey of PSG's customers. PSG persuaded Grant Thornton not to release those findings, including a question about misdating earnings, to Roustan. Now Roustan is suing Grant Thornton, court documents show. Roustan declined comment. (Emphasis added).

148.    On this news, shares of PSG fell $0.41 per share or over 10.35% to close at $3.55 per share on March 15, 2016, on an average 2-day trading volume of approximately 2.29 million shares, damaging investors.

**F.    PSG Hides Behind Irrelevant Customer Bankruptcies**

149.    During the Class Period, two of PSG's retail customers filed for bankruptcy protection. On December 16, 2015, Team Express, an online sporting goods retailer, filed for protection under Chapter 11 of the U.S. Bankruptcy Code. Then, on March 2, 2016, Sports Authority, a national sporting goods retail chain, filed for protection under Chapter 11 of the U.S. Bankruptcy Code.

150.    Although PSG and Defendants sought to hide the losses from its fraudulent scheme under the smoke screen of these bankruptcies, these were not the true cause of PSG's declining business. In fact, none of PSG's competitors even mentioned these bankruptcies as a cause or potential cause of business decline until months after PSG started using these bankruptcies as an excuse for its now faltering business.

**G.    PSG's Competitors Had No Issues with Market Demand or Retailer Bankruptcies in Late 2015**

151.    According to PSG's 2015 Annual Report, PSG's primary competitors in the baseball and softball space are Amer Sports (owners of the Wilson and Louisville Slugger baseball brands), Newell Brands (owner of Rawlings) and Mizuno. Nike is not listed in PSG's Annual Report as a primary competitor, but only as competitive in some "specific categories

such as batting gloves." PSG 2015 Annual Report, at 9.

152.    Contrary to PSG's and Defendants' claims of market conditions as the cause of the Company's poor performance in late calendar year 2015, the CEO of Amer Sports stated on February 3, 2016 at Amer's own Q4 2015 earnings conference call that its "pipeline is strong and momentum is good behind Louisville Slugger. As for our baseball overall, [ ] its fine. And we expect the year to be good."

153.    In its Q1 2016 earnings presentation, Amer also reported that its footwear revenue was up 16%, its apparel revenue was up 19%, its sports instruments revenue (including baseball bats) was up 14% and overall net sales were up 11%. In summary, Amer told the market that they were observing "broad-based growth in team sports further supported by Louisville Slugger."

154.    Similarly, Michael Polk, Newell Brand's CEO, in that company's own Q1 2016 earnings release, stated, "We are extremely pleased with our growth and financial results this quarter."

155.    In the hockey space, PSG competes with Reebok-CCM Hockey, which is owned by Adidas AG. In Adidas' FY 2015 Annual Report, dated March 3, 2016, Adidas also explained that it was experiencing "high single-digit increases at Reebok-CCM Hockey and double-digit sales increases in other centrally managed businesses." This was reported at the same time that PSG was reporting its own decreases as alleged herein.

### H.    Post Class Period Developments

156.    On March 15, 2016, a day after the Class Period, PSG and Defendant Davis announced at a Bank of America Merrill Lynch Conference that PSG would suspend its "Own the Moment" store retail strategy until after fiscal year 2017.

157.   In a press release of his own the following day, Roustan stated:

**Toronto, Ontario, Canada** – March 16, 2016 – W. Graeme Roustan, Chairman and CEO of Roustan Capital and Trustee of the Walter Graeme Roustan Trust today announced its pleasure with hearing the CEO of Performance Sports Group at the Bank of America Merrill Lynch Conference yesterday state that there will be no capital expenditures next (fiscal) year 2017 for Bauer retail store openings.

Mr. Roustan states; "Finally, Performance Sports Group has decided to not open any retail stores through FY 2017 after almost a year of warnings that these retail stores carry all kinds of risk." Yesterday, Mr. Roustan learned for the first time from CEO, Kevin Davis's statements that each store cost $4 million to open but he offered up no clarity on how much each existing store lost based on their statement on January 8th, 2015 that they expect retail operations would be unprofitable for the first 18 - 24 months.

