UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x
                                               :

JUAN FRANCISCO GONZALEZ NIEVES AS   :
TRUSTEEE OF THE GONZALEZ CORONADO  :
TRUST, individually and on behalf of all others  :
similar situated,                                  :
                                               :
                        Plaintiff,      :      Case No. 1:16-cv-03591-GHW
                                               :

               - against -           :
                                             :

KEVIN DAVIS and AMIR ROSENTHAL,     :
                                             :

                      Defendants.     :
-------------------------------------------------------------x

## CONSOLIDATED MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' JOINT MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

FRIEDMAN KAPLAN SEILER &
ADELMAN LLP

Edward A. Friedman
Jason C. Rubinstein
Timothy M. Haggerty
7 Times Square, 28th Floor
New York, New York 10036

*Attorneys for Defendant Amir Rosenthal*

WINSTON & STRAWN LLP

David L. Aronoff
Gayle I. Jenkins
Scott J. Fishwick
333 S. Grand Avenue
Los Angeles, California 90071

Seth C. Farber
200 Park Avenue
New York, New York 10166

*Attorneys for Defendant Kevin Davis*

# TABLE OF CONTENTS

**Page(s)**

PRELIMINARY STATEMENT ................................................................................1

STATEMENT OF FACTS .....................................................................................4

    A.    The Parties ..........................................................................................4

    B.    The SAC ..............................................................................................5

ARGUMENT ........................................................................................................9

I.    THE COURT SHOULD DISMISS THE FUND'S SECURITIES FRAUD CLAIM ................................................................................................................9

    A.    The SAC Fails to Identify Any False or Misleading Statements or Actionable Omissions ........................................................................9

        1.    The SAC Fails to Sufficiently Allege Any Fraudulent Sales Practices ................................................................................11

        2.    The SAC Relies on a Made-Up Definition of "Organic Growth" ............................................................................14

    B.    The SAC Fails to Plead that PSG's Statements about its Sales Practices Were Material ......................................................................17

        1.    Materiality Is an Essential Element of a Securities Fraud Claim ................................................................................17

        2.    The Fund Has Failed to Plead Facts Showing Materiality ........................20

    C.    The SAC Fails to Plead Scienter .........................................................23

        1.    Mere Knowledge of PSG's Sales Practices Fails to Support a Strong Inference of Scienter ................................................24

        2.    Unfounded Allegations of Defendants' Knowledge about the Risks of Aggressive Sales Practices Are Insufficient to Support Scienter ..................................................................27

        3.    Defendant Davis's Departure Is Not Probative of Scienter .....................32

        4.    Defendants' Motive to Maintain Corporate Profitability Does Not Support a Strong Inference of Scienter ..................................33

        5.    The Financial Performance of PSG's Competitors Fails to Support a Strong Inference of Scienter ..............................................36

    D.    Events Occurring After the Fund Disposed of Its PSG Stock Are Irrelevant to Its Securities Fraud Claim. ..............................................39

**Page(s)**

II.    THE COURT SHOULD DISMISS THE FUND'S CLAIM OF CONTROL
        PERSON LIABILITY ...........................................................................................40

CONCLUSION.........................................................................................................................40

3275587.1

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007)...........................................................................24, 40

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988)..................................................................................................17

*In re BISYS Sec. Litig.*,
    397 F. Supp. 2d 430 (S.D.N.Y. 2005)...................................................................33

*In re Braskem S.A. Sec. Litig.*,
    No. 15 CIV. 5132 (PAE), 2017 WL 1216592 (S.D.N.Y. Mar. 30, 2017) ........................10, 17

*In re Bristol-Myers Squibb Sec. Lit.*,
    312 F. Supp. 2d 549 (S.D.N.Y. 2004)....................................................12, 13, 25, 26

*Broudo v. Dura Pharms., Inc.*,
    339 F.3d 933 (9th Cir. 2003) ...............................................................................13

*C.D.T.S. No. 1 & A.T.U. Local 1321 Pension Plan v. UBS AG*,
    No. 12-cv-4924, 2013 WL 6576031 (S.D.N.Y. Dec. 13, 2013).............................33

*In re Canandaigua Sec. Litig.*,
    944 F. Supp. 1202 (S.D.N.Y. 1996)......................................................................17

*Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*,
    750 F.3d 227 (2d Cir. 2014)...........................................................................1, 9, 10

*In re Cerner Corp. Sec. Litig.*,
    425 F.3d 1079 (8th Cir. 2005) .............................................................................31

*Chill v. Gen. Elec. Co.*,
    101 F.3d 263 (2d Cir. 1996)..................................................................................34

*City of Austin Police Ret. Sys. v. Kinross Gold Corp.*,
    957 F. Supp. 2d 277 (S.D.N.Y. 2013)...............................................................31, 32

*City of Omaha Police and Fire Ret. Sys. v. Timberland Co.*,
    No. 11-cv-277, 2013 WL 1314426 (D.N.H. Mar. 28, 2013)...................................19

*Decker v. Massey-Ferguson, Ltd.*,
    681 F.2d 111 (2d Cir. 1982)..................................................................................18

**Page(s)**

*In re Dura Pharms., Inc. Sec. Litig.*,
   452 F. Supp. 2d 1005 (S.D. Cal. 2006)................................................................26

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005)................................................................................................39

*In re: Ebix, Inc. Sec. Litig.*,
   898 F. Supp. 2d 1325 (N.D. Ga. 2012)................................................................14

*ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
   553 F.3d 187 (2d Cir. 2009)..............................................................17, 23, 24, 34

*In re Elan Corp. Sec. Litig.*,
   543 F. Supp. 2d 187 (S.D.N.Y. 2008)..................................................................31

*Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*,
   794 F.3d 297 (2d Cir. 2015)....................................................................18, 19, 20

*Feasby v. Industri-Matematik Int'l, Corp.*,
   No. 99-cv-8761, 2003 WL 22976327 (S.D.N.Y. Dec. 19, 2003) ..........................30

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
   308 F. Supp. 2d 249 (S.D.N.Y. 2004)..................................................................30

*Garfield v. NDC Health Corp.*,
   466 F.3d 1255 (11th Cir. 2006) ..............................................................13, 25, 26

*Gavish v. Revlon, Inc.*,
   No. 00-cv-7291, 2004 WL 2210269 (S.D.N.Y. Sept. 30, 2004) ................... *passim*

*In re GeoPharma, Inc. Sec. Litig.*,
   399 F. Supp. 2d 432 (S.D.N.Y. 2005)..................................................................27

*In re GeoPharma, Inc. Sec. Litig.*,
   411 F. Supp. 2d 434 (S.D.N.Y. 2006)..................................................................24

*Gillis v. QRX Pharma Ltd.*,
   197 F. Supp. 3d 557 (S.D.N.Y. 2016)......................................................27, 28, 33

*Glaser v. The9, Ltd.*,
   772 F. Supp. 2d 573 (S.D.N.Y. 2011)......................................................30, 32, 33

*Greebel v. FTP Software, Inc.*,
   194 F.3d 185 (1st Cir. 1999)..........................................................................12, 13

*Gross v. Summa Four, Inc.*,
   93 F.3d 987 (1st Cir. 1996)...................................................................................19

**Page(s)**

*In re IAC/InterActiveCorp Sec. Litig.*,
   695 F. Supp. 2d 109 (S.D.N.Y. 2010)....................................................................................16

*In re Int'l Bus. Machines Corporate Sec. Litig.*,
   163 F.3d 102 (2d Cir. 1998)........................................................................................18, 23

*Janbay v. Can. Solar, Inc.*,
   No. 10-cv-4430, 2012 WL 1080306 (S.D.N.Y. Mar. 30, 2012)............................................40

*Johnson v. Tellabs, Inc.*,
   262 F. Supp. 2d 937 (N.D. Ill. 2003) ...................................................................................19

*Kalnit v. Eichler*,
   264 F.3d 131 (2d Cir. 2001)........................................................................................23, 34

*KBC Asset Mgt. NV v. 3D Sys. Corp.*,
   No. 15-CV-02393-MGL, 2016 WL 3981236 (D.S.C. July 25, 2016)....................................14

*In re Lions Gate Entm't Corp. Sec. Litig.*,
   165 F. Supp. 3d 1 (S.D.N.Y. 2016)............................................................................9, 10, 16

*Local 731 I.B. of T. Excavators & Pavers Pension Trust Fund v. Diodes, Inc.*,
   810 F.3d 951 (5th Cir. 2016) ..............................................................................................13

*Local No. 38 Int'l Broth. of Elec. Workers Pension Fund v. Am. Express Co.*,
   430 F. App'x 63 (2d Cir. 2011) ...........................................................................................37

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
   513 F.3d 702 (7th Cir. 2008) .......................................................................................12, 25

*In re MoneyGram Int'l Inc. Sec. Litig.*,
   626 F. Supp. 2d 947 (D. Minn. 2009)..................................................................................40

*In re MRU Holdings Sec. Litig.*,
   769 F. Supp. 2d 500 (S.D.N.Y. 2011)..................................................................................23

*In re Network Assocs., Inc. Sec. Litig.*,
   No. 99-cv-1729, 2000 WL 33376577 (N.D. Cal. Sept. 5, 2000)............................................37

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000)....................................................................................27, 30, 34

*In re Oak Tech. Sec. Litig.*,
   No. 96-cv-20552, 1997 WL 448168 (N.D. Cal. Aug. 1, 1997) .............................................18

*In re Omnicom Group, Inc. Sec. Litig.*,
   No. 02 Civ. 4483(RCC), 2005 WL 735937 (S.D.N.Y. Mar. 30, 2005)....................................14

v

**Page(s)**

*In re Optionable Sec. Litig.*,
   577 F. Supp. 2d 681 (S.D.N.Y. 2008) ..................................................................17

*Orton v. Parametric Tech. Corp.*,
   344 F. Supp. 2d 290 (D. Mass. 2004) ..................................................................19

*Owens v. Jastrow*,
   789 F.3d 529 (5th Cir. 2015) ..............................................................................33

*Plumbers & Steamfitters Local 773 Pension Fund v. Can. Imperial Bank of*
   *Commerce*,
   694 F. Supp. 2d 287 (S.D.N.Y. 2010) ..................................................................28

*Ret. Sys. v. Hartford Fin. Servs. Grp., Inc.*,
   No. 10-cv-2835, 2011 WL 4357368 (S.D.N.Y. Sept. 19, 2011) ...........................14

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004) ...........................................................................9, 35

*Rothman v. Gregor*,
   220 F.3d 81 (2d Cir. 2000) .............................................................................24, 35

*In re Sanofi Sec. Litig.*,
   155 F. Supp. 3d 386 (S.D.N.Y. 2016) .............................................................14, 29

*In re Satyam Comp. Servs. Ltd. Sec. Litig.*,
   915 F. Supp. 2d 450 (S.D.N.Y. 2013) ..................................................................40

*In re Sawtek, Inc. Sec. Litig.*,
   No. 03-cv-294, 2005 WL 2465041 (M.D. Fla. Oct. 6, 2005) ................................19

*In re Scholastic Corp. Sec. Lit.*,
   252 F.3d 63 (2d Cir. 2001) .............................................................................19, 20

*SEC v. Espuelas*,
   579 F. Supp. 2d 461 (S.D.N.Y. 2008) ..................................................................32

*Shields v. Citytrust Bancorp., Inc.*,
   25 F.3d 1124 (2d Cir. 1994) ................................................................................27

*In re Sierra Wireless, Inc. Sec. Litig.*,
   482 F. Supp. 2d 365 (S.D.N.Y. 2007) ..................................................................30

*Slayton v. Am. Express Co.*,
   604 F.3d 758 (2d Cir. 2010) ................................................................................24

*Stratte-McClure v. Morgan Stanley*,
   776 F.3d 94 (2d Cir. 2015) ..................................................................................17

**Page(s)**

*Tabak v. Can. Solar Inc.*,
  549 F. App'x 24 (2d Cir. 2013) ...........................................................................18

