**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JUAN FRANCISCO GONZALEZ NIEVES, AS TRUSTEE OF THE GONZALEZ CORONADO TRUST, individually and on behalf of all others similarly situated,<br><br>                        Plaintiff,<br><br>          v.<br><br>KEVIN DAVIS and AMIR ROSENTHAL,<br><br>                        Defendants. | Case No. 16-3591 (GHW) |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' JOINT MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION ............................................................................................................. 1

STATEMENT OF FACTS ................................................................................................. 4

    I.      DEFENDANTS' OBSESSION WITH GROWTH DRIVES THEM TO
           DEVISE A PROGRAM TO STRONG-ARM PSG'S RETAILER
           CUSTOMERS ............................................................................................... 5

    II.     DEFENDANTS RECEIVE MULTIPLE, SPECIFIC WARNINGS
           ABOUT THE RISKS OF THEIR HIGH-PRESSURE SALES
           STRATEGY .................................................................................................. 7

    III.    DEFENDANTS CONCEAL FROM INVESTORS A MATERIAL
           ASPECT OF PSG'S GROWTH AND THE RISKS OF THAT HIGH-
           PRESSURE GROWTH STRATEGY. ........................................................... 8

    IV.    AS THE CONCEALED RISKS MATERIALIZE, THE INVESTING
           PUBLIC FINALLY LEARNS THE EXTENT OF DEFENDANTS'
           DECEPTION AND HALF-TRUTHS. ......................................................... 11

ARGUMENT ................................................................................................................... 13

    I.      THE SECOND AMENDED COMPLAINT SETS FORTH
           DEFENDANTS' MATERIALLY FALSE AND MISLEADING
           STATEMENTS ............................................................................................ 14

          A.     The Second Amended Complaint sufficiently identifies
                Defendants' half-truths and omissions, all of which created a
                highly misleading portrait of PSG. .......................................... 14

          B.     The Second Amended Complaint sufficiently identifies
                Defendants' failure to disclose a "known trend" that they were
                under a duty to disclose ............................................................ 19

    II.     THE SECOND AMENDED COMPLAINT SUFFICIENTLY ALLEGES
           THAT KNOWLEDGE OF THE HIGH-PRESSURE SALES PROGRAM
           AND ITS RISKS WOULD HAVE BEEN MATERIAL TO A
           REASONABLE INVESTOR. ...................................................................... 21

          A.     A "reasonable investor" would have considered knowledge of
                Defendants' scheme to boost earnings through aggressive sales
                practices a "significant" factor in deciding whether to invest in
                PSG. ........................................................................................... 22

i

B.     None of Defendants' material misrepresentations constitute nonactionable statements of corporate optimism or puffery.................... 26

III.     DEFENDANTS ACTED WITH SCIENTER. .................................................... 27

A.     Defendants Davis and Rosenthal acted with scienter. ............................. 28

B.     Defendants' myopic focus on "channel stuffing" not being fraudulent *per se* misconstrues Plaintiff's allegations. ............................ 31

C.     Defendants had direct knowledge of the risks that their sales tactics posed to PSG, and they acted contrary to that knowledge and misled investors about the nature of those risks. ....................................... 33

D.     Defendants' attack on Confidential Witness #3 fails................................ 35

E.     The inference of scienter is at least as compelling as any opposing inference one could draw from the facts alleged. ..................................... 37

IV.     EVENTS OCCURRING AFTER PLAINTIFF SOLD ITS PSG STOCK ARE RELEVANT TO THE SECURITIES FRAUD CLAIMS. .......................... 38

V.     THE CONTROL PERSON CLAIM IS ADEQUATELY PLED. ........................ 39

CONCLUSION.................................................................................................................... 40

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Bharucha v. Reuters Holdings PLC,*
    810 F. Supp. 37 (S.D.N.Y. 1993) ........................................................39

*In re BioScrip, Inc. Sec. Litig.,*
    95 F. Supp. 3d 711 (S.D.N.Y. 2015)...................................................17

*In re Braskem S.A. Sec. Litig.,*
    -- F. Supp. 3d --, 2017 WL 1216592 (S.D.N.Y. Mar. 30, 2017) .....................16, 17

*In re Bristol-Myers Squibb Sec. Litig.,*
    312 F. Supp. 2d 549 (S.D.N.Y. 2004)...................................................18, 19, 32

*In re Burlington Coat Factory,*
    114 F.3d 1410 (3d Cir. 1997)...............................................................25

*In re Cabletron Sys.,*
    311 F.3d 11 (1st Cir. 2002)..................................................................19

*Caiola v. Citibank, N.A.,*
    295 F.3d 312 (2d Cir. 2002).................................................................17

*Carpenters Pension Trust Fund of St. Louis, St. Clair Shores Police & Fire Ret.
    Sys. v. Barclays PLC,*
    56 F. Supp. 3d 549 (S.D.N.Y. 2014)....................................................40

*Carpenters Pension Trust Fund of St. Louis v. Barclays PLC,*
    750 F.3d 227 (2d Cir. 2014)................................................................14, 22

*In re Cerner Corp. Sec. Litig.,*
    425 F.3d 1079 (8th Cir. 2005) ............................................................36

*City of Austin Police Ret. Sys. v. Kinross Gold Corp.,*
    957 F. Supp. 2d 277 (S.D.N.Y. 2013)..................................................36

*Cunha v. Hansen Natural Corp.,*
    2011 WL 8993148 (C.D. Cal. May 12, 2011) .....................................24

*In re Dura Pharms., Inc. Sec. Litig.,*
    452 F. Supp. 2d 1005 (S.D. Cal. 2006)...............................................32

*Dura Pharms., Inc. v. Broudo,*
    544 U.S. 336 (2005)...........................................................................32, 38

*ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009)...............................................................................22, 26

*In re Eletrobras Sec. Litig.*,
  -- F. Supp. 3d --, 2017 WL 1157138 (S.D.N.Y. Mar. 27, 2017) ............................24

*In re EZCorp, Inc. Sec. Litig.*,
  181 F. Supp. 3d 197 (S.D.N.Y. 2016)....................................................................13

*In re Facebook, Inc. IPO Sec. and Deriv. Litig.*,
  986 F. Supp. 2d 487 (S.D.N.Y. 2013)....................................................................21

*Feasby v. Industri-Matematik Int'l Corp.*,
  2003 WL 22976327 (S.D.N.Y. Dec. 19, 2003) ......................................................36

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
  308 F. Supp. 2d 249 (S.D.N.Y. 2004).....................................................................36

*Freudenberg v. E*Trade Fin. Corp.*,
  712 F. Supp. 2d 171 (S.D.N.Y. 2010)................................................................18, 29

*Ganino v. Citizens Utils. Co.*,
  228 F.3d 154 (2d Cir. 2000)..............................................................................21, 25

*Garfield v. NDC Health Corp.*,
  466 F.3d 1255 (11th Cir. 2006) .............................................................................32

*Gavish v. Revlon, Inc.*,
  2004 WL 2210269 (S.D.N.Y. Sept. 30, 2004).....................................................19, 24

*In re Gentiva Sec. Litig.*,
  932 F. Supp. 2d 352 (E.D.N.Y. 2013) ....................................................................31

*In re GeoPharma, Inc. Sec. Litig.*,
  399 F. Supp. 2d 432 (S.D.N.Y. 2005).....................................................................33

*Gillis v. QRX Pharma Ltd.*,
  197 F. Supp. 3d 557 (S.D.N.Y. 2016).....................................................................33

*Glaser v. The9, Ltd.*,
  772 F. Supp. 2d 573 (S.D.N.Y. 2011)....................................................................36

*Howard v. Liquidity Servs., Inc.*,
  177 F. Supp. 3d 289 (D.D.C. 2016) ........................................................................18

*Hutchison v. Deutsche Bank Sec. Inc.*,
  647 F.3d 479 (2d Cir. 2011)....................................................................................22

*In re Inv. Tech. Grp., Inc., Sec. Litig.*,
   -- F. Supp. 3d --, 2017 WL 1498055 (S.D.N.Y. Apr. 26, 2017)............................................27

*Janbay v. Canadian Solar, Inc.*,
   2012 WL 1080306 (S.D.N.Y. Mar. 30, 2012) ..........................................................................40

*In re Lions Gate Entm't Corp. Sec. Litig.*,
   165 F. Supp. 3d 1 (S.D.N.Y. 2016) ...........................................................................................17

*Litwin v. Blackstone Group, L.P.*,
   634 F.3d 706 (2d Cir. 2011)..............................................................................................22, 24

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
   797 F.3d 160 (2d Cir. 2015)........................................................................................13, 25, 40

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
   513 F.3d 702 (7th Cir. 2008) ..................................................................................... *passim*

*Meyer v. Jinkosolar Holdings Co., Ltd.*,
   761 F.3d 245 (2d Cir. 2014)............................................................................................17, 18

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000)...................................................................................... *passim*

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
   681 F.3d 114 (2d Cir. 2012)............................................................................................20, 21

*In re Petrobras Sec. Litig.*,
   116 F. Supp. 3d 368 (S.D.N.Y. 2015).......................................................................................24

*Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*,
   89 F. Supp. 3d 602 (S.D.N.Y. 2015).........................................................................................31

*Ret. Sys. of Gov't. of the Virgin Islands v. Blanford*,
   794 F.3d 297 (2d Cir. 2015)................................................................................14, 23, 24, 25

*Ret. Sys. v. Hartford Fin. Servs. Grp., Inc.*,
   2011 WL 4357368 (S.D.N.Y. Sept. 19, 2011)..........................................................................15

*In re Salix Pharm., Ltd.*,
   2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016)......................................................................16, 27

*In re Sanofi Sec. Litig.*,
   155 F. Supp. 3d 386 (S.D.N.Y. 2016).......................................................................................15

*In re Satyam Computer Servs. Ltd. Sec. Litig.*,
   915 F. Supp. 2d 450 (S.D.N.Y. 2013).......................................................................................40

*In re Scholastic Corp. Sec. Litig.*,
  252 F.3d 63 (2d Cir. 2001)..................................................................................24, 39

*In re Scientific-Atlanta, Inc. Sec. Litig.*,
  239 F. Supp. 2d 1351 (N.D. Ga. 2002) .......................................................................32

*SEC v. DiMaria*,
  207 F. Supp. 3d 343 (S.D.N.Y. 2016)........................................................................22

*Shemian v. Research in Motion Ltd.*,
  2013 WL 1285779 (S.D.N.Y. Mar. 29, 2013) ...........................................................39

*Shields v. Citytrust Bancorp, Inc.*,
  25 F.3d 1124 (2d Cir. 1994).......................................................................................33

*In re Sierra Wireless, Inc. Sec. Litig.*,
  482 F. Supp. 2d 365 (S.D.N.Y. 2007).........................................................................36

*In re St. Jude Med., Inc. Sec. Litig.*,
  836 F. Supp. 2d 878 (D. Minn. 2011) .........................................................................30

*Stratte-McClure v. Morgan Stanley*,
  776 F.3d 94 (2d Cir. 2015)..........................................................................................20

*Strougo v. Barclays PLC*,
  105 F. Supp. 3d 330 (S.D.N.Y. 2015).........................................................................25

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)............................................................................................ *passim*

*In re Urban Outfitters, Inc. Sec. Litig.*,
  103 F. Supp. 3d 635 (E.D. Pa. 2015) ..........................................................................29

