**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JUAN FRANCISCO GONZALEZ NIEVES, AS TRUSTEE OF THE GONZALEZ CORONADO TRUST, Individually and on Behalf of All Others Similarly Situated, | Case No.: 1:16-CV-3591-GHW |
| Plaintiff, | JURY TRIAL DEMANDED |
| v. | |
| KEVIN DAVIS AND AMIR ROSENTHAL, | |
| Defendants. | |

**THIRD AMENDED CLASS ACTION COMPLAINT FOR**
**VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................... i

NATURE OF THE ACTION ................................................................................................ 2

JURISDICTION AND VENUE ........................................................................................... 15

PARTIES AND RELEVANT NON-PARTIES ................................................................... 15

SUBSTANTIVE ALLEGATIONS ...................................................................................... 18

    A.    Determined to maintain the perception that PSG was continually growing its sales and revenue numbers, Davis and Rosenthal enabled, oversaw, and concealed PSG's use of high-risk sales practices. ............................................................................... 19

        1.    Punitive use of discounts ................................................................. 21

        2.    Flooding the market with cheap inventory ("closeouts") ............................... 24

        3.    ████████████ to hit quarterly sales targets ......................................... 28

        4.    Extended payment terms ................................................................. 33

        5.    Pushing sales to customers ████████████ ............................... 37

        6.    ████████████ ......................................................................... 42

    B.    The truth begins to reveal itself: the risks that Defendants concealed predictably materialized, ultimately causing PSG's bankruptcy. .................................................... 50

    C.    Defendants acted with scienter. ..................................................................... 59

    D.    Defendants made false and misleading statements to investors about the nature of PSG's growth, the substantial risks associated with the practices used to achieve that growth, and their ability to manage those substantial risks with effective internal controls. ..... 64

i

1.   January 14 and 15, 2015 ........................................................................... 66

2.   April 13 and 14, 2015 .............................................................................. 68

3.   July 7 and 8, 2015 ................................................................................... 71

4.   August 26, 2015 ...................................................................................... 74

5.   August 27, 2015 ...................................................................................... 76

6.   October 14 and 15, 2015 ......................................................................... 84

7.   January 14, 2016 ..................................................................................... 87

E.   Defendants and PSG violated Item 303 of Regulation S-K by failing to disclose unfavorable known trends or uncertainties. .................................................... 89

LOSS CAUSATION ................................................................................................ 92

RELIANCE ............................................................................................................... 93

NO SAFE HARBOR ................................................................................................ 94

CLASS ACTION ALLEGATIONS ........................................................................ 94

CAUSES OF ACTION ............................................................................................ 96

The allegations set forth in this Third Amended Class Action Complaint for Violations of the Federal Securities Laws (the "Complaint") are based on the investigation undertaken by Lead Counsel on behalf of Lead Plaintiff Plumbers & Pipefitters National Pension Fund ("Lead Plaintiff").

Lead Plaintiff brings this Complaint against Kevin Davis ("Davis"), the former Chief Executive Officer ("CEO") and director of Performance Sports Group Ltd. ("PSG" or the "Company"), and Amir Rosenthal ("Rosenthal"), the Company's former Chief Financial Officer ("CFO"), President, and interim CEO (after Davis' termination).

Lead Plaintiff's allegations are based on personal knowledge as to its own acts, and on information and belief as to all other matters, such information and belief having been informed by the investigation conducted by and under the supervision of its counsel, which included, among other things: (i) review and analysis of PSG's public filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) review and analysis of the sports equipment industry, analyst reports, and other publicly available materials concerning PSG's business practices; (iii) review and analysis of other publicly available information concerning PSG; (iv) interviews with former PSG employees and customers of PSG (most of whom have provided information in confidence; these confidential witnesses ("CWs") will be identified herein by number (CW1, CW2, etc.)), including W. Graeme Roustan ("Roustan"), the former Chairman of PSG's Board of Directors; (v) review and analysis of internal Company documents produced pursuant to a settlement agreement with PSG's equity holders and debtors in the Company's bankruptcy proceedings; and (vi) consultations with experts.

Substantial additional evidentiary support exists for Lead Plaintiff's allegations, including records of PSG's internal investigation and the audit workpapers of its independent public auditor, KPMG, which Lead Plaintiff will seek after it is granted a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      Lead Plaintiff brings this federal securities class action on behalf of itself and a proposed class of persons and entities (the "Class") who purchased or acquired PSG common stock on the New York Stock Exchange ("NYSE") during the period from January 15, 2015 through October 28, 2016, inclusive (the "Class Period"). Lead Plaintiff seeks remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      PSG was a developer and manufacturer of sports equipment and apparel that it sold to independent retailers internationally. On June 20, 2014, PSG – which had previously been called Bauer Performance Sports Ltd. and was publicly trading on the Toronto Stock Exchange – held its initial public offering in the United States, issuing more than 7 million shares of stock to the public at a price of $15.50 per share, and changed its name to Performance Sports Group Ltd. Following the U.S. initial public offering, PSG's stock also traded on the NYSE.

3.      PSG sold its goods to retailers under several brands, many of which it acquired: Bauer (hockey), Easton (baseball/softball) (acquired: April 2014, for $330 million), Combat (baseball) (acquired: May 2013, for CAD$4 million), Cascade (lacrosse) (acquired: June 2012, for $64 million), Maverik (lacrosse) (acquired: June 2010), Inaria (soccer) (acquired: October 2012, for CAD$7 million), Mission (hockey) (acquired: September 2008), and Easton (hockey) (acquired: January 2016, for $12 million). In acquiring these brands, PSG accumulated significant debt, which it financed through agreements with certain creditors.

2

4.      PSG's most recognizable brands were Bauer hockey and Easton baseball/softball. Those two brands were the biggest part of PSG's business throughout the Class Period. Generally, PSG's business model was to sell its goods to its customers – retailers – who would then sell those PSG-branded goods to consumers. Its fiscal year ran from June 1 to May 31.

5.      Throughout the Class Period, Defendants Davis and Rosenthal repeatedly touted PSG's record of impressive sales growth, the reasons for that growth, and their successful integration of PSG's various acquired brands. These statements were misleading: Davis and Rosenthal misled investors about the true drivers of PSG's sales growth, the risks associated with the mechanisms they were using to achieve that growth, and the quality of the internal controls that were supposed to address those risks.

6.      To sustain that perception of strong sales and revenue growth, Defendants Davis and Rosenthal led an effort to grow the Company's revenue and sales figures by any means necessary. This included employing high-risk and sometimes fraudulent sales practices, such as (1) threatening the loss of volume-based discounts as a penalty to force retailers to take on more inventory than they reasonably could; (2) flooding the market with inventory, often at extreme, unprofitable discounts referred to within PSG as "closeouts"; (3) "pulling" orders into different quarters so as to meet certain short-term sales targets; (4) relying on wildly extended payment terms to convince customers to take more and more product and not pay for it until months or even quarters later; (5) pushing sales to customers ██████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████

3

7.     Layered on top of these high-risk sales practices was another, closely-related deception: Defendants concealed that PSG's internal controls regarding the detection and management of these high-risk sales practices were shoddy or non-existent, regularly violated, and left to crumble by Davis and Rosenthal – ███████████████████████████████
█████████████████████████████████████████

8.     The unique risk posed by Defendants' conduct was substantial. Flooding the market with cheap inventory and using high-pressure tactics to get retailers to take more inventory than they could reasonably sell would inevitably cannibalize future, sustainable, higher-margin sales for the sake of short-term bumps in quarterly growth. In the words of one PSG retailer quoted in a local business journal: "they [PSG] did try to jam orders down our throat, to take orders early, to overstock, oversupply, over-inventory us. ***They said it would all work out, and then things hit a wall***."

9.     Similarly, pushing and pulling orders, using extended payment terms, and entering into consignment agreements risked cannibalization of future, healthy sales – *and* the improper recognition of revenue, a violation of accounting rules – which could shake the foundation of PSG.

10.     These risks were not theoretical, but in fact materialized during the Class Period. They were vividly described in ███████████████████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████ Thus, Defendants' focus on ████████

that is, their relentless drive towards the appearance of short-term sales growth by any means necessary, had cannibalized PSG's healthy growth and caused the U.S. sporting goods market overall to suffer from glut.

11.     If Defendants' high-risk sales practices were the spark to PSG's ultimate collapse, PSG's deficient internal controls were the kindling. The risks arising out of PSG's use of these sales tactics were made even more probable and existential due to Defendants' failure to maintain and enforce fundamental internal controls. In particular, ██████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

5

██████████████████████████████████████████████████████

█████████████████████████

12.    In fact, ███████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████ their public statements about the nature of PSG's growth, the risks associated with the

mechanisms they used to achieve that growth, and the internal control environment, in which

Defendants assumed those substantial risks, were not accurate. Davis, Rosenthal, and PSG failed

– █████████████████████████ – to assess just how much the Company was relying on

its use of extended payment terms, ██████████████████████, or any of the other

high-risk tactics identified above to drive sales growth. ██████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████████

13.    Davis, Rosenthal, and other members of PSG's senior management knew facts and

had access to information showing that their public statements about the nature of PSG's growth,

the mechanisms used to achieve that growth, the risks associated with those mechanisms, and the

deficient internal control environment in which Defendants and PSG undertook those actions were

not accurate or the whole truth. Moreover, Davis, Rosenthal, and other members of PSG's senior

management failed to check information they had a duty to monitor under the federal securities

laws – a duty they had when they made misleading statements, a duty they had under Item 303 of

Regulation S-K, and a duty they had after they received multiple, repeated warnings and signs that

PSG was engaging in high-risk sales practices and that those risks were going to cause serious damage to PSG's business.

14. The risks posed by the aggressive sales practices and the deficient internal controls were by themselves considerable and capable of crippling PSG's business – but when those risks materialized and combined, they became existential threats to the Company. For example, ███

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████

15. Another example: when several of PSG's largest customers began to experience financial stress and go bankrupt, PSG's relentless stuffing of the market with inventory using the high-risk practices identified above – ██████████████████████████████

███████████████████ – left PSG in an untenable situation. ██████████████

██████████████████████████████████████████████████████████

████████████████████████████.

16. Defendants understood these risks in real-time, ██████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

7

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████

17.     There were other warnings. ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████

18.     Davis had a more draconian response: he fired Kinnaly the following month. According to Confidential Witness 3 ("CW3"), Kinnaly had challenged Davis and Rosenthal about the Company's sales and booking practices at a meeting of PSG's Board of Directors (Davis was a director on the Board). Kinnaly warned those in attendance, including Davis, that pulling orders forward or "trade loading" in order to make their numbers would eventually catch up with PSG

and cannibalize their future sales. Soon after that Board of Directors meeting, Davis fired Kinnaly for speaking out about the sales practices.

19.  ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

20.     The warnings continued. W. Graeme Roustan, a major PSG shareholder and the former Chairman of its Board of Directors, on two occasions in 2015 – once with the assistance of accounting firm Grant Thornton and once through the survey website "SurveyMonkey.com" – surveyed a sample of PSG's largest customers and found (among other things) credible evidence that, ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████

21.     But as they did with Kinnaly, Defendants took extreme measures to silence Roustan. They threatened Grant Thornton with litigation, causing the accounting firm to withhold

from Roustan the results of the very survey he commissioned. They then threatened Roustan with litigation for purportedly interfering in their business. The aforementioned warnings about the risks Davis and Rosenthal's tactics were causing the Company are a mere sampling of those issued.

22. None of this was ever disclosed to investors. Instead, Defendants repeatedly misled the investing public about the nature of PSG's growth, the risks associated with the methods used to achieve that growth, and the quality of PSG's internal controls in managing those risks. They did so by making statements like the following:

- In an earnings call on January 15, 2015, Davis stated that "[a]ll in all, ***the first half of FY15 has been highlighted by record revenues, the smooth progression of our EASTON integration, and the continued strong growth of our hockey business. We also delivered record quarterly earnings*** despite an estimated $0.08 per share of negative impact from currency compared to the prior year, and the estimated revenue loss of our lacrosse helmets in the quarter. ***The strong reported results in the face of these headwinds are a testament to the strength of our brands, platform and our great people.***"

- PSG's 2015 Annual Report stated that Defendants' "***successful . . . integration of seven businesses since 2008 has demonstrated our ability to . . . integrate acquired businesses.***" (2015 Form 10-K at 20).

- PSG's 2015 Annual Report stated that "[o]ur business is affected by seasonality, which could result in fluctuations in our operating results and the trading price of the Common Shares," and specifically stated that "***our customers may cancel orders, change delivery schedules or change the mix of products ordered with minimal notice. We may also make strategic decisions to deliver and invoice product at certain dates in order to lower costs or improve supply chain efficiencies.***" (2015 Form 10-K at 30).

23. Statements like these painted a misleading picture. They gave investors the impression that PSG was achieving "record quarterly earnings" through typical, healthy means, such as gaining market share with retailers or improving customer demand for PSG's products, but that was not true: PSG's "record quarterly results" were buoyed by high-risk sales practices and a ██████████████████ driving those "record" earnings. Defendants' statements painted the picture that PSG had smoothly integrated its acquired brands into PSG's systems, but

that too was not true: ███████████████████████████████████

███████████████, and were a consequence of Defendants' *unsuccessful* integrations. Moreover, Defendants' statements purported to warn investors of certain risk factors that seemed outside of PSG's control, like the impact of seasonality on order timing, but this also was not true: PSG pulled orders forward to hit quarterly sales targets.