Mr. Roustan also stated; "In my June 5th, 2015 meeting with Chairman Bernie McDonell, Director Bob Nicholson, Director Karyn Barsa and the CEO and Director Kevin Davis, *I pleaded with them to abandon and reverse their Bauer retail store strategy. Without the Grant Thornton Survey Report that I contracted specifically for my June 5th meeting that Performance Sports Group lawyers and Chairman requested Grant Thornton withhold from me, I was unable to convince them that retail partners would likely react negatively to the abrupt change in business strategy and reduce their purchases of Bauer, Easton, Cascade products."* Since the June 5th, 2015 meeting where Mr. Roustan did not have the Grant Thornton Survey Report to present, the stock has declined approximately $20 CDN or 80% per share.

Roustan Capital Press Release, March 16, 2016 (emphasis added).

158.   Then, just days later, and on the heels of the *New York Post*'s disclosure of the Company's aggressive and manipulative sales practices, on March 22, 2016, following the markets' close, the Company announced that Defendant Davis had abruptly resigned and was leaving the Company immediately. Defendant Rosenthal was appointed by the Company's Board of Directors as interim CEO.

159.   On June 8, 2016, PSG announced the appointment of Harlan Kent ("Kent") as CEO. Once appointed, Kent attempted to fix the damage that Defendants' conduct had caused, realizing losses that should have been realized earlier, restructuring divisions, and laying off

employees. However, Kent's attempts were to no avail as the Company has since been forced, as described herein, to file for bankruptcy protection in the United States and Canada.

160.    On August 15, 2016, Lead Plaintiff filed its Amended Class Action Complaint for Violations of the Federal Securities Laws (the "First Amended Complaint") alleging that Defendants had fraudulently misstated and concealed during the Class Period the known trend of a material revenue reduction that had become inevitable as a result of Defendants' manipulative sales practices described in the First Amended Complaint.

161.    That same day, PSG was expected and required to file its financial results for the fourth quarter and full year 2016 with the SEC on Form 10-K. However, rather than filing its Form 10-K, the Company filed a press release with the SEC on Form 8-K in which it announced "that its Annual Report on Form 10-K, including its annual audited financial statements for the fiscal year ended May 31, 2016 and the related management's discussion and analysis (collectively, the "Form 10-K"), will not be filed by the required filing date of August 15, 2016." The Company disclosed, in vague fashion, that the delay was the result of an internal investigation being conducted by PSG's Audit Committee into the Company's financial results. Specifically, the Company stated, "The delay is a result of the decision of Performance Sports Group's Audit Committee to conduct an internal investigation in connection with the finalization of the Company's financial statements and the related certification process." PSG explained that the failure to file its Form 10-K would result in a default under the Company's credit facilities which would force PSG into bankruptcy if an agreement could not be reached between PSG and its creditors. On August 30, 2016, the Company announced such an agreement with its creditors that gave the Company until October 28, 2016 to file its Form 10-K.

162.    Two days later, on August 17, 2016, the Company again filed a Form 8-K with

the SEC, this time disclosing that, in addition to being the subject of the above-captioned class action lawsuit, the Company was also the subject of investigations by both Canadian securities regulators and the SEC. Although no further information was provided by the Company, the disclosure of the Company's internal investigation and investigations by the SEC and Canadian regulators all came within days of the filing of Lead Plaintiff's First Amended Complaint.

163.    On October 28, 2016, however, the Company again failed to file any financial reports with the SEC. Instead, news outlets, including Reuters, announced that PSG was "preparing to file for protection from its creditors as early as Monday under chapter 11 in the United States and a similar court process in Canada."

164.    On October 31, 2016, before the markets opened, PSG announced, on a Form 8-K filed with the SEC, that it had filed voluntary petitions in the United States Bankruptcy Court for the District of Delaware for relief under Chapter 11 of the United States Bankruptcy Code and had sought creditor protection in the Ontario Superior Court of Justice (Commercial List) under the Companies' Creditors Arrangement Act (the "CCAA").

165.    In the same Form 8-K filing, PSG announced that it had entered into an asset purchase agreement for the sale of the Company with a group of investors led by Sagard Capital Partners, L.P. and Fairfax Financial Holdings Limited.