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)................................................................................... *passim*

*In re Trex Co., Inc. Sec. Litig.*,
  212 F. Supp. 2d 596 (W.D. Va. 2002) ............................................................20, 25

*TSC Indus., Inc. v. Northway, Inc.*,
  426 U.S. 438 (1976)...........................................................................................17

*In re Wachovia Equity Sec. Litig.*,
  753 F. Supp. 2d 326 (S.D.N.Y. 2011).................................................................40

*Wilson v. Merrill Lynch & Co., Inc.*,
  671 F.3d 120 (2d Cir. 2011).............................................................................9, 10

*Zoumboulakis on Behalf of VeriFone Sys., Inc. v. McGinn*,
  No. 5:13-CV-02379-EJD, 2014 WL 3926565 (N.D. Cal. Aug. 7, 2014)...............14

*Zucco Partners, LLC v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009) ............................................................................31

**Statutes, Rules and Regulations**

15 U.S.C. § 78j...................................................................................... *passim*

15 U.S.C. § 78t...................................................................................... *passim*

15 U.S.C. § 78u-4(b)(1) ......................................................................................9

15 U.S.C. § 78u-4(b)(2)(A)................................................................................23

Fed. R. Civ. P. 9(b) ....................................................................................1, 9, 18

Fed. R. Civ. P. 12(b)(6).......................................................................................1

17 C.F.R. § 229.303 .........................................................................................16

17 C.F.R. § 240.10b–5 ..........................................................................9, 10, 16, 23

**Other Authorities**

Bob Sanders, *Questions Abound Over Performance Sports Group*,
  New Hampshire Business Review, Sept. 1, 2016.................................................7

Edward D. Hess, *The Quest for Organic Growth*, Corp. Fin. Rev.,
  2007 WL 8321806 (July/Aug. 2007) ................................................................15, 16

3275587.1

**Page(s)**

Edward D. Hess & Robert K. Kazanjian, eds.,
    THE SEARCH FOR ORGANIC GROWTH (Cambridge University Press 2006) ......................15, 16

Defendants Amir Rosenthal and Kevin Davis (together, the "**Defendants**") respectfully submit this memorandum of law in support of their motion, pursuant to FED. R. CIV. P. 9(b) and 12(b)(6), to dismiss lead plaintiff Plumbers & Pipefitters National Pension Fund's (the "**Fund**") Second Amended Complaint ("**SAC**").

## PRELIMINARY STATEMENT

In the SAC, the Fund condemns as "fraudulent" purported "coercive, strong-arm" sales practices by Performance Sports Group Ltd. ("**PSG**") that, as a matter of law, are not fraudulent and not even wrongful. The Fund does not allege that any of the sales reported by PSG were sham, or anything other than real, sales. Rather, it contends that PSG, with the knowledge of Defendants (then senior officers of PSG), "bull[ied]" customers—by awarding or withdrawing discounts—to buy more merchandise and accept early deliveries. In conclusory fashion, the Fund alleges that Defendants knew the market was already "saturated" with PSG merchandise, but that they nevertheless exploited these "unsustainable" sales tactics to temporarily inflate PSG's earnings. The Fund also alleges that, because Defendants purportedly knew that these sales tactics were fraudulent and unsustainable, their description of PSG's growth as "organic" in the company's disclosures was deceptive. The Fund's theory fails as a matter of law, and is unsupported by the specific factual allegations necessary to sustain a securities fraud claim based on Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (Counts I and II of the SAC, respectively).

The most basic requirement of a securities fraud claim is a deceptive statement or omission. The SAC identifies none. There is nothing inherently false or misleading about aggressive sales campaigns that yield, as the SAC concedes, only *bona fide* sales. Nor is there legal support for the Fund's argument that PSG had a duty to disclose its specific sales practices. The reason is that courts have repeatedly found legitimate reasons for engaging in the sales

1

practices that the Fund challenges (which it branded as "channel stuffing" in its prior complaint, but now refers to with more generic labels in light of the overwhelming precedent that "channel stuffing" is not inherently fraudulent).  Moreover, the Fund's allegation that Defendants deceived investors by using the term "organic" to describe PSG's growth relies on a made-up definition of the term.  To market participants (including the authors of the book the Fund misleadingly quotes in the SAC), "organic" is uniformly understood to mean growth from *all* sources other than mergers and acquisitions.  The use of "organic" to describe PSG's growth told investors nothing about the nature of its sales practices, or whether its growth was sustainable.  *See* Part I.A.

The SAC is equally deficient in pleading materiality.  For a fraudulent sales practice to form the basis of its securities fraud claim, the Fund would need to plead with particularity that the volume of relevant sales was material to the financial results of a company the size of PSG.  But the SAC utterly fails to quantify, as it must, the frequency of such sales practices or their impact on PSG's revenues or earnings.  Rather, the SAC cites (i) surveys that say nothing about the frequency or economic significance of the challenged sales practices, (ii) the drop in PSG's stock price (while dismissing the effect of undisputed, material adverse developments on the stock's performance), and (iii) vague, anecdotal statements by "confidential witnesses" who are not in a position to know the extent of the alleged sales practices or their relative financial impact.  Indeed, the SAC identifies only *one* instance (a *bona fide* sale, at that) in which a PSG customer agreed to accept an order early (in exchange for free delivery), and the vague allegations about that sale (described as "large" by a single retailer in Wisconsin) belie any suggestion that it was material to a company with 5,000 retail customers.  *See* Part I.B.

Finally, the Fund fails to plead scienter.  The SAC's allegations that Defendants knew about PSG's sales practices and knew that those practices would cannibalize PSG's future

2

sales are insufficient to establish scienter.  There was nothing inherently fraudulent about PSG's alleged sales practices, and the SAC fails to plead with particularity facts supporting the implausible inference that Defendants (who are not alleged to have had any concrete, personal motive to doom PSG) knowingly pursued a futile, self-defeating business strategy.  Further, the Fund's allegations that Defendants were present at sales meetings (in the case of defendant Rosenthal) and a single board meeting (in the case of defendant Davis) at which the challenged sales practices were discussed, as well as its generalized allegation that Defendants had requisite knowledge of these matters based on their senior roles at PSG, are not sufficient to plead scienter.  As noted, the alleged sales practices were lawful, and there is no allegation that either Defendant was exposed to factual information (as opposed to uncorroborated, lay opinion) at these meetings alerting them that PSG's sales practices were unsustainable.

Nor can scienter be inferred from the alleged statements of the Fund's "confidential witnesses"—none of them alleges any contacts with Defendants, and therefore none of them is in a position to credibly assert that Defendants knew PSG's sales practices were deceptive or unsustainable.  Likewise, the allegations of PSG's former chairman, who left PSG nearly three years before the Class Period began, do not support an inference of scienter.  Rather than allege that Defendants knew PSG's sales practices to be deceptive or unsustainable, or that they would obtain some personal benefit from deceiving PSG's shareholders, the former chairman's primary contribution to the SAC is his belief that PSG made a poor business decision by opening two retail stores of its own.  But that belief—amounting to a difference over operational strategy—does not establish fraudulent intent.

The SAC's remaining allegations also fail to support an inference of scienter.  The Fund cites defendant Davis's resignation shortly after PSG's sales deteriorated as evidence of

scienter, but it is well established that an officer's departure in these circumstances is not "highly unusual and suspicious," and thus not probative of scienter. In addition, courts have repeatedly rejected the Fund's theory that fraudulent intent can be inferred from Defendants' alleged efforts to maintain the appearance of PSG's profitability—a theory that, if accepted, would impute a criminal intent to all U.S. corporations. And the Fund's assertion that scienter can be inferred from PSG's allegedly poor performance relative to its peers in early 2016 is unsustainable. It is undisputed that PSG was beset by a series of adverse developments in late 2015 and 2016— including, *e.g.*, the bankruptcies of major customers. Against this backdrop, PSG's weak performance does not support an inference of fraudulent intent. *See* Part I.C.

For these reasons, and those set forth below, the Court should dismiss the Fund's claim under Section 10(b) (Count I). Moreover, because the Fund fails to state a primary violation, its claim for control person liability under Section 20(a) (Count II) is also fatally flawed and should be dismissed. *See* Part II.

## STATEMENT OF FACTS

### A.    The Parties

The Fund held stock in PSG from August 28, 2015 to March 10, 2016, SAC Schedule A, although it defines a purported class period running from January 15, 2015 to March 14, 2016 (the "**Class Period**"), SAC ¶ 1.

Prior to its bankruptcy, PSG was a leading manufacturer of sports equipment and related apparel under different brand names, including Bauer Hockey ("**Bauer**") and Easton Baseball/Softball ("**Easton**"). *Id.* ¶¶ 2-3. Following its initial public offering in June 2014, PSG's stock was traded on the New York Stock Exchange. *Id.* ¶ 4. On October 31, 2016, PSG along with 17 of its affiliates filed voluntary petitions for bankruptcy pursuant to Chapter 11 of

4

the Bankruptcy Code.  *Id.* at 1 n.1.  As a result of PSG's bankruptcy, its stock is no longer traded on the New York Stock Exchange.  *Id.* ¶ 27.

Defendant Davis served as PSG's CEO throughout the Class Period and separated from PSG on March 22, 2016.  *Id.* ¶¶ 28, 158.  Defendant Rosenthal held the roles of CFO and President of PSG Brands (the latter from May 28, 2015).  He served as CFO until December 14, 2015 (when the position passed to his successor) and as President of PSG Brands until his departure from PSG, which was announced on October 31, 2016.  *Id.* ¶ 29.

**B.    The SAC**

The SAC asserts two counts.  Count I alleges that Defendants committed securities fraud in violation of Section 10(b) of the Securities Exchange Act of 1934 (the "**Exchange Act**") and Rule 10b-5 promulgated thereunder.  *Id.* ¶¶ 190-96.  Count II alleges control person liability against Defendants pursuant to Section 20(a) of the Exchange Act, for the same fraudulent scheme alleged in Count I.  *Id.* ¶¶ 197-200.  The Fund presses these claims on behalf of itself and a putative class of shareholders who acquired PSG stock during the Class Period.  *Id.* ¶ 1.

According to the SAC, PSG misled the investing public by failing to disclose that its revenue growth was fueled by "aggressive" sales practices that would lead to PSG's "inevitable demise."  *Id.* ¶¶ 1, 8-17.  Those sales practices, which the Fund pejoratively labeled as "channel stuffing" in its previous complaint, *see* Am. Compl. [ECF No. 62] ¶ 7, allegedly included the use of "strong-arm tactics and penalties," such as the loss of price discounts, to coerce customers to purchase product in quantities that exceeded their present need.  SAC ¶¶ 8-17, 44.  As a result of these sales practices, which the SAC also labels as "fraudulent" and "manipulative," the SAC further contends that PSG's growth was not "organic," as PSG had stated in various financial disclosures.  *Id.* ¶¶ 5-8, 15, 73-77.  The SAC alleges that the term

"organic growth" implies sustainable growth through only certain types of sales practices, and not through the types of sales practices that PSG employed. *Id.* ¶¶ 7-8, 74-77.

The SAC relies on one named and four unnamed witnesses (each, a "**CW**") who claim to have knowledge of PSG's sales practices and their impact on PSG's earnings:

- Graeme Roustan served as chairman of PSG's Board of Directors from 2008 to 2012. *Id.* ¶ 147. Since his departure, he has been an outspoken critic of PSG, objecting particularly vociferously to its "Own the Moment" ("**OTM**") initiative to open and operate retail stores. *Id.* ¶¶ 51, 83. The SAC alleges that, in June 2015, Roustan told PSG's Board of Directors, which included defendant Davis, that the OTM initiative would have a negative impact on customer demand. *Id.* ¶¶ 51, 83. The SAC also contends that Roustan confirmed that PSG moved orders to earlier periods through surveys of ten PSG customers, the "majority" of whom allegedly responded that they were asked by PSG to accelerate orders on at least one occasion. *Id.* ¶¶ 69-72. Finally, since his departure, Roustan has "been fighting" with PSG to "try[] to get back on the [Company's] board," but these attempts have been unsuccessful. *Id.* ¶ 147.