*In re Vale S.A. Sec. Litig.*,
  2017 WL 1102666 (S.D.N.Y. Mar. 23, 2017) ..........................................................9, 22

*In re Van der Moolen Holding N.V. Sec. Litig.*,
  405 F. Supp. 2d 388 (S.D.N.Y. 2005).........................................................................16

*In re Virtus Inv. Partners, Inc. Sec. Litig.*,
  195 F. Supp. 3d 528 (S.D.N.Y. 2016).....................................................................16, 17

*In re Vivendi, S.A. Sec. Litig.*,
  838 F.3d 223 (2d Cir. 2016)........................................................................................26

*Walker v. Schult*,
  717 F.3d 119 (2d Cir. 2013)........................................................................................13

**STATUTES**

Private Securities Litigation Reform Act,
   15 U.S.C. § 78u-4 ..............................................................................................27, 40

Securities Exchange Act of 1934,
   15 U.S.C. § 78a, *et seq.* ....................................................................................... *passim*

**OTHER AUTHORITIES**

Federal Rules of Civil Procedure ..................................................................................13, 14, 40

Regulation S-K, Item 303,
   17 C.F.R. § 228.303(a)(3)(ii) ................................................................................19, 20

SEC Exchange Act Release No. 6835,
   1989 WL 1092885 (May 18, 1989) ..............................................................................20

SEC Rule 10b-5,
   17 C.F.R. § 240.10b-5 ...........................................................................................13, 14, 17

SEC Staff Accounting Bulletin,
   64 Fed. Reg. 45, 150 (1999) No. 99 ..........................................................................22, 24

2256443.6

## INTRODUCTION

In an effort to escape liability, Defendants Kevin Davis and Amir Rosenthal have constructed an impressively elaborate straw man.  Defendants – the former chief executive officer and chief financial officer of Performance Sports Group ("PSG" or the "Company"), the now-bankrupt sports equipment manufacturer – move to dismiss the supposed claim that they violated the federal securities laws by failing to disclose the existence of a high-pressure sales strategy.  That strategy included threatening price spikes if a customer did not order greater amounts of product, and requiring that orders be placed and accepted in earlier quarters.  Against this claim, Defendants contend that dismissal is appropriate because "[t]here is nothing inherently false or misleading about aggressive sales campaigns that yield . . . only *bona fide* sales."  Def. Mot. at 1.

But that is not Plaintiff's claim in this case.  Rather, the claim is that Defendants concealed from investors a material aspect of PSG's business – its use of those high-pressure sales tactics to meet quarterly targets – while representing at the same time that the Company's growth was "solid," "record-setting," "organic," and due to PSG's "growing market share and profitability" and "continued strong performance" of its main two product lines.  Concealing these facts from investors was misleading, particularly given that Defendants did so even after receiving multiple warnings that the Company's high-pressure sales tactics posed a material risk to its business and the very growth numbers Defendants were touting.

Those warnings came in multiple forms, including two inside-the-boardroom accounts: an executive vice president, Edward Kinnaly, who as early as 2013 warned both Defendants during a Board of Directors meeting that the Company's high-pressure sales tactics were unsustainable and would eventually catch up with the Company; and W. Graeme Roustan, the

1

former chairman of PSG's Board of Directors and a major PSG shareholder who, during a June 2015 meeting with the Board of Directors (including Defendant Davis), amplified Kinnaly's warning in light of PSG's evolving business strategy.  PSG had by then announced that it was going to open its own retail operations and compete against its own retailer customers; Roustan warned the Board that the combination of squeezing PSG's retailer customers via high-pressure sales tactics while directly competing against them would trigger an acute risk to the Company – those customers would reduce their purchases of and/or stop buying PSG products.   In preparation for his meeting with the Board, Roustan commissioned Grant Thornton, the global accounting firm, to survey PSG's largest retailer customers and provide data on, among other things, the Company's high-pressure sales tactics and its decision to compete against its customers, including whether PSG asked them to move orders into earlier periods.

In both cases, Defendants chose the same strategy: *suppression*.  After Kinnaly spoke out to Defendants about the high-pressure sales tactics and their risks, Defendants fired him.  After learning of the Grant Thornton survey, PSG and Defendants blocked Grant Thornton from releasing the survey results to Roustan and the investing public.  Roustan persisted, presenting data to the Board and Defendant Davis on the effects of their tactics: he collected information from the Company's largest customers via SurveyMonkey, confirming that PSG was engaged in high-pressure sales tactics with them, including asking them to move orders into earlier quarters.  But that merely corroborates what Defendants' suppression strategy already shows: that they knew what was going on at PSG and the risks associated with its sales tactics – they just didn't want their investors to know.

The concealed risks began to materialize just as the media caught on.  A March 2016 *New York Post* story disclosing the high-pressure sales tactics was the first domino to fall.  In the

next six months, Defendants Davis and Rosenthal lost their jobs, the U.S. Securities and Exchange Commission opened an investigation into PSG, the Canadian securities regulator opened its own investigation into PSG, PSG's Audit Committee conducted an internal investigation into the Company's financial statements and related certification process, the Company sold its assets to private investors, and then the Company ultimately filed for bankruptcy.  PSG's share price during the Class Period reached a high of $21.65; by March 14, 2016, the end of the Class Period, the share price had cratered to $3.96.

Viewed against the real allegations in Plaintiff's complaint, Defendants' arguments fail:

1.      Baseless is the argument that Defendants' statements during the Class Period accurately represented the nature of PSG's growth and the risks associated with the methods they were using to achieve that growth.  Those statements were misleading because they omitted facts on the very subject matter – growth, the nature and cause of that growth, and a trend and risks that would impact that growth – upon which Defendants and PSG were speaking.

2.      Defendants' argument that these facts were immaterial as a matter of law is premature at the pleadings stage, and in any event is quite wrong: a reasonable investor would have viewed disclosure of the high-pressure sales tactics and the risks associated with them – risks identified to and recklessly disregarded by Defendants – as significantly altering the total mix of information available.  In fact, investors *did* want to know: Roustan (a major shareholder) had interest in the information, but PSG blocked him from receiving it, and the *New York Post* story ultimately disclosing the practice sent investors scrambling.

3.      Viewed holistically, the allegations establish that it is at least as plausible as any other inference that Defendants were reckless in their misstatements, *i.e.*, that they knew facts and had access to information showing that their public statements were inaccurate and

misleading, and/or failed to check information they had a duty to monitor. Defendants' argument that this was all business as a matter of course is belied by the cascade of events that occurred in the six months after the *New York Post* story broke: both Defendants lost their jobs, and investigations were commenced by PSG's Audit Committee, the Canadian securities regulators, and the SEC. Defendants take unpersuasive potshots at the confidential witness accounts (which easily meet the Second Circuit's standard), attempt to attack Roustan's credibility (improper at this stage), and note the lack of insider trading (not necessary under Supreme Court law) – but none of that rebuts the conclusion that the facts, viewed holistically, show an inference of scienter at least as plausible as any competing inference.

For these reasons and those that follow, Defendants' motion to dismiss should be denied.

## STATEMENT OF FACTS

Performance Sports Group was a publicly traded developer and manufacturer of sports equipment and apparel. SAC ¶¶ 2, 4.[1] Its business involved selling ice hockey, roller hockey, lacrosse, baseball, and softball equipment under its brand names to retailers who would then sell those products to consumers. *Id.* ¶ 39. PSG's brands included Bauer, Cascade, and Easton, among others. *Id.* Bauer and Easton were the core parts of PSG's business: Bauer was "the world's leading manufacturer of ice hockey equipment," *id.* ¶ 49, while Easton was the number one brand of baseball and softball equipment and apparel, *id.* ¶ 46. Defendant Kevin Davis was PSG's chief executive officer until March 22, 2016, when he abruptly resigned. *Id.* ¶¶ 28, 158, 158. Defendant Amir Rosenthal was its chief financial officer and executive vice president of finance and administration until December 2015. *Id.* ¶ 29. In October 2015, Rosenthal became

---

[1] References to "SAC" are to the Second Amended Complaint. *See* Dkt. 115 (filed June 22, 2017).

President of PSG Brands, giving him oversight over and responsibility for Bauer and Easton; he left the Company on October 31, 2016, the day PSG filed for bankruptcy. *Id.* ¶¶ 164-66.

## I.    DEFENDANTS' OBSESSION WITH GROWTH DRIVES THEM TO DEVISE A PROGRAM TO STRONG-ARM PSG'S RETAILER CUSTOMERS.

During the Class Period (January 15, 2015 until March 14, 2016), PSG employed a "progressive sales program" that had the goal of consistently boosting the volume of sales to PSG's retailer customers. *Id.* ¶ 42. Styled by the Company to the public as a "cooperative marketing incentive program[]," *id.* ¶ 43, the program was in fact the opposite of cooperative: PSG sales representatives were ordered to lure their retailer customers with incredibly steep discounts on merchandise, and then threaten those customers with sharp price spikes – removal of the discounts – if the customers did not agree to increase the size of their orders each year, place their orders earlier, and accept merchandise shipments earlier. *Id.* ¶ 44.

Defendants Davis and Rosenthal, who had responsibility for oversight and management of the Company's core business, *id.* ¶¶ 28, 29, 32, 33, 35, created and oversaw this high-pressure sales program. *Id.* ¶ 42. Confidential Witness #1 ("CW1"), a sales representative and independent contractor at Bauer for 29 years (until February 1, 2016), corroborated that Defendants created this program. CW1 reported to Bryan McDermott, Bauer's Business Director for North America, and Matt Hayes, who in turn reported to Paul Healey, Bauer's Vice President of Sales for North America. *Id.* ¶ 38. CW1 stated that PSG executives, including Healey, Defendant Davis, and Defendant Rosenthal, were responsible for the creation of this program. *Id.* ¶ 42. Defendant Rosenthal in particular attended the biyearly sales meetings with CW1, at which he would review PSG's sales practices and order PSG sales representatives to aggressively push retailer customers to place earlier orders of larger volumes of PSG product. *Id.* ¶¶ 13, 167.

This high-pressure sales program occurred across PSG's brands, and several long-time retailer customers corroborated its existence and operation.  For example, CW3 – the co-owner of a multi-franchise retailer customer based in New Hampshire, *id.* ¶ 38 – was told by Healey (Bauer's Vice President of Sales for North America) in the summer of 2015 to increase his purchases by at least 15% over the previous year or face price spikes by losing Bauer's discount, *id.* ¶ 53; he was also pressured during the Class Period to place orders whenever Bauer asked him to – sometimes even a year early, even though it was impossible for him to predict demand a year in advance.  *Id.* ¶ 64.  CW2, the store manager of a retailer customer based in New Jersey, *id.* ¶ 38, was told multiple times during the Class Period by Bauer representatives to either increase the size of his orders or risk price spikes via loss of the store's wholesale discount, *id.* ¶ 53.  On one occasion he was told by Bauer to place his order a full year early – even without knowing customer demand for the product that far in advance.  *Id.* ¶ 63.  CW4, the franchise owner of a retailer customer based in Wisconsin, *id.* ¶ 38, accepted orders early according to Easton's demands, and specifically recounted an incident in November 2015 when he asked Easton to cut down a large baseball equipment order; the Easton representative ignored this and instead had the order delivered more than two months early.  *Id.* ¶ 60-61.  Ronald Rugal, the president of a Midwestern retailer customer, stated that PSG's goal during the Class Period was to "jam orders down our throat, to take orders early, to overstock, oversupply, over-inventory us," all in an effort to meet quarterly sales targets by any means necessary.  *Id.* ¶¶ 58-59.