24.     When it became evident to investors in 2016 that PSG's business was failing, Davis and Rosenthal became particularly adept at misleading investors about the reasons why. They discussed certain market events that had an adverse impact on PSG's business – like the bankruptcy of a major retailer, or a slowdown in the retail markets – but omitted discussing *their own roles* in both creating and magnifying the impact of those adverse market events. For example, on March 8, 2016, PSG made a major announcement disclosing that its business was weakening and that it was slashing its earnings guidance. In explaining why, Davis stated on an earnings call that "[t]he second half of fiscal 2016 has been impacted by *adverse market conditions and related customer credit issues*. The baseball/softball market is experiencing an *unexpected significant downturn in retail sales*, including in our important bat category. *This weakening of consumer demand, coupled with the chapter 11 filing by one of our largest US national sporting goods retailers, is reducing our sales for baseball and softball products.*"

25.     But what Davis withheld was ██████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████. Davis also omitted that ████

███████████████████████████████████████████████████████

███████████████████ And he failed to mention ██████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████

26.     The risks posed by this fraud were not hypothetical: they predictably materialized

by forcing PSG into bankruptcy. The first domino fell ████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████ Defendants never disclosed

this.

27.     Beginning in 2015 and extending into 2016, █████████████████████████████

███████████████████████████████████████████████████

███████████████████████████ When four of PSG's larger customers (Team

Express, Sports Chalet, Total Hockey, and The Sports Authority) then filed for bankruptcy, ██████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

28.     The situation grew worse throughout 2016. A January 11, 2016 *Reuters* article

revealed that Roustan had sued Grant Thornton for ending his engagement and refusing to provide

him the results of his commissioned survey of PSG's major customers. Two days later, on January

13, 2016, PSG issued a press release revising substantially downward its earnings guidance for

fiscal year 2016, cutting its adjusted net income and adjusted earnings per share numbers

substantially, and announcing weak 2016 second quarter results "largely driven by a bad debt write-off related to outstanding receivables for an internet baseball retailer [Team Express] that filed for bankruptcy reorganization." On this news, PSG's stock price experienced a 3-day fall from its opening price on January 14, 2016 of $7.08 per share to a closing price on January 19, 2016 of $5.92 per share, on heightened average trading volume of 1.28 million shares per day, damaging investors.

29.     On March 8, 2016, PSG again revised downward its guidance for fiscal year 2016. In a press release issued that day, PSG attributed the revision to "a write down of the receivable balance from a U.S. national sporting goods retailer that has filed under chapter 11 [The Sports Authority] and the related anticipated loss of sales from this retailer," "an anticipated reduction in sales, particularly due to weakness in the baseball/softball market," and "additional bad debt reserves primarily for certain U.S. hockey customers and the related anticipated loss of sales from such customers[.]" In the press release, Davis cited "customer credit issues" as an "adverse market condition[]" impacting the Company. On this news, shares of PSG fell $5.75 per share or over 66% to close at $2.91 per share on March 8, 2016, on trading volume of 18.6 million shares, damaging investors.

30.     On March 14, 2016, the *New York Post* published an article entitled "Bauer's Parent Company Questioned About Misdating Earnings," stating that "[c]ustomers told former PSG Chair Graeme Roustan that the company had asked them to misdate earnings, a source with direct knowledge of the situation said." On this news, shares of PSG fell $0.41 per share or over 10.35% to close at $3.55 per share on March 15, 2016, on an average two-day trading volume of approximately 2.29 million shares, damaging investors.

31.     The revelations continued. By the end of the Class Period on October 28, 2016, among other things: (1) PSG had announced a non-cash total impairment of **$210 million** – triggered by the weakening sales cycle that had materialized in response to PSG's high-risk sales practices – in April 2016; (2) the U.S. Securities and Exchange Commission had opened an investigation into PSG that looked into the same issues raised in this litigation; (3) the Canadian securities regulator (the Ontario Securities Commission) opened its own similar investigation into PSG; and (4) PSG's Audit Committee had initiated an internal investigation into the Company's financial statements that involved the same issues raised in this litigation and which ultimately put in motion the final cascading of events leading to PSG's bankruptcy.

32.     That internal investigation, prompted by ███████████████████████████ ████████████████████ was the final straw. ███████████████████████████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ████████ PSG was thus forced to delay the filing of its 2016 Annual Report and audited financial statements until it was too late: by failing to file those documents, PSG breached the terms of its two massive loan agreements with its creditors, forcing it into bankruptcy and wiping out hundreds of millions of dollars in shareholder value. PSG's share price during the Class Period reached a high of $21.65. By November 1, 2016, the first trading day after the formal announcement of the bankruptcy filing the share price had cratered to $1.67 on a volume of 8.7 million trades.

14

## JURISDICTION AND VENUE

33.     The federal securities claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5]).

34.     This Court has jurisdiction over the subject matter of the federal securities claims pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

35.     Venue is proper in the Southern District of New York pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b), given that many of the acts and practices complained of herein occurred in this District as the Company's stock was traded on the NYSE during the Class Period.

## PARTIES AND RELEVANT NON-PARTIES

36.     Lead Plaintiff **Plumbers & Pipefitters National Pension Fund** engaged in the transactions listed in the attached certification during the Class Period and was injured as a result of Defendants' false and misleading statements and omissions. Lead Plaintiff is a multi-employer plan that provides benefits to more than 150,000 participants associated with more than 4,600 employers. Lead Plaintiff's primary place of business is 103 Oronoco Street, Alexandria, Virginia 22314.

37.     Bankrupt non-Defendant **Performance Sports Group Ltd.** ("PSG") was a designer, developer, and manufacturer of sports equipment and related apparel. PSG stock traded in an efficient market on the NYSE during the Class Period. The Company's stock has been delisted from the NYSE and now trades on the OTC market. PSG headquarters were located at 100 Domain Drive, Exeter, New Hampshire 03833.

15

38.     Defendant **Kevin Davis** ("Davis") served as CEO and a director of PSG until March 22, 2016, ██████████████████████████████████████████ While he was CEO, Davis was a signatory on each of the Company's publicly filed documents during the Class Period and was directly responsible for overseeing the revenue recognition policies and progressive sales structure of PSG's business.

39.     From the start of the Class Period through December 14, 2015, Defendant **Amir Rosenthal** ("Rosenthal") served as CFO and Executive Vice President ("EVP") of Finance and Administration of PSG. On May 28, 2015, Rosenthal was appointed to a newly created position of President of PSG Brands, in which he became responsible for overseeing PSG's portfolio of brands, including Bauer, Mission, Maverik, Cascade, Inaria, Combat, and Easton. Following his appointment as President, Rosenthal retained the day-to-day responsibilities of CFO, including serving as a signatory on all of PSG's public filings, until December 14, 2015. Rosenthal, as CFO and EVP of Finance, was directly responsible for PSG's sales and revenue oversight and its credit procedures. Rosenthal was appointed as interim CEO following Davis' departure until June 8, 2016, when Harlan Kent was hired as CEO of PSG. On October 31, 2016, PSG announced Rosenthal's departure from the Company.

40.     Davis and Rosenthal are collectively referred to as the "Defendants."

41.     Internal PSG documents show that Defendants had access to adverse undisclosed information about every aspect of the Company's business. Both attended Board of Directors' meetings. Both attended meetings of the Board of Directors' Audit Committee. Davis and Rosenthal often spoke with one another and kept in constant touch regarding many detailed aspects of PSG's business. Both were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information concerning the Company

16

and its business. Davis and Rosenthal were both involved in drafting, producing, reviewing, and disseminating the Company's public statements (*e.g.*, SEC filings, press releases, presentations to investors) and non-public statements (*e.g.*, correspondence on behalf of the Company with major shareholders, analysts, and employees).

42.     Both also understood that, as officers and controlling persons of a publicly held company whose common stock was and is registered with the SEC pursuant to the Exchange Act, they had a duty to disseminate prompt, accurate, and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded common stock would be based on truthful and accurate information.

43.     Both were also involved in the setting, management, and revision of PSG's sales targets, earnings guidance, and forecasts, and thus both were deeply involved in the management of PSG's sales practices and the assessment of whether PSG would hit its relevant sales targets.

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████

██████████

## SUBSTANTIVE ALLEGATIONS

44.     The sources for Lead Plaintiff's allegations regarding Defendants' fraudulent conduct were derived from the investigation of Lead Counsel, which included, among other things: (1) an interview of W. Graeme Roustan, the former Chairman of the Board of Directors of Bauer and shareholder of PSG; (2) review of statements made by Ronald Rugal, president of B&R Sports, a Bauer retailer, published in an article in the *New Hampshire Business Review*; (3) interviews of former PSG employees who worked at PSG during the Class Period and/or immediately before or after the Class Period and current and former customers of PSG with first-hand knowledge of PSG's sales tactics; (4) review and analysis of internal Company documents pursuant to the terms of a November 1, 2017 settlement agreement between Lead Plaintiff and the Class, and the Equity Holders and Debtors in PSG's bankruptcy proceeding.

45.     The accounts of four Confidential Witnesses are discussed in this Complaint. **CW1** was a sales representative and independent contractor at Bauer for 29 years until his contract was not renewed on February 1, 2016. CW1 reported to regional sales manager Matt Hayes ("Hayes"), who reported to Paul Healey ("Healey"), Bauer's then-Vice President of Sales, North America. CW1 also reported to Bryan McDermott ("McDermott"), Bauer's Business Director for North America. **CW2** is the store manager of a Bauer customer located in Summit, New Jersey. CW2's store has purchased products from Bauer since the early 1990's. **CW3** is the co-owner of a Bauer customer based in Salem, New Hampshire. CW3's company has six additional locations in Massachusetts and New Hampshire. **CW4** is a franchise owner of an Easton baseball/softball customer based in Milwaukee, Wisconsin.

**A.    Determined to maintain the perception that PSG was continually growing its sales and revenue numbers, Davis and Rosenthal enabled, oversaw, and concealed PSG's use of high-risk sales practices.**

46.    PSG pushed its sales staff to increase its sales numbers without regard to market demand or customer requirements. That tone was set by Davis and Rosenthal, who were determined to portray an image of strong sales growth to PSG's investors.

47.    This culture began well before the Class Period. ████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████ Davis and Rosenthal both believed this type of extreme messaging was effective. ████████████████████████████
████████████████████████████

48.    Defendants' message had its intended effect: it signaled to PSG's sales staff that the goal was to obtain sales growth and meet the sales targets by any means necessary – or face the wrath of Davis and Rosenthal. PSG's salespeople, overseen and encouraged by Davis and Rosenthal, thus engaged in several types of high-risk, aggressive, and sometimes fraudulent business practices to boost PSG's short-term growth numbers. PSG, Davis and Rosenthal then concealed from investors the tactics they used to achieve that growth, the known risks those tactics posed to PSG's business, and the deficient internal control environment that was incapable of managing those risks.

19

49.     Specifically, PSG and the Defendants concealed from investors that PSG was engaged in high-risk and sometimes fraudulent sales practices that risked cannibalizing future, healthy sales and violating accounting rules. Instead, PSG told investors in its Form 10-K filed on August 27, 2015, for example, that "[w]e generate revenues from the sale of performance sports equipment and related apparel and accessories. We offer various ***cooperative marketing incentive programs*** to assist our sales channels with the marketing and selling of our products." (2015 Form 10-K at 51.) The truth was quite the opposite. There was nothing "cooperative" about the nature of these programs. Instead, they were high-risk, high-pressure, and sometimes fraudulent.

50.     The high-risk sales practices at PSG included the following, with various combinations and permutations: (1) using discounts punitively to pressure retailers to buy progressively more PSG-branded product, (2) using high-volume sales of discounted product (referred to as "closeouts" at PSG) to drive sales growth, (3) routinely pushing and pulling orders into quarters to meet short-term sales targets, (4) using wildly extended payment terms with retailers to enable them to take more PSG-branded product than they reasonably could to hit short-term sales targets, (5) pushing product out to customers ██████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████, to push more PSG-branded product out into the marketplace.

51.     Defendants concealed from investors their use of these sales tactics and the serious risks created by them. Those risks included cannibalizing future sales cycles by flooding the market with excess inventory that could not be sustained by consumer demand; creating supply and inventory problems, increasing the likelihood of non-payment by retailers who had been pressured to take more and more PSG product; and violating accounting rules by misstating PSG's

financials, which itself could trigger government investigations, auditor investigations and shareholder litigation.

### 1. Punitive use of discounts

52. To maintain the image of *increasing* growth, Davis and Rosenthal oversaw a sales program in which PSG salespeople used the threat of the loss of steep discounts as a penalty to force retailers to accept progressively greater amounts of product over time. The effect of this was to pressure retailers to accept increasing amounts of product – which PSG would record as increased sales and revenue – but to risk oversaturating the market with PSG inventory that could not be sustained through consumer demand. The inevitable consequence of this was that Defendants and PSG created an unsustainable business model: at some point, consumer demand would be satiated, retailers would no longer be able to sell all of the existing and indeed increasing amounts of PSG product on their shelves, and retailers would have no choice but to stop or substantially slow down their purchases of PSG product.

53. Confidential witnesses confirmed the use of these practices. As CW2, a manager for a Bauer retailer, recalled, there was strong pressure to go along with PSG's and Defendants' tactics if you wanted to sell Bauer's merchandise. CW2 remembers being told frequently by Bauer representatives to either increase the size of orders or risk losing the store's wholesale discount. This same "threat" was made to CW3, the co-owner of a Bauer retailer, who, in a meeting with Healey in the summer of 2015, was told that if CW3's store did not increase its retail bookings or purchase orders by at least 15%, CW3's store would lose its existing discount. CW2 knew that even if increasing the store's order was not necessary, it was cheaper to comply than lose the discount on the existing order.

54.     As CW1, a former independent contractor for Bauer, put it, "we were 'asked' through sales programs to ask [retailers] for increased volume from the previous year to maintain current or increased discounts. Dealers complained about the increase due to larger dealer shelf space already given to Bauer and the fact the dealer's business wasn't growing." CW1 also recalled instances where he was asked to work with retailers to accept early deliveries. For instance, if a product was scheduled to ship to a retailer in September, PSG would ask the retailer to accept the product in early August.

55.     Davis and Rosenthal knew that these strong-arm tactics were punitive in nature and risked flooding the market with unsellable inventory (███████████████████████████ ███████), but their interest in short-term growth and meeting quarterly targets took priority over long-term, sustainable growth. One of those warnings came early – before the Class Period – from Ed Kinnaly, the then-longtime Executive Vice President of Bauer hockey, █████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ █████████████████████████████████████, Davis and Rosenthal fired Kinnaly.