166.    At the same time, PSG also announced the departure of Defendant Rosenthal from the Company.

## V.    THE FACTS GIVE RISE TO A STRONG INFERENCE THAT PSG AND THE DEFENDANTS ACTED WITH SCIENTER

167.    As set forth above, Defendants and PSG knew or recklessly disregarded the truth about the Company's sales practices. Meetings involving the sales representatives, like CW1, were held twice per year. Defendant Rosenthal, as CFO and EVP of Finance, attended those

meetings. CW3 recounted that Kinnaly told PSG's Board of Directors, including Defendant Davis about the Company's aggressive and coercive sales practices as early as 2013 and warned them that those practices would catch up with the Company. Furthermore, according to Roustan's March 2016 press release, Roustan met with Defendant Davis and the Chairman of the PSG's Board during the Class Period and told them that demand was going to drop as a result of the Company's decision to proceed with the Bauer "Own the Moment" retail stores.

168.    In addition to the foregoing facts, all of which support a strong inference of scienter on the part of Defendants and PSG, Defendants Davis and Rosenthal also had the motive and opportunity to foster PSG's aggressive and unsustainable sales practices and revenue manipulation. The opening of Bauer's "Own the Moment" retail stores in January 2015, which customers of PSG were resoundingly unsupportive of, put PSG directly into competition with its own customers, causing overall sales and revenue to decline.

169.    Roustan made clear to PSG's Board of Directors, including Defendant Davis, that customer demand would decline as a result of this retail strategy.

170.    PSG and Defendants pushed ahead with their retail stores during the Class Period anyway, and concealed the truth as the risks of their strategy materialized.

171.    They were thus motivated to conceal the true lackluster performance of PSG's core business, *i.e.*, its hockey and baseball/softball sales and revenue figures, by persuading customers to move purchases to earlier quarters and bullying and coercing retailers to order more product that was needed in exchange for keeping their existing discounts. These sales practices were effective because they made the Company's retail strategy, which was otherwise unprofitable, appear to be profitable in the short term.

172.    As CEO during the time PSG acquired Easton Baseball/Softball and Easton

Hockey, and at the time the "Own the Moment" store strategy (a strategy that was widely disliked by the Company's customers) was created and announced to the market, Defendant Davis needed PSG to continue the success it had been experiencing before the Class Period and thus was further motivated to conceal the truth regarding PSG's sales and demand.

173.   As CFO and President of PSG Brands during the same period, Defendant Rosenthal also needed PSG to continue the success it had experienced before the Class Period and thus was motivated to conceal the truth regarding PSG's "record-setting" financial results.

174.   PSG and Defendants each acted with scienter in that, as set forth herein, each knew or recklessly disregarded that PSG's public statements about the Company's revenues, sales and profitability issued during the Class Period were materially false and misleading. These Defendants were the senior management of the Company, and thus at all times were the individuals with principal responsibility for ensuring that the Company's statements were accurate and truthful, and spoke on the Company's behalf.

### A.   Defendant Davis' Abrupt Departure Just Days After the Truth Was Revealed Supports an Inference of Scienter

175.   The suspension of PSG's "Own the Moment" retail strategy and Defendant Davis' departure from PSG all within one week of the materialization of the risks concealed by Defendants' fraudulent scheme are highly indicative of scienter.

### VI.   LOSS CAUSATION

176.   During the Class Period, as detailed herein, PSG and Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated and/or maintained the price of PSG's common stock and operated as a fraud or deceit on Class Period purchasers of PSG common stock by failing to disclose and misrepresenting the true reasons for the growth of the Company's sales as detailed herein. As the risks of PSG's and Defendants' fraudulent

scheme materialized and the falsity of their prior misrepresentations and fraudulent conduct became apparent to the market, the artificial inflation embedded in the price of PSG stock dissipated and the price of PSG common stock declined significantly.

177.   As a result of their purchases of PSG common stock during the Class Period, Lead Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws. PSG's and Defendants' false and misleading statements and omissions had their intended effect and caused PSG common stock to trade at artificially-inflated and/or maintained levels throughout the Class Period, reaching as high as $21.65 per share on May 18, 2015.

178.   By concealing from investors the adverse facts detailed herein, PSG and Defendants presented a misleading picture of PSG's business, products and operations. As the truth about the Company materialized and began to be revealed to the market, the price of PSG common stock began to fall significantly. These declines removed the artificial inflation from the price of PSG common stock, causing real economic loss to investors who had purchased PSG common stock during the Class Period.