- CW1 was an independent sales representative at Bauer for 29 years, until his contract was not renewed in February 2016. *Id.* ¶ 38. According to CW1, PSG provided incentives for customers to increase their volume of purchases year-over-year, and he recalls instances when PSG asked customers to accept early deliveries of their orders. *Id.* ¶¶ 54, 56. He does not allege that either of these practices was uncommon in the industry. According to CW1, "[t]he program was simple; the greater the volume of equipment purchased, the greater the discount." *Id.* ¶ 42.

- CW2, a store manager of a retail customer, alleges that Bauer pressed CW2 to increase orders by conditioning certain discounts on increased volume and insisted that orders be placed a year in advance, but does not allege that placing orders well in advance is uncommon in this industry. *Id.* ¶¶ 38, 53, 63.

- CW3, a co-owner of a retail store that purchases product from Bauer, alleges that in 2013 a former PSG officer "warned" attendees at a PSG board meeting, including defendant Davis, that "pulling orders forward . . . to make their numbers would eventually catch up with PSG" and was fired for "speaking out." *Id.* ¶¶ 38, 62. CW3 also allegedly expressed to Bauer his discontent with the OTM initiative. *Id.* ¶ 50. According to CW3, Bauer (i) warned him that he would lose certain discounts if he did not increase his purchases, even though the market, as CW3 believed, was saturated with product, and (ii) asked him to accept shipments early, so that PSG could meet its quarterly sales targets. *Id.* ¶¶ 53, 57, 65-66. CW3

does not state that he ever agreed to accept shipments early, or that any of the alleged practices were uncommon in the industry.

- CW4, a franchise owner of a retailer that does business with Easton, alleges that, on one occasion, he/she accepted early shipment of an order after the Easton salesperson offered CW4 free shipping in exchange for doing so.  *Id.* ¶¶ 38, 60.  CW4 also alleges that Easton ignored his/her request to reduce another order and delivered it more than two months early, while keeping the original payment terms unchanged.  *Id.* ¶¶ 61, 65.

In addition to these CWs, whom the Fund claims to have interviewed, *id.* ¶ 38, the SAC also selectively quotes comments reportedly made by Ronald Rugal to the *New Hampshire Business Review* for an article published in September 2016, *id.*  Rugal, the president of a PSG customer that operated twelve retail stores, claimed that PSG sales representatives engaged in aggressive sales practices and tried to get his stores to accept orders early.  *Id.* ¶ 58 (quoting *Questions Abound Over Performance Sports Group*, NEW HAMPSHIRE BUSINESS REVIEW, Sept. 1, 2016 ("**_NHBR_**")).[1]

The SAC contends that PSG's aggressive sales tactics collapsed under their own weight in the first quarter of 2016, when PSG "ran out of customer orders to pull forward."  SAC ¶ 17.  On January 13, 2016, PSG reported that quarterly revenues, gross profit, and earnings had declined year-over-year, and it projected that its financial results would continue to underperform for the rest of the fiscal year.  *Id.* ¶¶ 131-32.  Two months later, PSG announced that its forecasted results for the fiscal year would be even weaker than previously forecast.  *Id.* ¶ 139.  Explaining the causes of the revenue decline, PSG pointed to a number of unfavorable business developments, including (i) the weakening of the Canadian dollar relative to the U.S.

---

[1] In a portion of the article that the Fund omits from the SAC, Rugal said of these practices:  "I'm half to blame . . . . I could have said no," and specifically rejects the charge that PSG engaged in coercion— "[c]oercion, however, is too strong of a word."  Ex. A to the accompanying Declaration of Jason C. Rubinstein ("**Rubinstein Decl.**").  Rugal further explained that his decision to reduce PSG inventory in his stores was unrelated to PSG's allegedly aggressive sales practices, and was prompted by his frustration with the OTM initiative.  *Id.*

dollar; (ii) the December 2015 bankruptcy filing of Team Express, a large Easton customer; (iii) consolidation among significant Bauer customers; (iv) the March 2016 bankruptcy filing of The Sports Authority, one of Easton's largest customers; (v) general weakness in the baseball market; and (vi) financial difficulties at a significant Bauer customer that later filed for bankruptcy, creating significant losses for PSG.  *Id.* ¶¶ 131, 134-35, 139-42, 149-50.

   The SAC does not contest the truth of these statements or deny that they constituted material adverse developments for PSG.  Instead, the Fund implausibly contends that PSG caused its own demise by oversupplying its retail customers and delivering product earlier than requested, and that this practice—not the bankruptcy of major customers, market consolidation, unfavorable exchange rates, and market softening—was "the true cause" of PSG's decline in revenue.  *Id.* ¶¶ 135, 141, 143-44.  But the SAC does not specify the frequency of PSG's alleged requests to customers to buy more product and accept its early delivery, whether customers complied with such requests, the volume of product involved, or the revenue tied to these sales.  In total, it identifies only one instance in which a customer actually agreed to PSG's request to accept product early, and even as to that instance, the SAC provides no specifics.  *Id.* ¶ 60 (stating merely that the order was "large").  The SAC does not identify a single sham sale.

   Finally, in support of its allegation that Defendants knew that PSG's aggressive sales strategy would impair future earnings, the SAC relies on CW3's allegation that a senior executive "warned" PSG's Board of Directors in 2013 that "pulling orders forward to make its numbers would catch up with it."  *Id.* ¶ 83.  The SAC further contends that the alleged underperformance of two retail stores that PSG opened under its OTM strategy provided Defendants with a motive to conceal the failure of that strategy by relying on fraudulent sales practices.  *Id.* ¶¶ 168-73.  The SAC, however, does not specify the relative financial impact of

the retail stores' alleged underperformance or attempt to quantify the extent to which PSG's

challenged sales practices offset that underperformance, let alone suggest that the

underperformance of two stores would be sufficiently significant to provide an incentive for

Defendants to engage in securities fraud.  In addition, the SAC alleges that the facts that the

OTM strategy was suspended and that Davis departed PSG shortly following PSG's

announcement of its poorer-than-anticipated results "are highly indicative of scienter."  *Id.* ¶ 175.

## ARGUMENT

### I.

### THE COURT SHOULD DISMISS THE FUND'S SECURITIES FRAUD CLAIM

**A.**   **The SAC Fails to Identify Any False or Misleading Statements or Actionable Omissions**

To plead a securities fraud claim, the Private Securities Litigation Reform Act

("**PSLRA**") requires plaintiffs to identify statements or omissions that are false or misleading.

15 U.S.C. § 78u-4(b)(1); *Wilson v. Merrill Lynch & Co., Inc.*, 671 F.3d 120, 128-29 (2d Cir.

2011).  Plaintiffs must also explain *why* each identified statement is misleading and state with

particularity all facts on which that belief is formed.  *Wilson*, 671 F.3d at 128-29; 15 U.S.C. §

78u-4(b)(1); FED. R. CIV. P. 9(b).  It is not sufficient for plaintiffs to simply say that statements

were false or misleading; rather, plaintiffs "must demonstrate with specificity why and how that

is so."  *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir.

2014) (quoting *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004)).

Similarly, with respect to alleged omissions, plaintiffs must do more than allege

that omitted facts were material—Rule 10b-5 imposes no duty to disclose all material, nonpublic

information.  Plaintiffs must show that the defendant had a legal duty to disclose the particular

fact at issue.  *In re Lions Gate Entm't Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 11 (S.D.N.Y. 2016)

9

("[s]ilence, absent a duty to disclose, is not misleading under Rule 10b-5") (internal citation and quotation marks omitted).  Such a duty arises when disclosure is "necessary . . . to make the statements [the issuer actually] made, in the light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b–5.  The scope of this duty tracks the scope of the company's affirmative statements—a company "only [has to reveal] such [facts], if any, that are needed so that what was revealed would not be so incomplete as to mislead."  *In re Lions Gate*, 165 F. Supp. 3d at 15 (internal citation and quotation marks omitted).  For example, a corporation that reports its income "does not take on a duty to disclose that some of that income may be due, in part, to unlawful conduct," unless it misleadingly describes the legal sources of its income while omitting reference to the illegal sources.  *In re Braskem S.A. Sec. Litig.*, No. 15 CIV. 5132 (PAE), 2017 WL 1216592, at *11 (S.D.N.Y. Mar. 30, 2017).

Where plaintiffs fail to specifically demonstrate "why and how" affirmative representations or omissions are false or misleading, their claims are routinely dismissed as insufficient to state a claim.  *See, e.g., Carpenters Pension*, 750 F.3d at 236; *Wilson*, 671 F.3d at 132, 134-35 (dismissing as insufficient allegation that defendants fraudulently inflated demand by bidding in their own securities auctions where practice was permissible and disclosed).

The SAC fails to satisfy this most basic pleading requirement.  The gravamen of the Fund's claim is that Defendants artificially inflated PSG's earnings through "coercive, fraudulent sales practices" (branded as "channel stuffing" in the last version of Plaintiff's complaint) and misled investors into believing that PSG's success was "sustainable" by describing its sales growth as "organic" in public disclosures.  SAC ¶ 5.  The Fund asserts that PSG's growth was not "organic"—and that its disclosures were therefore deceptive—because that growth allegedly resulted from "fraudulent or manipulated sales practices," *id.* ¶ 7, and was

not "sustainable." *Id.* ¶ 11.  The Fund's claim warrants dismissal because, *first*, the SAC fails to sufficiently allege any fraudulent sales practices by PSG, and, *second*, the SAC relies on a made-up definition of "organic growth" that has no currency in the securities market.

### 1.  <u>The SAC Fails to Sufficiently Allege Any Fraudulent Sales Practices</u>

Read in the light most favorable to the Fund, the SAC alleges facts showing that some PSG salespeople engaged in aggressive sales tactics with some PSG customers.  But there is nothing misleading or improper about the sales tactics described by the SAC.

The practices described in the SAC—offering customers incentives to induce bigger and earlier orders, and shipping orders early to meet sales and earning goals—are sometimes given the pejorative label "channel stuffing."  *See, e.g., Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 325 (2007).  Indeed, that is how the Fund referred to PSG's alleged sales practices in its prior complaint.  Am. Compl. [ECF No. 62] ¶ 7.  As Defendants demonstrated in their motion to dismiss that complaint, "channel stuffing" is not illegitimate *per se*, but only crosses the line into fraud when it involves practices such as writing fake orders or making sham sales—none of which is alleged here.  *See, e.g., Tellabs*, 551 U.S. at 325 (holding that channel stuffing is not inherently fraudulent); *Gavish v. Revlon, Inc.*, No. 00-cv-7291, 2004 WL 2210269, at *17 (S.D.N.Y. Sept. 30, 2004) (same).  Unable to overcome that authority, the SAC jettisons the term "channel stuffing," and instead refers to the exact same sales practices as "aggressive," "manipulative," or "coercive."  SAC ¶¶ 158, 167.  The Fund cannot cure its failure to allege fraudulent sales practices through an exercise in relabeling.

Regardless of what the Fund calls them, aggressive sales practices are not fraudulent unless they involve an element of deception.  This was precisely the distinction that the Supreme Court recognized in *Tellabs*.  551 U.S. at 325.  There, the Court noted that "offering customers discounts as an incentive to buy" was a "legitimate kind" of channel stuffing, while

"writing orders for products customers had not requested" was "illegitimate." *Id.* On remand, the Seventh Circuit held that channel stuffing "could be innocent and might not even mislead," such as where a seller sought to "incite" distributors to make "more vigorous" sales efforts, and made clear that "[c]hannel stuffing becomes a form of fraud only when it is used . . . to book revenues on the basis of goods shipped but not really sold because the buyer can return them." *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 709 (7th Cir. 2008).