It did not matter to Defendants and PSG that the retailer customers' businesses were not growing, that the fundamentals of the sports equipment market had not changed, *id.* ¶¶ 54-55, that the retailer customers did not even have to pay PSG when orders were shipped early to meet quarterly deadlines, *id.* ¶ 65, or that the ice hockey equipment market was fully saturated during

the Class Period, *id.* ¶¶ 66-68.  All that mattered was that PSG's quarter-over-quarter numbers continue to grow during the Class Period.  *Id.* ¶¶ 57, 59.  Defendants concealed the true nature of the sales program, yet they consistently touted to the investing public PSG's sales and revenue growth, *id.* ¶ 92, its "solid demand," *id.* ¶ 86, and the growth of PSG's market share, *id.* ¶ 92.

## II.   DEFENDANTS RECEIVE MULTIPLE, SPECIFIC WARNINGS ABOUT THE RISKS OF THEIR HIGH-PRESSURE SALES STRATEGY.

On January 8, 2015, PSG announced that Bauer would expand its business from developing and manufacturing ice hockey equipment and apparel to selling that equipment to consumers via a brick-and-mortar retail experience; the goal was to open six to eight locations over the course of the following 18 to 24 months.  *Id.* ¶ 49.  These "Own The Moment" retail locations would compete directly with Bauer's retail customers.  *Id.*

Given PSG's aggressive marketing tactics, this strategy posed a particularly dangerous risk to the Company, which multiple sources communicated directly to Defendants and PSG's senior management.  PSG's retailer customers registered their strong objections to the Own The Moment strategy.  *Id.* ¶ 50.  CW1 – a Bauer sales representative for 29 years – explained to Healey (Bauer's Vice President of Sales for North America) the danger of competing directly with PSG retailer customers while at the same time using aggressive sales tactics like threatened price spikes to progressively boost sales volume.  *Id.*

Reports from inside the boardroom corroborate that Defendants were specifically warned of and knew the risks of their strategy.  Rather than disclose those risks to investors, Defendants Davis and Rosenthal took a more draconian approach.  As far back as 2013, Edward Kinnaly – an executive vice president at the time – warned Healy, Defendant Davis, and Defendant Rosenthal about the risks inherent in the Company's sales practices at a Board of Directors meeting; he stated in particular that PSG's practice of "trade loading" – pulling orders forward

7

from one quarter into an earlier quarter to make PSG's numbers look impressive – would inevitably catch up with PSG once there were no more orders to pull forward. *Id.* ¶ 62. PSG promptly fired Kinnaly for speaking out. *Id*.

Firing Kinnaly was not the end. In June 2015, after the announcement of the Own The Moment strategy, Graeme Roustan, Bauer's former Chairman and a large shareholder of PSG, held a meeting with PSG's Board of Directors, including Defendant Davis, to express his concern that PSG's retailer customers "would likely react negatively to the abrupt change in business strategy" by reducing their purchases of PSG's Bauer, Easton, and Cascade-branded products. *Id.* ¶ 51. Roustan had previously retained Grant Thornton, the global accounting firm, to assess PSG's accounting practices and survey its ten largest customers in the U.S. and Canada about, among other things, whether PSG had asked those customers to move an order into an earlier quarter. *Id.* ¶¶ 69-70. A majority of the surveyed customers responded that they had indeed been asked to pull orders into an earlier quarter, a significant fact given that those surveyed constituted 50-55% of PSG's business. *Id.* ¶¶ 69-70. Roustan sought to have the Grant Thornton survey results disclosed to PSG's Board of Directors and its investors, but Defendants blocked Grant Thornton from disclosing the final results of the survey to Roustan. *Id.* ¶¶ 71, 147, 157. Roustan then conducted another survey of the same PSG customers using SurveyMonkey, and presented his findings to the PSG Board of Directors and Defendant Davis; that survey confirmed that a majority of the respondents had indeed been asked by PSG to pull an order forward into an earlier quarter. *Id.* ¶¶ 71-72, 147.

## III.   DEFENDANTS CONCEAL FROM INVESTORS A MATERIAL ASPECT OF PSG'S GROWTH AND THE RISKS OF THAT HIGH-PRESSURE GROWTH STRATEGY.

8

None of this was disclosed to investors.  Instead, Defendants Davis and Rosenthal – while certifying the truth, accuracy, and completeness of their representations in SEC filings, *e.g.*, *id.* ¶¶ 112, 117 (2015 Form 10-K, May 31, 2015, and Q1 2016 Form 10-Q, Oct. 14, 2015) – painted a picture of PSG as a fast and consistently growing business whose growth was attributable to "continued strong performance" of the core parts of its business – the Easton baseball and softball business, and "solid growth in [Bauer] ice hockey equipment[.]"  *E.g.*, *id.* ¶ 79; *id.* ¶ 85 (PSG in Q3 2015 Form 6-K on April 14, 2015).[2]  Those statements misled investors about material aspects of PSG's growth – threatening price spikes to progressively boost sales volume, demanding that orders be pulled back to meet quarterly numbers, *e.g.*, *id.* ¶¶ 81-83 – and concealed from investors the risks of those undisclosed methods that Defendants were using to achieve that growth, which included running out of orders to pull forward, killing demand by saturating the market, and alienating retailer customers, *e.g.*, *id.* ¶¶ 108-10.  Hewing closely to their narrative of growth and continued strong performance, Defendants made the following representations, among others:

- In **January 2015**, PSG experienced "another record quarter" "driven by the continued strong performance of the EASTON baseball/softball business and another quarter of more than 10% organic sales growth," *id.* ¶ 79 (Davis on Q2 2015 earnings call, Jan. 15, 2015), and revenues "increased 47% to $172.3 million compared to the same year ago period, or 51% without the impact of changes in foreign currencies," *id.* ¶ 80 (Rosenthal on same call);

---

[2] Defendants do not dispute that the statements made by PSG are attributable to them, which is correct because Defendants constitute a narrowly-defined group of high-level officials who, by virtue of their positions in the Company, had ultimate authority over the content of PSG's SEC filings, press releases, and other public statements – statements on topics directly relevant to Defendants' job responsibilities and PSG's core business.  SAC ¶¶ 33, 36; *see In re Vale S.A. Sec. Litig.*, 2017 WL 1102666, at *33 (S.D.N.Y. Mar. 23, 2017) (Woods, J.) (holding that defendants who received copies of and had control over company's public statements were liable for those statements).

- In **April 2015**, PSG's revenues "increased 121% to $137.7 million compared to $62.2 million in the same year-ago quarter," and "[t]he increase was primarily due to the addition of revenues generated by EASTON and solid growth in ice hockey equipment," *id.* ¶ 85 (PSG in Q3 2015 Form 6-K, April 14, 2015). This represented "another record quarter due to the continued strong performance of Easton, the fifth consecutive quarter of double-digit hockey growth, and an overall 16% organic sales growth net of currency changes," based on "solid demand for [Easton] products," *id.* ¶ 86 (Davis on Q3 2015 earnings call, April 14, 2015);

- In **July 2015**, PSG's revenue results were "record-setting," PSG had "outpace[d] the growth of the markets . . . by growing market share and profitability" and "leverag[ing] [its] Performance Sports platform," and PSG was "very well-positioned to continue [its] momentum into 2016 and beyond," *id.* ¶ 92 (Davis on 4Q 2015 conference call, July 8, 2015);

- In **August 2015**, PSG had a 51% increase in revenue over the prior fiscal year, *id.* ¶ 106 (PSG in 2015 10-K, Aug. 27, 2016), its revenue results were "record-setting," and those results were driven by the strongly performing "fundamental building blocks of [PSG's] shareholder value" and PSG's ability to "outpace the growth of the markets in which we participate by growing market share and profitability," *id.* ¶ 97 (Davis in FY2015 press release, Aug. 26, 2015); and

- In **October 2015**, PSG "continue[s] to see solid growth across [its] brand, including continued market share gains in the recently completed back-to-hockey season," did not "see any sort of decline in demand from consumers for those products [hockey and lacrosse equipment]," and any dips in the numbers were due to consolidation in the U.S. hockey retail market, *id.* ¶¶ 121-22 (Davis on 1Q 2016 conference call, Oct. 15, 2015).

10

For a time, Defendants successfully hid any information regarding their high-pressure sales program, the impact of that program on PSG's bottom line, and the risks of that program. They instead constructed a narrative of consistent, stable, and fast growth for PSG, and led investors to believe that this growth was due to consumer demand for PSG's core products.

## IV.    AS THE CONCEALED RISKS MATERIALIZE, THE INVESTING PUBLIC FINALLY LEARNS THE EXTENT OF DEFENDANTS' DECEPTION AND HALF-TRUTHS.

This narrative began crumbling in January 2016.  After consistently pumping up investor expectations, PSG revised downward its fiscal 2016 guidance and disclosed declines in PSG's financials across the board, including revenue, adjusted gross profit, gross profit, adjusted EBITDA, and net income.  *Id.* ¶¶ 131-32.  Defendants did not take this opportunity to disclose the full truth, and instead told a new half-truth: that PSG's losses were not due to the concealed, materializing risks, but to other market factors.  On a January 14, 2016 earnings call, Defendant Davis told investors that PSG's "brands continued to take market share, and demonstrated strong resilience in some very challenging markets."  *Id.* ¶ 134 (Q2 2016 earnings call).  Instead, the Company attributed its worsening financials to "unfavorable impact from foreign exchange, variations in product launch cycles in our hockey segment, . . . retailer consolidation in the U.S. and continued challenging market conditions from our hockey business in Russia and eastern Europe."  *Id.* ¶ 135.  Notably, these factors were not mentioned by PSG's main rival, Reebok-CCM Hockey, or any of PSG's competitors during the same period.  *Id.* ¶¶ 136-37, 149-55.  On this news, investors fled PSG in atypically high volumes of trading, causing its stock price to fall for four days straight from $7.71 per share to $5.92 per share.  *Id.* ¶ 138.

In March 2016, the Company again revised downward its guidance for the fiscal year ending on May 31, 2016, reducing its fiscal year 2016 adjusted earnings per share guidance by

approximately $.55 per share – a significant change, given that the prior guidance was $.66 to $.69 per share. *Id.* ¶ 139. Defendant Davis attributed the worsening financials to an "unexpected significant downturn in retail sales" in the baseball and softball market, triggered by "weakening of consumer demand" and "the chapter 11 filing by one of our largest U.S. national sporting goods retailers," as well as reduced consumer demand for ice hockey equipment caused by consolidation in the hockey retail industry. *Id.* ¶ 140 (Davis on 3Q 2016 conference call, March 8, 2016). Defendant Rosenthal cited the same factors, as well as an "unexpected significant downturn in retail sell-through in the baseball/softball category," the bankruptcy of a large retailer, and the consolidation of the U.S. hockey market. *Id.* ¶ 142 (Rosenthal on 3Q 2016 conference call, March 8, 2016). PSG's stock price fell again from $5.75 to $2.91, a drop of over 66%. *Id.* ¶ 145.