56.     Those warnings about the risks of the "████████" approach continued throughout the Class Period. For example, ██████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████

22

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████

57.     Both Davis and Rosenthal understood the risks and ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████

58.     These comments were corroborated by what Davis and Rosenthal could see in the industry, or recklessly disregarded. Consumer interest in the sports themselves (*e.g.*, hockey, baseball) was not growing quickly enough to sustain Davis' and Rosenthal's drive for increased sales growth. Statistics published by USA Hockey showed that player membership grew by less

than 2% during the Class Period, yet PSG insisted that its retailers increase orders by 10-15% or more every year.[1]

59.     Even with all this information, nothing changed. As one retailer, Ronald Rugal of B&R Sports, described to the *New Hampshire Business Review* in an article dated September 1, 2016, PSG's practice during the Class Period was to "jam orders down our throat, to take orders early, to overstock, oversupply, over-inventory us. They said it would all work out, ***and then things hit a wall***." Rugal stated that this was done to meet quarterly numbers.

60.     In any event, by January 2016, it was too late. The market had been so jammed with product due to PSG's punitive use of discounts and its other high-risk sales practices that the concealed risk of oversaturation had begun to materialize in PSG's weakening business and the softening of the sports equipment market in January 2016.

### 2.     Flooding the market with cheap inventory ("closeouts")

61.     ██████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████  By their very nature, closeouts offered PSG an opportunity to push excess, unsold PSG product out into the marketplace and generate some revenue, but at a lower margin – and sometimes at a loss.

62.     Relying too much on closeouts was risky, particularly when it was repeatedly used to reach sales targets. Closeouts could be used to hit quarterly sales and earnings targets, but even

---

[1] According to USA Hockey, player membership in 2014-2015 was 533,172. In 2015-2016, that figure grew by just 9,411, or 1.7%, to 542,583. In fact, between the 2012-2013 and 2013-2014 seasons, the number of hockey players had actually decreased by 899 players.

when they did, they came at a higher cost (smaller margins) to PSG. Closeouts also risked over-saturating the market (or stuffing the channel) with PSG product and cannibalizing future sales cycles. And when combined with some of the other high-risk sales practices PSG used and overly relied upon, closeouts could cause accounting violations and trigger non-collectability risks if the closeouts were with retailers who were in excess of their customer credit limits, had extended payment terms, or were subject to consignment agreements.

63.  ███████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████  This large order was particularly risky: ████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

64.  Davis and Rosenthal received warnings about these practices and their risks. As CW3, an experienced veteran hockey-equipment retailer, recounted, Healey and Davis both knew, for example, that the hockey equipment market was fully saturated during the Class Period.

65.  Davis and Rosenthal also received explicit warnings from Graeme Roustan, the former Chairman of the Board of Directors of Bauer. ███████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████

25

66.     Davis and Rosenthal purported to address Roustan's accusations, but their insatiable appetite for revenue and dislike of the light Roustan was shining on their tactics caused them to take extreme measures to silence him. They threatened Grant Thornton, the accounting firm Roustan retained to survey PSG's retailers about these practices, with litigation, causing Grant Thornton to withhold the results of the survey from Roustan. They threatened Roustan himself with litigation. And they claimed (incorrectly) that Roustan's warnings were made-up.

67.     But they were not made-up. After Roustan first issued his warnings █████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████

68.     As PSG's business was deteriorating, ████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████     The responses were telling: ██████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

26

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████

69.     Davis and Rosenthal knew all this but recklessly disregarded the risks of the sales practices they instilled and oversaw. ██████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████

70.     The risks posed by excess closeout and discount sales – that the market would become oversaturated, and retailers would no longer be willing to make new purchases – predictably materialized. By March 2016, it had become apparent within PSG that the baseball and softball market had in fact collapsed *because of* PSG's closeout tactics: two of PSG's largest customers – The Sports Authority and Team Express – went bankrupt after PSG had pushed both to the brink with its high-risk sales tactics. ████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████████████ The same was true for

hockey: ████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████

     **3.**    ████████████████████ **to hit quarterly sales targets**

71.    When Davis and Rosenthal set the tone at the top – ███████████████████████

███████████████████████████████████████ – they created the

conditions in which PSG's sales, accounting, and finance departments moved orders into (typically

earlier) quarters to hit targets when current sales patterns suggested there would be a shortfall from

those targets. █████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████

72.    Davis and Rosenthal misled investors about this practice throughout the Class

Period. They boasted about their quarterly sales and revenue growth, neglecting to mention

anything about the nature of that growth (that it sometimes was maintained by pulls from later

quarters) or the risks associated with the mechanisms used to maintain that appearance of growth.

Moreover, PSG's 2015 Annual Report stated that "our customers may cancel orders, change

delivery schedules or change the mix of products ordered with minimal notice. ***We may also make***

***strategic decisions to deliver and invoice product at certain dates in order to lower costs or improve supply chain efficiencies***." (2015 Form 10-K at 30.) This, too, was false and misleading: PSG at the time was *often* (not "may") making tactical decisions to deliver and invoice product at certain dates, and it was doing so to ensure that the Company would hit its quarterly forecasted sales targets, not "to lower costs or improve supply chain efficiencies."

73.     This constant pulling of orders had substantial risks to PSG's business. ██

████████████████████████████████████████████████████████████

████████████████████████████████████████████ Pulling orders cannibalized future orders for the sake of maintaining the appearance of quarter-over-quarter growth. If it were done often enough, PSG would inevitably run out of orders to pull forward ████████████████). Pulling orders would also cause supply chain *inefficiencies* – it disrupted the order flow process and sometimes would leave PSG without inventory for future orders, causing even more sales losses. Pulling orders further risked violating accounting rules governing revenue recognition; ██

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████ – a recipe for errors and particularly significant ones in an internal control environment as deficient as that of PSG, as described *infra*.

74.     Multiple confidential witnesses have also further confirmed PSG's order pulling tactics. CW3 regularly received calls during the Class Period from PSG headquarters asking whether CW3 would accept shipments of orders early. CW3 stated that orders were shipped early "to make [PSG's] numbers in a certain quarter." And when product was sent to retailers prior to

its scheduled shipping date, retailers did not have to pay or initiate any scheduled payment plan until the agreed-upon payment date, as both CW3 and CW4 recalled.

75.     These practices were not restricted to one business unit. Things were no different for PSG's baseball/softball brand, Easton. For example, CW4, an Easton customer during the Class Period agreed to accept early shipment of a large order in return for free shipping. At one point, in October or November 2015, CW4 attempted to contact CW4's Easton representative to downsize a large baseball equipment order that was placed for 2016. However, the Easton representative ignored CW4's request, and instead the full order was delivered more than two months early.

76.     Not only did PSG coerce its retailers to order larger quantities, it also demanded that stores place their orders earlier and earlier, as CW2 recalls. During the Class Period, Bauer insisted that CW2 place the store's order a full year early which was extremely difficult and unrealistic because CW2 would not know what degree of demand there would be for the product that far in advance. Similarly, CW3 had to place the store's order whenever Bauer told him to, even if it was a year early. If CW3's shelves were already fully stocked, it was impossible to forecast what would be needed the next year, but PSG did not care, according to CW3 – it just needed the order.

77.     Internal Company documents corroborate the confidential witness accounts. ▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

████████████████████████████████████████████████████

████████████████████████████████

78.    At Easton baseball/softball, ████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████ ▪

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

79.    The risks associated with all this pulling forward materialized as expected. ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████ The same was

true at Bauer: ████████████████████████████████████████

---

[2] ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████

████████████████████████████████████████████████

█████████████████

80.    ███████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████ In a notable sign of how dysfunctional PSG's sales culture had become under Davis and Rosenthal, ██████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████

81.    Davis and Rosenthal received warnings about the risks associated with the use of pulling orders to hit quarterly sales targets. For example, according to CW3, Kinnaly warned Davis and Rosenthal as early as 2013 that pulling orders forward or "trade loading" to make their numbers would eventually catch up with PSG. Rather than heeding his warning, they fired Kinnaly for speaking out.

82.    In another set of warnings, Roustan ██████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

After Davis and Rosenthal thwarted Roustan's access to the data collected by Grant Thornton, Roustan collected his own data via SurveyMonkey that showed that the majority of the sample of

retailers polled stated that they had been asked by PSG to accept orders in earlier quarters (the rest of the retailers responded "Not Sure").

83.     The risks of ███████████████████ to create a false impression of growth were foreseeable. After Harlan Kent was appointed as the CEO and tried to remedy the mistakes of Davis and Rosenthal, ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████ His comments reflected what was common knowledge at PSG: ██████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████

### 4.     Extended payment terms

84.     Another high-risk sales practice was PSG's use of wildly extended payment terms with its retailers. During the Class Period, ████████████████████████████████████

████████████████████████████████████████████████ These extended terms were another mechanism for PSG to push more of its product out to the market and boost short-term sales growth numbers, in particular with financially troubled accounts that could not afford to take on the amount of product PSG wanted to sell.

85.     The risks of using these extended payment terms were considerable. ██████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████

86.   ████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

---

[3] ██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████

87.    ██████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████

88.    The risks materialized as expected. ████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

35

███████████████████████████████████████████████████████

████████████████████████████████████████████████

89.     Davis and Rosenthal, however, continued to mislead investors by claiming that PSG's failing business was due to unforeseen, unanticipated, act-of-God-type circumstances. For example, as retailers struggled to sell PSG inventory in late 2015 and 2016, Rosenthal told investors in April 2016 that "third-quarter results were impacted by ***adverse market conditions and related customer credit issues***. Specifically, the baseball/softball market is experiencing an ***unexpected and significant downturn in retail sales across all product categories***, particularly in our important bat category. ***The impact of this downturn is in addition to the Chapter 11 filing by one of the largest US national sporting goods retailers, which also impacted sales for our baseball and softball products.*** In light of these events, including the bankruptcy of an Internet baseball retailer in our second quarter, we increased our bad [debt] reserves in the third quarter for certain of our US hockey customers as well as our baseball/softball customers."

90.     This statement misled investors in several ways. By tying "customer credit issues" to "adverse market conditions," Rosenthal concealed that PSG had played a substantial role in *causing* those market conditions by flooding the market with inventory and cannibalizing future sales cycles. Further, his reference to the "impact" of certain retailer bankruptcies and attendant customer credit issues omitted that ████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████

     **5.**       **Pushing sales to customers** ████████████████████████

91.     In their zeal to grow quarterly numbers and maintain the appearance of sales

momentum, Davis and Rosenthal oversaw a crumbling internal control environment in which ████

████████████████████████████████████████████████████

████ PSG's sales practices frequently did not require retailers to pay cash in advance for

inventory. Instead, retailers used payment plans (often the extended payment terms discussed

above) under which PSG would record revenue when inventory shipped, but would effectively

provide the retailer with a credit line in exchange for a promise to pay over time. ███████████

████████████████████████████████████████████████████

████████████████████████████████████

92.     In this business model, the risks of exceeding customer credit limits were

foreseeable – indeed, they were obvious. If PSG lent a retailer a certain amount of money that the

retailer had no reasonable way of paying back, or paying back in a timely manner, it would cause

collectability problems, revenue recognition rule violations, or force PSG to extend its payment

terms, which would then raise similar revenue recognition and collectability problems as those

triggered by PSG's use of extended payment terms (as discussed above). If a retailer suffered from

financial stress or filed for bankruptcy, ignoring PSG's customer credit limit in the quest to push

out more product would magnify the financial impact of that bankruptcy on PSG. Further, failing

to maintain and adhere to customer credit limits was a violation of internal controls over financial

reporting, and risked auditor scrutiny, internal investigations, regulatory investigations, and shareholder litigation.

93.    All of those risks materialized in precisely that way. ███████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████ In other words, PSG's mixing of high-risk sales practices – unprofitable closeouts jamming the market with inventory *combined* with PSG lending in excess of a financially troubled retailer's credit limit – had created significant risks to PSG's business (non-collectability) and caused substantial losses to investors when PSG's business collapsed as a result.[4]

94.    Neither Davis nor Rosenthal mentioned this in their statements to investors. Instead, they would make oblique statements: "***Baseball/Softball EBITDA in the second quarter decreased 31%*** (including and excluding the impact of foreign currency) ***to $7.9 million, which was largely driven by a bad debt write-off related to outstanding receivables for an internet baseball retailer that filed for bankruptcy reorganization***." They withheld, however, that: (1) the

---

[4] ███████████████████████████████████████████████████████
███████████████████████████████████████████████

"internet baseball retailer" was Team Express, (2) the magnitude of the write-off was as big as it

was ████████████████████████████████████████████████████████████

████████████████████████████████████, and (3) ████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████

95.     The scale of the problem regarding PSG's continual disregard of its credit limits

was substantial. Davis and Rosenthal both knew that adherence to and maintenance of PSG's credit

limits was a recurring problem – indeed, ████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

96.     But Davis and Rosenthal did nothing to remedy these deficiencies. ████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████

97. ███████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████

98.     Despite ████████, however, nothing changed. ████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████ and the money PSG had in effect lent these retailers by not having enforceable

payment terms was no safer merely by virtue of PSG choosing to raise the limits to make itself not

look so bad.

99.     PSG never effectively addressed or remedied its treatment of its credit limits. ████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

40

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

100.   ██████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

101.   When these risks materialized, they were existential. ████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████[5] – the same four customers who had been subject to PSG's toxic mix of closeouts, inventory jamming, consignment contracts, pushing and pulling, extended payment terms, and violated credit limits.