179.   The declines in the price of PSG common stock after the truth came to light were a direct result of the nature and extent of Defendants' fraudulent misrepresentations and omissions being revealed to investors and the market. The timing and magnitude of the price decline in PSG common stock indicate that the losses suffered by Lead Plaintiff and Class members was not exclusively caused by changed market conditions, overall stock market and/or industry-specific factors, or Company-specific information unrelated to PSG's and Defendants' fraudulent conduct.

180.   The economic loss, *i.e.*, damages, suffered by Lead Plaintiff and the other Class

members was a direct result of PSG's and Defendants' fraudulent scheme to artificially inflate and/or maintain the price of PSG common stock and the subsequent significant decline in the value of PSG common stock when the inherent risks of PSG's and Defendants' fraudulent scheme materialized toward the end of the Class Period.

**VII.      APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE**

181.    At all relevant times, the market for PSG's common stock was an efficient market for the following reasons, among others:

i.      PSG common stock met the requirements for listing and was listed and actively traded on the NYSE during the Class Period, a highly efficient and automated market;

ii.     As a regulated issuer during the Class Period, PSG filed periodic public reports with the SEC and the NYSE;

iii.    PSG regularly communicated with public investors via established market communications mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

iv.     PSG was followed by several securities analysts employed by major brokerage firms who wrote the reports that were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

182.    As a result of the foregoing, the market for PSG common stock promptly digested current information regarding PSG from all publicly available sources, including nationally circulated newspapers, and reflected such information in PSG's stock price. Under these circumstances, all purchasers of PSG common stock during the Class Period suffered similar

injury through their purchase of PSG common stock at artificially inflated and/or maintained prices and a presumption of reliance applies to Lead Plaintiff's allegations.

## VIII.   APPLICABILITY OF PRESUMPTION OF RELIANCE – *AFFILIATED UTE* DOCTRINE

183.   Lead Plaintiff and the Class are also entitled to a presumption of reliance under *Affiliated Ute v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants[8] are primarily predicated upon the omission of material facts that PSG and Defendants had a duty to disclose, namely that PSG's financial results during the Class Period were the result of an undisclosed practice of coercing customers to pull sales into earlier quarters in order to inflate the Company's performance.

## IX.   NO SAFE HARBOR

184.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those purportedly forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was

---

[8] Again, because PSG has filed for bankruptcy protection and is covered by the Bankuptcy Code's Automatic Stay provision, the claims asserted herein are not asserted against PSG at this time.

authorized and/or approved by an executive officer of PSG who knew that those statements were false when made.

## X.     CLASS ACTION ALLEGATIONS

185.    Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3) on behalf of a class consisting of all persons and entities that purchased or acquired PSG common stock on the New York Stock Exchange ("NYSE") during the Class Period, seeking to pursue remedies under the Exchange Act. Excluded from the Class are Defendants; the officers and directors of the Company, at all relevant times; members of their immediate families and their legal representatives, heirs, successors, or assigns; and any entity in which any of the Defendants have or had a controlling interest.

186.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, PSG common stock was actively traded on the NYSE. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Millions of PSG shares were traded publicly during the Class Period on the NYSE. Record owners and other members of the Class may be identified from records maintained by PSG or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

187.    Lead Plaintiff's claims are typical of the claims of Class members, who were all similarly affected by Defendants' wrongful conduct in violation of federal securities laws that is complained of herein. Further, Lead Plaintiff will fairly and adequately protect the interests of Class members and has retained counsel competent and experienced in class and securities litigation.

188.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

    a) whether the federal securities laws were violated by PSG and Defendants' conduct alleged herein;

    b) whether statements made by PSG and Defendants to the investing public during the Class Period omitted or misrepresented material facts about the business, operations, known trends and prospects of PSG; and

    c) to what extent Class members have sustained damages and the proper measure of damages.

189.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Further, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for Class members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XI.    CAUSES OF ACTION

### COUNT I

**(Against Defendants for Violation of Section 10(b) of the Exchange Act and
Rule 10b-5 of the Securities and Exchange Commission)**

190.    Lead Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

191.    This Count is asserted against both Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder.

192.    During the Class Period, Defendants, singularly and in concert, directly made

various deceptive and untrue statements of material facts and omitted to state material facts in order to make the statements made, in light of the circumstances under which they were made, not misleading to Lead Plaintiff and the other members of the Class, including statements in SEC filings and other public statements that falsely touted the financial strength of the Company and strength and growth of the Company's sales and revenue streams. The purpose and effect of said scheme, plan, and unlawful course of conduct was, among other things, to induce Lead Plaintiff and the other members of the Class to purchase PSG common stock during the Class Period at artificially inflated and/or maintained prices.