In this District, courts have found nothing fraudulent about aggressive sales practices that offer customers incentives for the purpose of meeting sales and earnings goals—precisely the activity alleged here. In *In re Bristol-Myers Squibb Securities Litigation*, plaintiffs claimed that defendants violated Rule 10b-5 by recognizing revenue that was generated by offering incentives to customers, such as discounts and extended payment terms, at the end of fiscal quarters to meet earnings estimates. 312 F. Supp. 2d 549, 566 (S.D.N.Y. 2004). The court dismissed those claims, observing it was a legitimate, "common practice" for a seller to offer incentives to meet sales or earnings goals, and "real products were shipped to real customers who paid real money." *Id.* at 566, 568. *Revlon* also ruled that there was "nothing inherently improper" about similarly aggressive sales practices. 2004 WL 2210269, at *17 (quoting *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 202 (1st Cir. 1999)). There, plaintiffs alleged that defendants inflated their revenue through undisclosed sales practices, such as offering discounts to induce larger orders and shipping products early. *Id.* at *18. The court dismissed these allegations as "unspecific, innocuous, or both," reasoning that "there may [have been] any number of legitimate reasons" behind the alleged channel stuffing practices. *Id.* at *18-19.

The First, Fifth, Ninth, and Eleventh Circuits have also concluded that attempting to move sales into earlier periods is not inherently fraudulent. *See Greebel*, 194 F.3d at 189,

202-03 (there "may be any number of legitimate reasons for attempting to achieve sales earlier");

*Local 731 I.B. of T. Excavators & Pavers Pension Trust Fund v. Diodes, Inc.*, 810 F.3d 951, 959-

60 (5th Cir. 2016) (shipping orders early is a "legal practice that may be supported by 'any

number of legitimate reasons'") (quoting *Greebel*, 194 F.3d at 203); *Broudo v. Dura Pharms.,*

*Inc.*, 339 F.3d 933, 940 (9th Cir. 2003) (finding "no fault" with district court's ruling that

channel stuffing allegations involving price discounts were not inherently fraudulent due to

"other legitimate reasons for attempting to achieve sales earlier"), *rev'd on other grounds*, 544

U.S. 336 (2005); *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1261 (11th Cir. 2006)

("Channel stuffing is not fraudulent *per se*.").

   In light of this precedent, the SAC's allegation that PSG's sales practices were

fraudulent does not withstand scrutiny.  The SAC fails to identify any deceptive sales practices

by PSG—*e.g.*, booking bogus sales or offering a guaranteed right of return.  The Fund alleges

nothing more than that some PSG sales representatives, possibly in an effort to meet their own

personal sales goals or help PSG meet its quarterly forecasts, offered certain customers

incentives to buy products in greater quantities or to accept delivery early.  SAC ¶¶ 53, 56-61.

But that is exactly the kind of practice that courts have found to be legitimate.  *Bristol-Myers*,

312 F. Supp. 2d at 566 ("Offering incentives to meet sales or earnings goals is a common

practice . . . ."); *Local 731*, 810 F.3d at 959-960 (finding early shipments of orders without prior

customer authorization was a "legal practice"); *see also Tellabs*, 551 U.S. at 325 (perceiving

nothing illegitimate about "offering customers discounts as an incentive to buy").  Having failed

to plead any actual deceptive practice, the Fund has failed to show that there was anything false

or misleading about how Defendants presented PSG's sales efforts to the public.[2]

---

[2] Although the Fund primarily bases its fraud claim on Defendants' statements about PSG's earnings
growth, it also alleges that statements made in certifications pursuant to Section 302 of the Sarbanes-

2.      **The SAC Relies on a Made-Up Definition of "Organic Growth"**

In an apparent effort to sidestep the inadequacy of its "channel stuffing" theory, the Fund alleges that Defendants' use of "organic" to describe PSG's growth was deceptive because the market understands "organic" growth to mean "sustainable" growth, not growth arising from "aggressive" sales practices.  SAC ¶¶ 7, 73-77.[3]  There is no support—none at all— for this assertion.

In the financial markets, the term "organic growth" is well understood to mean growth from all sources other than mergers and acquisitions (it is thus sometimes referred to as "non-acquisitive growth").  *See In re Omnicom Group, Inc. Sec. Litig.*, No. 02 Civ. 4483(RCC), 2005 WL 735937, at *1 (S.D.N.Y. Mar. 30, 2005) ("[O]rganic growth . . . is a measure of a company's growth from existing operations."); *KBC Asset Mgt. NV v. 3D Sys. Corp.*, No. 15-CV-02393-MGL, 2016 WL 3981236, at *1 (D.S.C. July 25, 2016) (defining "organic growth" as "growth not resulting from mergers and acquisitions"); *Zoumboulakis on Behalf of VeriFone Sys., Inc. v. McGinn*, No. 5:13-CV-02379-EJD, 2014 WL 3926565, at *1 (N.D. Cal. Aug. 7, 2014) (distinguishing growth "attributed to . . . acquisitions" from "'organic' growth"); *In re:*

---

Oxley Act of 2002 ("**SOX Certifications**") were false and misleading.  SAC ¶¶ 14, 113, 118.  The Fund alleges that, contrary to the SOX Certifications, PSG lacked the "proper internal controls to prevent the manipulation of its sales revenues" through the same sales practices that it claims are fraudulent.  *Id.* ¶¶ 113, 118.  The Fund's theory is defective and the Court should reject it out of hand.  *First*, for the reasons discussed above, the SAC fails to plead why PSG's sales practices were illegitimate.  *Second*, because the SAC alleges nothing about PSG's internal structure for financial reporting, its conclusory allegations fail the basic pleading requirements of the PSLRA.  *See, e.g.*, *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 402 (S.D.N.Y. 2016) (dismissing allegations that SOX Certifications regarding internal controls were false and misleading where plaintiffs failed to allege any facts pertaining to the company's internal structure for financial reporting); *City of Monroe Emps.' Ret. Sys. v. Hartford Fin. Servs. Grp., Inc.*, No. 10-cv-2835, 2011 WL 4357368, at *22 (S.D.N.Y. Sept. 19, 2011) (same).

[3] The Fund also asserts that PSG's growth was not "organic" because it was based on "fraudulent" sales practices, SAC ¶ 7.  This allegation fails because the Fund has not alleged any fraudulent sales practices by PSG.  *Supra* Part I.A.1.

*Ebix, Inc. Sec. Litig.*, 898 F. Supp. 2d 1325, 1343 (N.D. Ga. 2012) ("Defendants consistently represented in filings . . . that Ebix was growing organically, not just through acquisitions.").

   The SAC acknowledges this common understanding of "organic growth," noting that the term, as it is "generally used, refers to growth based on increased output, customer base expansion, or new product development, *as opposed to mergers and acquisitions*."  SAC ¶ 7 (emphasis added).  Nevertheless, the SAC insists that "reasonable investors could not have known, and could not have reasonably expected, that PSG's 'organic' growth included growth resulting from manipulative, aggressive, and unsustainable sales tactics," *id.* ¶ 77.  The Fund identifies no basis for this assertion apart from an academic manuscript, *Hess & Kazanjian*, THE SEARCH FOR ORGANIC GROWTH, Cambridge Univ. Press (2006) ("***Hess & Kazanjian***") (quoted in SAC ¶¶ 75-76),[4] which it blatantly mischaracterizes.  Contrary to its depiction in the SAC, *Hess & Kazanjian* confirms that "organic growth" is commonly understood to mean all non-acquisitive growth.  *Id.* at 104 ("Organic growth was defined as the opposite of acquisitive growth.  Almost all academic research counted . . . every cent of earnings equally.") (quoted in SAC ¶ 75); *see also* Edward D. Hess, *The Quest for Organic Growth*, CORP. FIN. REV., 2007 WL 8321806, at *4 (July/Aug. 2007) ("Historically, academics define organic growth as nonacquiring growth.").[5]  *Hess & Kazanjian*'s thesis is that this definition is not useful "if you are trying to evaluate the . . . *sustainability* . . . of a business's core operations."  *Hess & Kazanjian* at 104 (emphasis added).  That is because certain forms of earnings (*e.g.*, earnings

---

[4] Relevant excerpts of *Hess & Kazanjian* are annexed as Ex. B to the Rubinstein Decl.

[5] *Hess & Kazanjian* urge the creation of an "Organic Growth Index" to weigh corporate earnings differently based on whether they arise from practices the authors regard as desirable or undesirable. SAC ¶ 76 (quoting *Hess & Kazanjian* at 105-06).  But the authors do not claim that their approach has been adopted to an extent that it would inform how reasonable investors understand the term "organic growth."  Rather, they admit, "[o]ur research is controversial," and "Wall Street . . . questions our research."  *Hess & Kazanjian* at 105, 106.

from R&D) are more desirable than others (*e.g.*, earnings from financial engineering).  *Id.* at 12, 105.  In short, *Hess & Kazanjian*'s beef with "organic growth," as that term is generally used, is that it tells investors *nothing* about whether a company's earnings come from sustainable or unsustainable practices—the very opposite of what the Fund asserts.

Consistent with the term's historical usage, a reasonable investor considering Defendants' statements about "organic" growth would understand them as references to growth that was not attributable to acquisitions, not as an attempt to distinguish between growth from passive, as opposed to aggressive, sales practices.  Indeed, PSG's 2015 10-K unambiguously used "organic growth" in the commonly understood manner.  In a section titled "Continue to Pursue Strategic Acquisitions," PSG disclosed, "We are continuing to explore a number of potential near-term opportunities to complement our organic growth."  Rubinstein Decl. Ex. C at 20.  PSG's use of the term "organic" to mean "non-acquisitive" makes perfect sense in light of its recent, undisputed history of growth through acquisitions.  SAC ¶¶ 3, 45.  Understood in the proper context, nothing in PSG's statements about its "organic growth" created a misimpression among investors that it employed only passive sales practices.

Finally, the Fund's assertion that PSG's disclosures misleadingly omitted material facts, SAC ¶ 61, fails because nothing in the SAC supports the conclusion that PSG had a duty to disclose its sales practices.  *See In re Lions Gate*, 165 F. Supp. 3d at 11 (dismissing Rule 10b-5 omission claim where company had no duty to disclose investigations).[6]  The securities laws do

---

[6]  The SAC contends that Defendants are liable for failing to disclose, pursuant to Item 303 of Regulation S-K, the "known trend" of channel stuffing.  SAC ¶¶ 125-29.  This conclusory contention fails because the SAC lacks factual allegations showing that Defendants had <u>actual knowledge</u> of any existing trend that was "reasonably likely to have material effects" on PSG's financial condition, and thus required disclosure.  *In re IAC/InterActiveCorp Sec. Litig.*, 695 F. Supp. 2d 109, 118 (S.D.N.Y. 2010) ("Defendants' actual knowledge of the trend is an essential allegation . . . .") (internal citation and quotation marks omitted); 17 C.F.R. § 229.303 (Instruction #3); SEC Release Nos. 33-6835; 34-26831 (May 18, 1989).  Moreover, even if disclosure were required, "a violation of Item 303's disclosure

not require companies to disclose their sales practices, whether lawful or unlawful, unless their

failure to do so would make their affirmative statements misleading.[7]  This is true even if

investors would be interested in learning about those sales practices.  *See In re Canandaigua Sec.*

*Litig.*, 944 F. Supp. 1202, 1208 (S.D.N.Y. 1996) (non-disclosure of discounting strategy not

actionable); *In re Optionable Sec. Litig.*, 577 F. Supp. 2d 681, 692 (S.D.N.Y. 2008)

("corporation is not required to disclose a fact merely because a reasonable investor would . . .

like to know" it) (internal citation and quotation marks omitted).  Here, the SAC alleges no

affirmative statements made misleading by the nondisclosure of PSG's sales practices.