The other shoe finally dropped a few days later. As Defendants scrambled to explain PSG's abrupt switch from a narrative of growth to one of freefall, a March 14, 2016 *New York Post* story made a startling set of revelations: that PSG had been asking its retailer customers to move their future orders into earlier quarters; that Roustan had commissioned Grant Thornton to survey PSG's customers and ask them about the scope and magnitude of this practice; that PSG had *blocked* Grant Thornton from releasing those findings to Roustan; and that Roustan had then commissioned SurveyMonkey to ask PSG's customers the same questions and then presented those findings to PSG's Board of Directors. *Id.* ¶ 147. None of this had been disclosed to investors; all they knew was PSG's narrative of record quarters, "strong performance," and sales growth.

The revelations rocked PSG. Eight days after the *New York Post* story, Davis resigned. *Id.* ¶ 158. PSG suspended its Own The Moment strategy. *Id.* ¶ 156. The SEC subsequently

12

opened an investigation into PSG, as did the Canadian securities regulator.  *Id.* ¶ 162.  In August

2016, PSG declared that it would not be filing its annual report with the SEC on time due to an

internal investigation being conducted by PSG's Audit Committee into the Company's financial

statements and related certification process.  *Id.* ¶ 161.  By Halloween 2016, PSG had announced

Rosenthal's departure, *id.* ¶ 166, sold some of its assets to a group of private investors, *id.* ¶ 165,

and filed for bankruptcy after failing to file its financial reports with the SEC, *id.* ¶¶ 163-64.

## ARGUMENT

On a motion to dismiss, courts must accept the factual allegations in a plaintiff's

complaint as true and draw all reasonable inferences in the plaintiff's favor.  *See Tellabs, Inc. v.

Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).  Although Rule 9(b) requires that the

circumstances constituting fraud be stated with particularity, "it does not require factual

pleadings that demonstrate the *probability* of wrongdoing. . . . At the pleadings stage, the alleged

fraud need only be *plausible*[.]"  *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797

F.3d 160, 174 (2d Cir. 2015) (emphasis in original) (internal citations and quotation marks

omitted).  "Ultimately, on a motion to dismiss '[t]he issue is not whether a plaintiff will

ultimately prevail but whether the claimant is entitled to offer evidence to support the

claims.'"  *In re EZCorp, Inc. Sec. Litig.*, 181 F. Supp. 3d 197, 205 (S.D.N.Y. 2016) (quoting

*Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013)).

To maintain a private damages action under Section 10(b) and Rule 10b-5, a plaintiff

must show: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a

connection between the misrepresentation or omission and the purchase or sale of the security;

(4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.

*See Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232 (2d Cir.

2014).  Defendants only dispute Plaintiff's pleading with respect to the first and second elements. As set forth below, the SAC sufficiently alleges both elements and thus states a claim under Section 10(b) of the Exchange Act and Rule 10b-5.

## I.   THE SECOND AMENDED COMPLAINT SETS FORTH DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS.

Defendants repeatedly misled investors during the Class Period about the nature of PSG's "record" revenues and failed to disclose the self-built house of cards that the Company was teetering atop.  Because knowledge of Defendants' sales scheme and its risks would have been material to a reasonable investor, Defendants' half-truths and omissions constitute actionable misstatements under Section 10(b) and Rule 10b-5.

### A.  The Second Amended Complaint sufficiently identifies Defendants' half-truths and omissions, all of which created a highly misleading portrait of PSG.

It strains credulity to claim, as Defendants do, that the SAC does not even identify any false or misleading representations.  *See* Def. Mot. at 9.  Under Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b)(1)(B), plaintiffs must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Emps.' Ret. Sys. of Gov't. of the Virgin Islands v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015).

The SAC satisfies this pleading standard in spades.  It identifies the who, what, why, where, and when for each misstatement.  *See* SAC ¶ 79 (Jan. 15, 2015 earnings call); ¶¶ 85-86 (Apr. 14, 2015 Form 6-K and conference call); ¶ 92 (July 8, 2015 earnings call); ¶¶ 97, 101 (Aug. 26, 2015 press release); ¶¶ 106-07, 112 (Aug. 27, 2015 Form 10-K and SOX certifications); ¶ 117 (Oct. 14, 2015 Form 10-Q SOX certifications); ¶¶ 121-22 (Oct. 15, 2015

earnings call); ¶¶ 131-35 (Jan. 13, 2016 press release and earnings call); ¶¶ 139-42 (Mar. 8, 2016 press release and conference call revising fiscal 2016 outlook and announcing preliminary earnings).[3]   The SAC alleges that these statements were misleading because they either (a) claimed that "record-setting" revenue growth between January 2015 and January 2016 was based on "organic sales growth," "shift[s] in demand," and "growing market share," when, in fact, the revenue growth was based at least in material part on high-pressure sales tactics, and those tactics posed a material risk that was concealed from investors; or (b) assured investors that "unexpected" post-January 2016 declining revenues stemmed from factors like foreign exchange rates, customer bankruptcies, and "redundant inventories," when, in fact, the plummeting revenue resulted at least in material part from the fruition of Defendants' own sales program.[4]

Defendants argue at length that the identified statements are not misrepresentations at all because "courts have found nothing fraudulent about aggressive sales practices[.]" Def. Mot. at 11-13.   That totally misapprehends this case: it *is* fraudulent to assuage investors about the company's financial performance, strong-arm customers into buying products that they neither want nor need, and then conceal that information and the risks associated with it.  *See Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 705-06 (7th Cir. 2008) (reversing motion to

---

[3] Plaintiff has adequately alleged that Defendants' Sarbanes-Oxley ("SOX") certifications during the Class Period, which attested that PSG's financial statements contained no material misstatements or omissions, were themselves false and misleading when made, SAC ¶¶ 112, 117, notwithstanding Defendants' assertion that the SOX certifications are nonactionable because the SAC "alleges nothing about PSG's internal structure for financial reporting." *See* Def. Mot. at 13 n. 2.  Unlike the cases on which Defendants rely, namely *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 402 (S.D.N.Y. 2016), and *City of Monroe Emps.' Ret. Sys. v. Hartford Fin. Servs. Grp., Inc.*, 2011 WL 4357368, at *22 (S.D.N.Y. Sept. 19, 2011), Plaintiff here has alleged that Defendants knowingly and/or recklessly made material misstatements or omissions on PSG's Form 10-K, SAC ¶¶ 106-07, and thus acted with scienter when they falsely certified that the Company's financial statements contained no material misstatements or omissions.  *See infra* Argument Section III.

[4] Defendants' assertion that "the SAC does not identify any false or misleading statements by Defendant Rosenthal" is plainly wrong.  *Compare* Def. Mot. at 22 n.10 *with e.g.*, SAC ¶ 142 (highlighting multiple misleading statements made by Defendant Rosenthal on the March 8, 2016 conference call, at which Defendants tried to justify PSG's tanking numbers).

dismiss when company fraudulently claimed that sales are "still going strong" and "demand []
continues to grow," when it had "flood[ed] its customers with tens of millions of dollars worth of
[products] that the customers had not requested, in order to create an illusion of demand"); *In re
Salix Pharm., Ltd.*, 2016 WL 1629341, at *2, 8 (S.D.N.Y. Apr. 22, 2016) (company fraudulently
claimed that inventory levels of its wholesale customers were "normal" when in fact they were
overloaded with sales generated by, among other things, "steep price discounts," all in an effort
to make the company's "financial performance appear stronger than it actually was").[5]

It is also misleading for executives to tout their company's revenues while leading
investors astray about a material source of those revenues or future expectations for those
revenues, and conceal the attendant risks of those sources.  *See, e.g.*, *In re Braskem S.A. Sec.
Litig.*, 2017 WL 1216592, at *17 (S.D.N.Y. Mar. 30, 2017) (company's failure to disclose
bribery scheme undergirding the low price of one of its inputs created a "selective portrait" of its
revenue that, "if not inescapably misleading, is certainly plausibly alleged to have been so"); *In
re Virtus Inv. Partners, Inc. Sec. Litig.*, 195 F. Supp. 3d 528, 536-37 (S.D.N.Y. 2016)
(misleading for manager to state that revenues were driven by "portfolio managers' investment
performance" for real clients when revenues were actually driven by back-tested model
predictions); *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 401 (S.D.N.Y.
2005) (misleading for company to discuss sources of revenue while omitting that the "true
source" of such revenue was illegal trading); *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711,

---

[5] Although Defendants contend that *Tellabs* holds that a guaranteed right of return is necessary for a forced sales
program to be fraudulent, *see* Def. Mot. at 12, the Seventh Circuit actually based its decision on numerous factors.
The gravamen of the inquiry is whether forced sales are being used to "conceal the disappointing demand" or to
"prod distributors to work harder."  *Tellabs*, 513 F.3d at 710.  In this case, it is squarely alleged that Defendants'
practices were for the former, inappropriate reason.  *See, e.g.*, SAC ¶ 5 ("In an effort to sustain the perception of
strong growth, [Defendants] began an aggressive push . . . to further increase the Company's revenue and sales
figures by any means necessary[.]").

737 (S.D.N.Y. 2015) (misleading for company to tell investors that they expected "relatively flat" revenues in the future without disclosing that the company had just lost a major client).  In other words, "[e]ven when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth."  *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014).[6]

Here, not only did Defendants "jam orders down [their customers'] throats," SAC ¶¶ 8, 59, and send orders to customers that they did not request, *id.* ¶ 61 – all in an effort to make "the Company's retail strategy, which was otherwise unprofitable, appear profitable in the short run," *id.* ¶ 171 – but they also put the sources of PSG's revenues "at issue" in their financial filings and earnings calls before then "cherry-pick[ing] for public consumption benign factors" related to PSG's revenue (*i.e.*, "growing market share" in good times, "customer bankruptcies" in bad times) and "deceptively omit[ing] . . . a major factor" behind those revenue figures (*i.e.*, the fraudulent sales scheme and its eventual materialization).  *Braskem*, 2017 WL 1216592, at *17.  Once they began boasting about the reasons for PSG's "record-setting" revenue growth – and then explaining away the reasons for PSG's "unexpected" revenue loss – Defendants were "not at liberty to selectively omit what the SAC fairly alleges as a central determinant of [their revenue numbers]."  *Braskem*, 2017 WL 1216592, at *19.[7]

---

[6] *In re Lions Gate Entm't Corp. Sec. Litig.*, cited by Defendants, is not to the contrary. That decision similarly noted that, "even though Rule 10b-5 imposes no duty to disclose all material, nonpublic information, *once a party chooses to speak, it has a 'duty to be both accurate and complete.'*" 165 F. Supp. 3d 1, 11 (S.D.N.Y. 2016) (quoting *Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002)) (emphasis added).  Moreover, that case involved a company's freestanding duty to disclose an SEC investigation and had nothing to do with the kind of misleading statements at issue here or in cases like *Braskem* or *Virtus*.

[7] Defendants' gloss on *Braskem* – that it is only misleading to describe "*legal* sources of its income while omitting reference to the *illegal* sources" of income – is itself misleading. Def. Mot. at 10 (emphasis added); *see also id*. at 17 n.7.  *Braskem* never held that an underlying source of income had to be illegal in order for a company to make misleading half-truths, which are illegal in and of themselves.