102.    The scale of those losses was thus directly attributable to – and a foreseeable consequence of – the high-risk sales practices implemented, maintained, and overseen by Davis, Rosenthal, and their Company, PSG. ██████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████

**6.**     ████████████████████

103.    Layered on top of all these high-risk sales practices was ██████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

─────────────────────
[5] ██████████████████████████████████████
████████████████████████████████████████
████████████████

104.     These contracts risk violating accounting rules governing the recognition of revenue. If those rules are violated with a sufficiently material impact on a company, they can trigger everything from an accounting restatement to regulatory investigations to Audit Committee investigations to shareholder litigation. PSG told investors that it recognized revenue "as products are shipped to customers" (retailers). ███████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████ In an internal control environment as deficient as that of PSG, the risk of PSG misstating its financials due to violations of accounting rules for revenue recognition was particularly acute, as were the attendant risks: investigations by U.S. and Canadian securities regulators, increased auditor scrutiny and the risk of internal investigations, shareholder litigation, and an accounting restatement.

105.     U.S. generally accepted accounting principles – or "GAAP" – require that income not be recognized until it is "realized or realizable" and "earned,"[6] and the SEC warns that companies entering into "side agreements" to contracts affecting revenue recognition must have sufficient controls to ensure that they are accounted for in accordance with GAAP.[7] PSG stated that it followed these rules, telling investors that "[t]he criteria for recognition of revenue are met when persuasive evidence that an arrangement exists and both title and risk of loss have passed to the customer, the price is fixed or determinable and collectability is reasonably assured." (2015 Form 10-K at 89.)

---

[6] *See* Financial Accounting Standards Board ("FASB") Concepts Statement No. 5, ¶ 83.

[7] *See* SEC Staff Accounting Bulletin No. 101: Revenue Recognition in Financial Statements, 17 C.F.R. Part 211, at 4 (Dec. 3, 1999).

106.    PSG's revenue recognition practices with respect to ███████████

████████████████████████████████████████ violated these rules. ███████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████

107.    ████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███ ██ ███ ██ ███ █ █ ██ ███ ██ █ ████ ████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████

44

108.    Throughout the Class Period, Davis and Rosenthal received additional, explicit

warnings about ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████████████████████████████

109.    ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

45

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████

110.    These issues were raised to the highest level of the Company, ████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████

111.    But neither Davis nor Rosenthal took the warnings seriously, ████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

---

[8] ██████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
█████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████

112.    Davis and Rosenthal's dismissive attitude toward PSG's internal controls also extended to the Company's Internal Audit unit. ████████████████████████████

████████████████████████████████████████████████

Throughout the Class Period, ██████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████[9]

---

[9] ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████

113.   Davis' and Rosenthal's failure ███████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████

114.   █████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████

115.   The risks associated with PSG's ████████████████ and internal control

deficiencies foreseeably materialized. ███████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████

116.    But the ████████ transaction was the tip of the iceberg. ████████████████ ████████████████████████████████████████████, and Roustan's warnings about pulling orders ████████████████████████████ the Audit Committee's launching of an internal investigation. ████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████

117.    Because of the scope of the problems at PSG and its woefully deficient internal controls, the Audit Committee did not complete its internal investigation in time for PSG to file its 2016 Annual Report. When PSG announced on August 15, 2016 that its 2016 Annual Report would not be filed by the required filing date of August 15, 2016, PSG explained that the delay was "a result of the decision of Performance Sports Group's Audit Committee to conduct an internal investigation ***in connection with the finalization of the Company's financial statements and the related certification process.*** . . . The failure to file the Annual Report on Form 10-K on time is expected to result in ***a default*** under the Company's credit facilities." Even with additional time, the Audit Committee was ultimately unable to complete its internal investigation, ████████

███████████████████████████████████████████████████████

49

██████████████████████████████████████████████ This resulted in a default on PSG's credit facilities/lender agreements, and forced PSG into bankruptcy.

**B.  The truth begins to reveal itself: the risks that Defendants concealed predictably materialized, ultimately causing PSG's bankruptcy.**

118.  The truth regarding Defendants' fraud began to leak out to the public in the beginning of 2016, with revelations continuing until October 31, 2016, when PSG announced its bankruptcy and Rosenthal's termination.

119.  As explained above, the concealed risks associated with the high-risk sales practices Defendants pursued during the Class Period foreseeably materialized by (1) leaking out pieces of information to the public through news reports, such as those involving Davis' and Rosenthal's suppression of Roustan's Grant Thornton survey or the reports regarding the misdating of earnings published in the *New York Post*, (2) certain admissions by Rosenthal and Davis about the nature of the business slowdown, (3) causing retailers to stop buying PSG product, because PSG's sales practices had jammed the market with too much inventory that could not be sold to consumers, and had "pulled" forward too many orders, causing PSG to run out of future business to cannibalize, (4) ███████████████████████████ and, eventually, investigations into PSG's high-risk sales practices, including investigations by the Board of Directors' Audit Committee, the SEC, and Ontario Securities Commission (the Canadian securities regulator), (5) causing repeated, large write-downs in bad debt from retailers who were suffering financially or went bankrupt, the scale and the fact of which was due to how much and how often PSG violated its customer credit limits in pushing sales out, (6) causing a major declared impairment to the value of Combat and Easton baseball/softball of approximately $146 million in the third quarter of fiscal year 2016, due to the weakness Defendants created in the baseball/softball market, the bankruptcies of various top PSG customers exacerbated by Defendants' sales tactics,

and the high amount of inventory in the market that deteriorated the future sales cycle, and (7) causing PSG's bankruptcy, when the Audit Committee's internal investigation could not be completed in time and KPMG declined to certify PSG's audited financial results without completion of that investigation. As this news reached the markets, PSG's stock price continued to fall and Lead Plaintiff and the Class were injured.

120.    ***January 11, 2016.*** On January 11, 2016, *Reuters* reported in an article entitled "Ex-Performance Sports chairman sues accounting firm in Canada" that Graeme Roustan had sued Grant Thornton for breach of contract and defamation for failing to complete its engagement with him regarding the customer survey he commissioned. That failure was due to PSG's and Defendants' efforts to suppress the release of information collected by Grant Thornton that would have revealed the truth about PSG's high-risk sales practices, including specifically the pushing and pulling of orders into various quarters to manipulate sales numbers and the use of closeouts to boost quarterly sales growth. On this news, PSG's stock price declined by $0.45, or 5.53%, on trading volume of over 330,000 shares.

121.    ***January 14, 2016.*** After the market closed on January 13, 2016, PSG issued a press release announcing its financial results for the quarter ended November 30, 2015 (Q2 2016). The press release revised downward the previously issued guidance for fiscal year 2016, slashing the fiscal 2016 guidance for adjusted net income and adjusted earnings per share. The press release stated (among other things) that Bauer hockey revenues had decreased year-over-year and that Easton baseball/softball earnings had suffered: "Baseball/Softball EBITDA in the second quarter decreased 31% (including and excluding the impact of foreign currency) to $7.9 million, which was largely driven by a bad debt write-off related to outstanding receivables for an internet baseball retailer [Team Express] that filed for bankruptcy reorganization[.]" The following day, on January

14, 2016, the Company filed its financial results on Form 10-Q for the second quarter of 2016, ending November 30, 2015 ("Q2 2016 10-Q"). The Company's Q2 2016 10-Q disclosed, for the first time, declines in revenue, declines in gross profit, and declines in adjusted EBITDA. As discussed, these declines were the direct and foreseeable result of Defendants' high-risk sales practices and accompanying deficient internal controls. As a result of the Company's Q2 2016 disclosures, PSG's stock price experienced a three-day fall from its opening price on January 14, 2016 of $7.08 per share to a closing price on January 19, 2016 of $5.92 per share on heightened average trading volume of 1.28 million shares per day.

122.    ***March 8, 2016.*** Before the market opened on March 8, PSG issued a press release revising downward its guidance for the fiscal year ending May 31, 2016. It stated that "[t]he Company has reduced its fiscal year 2016 Adjusted EPS guidance by approximately $0.55 per diluted share to approximately $0.12 to $0.14 per diluted share as compared to its prior publication of guidance ($0.66 to $0.69 per diluted share), primarily as a result of the following three factors: (i) a write down of the receivable balance from a U.S. national sporting goods retailer [The Sports Authority] that has filed under chapter 11 and the related anticipated loss of sales from this retailer ($0.09 per share); (ii) an anticipated reduction in sales, particularly due to weakness in the baseball/softball market ($0.31 per share); and (iii) additional bad debt reserves primarily for certain U.S. hockey customers and the related anticipated loss of sales from such customers ($0.19 per share)."

123.    About an hour after the press release, the Company held a conference call to discuss the revised fiscal year 2016 guidance and the preliminary third quarter 2016 results. Rosenthal admitted that "one of the factors" causing Easton baseball/softball's weakening sales was "the amount of close out inventory that is in the marketplace ***from ourselves*** and other brands."

124.     But Davis, Rosenthal, and Vendetti blamed most of PSG's declining financial results on "weakening of consumer demand," customer bankruptcies, and other causes they claimed were "unexpected." In reality, however, it was PSG's own high-risk sales practices that pushed revenue into earlier quarters, browbeating retailers to increase bookings without regard for market demand, and pushing product out on consignment and in violation of customer credit limits that were the true causes of the decline.

125.     In sum, PSG's and Defendants' March 8, 2016 statements made clear that the risks concealed by PSG's and Defendants' fraudulent scheme of manipulating the Company's sales revenue were materializing. PSG and Defendants had known about this trend, which was reasonably likely to materially affect the Company's future financial results, before the start of the 2016 calendar year. Even with this knowledge or their reckless disregard for the truth, PSG and Defendants promoted and condoned the Company's high-risk sales practices anyway. Further, instead of accurately disclosing that the Company had been engaged in these high-risk sales practices, including coercing its customers to accept its products early to shift revenue to earlier quarters and bullying PSG's customers to increase their orders under threat of the loss of their discounts, PSG attributed its "purportedly" new-found decline to bankruptcies and market demand. Similarly, PSG and Defendants continued to hide the true cause of the Company's downturn by blaming it on "redundant inventory." In reality, they had caused the Company's own demise by oversupplying its customers with product and delivering that product earlier than the product was needed.

126.     On this news, shares of PSG fell $5.75 per share or over 66% to close at $2.91 on March 8, 2016, on trading volume of 18.6 million shares.

127.     ***March 14 and 15, 2016.*** Analysts were beginning to pick up on the problems that

PSG was truly facing, despite PSG's and Defendants' misleading explanations. On March 14, 2016, analyst Jay Sole at Morgan Stanley downgraded PSG to "Equal Weight" from its previous rating of "Overweight," stating that the "profit warning signals visibility into the business is much poorer than previously thought."

128.    On that same day, the *New York Post* published an article disclosing that PSG had been questioned about manipulating revenue. The article disclosed that "Customers told former PSG Chair Graeme Roustan that the company had asked them to misdate earnings, a source with direct knowledge of the situation said," that Roustan had commissioned SurveyMonkey "to ask PSG customers if they were told to move future orders into an earlier quarter. Roustan presented his findings to the PSG board," and that "Roustan had first hired Grant Thornton to take a survey of PSG's customers," but that "PSG persuaded Grant Thornton not to release those findings, including a question about misdating earnings[.]" On this news, shares of PSG fell $0.41 per share or 10.35% to close at $3.55 per share on March 15, 2016, on an average 2-day trading volume of approximately 2.29 million shares, damaging investors.

129.    ***March 22 and 23, 2016.*** Just days later, on March 22, 2016, following the market's close, PSG announced that Davis had abruptly resigned and was leaving PSG immediately. Rosenthal was appointed by the Company's Board of Directors as interim CEO. ████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████ On the news of Davis' resignation, PSG's stock price closed on March 23 at $3.34, a 4.84% drop from its opening price of $3.50.

130.    ***March 28, 2016.*** In light of Davis' departure and "a challenging environment that was primarily created by a slowdown in baseball bat sell-through and customer consolidation / credit issues," Bank of America analysts downgraded PSG's rating to "Underperform" from "Neutral." On this news, PSG's stock price closed on March 28 at $3.10, from the prior trading day's closing price of $3.33, a 6.91% drop.

131.    ***April 15, 2016.*** On April 15, 2016, PSG announced that it was booking "a non-cash impairment charge of $145.1 million within the Baseball/Softball reporting unit." This impairment – both the triggering events that led to it, and its size – was the direct result of the high-risk sales practices and internal control deficiencies Defendants enabled within PSG and then concealed from their investors. On this news, PSG's common stock price declined 15.45%: PSG's stock closed on April 14 at $3.82, it opened on April 15 at $3.61, and it closed on April 15 at $3.23, on heavy trading volume (2.60 million shares).

132.    ***June 8 and 9, 2016.*** On June 8, 2016, after the markets closed, PSG reported its preliminary fourth quarter 2016 and full year fiscal 2016 results. It reported that "challenging market conditions created customer credit issues that exceed[ed] [PSG's] expectations," and disclosed signs revealing its problems with customer credit, *i.e.*, that PSG had to take "actions during the quarter to reduce shipments to customers that were not settling their outstanding payments in line with our requirements." ███████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████ although PSG and Defendants did not disclose that causation at the time. On this news, PSG's stock – which had closed at $3.49 on June 8 – opened on June 9, 2016 at $3.27, and closed on June 9 at $3.17. The stock declined 9.17%, on high trading volume.

133.   ***August 15, 2016.*** PSG was expected and required to file its financial results for the fourth quarter and full year 2016 with the SEC on Form 10-K. However, rather than filing its Form 10-K, PSG filed a press release announcing "that its Annual Report on Form 10-K, including its annual audited financial statements for the fiscal year ended May 31, 2016 and the related management's discussion and analysis (collectively, the "Form 10-K"), will not be filed by the required filing date of August 15, 2016." PSG explained that the delay was "a result of the decision of Performance Sports Group's Audit Committee to conduct an internal investigation in connection with the finalization of the Company's financial statements and the related certification process. . . . The failure to file the Annual Report on Form 10-K on time is expected to result in a default under the Company's credit facilities."

134.   As discussed at length in Section A (*see* ¶¶ 112–17), PSG had not, in fact, made the decision to delay its Annual Report or conduct an internal audit of its own volition; ███████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████ PSG and Defendants did not explain the impetus of their audit to investors.