193.    During the Class Period, PSG and Defendants knowingly and/or recklessly issued, caused to be issued, or participated in the issuance of, the preparation and issuance of deceptive and materially false and misleading statements to the investing public as particularized above.

194.    As a result of the dissemination of the false and misleading statements set forth above, the price of PSG common stock was artificially inflated and/or maintained during the Class Period. In ignorance of the false and misleading nature of the statements described above and the deceptive and manipulative devices and contrivances employed by PSG and Defendants, Lead Plaintiff and the other members of the Class relied, to their detriment, on the integrity of the price of the common stock of PSG. Had Lead Plaintiff and the other members of the Class known the truth, they would not have purchased said shares or would not have purchased them at the inflated prices that were paid.

195.    Lead Plaintiff and the other members of the Class have suffered substantial damages as a result of the wrongs herein alleged in an amount to be proved at trial.

196.    By reason of the foregoing, Defendants directly violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they made untrue statements of

material facts or omitted to state material facts in order to make the statements made, in light of the circumstances under which they were made, not misleading during the Class Period.

## COUNT II

### (Against Defendants for Violation of Section 20(a) of the Exchange Act)

197.    Lead Plaintiff repeats and realleges each and every allegation contained in each of the foregoing paragraphs as if set forth fully herein.

198.    Defendants Davis and Rosenthal, by virtue of their positions and specific acts described above, were, at the time of the wrongs alleged herein, controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act.

199.    Defendants had the power and influence and exercised the same to cause the Company to engage in the illegal conduct and practices complained of herein.

200.    By reason of the conduct alleged in Count I of this Complaint which also applies to the Company and for which the Company would be liable had it been named as a Defendant herein, Defendants are liable for the aforesaid wrongful conduct as control persons of the Company, and are liable to Lead Plaintiff and to the other members of the Class for the substantial damages which they suffered in connection with their purchases of PSG common stock during the Class Period.

WHEREFORE, Lead Plaintiff prays for relief and judgment, as follows:

(a)     determining that this action is a proper class action and certifying Lead Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure;

(b)     awarding compensatory damages in favor of Lead Plaintiff and the other Class members against both Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     awarding Lead Plaintiff and the Class their reasonable costs and expenses

incurred in this action, including counsel fees and expert fees; and

(d)     such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Lead Plaintiff demands a trial by jury.

Dated: November 3, 2016                    Respectfully submitted,

**COHEN MILSTEIN SELLERS**
**  & TOLL PLLC**

*/s/ Steven J. Toll*
Steven J. Toll
S. Douglas Bunch (SB-3028)
1100 New York Ave. NW
Suite 500, West Tower
Washington, DC 20005
Telephone:  (202) 408-4600
Facsimile:  (202) 408-4699

- and -

Carol V. Gilden
190 South LaSalle Street
Suite 1705
Chicago, IL 60603
Telephone:  (312) 357-0370
Facsimile:  (312) 357-0369

- and -

Kenneth M. Rehns (KR-9822)
88 Pine Street, 14th Floor
New York, New York 10005
Telephone:  (212) 838-7797
Facsimile:  (212) 838-7745

***Attorneys for the Plumbers & Pipefitters***
***National Pension Fund and Lead Counsel***
***for the Class***

James R. O'Connell

Mark W. Kunst
**O'DONOGHUE & O'DONOGHUE LLP**
4748 Wisconsin Avenue, N.W.
Washington, DC  20016
Telephone: (202) 362-0041
Facsimile: (202) 362-2640

***Additional Attorneys for the Plumbers &
Pipefitters National Pension Fund***

67

# CERTIFICATION

William T. Sweeney, Jr., Fund Administrator for the Plumbers & Pipefitters National Pension Fund ("Plumbers National Pension Fund"), declares, as to the claims asserted under the federal securities laws, that:

1.   I am authorized to make this certification on behalf of Plumbers National Pension Fund.

2.   I have reviewed a complaint filed in this matter and wish to serve as a lead plaintiff.

3.   Plumbers National Pension Fund did not purchase the securities that are the subject of this action at the direction of its counsel or to participate in this action.