**B.**    **The SAC Fails to Plead that PSG's Statements about its Sales Practices Were Material**

   **1.**    **Materiality Is an Essential Element of a Securities Fraud Claim**

         To avoid dismissal, a plaintiff must plead facts showing that the alleged

misstatement or omission was material.  *See, e.g.*, *ECA and Local 134 IBEW Joint Pension Trust*

*of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009).  In claims involving

omissions, the materiality requirement is satisfied if there is a "substantial likelihood that the

disclosure of the omitted fact[s] would have been viewed by the reasonable investor as having

significantly altered the 'total mix' of information made available."  *Basic Inc. v. Levinson*, 485

U.S. 224, 231-32 (1988) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

---

requirements can only sustain a claim under Section 10(b) and Rule 10b-5 if the allegedly omitted information satisfies *Basic*'s test for materiality."  *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 103 (2d Cir. 2015).  As shown below, the Fund fails to allege that PSG's challenged sales practices were material, and this also dooms its claim based on Item 303 of Regulation S-K.

[7]  Thus, in *Braskem*, the court held that the company was under no "freestanding legal duty" to disclose its use of bribery and kickbacks to obtain favorable pricing,  2017 WL 1216592, at *11 ("a corporation, by reporting its income, does not take on a duty to disclose that some of that income may be due, in part, to unlawful conduct").  The company's failure to disclose its criminal scheme became actionable when it disclosed only the lawful bases for its favorable pricing.  Those disclosures were misleading because they omitted the major role that bribery and kickbacks had played in obtaining the pricing.  *Id.* at *16-18.

17

Materiality cannot be pleaded in a conclusory manner.  To satisfy the PSLRA and FED. R. CIV. P. 9(b), a complaint must demonstrate materiality by placing the alleged omission within the context of a defendant's "overall financial picture."  *Tabak v. Can. Solar Inc.,* 549 F. App'x 24, 26-27 (2d Cir. 2013) (citing *Decker v. Massey-Ferguson, Ltd.*, 681 F.2d 111, 116 (2d Cir. 1982)).  Statements constituting opinion, puffery, or indefinite expressions of corporate optimism are too indefinite to meet this materiality requirement.  *In re Int'l Bus. Machines Corporate Sec. Litig.*, 163 F.3d 102, 110 (2d Cir. 1998) ("*In re IBM*").  Rather, plaintiffs must provide some measure of the impact of the allegedly problematic practice on a corporation's financials, or at least an approximation of the magnitude or degree of the supposedly problematic sales.  *See, e.g.*, *In re Oak Tech. Sec. Litig.*, No. 96-cv-20552, 1997 WL 448168, at *8 (N.D. Cal. Aug. 1, 1997) ("To adequately plead financial fraud based on improper revenue recognition, Plaintiffs must allege, at a minimum, some particular transactions where revenues were improperly recorded, including the names of the customers, the terms of specific transactions, when the transactions occurred, and the approximate amount of the fraudulent transactions.").

The Second Circuit has spoken clearly on this issue, providing guidance on the level of detail required to avoid dismissal.  In *Employees' Retirement System of Government of the Virgin Islands v. Blanford*, the plaintiffs alleged that the defendants fraudulently concealed their overproduction of products by, among other things, making phantom shipments to customers.  794 F.3d 297, 301-02 (2d Cir. 2015).  Accepting the allegations as sufficient to plead materiality, the Second Circuit noted that the plaintiffs had specified the <u>name</u> of a customer who was allegedly shipped phantom orders, the <u>timing</u> and <u>amount</u> of product tied to those orders, and the <u>percentage</u> of the orders that were ultimately returned by the customer.  *Id.* at 302, 307.  In doing so, the plaintiffs provided sufficient detail to allow the court to evaluate the impact of

18

the phantom sales on the defendant company's overall financial picture.  That court reached the same conclusion in *In re Scholastic Corp. Securities Litigation*, which involved allegations that the defendants fraudulently concealed adverse figures regarding the number of books returned by customers.  252 F.3d 63, 66-67 (2d Cir. 2001).  The plaintiffs there satisfied the materiality requirement because they quantified the total amount of product returned during certain periods and provided detailed information about the total decline in sales, expressed both as a percentage and in terms of the quantity of product sold.  *Id.* at 70-72.[8]

Absent this level of specificity, courts routinely reject plaintiffs' claims for lack of materiality.  In *Revlon*, for example, the plaintiffs challenged sales practices similar to those at issue here.  2004 WL 2210269, at *2-4.  But they failed to establish materiality because they provided no context to show the impact of the challenged sales practices on Revlon's "total financial picture."  *Id.* at *16.  The court found that the plaintiffs did not make any effort to estimate the degree of the allegedly misleading financial statements, as "[n]one of the . . . allegations of improper sales practices contain a specific allegation of monetary consequence at all, let alone one large enough to have been reflected in Revlon's financial statements."  *Id.*[9]

---

[8] Unlike *Blanford* and *Scholastic*, the SAC does not dispute the *bona fides* of PSG's actual sales or earnings, and there is no allegation that its sales were fictitious, illusory, or subject to reversal based on an undisclosed right of return.

[9] Other courts have reached the same conclusion on similar facts.  *See, e.g., Gross v. Summa Four, Inc.*, 93 F.3d 987, 996 (1st Cir. 1996) (affirming dismissal where plaintiff failed to allege amount of earnings inflated through improper accounting methods or net effect on earnings); *AIG Global Sec. Lending Corp. v. Banc of Am. Sec. LLC*, 254 F. Supp. 2d 373, 385 (S.D.N.Y. 2003) (finding allegations inadequate where plaintiffs "provided no indication of the amount by which the figures were supposedly under or overstated"); *City of Omaha Police and Fire Ret. Sys. v. Timberland Co.*, No. 11-cv-277, 2013 WL 1314426, at *13 (D.N.H. Mar. 28, 2013) (confidential witnesses provided no details "from which to infer even a broad approximation of the amount of sales affected by alleged channel stuffing tactics"); *In re Sawtek, Inc. Sec. Litig.*, No. 03-cv-294, 2005 WL 2465041, at *8 (M.D. Fla. Oct. 6, 2005) (dismissing channel stuffing claim where plaintiffs did not approximate the amounts of money or inventory at issue); *Orton v. Parametric Tech. Corp.*, 344 F. Supp. 2d 290, 308 (D. Mass. 2004) (same, where complaint did not state amount of revenue misstated due to channel stuffing); *Johnson v. Tellabs, Inc.*, 262 F. Supp. 2d 937, 949 & n.12 (N.D. Ill. 2003) (same, where complaint merely alleged channel stuffing-based returns

2.      **The Fund Has Failed to Plead Facts Showing Materiality**

The SAC sheds no light on the impact of PSG's challenged sales practices on its earnings.  There is no estimate of how many sales resulted from these practices, how much revenue they generated, or what percentage of PSG's revenue was attributable to them.  Instead, the Fund relies on three data points:  (i) a purported survey of PSG customers; (ii) the anecdotes of four confidential witnesses and a retailer quoted in the *NHBR*; and (iii) the fact that PSG's earnings fell during the Class Period.  None of these allegations is sufficient to establish materiality.

*First*, the Fund relies on two duplicative, unsubstantiated surveys purportedly conducted by Roustan, or at his request.  These surveys allegedly state that a majority of PSG's ten largest customers received at least *one request* during the previous two years to move orders to an earlier quarter.  SAC ¶¶ 69-72.  Although these ten customers allegedly, but implausibly, represented 50-55% of PSG's overall business, *id.* ¶ 69, the Fund does not even attempt to estimate, how much, if any, of PSG's business with these customers was attributable to this alleged sales practice.  In fact, the SAC does not claim that even a single one of these customers actually *agreed* to move orders to an earlier quarter.  The SAC's allegations that rely on the surveys, therefore, pale in comparison to the allegations found to satisfy materiality in *Blanford* and *Scholastic* because Roustan's surveys neither indicate the scale of PSG's allegedly problematic sales practices nor estimate their relative impact on PSG's overall financial picture.  *See Blanford*, 794 F.3d at 302, 307; *Scholastic*, 252 F.3d at 70-72.  The Fund's allegations based on Roustan's surveys lack the particularity required to plead materiality.

---

worth "millions" of dollars, which were not material in a company with quarterly sales of "more than a billion dollars"); *In re Trex Co., Inc. Sec. Litig.*, 212 F. Supp. 2d 596, 611 (W.D. Va. 2002) (same, where plaintiffs did not provide the amount or percentage of revenues generated by the questioned transactions).

*Second*, the Fund cites the alleged testimony of four confidential witnesses who claim to have been asked to participate in, or to have been targets of, PSG's alleged channel stuffing scheme. Yet, those witnesses do not help the Fund establish materiality because they, too, fail to specify the extent or financial impact of PSG's allegedly improper sales.

- CW1, who was an independent sales representative of Bauer, purportedly recalls instances where he was asked by PSG to work with customers to ship orders early. SAC ¶ 56. That is the extent of his allegation. CW1 does not identify, among other things: (i) the customers he was asked to work with for this purpose; (ii) the number of occasions when he was asked to try to ship orders early; (iii) the number of occasions when he actually shipped orders early; or (iv) the quantity, monetary value, or timing of any orders that he ultimately shipped early.

- CW2, a store manager at *one* of PSG's retail customers, alleges in a similarly vague manner that PSG insisted during the Class Period that an order be placed a year in advance. *Id.* ¶ 63. Again, there are no details to support this allegation. CW2 does not indicate whether he/she agreed to PSG's request, much less approximate the quantity or monetary value of the order he/she was asked to place earlier.

- CW3, a co-owner of a PSG retail customer, claims to have received calls from PSG asking him to accept shipments early to allow PSG to meet its quarterly targets. *Id.* ¶ 57. Like CW1 and CW2, CW3 does not specify the magnitude of these allegedly improper transactions or even state that they occurred.

- CW4, a franchise owner of an Easton retail customer, claims that he/she agreed on *one* occasion to accept early shipment of a "large order" in return for free shipping. *Id.* ¶ 60. CW4's description of this one allegedly improper order as "large" is too vague to establish materiality. There is no reason to believe that an order considered "large" by the owner of a single retail franchise in Milwaukee, *id.* ¶ 38, is material, much less "large," to a publicly traded company with over 5,000 retail customers. Without knowing the quantity and monetary value of this one order, it is impossible to evaluate its materiality in the context of PSG's overall business.

- Rugal's alleged statements to the *NHBR* are also wanting. Although Rugal alleged that PSG "tried" to get him to accept orders early, he does not state that he actually did so or, if he did, in what amount. *Id.* ¶¶ 58-59.

21

The only other allegation in the SAC that could even remotely be interpreted to touch on materiality is similarly deficient.  The SAC states that PSG's earnings guidance was revised downward during the Class Period by about 80%, and, in entirely conclusory fashion, attributes this solely to PSG's aggressive sales practices.  *Id.* ¶ 19.  In doing so, the Fund dismisses all of the other, more plausible, explanations given by PSG for this decline—the substantial weakening of the Canadian dollar, bankruptcy filings by Team Express and The Sports Authority, the consolidation of Bauer customers, general weakness in the baseball market, and financial difficulties at an important Bauer customer, which later filed for bankruptcy and created significant losses for PSG.  *Id.* ¶¶ 131, 134-35, 139-42, 149-50.  The Fund sets forth no facts to support its contention that this drop resulted solely, or even primarily, from the disputed sales practices.  Nor does it attempt to identify what percentage *might* be attributable to those practices.  The Fund's generalized allegation regarding the total drop in PSG's earnings provides no insight into the degree to which the disputed sales practices inflated PSG's revenues.

Even if the Court were to find PSG's allegedly problematic sales practices to be material, the majority of statements that the SAC identifies as fraudulent—consisting primarily of statements of defendant Davis at earnings calls or in press releases[10]—are, in fact, nonactionable statements of corporate optimism.  These statements, reproduced below, are classic examples of corporate optimism about PSG's results and prospects that investors do not rely upon when making investment decisions.

- "We experienced another record quarter for PSG, and our Q2 results were driven by the continued strong performance of the EASTON baseball/softball business . . . ."  SAC ¶ 79;

---

[10]  The SAC does not identify any allegedly false or misleading statements by defendant Rosenthal outside of PSG's financial statements.