17

Defendants contend it is not misleading to gloat about high rates of "organic growth" while simultaneously concealing a material aspect of that growth and its attendant risks, Def. Mot. at 14.  That is wrong: courts *have* held that it is misleading to tout high "organic growth" while simultaneously misstating a risky source of that growth, as Defendants did here.  *See, e.g.*, *Howard v. Liquidity Servs., Inc.*, 177 F. Supp. 3d 289, 296-98, 305-07 (D.D.C. 2016) (statements about a company's "broad-based organic growth" in non-governmental divisions misled investors because growth actually came from governmental division); *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 184-85 (S.D.N.Y. 2010) (statements regarding "significant organic growth" in self-originated loans misled investors because loans were actually being purchased from elsewhere).  In any event, Defendants' high attention to the precise meaning of "organic growth" ignores the overwhelming number of other statements that form the core of the SAC: that Defendants misleadingly described their "record-setting" revenue growth as a product of "highly successful" product launches, SAC ¶ 86, "shift[s] in demand," *id*. ¶ 86, "growing market share," *id*. ¶ 106, "outpace[d] growth," *id*. ¶ 92, and a "leverage[d] performance sports platform," *id*. ¶ 97, *in addition to* "organic growth."  In that context, calling growth "organic" communicates something more than simply whether that growth is attributable to acquisitions.  At a minimum, Defendants' attacks about the meaning of "organic growth" fail to address the half-truths Defendants told in their rush to explain away PSG's falling earnings after January 2016.  *See id*. ¶¶ 130-55.

Once Defendants spoke on PSG's growth and decline, they were required – but failed to – "tell the whole truth."  *Meyer*, 761 F.3d at 250.  The cases Defendants cite for the proposition that there was "nothing fraudulent" about their sales program are thus either distinguishable or irrelevant (or both).  *See* Def. Mot. at 12.  In *In re Bristol-Myers Squibb Sec. Litig*., the defendant

18

pharmaceutical company offered its wholesalers incentives so that the company could meet its quarterly sales projections. 312 F. Supp. 2d 549, 563 (S.D.N.Y. 2004). That opinion, however, (1) focused on the nature of accounting principles and consignment sales, not whether the plaintiff adequately identified material misrepresentations, and (2) involved general allegations of earnings manipulation, whereas the SAC here contains detailed allegations by both company insiders and longstanding customers about particular efforts Defendants made to force sales upon customers that they neither wanted nor needed, and about the Company's implosion once Defendants' sales scheme fully materialized. *Gavish v. Revlon, Inc.*, 2004 WL 2210269, at *17 (S.D.N.Y. Sept. 30, 2004), is similarly distinct because the defendants in that case "repeatedly warned the market" about the excess inventory piling up in their customers' warehouses, whereas PSG's sales scheme remained shrouded in darkness until the March 14, 2016 *New York Post* story.[8] Accordingly, the SAC sufficiently identifies actionable misrepresentations and omissions made by Defendants.

**B. The Second Amended Complaint sufficiently identifies Defendants' failure to disclose a "known trend" that they were under a duty to disclose.**

Independent of the aforementioned misrepresentations, Defendants violated Item 303 of Regulation S-K, 17 C.F.R. § 228.303(a)(3)(ii) ("Item 303"). In relevant part, the regulation requires a public company to describe in its Forms 10-K or 10-Q "known trends or uncertainties" that the company "reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." Moreover, "[i]f a registrant knows

---

[8] Nor do the out-of-circuit cases cited by Defendants – which are about *scienter*, not falsity or materiality – indicate that the SAC fails to identify any material misrepresentations. *See* Def. Mot. at 12-13. Indeed, just three years after acknowledging that there *may* be legitimate reasons to attempt to achieve early sales in *Greebel*, the First Circuit found that analogous early sales practices resulted in actionable misrepresentations when accompanied by evidence from insiders and pled with adequate specificity, as is the case here. *See In re Cabletron Sys.*, 311 F.3d 11, 26 (1st Cir. 2002).

of events that will cause a material change in the relationship between costs and revenues (such as known future increases in . . . inventory adjustments), the change in the relationship shall be disclosed." *Id.* The Second Circuit has held that a violation of Item 303 "give[s] rise to liability under Section 10(b)," so long as the omitted "known trend[] or uncertaint[y]" was material. *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 102 (2d Cir. 2015).[9] Relying on SEC guidance, the Second Circuit has stated that, once a trend becomes known, management must disclose that trend if (1) the known trend is "likely to come to fruition" or (2), if it is impossible to know if the trend will come to fruition, if the trend is "reasonably likely" to have a "material effect" on the company's "financial condition." *Id.* (citing Exchange Act Release No. 6835, 1989 WL 1092885, at *6). When faced with a trend in need of disclosure, companies cannot get away with generic disclosures. In *Stratte-McClure*, the Second Circuit rejected Morgan Stanley's "generic" disclosures about the deteriorating real estate, credit, and subprime mortgage markets and noted that "the SEC has emphasized that Item 303 requires not only a discussion but also an analysis of known material trends." *Id.* at 105 (internal quotation marks omitted).

The SAC identifies the kind of "known trend and uncertainty" contemplated by Item 303. *See* SAC ¶¶ 126-27 (discussing Defendants' "frontloading" and "propping up [of] the Company's sales," which Defendants knew was "not sustainable" and "reasonably likely to catch up with PSG"). In *Panther Partners Inc. v. Ikanos Communications, Inc.*, the Second Circuit found a semiconductor company liable under Item 303 for failing to disclose potential defects in one of its products, given that it had received an "increasing flow of highly negative information

---

[9] The Supreme Court has granted *certiorari* on the question of whether Item 303 creates a freestanding duty to disclose actionable under Section 10(b). Regardless of how the Supreme Court decides the case, this Court should sustain Plaintiff's claims: if the Court agrees that Item 303 creates a freestanding duty to disclose, then Defendants' arguments on falsity and materiality are more quickly rejected; and if the Court holds (contrary to current Second Circuit law) that Item 303 does not create a privately enforceable duty, Plaintiff's claims – which are based on affirmative statements made by Defendants that were misleading in light of the omissions – should still be sustained.

from key customers" about product issues.  681 F.3d 114, 120 (2d Cir. 2012).  Even if it was not 100% certain what would come of these increasing complaints, the court held, "it goes without saying that such 'known uncertainties' could materially impact revenues."  *Id*. at 121-22; *accord In re Facebook, Inc. IPO Sec. and Deriv. Litig.*, 986 F. Supp. 2d 487 (S.D.N.Y. 2013) (failure to make mention of increased mobile usage affecting ad revenues, when company was aware of the trend, was actionable omission).   Likewise here, Defendants received numerous complaints about PSG's forced early sales from individuals ranging from longstanding customers to the Company's former Chairman, such that the materialization of the scheme was, at the very least, a "known uncertaint[y] [that] could materially impact revenues."[10]   This case is stronger than *Panther Partners* and *Facebook*: those cases focused on the *sufficiency* of disclosures, but here Defendants were completely silent – they did not disclose *anything* about the sustainability of their sales practices at any point in time.  The March 14, 2016 *New York Post* article constituted the public unveiling of Defendants' scheme.  *See* SAC ¶ 147.  The SAC thus sufficiently identifies a "known trend or uncertainty" that Defendants were under a duty to disclose.

## II.   THE SECOND AMENDED COMPLAINT SUFFICIENTLY ALLEGES THAT KNOWLEDGE OF THE HIGH-PRESSURE SALES PROGRAM AND ITS RISKS WOULD HAVE BEEN MATERIAL TO A REASONABLE INVESTOR.

Defendants' misrepresentations and omissions involved facts that a "reasonable investor would have considered significant in making investment decisions."   *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000).  A complaint "may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously

---

[10] *See, e.g.*, SAC ¶ 55 (noting that "Defendants disregarded these complaints" about the sales program and "pushed ahead . . . with the Company's highly aggressive and bullying sales tactics"); ¶ 62 (describing executive vice president Edward Kinnaly's in-person warning about the sales program to Defendants at a meeting of PSG's Board of Directors); ¶¶ 69-72 (detailing sales program survey results that PSG "tried to block or delay" from release); ¶ 147 (highlighting that "customers told former PSG Chair Graeme Roustan that the [C]ompany had asked them to misdate earnings" and that Roustan had "presented his findings to the PSG board").

21

unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Carpenters Pension Trust Fund*, 750 F.3d at 235.   As this Court has recognized, materiality is a mixed question of law and fact and fact-specific, and thus rarely is the basis for dismissal.  *Id.*; *Vale*, 2017 WL 1102666, at *30 (Woods, J.).

> ## A. A "reasonable investor" would have considered knowledge of Defendants' scheme to boost earnings through aggressive sales practices a "significant" factor in deciding whether to invest in PSG.

No court has adopted Defendants' argument that – at the pleadings stage – the materiality inquiry is a strict numerical exercise; the Second Circuit has instead "consistently rejected a formulaic approach to assessing the materiality of an alleged misrepresentation."  *Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 485 (2d Cir. 2011).   In assessing materiality, courts generally look to the SEC's Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45, 150 (1999) ("SAB No. 99"), which provides that courts should consult both quantitative *and* qualitative factors in conducting their analysis.  *See, e.g.*, *Litwin v. Blackstone Group, L.P.*, 634 F.3d 706, 720 (2d Cir. 2011) (applying SAB No. 99 and noting the importance of whether the misrepresentations "mask a change in earnings or other trends").   Even misstatements related to less than 5% of a financial statement are material when they attempt to "manage earnings" and "conceal [the company's] failure to meet analysts' consensus expectations."  *SEC v. DiMaria*, 207 F. Supp. 3d 343, 353 (S.D.N.Y. 2016) (Woods, J.).

Defendants' misrepresentations and omissions were quantitatively material.  The SAC adequately alleges that Defendants' sales scheme affected at least five percent of PSG's business. *See ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 204 (2d Cir. 2009) (citing SAB No. 99 and calling the "five percent numerical threshold" a "basis for a preliminary assumption" of materiality).  The SAC alleges that a majority of PSG's

ten largest customers, representing 50-55% of PSG's business, were told to pull orders into earlier quarters.   *See* SAC ¶¶ 69-72.   Interviews and statements from customers, including Ronald Rugal, a 12-store PSG customer, indicate that these revenue-manipulating sales were "frequent," SAC ¶ 53, and "regular," *id.* ¶ 57, and often involved demands to increase orders by 15 percent or more every year, *id.* ¶¶ 53, 67.[11]   The SAC also alleges that Defendants reduced their earnings per share guidance by nearly *80 percent* as a result of the scheme's materialization. *Id.* ¶ 19.   Courts have found similar evidence indicative of materiality.   In *Blanford*, for instance, the investor plaintiffs primarily relied on confidential witnesses who reported that the company was lying about its inventory and expected revenues; this fraud eventually materialized when the company's stock tanked after management belatedly acknowledged a revenue shortfall.   794 F.3d at 302.   Although the confidential witnesses reported one specific fraudulent transaction by order size and customer name, almost all of the allegations consisted of mutually-corroborating experiences.   If anything, the SAC here goes further than the *Blanford* complaint, as it numerically highlights the breadth of customers impacted by Defendants' scheme.