135.   Defendants had known about this problem for weeks. ██████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████

56

136. ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████

137.    On the August 15 news of PSG's delayed filing, PSG's stock price fell to close at $1.85, from the prior day closing price of $3.48, a 46.84% drop, on extraordinarily heavy trading volume (over 14.5 million shares).

138.    ***August 17, 2016.*** On August 17, 2016, PSG disclosed that, in addition to being the subject of shareholder litigation, the Company was also the subject of investigations by both Canadian securities regulators and the SEC. ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████ On this news, PSG's stock price declined 12.44% on August 17, to close at $1.83 from an opening of $2.02.

139.    ***September 2 to 6, 2016.*** On September 2, 2016, after the markets closed, PSG

57

announced that it was terminating its shareholder nomination agreement with Sagard Capital Partners, L.P., its then-largest shareholder with beneficial ownership of approximately 17% of PSG's issued and outstanding common shares. The termination was done due to "the previously disclosed postponement of [PSG's] 2016 annual meeting of shareholders and the ongoing review and evaluation of strategic alternatives by the special committee . . . of its Board of Directors[.]" On this news, PSG's stock price, which closed on September 2 at $3.56, opened on September 6 (after the holiday) at $3.21 and closed the same day at $3.22, a decline of 9.55%, on heavy trading.

140. ***October 28 to 31, 2016.*** On October 28, 2016, after the markets closed, news outlets including *Reuters* announced in an article entitled "Exclusive: Bauer hockey gear maker preparing to file for bankruptcy – sources" that PSG was "preparing to file for bankruptcy in the United States and Canada as early as Sunday evening, according to people familiar with the matter." The bankruptcy was the materialization of the risks Defendants created through their high-risk sales practices, which were paired with dangerously lax or unenforced internal controls.[10]

141. On October 31, 2016, PSG announced that it had filed voluntary petitions in the United States Bankruptcy Court for the District of Delaware for relief under Chapter 11 of the United States Bankruptcy Code and had sought creditor protection in the Ontario Superior Court of Justice (Commercial List) under the Companies' Creditors Arrangement Act (the "CCAA"). In the same Form 8-K filing, PSG announced that it had entered into an asset purchase agreement for the sale of the Company with a group of investors led by Sagard Capital Partners, L.P. and Fairfax Financial Holdings Limited. Analysts noted that "PSG was unable to negotiate new extensions

---

[10] ████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████

[from its creditors] and saw bankruptcy as a viable outcome, given adverse market conditions, customer credit issues, currency pressures, and liquidity constraints amidst ongoing investigations and securities litigation," all of which represented the materialization of the foreseeable risks Defendants had previously concealed from investors.

142.    PSG also announced the departure of Defendant Rosenthal from the Company.

143.    The New York Stock Exchange commenced delisting proceedings on October 31, 2016, and suspended trading of PSG common stock the same day.

144.    On this news, PSG's stock suffered a further decline. On October 28, 2016, PSG's stock closed at $3.48. On November 1, the first day after the official bankruptcy filing announcement, the stock closed at $1.67, a 52.01% decline from the October 28 closing price (the prior trading day), on extraordinarily heavy trading volume.

145.    PSG's stock was delisted from the Toronto Stock Exchange on November 8, 2016.

**C.    Defendants acted with scienter.**

146.    Defendants and PSG knew or recklessly disregarded the truth about the Company's high-risk sales practices, the risks associated with those practices, and the deficient internal controls that were supposed to contain those risks. The facts discussed above – ███████████████ ████████████████████████████████████████████████ ████████████████████████████████████████ – support a strong inference of scienter, and are incorporated herein by reference.

147.    ***Kinnaly.*** ████████████ confidential witness accounts show that Kinnaly repeatedly warned Davis and Rosenthal about the risks of pursuing these high-risk sales practices, ████████████████████████████████████████████████ ████████████████████████████████ CW3 recounted, for example, that

Kinnaly told PSG's Board of Directors, including Defendant Davis, about the Company's aggressive and coercive sales practices as early as 2013 and warned them that those practices would cannibalize future sales and catch up with the Company, after which Davis and Rosenthal fired him. ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████ Davis and Rosenthal fired Kinnaly days later, and sought to misrepresent the circumstances of Kinnaly's departure.

148.   ***Roustan.*** Roustan repeatedly warned Davis, Rosenthal, and members of PSG's Board of Directors that retailers had told him that PSG was asking them to move orders into earlier quarters. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████ Roustan met in person with Davis and the Chairman of PSG's Board (Bernard McDonnell) in May 2015 and told them that retailer demand in particular was going to drop as a result of the Company's decision to proceed with the Bauer "Own the Moment" retail stores; over-saturated retailers subject to '█████████' sales tactics would adamantly refuse to buy PSG product upon learning that PSG had decided to compete against them. In May 2015, Davis and Rosenthal learned of the Grant Thornton survey Roustan commissioned, suppressed its

release, and knew that a majority of those surveyed had answered "yes" to the question about whether anyone in the past two years at PSG had asked the customers to move an order into an earlier quarter. Davis and Rosenthal also learned about the SurveyMonkey questionnaire (███████

████████████████████████████), and thus again saw that a majority of the surveyed customers responded that they had been asked by PSG to move an order into an earlier quarter. But Defendants suppressed this information, failed to change their aggressive sales practices, and did not disclose those practices or their inherent risks to investors.

149.   ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████

150.   ***Personal involvement in high-risk sales practices.*** Confidential witnesses explained that Davis and Rosenthal had intimate knowledge of PSG's business and sales practices. Meetings involving the sales representatives like CW1, for example, were held twice per year. Rosenthal, as CFO and EVP of Finance, attended those meetings. ████████████████████

151.

152.

153.

███████████████████████████████████████

██████████████████████████

**D.      Defendants made false and misleading statements to investors about the nature of PSG's growth, the substantial risks associated with the practices used to achieve that growth, and their ability to manage those substantial risks with effective internal controls.**

154.      Instead of disclosing this ongoing scheme at any time during the Class Period, PSG and Defendants continued to tout the Company's record growth based on "strong performance" and "organic sales growth."

155.      In general, "organic growth," as used in the corporate and investment context, refers to a company's growth based on increased outputs, customer base expansion, or new product development, as opposed to mergers and acquisitions, which are generally referred to as inorganic growth. A company's organic growth does not include growth that results from fraudulent or aggressive sales practices aimed at boosting a company's earnings. Such earnings are transitory and not sustainable. As a result, earnings from PSG's high-risk – and sometimes fraudulent – sales practices should not have been considered part of, or a contributing factor to, the Company's core earnings and purportedly "organic" growth.[11] Thus, reasonable investors could not have known, and could not have reasonably expected, that PSG's "organic" growth included growth resulting from manipulative, aggressive, and unsustainable sales tactics.[12]

156.      More generally, PSG's and Defendants' representations about PSG's growth concealed the methods they were using to achieve that growth, the substantial and foreseeable risks

---

[11] *See* Edward Hess and Robert Kazanjian, *A Search for Organic Growth*, 103-04 (2006) (describing how the meaning of "organic" growth has changed following "the financial scandals of the late 1990s and early years of the following decade").

[12] *Id.* at 103-04 (in the context of organic growth, "all earnings are not equal if you are trying to evaluate the strength, sustainability, and predictability of a business's core operations and processes").

associated with those methods, and the deficient internal control environment that made those risks acute, inevitable, and an existential threat to PSG's business.

### 1.        January 14 and 15, 2015

157.    On January 14, 2015, PSG published a news release entitled "Performance Sports Group Reports Record Fiscal Second Quarter 2015" in which PSG reported "record" revenues and increases in adjusted gross profit and net income.

158.    The following day, on January 15, 2015, during PSG's Q2 2015 earnings conference call, Davis stated: "*We experienced another record quarter for PSG, and our Q2 results were driven by the continued strong performance of the EASTON baseball/softball business and another quarter of more than 10% organic sales growth*; significant adjusted gross margin expansion due to the addition of EASTON's product in Q2; and record adjusted EPS, even in the face of significant and increasing currency headwinds. . . . *Hockey drove our organic performance, generating, on a constant-currency basis, double-digit growth for the fourth consecutive quarter, led by the launch of new, innovative products.*"[13]

159.    Davis further stated on a January 15, 2015 earnings call that "*[o]ur hockey business continued to see strong sell-through during the holiday season; and while overall inventory levels at retail maintain what we call normalized levels, we began to observe -- that we began to observe in the fourth quarter of FY14. We grew in every category over the quarter*, with the exception of goal, which was down slightly due to the timing of the product launches in comparison to last year."

---

[13] Throughout this section, false and misleading statements are identified with bolding and italics, and additional portions of each statement are provided for context.

160.    In response to a question from an analyst about PSG's growth in its hockey business, Davis stated: "***We are seeing continued strong results. . . . what we can say anecdotally is we certainly expect these results are generating share gains for us and that Bauer products continue to resonate with kids. And that brand improvement and continued strong demand from hockey players at all levels is driving share gains in the categories that we talked about.*** So obviously, as I mentioned, and I know this isn't the easiest thing to map out for people, but our product launches across our categories and families do affect the timing of some of this but *the macro feedback from the holiday season is very strong demand for Bauer*."

161.    During the same call, Rosenthal explained that "[r]evenues in the second quarter of FY15 increased 47% to $172.3 million compared to the same year ago period, or 51% without the impact of changes in foreign currencies. This increase was primarily due to 12% growth in hockey, and the addition of EASTON, which contributed $47.3 million to our second-quarter revenues, and, as Kevin mentioned, is up 37% from the same period last year. Our strong growth in these sports was partially offset by the unfavorable effects of foreign exchange. Excluding this impact, as well as the results of EASTON, *organically we grew sales 10% in the quarter.*"

162.    PSG's and Defendants' January 2015 public statements – describing "another record quarter for PSG," "double-digit growth for the fourth consecutive quarter," how "brand improvement and continued strong demand from hockey players at all levels is driving share gains," that "overall inventory levels at retail maintain what we call normalized levels," and that "organically we grew sales 10% in the quarter" – concealed that PSG was achieving that growth not through consumer demand or market share gains, but rather through the use of PSG's high-risk, aggressive sales tactics, including (1) using discounts punitively to pressure retailers to buy progressively more PSG-branded product, (2) using high-volume sales of discounted product

(referred to as "closeouts" at PSG) to drive sales growth, (3) routinely pushing and pulling orders into quarters to meet short-term sales targets and maintain the appearance of consistent quarterly growth, (4) using wildly extended payment terms with retailers to enable them to take more PSG-branded product than they reasonably could to hit short-term sales targets, (5) pushing product out to customers ████████████████████████████████████████████

████████████████████████████████████████████

████████████, to push more PSG-branded product out into the marketplace. Defendants thus concealed the true drivers of PSG's sales and revenue growth and the substantial risks associated with the methods used to achieve that growth (discussed above).

163.    Defendants knew or recklessly disregarded that these statements were false and misleading. In particular, and in addition to the foregoing allegations, (1) Edward Kinnaly had warned Davis and Rosenthal as early as mid-2013 that their "████████" practices and focus on pushing out as much product as possible to get sales by any means necessary (████████████

████████████████████████████) had made the market and the business ████████████████ and would continue to expand that risk without changing PSG's sales practices (in response to which Davis and Rosenthal fired him), and (2) ████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████

### 2.    April 13 and 14, 2015

164.    After the market closed on April 13, 2015, PSG and Defendants issued a press release entitled, "Performance Sports Group Reports Record Fiscal Third Quarter 2015 Results."

The press release detailed PSG's financial position for the third quarter of its fiscal 2015 including record revenues and increases in adjusted gross profit and net income.

165.     The following day, on April 14, 2015, PSG filed its Report of Foreign Private Issuer on Form 6-K, attaching PSG's "Management's Discussion and Analysis of Financial Condition and Results of Operations for the three and nine month periods ended February 28, 2015" ("Q3 2015 6-K"). The Q3 2015 6-K repeated the financial results set forth in PSG's Q3 2015 press release. The Q3 2015 6-K favorably reported that "[r]evenues in the fiscal third quarter of 2015 increased 121% to $137.7 million compared to $62.2 million in the same year-ago quarter. On a constant currency basis, revenues were up 127%. The increase was primarily due to the addition of revenues generated by EASTON and *solid growth in ice hockey equipment*, partially offset by an unfavorable impact from foreign exchange. Excluding the results of EASTON, as well as the impact from foreign exchange, revenues grew organically by 16%."

166.     On that same day, during PSG's Q3 2015 earnings conference call, Davis again attributed PSG's record success to its strong performance and organic sales: "***Easton continued to experience solid demand for its products, and our hockey business, which grew 16%*** on a constant currency basis, benefited from the highly successful launch of our Vapor 1X stick, ***underscoring our well-defined strategy to grow our stick business, the largest hockey category.*** . . . we believe Easton will generate its highest sales volume in FY15 during the second and third quarters versus the third and fourth quarters historically, with Q3 being the most significant."

167.     Davis further stated that he was "***very pleased with our quarterly and year-to-date performance, both financially and operationally. Easton continues to be an excellent acquisition and we remain equally pleased with the organic growth profile of our Company*** . . . . As Amir mentioned, our hockey business was offset by lower sales in other equipment categories,

due to the timing of orders, and obviously, currency was a large offset to an otherwise very strong hockey sales in the quarter. Given these currency headwinds, *the fact that we're still able to grow our business 9% is a testament to the strength of the brand and an indication that we continue to gain market share.* Included within these results was our hockey apparel business. *Booking orders for the upcoming hockey season, spanning the fourth and first fiscal quarters, met our expectations.*" Davis further boasted that PSG had "*experienced five consecutive quarters of double-digit currency-neutral hockey sales growth, well in excess of the broader hockey market.* As we look forward, we expect to continue to grow market share annually; however, the quarterly flow of that growth is likely to change year-over-year, given the cadence of product launches." Davis also stated that "Combat continues to grow nicely and has been a great addition to our portfolio, with a passionate and talented team bringing game-changing technology to baseball and softball athletes."