4.   Plumbers National Pension Fund is willing to serve as a lead plaintiff and class representative on behalf of the Class, including providing testimony at deposition and trial if necessary.

5.   Plumbers National Pension Fund's transactions in the securities of Performance Sports Group Ltd. that are the subject of this action are set forth in Schedule A, attached hereto.

6.   During the three years prior to the date of this Certification, Plumbers National Pension Fund sought to serve as a representative party for a class under the federal securities laws in the following cases:

   - *Wallace v. IntraLinks Holdings, Inc.*, Civ. No. 11-8861-TPG (S.D.N.Y.);
   - *In re Questcor Sec. Litig.*, Civ. No. 12-1623-DMG (C.D. Cal);
   - *In re ITT Educ. Services, Inc. Sec. Litig.*, Civ. No. 13-cv-1620-JPO (S.D.N.Y.);
   - *Firefighters Pension & Relief Fund of the City of New Orleans v. Bulmahn, et al.*, Civ. No. 13-cv-03935 (E.D. La.);
   - *Singh v. Orthofix International et al.*, Civ. No. 13-cv-05696-JGK (S.D.N.Y.);
   - *Isolde v. Trinity Industries, Inc. et al.*, Civ. No. 15-cv-02093 (N.D. Tex.);
   - *Luna v. Marvell Technology Group, Ltd. et al.*, Civ. No. 15-cv-07214 (S.D.N.Y.);
   - *In re: Barclays Liquidity Cross and High Frequency Trading Litigation*, No. 14-md-2589 (JMF) (S.D.N.Y.);
   - *West Palm Beach Police Pension Fund v. DFC Global Corp., et al.*, Civ. No. 13-cv-06731 (E.D. Pa.)

7.   Plumbers National Pension Fund will not accept any payment for serving as a class representative on behalf of the class beyond its *pro rata* share of any recovery, except such reasonable costs and expenses (including lost wages) relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 17th day of May 2016.

William T. Sweeney, Jr.
Fund Administrator
*Plumbers & Pipefitters National Pension Fund*

## SCHEDULE A

| Trade Date | Transaction Type | # Shares | Share Price ($) |
|:---:|:---:|:---:|---:|
| 8/28/2015 | PURCHASES | 8,700 | 12.94 |
| 8/28/2015 | PURCHASES | 5,000 | 12.88 |
| 8/31/2015 | PURCHASES | 6,800 | 12.93 |
| 9/1/2015 | PURCHASES | 4,900 | 12.52 |
| 9/2/2015 | PURCHASES | 1,400 | 12.15 |
| 9/2/2015 | PURCHASES | 1,000 | 12.15 |
| 9/3/2015 | PURCHASES | 2,095 | 12.95 |
| 9/8/2015 | PURCHASES | 7,473 | 13.81 |
| 9/25/2015 | PURCHASES | 11,300 | 13.97 |
| 9/29/2015 | PURCHASES | 1,800 | 13.89 |
| 10/1/2015 | PURCHASES | 2,900 | 12.58 |
| 11/3/2015 | PURCHASES | 6,450 | 11.87 |
| 11/4/2015 | PURCHASES | 10,049 | 11.87 |
| 11/10/2015 | PURCHASES | 7,825 | 11.1 |
| 11/30/2015 | PURCHASES | 8,700 | 11.62 |
| 12/7/2015 | PURCHASES | 4,300 | 11.46 |
| 12/8/2015 | PURCHASES | 7,700 | 11.18 |
| 12/9/2015 | PURCHASES | 4,740 | 10.96 |
| 1/20/2016 | PURCHASES | 1,650 | 5.83 |
| 3/8/2016 | SALES | 13,700 | 3.93 |
| 3/8/2016 | SALES | 49,700 | 3.18 |
| 3/9/2016 | SALES | 22,800 | 3.3 |
| 3/10/2016 | SALES | 18,582 | 3.8 |

## <u>CERTIFICATE OF SERVICE</u>

I, Steven J. Toll, counsel for Lead Plaintiff, hereby certify that on November 3, 2016, I filed the foregoing Second Amended Class Action Complaint for Violations of the Federal Securities Laws on the United States District Court for the Southern District of New York's Electronic Case Filing System which caused a copy of this document to be served on counsel of record for all Parties.

*/s/ Steven J. Toll*
Steven J. Toll