- "We reported another record quarter due to the continued strong performance of Easton . . . . Easton continued to experience solid demand . . . ." *Id.* ¶ 86;

- "[W]e continue to outpace the growth of the markets . . . . We remain very well-positioned to continue our momentum into fiscal 2016 and beyond." *Id.* ¶¶ 92, 97;

- "[W]e continue to see solid growth across our brand . . . ." *Id.* ¶ 121;

- "But otherwise, we don't see any sort of decline in demand from consumers for those products." *Id.* ¶ 122.

None of these statements is sufficiently material as a matter of law to give rise to a claim for securities fraud. *See In re IBM*, 163 F.3d at 107 (holding that statements regarding future performance may be actionable "if they are worded as guarantees or are supported by specific statements of fact"). Defendant Davis's statements, by contrast, "are too general to cause a reasonable investor to rely upon them." *JP Morgan Chase Co.*, 553 F.3d at 206. Moreover, the Fund has failed to allege any particularized facts that defendant Davis did not believe these statements when made. *See In re MRU Holdings Sec. Litig.*, 769 F. Supp. 2d 500, 510-11 (S.D.N.Y. 2011) ("Because 'the challenged statements regarding the future . . . were predictions or opinions, and not guarantees,' and because 'there is no evidence in the record indicating that [the Individual Defendants] did not genuinely believe' in those predictions, '[P]laintiff[s] ha[ve] failed to identify any misstatements or omissions of material fact which would support a Section 10(b) or Rule 10b-5 claim.'") (citation omitted) (alterations in original).

## C.     The SAC Fails to Plead Scienter

In securities fraud cases, plaintiffs must plead specific facts that give rise to a "strong inference" of a defendant's fraudulent intent. *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001); 15 U.S.C. § 78u-4(b)(2)(A). Applying that standard, the Supreme Court has held that an "inference of scienter must be more than merely plausible or reasonable—it must be cogent

23

and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.  Under *Tellabs*, courts "must take into account plausible opposing inferences" of nonfraudulent intent, *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (quoting *Tellabs*, 551 U.S. at 323), and if a fraudulent inference is not "at least as compelling" as a nonfraudulent one, it must be rejected, even in a "close case." *Slayton v. Am. Express Co.*, 604 F.3d 758, 777 (2d Cir. 2010).

A plaintiff may satisfy the scienter requirement by pleading facts (i) showing that a defendant had "motive and opportunity to commit the fraud" or (ii) "constituting strong circumstantial evidence of conscious misbehavior or recklessness." *Shaar*, 493 F.3d at 99.  For conduct to be reckless under this standard, it must have been "highly unreasonable, representing an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Rothman v. Gregor*, 220 F.3d 81, 90 (2d Cir. 2000) (internal citation and quotation marks omitted).  While plaintiffs are not required to plead scienter based on a defendant's motive, where motive is not shown, the strength of their circumstantial allegations regarding conscious misbehavior or recklessness "must be correspondingly greater." *JP Morgan Chase Co.*, 553 F.3d at 198-99.[11]

### 1.  Mere Knowledge of PSG's Sales Practices Fails to Support a Strong Inference of Scienter

The Fund contends that scienter can be inferred from Defendants' mere knowledge of PSG's "aggressive and unsustainable sales practices," relying on allegations that defendant Rosenthal attended sales meetings where these practices were discussed and that

---

[11] Courts scrutinize scienter allegations with particular rigor in cases involving alleged omissions "because defendants should not be required to incur litigation expenses every time an aggrieved investor claims that an accurate statement was rendered misleading based on the absence of additional information." *In re GeoPharma, Inc. Sec. Litig.*, 411 F. Supp. 2d 434, 437 (S.D.N.Y. 2006).

defendant Davis attended a board meeting where they were discussed.  *See, e.g.*, SAC ¶¶ 62, 90, 95, 104, 110, 167.

No such inference is reasonable because, as discussed *supra* at Part I.A.1, the sales practices described in the SAC are neither fraudulent nor wrongful.  There are legitimate reasons for pursuing aggressive sales tactics and persuading customers to increase the size and frequency of their orders, such as meeting earnings goals, presenting distributors with an incentive to sell products more vigorously, and gaining market share relative to the company's competitors.  *See, e.g.*, *Bristol-Myers*, 312 F. Supp. 2d at 566; *Makor Issues*, 513 F.3d at 709.  In light of those plausible and lawful motivations, it is unreasonable to infer fraudulent intent from the mere fact that aggressive sales practices have been used.  *See Bristol-Myers*, 312 F. Supp. 2d at 566, 568 (finding that offering incentives to meet sales or earnings goals, without more, was an insufficient basis for scienter); *Revlon*, 2004 WL 2210269, at *17, 19 (finding aggressive sales practices, such as offering discounts and shipping products early, did not by themselves raise a strong inference of scienter); *Garfield*, 466 F.3d at 1265 (finding that promotion of channel stuffing at a series of meetings did not establish scienter); *Trex*, 212 F. Supp. 2d at 608-09 (collecting cases ruling that channel stuffing does not support a strong inference of scienter).

In fact, courts have roundly rejected far stronger allegations than those made here.  For example, in *Garfield*, the plaintiffs sought to demonstrate scienter by pleading that company officers attended monthly meetings where "aggressive channel stuffing and mounting problems with accounts receivable" were discussed in detail, and that the officers were aware of the problem but "decided to continue" with the aggressive practices "because the company had to make its numbers."  466 F.3d at 1264-65.  The Eleventh Circuit found scienter lacking.  In *Bristol-Myers*, plaintiffs asserted that scienter could be inferred because (1) management set

25

aggressive targets, (2) incentives were given to customers to buy product before they needed it, (3) this was done to meet earnings estimates, and (4) it was known that customer inventories were high.  *Bristol-Myers*, 312 F. Supp. 2d at 568.  The court deemed these allegations insufficient, noting that "[o]ffering incentives to meet sales or earnings goals is a common practice," and the plaintiff had not alleged that the reported sales were fictitious.  *Id.* at 566, 568.

The scienter allegations here as to Defendants are far weaker than those in *Garfield* and *Bristol-Myers*.  Unlike *Garfield*, there is no allegation that PSG's sales practices created any problems with its accounting or financial statements that might have given Defendants cause to investigate further.  The SAC merely alleges that Defendants attended meetings where the sales practices were discussed.  Scienter cannot be inferred from these alleged meetings because the sales practices themselves are not inconsistent with innocuous conduct (including, as found in both *Garfield* and *Bristol-Myers*, the desire to meet earnings objectives).  Similarly, scienter cannot be inferred from the allegations that PSG set "aggressive" sales targets, SAC ¶ 5, offered incentives to customers (*e.g.*, volume discounts and free shipping) to buy product before they needed it, *id.* ¶¶ 53-61, or saturated the market with inventory in a manner that could erode future sales, *id.* ¶ 66.  These are merely watered-down versions of the allegations found deficient in *Bristol-Myers* and do not support an inference of scienter.[12]

Further, the Fund's allegations about the surveys conducted by PSG's former chairman (Roustan), which purport to show that PSG asked certain retail customers to move an order into an earlier quarter, do not support an inference of scienter.  Even supposing the surveys

---

[12]  Courts infer scienter in channel stuffing cases where the plaintiff pleads direct evidence of defendants' intent to deceive the market.  For example, in *In re Dura Pharms., Inc. Sec. Litig.*, 452 F. Supp. 2d 1005 (S.D. Cal. 2006), the defendants discussed how they could make analysts "perceive" that the company was doing better than it was.  Courts do not infer scienter based only on allegations (such as the SAC's) that the company offered discounts or other incentives to increase *bona fide* sales at quarter-end.

evidenced a fraudulent scheme (they do not), the SAC alleges no facts tying the surveys to Defendants.  The SAC merely alleges that the surveys existed; it does not allege that Defendants knew of their existence or their purported results, let alone how they were made aware, at what time, and by whom (in fact, the SAC alleges that the surveys were commissioned by Roustan years after he left PSG, at a time when he had no role at PSG).  SAC ¶¶ 69-72.  The survey allegations, therefore, do not provide evidence of scienter as to Defendants because they are not pleaded with particularity.  *See Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000) ("[T]o plead scienter, plaintiffs must 'state *with particularity* facts giving rise to a strong inference that *the defendant* acted with the required state of mind.'") (emphasis added) (internal citation omitted).

## 2. Unfounded Allegations of Defendants' Knowledge about the Risks of Aggressive Sales Practices Are Insufficient to Support Scienter

The SAC also attempts to plead scienter by claiming that Defendants knew or recklessly disregarded the truth that PSG's sales practices were cannibalizing future sales and thus spelled doom for PSG, but nevertheless deceived investors about PSG's true prospects.  SAC ¶¶ 17, 19, 127-29, 167.  This claim fails on multiple levels, starting with logic.  The Fund's assertion that Defendants acted against their own economic self-interest in pursuing a failing strategy strains credulity.  It is implausible for anyone, let alone the leaders of a publicly traded company, to engage in a scheme that is doomed to fail.  *See Shields v. Citytrust Bancorp., Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994) (holding that allegations that defendants inflated their stock price by concealing adverse facts could not show scienter because the alleged scheme would have provided only a "short respite" of several months, as adverse facts were uncovered anyway in the ordinary course of bank business); *In re GeoPharma, Inc. Sec. Litig.*, 399 F. Supp. 2d 432, 449 (S.D.N.Y. 2005) (finding scienter allegations insufficient where the "alleged scheme could not possibly have succeeded"); *Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 600 (S.D.N.Y.

2016) (same, where "as pled, the scheme . . . lacks a coherent rational objective . . . [and] by its nature . . . could not have continued in perpetuity").

The SAC pleads no facts that explain why Defendants would pursue a futile strategy. It does not, for example, allege that Defendants benefitted in any way from the strategy, including by making insider stock sales that took advantage of the strategy's alleged inflationary effect on PSG's stock price. The opposite is true. Accepting the Fund's version of events, Defendants and PSG have suffered significant harm from pursuing this strategy— Defendants have lost their jobs and PSG has filed for bankruptcy. Absent any allegations as to how Defendants benefitted, it is difficult to conceive of why they would have pursued such a hopeless strategy in the first place, making an inference of scienter far from plausible. *See QRX Pharma*, 197 F. Supp. 3d at 600 (finding that where "there would be no concrete benefit to defendants to justify these risks," "[c]ourts regularly refuse to infer scienter . . . when confronted with such illogical allegations").[13]

The inference is also inadequately supported by the SAC's factual allegations. The Fund contends that Defendants' knowledge of the harmful consequences of the sales practices is established by their "access to [] adverse undisclosed information" about PSG's business as corporate officers. SAC ¶ 32. That allegation is insufficient to establish the relevant knowledge. Courts in this District have "long held" that accusations of a defendant's knowledge of adverse information "founded on nothing more than a defendant's corporate position are entitled to no weight." *Plumbers & Steamfitters Local 773 Pension Fund v. Can. Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 300 (S.D.N.Y. 2010). Scienter cannot be inferred solely

---

[13] Indeed, rather than having any incentive to pursue a futile strategy, the Defendants were <u>acquiring</u> PSG stock at the same time the SAC alleges that they were overseeing sales practices that they knew would doom the company's future financial results. SAC ¶ 143; Rubinstein Decl. Exs. D-G.

from the fact that a defendant, due to his executive position, had access to adverse information. *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 407 (S.D.N.Y. 2016). Amounting to little more than a claim that Defendants "must have known," the Fund's arguments based on Defendants' status within PSG should be rejected.