Defendants' countervailing suggestion that Plaintiff must allege fraudulent transactions in extraordinary detail to survive a motion to dismiss is wrong.   *See* Def. Mot. at 18 (citing unpublished, out-of-circuit opinion).[12]   The two Second Circuit cases Defendants cite to buttress

---

[11] The confidential witnesses, all of whom are current or former customers/sales representatives of PSG's with first-hand knowledge of the company's sales tactics, are alleged with "sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged."   *Emps.' Ret. Sys. of Gov't. of the Virgin Islands v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015) (confidential source allegations credited because witnesses were in a position to know that a company's increasing inventory buildup was based on fraud and had seen the defendants ignore complaints about the fraud); *see also Tellabs*, 513 F.3d at 712 (crediting CWs when allegations were "corroborated by multiple sources").   Their accounts are corroborated by named sources Roustan, Rugal, and Kinnaly.

[12] In response to the standard that Defendants cite, one court noted that demanding such details in a complaint would "run the risk of making the 'confidential witness' practice in this case something of a farce."   *Cunha v. Hansen Natural Corp.*, 2011 WL 8993148, at *3 n.8 (C.D. Cal. May 12, 2011).

their incorrect standard in no way support their argument.  As noted above, *supra* at 23, the court in *Blanford* never suggested that plaintiffs need to allege fraudulent transactions in exacting detail to demonstrate materiality, especially when a company's declining financial numbers and stock price all but speak for themselves; the Second Circuit in *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001), specifically stated that "[e]ven with the heightened pleading standard under Rule 9(b) and the Securities Reform Act we do not require the pleading of detailed evidentiary matter in securities litigation," and so the evidence Plaintiff identifies in the SAC with regard to materiality – *e.g.*, customer surveys quantifying the extent of the fraud, detailed allegations from insider confidential witnesses about the risks, dramatically re-adjusted earnings per share guidance – adequately show materiality at the pleadings stage.[13]

Separately, the SAC also alleges substantial qualitative factors militating in favor of materiality.  Per SAB No. 99, the relevant factors that courts in this District have used to support materiality where the exact numerical effect of the alleged misrepresentation is low or uncertain include: (a) whether the misstatement "mask[s] a change in earnings or other trends," *Litwin*, 634 F.3d at 720; (b) whether the misstatement "overstate[] earnings" and therefore "changes a loss into income," *In re Eletrobras Sec. Litig.*, 2017 WL 1157138, at *8 (S.D.N.Y. Mar. 27, 2017); (c) whether the misstatement "relate[s] to the value of . . . the core of [defendant's] business," *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 380 (S.D.N.Y. 2015); and (d) whether disclosure of the misstatement results in a substantial and expected market reaction, *Strougo v. Barclays*

---

[13] *Revlon*, which Defendants also cite, is not to the contrary.  *See* Def. Mot. at 19.  Although the *Revlon* plaintiffs alleged a similar scheme to the one at issue here, their complaint did not include specific surveys detailing the numeric extent of and specific risk posed by the fraud, as the SAC does.  The *Revlon* court also did not address arguments regarding the qualitative factors routinely relied upon in this Circuit or the case law regarding half-truths described *supra*, both of which are fully briefed here.

*PLC*, 105 F. Supp. 3d 330, 339, 349 (S.D.N.Y. 2015) (disclosure caused market price of relevant asset to fall "7.38 percent on heavy volume" and share price to drop one-and-a-half percent).

All of these factors exist here: (a) the misstatements were first made to "conceal from the market that the Company's 'record' revenues were the result of overly aggressive sales practices and manipulation" and then made to "conceal the true cause of the declin[ing sales, revenue, and profit numbers]," SAC ¶¶ 15, 18; (b) the misstatements related to sales practices that "made the company's retail strategy, which was otherwise unprofitable, appear to be profitable in the short term," *id.* ¶ 171; (c) the sales scheme involved "all of PSG's retail customers" and PSG's core product lines – the "strongest and most recognized brand" in hockey, Bauer, and "the No.1 North American" brand in baseball and softball, Easton, *id.* ¶¶ 16, 39; and (d) the Company's share price fell by 66 percent on heavy trading when the Company readjusted its earnings per share guidance, and by an additional 10 percent following the *New York Post* story, *id.* ¶¶ 18-20. Moreover, Defendants' statements touched on revenue and earnings, and courts have long considered those the "pieces of data that investors find most relevant to their investment decisions." *Ganino*, 228 F.3d at 164 (citing *In re Burlington Coat Factory*, 114 F.3d 1410, 1420 n.9 (3d Cir. 1997) (Alito, J.)).

In response to these straightforward allegations of materiality, Defendants ask the Court to consider "other, more plausible, explanations" for why PSG's revenues dropped in January 2016, and argue that the Company's stock price fell for reasons unrelated to the alleged fraud. Def. Mot. at 22.  This argument is premature.  The Second Circuit rejected that kind of analysis in *Loreley*, where the court held that "plausible opposing inferences" have no place in a materiality inquiry at the pleadings stage.  797 F.3d at 176 n.9; *see also Blanford*, 794 F.3d at 307 (noting that defendant corporation's explanation for its plummeting revenue is "entitled to

little weight at this stage of litigation").  In any event, the investigations commenced by PSG's Audit Committee, the SEC, and Canadian regulators after PSG's implosion are inconsistent with an explanation that market forces were the sole cause of PSG's collapse.  *See* SAC ¶¶ 161-64.

### B. None of Defendants' material misrepresentations constitute nonactionable statements of corporate optimism or puffery.

Defendants contend that "the majority" of the alleged misrepresentations constitute "nonactionable statements of corporate optimism."  *See* Def. Mot. at 22.  Not so.  Even accepting at face value Defendants' selective quotations of the SAC, none of the identified statements are "too general to cause a reasonable investor to rely upon them."  *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 245 (2d Cir. 2016).  The misleading statements highlighted in the SAC include detailed, historical explanations of the factors "driving" PSG's "record" growth, SAC ¶¶ 79, 86, 92, 96, 106-07, and of the reasons for PSG's "unexpected" revenue decline, *id.* ¶¶ 135, 140-42, all of which occurred when Defendants allegedly knew the prominent role that their sales scheme was having on PSG's revenue.  These kinds of statements are more definite than the statements at issue in *Vivendi*, where the Second Circuit found actionable statements such as "[Vivendi] posted record-high net income, and ha[d] cash available for investing" and "the results produced by Vivendi Universal in the second quarter are well ahead of market consensus."  *Vivendi*, 838 F.3d at 245; *see also Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000) (finding that statements describing retailer's inventory as "in good shape" and "under control" were not puffery when defendants "allegedly knew that the contrary was true").  Defendants' misrepresentations are a far cry from the statements found to be puffery in *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, which Defendants cite, as those alleged misstatements concerned generic promises of "integrity" and "financial discipline."  553 F.3d 187, 206 (2d Cir. 2009).  Here, Defendants repeatedly delved into the weeds of PSG's financial performance,

26

including on phone calls with analysts, and failed to make note of their sales scheme and the material impact it was having, or could have, on the Company's growth.

Courts have also held that "statements relat[ing] to aspects of a company's brand or reputation that are touted as sources of its success" are particularly likely to "cause a reasonable investor to rely upon them." *In re Inv. Tech. Grp., Inc., Sec. Litig.*, 2017 WL 1498055, at *9-10 (S.D.N.Y. Apr. 26, 2017) (finding statements "tout[ing] specific advantages" of a "leading product" were "more than mere puffery"). Here, given that Defendants' misrepresentations were not only specific, but also related to the Company's leading brands and sources of reputational success – Easton, SAC ¶¶ 79, 39, and Bauer, *id.* ¶ 107 – it begs belief to suggest that the identified misstatements constitute non-actionable puffery.[14]

## III.   DEFENDANTS ACTED WITH SCIENTER.

A claim of securities fraud requires pleading with particularity "facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). In the context of a motion to dismiss, a court assesses whether a reasonable person viewing the complaint's allegations holistically would "deem the inference of scienter at least as strong as any opposing inference[.]" *Tellabs*, 551 U.S. at 326. Three principles guide this inquiry: first, a court's scienter analysis must be *cumulative*, *i.e.*, "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically," *id.*; second, the inference of scienter must be as *plausible* as any opposing inference, but need not be irrefutable or even more plausible than any opposing inference, *id.* at 324; and third, pleading

---

[14] Defendants also appear to suggest that the identified misrepresentations are merely statements of opinion. *See* Def. Mot. at 23. Defendants' detailed, technical explanations for PSG's revenue growth (and decline) are not opinions, and in any event, the SAC adequately alleges that Defendants knew that these statements were materially misleading at the time that they were made. *See Salix*, 2016 WL 1629341, at *12 n.10 (rejecting similar argument and holding that misleading statements about a company's inventory were neither non-actionable statements of opinion nor puffery).

scienter does not require a showing of motive or personal financial gain, *id.* at 325, and instead can be shown with facts constituting "strong circumstantial evidence of conscious misbehavior or recklessness." *Novak*, 216 F.3d at 307 (internal quotations and citations omitted). Facts showing that the defendants (1) "benefitted in a concrete and personal way from the purported fraud," (2) "engaged in deliberately illegal behavior," (3) "knew facts or had access to information suggesting that their public statements were not accurate," or (4) "failed to check information they had a duty to monitor" meet the standard for conscious misbehavior or recklessness. *Id.* at 311.

### A. Defendants Davis and Rosenthal acted with scienter.

Defendants recklessly misled the investing public regarding material facts about the nature of PSG's growth and the corresponding material risks associated with the methods they used to achieve that growth, *supra* Statement of Facts Section III, and they did so (a) knowing or having access to information "suggesting that their public statements were not accurate," and (b) while facing salient information about the risks of their high-pressure sales tactics that they had a duty to monitor but "failed to check[.]" *Novak*, 216 F.3d at 311.

Defendants Davis and Rosenthal knew that PSG was engaged in this high-pressure sales strategy because they devised it, SAC ¶ 42, and they knew that the strategy was material to PSG's financials and investors because it touched on the most important parts of PSG's business – ice hockey, baseball, and softball equipment sales, *id.* ¶¶ 49, 46. It is plausible that a member of senior management who makes misleading statements about sales of the company's "most important products" – like a Microsoft executive making statements about sales of Windows – makes those statements with the requisite mental state; indeed, the alternative inference that the

executive was just innocently spouting misstatements about the company's key products is "exceedingly unlikely." *Tellabs*, 513 F.3d at 709.

That Defendant Davis in particular took responsibility for making statements about the nature of PSG's sales growth and trends in response to analyst questions on conference calls, *e.g.*, SAC ¶ 122, further bolsters the strong inference of scienter.  One court faced with similar facts – a defendant executive answering questions from an analyst about a retailer's sales trends – found that this combination was some of "the most powerful evidence of scienter[.]"  *In re Urban Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 653 (E.D. Pa. 2015) (citation and quotations omitted).  Defendant Rosenthal in particular made statements on the subjects of consumer demand and sales growth, *e.g.*, SAC ¶ 142, and he knew about the high-pressure sales tactics and their effects on sales because he attended the biyearly sales meetings, where he encouraged PSG's sales representatives to put even more pressure on the retailer customers.  *Id.* ¶¶ 13, 167.  A chief financial officer who makes public statements about the topics at issue in litigation, while attending meetings where the company's strategies and corresponding risks are discussed, is considered to have had "first-hand involvement" and therefore may be found to have acted with scienter.  *See Freudenberg*, 712 F. Supp. 2d at 198.