168.    PSG's and Defendants' April 2015 public statements were false and misleading. In particular, PSG's references to its "solid growth" and "five consecutive quarters of double-digit currency neutral hockey sales growth, well in excess of the broader hockey market," and its corresponding characterizations of the reasons for that growth – "solid demand for its products," "strength of the brand" and "gain[ing] market share," and a strong "organic growth profile" for the Company and Easton baseball/softball – concealed that PSG was achieving that growth not through a strong brand or growing consumer demand or market share gains, but rather through the use of PSG's high-risk, aggressive sales tactics, including (1) using discounts punitively to pressure retailers to buy progressively more PSG-branded product, (2) using high-volume sales of discounted product (referred to as "closeouts" at PSG) to drive sales growth, (3) routinely pushing and pulling orders into quarters to meet short-term sales targets and maintain the appearance of

consistent quarterly growth, (4) using wildly extended payment terms with retailers to enable them to take more PSG-branded product than they reasonably could to hit short-term sales targets, (5) pushing product out to customers ████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

████████████████████████, to push more PSG-branded product out into the marketplace. Defendants thus concealed the true drivers of PSG's sales and revenue growth and the substantial risks associated with the methods used to achieve that growth (discussed above).

169.    Defendants knew or recklessly disregarded that these statements were false and misleading. In particular, and in addition to the foregoing allegations, (1) Edward Kinnaly had warned Davis and Rosenthal as early as mid-2013 that their "████████" practices and focus on pushing out as much product as possible to get sales by any means necessary (████████████████

███████████████████████████████████████) had made the market and the business ████████████████████ and would continue to expand that risk without changing PSG's sales practices (in response to which Davis and Rosenthal fired him), and (2)████████████████

███████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████

### 3.    July 7 and 8, 2015

170.    After the market closed on July 7, 2015, PSG issued a press release entitled, "Performance Sports Group Provides Preliminary Fiscal Fourth Quarter and Full Year 2015 Results." The press release detailed PSG's preliminary financial position for the fourth quarter of its fiscal 2015. The following day, on July 8, 2015, the Company again held a conference call with

analysts regarding its fourth quarter and full year 2015 financial results. During the conference call, Davis explained, "As stated in our release last night *our anticipated fourth-quarter and full-year revenue results are record-setting and expected to contribute to another fantastic year for PSG delivering record returns for shareholders*. . . . The key components of this message is that *we continue to outpace the growth of the markets in which we participate by growing market share and profitability and we continue to leverage our Performance Sports platform which is improving efficiency and driving constant dollar currency profit growth rates that exceed our revenue growth.* While the rapid strengthening of the US dollar will continue to impact our reported results, especially in the first half of 2016, *we remain very well-positioned to continue our momentum into 2016 and beyond.*" Davis "reiterate[d] that the same *fundamental growth drivers* that attracted our current investors and have been articulated by all of our analysts *are very much alive and well inside of PSG*."

171.    PSG's and Defendants' July 2015 public statements – that PSG's fiscal year 2015 "record-setting" results were due to PSG's ability "to outpace the growth of the markets in which we participate by growing market share and profitability," that the Company's "platform" was "driving . . . growth rates," and that PSG's results and were based on "fundamental growth drivers," as well as the statement that the Company was "well-positioned to continue [its] momentum into 2016 and beyond" – were false and misleading, and contradicted by facts well known to Defendants: these statements concealed that PSG's "record" revenues were the result of PSG's high-risk, aggressive sales tactics, including (1) using discounts punitively to pressure retailers to buy progressively more PSG-branded product, (2) using high-volume sales of discounted product (referred to as "closeouts" at PSG) to drive sales growth, (3) routinely pushing and pulling orders into quarters to meet short-term sales targets and maintain the appearance of

consistent quarterly growth, (4) using wildly extended payment terms with retailers to enable them to take more PSG-branded product than they reasonably could to hit short-term sales targets, (5) pushing product out to customers █████████████████████████████████ █████████████████████████████████████████████████████████████████ █████████████████████, to push more PSG-branded product out into the marketplace. Defendants thus concealed the true drivers of PSG's sales and revenue growth and the substantial risks associated with the methods to achieve that growth (discussed above).

172.     Defendants knew or recklessly disregarded that these statements were false and misleading. In particular, and in addition to the foregoing allegations: (1) Edward Kinnaly had warned Davis and Rosenthal as early as mid-2013 that their "████████" practices and focus on pushing out as much product as possible to get sales by any means necessary (█████████████ █████████████████████████████████████) had made the market and the business ██████████████████████ and would continue to expand that risk without changing PSG's sales practices (in response to which Davis and Rosenthal fired him); (2) ████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████; and (3) Roustan had warned Davis, Rosenthal, and the Board of Directors ████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████

73

██████████████████████████████ (in response, Davis and Rosenthal blocked Grant Thornton from releasing the survey results to Roustan and threatened all involved with litigation).

### 4.     August 26, 2015

173.    After the market closed on August 26, 2015, the Company issued a press release announcing its fourth quarter and full year 2015 financial results, which it again described as "record setting" ("August 26 Press Release").

174.    Explaining the "***record setting***" figures, the Management Commentary stated: "'Our fourth quarter and full year revenue results were ***record‑setting*** and contributed to ***market share gains in all of the sports we serve***,' said Kevin Davis, CEO of Performance Sports Group." Davis further stated that **"**[t]hese results reinforce that ***the fundamental building blocks of our shareholder value are continuing to perform quite strongly. Our Company continues to outpace the growth of the markets in which we participate by growing market share and profitability. We also continue to leverage our performance sports platform, which is driving cost efficiencies and, on a currency neutral basis, profit growth rates that exceed our revenue growth.*** We remain very well positioned to continue our momentum into fiscal 2016 and beyond."

175.    PSG's and Defendants' August 26, 2015 public statements – that PSG's "fundamental building blocks" were performing "quite strongly," that the Company's "platform" was "driving . . . growth rates," and that the Company's "record-setting" growth numbers were being driven by "market share gains in all of the sports we serve" and were "outpac[ing] the growth of the markets in which we participate by growing market share and profitability" – were false and misleading: those statements concealed that the true drivers for PSG's consistent "record-setting" sales growth were not market share gains across all sports and growing profitability, but instead the use of certain high-risk sales practices, including (1) using discounts punitively to pressure

retailers to buy progressively more PSG-branded product, (2) using high-volume sales of discounted product (referred to as "closeouts" at PSG) to drive sales growth, (3) routinely pushing and pulling orders into quarters to meet short-term sales targets and maintain the appearance of consistent quarterly growth, (4) using wildly extended payment terms with retailers to enable them to take more PSG-branded product than they reasonably could to hit short-term sales targets, (5) pushing product out to customers ████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████, to push more PSG-branded product out into the marketplace. Defendants thus concealed the true drivers of PSG's sales and revenue growth and the substantial risks associated with the methods used to achieve that growth (discussed above).

176.    Defendants knew or recklessly disregarded that these statements were false and misleading. In particular, and in addition to the foregoing allegations: (1) Edward Kinnaly had warned Davis and Rosenthal as early as mid-2013 that their "██████████" practices and focus on pushing out as much product as possible to get sales by any means necessary (█████████████

███████████████████████████████████) had made the market and the business

██████████████████████████ and would continue to expand that risk without changing PSG's sales practices (in response to which Davis and Rosenthal fired him); (2) ████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████; (3) Roustan had warned Davis, Rosenthal, and the Board of Directors ██████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████ (in response, Davis and Rosenthal blocked Grant

Thornton from releasing the survey results to Roustan and threatened all involved with litigation);

and (4) ████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████

### 5.     August 27, 2015

177.     The following day, on August 27, 2015, the Company filed its annual report on

Form 10-K with the SEC for the fiscal year ending May 31, 2015 (the "2015 Form 10-K").

Defendants Rosenthal and Davis each signed the 2015 Form 10-K and internal Company

documents show that they played a critical part in crafting it.

178.     The 2015 Form 10-K reported record PSG sales and revenue growth, stating that

"*[w]e continued to outpace the growth of the markets in which we participate by growing market*

*share and profitability and we continue to leverage our performance sports platform, which is*

*improving efficiency and driving constant currency profit growth that exceeds revenue*

*growth*[.]" (2015 Form 10-K at 50-51.) Defendants Rosenthal and Davis also stated that "*[i]n*

*recent years, we have experienced strong revenue and profit growth through innovation,*

*product development, marketing and acquisitions that have driven market share gains in all of*

*our sports.*" (*Id.* at 14.)

179.     The 2015 Form 10-K also continued to tout as a cause of the Company's growth

Defendants' ability to integrate its recently-acquired brands, like Easton and Combat: "We have repeatedly used our world-class performance sports product platform to grow our business into new performance equipment and apparel categories and sports markets. ***Our successful acquisition and integration of seven businesses since 2008 has demonstrated our ability to identify targets and integrate acquired businesses.*** We are continuing to explore a number of potential near-term opportunities to complement our organic growth." (2015 Form 10-K at 20.)

180.   Relatedly, the 2015 Form 10-K's risk factors warned investors that:

- "***[o]ur competitors may overproduce or face financial or liquidity difficulties which may lead them to release their products at lower prices into the market or offer discounts to clear their inventory***, resulting in decreased demand for our products," (2015 Form 10-K at 26);

- "[a]lthough our booking orders give us some visibility into our future financial performance, ***there may not be a direct relationship between our booking orders and our future financial performance given several factors, among which are: (i) the timing of order placement compared to historical patterns, (ii) our ability to service demand for our product, (iii) the willingness of our customers to commit to purchasing our product, and (iv) the actual sell-through of our products at retail driving changes in repeat orders***," (*id.* at 30);

- "[o]ur business is affected by seasonality, which could result in fluctuations in our operating results and the trading price of the Common Shares," and specifically stated that "***our customers may cancel orders, change delivery schedules or change the mix of products ordered with minimal notice. We may also make strategic decisions to deliver and invoice product at certain dates in order to lower costs or improve supply chain efficiencies***," (*id.*);

- "[t]he loss of one or more key customers could result in a material loss of revenues," specifically providing that "our customers in the retail industry continue to experience consolidation and some may face financial difficulties from time to time. A large portion of our sales are to specialty and 'big box' sporting goods retailers, certain of whom are not strongly capitalized. ***Adverse conditions in the sporting goods retail industry can adversely impact the ability of retailers to purchase our products, or could lead retailers to request credit terms that would adversely affect our cash flow and involve significant risks of nonpayment. As a result, we may experience a loss of customers or the un-collectability of accounts receivable in excess of amounts against which we have reserved, which could adversely affect our business and financial condition***," (*id.* at 32);

- "[p]roblems with [PSG's] distribution system could harm our ability to meet customer expectations, manage inventory, complete sales, and achieve objectives for operating efficiencies," and specifically stated that "*[i]f we encounter problems with our distribution system, our ability to meet customer expectations, manage inventory, complete sales and achieve objectives for operating efficiencies could be harmed, which could adversely affect our business and financial condition*," (*id.*);

- PSG's "results of operations may suffer if we are not able to accurately forecast demand for our products," and specifically stated the following: "To reduce purchasing costs and ensure supply, we place orders with our suppliers in advance of the time period we expect to deliver our products. However, a large portion of our products are sold into consumer markets that are difficult to accurately forecast. *If we fail to accurately forecast demand for our products, we may experience excess inventory levels or inventory shortages.* Factors that could affect our ability to accurately forecast demand for our products include, among others: . . . *changes in consumer demand for our products or the products of our competitors*," "*failure to accurately forecast consumer acceptance of our products*," "*inability to realize revenues from booking orders*," "*unanticipated changes in general market conditions or other factors,* which may result in cancellations of advance orders or a reduction or increase in the rate of reorders placed by retailers," and that "*[i]nventory levels in excess of consumer demand may result in inventory write-downs and the sale of excess inventory at discounted prices, which could significantly harm our operating results and impair the value of our brands. Inventory shortages may result in unfulfilled orders, negatively impact customer relationships, diminish brand loyalty and result in lost revenues, any of which could adversely affect our business and financial condition*," (*id.* at 34).

181.    The 2015 Form 10-K also provided the following rules governing PSG's recognition of revenue: "*[s]ales are recognized, in general, as products are shipped to customers, net of an allowance for sales returns and sales programs in accordance with Accounting Standards Codification ("ASC") Topic 605,* Revenue Recognition. . . . The criteria for recognition of revenue are met when persuasive evidence that an arrangement exists and both title and risk of loss have passed to the customer, the price is fixed or determinable and collectability is reasonably assured. Sales returns are estimated based upon historical returns, current economic trends, changes in customer demands and sell-through of products." (2015 Form 10-K at 89.)

182.    The 2015 Form 10-K was signed by Defendants Davis and Rosenthal. Attached to

78

the 2015 Form 10-K were certifications pursuant to the Sarbanes-Oxley Act ("SOX certifications") signed by Defendants Davis and Rosenthal attesting to the accuracy of financial reporting and effectiveness of the Company's internal controls. In their certifications, Davis and Rosenthal both stated that the 2015 Form 10-K "***does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading***," that they had "[d]esigned [PSG's] disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, ***to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities***, particularly during the period in which this report is being prepared," that they had "[d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, ***to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements*** for external purposes in accordance with generally accepted accounting principles," that they had "[e]valuated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation," and that they had "[d]isclosed in this report ***any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter*** (the registrant's fourth fiscal quarter in the case of an annual report) ***that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting***[.]" (2015 Form 10-K, Exs. 31.1, 31.2.)

183.    On the same day, the Company held a conference call to discuss PSG's first quarter 2016 financial results. On the call, Davis stated that "***the growth of our brand continues to outpace***

*the growth of the markets in which we participate, resulting in growing market share each year, and while also growing our profitability.*" He stated that "[h]ockey grew 17% in the fourth quarter and 13% for the year on a constant-currency basis. This is an incredible performance and I want to again thank our hard-working Bauer team for another outstanding year." Davis further stated that an analyst's analysis of "high single-digit rate" growth in hockey sales was "directionally correct," and he attributed that growth to "*growth in the sport, particularly in the U.S., from participation*," and "improved innovation" in PSG's product development.