Elsewhere in the SAC, the Fund relies on similarly unsupported allegations regarding Defendants' alleged knowledge of the harmful consequences of the challenged sales practices. SAC ¶¶ 66-68. The Fund asserts that defendant Davis "knew that the hockey equipment market was saturated," yet "insisted" that retailers increase orders every year. *Id.* ¶ 66.[14] It also states that "due to PSG's sales practices and the material volume of early shipments . . . Defendants knew that PSG's sales figures, on the back of these tactics, were unsustainable." *Id.* ¶ 68. These are precisely the types of conclusory, generalized allegations that are not probative of scienter. *Revlon*, 2004 WL 2210269, at *18-19 (ruling that inferring recklessness based on knowledge of sales practices alone would improperly credit "totally conclusory allegations regarding defendants' omniscient awareness of traffic into and out of the channel").

The Fund also claims that Defendants were warned about the risks of PSG's aggressive sales practices by a former PSG executive. SAC ¶¶ 62, 167. But there are several problems with this claim. The sole source of this allegation is CW3, identified in the SAC as the co-owner of one of Bauer's retail customers in New Hampshire. *Id.* ¶ 38. According to CW3, Edward Kinnaly, a former PSG officer, told the attendees of a 2013 meeting of PSG's Board that

---

[14] The Fund cites to retrospective membership data from USA Hockey to support its allegation that the hockey equipment market was saturated. *Id.* ¶ 9. But these data do not cure its failure to plead scienter. First, the SAC does not allege that Defendants were even aware of these statistics or could have accessed them during the Class Period. Second, USA Hockey is a fee-based organization and its data do not track recreational ice hockey participants and therefore cannot be relied on to gauge the overall market demand for PSG products. Third, the USA Hockey figures (which show a *growing* membership during the Class Period, *see id.*) do not compel the conclusion that Defendants (had they seen the data) should have known that PSG's desired growth rate was unattainable; they are just a single data point.

the company's sales practices "would eventually catch up with PSG." *Id.* ¶ 62. CW3 further alleges that Kinnaly was fired for raising this concern. *Id.* Notably, CW3 is not alleged to have personal knowledge of these matters. Nor does CW3 contend that defendant Rosenthal was at the 2013 Board meeting where Kinnaly supposedly expressed this concern, or specify when or how (if at all) Rosenthal became aware of it.

Nothing in the SAC provides a sound basis to credit CW3's allegations. Courts in the Second Circuit have held that confidential witness allegations may be considered only if "they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Kasaks*, 216 F.3d at 314; *see also In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 308 F. Supp. 2d 249, 262 (S.D.N.Y. 2004) (discounting confidential witness allegations where "it is not apparent from the informant's title that he or she would probably possess such information"); *In re Sierra Wireless, Inc. Sec. Litig.*, 482 F. Supp. 2d 365, 376 (S.D.N.Y. 2007) (same). This requires a plaintiff to describe the confidential witnesses' background "sufficiently to indicate a high likelihood that they actually knew facts underlying their allegations." *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 590 (S.D.N.Y. 2011); *see also Feasby v. Industri-Matematik Int'l, Corp.*, No. 99-cv-8761, 2003 WL 22976327, at *4 (S.D.N.Y. Dec. 19, 2003) (discounting confidential witness allegations where the complaint did not "describe the position held by or work assignments of the former employee or consultant sources, or any other information that would support an inference that the sources would possess the information attributable to them"). Alternatively, if the plaintiff pleads "independent [] factual allegations" that corroborate the confidential witness's allegations, the requirement of describing the source's position is loosened. *Glaser*, 772 F. Supp. 2d at 590.

30

Under this precedent, CW3's allegation should be set aside.  The SAC provides no indication, let alone a "high likelihood," that CW3 would have been privy to Kinnaly's alleged statement at the 2013 Board meeting.  The SAC does not allege that CW3—who is not described as having ever been employed by PSG or a member of its Board—was present at this Board meeting, nor does it indicate that CW3 had a relationship with Kinnaly, or any other basis for CW3 coming to learn of this alleged statement.  Furthermore, the Fund does not otherwise allege a single fact that corroborates CW3's assertion that Kinnaly provided this conclusory opinion (or was fired by PSG for expressing it).  We are, therefore, left guessing as to how CW3 learned of this alleged statement, and how many levels of hearsay are involved.[15]

Even if the Court were to accept CW3's account as true, Kinnaly's alleged statement is insufficient to show that Defendants knew, or were at least reckless about, the future effects of the alleged sales practices.  Differences of opinion, "even stark differences, between employees do not reveal scienter."  *City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 957 F. Supp. 2d 277, 299 (S.D.N.Y. 2013); *see also In re Cerner Corp. Sec. Litig.*, 425 F.3d 1079, 1085-86 (8th Cir. 2005) (holding that allegation that regional sales manager believed earnings forecasts were unattainable "sheds no light on . . . whether the Individual Defendants shared this view, or indeed of whether the forecasts were necessarily unattainable").  Kinnaly's alleged general statement that PSG's sales practices "would eventually catch up with" it is just such a difference of opinion, and it is insufficient to show that Defendants acted with the requisite

---

[15]  While a confidential witness's relaying of hearsay does not automatically disqualify his statement from consideration in the scienter analysis, the hearsay "may indicate that a confidential witness' report is not sufficiently reliable."  *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 997 n.4 (9th Cir. 2009).  Here, where the layers of hearsay are unknowable because of the Fund's failure to substantiate CW3's awareness of this alleged statement, CW3's allegations in this respect are unreliable and cannot support a strong inference of scienter.  *See In re Elan Corp. Sec. Litig.*, 543 F. Supp. 2d 187, 220 (S.D.N.Y. 2008) (rejecting CW's allegation that company's senior management had knowledge because plaintiffs failed to allege any facts indicating that the CW "was in a position to have knowledge regarding communications with [defendant company's] senior management").

fraudulent intent.  SAC ¶ 62.  This is particularly true given the SAC's complete failure to allege that Kinnaly's supposed statement was supported by *any* evidence, facts, or data.  *See Kinross*, 957 F. Supp. 2d at 299 (allegations that an employee "notified [defendants] of facts" supporting his opinion may show conscious misbehavior or recklessness).

Finally, CW3's allegation suffers from the same fundamental problem that infects the entire SAC—it provides no support for the inference that Defendants knew, or were reckless in not knowing, that PSG's alleged sales practices were improper.  CW3's allegation that Defendants were informed that the sales practice "would catch up with PSG" does not remedy this fatal flaw because allegations such as CW3's that are "consistent with innocent conduct are never sufficient for a strong inference [of scienter]."  *SEC v. Espuelas*, 579 F. Supp. 2d 461, 474 (S.D.N.Y. 2008).

**3.      Defendant Davis's Departure Is Not Probative of Scienter**

The SAC's allegations regarding defendant Davis's departure do not support an inference of scienter because the Fund does not allege special circumstances surrounding the departure.  The Fund attempts to show scienter through defendant Davis's departure in March 2016, after PSG had experienced months of decline.  But it is well established that an officer's departure, without more, is not probative of scienter.  For an officer's departure to be probative of scienter, it must be "highly unusual and suspicious."  *Glaser*, 772 F. Supp. 2d at 598.  The SAC alleges no facts to establish that Davis's departure was "highly unusual and suspicious."

Courts are cautious about inferring scienter from an officer's resignation because resignations are commonplace among corporate executives and can arise from innumerable causes.  A court will consider a resignation "highly unusual and suspicious" for purposes of inferring scienter when "independent facts indicate that the resignation was somehow tied to the fraud alleged, that the resignation somehow alerted defendants to the fraud, or that defendant's

scienter was otherwise evident." *Id.* For example, in *In re Salix Pharm., Ltd.*, the court found officers' resignations highly unusual and suspicious where the board had exercised the clawback provisions of the executives' compensation agreements—which required a finding of intentional wrongdoing—and the company later restated its financial results. No. 14-CV-8925 (KMW), 2016 WL 1629341, at *15 (S.D.N.Y. Apr. 22, 2016). Mere temporal proximity of an officer's resignation to a company's corrective disclosure is not probative of scienter. *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 446-47 (S.D.N.Y. 2005); *C.D.T.S. No. 1 & A.T.U. Local 1321 Pension Plan v. UBS AG*, No. 12-cv-4924, 2013 WL 6576031, at *7 (S.D.N.Y. Dec. 13, 2013) (no strong inference of scienter from resignation where "there are a number of other, more plausible reasons why personnel may have been demoted and resigned"). In addition, a company's overall decline does not constitute a special circumstance that is probative of scienter. *See QRX Pharma*, 2016 WL 3685095, at *35 (citing *Owens v. Jastrow*, 789 F.3d 529, 541 n.9 (5th Cir. 2015), and explaining that in *Owens*, the court "not[ed] that [the] district court had rejected scienter allegation[s] on [the] ground that [the] company's overall decline, rather than securities fraud, was likely the impetus for the resignations").

Here, the SAC alleges no special circumstances surrounding defendant Davis's departure. It merely alleges that he resigned shortly after PSG's challenged sales practices were revealed to the marketplace. As explained above, this temporal proximity is not probative of scienter because the Fund alleges no independent facts tying Davis's departure to the alleged fraud, and there are a number of plausible independent reasons why he might have left PSG.

### 4. Defendants' Motive to Maintain Corporate Profitability Does Not Support a Strong Inference of Scienter

The Fund's efforts to establish scienter through Defendants' alleged motive and opportunity to commit fraud are equally unsuccessful. According to the SAC, Defendants had a

33

motive to ensure that PSG "continue [its] success" as a public company.  SAC ¶¶ 172-73.  But

that motive is insufficient to support a strong inference of fraudulent intent.  To infer scienter

based on motive, plaintiffs must allege that defendants could realize "concrete and personal"

benefits through the alleged fraudulent statements.  *Kasaks*, 216 F.3d at 307-08.  For example, a

motive to raise a company's stock price artificially so that an insider could sell shares at inflated

prices might qualify as such a motive because it specifies a concrete and personal benefit that

could be realized by the insider as a result of the fraudulent statement.  *Id.*

        Here, all that the Fund offers is a generalized motive that could be "imputed to

any publicly-owned, for-profit endeavor," such as the "motive to maintain the appearance of

corporate profitability"; that is insufficient to show scienter.  *Chill v. Gen. Elec. Co.*, 101 F.3d

263, 268 (2d Cir. 1996); *see also Kasaks*, 216 F.3d at 307; *Kalnit*, 264 F.3d at 139 (desire to

make corporation appear profitable is not probative of scienter); *JP Morgan Chase Co.*, 553 F.3d

at 198 (same).  The Second Circuit has held that such generalized motives naturally entail benefit

to the corporation, but do not show the concrete, personal benefits necessary to satisfy the motive

requirement.  *Chill*, 101 F.3d at 268.  This rule is animated by a practical rationale—if the desire

to maintain the appearance of profitability establishes scienter, "virtually every company in the

United States that experiences a downturn in stock price could be forced to defend securities

fraud actions."  *Id.* (internal citation and quotation marks omitted).  Inferring fraudulent intent

from such a commonplace motive, as the Fund urges, runs counter to settled law.

        It is no answer for the Fund to say that the SAC also contains allegations about

Defendants' motive to "conceal" their allegedly failing OTM store strategy.  SAC ¶ 172.  The

Fund contends that PSG's OTM initiative depressed customer demand and took a toll on sales,

which Defendants hoped to conceal through the challenged sales practices.  *Id.*  But that is just

another way of saying that Defendants were trying to maintain the appearance of profitability.[16] The Second Circuit rejected precisely such a contention in *Rombach v. Chang*, where plaintiffs alleged that defendants were motivated to make a series of corporate acquisitions to artificially inflate their falling stock price.  355 F.3d 164, 168, 177 (2d Cir. 2004).  The court held this motive insufficient to show scienter, equating it with the non-fraudulent desire to "maintain the appearance of corporate profitability."  *Id.* at 177.  The same result should follow here.

Even if the Fund's argument were not foreclosed by precedent, it would fail for lack of specificity.  The SAC contains no facts bearing on the degree to which the OTM strategy depressed customer demand or revenues.  SAC ¶ 49.  To the contrary, there is good reason to doubt that the poor performance of PSG's retail stores—of which there were only two in 2015, *id.*—would have had any measurable effect on the performance of PSG, a company with over 5,000 retail customers worldwide.  Rubinstein Decl. Ex. C (2015 10-K) at 21.  It is therefore implausible, at a minimum, to infer that the weak performance of such a minor piece of PSG's business would provide a motive to execute a company-wide fraudulent scheme.