Both Defendants similarly knew that there was a material risk that PSG's retail strategy would backfire, yet failed to disclose it while touting the Company's strong sales growth.  The Second Circuit has reversed the dismissal of a securities fraud complaint when the allegations showed that the defendant executives had knowledge of or access to information about the risks of certain business practices at C-level meetings – holding excessive amounts of inventory, for example – but refused to disclose those risks to investors while at the same time touting excellent financials.  *See Novak*, 216 F.3d at 311.  Similarly, an executive's receipt of internal forecasting

data, daily sales reports, and warnings from sales representatives about a company's unsustainable channel stuffing and bulk sales practices constitutes a showing of scienter at the pleadings stage – particularly when that same defendant has made public statements about the company's positive sales outlook in the face of dangerous market conditions. *In re St. Jude Med., Inc. Sec. Litig.*, 836 F. Supp. 2d 878, 898-99 (D. Minn. 2011).

The facts in this case are stronger. PSG's sales representatives warned executives of the risks of competing against PSG's retailer customers via the Own The Moment initiative while also extracting increased purchase volume, earlier purchases, and earlier shipments from those same customers; CW1 specifically warned Healey (Bauer's Vice President of Sales for North America) that the retailer customers would stop buying PSG products, and PSG's retailer customers echoed those concerns, *id.* ¶ 50. Both Defendants had access to internal, executive-level information identifying the material risks posed by pursuing their high-pressure sales strategy: in 2013, well before the Class Period, Kinnaly (then an executive vice president) warned Healy, Defendant Davis, and Defendant Rosenthal that the Company's sales practices would catch up with it when the number of sales to pull forward ran out – they fired him for speaking out, *id.* ¶ 62; and in June 2015, Roustan expressed during a meeting with the PSG Board of Directors and Defendant Davis that PSG's retailer customers would begin reducing their purchases because of the combination of PSG's high-pressure sales strategy and the added competitive pressure of the Own The Moment strategy, *id.* ¶ 51. Roustan presented his SurveyMonkey data, showing that a majority of the PSG retailer customer respondents in the U.S. and Canada (a market that comprised over 50% of PSG's business) had indeed been asked by PSG to pull orders forward into an earlier quarter. *Id.* ¶¶ 71-72. That Defendants suppressed the information in Roustan's Grant Thornton survey shows – at minimum – that they had access

to information from a global accounting firm bearing directly on the risks of their high-pressure sales tactics, and they went out of their way to conceal that information. *Id.* ¶¶ 69-72, 147, 157.

This case has all these facts and more: the resignations of both Defendants were tied to the underlying fraud. "The timing and circumstances of the resignations of" Defendants Davis and Rosenthal – Defendant Davis left PSG *eight days* after the *New York Post* story ran, SAC ¶¶ 147, 158, and Defendant Rosenthal left under the cloud of investigations by the Audit Committee, the Canadian securities regulator, and the SEC, *id.* ¶¶ 161, 162, 166 – "lend further weight to an inference of scienter." *Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 619 (S.D.N.Y. 2015). Defendants' assertion that "[m]ere temporal proximity of an officer's resignation to a company's corrective disclosure is not probative of scienter," Def. Mot. at 33, makes no sense. In this case, it was *the media* that published the exposé revealing PSG's sales practices, not the Company, and a few days after the story broke, Davis was gone. The added presence of three investigations in the next six months is a fact weighing in favor of scienter. *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 380 (E.D.N.Y. 2013). It is thus more than plausible that the resignations were connected to the concealment of the risks identified above.

### B. Defendants' myopic focus on "channel stuffing" not being fraudulent *per se* misconstrues Plaintiff's allegations.

Although it is not disputed that Defendants knew about PSG's high-pressure sales tactics, Defendants argue that because PSG's sales practices were "neither fraudulent nor wrongful," knowledge of those practices alone cannot constitute an intent to defraud investors. Def. Mot. at 25-26. But this case is not about the legality of PSG's high-pressure sales tactics in a vacuum. *Supra* Argument Section I. Rather, this case is about whether Defendants recklessly misled the investing public regarding material facts about the nature of PSG's growth, and whether they

31

concealed the corresponding material risks of the tactics they used to achieve that growth. Whether channel stuffing by itself constitutes "indirect evidence of scienter" is different than whether "non-disclosure of channel stuffing" in certain circumstances is actionable under the federal securities laws; one court has noted this distinction in holding that the defendants who knew that sales would weaken acted with scienter when they concealed information about channel stuffing while touting their strong sales, earnings, and growth projections.  *In re Scientific-Atlanta, Inc. Sec. Litig.*, 239 F. Supp. 2d 1351, 1362-63, n.7, and 1365-66 (N.D. Ga. 2002).

Unlike the cases Defendants cite, Plaintiff has pleaded significantly more than merely the fact that Defendants knew that PSG was engaged in these high-pressure sales tactics: the sum, diversity, and detail of information Defendants had access to – warnings from Roustan, Kinnaly (whom they fired), sales representatives, and retailer customers, along with the SurveyMonkey data and the suppressed Grant Thornton survey, SAC ¶¶ 50, 51, 62, 69-72, 147, 157 – is much more than simply an allegation that defendants discussed "the difficult tension" and dangers of channel stuffing.  *See Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1264-65 n.7 (11th Cir. 2006).  Defendants' citation to *In re Dura Pharmaceuticals, Inc. Sec. Litig.*, 452 F. Supp. 2d 1005, 1027-30 (S.D. Cal. 2006), backfires on them: the court in that case *denied* a motion to dismiss when the defendants directed their sales representatives to offer steep discounts at the end of quarters to meet quarterly sales targets.  That the *Dura* defendants made smoking gun-type statements like "let 'em catch us" is certainly sufficient, but not necessary under *Tellabs*, 551 U.S. at 324, which was decided a year after *Dura*.  As noted above, *supra* at 18-19, *Bristol-Myers*, 312 F. Supp. 2d at 568, is irrelevant because this case is not about whether Defendants

32

"knew or were reckless in not knowing that *the accounting* for the sales at issue was wrong[.]" (Emphasis added.)

Defendants counter that "[t]he SAC merely alleges that the surveys existed, it does not allege that Defendants knew of their existence or their purported results[.]"  Def. Mot. at 27. This is false.  Roustan indeed presented his SurveyMonkey data to the Board of Directors, which included Defendant Davis, during his June 2015 meeting.  *Id.* ¶¶ 71-72, 147.  That Defendants had the Grant Thornton survey suppressed indicates that they knew or had access to information "suggesting that their public statements were not accurate," and/or "failed to check information they had a duty to monitor[.]"  *Novak*, 216 F.3d at 311.  That Roustan was a former chairman, a significant shareholder, and worthy of a one-on-one meeting with the Board is a reason to credit the information attributed to him, not discount it – and in any event, those allegations must be accepted as true.  *Id.* ¶¶ 71-72, 147.

### C. Defendants had direct knowledge of the risks that their sales tactics posed to PSG, and they acted contrary to that knowledge and misled investors about the nature of those risks.

Defendants argue that it is unlikely that they were reckless because they did not personally benefit from engaging in this fraud and in fact lost their jobs because of it.  Def. Mot. at 27-28.  This argument improperly conflates recklessness with motive and opportunity. Pleading scienter does not require a showing of motive or personal financial gain, *Tellabs*, 551 U.S. at 326, and so the absence of personal financial benefit allegations is not dispositive or even remarkable.  The cases cited by Defendants on this point – *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994), *Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 600 (S.D.N.Y. 2016), and *In re GeoPharma, Inc. Sec. Litig.*, 399 F. Supp. 2d 432, 449 (S.D.N.Y. 2005) – are motive cases, not recklessness cases.  That Defendants acquired additional stock in September

and October 2015, *see* Rubenstein Decl. Exs. D-G, is not inconsistent with recklessness, and does not insulate them from liability.

Moreover, one court has forcefully rejected Defendants' argument because it "confuses expected with realized benefits." *Tellabs*, 513 F.3d at 710.  The *Tellabs* defendants similarly argued that they had no incentive to recklessly make misleading statements about sales when they knew the risks were so great that their scheme would likely fail, but the Seventh Circuit rejected this logic: "the benefits of concealment might exceed the costs," and so "[t]he fact that a gamble – concealing bad news in the hope that it will be overtaken by good news – fails is not inconsistent with its having been a considered, though because of the risk a reckless, gamble." *Id.*  That logic applies here: Defendants Davis and Rosenthal may very well have believed that the Own The Moment retail strategy was going to be a boon to PSG, SAC ¶ 49, but recklessly understated the (concealed) risk that they were competing against the very retailer customers they were  squeezing for earlier and increased volume of sales, *supra* Statement of Facts Section II.

The rest of Defendants' arguments "scrutinize each allegation in isolation" and fail to "assess all the allegations holistically," and thus are prohibited under *Tellabs*, 551 U.S. at 326. Defendants argue that the fact they were corporate officers is not enough to establish scienter, Def. Mot. at 28, but Plaintiff pleads much more than that.  *Supra* at 28-31; *see, e.g.*, SAC ¶¶ 50, 51, 62, 69-72, 147, 157.  Analyzed cumulatively, Defendants' officer roles at PSG are a factor weighing in favor of an inference of scienter.  Defendants similarly argue that they did not have knowledge that their markets, particularly ice hockey, would become saturated.  Def. Mot. at 29. Again, those allegations must be considered along with the specific warnings from Roustan and Kinnaly, the surveys Roustan presented, the concerns communicated by sales representatives and

34

retailer customers to PSG about its high-pressure sales tactics and the Own The Moment stores, and publicly-available industry data showing that interest in hockey was waning during the Class Period and not in sync with purported growing demand for ice hockey equipment.  SAC ¶ 9. The argument that Defendants – executives of a publicly-traded global wholesaler of ice hockey equipment – had no access to this data or data like it is absurd.  Def. Mot. at 29, n.14.

> **D.     Defendants' attack on CW3 fails.**

As an initial matter, a motion to dismiss is not the place for credibility determinations or evidentiary objections.  The Court may thus easily reject Defendants' fusillade about whether "to credit CW3's allegations" or "how many levels of hearsay are involved[.]"  Def. Mot. at 30-31. At this stage, the factual allegations must be taken as true, *Tellabs*, 551 U.S. at 322, even those including hearsay (which Defendants' brief concedes, *see* Def. Mot. at 31, n.15).

The SAC provides more than enough particularity for the Court to credit CW3's allegations.  It pleads: CW3's job (co-owner of retailer customer), SAC ¶ 38; the PSG product line CW3's store purchased (Bauer), *id.*; the size of CW3's company (seven total locations in Massachusetts and New Hampshire, suggesting a larger retailer), *id.*; that CW3 had direct contact with higher-level officials at PSG (including Healey, the head of PSG's Bauer North American Sales group), *id.* ¶ 50; the date and content of what was said during CW3's talks with PSG officials (in summer 2015, Healey demanded that CW3 purchase 15% more in volume), *id.* ¶ 53; and that CW3 received regular contacts from PSG headquarters (to make him accept early shipments of inventory), *id.* ¶ 57.  The level of detail in CW3's account of what happened between Kinnaly and Defendants is also more than particular enough to be credited: CW3 recounted the date (2013), the individuals who were there (Healey, Davis, Rosenthal, the Board

of Directors), the nature of the meeting (a Board of Directors meeting), and specific actions that happened after that account (Kinnaly was fired). *Id.* ¶ 62. Defendants do not dispute any of this.