184.    Davis also stated that "we believe in general that *the inventory situation is relatively healthy, particularly in hockey. Outside of hockey, there's been a lot of changes in the baseball marketplace with acquisitions and brand movements and new product launches. There's probably a bit of excess inventory out there as a result of some of those actions in the baseball market in the U.S. Nothing alarming, but there's probably some excess inventory there that retailers need to work through. But otherwise we consider the businesses that we're in to be – and at retail – to be relatively healthy inventory levels.* We can't speak to what our competitors have in their warehouses to ship, but certainly for us and for the retail partners, we believe that the inventory position is healthy."

185.    These representations in the 2015 Form 10-K and accompanying earnings call were false and misleading. *First*, PSG's and Defendants' representations about PSG's sales growth – that the Company was "outpac[ing] the growth of the markets in which we participate by growing market share and profitability," and that PSG's growth was attributable to its "performance sports platform," "innovation, product development, [and] marketing," "growth in the sport [of hockey]," or to Defendants' "successful acquisition and integration of seven businesses since 2008" – were false and misleading because they concealed that those factors were not driving PSG's continued

80

growth, and that instead the growth was being driven by PSG's high-risk sales practices, including (1) using discounts punitively to pressure retailers to buy progressively more PSG-branded product, (2) using high-volume sales of discounted product (referred to as "closeouts" at PSG) to drive sales growth, (3) routinely pushing and pulling orders into quarters to meet short-term sales targets and maintain the appearance of consistent quarterly growth, (4) using wildly extended payment terms with retailers to enable them to take more PSG-branded product than they reasonably could to hit short-term sales targets, (5) pushing product out to customers ██████████

████████████████████████████████████████████████████████████████████

███████████████████████████, in a deficient internal control environment, to push more PSG-branded product out into the marketplace. ████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████

186. *Second*, PSG's and Defendants' representations about PSG's business risks and marketplace inventory – *i.e.*, that "competitors may overproduce or face financial or liquidity difficulties which may lead them to" stuff the market with cheaper or more inventory, that "booking orders" may not directly relate to "future financial performance, that "fail[ure] to accurately forecast demand for our products" could cause "excess inventory levels or inventory shortages," that "[i]nventory levels in excess of consumer demand may result in inventory write-downs and the sale of excess inventory at discounted prices," and that "[t]here's probably a bit of excess inventory out there as a result of some of those actions in the baseball market in the U.S.," but that it was "[n]othing alarming" – were false and misleading because they concealed that those risks and trends were not hypothetical but then-present and actively occurring; further, they

concealed that those risks and trends were not being caused by outside market forces or competitors, but rather by PSG's and Defendants' own use of the high-risk sales practices enumerated above.

187.   *Third*, PSG's and Defendants' representations about the nature of certain of PSG's business practices or operations – *i.e.*, that PSG "may also make strategic decisions to deliver and invoice product at certain dates in order to lower costs or improve supply chain efficiencies," that "[a]dverse conditions in the sporting goods retail industry can adversely impact the ability of retailers to purchase our products, or could lead retailers to request credit terms that would adversely affect our cash flow and involve significant risks of nonpayment," or that "problems with our distribution system . . . could adversely affect our business and financial condition" – were false and misleading. They concealed that PSG was using these practices to drive growth and sales (not for the reasons identified), that these practices were not hypothetical responses to adverse market conditions, but instead were then-present tools to drive sales growth, that these practices (particularly strategic timing of deliveries and invoices, ███████) were causing higher costs and supply chain *inefficiencies*, and that PSG was using credit terms with "significant risks of nonpayment" to drive sales growth (not in response to adverse, uncontrolled market conditions).

188.   *Finally*, PSG's and Defendants' representations regarding PSG's internal controls and accounting policies – that "[s]ales are recognized, in general, as products are shipped to customers, net of an allowance for sales returns and sales programs in accordance with" accounting rules, that the 2015 Form 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading," that Davis and Rosenthal had designed (or caused to be designed) PSG's internal controls "to ensure that material information relating to the

registrant, including its consolidated subsidiaries, is made known to us by others within those entities" and "to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements," and that they had disclosed "any change in [PSG'] internal control over financial reporting that . . . is reasonably likely to materially affect" that control – were false and misleading. ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████ and the Audit Committee's internal investigation to trigger PSG's default and bankruptcy – ████████████████████████████████████████

████████████████████████████ and the Audit Committee could not complete or sign-off on PSG's fiscal year 2016 annual report, triggering PSG's default and bankruptcy.

189.    Defendants knew or recklessly disregarded that these statements were false and misleading. In particular, and in addition to the foregoing allegations: (1) Edward Kinnaly had warned Davis and Rosenthal as early as mid-2013 that their "████████" practices and focus on pushing out as much product as possible to get sales by any means necessary (████████████

████████████████████████) had made the market and the business ████████████████████ and would continue to expand that risk without changing PSG's sales practices (in response to which Davis and Rosenthal fired him); (2) ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████; (3) Roustan had warned Davis, Rosenthal, and the Board of Directors ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████ (in response, Davis and Rosenthal blocked Grant

Thornton from releasing the survey results to Roustan and threatened all involved with litigation);

and (4) ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

### 6.    October 14 and 15, 2015

190.    On October 14, 2015, PSG filed its financial results on Form 10-Q for the first

quarter of the 2016 fiscal year ending August 31, 2015 ("Q1 2016 10-Q"). Like the 2015 Form 10-

K, the Q1 2016 10-Q was accompanied by identical SOX certifications signed by Defendants

Davis and Rosenthal which represented that the information included therein was true and correct

and that the Company's internal controls were effective. These SOX certifications were false and

misleading for the reasons described above at paragraph 182.

191.    Davis stated on the October 15, 2015 earnings call that PSG "*continue[d] to see*

*solid growth across our brand, including continued market share gains in the recently-*

*completed back-to-hockey season*[.]" In response to an analyst's question regarding sales

performance, Davis said that "[t]here has been a little of consolidation in the U.S. hockey retail

market over the past several months with two of the top three retailers in the U.S. hockey market

making acquisitions of two other retailers who are in the top seven. To say it in another [way] the

top seven are now the top five. I think also, there has been some remix of where our lacrosse product is being sold between specialty and mass retailers with [indiscernible] starting to take a little bit more share in the lacrosse base, as they dedicate more and more space to selling that product. ***But otherwise, we don't see any sort of decline in demand from consumers for those products.***"

192.     Davis also touted Easton's continued "market share expansion" in baseball, and stated that "COMBAT had a very strong first quarter, growing constant currency revenues by 80%." Davis further stated that PSG's "gains . . . over the past couple of years, ***have been primarily share based and you have obviously seen the growth in market share we have had in hockey and lacrosse. We are certainly growing each of those sports over the past several years at a faster rate than the underlying growth rates of the sports themselves.*** But I would not conclude that the underlying growth rates for the sports themselves as a demand from consumers is weak."

193.     These statements were false and misleading because they failed to disclose that PSG's purported growth over the prior few years was not due to "share based" gains in the market or growth in consumer demand, *i.e.*, "growing each of these sports," but rather was the result of PSG's high-risk, aggressive sales tactics, including (1) using discounts punitively to pressure retailers to buy progressively more PSG-branded product, (2) using high-volume sales of discounted product (referred to as "closeouts" at PSG) to drive sales growth, (3) routinely pushing and pulling orders into quarters to meet short-term sales targets and maintain the appearance of consistent quarterly growth, (4) using wildly extended payment terms with retailers to enable them to take more PSG-branded product than they reasonably could to hit short-term sales targets, (5) pushing product out to customers ███████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████, to push more PSG-branded product out into the marketplace.

194.   Defendants knew or recklessly disregarded that these statements were false and misleading. In particular, and in addition to the foregoing allegations: (1) Edward Kinnaly had warned Davis and Rosenthal as early as mid-2013 that their "████████████" practices and focus on pushing out as much product as possible to get sales by any means necessary (████████████ ███████████████████████████████████) had made the market and the business ███████████████████████████ and would continue to expand that risk without changing PSG's sales practices (in response to which Davis and Rosenthal fired him); (2) █████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████████████████; (3) Roustan had warned Davis, Rosenthal, and the Board of Directors █████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████████████ (in response, Davis and Rosenthal blocked Grant Thornton from releasing the survey results to Roustan and threatened all involved with litigation); (4) ██████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████████████████████████████; and (5) ███████████

███████████████████████████████████████

███████████████████████████████████████

████████

### 7.   January 14, 2016

195.   On the January 14, 2016 earnings call, Davis stated that "***our brands continued to take market share, and demonstrated strong resilience in some very challenging markets.***" Davis revised the estimated adjusted earnings per share downward by 50%, or $0.12 compared to the second quarter of fiscal year 2015, and stated that the adjusted earnings per share on a year-to-date basis was down 66%. He attributed 2/3 of the decline to "change in currency rate," and the remaining 1/3 "to the change in launch timing of new products in baseball and hockey."

196.   Further, in response to several questions about the amount of hockey inventory in the market (the state of the "channel"), Davis stated that while consolidation in the hockey market contributed to "inefficiencies," ***he did not "know that I'd call the inventory levels excessive, as much as they are not as efficient as you would expect once this consolidation occurred***. That's our view of the driver . . . impacting the U.S. market, and not the Canadian or the European markets." In response to a follow-up question about "actual numbers" for inventory in the channel, Davis said the information was not available to him and declined to share any additional information: "[w]hat we do is we rely on discussions with our customers to try and get a sense of inventory levels in the market place." When an analyst asked about how retailers work through excess inventory, Davis stated that "it's a combination of price and other promotional activity that you would expect," and volunteered that with respect to ***"sell-through for our brands, we're hearing positive things generally speaking across the entire spectrum of products that we offer.*** I think that's a statement about the quality of our products, the strength of our brand, and the

demand creation that we do at every level in the sport."

197.   These statements – that PSG's "brands continued to take market share and demonstrated strong resilience," and that Defendants were "hearing positive things" about the sell-through for the Company's brands – were false and misleading because they failed to disclose that inventory levels *were* excessive, that "sell-through" for PSG's brands was not positive, and that the high levels of inventory were the result of PSG's high-risk, aggressive sales tactics, including (1) using discounts punitively to pressure retailers to buy progressively more PSG-branded product, (2) using high-volume sales of discounted product (referred to as "closeouts" at PSG) to drive sales growth, (3) routinely pushing and pulling orders into quarters to meet short-term sales targets and maintain the appearance of consistent quarterly growth, (4) using wildly extended payment terms with retailers to enable them to take more PSG-branded product than they reasonably could to hit short-term sales targets, (5) pushing product out to customers ███████, ███████████████████████████████████████████████████████████, to push more PSG-branded product out into the marketplace.

198.   Defendants knew or recklessly disregarded that these statements were false and misleading. In particular, and in addition to the foregoing allegations: (1) Edward Kinnaly had warned Davis and Rosenthal as early as mid-2013 that their "███████" practices and focus on pushing out as much product as possible to get sales by any means necessary (███████████████████████████████████) had made the market and the business ███████████████ and would continue to expand that risk without changing PSG's sales practices (in response to which Davis and Rosenthal fired him); (2) ███████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████; (3) Roustan had warned Davis, Rosenthal,

and the Board of Directors ███████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████ (in response, Davis

and Rosenthal blocked Grant Thornton from releasing the survey results to Roustan and threatened

all involved with litigation); (4) █████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████; (5) ████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████; and (6) ███████████████████████

███████████████████████████████

**E.    Defendants and PSG violated Item 303 of Regulation S-K by failing to disclose unfavorable known trends or uncertainties.**

199.    Item 303 of Regulation S-K, 17 C.F.R. 229.303, requires public companies, in their Form 10-K filings, to "***[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.*** If the registrant knows of events that will

cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed."

200.    PSG and its senior executives, Davis and Rosenthal, knew PSG's success was due, at least in substantial part, to PSG's high-risk sales practices, including pressuring customers to accept orders before they were needed, placing orders earlier and earlier, penalizing customers that did not increase their PSG bookings by removing existing discounts regardless of whether market demand could support such increases, flooding the market with "closeouts" to meet growth targets, using extended payment terms with financially troubled accounts, pushing product out to customers ███████████████████████████████████████████ in a deficient internal control environment.

201.    PSG and the Defendants further knew that the Company's sales practices were not sustainable and that they were reasonably likely to catch up with PSG and/or trigger accounting violations, especially in light of the fact that Roustan, Kinnaly, ██████, and customers (including CW3) repeatedly told PSG so in face-to-face meetings, ███████████████████████ – and would thus result in a significant drop in sales and revenue as PSG adjusted its financial outlook to accurately reflect true market demand or cause the marketplace to stop accepting PSG branded product.

202.    These trends and circumstances were known to PSG and Defendants at the time when PSG filed its 2015 Annual Report on Form 10-K during the Class Period, which failed to disclose these known trends. As a result, Defendants caused PSG to violate Item 303 of Regulation S-K by failing to disclose this known trend and uncertainty to the marketplace.

203.    Rather than disclosing any known trend, Defendants and PSG offered pretextual

90

reasons for the failure of PSG's business, attempting to conceal the adverse trends they should have disclosed behind explanations of purportedly unpredictable, unforeseen, and act-of-God-like changes in the marketplace. But these explanations were false and misleading, as revealed by contemporaneous comparisons with PSG's competitors. According to PSG's 2015 Annual Report, PSG's primary competitors in the baseball and softball space were Amer Sports (owners of the Wilson and Louisville Slugger baseball brands), Newell Brands (owner of Rawlings), and Mizuno. Nike was not listed in PSG's Annual Report as a primary competitor, but only as competitive in some "specific categories such as batting gloves." (2015 Form 10-K at 9.) Contrary to PSG's and Defendants' claims of market conditions as the cause of the Company's poor performance in late calendar year 2015, the CEO of Amer Sports stated on February 3, 2016 at Amer's own Q4 2015 earnings conference call that its "pipeline is strong and momentum is good behind Louisville Slugger. As for our baseball overall, [ ] its fine. And we expect the year to be good."