Finally, the Fund alleges that PSG's former chairman, Roustan, "made clear" to defendant Davis that the retail store strategy would depress customer demand.  SAC ¶ 169. Again, no matter the strength of Roustan's conviction, this amounts to a dispute over operational strategy.  Even if Roustan had the better of the argument, "poor business judgment is not actionable" under the securities laws, nor does it give rise to a strong inference of fraudulent intent.  *Rothman*, 220 F.3d at 90.  To the contrary, it provides yet another nonfraudulent explanation for the decline in sales that is the subject of this lawsuit.

---

[16]  Other allegations in the SAC actually negate any inference of fraudulent intent based on the OTM initiative.  The SAC states that defendant Davis was in possession of an independent study finding that the OTM initiative *increased* the likelihood of consumers visiting local independent retailers.  SAC ¶ 134.

35

5.      **The Financial Performance of PSG's Competitors Fails to Support a Strong
Inference of Scienter**

The Fund cannot cure its failure to plead scienter by arguing that PSG's

competitors appeared to better withstand the market factors that battered PSG in early 2016.

Under the Fund's theory, the perceived strength of PSG's competitors demonstrates that PSG

provided pretextual reasons for its weak performance to conceal its "fraudulent scheme."  SAC

¶¶ 149-55.  This leap of logic amounts to rank speculation, falling well short of the requirement

that inferences be "cogent" and "compelling" to establish scienter.  *Tellabs*, 551 U.S. at 324.

Defendants have disclosed several non-fraudulent causes for PSG's financial

struggles, including the bankruptcies of major customers, market consolidation, unfavorable

exchange rates, and market softening.  SAC ¶¶ 135, 139-42.  The Fund does not contest that

these developments occurred during the Class Period.  And it is plain that any one of them, and

certainly all of them in concert, would exact a toll on any company's performance.  Nevertheless,

the Fund would have the Court believe that these headwinds facing PSG were not the "real"

reason for its poor performance; they simply camouflaged the drop-off in sales resulting from

PSG's alleged fraudulent channel stuffing.  *Id.* ¶¶ 21-22.  To support this claim, the Fund argues

that PSG's competitors did not experience similar financial difficulties and that, by extension,

Defendants' disclosures must have been false.  *Id.* ¶¶ 151-55.  This inference is unsustainable.

A competitor's superior ability to withstand market forces does not suggest that

less fortunate or less able companies were committing fraud.  If it were otherwise, a plaintiff

could satisfy the scienter requirement simply by pointing to another company in the same

industry that outperformed the target of the lawsuit.  Recognizing as much, the Second Circuit

has affirmed a district court's conclusion that scienter could not be shown simply because a

defendant's losses were higher than those of its competitors during the collapse of the credit

36

markets in the late 2000s.  *Local No. 38 Int'l Broth. of Elec. Workers Pension Fund v. Am. Express Co.*, 430 F. App'x 63, 65 (2d Cir. 2011).  In this context, rather than a fraudulent inference, the "more compelling inference" was that the defendants' "aggressive growth strategy was sideswiped" by factors that afflicted the entire market.  *Id.*  Similarly here, the Fund does not dispute that multiple negative factors were afflicting the market during the relevant time period. From *American Express*, it follows that the mere allegation that some competitors outperformed PSG during this time period is insufficient to transform the inference of scienter into something at least as compelling as the headwinds bearing on PSG.

The Fund's simplistic approach also ignores that market factors may affect different companies differently.  For example, PSG's significant exposure to the Canadian market made it far more vulnerable to currency fluctuations that disfavored the Canadian dollar relative to the U.S. dollar.  It is far from clear that any PSG competitors shared that level of vulnerability.  Likewise, there is no reason to believe that PSG and its competitors were equally harmed by the bankruptcies of major PSG customers.  Those customers may have been less significant, or not significant at all, to PSG's competitors.  In light of these obvious differences, courts have refused to infer fraudulent intent from the mere fact that a competitor outperforms the target of a securities fraud suit.  *See, e.g.*, *Am. Express*, 430 F. App'x at 65; *In re Network Assocs., Inc. Sec. Litig.*, No. 99-cv-1729, 2000 WL 33376577, at *13 (N.D. Cal. Sept. 5, 2000) (finding that although defendant's disclosed market-wide reason for its financial underperformance "allegedly did not affect [its] competitors," this was insufficient to show scienter).  The Fund's argument here should fare no better.

Even if the Fund could plead scienter by pointing to the success of a PSG competitor at a time when PSG struggled, its allegations should be rejected because they do not

present fair and accurate comparisons.  For example, the Fund alleges that, during late 2015 and early 2016, Reebok-CCM Hockey "reported an 18% increase in sales" while PSG announced that Bauer's sales were down 19%.  SAC ¶ 136.  But this figure applies to Reebok-CCM Hockey's sales for calendar year 2015 only.  Rubinstein Decl. Ex. H (Adidas Grp. Annual Report 2015) at 2-3.  Moreover, the SAC's statement that "it was not until much later than PSG that Reebok-CCM Hockey started to report any sort of negative results" is misleading.  SAC ¶ 136.  In fact, CCM Hockey reported a 14.7% decline in sales year-over-year *during the first half of 2016*—exactly the same time that PSG experienced a sales downturn.  *Id.* Ex. I (Adidas Grp. First Half Year Report Jan. – June 2016) at 147, 181.  In addition, the fact that the CEO of Newell Brands (which owns PSG competitor Rawlings) was "extremely pleased" with its Q1 2016 results does not necessarily entail positive performance for its Rawlings division.  SAC ¶ 154.  Newell Brands is a multi-billion dollar company, and Rawlings, which is the only major PSG competitor owned by that conglomerate, accounts for only a portion of its revenues.[17] Rubinstein Decl. Ex. K (Newell Brands Q2 FY16 Press Release (July 29, 2016)) at 1-3.  And even if some of PSG's competitors were successful during this period, that success could very well have come at PSG's expense.

The SAC also omits information about PSG's competitors who experienced similar financial difficulties in the first half of 2016.  Nike, for example, faced an 11% year-over-year decrease in North America equipment sales for the quarter that ended in February 2016.  *Id.* Ex. L (Nike, Inc. Divisional Revenues (Mar. 22, 2016)).  The performance of PSG's competitors,

---

[17]  Within Newell Brands, Rawlings is housed within a business named Outdoor Solutions.  Rubinstein Decl. Ex. J at 28.  In Q2 of FY16, Outdoor Solutions constituted approximately 25% of Newell Brands' net sales.  Rubinstein Decl. Ex. K at 1-3.  Thus, Rawlings accounts for less than approximately 25% of Newell Brands' net sales—and probably significantly less, given that the Outdoor Solutions business segment includes eight other brands.

insofar as it is even knowable from the SAC's allegations, simply does not show a robust, thriving industry; nor does it provide a sound basis to infer that PSG's alleged underperformance resulted from fraud.[18]

## D.   Events Occurring After the Fund Disposed of Its PSG Stock Are Irrelevant to Its Securities Fraud Claim.

The SAC contains allegations of events that occurred after the Fund disposed of the last of its PSG stock on March 10, 2016.  SAC Schedule A.  These allegations are irrelevant to whether Defendants committed securities fraud during the Class Period.

Most significantly, the SAC contains allegations about a 10.35% drop in PSG's stock price on March 15, 2016, the day after the *New York Post* published an article entitled "Bauer's Parent Company Questioned About Misdating Earnings."  *Id.* ¶¶ 20, 147, 158. Reductions in stock prices that occur after a plaintiff's complete disposition of holdings cannot support a fraud claim.  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005).  Because it owned no PSG stock after March 10, 2016, the Fund did not suffer any loss as a result of declines in PSG's share price after that date.

The SAC also alleges that, in August 2016, PSG disclosed an investigation by its audit committee of the "Company's financial statements and the related certification process," as well as investigations by certain regulators.  SAC ¶ 22.  But the SAC alleges nothing connecting these investigations to any alleged misconduct by Defendants or any injury to the Fund.[19]

---

[18]  The Fund asserts that Nike's declining equipment sales are irrelevant because it "is not listed in PSG's Annual Report as a primary competitor, but only as competitive in some 'specific categories such as batting gloves.'"  SAC ¶ 151.  That makes no sense.  As the Fund concedes, equipment sales—the very category in which Nike experienced a sharp decline in late 2015 and early 2016—is an area in which PSG and Nike competed, and Nike's drop off in equipment sales was symptomatic of the broader challenges facing the sporting goods industry.

[19]  Even if these investigations had been disclosed during the Class Period, that would not support an inference of scienter (or the other elements of securities fraud) because the SAC does not allege they reached any findings, much less any findings relevant to Defendants or the challenged sales practices.

39

Because they are irrelevant to the Funds' claims, the Court should strike the SAC's allegations about developments following March 10, 2016 and dismiss any claims based on such developments.

## II.

### THE COURT SHOULD DISMISS THE FUND'S CLAIM OF CONTROL PERSON LIABILITY

To state a claim for "control person" liability under Section 20(a) of the Exchange Act, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud. *Shaar*, 493 F.3d at 108. Where a plaintiff fails to state a primary violation under Section 10(b) of the Exchange Act, it cannot establish control person liability under Section 20(a). *E.g.*, *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 379 (S.D.N.Y. 2011).

As shown in Part I, the SAC fails to state a claim for a primary violation of Section 10(b), meaning that the control person claim must fail as well. In addition, for the same reasons that the SAC fails to plead facts giving rise to a strong inference of scienter, it has not alleged culpable participation by either Defendant.[20] Because the SAC fails to establish at least two essential elements of control person liability, the Court should dismiss Count II.

### CONCLUSION

For the reasons set forth above, the Court should dismiss the SAC.

---

*See In re MoneyGram Int'l Inc. Sec. Litig.*, 626 F. Supp. 2d 947, 981 (D. Minn. 2009) ("[W]here . . . an ongoing SEC investigation does not result in hearings or adverse findings, an inference 'that the SEC investigation uncovered no evidence of fraud,' is more compelling than an inference of fraud.").

[20] *See, e.g.*, *In re Satyam Comp. Servs. Ltd. Sec. Litig.*, 915 F. Supp. 2d 450, 482-83 (S.D.N.Y. 2013) (finding that for the same reasons that plaintiff failed to allege scienter, plaintiffs also failed to allege that any of the defendants were culpable participants); *Janbay v. Can. Solar, Inc.*, No. 10-cv-4430, 2012 WL 1080306, at *17 (S.D.N.Y. Mar. 30, 2012) (same).

Dated: New York, New York
         June 22, 2017

                              Respectfully submitted,


FRIEDMAN KAPLAN SEILER &              WINSTON & STRAWN LLP
ADELMAN LLP


s/ Edward A. Friedman                 s/ David L. Aronoff
Edward A. Friedman                    David L. Aronoff (*pro hac vice*)
Jason C. Rubinstein                   Gayle I. Jenkins (*pro hac vice*)
Timothy M. Haggerty                   Scott J. Fishwick (*pro hac vice*)
7 Times Square, 28th Floor            333 S. Grand Avenue
New York, New York 10036-6516         Los Angeles, California 90071-1543
Tel.  (212) 833-1100                  Tel.  (213) 615-1700
Fax  (212) 833-1250                   Fax  (213) 615-1750
efriedman@fklaw.com                   DAronoff@winston.com
jrubinstein@fklaw.com                 GJenkins@winston.com
thaggerty@fklaw.com                   SFishwick@winston.com

*Attorneys for Defendant Amir Rosenthal*    Seth C. Farber
                                      200 Park Avenue
                                      New York, New York 10166-4193
                                      SFarber@winston.com

                                      *Attorneys for Defendant Kevin Davis*


41