All of this is sufficient detail to credit the allegations attributed to CW3. The witness need not be named if he or she is described "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak*, 216 F.3d at 314. That standard is met. The SAC pleads significantly more than the cases Defendants cite, in which: (a) the confidential witnesses' roles, job titles, and/or positions were unspecified, *see In re Sierra Wireless, Inc. Sec. Litig.*, 482 F. Supp. 2d 365, 376 (S.D.N.Y. 2007), and *Feasby v. Industri-Matematik Int'l Corp.*, 2003 WL 22976327, at *4 (S.D.N.Y. Dec. 19, 2003); (b) the confidential witnesses had no contacts with anyone at the defendant company, *see Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 594 (S.D.N.Y. 2011); (c) the confidential witness' account was completely devoid of detail, *see In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 308 F. Supp. 2d 249, 261 (S.D.N.Y. 2004); or (d) the confidential witness' account did not even discuss the individual defendants, *see In re Cerner Corp. Sec. Litig.*, 425 F.3d 1079, 1086 (8th Cir. 2005).

Defendants counter that at most the Kinnaly account constitutes a disagreement of opinion over business. Def. Mot. at 31. Not so. This case is nothing like *City of Austin Police Retirement System v. Kinross Gold Corp.*, 957 F. Supp. 2d 277, 299 (S.D.N.Y. 2013), where the "differences of opinion" were held by lower-level employees who did not even communicate them to the company, its officers, or any individual defendant. Here, the SAC recounts multiple accounts of inside-the-boardroom discussions about the repeated risks of Defendants' sales tactics, and Defendants' suppression of information and firing of executives who communicated those risks. *Supra* Statement of Facts Section II. Defendants' remaining argument – that CW3's

36

account "provides no support for the inference that Defendants knew, or were reckless in not knowing, that PSG's alleged sales practices were improper," Def. Mot. at 32 – is redundant and flat wrong: firing Kinnaly was an egregiously disproportionate response if the sales practices were, as Defendants suggest, a minor and ordinary business practice. *Supra* at 31-33.

### E. The inference of scienter is at least as compelling as any opposing inference one could draw from the facts alleged.

Defendants offer no alternative inference, and certainly not one that is as "cogent and compelling" as the inference of scienter. *Tellabs*, 551 U.S. at 317, 324 (internal quotations and citation omitted). The scienter analysis does not require a "smoking-gun," and it need not be "the most plausible of competing inferences." *Id.* at 317, 324. Rather, it must be "at least as compelling as any opposing inference" – even if the inference is in equipoise with an alternative inference, the motion to dismiss should be denied. *Id.* at 324. That Defendants offer no alternative inference effectively concedes the issue to Plaintiff.

The closest Defendants come is to suggest that this was perhaps "poor business judgment" or disagreement over strategy. Def. Mot. at 35. But firing executives, like Kinnaly, who advise of the risks of engaging in high-pressure sales tactics is not a disagreement over business. SAC ¶ 62. Forcing a sophisticated, global accounting firm to suppress the contents of a survey requested and paid for by an investor – so that he could merely present those findings to the Board of Directors – is not a disagreement over operational strategy. Touting high-performing financials and raising investor expectations about sales without disclosing material aspects of that sales strategy – threatening customers with price spikes if they did not buy more product every year, pressuring them to make and accept orders earlier to meet quarterly targets – is not innocent behavior. The *New York Post* story, Defendant Davis' resignation, the SEC investigation, the Canadian securities regulator's investigation, the Audit Committee's internal

37

investigation, Rosenthal's departure, and the Company's bankruptcy – all packed into six months – tips the balance firmly in favor of a finding of scienter. *Supra* Statement of Facts Section IV.

Defendants' remaining arguments merit summary rejection. Defendants contend that a scheme to maintain corporate profitability is not scienter, Def. Mot. at 33, but neither motive nor opportunity are required for scienter, *Tellabs*, 551 U.S. at 325, and so the cases about corporate profitability and the financial performance of competitors are irrelevant to a theory of recklessness. Defendants argue that the Own The Moment strategy was too small a part of PSG's business to be a motive for "a company-wide fraudulent scheme," Def. Mot. at 35, and that there was a study about the possible success of Own The Moment, *id.* at 35, n.16, but Own The Moment's size or success is irrelevant; rather, the point is that the Own The Moment strategy exacerbated the (concealed) risk previously identified by Kinnaly and, later, by Roustan, which was that competing with PSG's retailer customers *while also* extracting higher volumes of sales and earlier purchases and shipments would cause PSG to lose sales. Defendants' argument that market factors are why the Company failed, Def. Mot. at 37, is for summary judgment and expert testimony; the SAC merely pleads that there is *some* indication that PSG's explanation was not true because its main competitors did not discuss the same market factors, a point that should be considered holistically with the rest of the allegations. *Tellabs*, 551 U.S. at 326.

## IV. EVENTS OCCURRING AFTER PLAINTIFF SOLD ITS PSG STOCK ARE RELEVANT TO THE SECURITIES FRAUD CLAIMS.

Defendants argue that, because Plaintiff sold its holdings of PSG's stock five days before the end of the Class Period, events following that sale are "irrelevant" to the Class's securities fraud claims. *See* Def. Mot. at 39. This argument fails to appreciate that Plaintiff seeks to represent a *class* of defrauded investors who bought PSG stock between January 15, 2015 and March 14, 2016. Nor is Defendants' argument supported by *Dura Pharms., Inc. v. Broudo*, Def.

38

Mot. at 39. Here, not only does the SAC allege losses for purchasers like Plaintiff, who sold its PSG holdings *after* the relevant truth began to leak out on March 8, 2016, but it also alleges losses for similarly-situated purchasers who did not sell their PSG stock until the complete truth emerged on March 14, 2016. *See* SAC ¶¶ 143-48; 176-80; *cf. Bharucha v. Reuters Holdings PLC*, 810 F. Supp. 37, 41 (S.D.N.Y. 1993) ("[P]ost-[class representative purchase] statements are relevant to the course of wrongful conduct alleged. . . . If Defendant's argument were taken to its natural conclusion, only those individuals who purchased stock on the last day of the class period could act as a representative of the class."). The Court should accordingly reject Defendants' unfounded and premature attempt to limit the damages they owe investors for their misconduct.[15]

## V.    THE CONTROL PERSON CLAIM IS ADEQUATELY PLED.

Defendants argue that dismissal is required because (1) the absence of a Section 10(b) violation precludes a finding of control person liability, and (2) the arguments with respect to scienter similarly show that there was no "culpable participation" by Defendants in the fraud. Def. Mot. at 40.

Both arguments wrongly conflate primary liability under Section 10(b) with control person liability under Section 20(a). If *PSG* is found to have committed a violation of federal securities law, and either or both Defendants "directly or indirectly" controlled PSG (which is

---

[15] Defendants also argue, without citation, that the Court should "strike" the SAC's allegations about highly salient investigations occurring after the close of the Class Period because "the SAC alleges nothing connecting these investigations to any alleged misconduct by Defendants or any injury to the Fund." Def. Mot. at 39-40. For one, the SAC repeatedly alleges glaring connections between these post-Class Period developments and Defendants' alleged wrongdoing. *See, e.g.*, SAC ¶ 22 (alleging that "news has continued to emerge that PSG's failings . . . resulted, in large part, from the Company's own coercive and manipulative sales practices that were concealed from the market by Defendants"); *see also id.* ¶¶ 156-66; 175. Moreover, it is axiomatic in this Circuit that pre- and post-class period information can be relevant when it "sheds light on whether class period statements were false or materially misleading." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001); *accord Shemian v. Research in Motion Ltd.*, 2013 WL 1285779, at *2 n.2 (S.D.N.Y. Mar. 29, 2013) ("pre-class facts, just like post-class facts, may be considered if relevant").

not disputed), then Defendants are liable as control people – their direct violation of Section 10(b) is not required. *See* 15 U.S.C. § 78t(a). *See Carpenters Pension Trust Fund of St. Louis, St. Clair Shores Police & Fire Ret. Sys. v. Barclays PLC*, 56 F. Supp. 3d 549, 560 (S.D.N.Y. 2014) (finding CEO and Chairman of the Board are both subject to control person liability for primary violations by bank they controlled). Similarly, applying scienter arguments to culpable participation is a mistake: they are not the same, and because "scienter is not an essential element of a section 20(a) claim," "neither Rule (9)(b) nor the PSLRA apply[.]" *Barclays*, 56 F. Supp. 3d at 560. Neither of the cases cited by Defendants – *In re Satyam Computer Servs. Ltd. Sec. Litig.*, 915 F. Supp. 2d 450, 482 (S.D.N.Y. 2013), and *Janbay v. Canadian Solar, Inc.*, 2012 WL 1080306, at *17 (S.D.N.Y. Mar. 30, 2012) – say otherwise.

The SAC far exceeds the requirements of Rule 8 notice pleading: it pleads that Defendants (1) held executive positions – CEO as to Defendant Davis, CFO and President of PSG Brands as to Defendant Rosenthal – during the Class Period, SAC ¶¶ 28-29; (2) made misleading statements and caused PSG to issue misleading statements by virtue of their executive positions, *supra* Statement of Facts Section III; and (3) each received internal information detailing the risks of pursuing PSG's high-pressure sales tactics, and then were in a position to (and did) conceal those risks from investors, *supra id.* Section II. Those facts have been held sufficient to state a claim for control person liability under Section 20(a). *See Barclays*, 56 F. Supp. 3d at 560.

## CONCLUSION

For the reasons stated above, Defendants' motion should be denied.[16]

---

[16] In the event the Court disagrees, Plaintiff respectfully requests leave to amend. Leave to amend is particularly appropriate in securities cases such as this one. *See Loreley*, 797 F.3d at 191 (reversing district court's denial of leave to amend securities fraud complaint).

Date:   July 24, 2017                         Respectfully submitted,

                                              *// s // Carol V. Gilden*
                                              Carol V. Gilden
                                              COHEN MILSTEIN SELLERS & TOLL PLLC
                                              190 South LaSalle Street / Suite 1705
                                              Chicago, IL 60603
                                              Tel. (312) 629-3737
                                              Fax (312) 357-0369
                                              cgilden@cohenmilstein.com

                                              Steven J. Toll
                                              S. Douglas Bunch (SB-3028)
                                              Adam H. Farra
                                              COHEN MILSTEIN SELLERS & TOLL PLLC
                                              1100 New York Avenue, N.W. / Fifth Floor
                                              Washington, D.C. 20005
                                              Tel. (202) 408-3640
                                              Fax (202) 408-4699
                                              stoll@cohenmilstein.com
                                              dbunch@cohenmilstein.com
                                              afarra@cohenmilstein.com

                                              *Attorneys for Lead Plaintiff Plumbers &*
                                              *Pipefitters National Pension Fund and Lead*
                                              *Counsel for the Class*

                                              James R. O'Connell
                                              Mark W. Kunst
                                              O'DONOGHUE & O'DONOGHUE LLP
                                              4748 Wisconsin Avenue, N.W.
                                              Washington, D.C. 20016
                                              Tel. (202) 362-0041
                                              Fax (202) 362-2640
                                              joconnell@odonoghuelaw.com
                                              mkunst@odonoghuelaw.com

                                              *Additional Attorneys for the Plumbers &*
                                              *Pipefitters National Pension Fund*

41