204.   In its Q1 2016 earnings presentation, Amer also reported that its footwear revenue was up 16%, its apparel revenue was up 19%, its sports instruments revenue (including baseball bats) was up 14%, and overall net sales were up 11%. In summary, Amer told the market that they were observing "broad-based growth in team sports further supported by Louisville Slugger." Similarly, Michael Polk, Newell Brand's CEO, in that company's own Q1 2016 earnings release, stated, "We are extremely pleased with our growth and financial results this quarter."

205.   In the hockey space, PSG competed with Reebok-CCM Hockey, which is owned by Adidas AG. In Adidas' fiscal year 2015 Annual Report, dated March 3, 2016, Adidas also explained that it was experiencing "high single-digit increases at Reebok-CCM Hockey and double-digit sales increases in other centrally managed businesses." This was reported at the same time that PSG was reporting its own decreases as alleged herein.

## LOSS CAUSATION

206.    During the Class Period, as detailed herein, PSG and Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated and/or maintained the price of PSG's common stock and operated as a fraud or deceit on Class Period purchasers of PSG's common stock by failing to disclose, misrepresenting, and concealing the true reasons for the growth of the Company's sales, the risks associated with the methods Defendants used to achieve that growth, and the deteriorated internal control environment that Defendants needed to manage those risks. As the risks of PSG's and Defendants' fraudulent scheme materialized and the falsity of their prior misrepresentations and fraudulent conduct began to leak out and become apparent to the market, the artificial inflation embedded in the price of PSG common stock began to dissipate, the price of PSG common stock declined significantly, and the Company was ultimately forced into bankruptcy.

207.    As a result of their purchases of PSG common stock during the Class Period, Lead Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws. PSG's and Defendants' false and misleading statements and omissions had their intended effect and caused PSG common stock to trade at artificially-inflated and/or maintained levels throughout the Class Period, reaching as high as $21.65 per share on May 18, 2015.

208.    By concealing from investors the adverse facts detailed herein, PSG and Defendants presented a misleading picture of PSG's business, products, operations, and risks. As the truth about the Company materialized and began to be revealed to the market, the price of PSG common stock began to fall significantly. These declines removed the artificial inflation from the price of PSG common stock, causing real economic loss to investors who had purchased PSG common stock during the Class Period.

92

209. The declines in the price of PSG common stock after the truth came to light were a direct result of the nature and extent of Defendants' fraudulent misrepresentations and omissions being revealed to investors and the market. The timing and magnitude of the price decline in PSG common stock indicate that the losses suffered by Lead Plaintiff and Class members was not exclusively caused by changed market conditions, overall stock market and/or industry-specific factors, or Company-specific information unrelated to PSG's and Defendants' fraudulent conduct.

## RELIANCE

210. At all relevant times, the market for PSG's common stock was an efficient market for the following reasons, among others: (1) PSG common stock met the requirements for listing and was listed and actively traded on the NYSE during the Class Period, a highly efficient and automated market; (2) as a regulated issuer during the Class Period, PSG filed periodic public reports with the SEC and the NYSE; (3) PSG regularly communicated with public investors via established market communications mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and (4) PSG was followed by several securities analysts employed by major brokerage firms who wrote the reports that were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

211. As a result of the foregoing, the market for PSG common stock promptly digested current information regarding PSG from all publicly available sources, including nationally circulated newspapers, and reflected such information in PSG's stock price. Under these circumstances, all purchasers of PSG common stock during the Class Period suffered similar injury through their purchases of PSG common stock at artificially inflated and/or maintained prices and

a presumption of reliance applies to Lead Plaintiff's allegations.

212.   Lead Plaintiff and the Class are also entitled to a presumption of reliance under *Affiliated Ute v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are primarily predicated upon the omission of material facts that PSG and Defendants had a duty to disclose, namely that PSG's financial results during the Class Period were the result of undisclosed high-risk sales practices and failing internal controls that had the effect of inflating the Company's performance.

## NO SAFE HARBOR

213.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those purportedly forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of PSG who knew that those statements were false when made.

## CLASS ACTION ALLEGATIONS

214.   Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3) on behalf of a class consisting of all persons and entities that purchased or acquired PSG common stock on the New York Stock Exchange ("NYSE") during

the Class Period, seeking to pursue remedies under the Exchange Act. Excluded from the Class are Defendants; the officers and directors of the Company, at all relevant times; members of their immediate families and their legal representatives, heirs, successors, or assigns; and any entity in which any of the Defendants have or had a controlling interest.

215.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, PSG common stock was actively traded on the NYSE. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Millions of PSG shares were traded publicly during the Class Period on the NYSE. Record owners and other members of the Class may be identified from records maintained by PSG or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

216.   Lead Plaintiff's claims are typical of the claims of Class members, who were all similarly affected by Defendants' wrongful conduct in violation of the federal securities laws that is complained of herein. Further, Lead Plaintiff will fairly and adequately protect the interests of Class members and has retained counsel competent and experienced in class and securities litigation.

217.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a)     whether the federal securities laws were violated by PSG's and Defendants' conduct alleged herein;

b)     whether statements made by PSG and Defendants to the investing public during the

95

Class Period omitted or misrepresented material facts about the business, operations, known trends, and prospects of PSG; and

c)      to what extent Class members have sustained damages and the proper measure of damages.

218.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Further, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for Class members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## CAUSES OF ACTION

### COUNT I

**(Against Defendants for Violation of Section 10(b) of the Exchange Act and
Rule 10b-5 of the Securities and Exchange Commission)**

219.    Lead Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

220.    This Count is asserted against both Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder.

221.    During the Class Period, Defendants, singularly and in concert, directly made various deceptive and untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading to Lead Plaintiff and the other members of the Class, including statements in SEC filings and other public statements that falsely touted the financial strength of the Company and strength and growth of the Company's sales and revenue streams. The purpose and effect of said scheme, plan, and unlawful course of conduct was, among other things, to induce

Lead Plaintiff and the other members of the Class to purchase PSG common stock during the Class Period at artificially inflated and/or maintained prices.

222.    During the Class Period, PSG and Defendants knowingly and/or recklessly issued, caused to be issued, or participated in the issuance of, the preparation and issuance of deceptive and materially false and misleading statements to the investing public as particularized above.

223.    As a result of the dissemination of the false and misleading statements set forth above, the price of PSG common stock was artificially inflated and/or maintained during the Class Period. In ignorance of the false and misleading nature of the statements described above and the deceptive and manipulative devices and contrivances employed by PSG and Defendants, Lead Plaintiff and the other members of the Class relied, to their detriment, on the integrity of the price of the common stock of PSG. Had Lead Plaintiff and the other members of the Class known the truth, they would not have purchased said shares or would not have purchased them at the inflated prices that were paid.

224.    Lead Plaintiff and the other members of the Class have suffered substantial damages as a result of the wrongs alleged herein in an amount to be proven at trial.

225.    By reason of the foregoing, Defendants directly violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading during the Class Period.

## COUNT II

**(Against Defendants for Violation of Section 20(a) of the Exchange Act)**

226.    Lead Plaintiff repeats and realleges each and every allegation contained in each of the foregoing paragraphs as if set forth fully herein.

227.    Defendants Davis and Rosenthal, by virtue of their positions and specific acts described above, were, at the time of the wrongs alleged herein, controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act.

228.    Defendants had the power and influence and exercised the same to cause the Company to engage in the illegal conduct and practices complained of herein.

229.    By reason of the conduct alleged in Count I of this Complaint which also applies to the Company and for which the Company would be liable had it been named as a Defendant herein, Defendants are liable for the aforesaid wrongful conduct as control persons of the Company, and are liable to Lead Plaintiff and to the other members of the Class for the substantial damages which they suffered in connection with their purchases of PSG common stock during the Class Period.

WHEREFORE, Lead Plaintiff prays for relief and judgment, as follows:

(a)    determining that this action is a proper class action and certifying Lead Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure;

(b)    awarding compensatory damages in favor of Lead Plaintiff and the other Class members against both Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Lead Plaintiff demands a trial by jury.

Dated: September 6, 2019                    Respectfully submitted,

                                           **COHEN MILSTEIN SELLERS**
                                           **      & TOLL PLLC**

                                           */s/ Carol V. Gilden*
                                           Carol V. Gilden
                                           190 South LaSalle Street
                                           Suite 1705
                                           Chicago, IL 60603
                                           Tel. (312) 357-0370
                                           Fax (312) 357-0369

                                           Steven J. Toll
                                           S. Douglas Bunch (SB-3028)
                                           1100 New York Avenue N.W.
                                           Suite 500, West Tower
                                           Washington, D.C. 20005
                                           Tel. (202) 408-4600
                                           Fax (202) 408-4699

                                           Alice R. Buttrick (5444120)
                                           88 Pine Street
                                           14th Floor
                                           New York, NY 10005
                                           Tel. (212) 838-7797
                                           Fax (212) 838-7745

                                           *Attorneys for the Plumbers & Pipefitters*
                                           *National Pension Fund and Lead Counsel for*
                                           *the Class*

                                           **O'DONOGHUE & O'DONOGHUE LLP**
                                           Mark W. Kunst
                                           4748 Wisconsin Avenue N.W.
                                           Washington, D.C. 20016
                                           Tel. (202) 362-0041
                                           Fax (202) 362-2640

                                           *Additional Attorneys for the Plumbers &*
                                           *Pipefitters National Pension Fund*

## CERTIFICATION

Toni C. Inscoe, Fund Administrator for the Plumbers & Pipefitters National Pension Fund ("Plumbers National Pension Fund"), declares, as to the claims asserted under the federal securities law, that:

1.      I am authorized to make this certification on behalf of Plumbers National Pension Fund.

2.      I have reviewed the third amended complaint to be filed in this matter and wish to continue to serve as lead plaintiff.

3.      Plumbers National Pension Fund did not purchase the securities that are the subject of this action at the direction of its counsel or to participate in this action.

4.      Plumbers National Pension Fund continues to be willing to serve as a lead plaintiff and class representative on behalf of the Class, including providing testimony at deposition and trial if necessary.

5.      Plumbers National Pension Fund's transactions in the securities of Performance Sports Group Ltd. that are the subject of this action are set forth in Schedule A, attached hereto.

6.      In the three years prior to the date of this certification, Plumbers National Pension Fund sought to serve as a representative party for a class under the federal securities laws in the following cases:

- *Plumbers and Pipefitters National Pension Fund v. Alta Mesa Resources, Inc. et al.*, No. 4:19-cv-02982 (S.D. Tex.); *Camelot Event Driven Fund, A Series of Frank Funds Trust v. Alta Mesa Resources, Inc. f/k/a Silver Run Acquisition Corporation II*, No. 4:19-cv-00957 (S.D. Tex.); *FNY Partners Fund LP et al v. Alta Mesa Resources, Inc. f/k/a Silver Run Acquisition Corporation II et al.*, 4:19-cv-01027 (S.D. Tex.);
- *Abarrientos v. Tableau Software, Inc. et al.*, No. 2:17-cv-01175 (W.D. Wash.); *Scheufele et al. v. Tableau Software, Inc. et. al.*, No. 1:17-cv-05753 (S.D.N.Y.); and
- *Luna v. Marvell Technology Group, Ltd. et al.*, Civ. No. 15-cv-07214 (S.D.N.Y.) (transferred to N.D. Cal. as Case No. 3:15-cv-05447).

7.      Plumbers National Pension Fund will not accept any payment for serving as a class representative on behalf of the class beyond its *pro rata* share of any recovery, except such reasonable costs and expenses (including lost wages) relating to representation of the class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this __6__ day of September, 2019.

Toni C. Inscoe
Fund Administrator
*Plumbers   &   Pipefitters   National*
*Pension Fund*

# SCHEDULE A

**SCEHDULE A**

| Trade Date | Transaction Type | # Shares | Share Price ($) |
|---|---|---|---|
| 8/28/2015 | PURCHASES | 8,700 | 12.94 |
| 8/28/2015 | PURCHASES | 5,000 | 12.88 |
| 8/31/2015 | PURCHASES | 6,800 | 12.93 |
| 9/1/2015 | PURCHASES | 4,900 | 12.52 |
| 9/2/2015 | PURCHASES | 1,400 | 12.15 |
| 9/2/2015 | PURCHASES | 1,000 | 12.15 |
| 9/3/2015 | PURCHASES | 2,095 | 12.95 |
| 9/8/2015 | PURCHASES | 7,473 | 13.81 |
| 9/25/2015 | PURCHASES | 11,300 | 13.97 |
| 9/29/2015 | PURCHASES | 1,800 | 13.89 |
| 10/1/2015 | PURCHASES | 2,900 | 12.58 |
| 11/3/2015 | PURCHASES | 6,450 | 11.87 |
| 11/4/2015 | PURCHASES | 10,049 | 11.87 |
| 11/10/2015 | PURCHASES | 7,825 | 11.1 |
| 11/30/2015 | PURCHASES | 8,700 | 11.62 |
| 12/7/2015 | PURCHASES | 4,300 | 11.46 |
| 12/8/2015 | PURCHASES | 7,700 | 11.18 |
| 12/9/2015 | PURCHASES | 4,740 | 10.96 |
| 1/20/2016 | PURCHASES | 1,650 | 5.83 |
| 3/8/2016 | SALES | 13,700 | 3.93 |
| 3/8/2016 | SALES | 49,700 | 3.18 |
| 3/9/2016 | SALES | 22,800 | 3.3 |
| 3/10/2016 | SALES | 18,582 | 3.8 |

## CERTIFICATE OF SERVICE

I, Carol V. Gilden, counsel for Lead Plaintiff, hereby certify that on September 6, 2019, I filed the foregoing Third Amended Class Action Complaint for Violations of the Federal Securities Laws on the United States District Court for the Southern District of New York's Electronic Case Filing System, which caused a copy of this document to be served on counsel of record for all Parties.

*/s/ Carol V. Gilden*
Carol V. Gilden