**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JUAN FRANCISCO GONZALEZ NIEVES, AS TRUSTEE OF THE GONZALEZ CORONADO TRUST, Individually and on Behalf of All Others Similarly Situated, | |
| Plaintiff, | Case No.: 1:16-CV-3591-GHW |
| v. | JURY TRIAL DEMANDED |
| KEVIN DAVIS AND AMIR ROSENTHAL, | |
| Defendants. | |

**THIRD AMENDED CLASS ACTION COMPLAINT FOR**
**VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

## TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................. i

NATURE OF THE ACTION ........................................................................................ 2

JURISDICTION AND VENUE ................................................................................... 15

PARTIES AND RELEVANT NON-PARTIES ......................................................... 15

SUBSTANTIVE ALLEGATIONS ............................................................................. 18

   A.    Determined to maintain the perception that PSG was continually growing its sales and revenue numbers, Davis and Rosenthal enabled, oversaw, and concealed PSG's use of high-risk sales practices. ............................................................................. 19

     1.    Punitive use of discounts ........................................................................... 21

     2.    Flooding the market with cheap inventory ("closeouts") .............................. 24

     3.    Routine order "pulls" to hit quarterly sales targets ..................................... 28

     4.    Extended payment terms ............................................................................ 33

     5.    Pushing sales to customers in violation of customer credit limits ................ 37

     6.    Consignment contracts ............................................................................... 42

   B.    The truth begins to reveal itself: the risks that Defendants concealed predictably materialized, ultimately causing PSG's bankruptcy. ................................................... 50

   C.    Defendants acted with scienter. ...................................................................... 59

   D.    Defendants made false and misleading statements to investors about the nature of PSG's growth, the substantial risks associated with the practices used to achieve that growth, and their ability to manage those substantial risks with effective internal controls. ..... 64

i

1.   January 14 and 15, 2015 ................................................................................. 66

2.   April 13 and 14, 2015 ..................................................................................... 68

3.   July 7 and 8, 2015 .......................................................................................... 71

4.   August 26, 2015 ............................................................................................. 74

5.   August 27, 2015 ............................................................................................. 76

6.   October 14 and 15, 2015 ................................................................................ 84

7.   January 14, 2016 ............................................................................................ 87

E.   Defendants and PSG violated Item 303 of Regulation S-K by failing to disclose unfavorable known trends or uncertainties. ................................................................. 89

LOSS CAUSATION ............................................................................................................. 92

RELIANCE ........................................................................................................................... 93

NO SAFE HARBOR ............................................................................................................. 94

CLASS ACTION ALLEGATIONS ..................................................................................... 94

CAUSES OF ACTION ......................................................................................................... 96

The allegations set forth in this Third Amended Class Action Complaint for Violations of the Federal Securities Laws (the "Complaint") are based on the investigation undertaken by Lead Counsel on behalf of Lead Plaintiff Plumbers & Pipefitters National Pension Fund ("Lead Plaintiff").

Lead Plaintiff brings this Complaint against Kevin Davis ("Davis"), the former Chief Executive Officer ("CEO") and director of Performance Sports Group Ltd. ("PSG" or the "Company"), and Amir Rosenthal ("Rosenthal"), the Company's former Chief Financial Officer ("CFO"), President, and interim CEO (after Davis' termination).

Lead Plaintiff's allegations are based on personal knowledge as to its own acts, and on information and belief as to all other matters, such information and belief having been informed by the investigation conducted by and under the supervision of its counsel, which included, among other things: (i) review and analysis of PSG's public filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) review and analysis of the sports equipment industry, analyst reports, and other publicly available materials concerning PSG's business practices; (iii) review and analysis of other publicly available information concerning PSG; (iv) interviews with former PSG employees and customers of PSG (most of whom have provided information in confidence; these confidential witnesses ("CWs") will be identified herein by number (CW1, CW2, etc.)), including W. Graeme Roustan ("Roustan"), the former Chairman of PSG's Board of Directors; (v) review and analysis of internal Company documents produced pursuant to a settlement agreement with PSG's equity holders and debtors in the Company's bankruptcy proceedings; and (vi) consultations with experts.

1

Substantial additional evidentiary support exists for Lead Plaintiff's allegations, including records of PSG's internal investigation and the audit workpapers of its independent public auditor, KPMG, which Lead Plaintiff will seek after it is granted a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     Lead Plaintiff brings this federal securities class action on behalf of itself and a proposed class of persons and entities (the "Class") who purchased or acquired PSG common stock on the New York Stock Exchange ("NYSE") during the period from January 15, 2015 through October 28, 2016, inclusive (the "Class Period"). Lead Plaintiff seeks remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.     PSG was a developer and manufacturer of sports equipment and apparel that it sold to independent retailers internationally. On June 20, 2014, PSG – which had previously been called Bauer Performance Sports Ltd. and was publicly trading on the Toronto Stock Exchange – held its initial public offering in the United States, issuing more than 7 million shares of stock to the public at a price of $15.50 per share, and changed its name to Performance Sports Group Ltd. Following the U.S. initial public offering, PSG's stock also traded on the NYSE.

3.     PSG sold its goods to retailers under several brands, many of which it acquired: Bauer (hockey), Easton (baseball/softball) (acquired: April 2014, for $330 million), Combat (baseball) (acquired: May 2013, for CAD$4 million), Cascade (lacrosse) (acquired: June 2012, for $64 million), Maverik (lacrosse) (acquired: June 2010), Inaria (soccer) (acquired: October 2012, for CAD$7 million), Mission (hockey) (acquired: September 2008), and Easton (hockey) (acquired: January 2016, for $12 million). In acquiring these brands, PSG accumulated significant debt, which it financed through agreements with certain creditors.

2

4.     PSG's most recognizable brands were Bauer hockey and Easton baseball/softball. Those two brands were the biggest part of PSG's business throughout the Class Period. Generally, PSG's business model was to sell its goods to its customers – retailers – who would then sell those PSG-branded goods to consumers. Its fiscal year ran from June 1 to May 31.

5.     Throughout the Class Period, Defendants Davis and Rosenthal repeatedly touted PSG's record of impressive sales growth, the reasons for that growth, and their successful integration of PSG's various acquired brands. These statements were misleading: Davis and Rosenthal misled investors about the true drivers of PSG's sales growth, the risks associated with the mechanisms they were using to achieve that growth, and the quality of the internal controls that were supposed to address those risks.

6.     To sustain that perception of strong sales and revenue growth, Defendants Davis and Rosenthal led an effort to grow the Company's revenue and sales figures by any means necessary. This included employing high-risk and sometimes fraudulent sales practices, such as (1) threatening the loss of volume-based discounts as a penalty to force retailers to take on more inventory than they reasonably could; (2) flooding the market with inventory, often at extreme, unprofitable discounts referred to within PSG as "closeouts"; (3) "pulling" orders into different quarters so as to meet certain short-term sales targets; (4) relying on wildly extended payment terms to convince customers to take more and more product and not pay for it until months or even quarters later; (5) pushing sales to customers in routine and excessive violation of PSG's own internal controls governing customer credit limits; and (6) entering into non-final sales agreements with "right of return" provisions and consignment arrangements that violated accounting rules governing revenue recognition.

7.      Layered on top of these high-risk sales practices was another, closely-related deception: Defendants concealed that PSG's internal controls regarding the detection and management of these high-risk sales practices were shoddy or non-existent, regularly violated, and left to crumble by Davis and Rosenthal – even after they received multiple, specific written and oral warnings from among others, PSG's independent auditor, KPMG.

8.      The unique risk posed by Defendants' conduct was substantial. Flooding the market with cheap inventory and using high-pressure tactics to get retailers to take more inventory than they could reasonably sell would inevitably cannibalize future, sustainable, higher-margin sales for the sake of short-term bumps in quarterly growth. In the words of one PSG retailer quoted in a local business journal: "they [PSG] did try to jam orders down our throat, to take orders early, to overstock, oversupply, over-inventory us. **They said it would all work out, and then things hit a wall**."

9.      Similarly, pushing and pulling orders, using extended payment terms, and entering into consignment agreements risked cannibalization of future, healthy sales – *and* the improper recognition of revenue, a violation of accounting rules – which could shake the foundation of PSG.

10.     These risks were not theoretical, but in fact materialized during the Class Period. They were vividly described in May 2016 by Paul Healey, Bauer's then-Vice President of Sales, in an email dated May 10, 2016 after he finally became fed up with Defendants' obsession with maintaining the perception of growing short-term sales. In angrily responding to criticism about whether he was intentionally low-balling his anticipated sales numbers, Healey exploded at his colleague about how Davis and Rosenthal had driven everyone within the Company into these high-risk sales practices and left PSG's business fundamentally "unhealthy": "**This is about stopping the channel stuffing and letting this business purge itself. The [s]porting [g]oods**

4

*business and hockey specifically is not at all healthy. Over retailed and over inventoried. This* [pushing for higher sales targets] *is exactly how we got here. Actually it takes more guts to say what is real than it is to give in and add dollars* [to the targets] *that are unrealistic. . . . We are so used to jamming we are losing sight of what's real and healthy.* Put it on me. I know it's hard to look at but *we['] re now putting a premium on getting paid versus revenue. If we had taken that approach a few years ago then we wouldn't be here now.* Not our fault but do you want to keep this up? *Look at the US market and what we did to hit numbers over the last number of years we took revenue from expanding retailers but still made regional players grow. We did Q2 and Q3 programs and drove very unhealthy activity. The pressures you mention are all the things that drove us to do what we did. No one stopped it and we had no choice but to push the envelope far beyond disciplined healthy business levels.*" Thus, Defendants' focus on "jamming," that is, their relentless drive towards the appearance of short-term sales growth by any means necessary, had cannibalized PSG's healthy growth and caused the U.S. sporting goods market overall to suffer from glut.

11.     If Defendants' high-risk sales practices were the spark to PSG's ultimate collapse, PSG's deficient internal controls were the kindling. The risks arising out of PSG's use of these sales tactics were made even more probable and existential due to Defendants' failure to maintain and enforce fundamental internal controls. In particular, Defendants failed to develop and employ a working system for the management of PSG's many contracts with its various retailers across its brands and failed to properly implement or abide by a system of credit limits for PSG's customers. Davis and Rosenthal knew about these problems, and even received repeated warnings about these issues in August 2014 and August 2015 from PSG's independent auditor, KPMG, which cited the

Company for significant deficiencies in these internal controls. Davis and Rosenthal nonetheless failed to remediate the deficiencies.

12.     In fact, PSG never had a working system for contract management: Defendants refused to develop or abide by one even after the facts and information to which they had access showed that their public statements about the nature of PSG's growth, the risks associated with the mechanisms they used to achieve that growth, and the internal control environment, in which Defendants assumed those substantial risks, were not accurate. Davis, Rosenthal, and PSG failed – even after receiving repeated warnings – to assess just how much the Company was relying on its use of extended payment terms, consignment agreements, "pulls" of orders, or any of the other high-risk tactics identified above to drive sales growth. Moreover, because PSG never had a working system for customer credit limits, Davis and Rosenthal regularly allowed PSG – as a matter of habit – to ignore the Company's purported credit limits for dozens of retailers, leaving PSG with the substantial risk of not being able to collect on the tens of millions of dollars that it had effectively lent retailers over and above PSG's own credit limits.

13.     Davis, Rosenthal, and other members of PSG's senior management knew facts and had access to information showing that their public statements about the nature of PSG's growth, the mechanisms used to achieve that growth, the risks associated with those mechanisms, and the deficient internal control environment in which Defendants and PSG undertook those actions were not accurate or the whole truth. Moreover, Davis, Rosenthal, and other members of PSG's senior management failed to check information they had a duty to monitor under the federal securities laws – a duty they had when they made misleading statements, a duty they had under Item 303 of Regulation S-K, and a duty they had after they received multiple, repeated warnings and signs that

6

PSG was engaging in high-risk sales practices and that those risks were going to cause serious damage to PSG's business.

14.     The risks posed by the aggressive sales practices and the deficient internal controls were by themselves considerable and capable of crippling PSG's business – but when those risks materialized and combined, they became existential threats to the Company. For example, when PSG's independent auditor discovered multiple retailer consignment contracts with right-of-return provisions in them – and further discovered that PSG had improperly recognized revenue on those contracts – Defendants' failure to maintain a working contract management system prevented KPMG (and, later, investigators) from precisely identifying how many consignment contracts there even were, whether there were additional accounting misstatements made in PSG's financial statements, and the scale of those accounting misstatements.

15.     Another example: when several of PSG's largest customers began to experience financial stress and go bankrupt, PSG's relentless stuffing of the market with inventory using the high-risk practices identified above – combined with Defendants' startling disregard of the credit limits for those customers – left PSG in an untenable situation. It had effectively lent tens of millions of dollars to some of its largest retailers in violation of PSG's own credit limits who, now facing bankruptcy, would never pay PSG back.

16.     Defendants understood these risks in real-time, because they each received many warnings about these risks from multiple sources. On August 12, 2014, for example, before the Class Period even began, KPMG wrote a letter to Davis and told him that it had found "deficiencies in internal control over financial reporting" during the fiscal year 2014 audit, and that in particular "*[t]he Company did not maintain appropriate credit limits for certain customers*." Over a year later, on October 9, 2015, Rosenthal was shown a PowerPoint slide prepared for the Board of

Directors' Audit Committee meeting showing that PSG had exceeded its credit limits to its top 20 customers by *$36 million*. His response: "*This is the 'punch me' slide*." One week later, in an email dated October 16, 2015, Scott Frerichs, the then-Senior Director of Finance for Bauer and, later, the Vice President of Finance for PSG, said that he and Rosenthal had received a "*flogging*" from the Audit Committee after reviewing "the state of our AR [accounts receivable] balances relative to our approved credit limits. . . . [A]fter the feedback from the Committee this week *we need to think a little harder about our credit risk*."

17.     There were other warnings. Executives within PSG sounded the alarm for Davis and Rosenthal about the risks of their sales growth tactics. Edward Kinnaly, the then-longtime Executive Vice President for Bauer hockey, warned as early as March 27, 2013, in an email to Rosenthal, that Davis' and Rosenthal's emphasis on short-term growth – the "Q2 go-get, Q3 go-get, bookings, *more, more, more*" – had demoralized the sales team and was predicated on unrealistic sales targets given the bloated inventory marketplace dynamics. (Within PSG, a "go-get" was the gap that needed to be filled between the quarterly sales target (referred to as the "forecast" within PSG) and sales up to that point in that quarter.) Rosenthal was fundamentally uninterested in hearing objections, rejecting any warnings about the impact of PSG's sales tactics. In an email to Kinnaly the same day, he replied: "I agree that . . . the stretch targets made last year difficult, but every year is difficult for some reason."

18.     Davis had a more draconian response: he fired Kinnaly the following month. According to Confidential Witness 3 ("CW3"), Kinnaly had challenged Davis and Rosenthal about the Company's sales and booking practices at a meeting of PSG's Board of Directors (Davis was a director on the Board). Kinnaly warned those in attendance, including Davis, that pulling orders forward or "trade loading" in order to make their numbers would eventually catch up with PSG

and cannibalize their future sales. Soon after that Board of Directors meeting, Davis fired Kinnaly for speaking out about the sales practices.

19.     This account is corroborated by internal PSG documents. Kinnaly indeed warned Davis and Rosenthal in a PowerPoint presentation on April 26, 2013 that the hockey marketplace was "[u]nhealthy" and "bloated," and he proposed (among other things) restructuring PSG's sales programs to "command a higher percentage of key customers OTB [open-to-buy]" by using an "'opt-in' approach *versus 'gun to head'*" approach that Davis and Rosenthal had historically preferred. Kinnaly was fired days later.

20.     The warnings continued. W. Graeme Roustan, a major PSG shareholder and the former Chairman of its Board of Directors, on two occasions in 2015 – once with the assistance of accounting firm Grant Thornton and once through the survey website "SurveyMonkey.com" – surveyed a sample of PSG's largest customers and found (among other things) credible evidence that, as Roustan explained in a letter to the Company's Board of Directors dated June 12, 2015, PSG had been engaging in "extreme discounting . . . on some orders simply to make quarterly numbers," that PSG was perhaps "dumping products at below cost to make quarterly numbers," and that a majority of those surveyed said that "over the past two years, several retailers have been asked by Performance Sports Group Ltd. to move orders forward into an earlier quarter." Roustan privately notified Defendants and the Board of Directors of these troubling facts in May, June, and December 2015, characterizing his concern that these types of sales practices "**emulate[] a Ponzi scheme of sorts**" – **pumping short-term sales growth by consuming future sales and poisoning the marketplace**.

21.     But as they did with Kinnaly, Defendants took extreme measures to silence Roustan. They threatened Grant Thornton with litigation, causing the accounting firm to withhold

9

from Roustan the results of the very survey he commissioned. They then threatened Roustan with litigation for purportedly interfering in their business. The aforementioned warnings about the risks Davis and Rosenthal's tactics were causing the Company are a mere sampling of those issued.

22.     None of this was ever disclosed to investors. Instead, Defendants repeatedly misled the investing public about the nature of PSG's growth, the risks associated with the methods used to achieve that growth, and the quality of PSG's internal controls in managing those risks. They did so by making statements like the following:

- In an earnings call on January 15, 2015, Davis stated that "[a]ll in all, ***the first half of FY15 has been highlighted by record revenues, the smooth progression of our EASTON integration, and the continued strong growth of our hockey business. We also delivered record quarterly earnings*** despite an estimated $0.08 per share of negative impact from currency compared to the prior year, and the estimated revenue loss of our lacrosse helmets in the quarter. ***The strong reported results in the face of these headwinds are a testament to the strength of our brands, platform and our great people.***"

- PSG's 2015 Annual Report stated that Defendants' "***successful . . . integration of seven businesses since 2008 has demonstrated our ability to . . . integrate acquired businesses.***" (2015 Form 10-K at 20).

- PSG's 2015 Annual Report stated that "[o]ur business is affected by seasonality, which could result in fluctuations in our operating results and the trading price of the Common Shares," and specifically stated that "***our customers may cancel orders, change delivery schedules or change the mix of products ordered with minimal notice. We may also make strategic decisions to deliver and invoice product at certain dates in order to lower costs or improve supply chain efficiencies.***" (2015 Form 10-K at 30).

23.     Statements like these painted a misleading picture. They gave investors the impression that PSG was achieving "record quarterly earnings" through typical, healthy means, such as gaining market share with retailers or improving customer demand for PSG's products, but that was not true: PSG's "record quarterly results" were buoyed by high-risk sales practices and a focus on things like "go-gets" driving those "record" earnings. Defendants' statements painted the picture that PSG had smoothly integrated its acquired brands into PSG's systems, but

10

that too was not true: internal control deficiencies were particularly pronounced with Easton baseball/softball, and were a consequence of Defendants' *unsuccessful* integrations. Moreover, Defendants' statements purported to warn investors of certain risk factors that seemed outside of PSG's control, like the impact of seasonality on order timing, but this also was not true: PSG pulled orders forward to hit quarterly sales targets.

24.     When it became evident to investors in 2016 that PSG's business was failing, Davis and Rosenthal became particularly adept at misleading investors about the reasons why. They discussed certain market events that had an adverse impact on PSG's business – like the bankruptcy of a major retailer, or a slowdown in the retail markets – but omitted discussing *their own roles* in both creating and magnifying the impact of those adverse market events. For example, on March 8, 2016, PSG made a major announcement disclosing that its business was weakening and that it was slashing its earnings guidance. In explaining why, Davis stated on an earnings call that "[t]he second half of fiscal 2016 has been impacted by *adverse market conditions and related customer credit issues*. The baseball/softball market is experiencing an *unexpected significant downturn in retail sales*, including in our important bat category. *This weakening of consumer demand, coupled with the chapter 11 filing by one of our largest US national sporting goods retailers, is reducing our sales for baseball and softball products.*"

25.     But what Davis withheld was that PSG had a consignment arrangement with the large bankrupt retailer in question (The Sports Authority), and thus lost all of the inventory PSG effectively lent it when The Sports Authority filed for bankruptcy. Davis also omitted that PSG lent The Sports Authority $428,293 over and in violation of *PSG's own customer credit limit* for The Sports Authority. And he failed to mention that the weakening of consumer demand in baseball/softball in 2016 was not unforeseen: both Davis and Rosenthal knew that some of their

11

biggest retailers were in financial distress and considering bankruptcy as early *as 2015*, and they knew that the slowdown was partly the consequence of PSG cannibalizing its future sales by (among other practices) consistently pumping inventory into the market without regard for retailer or consumer demand, or the credit worthiness of the retailers.

26.     The risks posed by this fraud were not hypothetical: they predictably materialized by forcing PSG into bankruptcy. The first domino fell in August 2015, when KPMG discovered consignment contracts with multiple retailers across PSG's business lines and attendant revenue recognition violations. KPMG formally notified Davis, Rosenthal, and the Board of Directors' Audit Committee, in a letter dated August 26, 2015, of "significant deficiencies" in PSG's internal controls that had in part enabled the revenue recognition problems. Defendants never disclosed this.

27.     Beginning in 2015 and extending into 2016, a thoroughly stuffed channel in hockey and baseball/softball caused retailers who were overloaded with PSG product to cut orders and significantly scale back their business with PSG. When four of PSG's larger customers (Team Express, Sports Chalet, Total Hockey, and The Sports Authority) then filed for bankruptcy, PSG was confronted with the reality that it had lent these companies tens of millions of dollars – in violation of PSG's credit limits – and had in some cases signed over PSG inventory to them under consignment arrangements that prevented PSG from getting paid or getting the inventory back.

28.     The situation grew worse throughout 2016. A January 11, 2016 *Reuters* article revealed that Roustan had sued Grant Thornton for ending his engagement and refusing to provide him the results of his commissioned survey of PSG's major customers. Two days later, on January 13, 2016, PSG issued a press release revising substantially downward its earnings guidance for fiscal year 2016, cutting its adjusted net income and adjusted earnings per share numbers

12

substantially, and announcing weak 2016 second quarter results "largely driven by a bad debt write-off related to outstanding receivables for an internet baseball retailer [Team Express] that filed for bankruptcy reorganization." On this news, PSG's stock price experienced a 3-day fall from its opening price on January 14, 2016 of $7.08 per share to a closing price on January 19, 2016 of $5.92 per share, on heightened average trading volume of 1.28 million shares per day, damaging investors.

29. On March 8, 2016, PSG again revised downward its guidance for fiscal year 2016. In a press release issued that day, PSG attributed the revision to "a write down of the receivable balance from a U.S. national sporting goods retailer that has filed under chapter 11 [The Sports Authority] and the related anticipated loss of sales from this retailer," "an anticipated reduction in sales, particularly due to weakness in the baseball/softball market," and "additional bad debt reserves primarily for certain U.S. hockey customers and the related anticipated loss of sales from such customers[.]" In the press release, Davis cited "customer credit issues" as an "adverse market condition[]" impacting the Company. On this news, shares of PSG fell $5.75 per share or over 66% to close at $2.91 per share on March 8, 2016, on trading volume of 18.6 million shares, damaging investors.

30. On March 14, 2016, the *New York Post* published an article entitled "Bauer's Parent Company Questioned About Misdating Earnings," stating that "[c]ustomers told former PSG Chair Graeme Roustan that the company had asked them to misdate earnings, a source with direct knowledge of the situation said." On this news, shares of PSG fell $0.41 per share or over 10.35% to close at $3.55 per share on March 15, 2016, on an average two-day trading volume of approximately 2.29 million shares, damaging investors.

13

31.     The revelations continued. By the end of the Class Period on October 28, 2016, among other things: (1) PSG had announced a non-cash total impairment of *$210 million* – triggered by the weakening sales cycle that had materialized in response to PSG's high-risk sales practices – in April 2016; (2) the U.S. Securities and Exchange Commission had opened an investigation into PSG that looked into the same issues raised in this litigation; (3) the Canadian securities regulator (the Ontario Securities Commission) opened its own similar investigation into PSG; and (4) PSG's Audit Committee had initiated an internal investigation into the Company's financial statements that involved the same issues raised in this litigation and which ultimately put in motion the final cascading of events leading to PSG's bankruptcy.

32.     That internal investigation, prompted by KPMG's increasing scrutiny of PSG's misrepresentations, was the final straw. KPMG – which had expressed repeated serious concerns about PSG's high-risk sales practices – refused to certify PSG's audited financial statements until the Audit Committee's investigation was complete. But the materials the Audit Committee then disclosed – which included evidence of high-risk sales practices with serious accounting implications, shrouded by woefully deficient internal controls – did not assuage KPMG's concerns. PSG was thus forced to delay the filing of its 2016 Annual Report and audited financial statements until it was too late: by failing to file those documents, PSG breached the terms of its two massive loan agreements with its creditors, forcing it into bankruptcy and wiping out hundreds of millions of dollars in shareholder value. PSG's share price during the Class Period reached a high of $21.65. By November 1, 2016, the first trading day after the formal announcement of the bankruptcy filing the share price had cratered to $1.67 on a volume of 8.7 million trades.

## JURISDICTION AND VENUE

33.      The federal securities claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5]).

34.      This Court has jurisdiction over the subject matter of the federal securities claims pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

35.      Venue is proper in the Southern District of New York pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b), given that many of the acts and practices complained of herein occurred in this District as the Company's stock was traded on the NYSE during the Class Period.

## PARTIES AND RELEVANT NON-PARTIES

36.      Lead Plaintiff **Plumbers & Pipefitters National Pension Fund** engaged in the transactions listed in the attached certification during the Class Period and was injured as a result of Defendants' false and misleading statements and omissions. Lead Plaintiff is a multi-employer plan that provides benefits to more than 150,000 participants associated with more than 4,600 employers. Lead Plaintiff's primary place of business is 103 Oronoco Street, Alexandria, Virginia 22314.

37.      Bankrupt non-Defendant **Performance Sports Group Ltd.** ("PSG") was a designer, developer, and manufacturer of sports equipment and related apparel. PSG stock traded in an efficient market on the NYSE during the Class Period. The Company's stock has been delisted from the NYSE and now trades on the OTC market. PSG headquarters were located at 100 Domain Drive, Exeter, New Hampshire 03833.

15

38.     Defendant **Kevin Davis** ("Davis") served as CEO and a director of PSG until March 22, 2016, when he was involuntarily terminated as CEO by the Board of Directors. While he was CEO, Davis was a signatory on each of the Company's publicly filed documents during the Class Period and was directly responsible for overseeing the revenue recognition policies and progressive sales structure of PSG's business.

39.     From the start of the Class Period through December 14, 2015, Defendant **Amir Rosenthal** ("Rosenthal") served as CFO and Executive Vice President ("EVP") of Finance and Administration of PSG. On May 28, 2015, Rosenthal was appointed to a newly created position of President of PSG Brands, in which he became responsible for overseeing PSG's portfolio of brands, including Bauer, Mission, Maverik, Cascade, Inaria, Combat, and Easton. Following his appointment as President, Rosenthal retained the day-to-day responsibilities of CFO, including serving as a signatory on all of PSG's public filings, until December 14, 2015. Rosenthal, as CFO and EVP of Finance, was directly responsible for PSG's sales and revenue oversight and its credit procedures. Rosenthal was appointed as interim CEO following Davis' departure until June 8, 2016, when Harlan Kent was hired as CEO of PSG. On October 31, 2016, PSG announced Rosenthal's departure from the Company.

40.     Davis and Rosenthal are collectively referred to as the "Defendants."

41.     Internal PSG documents show that Defendants had access to adverse undisclosed information about every aspect of the Company's business. Both attended Board of Directors' meetings. Both attended meetings of the Board of Directors' Audit Committee. Davis and Rosenthal often spoke with one another and kept in constant touch regarding many detailed aspects of PSG's business. Both were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information concerning the Company

16

and its business. Davis and Rosenthal were both involved in drafting, producing, reviewing, and disseminating the Company's public statements (*e.g.*, SEC filings, press releases, presentations to investors) and non-public statements (*e.g.*, correspondence on behalf of the Company with major shareholders, analysts, and employees).

42.     Both also understood that, as officers and controlling persons of a publicly held company whose common stock was and is registered with the SEC pursuant to the Exchange Act, they had a duty to disseminate prompt, accurate, and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded common stock would be based on truthful and accurate information.

43.     Both were also involved in the setting, management, and revision of PSG's sales targets, earnings guidance, and forecasts, and thus both were deeply involved in the management of PSG's sales practices and the assessment of whether PSG would hit its relevant sales targets. As PSG told the Ontario Securities Commission in a letter dated May 16, 2016, after the Commission began investigating PSG's disclosures to the market: "Sales and earnings are internally forecasted by PSG on a monthly basis, based in part on booking orders, planning orders, repeat orders and other orders, but also based on other factors considered to be relevant by management . . . . Preliminary forecasted numbers are then reviewed and vetted internally by PSG senior management, including its ***CEO*** [Davis, then Rosenthal], ***President of PSG Brands*** [Rosenthal], ***CFO*** [Rosenthal, until he became CEO], EVP of Hockey, EVP of Baseball/Softball

and the sports general managers, prior to forming the basis for the Company's quarterly earnings guidance[.]"

## SUBSTANTIVE ALLEGATIONS

44.   The sources for Lead Plaintiff's allegations regarding Defendants' fraudulent conduct were derived from the investigation of Lead Counsel, which included, among other things: (1) an interview of W. Graeme Roustan, the former Chairman of the Board of Directors of Bauer and shareholder of PSG; (2) review of statements made by Ronald Rugal, president of B&R Sports, a Bauer retailer, published in an article in the *New Hampshire Business Review*; (3) interviews of former PSG employees who worked at PSG during the Class Period and/or immediately before or after the Class Period and current and former customers of PSG with first-hand knowledge of PSG's sales tactics; (4) review and analysis of internal Company documents pursuant to the terms of a November 1, 2017 settlement agreement between Lead Plaintiff and the Class, and the Equity Holders and Debtors in PSG's bankruptcy proceeding.

45.   The accounts of four Confidential Witnesses are discussed in this Complaint. **CW1** was a sales representative and independent contractor at Bauer for 29 years until his contract was not renewed on February 1, 2016. CW1 reported to regional sales manager Matt Hayes ("Hayes"), who reported to Paul Healey ("Healey"), Bauer's then-Vice President of Sales, North America. CW1 also reported to Bryan McDermott ("McDermott"), Bauer's Business Director for North America. **CW2** is the store manager of a Bauer customer located in Summit, New Jersey. CW2's store has purchased products from Bauer since the early 1990's. **CW3** is the co-owner of a Bauer customer based in Salem, New Hampshire. CW3's company has six additional locations in Massachusetts and New Hampshire. **CW4** is a franchise owner of an Easton baseball/softball customer based in Milwaukee, Wisconsin.

A. **Determined to maintain the perception that PSG was continually growing its sales and revenue numbers, Davis and Rosenthal enabled, oversaw, and concealed PSG's use of high-risk sales practices.**

46.     PSG pushed its sales staff to increase its sales numbers without regard to market demand or customer requirements. That tone was set by Davis and Rosenthal, who were determined to portray an image of strong sales growth to PSG's investors.

47.     This culture began well before the Class Period. At a staff meeting on November 19, 2014, for example, according to internal Company emails, Davis berated Healey, the Vice President of Sales for Bauer Hockey (North America), in front of his colleagues, telling him that "*[m]issing 3 qtr Ebitda is completely unacceptable.* Praying for q4 revenue doesn't work for me. Cut the hell out of costs and make 100% certain the year comes in. Hope is not a plan. *Q2 current number[s] are an absolute. Don't miss them. Rev and margin. Better to exceed. Team biz has little creditability [sic] at this point given increased costs, terrible inventory, and lower sales. I'm unhappy. . . . Don't promise . . . and f[\*]ck it up*." Davis and Rosenthal both believed this type of extreme messaging was effective. In an email later that day, Davis asked Rosenthal whether his language was "[t]oo strong?" Rosenthal responded, "Nope."

48.     Defendants' message had its intended effect: it signaled to PSG's sales staff that the goal was to obtain sales growth and meet the sales targets by any means necessary – or face the wrath of Davis and Rosenthal. PSG's salespeople, overseen and encouraged by Davis and Rosenthal, thus engaged in several types of high-risk, aggressive, and sometimes fraudulent business practices to boost PSG's short-term growth numbers. PSG, Davis and Rosenthal then concealed from investors the tactics they used to achieve that growth, the known risks those tactics posed to PSG's business, and the deficient internal control environment that was incapable of managing those risks.

49.     Specifically, PSG and the Defendants concealed from investors that PSG was engaged in high-risk and sometimes fraudulent sales practices that risked cannibalizing future, healthy sales and violating accounting rules. Instead, PSG told investors in its Form 10-K filed on August 27, 2015, for example, that "[w]e generate revenues from the sale of performance sports equipment and related apparel and accessories. We offer various ***cooperative marketing incentive programs*** to assist our sales channels with the marketing and selling of our products." (2015 Form 10-K at 51.) The truth was quite the opposite. There was nothing "cooperative" about the nature of these programs. Instead, they were high-risk, high-pressure, and sometimes fraudulent.

50.     The high-risk sales practices at PSG included the following, with various combinations and permutations: (1) using discounts punitively to pressure retailers to buy progressively more PSG-branded product, (2) using high-volume sales of discounted product (referred to as "closeouts" at PSG) to drive sales growth, (3) routinely pushing and pulling orders into quarters to meet short-term sales targets, (4) using wildly extended payment terms with retailers to enable them to take more PSG-branded product than they reasonably could to hit short-term sales targets, (5) pushing product out to customers in violation of their customer credit limits, and (6) using consignment contracts, right-of-return contracts, and other non-final contract terms, in a deficient internal control environment, to push more PSG-branded product out into the marketplace.

51.     Defendants concealed from investors their use of these sales tactics and the serious risks created by them. Those risks included cannibalizing future sales cycles by flooding the market with excess inventory that could not be sustained by consumer demand; creating supply and inventory problems, increasing the likelihood of non-payment by retailers who had been pressured to take more and more PSG product; and violating accounting rules by misstating PSG's

financials, which itself could trigger government investigations, auditor investigations and shareholder litigation.

### 1.   Punitive use of discounts

52.     To maintain the image of *increasing* growth, Davis and Rosenthal oversaw a sales program in which PSG salespeople used the threat of the loss of steep discounts as a penalty to force retailers to accept progressively greater amounts of product over time. The effect of this was to pressure retailers to accept increasing amounts of product – which PSG would record as increased sales and revenue – but to risk oversaturating the market with PSG inventory that could not be sustained through consumer demand. The inevitable consequence of this was that Defendants and PSG created an unsustainable business model: at some point, consumer demand would be satiated, retailers would no longer be able to sell all of the existing and indeed increasing amounts of PSG product on their shelves, and retailers would have no choice but to stop or substantially slow down their purchases of PSG product.

53.     Confidential witnesses confirmed the use of these practices. As CW2, a manager for a Bauer retailer, recalled, there was strong pressure to go along with PSG's and Defendants' tactics if you wanted to sell Bauer's merchandise. CW2 remembers being told frequently by Bauer representatives to either increase the size of orders or risk losing the store's wholesale discount. This same "threat" was made to CW3, the co-owner of a Bauer retailer, who, in a meeting with Healey in the summer of 2015, was told that if CW3's store did not increase its retail bookings or purchase orders by at least 15%, CW3's store would lose its existing discount. CW2 knew that even if increasing the store's order was not necessary, it was cheaper to comply than lose the discount on the existing order.

54.     As CW1, a former independent contractor for Bauer, put it, "we were 'asked' through sales programs to ask [retailers] for increased volume from the previous year to maintain current or increased discounts. Dealers complained about the increase due to larger dealer shelf space already given to Bauer and the fact the dealer's business wasn't growing." CW1 also recalled instances where he was asked to work with retailers to accept early deliveries. For instance, if a product was scheduled to ship to a retailer in September, PSG would ask the retailer to accept the product in early August.

55.     Davis and Rosenthal knew that these strong-arm tactics were punitive in nature and risked flooding the market with unsellable inventory (referred to within PSG as "stuffing the channel"), but their interest in short-term growth and meeting quarterly targets took priority over long-term, sustainable growth. One of those warnings came early – before the Class Period – from Ed Kinnaly, the then-longtime Executive Vice President of Bauer hockey, who warned Davis and Rosenthal as early as April 2013 that the hockey marketplace in particular was "[u]nhealthy" and "bloated." When Kinnaly proposed restructuring PSG's sales programs to "command a higher percentage of key customers OTB [open-to-buy]" by using an "'opt-in' approach *versus 'gun to head'*" approach that Davis and Rosenthal had historically preferred, Davis and Rosenthal fired Kinnaly.

56.     Those warnings about the risks of the "gun to head" approach continued throughout the Class Period. For example, two reports Rosenthal emailed to Davis on December 30, 2015 (reports discussing both 2014 and 2015) contained the following retailer comments on the Company's sales tactics: "[u]nreasonable and unrealistic booking terms," PSG "expect[s] you to increase booking amount by 16% each year in order to maintain discounts"; "[t]hey [PSG] are getting arrogant and hard to deal with when it comes to programs and discounts"; "the buying

22

[p]rogram is terrible," "[i]t is complicated, and I believe it is unfair," "[t]hey [PSG] force you to buy and try to *load us up*"; "PROGRAMS TOO HIGH," "***DEMAND NOT STRONG ENOUGH TO DICTATE MORE DOLLARS EVERY YEAR***"; "[d]iscounts are very poor if you do not book huge numbers"; "[p]rograms are difficult to achieve," "I do my best to support and sell all other brands because of bauers horrible programs"; "[a]s a long time loyal dealer it feels like *we are being asked to order more and more each year just [to] maintain our discount*"; "*[b]ooking programs penalize retailers*"; "their programs become harder to achieve max discounts and as discounts diminish it is easier to move dollars to max out at other suppliers," "arrogance and programs leave an opening for other suppliers."

57.     Both Davis and Rosenthal understood the risks and discussed them with one another. After reviewing the reports, Rosenthal observed in a December 31, 2015 email to Davis that "[d]ealers feel 'forced into buying product' due to programs," and noted that "[w]e should relook at programs." Davis similarly noted in a December 30, 2015 email to Rosenthal that the "[n]et is not great. Many of the comments are anti-retail. Brand has taken a hit for sure YOY. . . . Of course we have to consider the size of the dealers in many of these but still *a trend is a trend*. The trust factor and arrogance is a very clear message."

58.     These comments were corroborated by what Davis and Rosenthal could see in the industry, or recklessly disregarded. Consumer interest in the sports themselves (*e.g.*, hockey, baseball) was not growing quickly enough to sustain Davis' and Rosenthal's drive for increased sales growth. Statistics published by USA Hockey showed that player membership grew by less

than 2% during the Class Period, yet PSG insisted that its retailers increase orders by 10-15% or more every year.[1]

59.     Even with all this information, nothing changed. As one retailer, Ronald Rugal of B&R Sports, described to the *New Hampshire Business Review* in an article dated September 1, 2016, PSG's practice during the Class Period was to "jam orders down our throat, to take orders early, to overstock, oversupply, over-inventory us. They said it would all work out, ***and then things hit a wall***." Rugal stated that this was done to meet quarterly numbers.

60.     In any event, by January 2016, it was too late. The market had been so jammed with product due to PSG's punitive use of discounts and its other high-risk sales practices that the concealed risk of oversaturation had begun to materialize in PSG's weakening business and the softening of the sports equipment market in January 2016.

### 2.     Flooding the market with cheap inventory ("closeouts")

61.     As PSG explained to the Ontario Securities Commission, a "closeout" or "close-out" order at PSG during Davis' and Rosenthal's tenure was "an order placed towards the end of the relevant sport selling season where PSG ha[d] certain excess inventory related to products at the end of their life and typically offer[ed] a promotional offer or discount in an effort to reduce such inventory." By their very nature, closeouts offered PSG an opportunity to push excess, unsold PSG product out into the marketplace and generate some revenue, but at a lower margin – and sometimes at a loss.

62.     Relying too much on closeouts was risky, particularly when it was repeatedly used to reach sales targets. Closeouts could be used to hit quarterly sales and earnings targets, but even

---

[1] According to USA Hockey, player membership in 2014-2015 was 533,172. In 2015-2016, that figure grew by just 9,411, or 1.7%, to 542,583. In fact, between the 2012-2013 and 2013-2014 seasons, the number of hockey players had actually decreased by 899 players.

when they did, they came at a higher cost (smaller margins) to PSG. Closeouts also risked over-saturating the market (or stuffing the channel) with PSG product and cannibalizing future sales cycles. And when combined with some of the other high-risk sales practices PSG used and overly relied upon, closeouts could cause accounting violations and trigger non-collectability risks if the closeouts were with retailers who were in excess of their customer credit limits, had extended payment terms, or were subject to consignment agreements.

63.     In May 2015, as PSG reported to the Ontario Securities Commission, the Company completed a "large close-out order of approximately $2.3 million from Team Express," which was in addition to a $1.4 million close-out order PSG had done with Team Express the prior baseball season. This large order was particularly risky: PSG knew that Team Express was past due on its account, it knew that the order vastly exceeded (and violated) PSG's customer credit limit for Team Express, and it knew that the baseball/softball markets were over-saturated with inventory.

64.     Davis and Rosenthal received warnings about these practices and their risks. As CW3, an experienced veteran hockey-equipment retailer, recounted, Healey and Davis both knew, for example, that the hockey equipment market was fully saturated during the Class Period.

65.     Davis and Rosenthal also received explicit warnings from Graeme Roustan, the former Chairman of the Board of Directors of Bauer. He privately advised them and the rest of the Board of Directors in a letter dated June 12, 2015 that he had "received credible information . . . that extreme discounting is taking place on some orders simply to make quarterly numbers. One might speculate that PSG perhaps is dumping products at below cost to make quarterly numbers." Roustan warned in particular that this practice risked cannibalizing future sales ("such conduct emulates a Ponzi scheme of sorts").

25

66.     Davis and Rosenthal purported to address Roustan's accusations, but their insatiable appetite for revenue and dislike of the light Roustan was shining on their tactics caused them to take extreme measures to silence him. They threatened Grant Thornton, the accounting firm Roustan retained to survey PSG's retailers about these practices, with litigation, causing Grant Thornton to withhold the results of the survey from Roustan. They threatened Roustan himself with litigation. And they claimed (incorrectly) that Roustan's warnings were made-up.

67.     But they were not made-up. After Roustan first issued his warnings in May and June 2015, David Lockridge, the Director of Sales for Easton baseball/softball, observed in a February 2, 2016 email to an Executive Vice President at Easton baseball/softball that Roustan had been correct about the risks: the "[c]hannel is stuffed and not in need of inventory . . . [w]e are all out there working and selling but *it seems that all the close outs we've built and shipped into the market, and all the pull forwards we've done are catching up to us*." Healey, the Director of Sales for Bauer hockey, similarly observed in a May 10, 2016 email to Cathy Tymowski, then PSG's Director of Finance, Hockey, and Rich Wurtherle, PSG's Executive Vice President, Hockey, that PSG had become "*so used to jamming we are losing sight of what's real and healthy*," and asked his colleagues to "*[l]ook at the US market and what we did to hit numbers over the last number of years*," which included "*Q2 and Q3* [closeout] *programs [that] drove very unhealthy activity.*"

68.     As PSG's business was deteriorating, some PSG salespeople in June 2016 tried to actually collect payment from the retailers they had stuffed with closeout and excess inventory in violation of those retailers' credit limits with PSG. The responses were telling: the retailers canceled millions of dollars in orders. In a June 10, 2016 email, one retailer wrote to his PSG sales representative that "*your email . . . disgusted me!* While I won't go into the details about how

26

much we've done for Bauer ($7MM in payments *to meet your year[-]end needs*, *taking product when we don't need it* and investing in Easton), suffice it to say that your email has resonated with me. . . . *We don't need you to do any favors for us with the closeouts (that don't generate any profit for Bauer). Keep them!* We've satisfied our needs with a $1.2MM buy *from one of your competitors* at much higher margins. . . . I've asked Rob to *cancel $1MM worth of Easton orders. We never wanted this stuff in the first place* and bought it only as an accommodation to Bauer."

69.     Davis and Rosenthal knew all this but recklessly disregarded the risks of the sales practices they instilled and oversaw. Indeed, when Davis was fighting for his job beginning in February 2016, he and Rosenthal made several critical admissions to the Board of Directors, as indicated in Davis' February 24, 2016 notes, entitled "Outline for Board Discussion," which Davis provided to Rosenthal via email that day. One was that they knew but "didn't communicate" that PSG's "*excess closeouts*" contributed to making the likelihood of Easton meeting its sales and earnings targets for fiscal year 2016 "*[h]igh risk*." Another was that he and Rosenthal had failed to check information they had a duty to monitor: under "Didn't know but[] should have," Davis wrote that "Baseball sell through was declining through holiday (Oct/Nov [2015]). Almost all major accounts across the board were seeing softness in BB/SB, especially bats."

70.     The risks posed by excess closeout and discount sales – that the market would become oversaturated, and retailers would no longer be willing to make new purchases – predictably materialized. By March 2016, it had become apparent within PSG that the baseball and softball market had in fact collapsed *because of* PSG's closeout tactics: two of PSG's largest customers – The Sports Authority and Team Express – went bankrupt after PSG had pushed both to the brink with its high-risk sales tactics. As described by Ricky Helland, the Director of Finance for Easton baseball/softball, in a March 29, 2016 email to Mark Vendetti and Todd Harman: "[t]he

27

slowdown in the retail environment has been caused by a few things; *one being the massive amount of closeouts that we put into the marketplace last year* [2015] *which has stuffed [Easton's customers'] inventory which still hasn't been sold through*[.]" The same was true for hockey: for instance, in a May 9, 2016 presentation that went to Rosenthal and other PSG senior management, retailers howled that "Supply exceeds demand ***," that there was "too much product in market," that "*Bauer's growth expectations fueling this,*" and that PSG's competitor (CCM), by contrast, had "Less closeouts" and was more careful about "Inventory monitoring" – unlike the relentless "*Growth focus from Bauer.*"

### 3. Routine order "pulls" to hit quarterly sales targets

71.     When Davis and Rosenthal set the tone at the top – where missing sales targets was "completely unacceptable" and those forecasted targets were "absolute[s]" – they created the conditions in which PSG's sales, accounting, and finance departments moved orders into (typically earlier) quarters to hit targets when current sales patterns suggested there would be a shortfall from those targets. This practice was so rampant within PSG that it had its own name: a "pull." Because PSG purportedly recognized revenue when orders shipped to retailers, a "pull" was PSG lingo for an order that was being shipped earlier than originally planned, and often so that PSG could hit a quarterly sales target.

72.     Davis and Rosenthal misled investors about this practice throughout the Class Period. They boasted about their quarterly sales and revenue growth, neglecting to mention anything about the nature of that growth (that it sometimes was maintained by pulls from later quarters) or the risks associated with the mechanisms used to maintain that appearance of growth. Moreover, PSG's 2015 Annual Report stated that "our customers may cancel orders, change delivery schedules or change the mix of products ordered with minimal notice. *We may also make*

*strategic decisions to deliver and invoice product at certain dates in order to lower costs or improve supply chain efficiencies*." (2015 Form 10-K at 30.) This, too, was false and misleading: PSG at the time was *often* (not "may") making tactical decisions to deliver and invoice product at certain dates, and it was doing so to ensure that the Company would hit its quarterly forecasted sales targets, not "to lower costs or improve supply chain efficiencies."

73.     This constant pulling of orders had substantial risks to PSG's business. An executive-level PSG presentation dated July 28, 2016 stated that risk succinctly: "*Quarter end pull forwards as a strategy to meet financial targets not sustainable*." Pulling orders cannibalized future orders for the sake of maintaining the appearance of quarter-over-quarter growth. If it were done often enough, PSG would inevitably run out of orders to pull forward ("not sustainable"). Pulling orders would also cause supply chain *inefficiencies* – it disrupted the order flow process and sometimes would leave PSG without inventory for future orders, causing even more sales losses. Pulling orders further risked violating accounting rules governing revenue recognition; an order scheduled to be shipped in June 2014 (Q1) pulled into May 2014 (Q4 of the prior fiscal year), for example, needed to have its accounting corrected, but if the retailer wanted to make its payment on the originally scheduled date (which happened often), then PSG would have to ship in May but not recognize revenue until the *originally scheduled* shipping date (June) – a recipe for errors and particularly significant ones in an internal control environment as deficient as that of PSG, as described *infra*.

74.     Multiple confidential witnesses have also further confirmed PSG's order pulling tactics. CW3 regularly received calls during the Class Period from PSG headquarters asking whether CW3 would accept shipments of orders early. CW3 stated that orders were shipped early "to make [PSG's] numbers in a certain quarter." And when product was sent to retailers prior to

its scheduled shipping date, retailers did not have to pay or initiate any scheduled payment plan until the agreed-upon payment date, as both CW3 and CW4 recalled.

75.     These practices were not restricted to one business unit. Things were no different for PSG's baseball/softball brand, Easton. For example, CW4, an Easton customer during the Class Period agreed to accept early shipment of a large order in return for free shipping. At one point, in October or November 2015, CW4 attempted to contact CW4's Easton representative to downsize a large baseball equipment order that was placed for 2016. However, the Easton representative ignored CW4's request, and instead the full order was delivered more than two months early.

76.     Not only did PSG coerce its retailers to order larger quantities, it also demanded that stores place their orders earlier and earlier, as CW2 recalls. During the Class Period, Bauer insisted that CW2 place the store's order a full year early which was extremely difficult and unrealistic because CW2 would not know what degree of demand there would be for the product that far in advance. Similarly, CW3 had to place the store's order whenever Bauer told him to, even if it was a year early. If CW3's shelves were already fully stocked, it was impossible to forecast what would be needed the next year, but PSG did not care, according to CW3 – it just needed the order.

77.     Internal Company documents corroborate the confidential witness accounts. Davis and Rosenthal both were familiar with and looked to pull forwards as tools to meet targets. After Davis berated Healey for failing to hit the 2014 Q2 and Q3 targets ("Don't promise . . . and f[*]ck it up"), Healey worked with Rosenthal and others to make the Q2 targets by pulling orders from December into November, the end of the quarter (for instance, one PSG employee summarized a Bauer Hockey sales meeting in a November 18, 2014 email as follows: "***Everyone knows to ship by 11/30***"). Faced with the shortfall in Q3 2014, a Combat baseball employee suggested in a

January 17, 2014 email to Davis that if Q3 was "super important" to him, "we could probably make that forecast *by pulling some Q4 orders in early*."

78.     At Easton baseball/softball, Davis and Rosenthal pulled forward so much that they hit the inevitable wall. In a February 2, 2015 email, Easton executives advised Davis and Rosenthal that to meet a Q3 2015 shortfall, they were "working to understand what orders can be pulled in from March [Q4 2015] to reduce the overall Q3 risk." These pulls starved Easton of orders,[2] but Davis and Rosenthal continued mortgaging Easton's future: on November 18, 2015, an Easton employee informed Rosenthal by email that Easton baseball/softball had again "pulled close to *$11m* in to Q2 and [that] demand is down for H2 compared to last year we should also discuss full year expectations as Q3 in particular is looking very challenging." In a February 18, 2016 email, Rosenthal explained to Davis that "the sense was we should be able to recover the revenue [of the $11 million pull] in H2 through a variety of initiatives. But then team express, TSA and the market softness hit us so it didn't come back." Davis responded, "Let's discuss tomorrow."

79.     The risks associated with all this pulling forward materialized as expected. As Todd Harman, the then-Executive Vice President of Easton baseball/softball, explained to Rosenthal in a January 15, 2016 email, Easton's business was failing in part because "*[t]he constant pull forward activity and especially the Q2 close has created a labor and capacity issue at the SLC DC* [Salt Lake City distribution center, one of PSG's shipping warehouses]. Due to the uneven flow of orders we are losing labor during slow periods and then as we try to ramp up to meet demand during the last few weeks of quarters we have a bandwidth/capacity issue." The same was true at Bauer: a November 3, 2015 presentation observed: "*Sales miss driven by pull into FY15*

---

[2] For instance, in a May 19, 2015 email regarding Q4 2015, Robert Diebold, Easton's Vice President for baseball / softball and lacrosse sales, wrote: "We currently have only $500K in June after we execute all the pull forward we have promised and only $700K in July on the books right now."

*and lower bookings/repeats due to high inventory levels at US key accounts*; partially offset by earlier Nexus launch."

80.      David Lockridge, the then-Director of Sales for Easton baseball/softball, agreed that the pull forwards (and PSG's other high-risk sales practices) caused Easton to run out of orders to pull forward: in a February 1, 2016 email, he explained the problem was that "all the close outs we've built and shipped into the market, and all the pull forwards we've done *are catching up to us*," and so "all of our usual partners are unable to help to the extent we've seen in the past partly *because they already took their orders early to help our Q2*[.]" In a notable sign of how dysfunctional PSG's sales culture had become under Davis and Rosenthal, Lockridge proposed another high-risk PSG sales tactic – "go[ing] deeper on discounts and incentives," *i.e.*, more closeouts and discounts – as a way to try to compensate for the closeouts and order pulling that had caught up to PSG.

81.      Davis and Rosenthal received warnings about the risks associated with the use of pulling orders to hit quarterly sales targets. For example, according to CW3, Kinnaly warned Davis and Rosenthal as early as 2013 that pulling orders forward or "trade loading" to make their numbers would eventually catch up with PSG. Rather than heeding his warning, they fired Kinnaly for speaking out.

82.      In another set of warnings, Roustan wrote letters to Davis and Rosenthal (and the Board of Directors) on June 12, 2015, and December 24, 2015, explaining that he had gathered evidence indicating that an "area of concern is that, over the past two years, several retailers have been asked by Performance Sports Group Ltd. to move orders forward into an earlier quarter." After Davis and Rosenthal thwarted Roustan's access to the data collected by Grant Thornton, Roustan collected his own data via SurveyMonkey that showed that the majority of the sample of

retailers polled stated that they had been asked by PSG to accept orders in earlier quarters (the rest of the retailers responded "Not Sure").

83.    The risks of "pulling" orders forward to create a false impression of growth were foreseeable. After Harlan Kent was appointed as the CEO and tried to remedy the mistakes of Davis and Rosenthal, Lockridge observed in a July 11, 2016 email to his colleagues that, with PSG now under new leadership in the form of Kent, salespeople had to "pay attention to the monthly flow of when you think the product will actually ship," because "*[w]e do not intend to pull orders forward like we did last year to artificially hit a quarter* so the sales curve should look much different than last year." His comments reflected what was common knowledge at PSG: the "pulls" and high-risk sales practices to hit sales targets was not by itself indicative of a healthy and sustainable sales cycle – they were risky practices designed to maintain "artificially" the appearance of increased growth.

### 4.    Extended payment terms

84.    Another high-risk sales practice was PSG's use of wildly extended payment terms with its retailers. During the Class Period, PSG had more than 35 different payment terms, and many of them allowed repayment over 90, 120, 180, or 200 or more days. These extended terms were another mechanism for PSG to push more of its product out to the market and boost short-term sales growth numbers, in particular with financially troubled accounts that could not afford to take on the amount of product PSG wanted to sell.

85.    The risks of using these extended payment terms were considerable. Because PSG often used these terms with financially troubled accounts, non-collectability became an acute risk. Moreover, by recognizing sales in one quarter (when the product shipped) but not receiving payment for that product until later quarters, PSG magnified its risk of non-payment and of

accounting rule violations, *i.e.*, recognizing revenue in the wrong quarter. As one PSG employee warned in a January 22, 2016 email to Vendetti, then PSG's CFO: "we offer terms to many customers in excess of 120 days. . . . *we may have a revenue recognition issue at some point soon as it would be considered 'consignment' sales. There is no doubt that many of our independent customers only pay us when they have sold our products*." That same employee repeatedly sounded the alarm on these terms. In a December 29, 2015 email to Robert Diebold, Easton's Vice President of baseball / softball, he wrote: "We have currently about *35 different payment terms* while I think we should aim to have less than 10. In that process we should also aim to *eliminate any terms over 120 days*. From an accounting perspective *we risk recognizing revenue when we in reality are funding their inventory (like consigned inventory) and in some cases much beyond that*."[3]

86.      Davis, Rosenthal, and PSG senior management ignored these warnings and others like them. A November 2013 email sent to Davis and Rosenthal reveals how PSG thought about payment terms (and other high-risk sales practices) as tools they could use to hit targets: "Today and in the last couple of days we have had several internal meetings with all involved departments, to check all different possibilities incl. *credit, push/pull, payment terms, crazy close-out deals etc…* We have asked favors from KA to take partial Q3 shipments[.]" Later, in September 2015, when a retailer (Monkey) complained that they were overloaded with inventory, Rosenthal personally approved that retailer's request for an extension of terms on their payment; in an indication of how widespread the practice of using extended terms was, he approved the extension (by 60 days), noting in a September 3, 2015 email that "*[w]e have done far more for far less*

---

[3] The same employee, Jasper Rathje, wrote a similar email to the Vice President of Finance for PSG on December 29, 2015, stating that "[e]xtended payment terms in an arrangement could also indicate that *collectability of the fee is not reasonably assured*." He raised the issue again to other senior employees in emails on January 6 and January 22, 2016.

*financially attractive customers*." Others within PSG realized how problematic this practice was (R. Wuerthele asked A. Rosenthal in a September 3, 2015 email, "***How does extending payment terms help Naaman [Monkey] reduce his inventory???***").

87.     When confronted with warnings about the extended payment terms, PSG senior management shut down any efforts to change them – because doing so would hurt PSG's relentless push to pursue more and more sales growth. After receiving one such warning, Lockridge, for example, agreed in a January 25, 2016 email that it "***sounds crazy that we have 35 different payment terms***," and that "[r]atcheting back would be good," but he acknowledged that changing PSG's practices on this point would be impossible: "our customers will just take the product later which will be a major shift in shipments. ***We just have to be willing to accept that and I'm not sure we are right now***." Others within PSG were terrified of the prospect of these warnings gaining traction – with Davis and Rosenthal at the helm, they knew they would not be able to sustain the appearance of growth without extended payment terms: an Easton Sports sales manager sent David Lockridge, Easton's Director of Sales for baseball / softball, an email on January 25, 2016, begging him to "[p]lease ***shut this down quickly before it gains any traction*** . . . *[r]educing our terms . . . would hurt our business*." Lockridge agreed in a January 26, 2015 email that it was "not feasible" to eliminate payment plans that triggered the first payment 120 days after shipment.

88.     The risks materialized as expected. The extended payment terms indeed raised revenue recognition violations. KPMG – which was intensifying its audit in mid-2016 – expressed doubt about its ability to certify PSG's fiscal year 2016 financial results due to its concerns about how PSG's high-risk sales practices were causing accounting rule violations. Weeks before PSG filed for bankruptcy, Vendetti noted in an April 27, 2016 email that "in general ***KPMG has become increasingly wary of how we recognize revenue*** (again we have not changed any practices in this

FY) *related to the extended terms and several cases where PSG found instances of invoices with guaranteed sales where the accounting was handled incorrectly at the time of shipment*."

89.     Davis and Rosenthal, however, continued to mislead investors by claiming that PSG's failing business was due to unforeseen, unanticipated, act-of-God-type circumstances. For example, as retailers struggled to sell PSG inventory in late 2015 and 2016, Rosenthal told investors in April 2016 that "third-quarter results were impacted by *adverse market conditions and related customer credit issues*. Specifically, the baseball/softball market is experiencing an *unexpected and significant downturn in retail sales across all product categories*, particularly in our important bat category. *The impact of this downturn is in addition to the Chapter 11 filing by one of the largest US national sporting goods retailers, which also impacted sales for our baseball and softball products.* In light of these events, including the bankruptcy of an Internet baseball retailer in our second quarter, we increased our bad [debt] reserves in the third quarter for certain of our US hockey customers as well as our baseball/softball customers."

90.     This statement misled investors in several ways. By tying "customer credit issues" to "adverse market conditions," Rosenthal concealed that PSG had played a substantial role in *causing* those market conditions by flooding the market with inventory and cannibalizing future sales cycles. Further, his reference to the "impact" of certain retailer bankruptcies and attendant customer credit issues omitted that PSG – under Defendants' oversight – had entered into extended payment terms (and other high-risk sales arrangements) with many of those retailers, even after Davis and Rosenthal had information indicating that those retailers were financially troubled, thus recklessly magnifying the impact of those bankruptcies on PSG. As Mark Vendetti, PSG's then-Chief Financial Officer, contemporaneously acknowledged to Rosenthal in a May 18, 2016 email that: "*we have been using extended terms to help drive sales to financially troubled accounts*."

36

In a July 7, 2016 email, Vendetti explained to Harlan Kent, PSG's new CEO, that while "[t]hese lengthy terms [of 60, 120, 180, and 210 days] may have helped generate sales," they "ultimately helped contribute to FY 16 results of $10M in sales and $8M in EBITDA *loss*[.]"

### 5. Pushing sales to customers in violation of customer credit limits

91.     In their zeal to grow quarterly numbers and maintain the appearance of sales momentum, Davis and Rosenthal oversaw a crumbling internal control environment in which PSG effectively lent tens of millions of dollars to retailers in violation of PSG's own retailer credit limits. PSG's sales practices frequently did not require retailers to pay cash in advance for inventory. Instead, retailers used payment plans (often the extended payment terms discussed above) under which PSG would record revenue when inventory shipped, but would effectively provide the retailer with a credit line in exchange for a promise to pay over time. "Aging" was PSG's internal lingo for measuring the amount of money that a retailer owed PSG that was past due the inventory shipment date, and/or past due the payment due date(s).

92.     In this business model, the risks of exceeding customer credit limits were foreseeable – indeed, they were obvious. If PSG lent a retailer a certain amount of money that the retailer had no reasonable way of paying back, or paying back in a timely manner, it would cause collectability problems, revenue recognition rule violations, or force PSG to extend its payment terms, which would then raise similar revenue recognition and collectability problems as those triggered by PSG's use of extended payment terms (as discussed above). If a retailer suffered from financial stress or filed for bankruptcy, ignoring PSG's customer credit limit in the quest to push out more product would magnify the financial impact of that bankruptcy on PSG. Further, failing to maintain and adhere to customer credit limits was a violation of internal controls over financial

reporting, and risked auditor scrutiny, internal investigations, regulatory investigations, and shareholder litigation.

93.     All of those risks materialized in precisely that way. When Team Express filed for bankruptcy, for example, PSG advised KPMG in the responses it recorded on an "Internal Controls Deficiency Evaluation Template" on January 8, 2016 that PSG's "***Customer credit limits were exceeded for both Easton (CL $1M vs high A/R of $4.2m) and Combat (CL $200K vs high A/R of $556k)***." Rosenthal similarly acknowledged to Davis in a November 22, 2015 email that "for both Easton and Combat [with Team Express], ***the credit limits were exceeded, but this is another example of an account where the credit limits were routinely exceeded.***" The interim Finance Director at Easton baseball / softball suggested in a December 11, 2015 email that Team Express' credit limit should and would have been much lower "if they didn't have ***the high close-out sales***. The high close-out sales brings the requirement up to that $3-4M range." In other words, PSG's mixing of high-risk sales practices – unprofitable closeouts jamming the market with inventory *combined* with PSG lending in excess of a financially troubled retailer's credit limit – had created significant risks to PSG's business (non-collectability) and caused substantial losses to investors when PSG's business collapsed as a result.[4]

94.     Neither Davis nor Rosenthal mentioned this in their statements to investors. Instead, they would make oblique statements: "***Baseball/Softball EBITDA in the second quarter decreased 31%*** (including and excluding the impact of foreign currency) ***to $7.9 million, which was largely driven by a bad debt write-off related to outstanding receivables for an internet baseball retailer that filed for bankruptcy reorganization***." They withheld, however, that: (1) the

---

[4] For instance, Rosenthal wrote an email to Davis on November 22, 2015, noting that Team Express had a $4.75 million account receivable balance, and calculating that the "full write-off = ***6 cents of EPS [earnings per share]***."

"internet baseball retailer" was Team Express, (2) the magnitude of the write-off was as big as it was because PSG had used excessive closeouts and violated its customer credit limits, making the receivable *multiples* higher than it should have been, and (3) Davis and Rosenthal knew of Team Express' possible bankruptcy nearly *six months earlier*. For instance, in November 2015, still months before Team Express's bankruptcy, Rosenthal himself stated in a November 8, 2015 email that Davis was aware that "the [Team Express] A/R [account receivable] is ***~$4.0M, that they are in deep trouble, and that we are in discussions with them about alternatives***, including converting our A/R to equity. ***He [Davis] is also aware that all possibilities are on the table for them, including bankruptcy***."

95.     The scale of the problem regarding PSG's continual disregard of its credit limits was substantial. Davis and Rosenthal both knew that adherence to and maintenance of PSG's credit limits was a recurring problem – indeed, they knew it before the Class Period even began, when KPMG advised PSG of a significant deficiency in its internal controls *in August 2014*, writing to Davis that "***[t]he Company did not maintain appropriate credit limits for certain customers***."

96.     But Davis and Rosenthal did nothing to remedy these deficiencies. In a presentation by Rosenthal to the Audit Committee of the Board of Directors, a slide illustrated in vivid detail how the top 20 customers of PSG were well over (in violation of) their respective credit limits set by PSG by ***$36,265,979***. Those customers included Team Express (over its credit limit by $2,812,355, and bankrupt by December 2015), Total Hockey (over its credit limit by $8,378,471, and bankrupt by July 2016), The Sports Authority (over its credit limit by $428,293, and bankrupt by March 2016), and Sports Chalet (over its credit limit by $317,892.25 and bankrupt by April 2016).

97.     Rosenthal's response in an October 9, 2015 email – "***This is the 'punch me' slide***." – demonstrated that he understood the risks of routinely violating credit limits on this scale, as did Frerichs' response: "***CLEARLY!***" When Rosenthal asked what they should say when the Audit Committee asked why the limits were never properly adjusted, Frerichs suggested withholding that information from the Audit Committee: "ADJUSTING THE LIMITS IN MANY CASES WOULD BE A FRUITLESS EXERCISE BECAUSE ***WE'D STILL BE OVER THEIR LIMIT IN MANY CASES AND WE WOULD CONTINUE TO OPERATE IN THE SAME WAY AS WE DO TODAY. I WOULD NOT SAY [THAT] TO THE COMMITTEE***." The Audit Committee's response to this information was predictably incredulous – Frerichs referred to it in an October 16, 2015 email to Rosenthal as a "***flogging***."

98.     Despite the flogging, however, nothing changed. Davis and Rosenthal purported to resolve the problem not by controlling the limits or enforcing them, but by *raising the limits* for many of the top 20 of PSG's retailers. But even that was an unsuccessful optics trick, as the top 20 retailers were still over their credit limits by an aggregate of ***$14,745,513*** under the upwardly revised limits, and the money PSG had in effect lent these retailers by not having enforceable payment terms was no safer merely by virtue of PSG choosing to raise the limits to make itself not look so bad.

99.     PSG never effectively addressed or remedied its treatment of its credit limits. Even after the credit limit revisions, KPMG in January 2016 again discussed finding a potential significant deficiency in PSG's credit limits, nearly a year and a half after the first one. In a January 12, 2016 presentation, KPMG observed: "The current credit limit policy is ***not robust*** and each entity is responsible for creating their own policy. ***Credit limits are not reviewed / updated on a consistent basis.*** The releasing of customer orders which ***exceed their established credit limits***

40

*does not follow a consistent process*. *The potential deficiency is related to a control gap as the controls are operating as designed*." The "impact" of this was that "*[r]easonable assurance of collectability is one of the revenue recognition principles and credit limits help establish reasonable assurance*"; violating those credit limits thus risked revenue recognition violations. Alex Byrne, the sole Internal Audit Manager at PSG, observed in his April 8, 2016 responses to KPMG's "Internal Control Deficiency Evaluation Template" that "[t]he potential magnitude of a potential material misstatement is that *the entire A/R receivables balance is uncollectable*."

100.     A July 26, 2016 presentation to the Audit Committee again flagged continued deficiencies in PSG's testing of its purportedly revised policies regarding customer credit limits. By August 26, 2016, PSG's Internal Audit team admitted in its "Assessment of Revenue and Receivables Control Deficiencies [f]or the year ended May 31, 2016" that the deficiencies in PSG's credit limit internal controls had not been remediated, and would result in another significant deficiency or potentially a material weakness: "*a control design deficiency was noted related to the Company's credit limit policy* as the existing policy did not address the following critical design elements: [1] *Each entity is responsible for creating their own policy* [2] *Credit limits were not reviewed / updated on a consistent basis* [and] [3] *The releasing of customer orders which exceed their established credit limits did not follow a consistent process[.]*"

101.     When these risks materialized, they were existential. An October 14, 2016 analysis of PSG done by Ernst & Young in preparation for the Company's bankruptcy revealed that PSG's cratering net sales numbers and rising bad debt numbers in fiscal years 2015 and 2016 could be "*largely attributed to credit-challenged customers ($31.7 million and $27.0 million respectively),*

41

*in particular four bankrupt customers*"[5] – the same four customers who had been subject to PSG's toxic mix of closeouts, inventory jamming, consignment contracts, pushing and pulling, extended payment terms, and violated credit limits.

102.    The scale of those losses was thus directly attributable to – and a foreseeable consequence of – the high-risk sales practices implemented, maintained, and overseen by Davis, Rosenthal, and their Company, PSG. After Harlan Kent became CEO, he reflected internally with clear-eyed understanding of how Davis' and Rosenthal's concealed high-risk sales practices had caused PSG's deterioration: for example, a July 7, 2016 presentation explained that PSG's issue with "Credit/PD [probability of default]" was the result of "***Bad habits created by topline push***"; its problem with "Marketplace Inventory" was "***Self Induced***" and a problem of "***Excess due to lack of discipline*** and forecasting prowess ***by Bauer***"; and it had become dependent on low-value closeouts and promotions that drove it towards off-price, low-margin, economically not-valuable sales.

### 6.    Consignment contracts

103.    Layered on top of all these high-risk sales practices was PSG's use of consignment and quasi-consignment contracts, *i.e.*, those with "guaranteed sale," "right-of-return," or "pay-by-scan" provisions, pursuant to which PSG would "sell" inventory to a retailer with the understanding that the retailer could either not pay PSG for that inventory until it was sold off the retailer's shelves to consumers, or could return unsold inventory to PSG at no cost to the retailer.

---

[5] Nor, as Davis and Rosenthal subsequently tried to argue, were foreign currency considerations a serious factor in PSG's weakening business. The same presentation noted that: "These credit-challenged customers are located primarily in the US. As such, ***foreign currency fluctuations would not impact the change in net sales for these customers.***"

104.    These contracts risk violating accounting rules governing the recognition of revenue. If those rules are violated with a sufficiently material impact on a company, they can trigger everything from an accounting restatement to regulatory investigations to Audit Committee investigations to shareholder litigation. PSG told investors that it recognized revenue "as products are shipped to customers" (retailers). But under proper application of revenue recognition rules, PSG could not recognize revenue in a consignment arrangement until the retailer sold that inventory and actually *paid* PSG; otherwise, the retailer could (and did) return the product to PSG at no cost. In an internal control environment as deficient as that of PSG, the risk of PSG misstating its financials due to violations of accounting rules for revenue recognition was particularly acute, as were the attendant risks: investigations by U.S. and Canadian securities regulators, increased auditor scrutiny and the risk of internal investigations, shareholder litigation, and an accounting restatement.

105.    U.S. generally accepted accounting principles – or "GAAP" – require that income not be recognized until it is "realized or realizable" and "earned,"[6] and the SEC warns that companies entering into "side agreements" to contracts affecting revenue recognition must have sufficient controls to ensure that they are accounted for in accordance with GAAP.[7] PSG stated that it followed these rules, telling investors that "[t]he criteria for recognition of revenue are met when persuasive evidence that an arrangement exists and both title and risk of loss have passed to the customer, the price is fixed or determinable and collectability is reasonably assured." (2015 Form 10-K at 89.)

---

[6] *See* Financial Accounting Standards Board ("FASB") Concepts Statement No. 5, ¶ 83.

[7] *See* SEC Staff Accounting Bulletin No. 101: Revenue Recognition in Financial Statements, 17 C.F.R. Part 211, at 4 (Dec. 3, 1999).

106.     PSG's revenue recognition practices with respect to its consignment contracts, namely to recognize the revenue when the product shipped, violated these rules. In a consignment arrangement, title and risk of loss does not pass to the retailer – it stays with the seller (PSG) – and collectability is not reasonably assured because if the inventory is not sold, the retailer can return it at no cost to the seller. Thus, revenue should not be recognized before the retailer sells the inventory.

107.     Davis and Rosenthal knew that PSG had consignment arrangements with at least some of its retailers, and they knew that PSG had recognized revenue improperly. They further knew that PSG did not have sufficient internal controls to ensure proper revenue recognition in accordance with accounting rules. As an initial matter, both Davis and Rosenthal knew that PSG used consignment agreements. For example, as early as December 2013 – before the Class Period even began – Davis' and Rosenthal's pre-acquisition due diligence into Easton baseball/softball, captured in a December 20, 2013 presentation, revealed that Easton had an agreement described as "***Sports Authority consignment***" in which Easton entered into an agreement "to become The Sports Authority's exclusive helmet supplier. In conjunction with this arrangement, BBGB repurchased $356,000 of inventory at The Sports Authority in Q4-12 . . . . ***The proposed adjustment removes the margin on the original sales relating to this inventory buy-back***." Davis' personal notes on the Easton acquisition (referred to within PSG as "Project Greenland") contemporaneously reflect that he knew that Easton's biggest accounts were The Sports Authority and Monkey (K. Davis: "3 us sales mgrs. top 3 accounts": "TSA/monkey," "Dicks/hibbets/models," "Amazon/pro athlete/baseball/ dunums"), and that at least some of those accounts had consignment arrangements with Easton (K. Davis, in a December 12, 2013 email: "***TSA has a consignment deal with Easton on helmets***").

44

108.     Throughout the Class Period, Davis and Rosenthal received additional, explicit warnings about consignment contracts, their accounting implications, and the internal controls PSG needed to manage the substantial accounting restatement risks associated with the use of consignment contracts. For example, KPMG uncovered in August 2015 a substantial return of product and notified PSG of its concerns: after Easton accepted approximately *$2 million of returns* from Dick's Sporting Goods in May of FY15 due to a slow selling product, an August 5, 2015 email from a PSG Accounting manager to Easton's Finance Director explained that KPMG had "expressed concern surrounding the Dick's return."

109.     When KPMG further investigated the existence of these consignment contracts, it found that PSG under Davis' and Rosenthal's leadership had no working contract management system: no one at PSG could reasonably identify how many consignment contracts there were, what the terms were, and how much product was impacted by those contracts. For this, KPMG informed PSG, Davis, and Rosenthal of a "significant deficiency" regarding PSG's internal controls over financial reporting in an August 26, 2015 letter specifically addressed to Davis: "***The Company's control associated with identifying the total population of customer contracts for finance to analyze the terms and conditions is not designed appropriately***. It appears that the distributed nature of contract management and oversight for revenue recognition terms on shipments ***creates the potential for finance to improperly monitor the accounting consequences*** when deviations from normal business practices occur. In one instance, the Company has been accounting for an agreement under normal shipping point terms as opposed to cash basis which is what the contract stipulated. . . . ***This resulted in passed entries to correct revenue in prior years including Fiscal Years ending May 31, 2014, 2013 and 2012***. In addition, KPMG identified ***three other instances*** where contracts with customers designated FOB destination terms for certain

45

shipments, and ***the Company did not have a process in place to monitor deviations from normal business practices to ensure proper revenue recognition***." By its very nature, as KPMG's letter explained, a "significant deficiency" in internal controls over financial reporting is a problem "important enough to merit attention by those responsible for oversight of the company's financial reporting."

110.    These issues were raised to the highest level of the Company, including Davis, Rosenthal, and the Board of Directors' Audit Committee.[8] According to an August 24, 2015 email from PSG's Corporate Controller, KPMG was "adamant" that these issues constituted a significant deficiency. Those within PSG made their warnings in more blunt terms (S. Frerichs, in an August 24, 2015 email: "I would say that Finance has ***failed to maintain a comprehensive set of customer agreements that are each reviewed for Revenue Recognition*** terms and conditions"). And, indeed, Davis and Rosenthal discussed this deficiency with each other, including in an August 25, 2015 email noting that "KPMG's updated presentation will include a finding of a significant deficiency in the area of sales contracts (terms and conditions) with our customers."

111.    But neither Davis nor Rosenthal took the warnings seriously, even after being notified by KPMG in August 2015 of a significant deficiency identifying the internal control problems and the improperly recognized revenue. As an initial matter, Davis and Rosenthal viewed the KPMG audit team with disdain, repeatedly complaining about KPMG as trying to make-work to justify its high fees. For example, after KPMG issued the significant deficiency, Davis defiantly

---

[8] For instance, August 26, 2015 Audit Committee minutes indicated that both Davis and Rosenthal attended the presentation in which KPMG advised them and members of the Board of Directors of "significant audit findings," including (1) the significant deficiencies in PSG's internal controls, and (2) that "a review of a customer contract reflected transfer of title upon payment to the Company, ***while the Company recognizes revenue upon shipment from the Company's distribution center***." Similarly, a January 12, 2016 presentation reflected that "***PSG does not have a robust customer and vendor contract management process to identify non-standard terms***," and that the "impact" of this was that "[w]ithout a robust customer and vendor contract review process, there is ***potential for misstatement*** as a result of incorrectly applied contractual transfer of ownership terms."

claimed in an August 25, 2015 email to Rosenthal and others that KPMG had "tried to make a few mountains out of molehills during their" fiscal year 2015 audit. In another example, after David Wilson (one of the KPMG partners auditing PSG) asked for a meeting to discuss KPMG's involvement in the Audit Committee's internal investigation into the high-risk sales practices, PSG's "credit risk controls," and "an update on [PSG's] plan and resources for . . . the remediation plan for the [internal control] deficiencies identified," Rosenthal called Wilson "an over-reactor" in a January 14, 2016 email and advised Vendetti to consider firing KPMG.

112.    Davis and Rosenthal's dismissive attitude toward PSG's internal controls also extended to the Company's Internal Audit unit. Defendants starved the "Internal Audit" unit – the department within PSG charged with remedying the internal control deficiencies – of resources. Throughout the Class Period, there was effectively only one person within PSG tasked with attempting to resolve these problems across all eight brands – Alex Byrne, the then-Internal Audit Manager at PSG. This became such a problem that KPMG contemplated issuing a material weakness solely as a result of Davis' and Rosenthal's refusal to provide adequate resources to complete the fiscal year 2016 audit (March 29, 2016 email from D. Wilson to A. Rosenthal and M. Vendetti: "Mark and Amir . . . Right now, I have to evaluate *whether there is a material weakness in the amount of resources available to pull this information together*."). This adversarial posture towards KPMG and resource starvation for the audit continued even towards the end of the Class Period, when PSG's business was failing.[9]

---

[9] For instance, in a July 21, 2016 email D. Wilson (KPMG) wrote to Vendetti and others: "*We have to get more people from the company along with any third party assistance involved to make this happen*." On July 22, 2016, Vendetti responded: "I am being told we are running into [a] situation where we are changing approaches or we continue to expand data requests after initial requests come in. Said another way, it is not possible to complete a task [if] the task itself keeps changing."

113.    Davis' and Rosenthal's failure to take KPMG seriously placed PSG in serious jeopardy. By April 2016 – more than seven months after the significant deficiency was formally issued – KPMG warned Byrne that its testing of the same internal controls was still yielding failure, and that the same issues could amount to a "material weakness" for fiscal year 2016. As KPMG explained in an August 26, 2015 letter to Davis, a "material weakness" is a deficiency in internal controls over financial reporting in which "there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis," and thus must be automatically disclosed to investors.

114.    As KPMG continued to investigate the scope of the problem with consignment contracts, it became apparent that the problem was not confined to one brand or a small group of salespeople. A July 26, 2016 presentation by KPMG to the Audit Committee, for example, flagged *additional* revenue recognition problems arising out of the use of rights of return and other consignment arrangements in the Combat business. In another example, an August 3, 2016 memo from an Easton Finance Director to KPMG disclosed an "accommodation as a good business partner" to a retailer (Hibbett's) by accepting $250,000 in returned product for a series of sales that effectively became consignment or right-of-return sales. In yet another example, KPMG learned of a November 25, 2015 Easton consignment agreement with Dunham's – the consignment program was known as "Pay-By-Scan" – that resulted in a $513,400 sale that was improperly recognized; Dunham's then returned ***$421,165 worth of inventory***, with the revenue being reversed in May 2016 – two quarters later.

115.    The risks associated with PSG's consignment contracts and internal control deficiencies foreseeably materialized. The Dunham's consignment transaction *alone* triggered panicked conversations within PSG about how to manage the situation with KPMG: in an August

10, 2016 email, one of PSG's consultants at PwC suggested to PSG's Internal Audit manager that the Company should "go[] with a ***significant deficiency on the Dunhams transaction given that the revenue amount was not insignificant*** (but not material) ***and a significant deficiency in the cycle overall***," and noted – in a reflection of how dire the situation had become – that she "didn't think we'd get KPMG to buy into anything less than" a significant deficiency on the Dunham's transaction.

116.    But the Dunham's transaction was the tip of the iceberg. Discovery of these consignment contracts, the internal control deficiencies, and Roustan's warnings about pulling orders and the aggressive use of closeouts precipitated the Audit Committee's launching of an internal investigation. The Audit Committee, working with KPMG, hired Richards Kibbe and Orbe LLP ("RKO") and the consulting firm AlixPartners to investigate these high-risk sales practices and PSG's deficient internal controls.

117.    Because of the scope of the problems at PSG and its woefully deficient internal controls, the Audit Committee did not complete its internal investigation in time for PSG to file its 2016 Annual Report. When PSG announced on August 15, 2016 that its 2016 Annual Report would not be filed by the required filing date of August 15, 2016, PSG explained that the delay was "a result of the decision of Performance Sports Group's Audit Committee to conduct an internal investigation ***in connection with the finalization of the Company's financial statements and the related certification process.*** . . . The failure to file the Annual Report on Form 10-K on time is expected to result in ***a default*** under the Company's credit facilities." Even with additional time, the Audit Committee was ultimately unable to complete its internal investigation, and its delay prevented KPMG – which refused to finish its fiscal year 2016 audit until completion of the

internal investigation – from certifying PSG's 2016 audited financial statements. This resulted in a default on PSG's credit facilities/lender agreements, and forced PSG into bankruptcy.

### B. The truth begins to reveal itself: the risks that Defendants concealed predictably materialized, ultimately causing PSG's bankruptcy.

118.    The truth regarding Defendants' fraud began to leak out to the public in the beginning of 2016, with revelations continuing until October 31, 2016, when PSG announced its bankruptcy and Rosenthal's termination.

119.    As explained above, the concealed risks associated with the high-risk sales practices Defendants pursued during the Class Period foreseeably materialized by (1) leaking out pieces of information to the public through news reports, such as those involving Davis' and Rosenthal's suppression of Roustan's Grant Thornton survey or the reports regarding the misdating of earnings published in the *New York Post*, (2) certain admissions by Rosenthal and Davis about the nature of the business slowdown, (3) causing retailers to stop buying PSG product, because PSG's sales practices had jammed the market with too much inventory that could not be sold to consumers, and had "pulled" forward too many orders, causing PSG to run out of future business to cannibalize, (4) triggering mounting warnings from KPMG and, eventually, investigations into PSG's high-risk sales practices, including investigations by the Board of Directors' Audit Committee, the SEC, and Ontario Securities Commission (the Canadian securities regulator), (5) causing repeated, large write-downs in bad debt from retailers who were suffering financially or went bankrupt, the scale and the fact of which was due to how much and how often PSG violated its customer credit limits in pushing sales out, (6) causing a major declared impairment to the value of Combat and Easton baseball/softball of approximately $146 million in the third quarter of fiscal year 2016, due to the weakness Defendants created in the baseball/softball market, the bankruptcies of various top PSG customers exacerbated by Defendants' sales tactics,

and the high amount of inventory in the market that deteriorated the future sales cycle, and (7) causing PSG's bankruptcy, when the Audit Committee's internal investigation could not be completed in time and KPMG declined to certify PSG's audited financial results without completion of that investigation. As this news reached the markets, PSG's stock price continued to fall and Lead Plaintiff and the Class were injured.

120. *January 11, 2016.* On January 11, 2016, *Reuters* reported in an article entitled "Ex-Performance Sports chairman sues accounting firm in Canada" that Graeme Roustan had sued Grant Thornton for breach of contract and defamation for failing to complete its engagement with him regarding the customer survey he commissioned. That failure was due to PSG's and Defendants' efforts to suppress the release of information collected by Grant Thornton that would have revealed the truth about PSG's high-risk sales practices, including specifically the pushing and pulling of orders into various quarters to manipulate sales numbers and the use of closeouts to boost quarterly sales growth. On this news, PSG's stock price declined by $0.45, or 5.53%, on trading volume of over 330,000 shares.

121. *January 14, 2016.* After the market closed on January 13, 2016, PSG issued a press release announcing its financial results for the quarter ended November 30, 2015 (Q2 2016). The press release revised downward the previously issued guidance for fiscal year 2016, slashing the fiscal 2016 guidance for adjusted net income and adjusted earnings per share. The press release stated (among other things) that Bauer hockey revenues had decreased year-over-year and that Easton baseball/softball earnings had suffered: "Baseball/Softball EBITDA in the second quarter decreased 31% (including and excluding the impact of foreign currency) to $7.9 million, which was largely driven by a bad debt write-off related to outstanding receivables for an internet baseball retailer [Team Express] that filed for bankruptcy reorganization[.]" The following day, on January

51

14, 2016, the Company filed its financial results on Form 10-Q for the second quarter of 2016, ending November 30, 2015 ("Q2 2016 10-Q"). The Company's Q2 2016 10-Q disclosed, for the first time, declines in revenue, declines in gross profit, and declines in adjusted EBITDA. As discussed, these declines were the direct and foreseeable result of Defendants' high-risk sales practices and accompanying deficient internal controls. As a result of the Company's Q2 2016 disclosures, PSG's stock price experienced a three-day fall from its opening price on January 14, 2016 of $7.08 per share to a closing price on January 19, 2016 of $5.92 per share on heightened average trading volume of 1.28 million shares per day.

122. ***March 8, 2016.*** Before the market opened on March 8, PSG issued a press release revising downward its guidance for the fiscal year ending May 31, 2016. It stated that "[t]he Company has reduced its fiscal year 2016 Adjusted EPS guidance by approximately $0.55 per diluted share to approximately $0.12 to $0.14 per diluted share as compared to its prior publication of guidance ($0.66 to $0.69 per diluted share), primarily as a result of the following three factors: (i) a write down of the receivable balance from a U.S. national sporting goods retailer [The Sports Authority] that has filed under chapter 11 and the related anticipated loss of sales from this retailer ($0.09 per share); (ii) an anticipated reduction in sales, particularly due to weakness in the baseball/softball market ($0.31 per share); and (iii) additional bad debt reserves primarily for certain U.S. hockey customers and the related anticipated loss of sales from such customers ($0.19 per share)."

123. About an hour after the press release, the Company held a conference call to discuss the revised fiscal year 2016 guidance and the preliminary third quarter 2016 results. Rosenthal admitted that "one of the factors" causing Easton baseball/softball's weakening sales was "the amount of close out inventory that is in the marketplace ***from ourselves*** and other brands."

52

124. But Davis, Rosenthal, and Vendetti blamed most of PSG's declining financial results on "weakening of consumer demand," customer bankruptcies, and other causes they claimed were "unexpected." In reality, however, it was PSG's own high-risk sales practices that pushed revenue into earlier quarters, browbeating retailers to increase bookings without regard for market demand, and pushing product out on consignment and in violation of customer credit limits that were the true causes of the decline.

125. In sum, PSG's and Defendants' March 8, 2016 statements made clear that the risks concealed by PSG's and Defendants' fraudulent scheme of manipulating the Company's sales revenue were materializing. PSG and Defendants had known about this trend, which was reasonably likely to materially affect the Company's future financial results, before the start of the 2016 calendar year. Even with this knowledge or their reckless disregard for the truth, PSG and Defendants promoted and condoned the Company's high-risk sales practices anyway. Further, instead of accurately disclosing that the Company had been engaged in these high-risk sales practices, including coercing its customers to accept its products early to shift revenue to earlier quarters and bullying PSG's customers to increase their orders under threat of the loss of their discounts, PSG attributed its "purportedly" new-found decline to bankruptcies and market demand. Similarly, PSG and Defendants continued to hide the true cause of the Company's downturn by blaming it on "redundant inventory." In reality, they had caused the Company's own demise by oversupplying its customers with product and delivering that product earlier than the product was needed.

126. On this news, shares of PSG fell $5.75 per share or over 66% to close at $2.91 on March 8, 2016, on trading volume of 18.6 million shares.

127. ***March 14 and 15, 2016.*** Analysts were beginning to pick up on the problems that

PSG was truly facing, despite PSG's and Defendants' misleading explanations. On March 14, 2016, analyst Jay Sole at Morgan Stanley downgraded PSG to "Equal Weight" from its previous rating of "Overweight," stating that the "profit warning signals visibility into the business is much poorer than previously thought."

128.     On that same day, the *New York Post* published an article disclosing that PSG had been questioned about manipulating revenue. The article disclosed that "Customers told former PSG Chair Graeme Roustan that the company had asked them to misdate earnings, a source with direct knowledge of the situation said," that Roustan had commissioned SurveyMonkey "to ask PSG customers if they were told to move future orders into an earlier quarter. Roustan presented his findings to the PSG board," and that "Roustan had first hired Grant Thornton to take a survey of PSG's customers," but that "PSG persuaded Grant Thornton not to release those findings, including a question about misdating earnings[.]" On this news, shares of PSG fell $0.41 per share or 10.35% to close at $3.55 per share on March 15, 2016, on an average 2-day trading volume of approximately 2.29 million shares, damaging investors.

129.     ***March 22 and 23, 2016.*** Just days later, on March 22, 2016, following the market's close, PSG announced that Davis had abruptly resigned and was leaving PSG immediately. Rosenthal was appointed by the Company's Board of Directors as interim CEO. According to PSG's March 22, 2016 Board Minutes, the Board of Directors – "based on discussions held ***and consensus reached by the independent auditors on March 15, 2016***" – fired Davis due to the materialization of the risks related to PSG's shoddy internal controls and aggressive and high-risk sales practices, which continued to be concealed from investors. The Board's reason for firing Davis was also withheld from investors. On the news of Davis' resignation, PSG's stock price closed on March 23 at $3.34, a 4.84% drop from its opening price of $3.50.

130.    *March 28, 2016.* In light of Davis' departure and "a challenging environment that was primarily created by a slowdown in baseball bat sell-through and customer consolidation / credit issues," Bank of America analysts downgraded PSG's rating to "Underperform" from "Neutral." On this news, PSG's stock price closed on March 28 at $3.10, from the prior trading day's closing price of $3.33, a 6.91% drop.

131.    *April 15, 2016.* On April 15, 2016, PSG announced that it was booking "a non-cash impairment charge of $145.1 million within the Baseball/Softball reporting unit." This impairment – both the triggering events that led to it, and its size – was the direct result of the high-risk sales practices and internal control deficiencies Defendants enabled within PSG and then concealed from their investors. On this news, PSG's common stock price declined 15.45%: PSG's stock closed on April 14 at $3.82, it opened on April 15 at $3.61, and it closed on April 15 at $3.23, on heavy trading volume (2.60 million shares).

132.    *June 8 and 9, 2016.* On June 8, 2016, after the markets closed, PSG reported its preliminary fourth quarter 2016 and full year fiscal 2016 results. It reported that "challenging market conditions created customer credit issues that exceed[ed] [PSG's] expectations," and disclosed signs revealing its problems with customer credit, *i.e.*, that PSG had to take "actions during the quarter to reduce shipments to customers that were not settling their outstanding payments in line with our requirements." PSG's internal documents show that these credit issues were the direct result of Defendants enabling risky and aggressive sales practices with lax credit requirements and internal controls (*see supra* Section A.5), although PSG and Defendants did not disclose that causation at the time. On this news, PSG's stock – which had closed at $3.49 on June 8 – opened on June 9, 2016 at $3.27, and closed on June 9 at $3.17. The stock declined 9.17%, on high trading volume.

55

133.   **August 15, 2016.** PSG was expected and required to file its financial results for the fourth quarter and full year 2016 with the SEC on Form 10-K. However, rather than filing its Form 10-K, PSG filed a press release announcing "that its Annual Report on Form 10-K, including its annual audited financial statements for the fiscal year ended May 31, 2016 and the related management's discussion and analysis (collectively, the "Form 10-K"), will not be filed by the required filing date of August 15, 2016." PSG explained that the delay was "a result of the decision of Performance Sports Group's Audit Committee to conduct an internal investigation in connection with the finalization of the Company's financial statements and the related certification process. . . . The failure to file the Annual Report on Form 10-K on time is expected to result in a default under the Company's credit facilities."

134.   As discussed at length in Section A (*see* ¶¶ 112–17), PSG had not, in fact, made the decision to delay its Annual Report or conduct an internal audit of its own volition; instead, it was effectively *required* to do so by its external auditor, KPMG, after multiple internal control deficiencies went unremediated and PSG's Audit Committee stated that it could not complete its internal investigation in time. PSG and Defendants did not explain the impetus of their audit to investors.

135.   Defendants had known about this problem for weeks. For instance, an Internal Audit document dated April 18, 2016 recounted some of AlixPartners' findings that several serious internal control deficiencies KPMG had identified the previous year remained unresolved, and in many cases, had worsened. These included inadequate recordkeeping and failure to document or track approvals for contract changes or returned merchandise. Similarly, in a July 16, 2016 email to other senior finance staff at PSG, Vendetti identified the following risk to PSG for inclusion in his quarterly review: "**KPMG unable to give PSG clean audit for FY 16**[.]"

136.    By the first week of August 2016, PSG was openly contemplating announcing a material weakness with respect to revenue recognition. In an August 2, 2016 email, PSG's consultants at PwC (which PSG retained for help with its audit) provided PSG's Corporate Controller with examples of "Item 9A *disclosure around a material weakness on revenue recognition*" for two public companies after PSG, PwC, and KPMG representatives met to discuss the fiscal year 2016 audit. The following day, Vendetti informed the Board of Directors' Audit Committee via email that with respect to Combat's financials, "[w]e are also at a point in our process *if I agree to a change* [increasing bad debt reserves for accounts receivable]*, we may face a weakness of some kind but if I don't agree to a change, KPMG may say they cannot sign off on the audit.*"

137.    On the August 15 news of PSG's delayed filing, PSG's stock price fell to close at $1.85, from the prior day closing price of $3.48, a 46.84% drop, on extraordinarily heavy trading volume (over 14.5 million shares).

138.    *August 17, 2016.* On August 17, 2016, PSG disclosed that, in addition to being the subject of shareholder litigation, the Company was also the subject of investigations by both Canadian securities regulators and the SEC. Internal Company documents have now revealed that the investigations focused on the same topics that are the subject of the instant class action, *i.e.*, PSG's fiscal year 2015 and 2016 sales growth and how it was achieved, the Audit Committee's internal investigation, PSG's use of incentives and discounts to drive its growth, revenue recognition problems, and (among other things) the relationship between retailer demand, consumer demand, inventory levels, and PSG's sales practices. On this news, PSG's stock price declined 12.44% on August 17, to close at $1.83 from an opening of $2.02.

139.    *September 2 to 6, 2016.* On September 2, 2016, after the markets closed, PSG

57

announced that it was terminating its shareholder nomination agreement with Sagard Capital Partners, L.P., its then-largest shareholder with beneficial ownership of approximately 17% of PSG's issued and outstanding common shares. The termination was done due to "the previously disclosed postponement of [PSG's] 2016 annual meeting of shareholders and the ongoing review and evaluation of strategic alternatives by the special committee . . . of its Board of Directors[.]" On this news, PSG's stock price, which closed on September 2 at $3.56, opened on September 6 (after the holiday) at $3.21 and closed the same day at $3.22, a decline of 9.55%, on heavy trading.

140.   ***October 28 to 31, 2016.*** On October 28, 2016, after the markets closed, news outlets including *Reuters* announced in an article entitled "Exclusive: Bauer hockey gear maker preparing to file for bankruptcy – sources" that PSG was "preparing to file for bankruptcy in the United States and Canada as early as Sunday evening, according to people familiar with the matter." The bankruptcy was the materialization of the risks Defendants created through their high-risk sales practices, which were paired with dangerously lax or unenforced internal controls.[10]

141.   On October 31, 2016, PSG announced that it had filed voluntary petitions in the United States Bankruptcy Court for the District of Delaware for relief under Chapter 11 of the United States Bankruptcy Code and had sought creditor protection in the Ontario Superior Court of Justice (Commercial List) under the Companies' Creditors Arrangement Act (the "CCAA"). In the same Form 8-K filing, PSG announced that it had entered into an asset purchase agreement for the sale of the Company with a group of investors led by Sagard Capital Partners, L.P. and Fairfax Financial Holdings Limited. Analysts noted that "PSG was unable to negotiate new extensions

---

[10] As discussed at length above, internal Company documents demonstrate that causal chain. PSG's consultants reached the same conclusion: for instance, an October 14, 2016 Financial Due Diligence Report prepared by Ernst & Young LLP stated that, due in part to the regulatory investigations, "we understand the Company may be filing for bankruptcy as early as October 2016."

[from its creditors] and saw bankruptcy as a viable outcome, given adverse market conditions, customer credit issues, currency pressures, and liquidity constraints amidst ongoing investigations and securities litigation," all of which represented the materialization of the foreseeable risks Defendants had previously concealed from investors.

142.    PSG also announced the departure of Defendant Rosenthal from the Company.

143.    The New York Stock Exchange commenced delisting proceedings on October 31, 2016, and suspended trading of PSG common stock the same day.

144.    On this news, PSG's stock suffered a further decline. On October 28, 2016, PSG's stock closed at $3.48. On November 1, the first day after the official bankruptcy filing announcement, the stock closed at $1.67, a 52.01% decline from the October 28 closing price (the prior trading day), on extraordinarily heavy trading volume.

145.    PSG's stock was delisted from the Toronto Stock Exchange on November 8, 2016.

**C.    Defendants acted with scienter.**

146.    Defendants and PSG knew or recklessly disregarded the truth about the Company's high-risk sales practices, the risks associated with those practices, and the deficient internal controls that were supposed to contain those risks. The facts discussed above – many of which cite Davis' and Rosenthal's personal emails, presentations that Davis and Rosenthal gave, edited, or attended, and documents referencing conversations with Davis or Rosenthal – support a strong inference of scienter, and are incorporated herein by reference.

147.    ***Kinnaly.*** Documents and confidential witness accounts show that Kinnaly repeatedly warned Davis and Rosenthal about the risks of pursuing these high-risk sales practices, particularly the "gun to head" sales tactics, pulling orders to meet targets, and focusing on "go-gets" at the expense of long-term, sustainable business cycles. CW3 recounted, for example, that

Kinnaly told PSG's Board of Directors, including Defendant Davis, about the Company's aggressive and coercive sales practices as early as 2013 and warned them that those practices would cannibalize future sales and catch up with the Company, after which Davis and Rosenthal fired him. Internal Company documents show that as early as March 27, 2013, Kinnaly warned Rosenthal in an email that Davis' and Rosenthal's emphasis on short-term growth – the "Q2 go-get, Q3 go-get, bookings, **more, more, more**" – had demoralized the sales team and was predicated on unrealistic sales targets given the bloated inventory marketplace dynamics. Kinnaly again warned Davis and Rosenthal in an April 25, 2013 presentation entitled "FY14 Hockey Strategic Roadmap" that the hockey marketplace was "[u]nhealthy" and "bloated," and he proposed (among other things) restructuring PSG's sales programs to "command a higher percentage of key customers OTB [open-to-buy]" by using an "'opt-in' approach **versus 'gun to head'**" approach that Davis and Rosenthal had historically preferred. Davis and Rosenthal fired Kinnaly days later, and sought to misrepresent the circumstances of Kinnaly's departure.

148. **Roustan.** Roustan repeatedly warned Davis, Rosenthal, and members of PSG's Board of Directors that retailers had told him that PSG was asking them to move orders into earlier quarters. He warned them that he had learned of certain high-risk sales practices – the "dumping" of product into the market and the excessive use of discounts – and he warned that these practices had a "Ponzi scheme"-like quality. Roustan met in person with Davis and the Chairman of PSG's Board (Bernard McDonnell) in May 2015 and told them that retailer demand in particular was going to drop as a result of the Company's decision to proceed with the Bauer "Own the Moment" retail stores; over-saturated retailers subject to "gun to head" sales tactics would adamantly refuse to buy PSG product upon learning that PSG had decided to compete against them. In May 2015, Davis and Rosenthal learned of the Grant Thornton survey Roustan commissioned, suppressed its

release, and knew that a majority of those surveyed had answered "yes" to the question about whether anyone in the past two years at PSG had asked the customers to move an order into an earlier quarter. Davis and Rosenthal also learned about the SurveyMonkey questionnaire (Roustan sent them the survey in December 2015), and thus again saw that a majority of the surveyed customers responded that they had been asked by PSG to move an order into an earlier quarter. But Defendants suppressed this information, failed to change their aggressive sales practices, and did not disclose those practices or their inherent risks to investors.

149.     ***KPMG and related warnings.*** KPMG issued notices to Davis and Rosenthal about PSG's deficient credit limits (in August 2014) and deficient contract management system and associated revenue recognition problems (in August 2015). Defendants discussed the significant deficiencies with one another, including in an August 25, 2015 email thread in which the two men strategized about how to present the deficiencies to the Audit Committee. Both knew that PSG had lent retailers money in violation on PSG's customer credit limits. Both knew that there were revenue recognition problems due to PSG's use of consignment contracts. Both represented in their respective Sarbanes-Oxley certifications that they understood their duties to maintain a sufficient internal control environment. Both received updates from KPMG throughout 2015 and 2016 about how the fiscal year 2016 audit was proceeding, the risks associated with that audit, and that there was a substantial risk that KPMG would issue a "material weakness" to PSG for its deficient internal controls.

150.     ***Personal involvement in high-risk sales practices.*** Confidential witnesses explained that Davis and Rosenthal had intimate knowledge of PSG's business and sales practices. Meetings involving the sales representatives like CW1, for example, were held twice per year. Rosenthal, as CFO and EVP of Finance, attended those meetings. Internal Company documents

bear this out. For example, Rosenthal in particular was directly involved in the discussion about Team Express at least as early as 2015 and knew that Team Express was financially struggling, and had a $4.5 million account receivable with $1.8 million of that past due as of October 2015. Rosenthal understood the consequences that extended payment terms could have for revenue recognition. For instance, in an August 4, 2015 email to Easton's Vice President and Senior Strategic Account Sales Manager, Rosenthal contemplated offering Team Express extended payment terms because Team Express was in financial "trouble," and acknowledged that "[w]e may have revenue recognition issues if we have a/r [accounts receivable] that past due."

151.    In another example, Rosenthal was similarly involved in a massive order in 2016 with one of PSG's retailers (Monkey) that combined many of the Company's high-risk sales practices: according to a chain of emails in May 2015 between PSG employees, the Company entered into a "close to $1M" deal with Monkey for inventory that shipped in May 2016 – but it was a "closeout" deal with extended payment terms, such that no payment would be due until December 2016, *i.e.*, *the following fiscal year (2017)*, *and* the retailer had wanted the inventory *in September 2016* but agreed to accept it *in May 2016* in light of pressure from PSG. This deal, like others, raised a host of foreseeable risks: it triggered revenue recognition issues (per a July 13, 2016 email from C. Tymowski, PSG's Senior Director of Finance, "the budget assumed that Monkey [the retailer] would be recognized in Q1, ***but based on the ridiculous payment terms that Sales negotiated with Monkey, it seems that we may not recognize until Q3 [and] [i]t will be negative margin when we do recognize***"), it prioritized the appearance of short-term sales growth over completing economically valuable sales (C. Tymowski, in a subsequent July 13, 2016 email, observed: "***This seems like a case where we would have been better off scrapping the inventory***"), and it would trigger an investigation by KPMG (C. Tymowski to M. Vendetti in a July 16, 2016

email: "***Monkey effectively got terms of 180 and 1/8ths to take product at 60% of cost, and we'll probably pay $50K in audit fees for KPMG to review the transaction. Not a lot to like about this order!***"). Those known risks all predictably materialized at the same time KPMG was deliberating refusing to certify PSG's fiscal year 2016 financial results: in August/September 2016, KPMG – as anticipated by PSG – became concerned about the Monkey closeout order. In comments dated September 19, 2016, one KPMG team member asked PSG for evidence regarding title transfer of the inventory, receipt of any payments, and whether "Monkey did in fact place an order" for "a delivery date of Sept FY17[.]" James Holland (another member of the KPMG audit team) warned in an October 5, 2016 email to PSG's Corporate Controller that the scrutiny was justified because "***the inventory is being sold at a loss so you have an asset on the books above* its future economic benefit that needs to be recognized in the quarter in which it is probable and estimable.***" Rosenthal was present when the deal was negotiated.

152.     Both Davis and Rosenthal ultimately admitted privately that they had withheld information, including from the Board of Directors, about their growth targets and the mechanisms they were using to achieve them. Davis' personal notes (sent by email to Vendetti and Rosenthal on February 24, 2016) for a presentation Davis and Rosenthal later made to the Board of Directors admitted that they had knowledge of the risks associated with their growth "strategy" and failed to communicate those risks. For example, Davis acknowledged that there were things he withheld from the Board of Directors (that he knew and "***Didn't communicate***") including that the Easton baseball/softball growth target they set was "***High risk***," particularly due to "***Market dynamics, excess closeouts, etc.***," and that the Combat growth target was similarly too risky ("***had a high likelihood of significantly missing the forecast***"). Davis admitted that he and Rosenthal "should have" known that the baseball/softball market was slowing down because of consumer demand

being satiated ("***Baseball sell through was declining through holiday*** (Oct/Nov [2015]),"
"***[a]lmost all major accounts across the board were seeing softness***" in baseball/softball), and he
attributed that to the market being stuffed with inventory ("***Marketplace is full of off-price units***,"
"Retailers are rapidly reducing open-to-buy based on current dynamic"). He admitted that PSG's
own high-risk emphasis on excess closeouts had spoiled the marketplace and cannibalized future
sales, in particular for baseball/softball ("***Closed out large amount of high-end bat units in***
***FY15***"). And he admitted that they had credit problems with Total Hockey, one of their biggest
customers that was facing financial difficulties. These statements showed Davis' and Rosenthal's
understanding that the risks of their business model – driving PSG towards higher quarterly targets
("forecast") while knowing that there was excess inventory from PSG's conduct ("Market
dynamics, excess closeouts, etc.") – were too high ("risk was high") and likely to fail ("high
likelihood of significantly missing the forecast").

153. ***Financial Industry Regulatory Authority ("FINRA") Investigation***. Davis'
knowledge can also be inferred from his role in a FINRA investigation into suspiciously timed
trades. On March 10, 2016, a FINRA analyst contacted PSG to inquire about the Company's March
8, 2018 announcement of its revised fiscal outlook. On March 21, 2016, FINRA's Office of Fraud
Detection and Market Intelligence followed up with a formal letter requesting information about
people with knowledge of the revised financial results, as well as information about the Company's
trading policies and restrictions for Board members and employees. After receiving the Company's
response, the Office of Fraud Detection sought additional information concerning the relationship
between certain individuals, who apparently had made trades during the period, and PSG
employees. These individuals included three people with whom Davis had personal and financial
ties. Ernst & Young subsequently observed in a Financial Due Diligence report on the Company

64

dated October 14, 2016 that Davis "was terminated on March 22, 2016, a day after FINRA sen[t] a letter to the Company regarding review of company stock performance."

    **D.**    **Defendants made false and misleading statements to investors about the nature of PSG's growth, the substantial risks associated with the practices used to achieve that growth, and their ability to manage those substantial risks with effective internal controls.**

154.    Instead of disclosing this ongoing scheme at any time during the Class Period, PSG and Defendants continued to tout the Company's record growth based on "strong performance" and "organic sales growth."

155.    In general, "organic growth," as used in the corporate and investment context, refers to a company's growth based on increased outputs, customer base expansion, or new product development, as opposed to mergers and acquisitions, which are generally referred to as inorganic growth. A company's organic growth does not include growth that results from fraudulent or aggressive sales practices aimed at boosting a company's earnings.  Such earnings are transitory and not sustainable. As a result, earnings from PSG's high-risk – and sometimes fraudulent – sales practices should not have been considered part of, or a contributing factor to, the Company's core earnings and purportedly "organic" growth.[11] Thus, reasonable investors could not have known, and could not have reasonably expected, that PSG's "organic" growth included growth resulting from manipulative, aggressive, and unsustainable sales tactics.[12]

156.    More generally, PSG's and Defendants' representations about PSG's growth concealed the methods they were using to achieve that growth, the substantial and foreseeable risks

---

[11] *See* Edward Hess and Robert Kazanjian, *A Search for Organic Growth*, 103-04 (2006) (describing how the meaning of "organic" growth has changed following "the financial scandals of the late 1990s and early years of the following decade").

[12] *Id.* at 103-04 (in the context of organic growth, "all earnings are not equal if you are trying to evaluate the strength, sustainability, and predictability of a business's core operations and processes").

associated with those methods, and the deficient internal control environment that made those risks acute, inevitable, and an existential threat to PSG's business.

### 1.    January 14 and 15, 2015

157.    On January 14, 2015, PSG published a news release entitled "Performance Sports Group Reports Record Fiscal Second Quarter 2015" in which PSG reported "record" revenues and increases in adjusted gross profit and net income.

158.    The following day, on January 15, 2015, during PSG's Q2 2015 earnings conference call, Davis stated: "*We experienced another record quarter for PSG, and our Q2 results were driven by the continued strong performance of the EASTON baseball/softball business and another quarter of more than 10% organic sales growth*; significant adjusted gross margin expansion due to the addition of EASTON's product in Q2; and record adjusted EPS, even in the face of significant and increasing currency headwinds. . . . *Hockey drove our organic performance, generating, on a constant-currency basis, double-digit growth for the fourth consecutive quarter, led by the launch of new, innovative products.*"[13]

159.    Davis further stated on a January 15, 2015 earnings call that "*[o]ur hockey business continued to see strong sell-through during the holiday season; and while overall inventory levels at retail maintain what we call normalized levels, we began to observe -- that we began to observe in the fourth quarter of FY14. We grew in every category over the quarter*, with the exception of goal, which was down slightly due to the timing of the product launches in comparison to last year."

---

[13] Throughout this section, false and misleading statements are identified with bolding and italics, and additional portions of each statement are provided for context.

160.    In response to a question from an analyst about PSG's growth in its hockey business, Davis stated: "***We are seeing continued strong results. . . . what we can say anecdotally is we certainly expect these results are generating share gains for us and that Bauer products continue to resonate with kids. And that brand improvement and continued strong demand from hockey players at all levels is driving share gains in the categories that we talked about.*** So obviously, as I mentioned, and I know this isn't the easiest thing to map out for people, but our product launches across our categories and families do affect the timing of some of this but ***the macro feedback from the holiday season is very strong demand for Bauer***."

161.    During the same call, Rosenthal explained that "[r]evenues in the second quarter of FY15 increased 47% to $172.3 million compared to the same year ago period, or 51% without the impact of changes in foreign currencies. This increase was primarily due to 12% growth in hockey, and the addition of EASTON, which contributed $47.3 million to our second-quarter revenues, and, as Kevin mentioned, is up 37% from the same period last year. Our strong growth in these sports was partially offset by the unfavorable effects of foreign exchange. Excluding this impact, as well as the results of EASTON, ***organically we grew sales 10% in the quarter.***"

162.    PSG's and Defendants' January 2015 public statements – describing "another record quarter for PSG," "double-digit growth for the fourth consecutive quarter," how "brand improvement and continued strong demand from hockey players at all levels is driving share gains," that "overall inventory levels at retail maintain what we call normalized levels," and that "organically we grew sales 10% in the quarter" – concealed that PSG was achieving that growth not through consumer demand or market share gains, but rather through the use of PSG's high-risk, aggressive sales tactics, including (1) using discounts punitively to pressure retailers to buy progressively more PSG-branded product, (2) using high-volume sales of discounted product

(referred to as "closeouts" at PSG) to drive sales growth, (3) routinely pushing and pulling orders into quarters to meet short-term sales targets and maintain the appearance of consistent quarterly growth, (4) using wildly extended payment terms with retailers to enable them to take more PSG-branded product than they reasonably could to hit short-term sales targets, (5) pushing product out to customers in violation of PSG's customer credit limits, and (6) using consignment contracts, right-of-return contracts, and other non-final contract terms, in a deficient internal control environment, to push more PSG-branded product out into the marketplace. Defendants thus concealed the true drivers of PSG's sales and revenue growth and the substantial risks associated with the methods used to achieve that growth (discussed above).

163.    Defendants knew or recklessly disregarded that these statements were false and misleading. In particular, and in addition to the foregoing allegations, (1) Edward Kinnaly had warned Davis and Rosenthal as early as mid-2013 that their "gun to head" practices and focus on pushing out as much product as possible to get sales by any means necessary (*e.g.*, the emphasis on "Q2 go-get, Q3 go-get, bookings, more, more, more") had made the market and the business "[u]nhealthy" and "bloated," and would continue to expand that risk without changing PSG's sales practices (in response to which Davis and Rosenthal fired him), and (2) KPMG had already issued a significant deficiency in August 2014 to Davis and Rosenthal for PSG's deteriorated customer credit limits, placing them on notice that there were issues with the internal controls and creating a duty for them to ensure that PSG's representations regarding its growing sales were not concealing substantial credit and collectability risks.

### 2.    April 13 and 14, 2015

164.    After the market closed on April 13, 2015, PSG and Defendants issued a press release entitled, "Performance Sports Group Reports Record Fiscal Third Quarter 2015 Results."

The press release detailed PSG's financial position for the third quarter of its fiscal 2015 including record revenues and increases in adjusted gross profit and net income.

165.    The following day, on April 14, 2015, PSG filed its Report of Foreign Private Issuer on Form 6-K, attaching PSG's "Management's Discussion and Analysis of Financial Condition and Results of Operations for the three and nine month periods ended February 28, 2015" ("Q3 2015 6-K"). The Q3 2015 6-K repeated the financial results set forth in PSG's Q3 2015 press release. The Q3 2015 6-K favorably reported that "[r]evenues in the fiscal third quarter of 2015 increased 121% to $137.7 million compared to $62.2 million in the same year-ago quarter. On a constant currency basis, revenues were up 127%. The increase was primarily due to the addition of revenues generated by EASTON and *solid growth in ice hockey equipment*, partially offset by an unfavorable impact from foreign exchange. Excluding the results of EASTON, as well as the impact from foreign exchange, revenues grew organically by 16%."

166.    On that same day, during PSG's Q3 2015 earnings conference call, Davis again attributed PSG's record success to its strong performance and organic sales: "***Easton continued to experience solid demand for its products, and our hockey business, which grew 16%*** on a constant currency basis, benefited from the highly successful launch of our Vapor 1X stick, ***underscoring our well-defined strategy to grow our stick business, the largest hockey category.*** . . . we believe Easton will generate its highest sales volume in FY15 during the second and third quarters versus the third and fourth quarters historically, with Q3 being the most significant."

167.    Davis further stated that he was "***very pleased with our quarterly and year-to-date performance, both financially and operationally. Easton continues to be an excellent acquisition and we remain equally pleased with the organic growth profile of our Company*** . . . . As Amir mentioned, our hockey business was offset by lower sales in other equipment categories,

due to the timing of orders, and obviously, currency was a large offset to an otherwise very strong hockey sales in the quarter. Given these currency headwinds*, the fact that we're still able to grow our business 9% is a testament to the strength of the brand and an indication that we continue to gain market share.* Included within these results was our hockey apparel business. *Booking orders for the upcoming hockey season, spanning the fourth and first fiscal quarters, met our expectations.*" Davis further boasted that PSG had "*experienced five consecutive quarters of double-digit currency-neutral hockey sales growth, well in excess of the broader hockey market.* As we look forward, we expect to continue to grow market share annually; however, the quarterly flow of that growth is likely to change year-over-year, given the cadence of product launches." Davis also stated that "Combat continues to grow nicely and has been a great addition to our portfolio, with a passionate and talented team bringing game-changing technology to baseball and softball athletes."

168.    PSG's and Defendants' April 2015 public statements were false and misleading. In particular, PSG's references to its "solid growth" and "five consecutive quarters of double-digit currency neutral hockey sales growth, well in excess of the broader hockey market," and its corresponding characterizations of the reasons for that growth – "solid demand for its products," "strength of the brand" and "gain[ing] market share," and a strong "organic growth profile" for the Company and Easton baseball/softball – concealed that PSG was achieving that growth not through a strong brand or growing consumer demand or market share gains, but rather through the use of PSG's high-risk, aggressive sales tactics, including (1) using discounts punitively to pressure retailers to buy progressively more PSG-branded product, (2) using high-volume sales of discounted product (referred to as "closeouts" at PSG) to drive sales growth, (3) routinely pushing and pulling orders into quarters to meet short-term sales targets and maintain the appearance of

consistent quarterly growth, (4) using wildly extended payment terms with retailers to enable them to take more PSG-branded product than they reasonably could to hit short-term sales targets, (5) pushing product out to customers in violation of PSG's customer credit limits, and (6) using consignment contracts, right-of-return contracts, and other non-final contract terms, in a deficient internal control environment, to push more PSG-branded product out into the marketplace. Defendants thus concealed the true drivers of PSG's sales and revenue growth and the substantial risks associated with the methods used to achieve that growth (discussed above).

169.    Defendants knew or recklessly disregarded that these statements were false and misleading. In particular, and in addition to the foregoing allegations, (1) Edward Kinnaly had warned Davis and Rosenthal as early as mid-2013 that their "gun to head" practices and focus on pushing out as much product as possible to get sales by any means necessary (*e.g.*, the emphasis on "Q2 go-get, Q3 go-get, bookings, more, more, more") had made the market and the business "[u]nhealthy" and "bloated," and would continue to expand that risk without changing PSG's sales practices (in response to which Davis and Rosenthal fired him), and (2) KPMG had already issued a significant deficiency in August 2014 to Davis and Rosenthal for PSG's deteriorated customer credit limits, placing them on notice that there were issues with the internal controls and creating a duty for them to ensure that PSG's representations regarding its growing sales were not concealing substantial credit and collectability risks.

### 3.    July 7 and 8, 2015

170.    After the market closed on July 7, 2015, PSG issued a press release entitled, "Performance Sports Group Provides Preliminary Fiscal Fourth Quarter and Full Year 2015 Results." The press release detailed PSG's preliminary financial position for the fourth quarter of its fiscal 2015. The following day, on July 8, 2015, the Company again held a conference call with

analysts regarding its fourth quarter and full year 2015 financial results. During the conference call, Davis explained, "As stated in our release last night *our anticipated fourth-quarter and full-year revenue results are record-setting and expected to contribute to another fantastic year for PSG delivering record returns for shareholders*. . . . The key components of this message is that *we continue to outpace the growth of the markets in which we participate by growing market share and profitability and we continue to leverage our Performance Sports platform which is improving efficiency and driving constant dollar currency profit growth rates that exceed our revenue growth.* While the rapid strengthening of the US dollar will continue to impact our reported results, especially in the first half of 2016, *we remain very well-positioned to continue our momentum into 2016 and beyond.*" Davis "reiterate[d] that the same *fundamental growth drivers* that attracted our current investors and have been articulated by all of our analysts *are very much alive and well inside of PSG*."

171.    PSG's and Defendants' July 2015 public statements – that PSG's fiscal year 2015 "record-setting" results were due to PSG's ability "to outpace the growth of the markets in which we participate by growing market share and profitability," that the Company's "platform" was "driving . . . growth rates," and that PSG's results and were based on "fundamental growth drivers," as well as the statement that the Company was "well-positioned to continue [its] momentum into 2016 and beyond" – were false and misleading, and contradicted by facts well known to Defendants: these statements concealed that PSG's "record" revenues were the result of PSG's high-risk, aggressive sales tactics, including (1) using discounts punitively to pressure retailers to buy progressively more PSG-branded product, (2) using high-volume sales of discounted product (referred to as "closeouts" at PSG) to drive sales growth, (3) routinely pushing and pulling orders into quarters to meet short-term sales targets and maintain the appearance of

consistent quarterly growth, (4) using wildly extended payment terms with retailers to enable them to take more PSG-branded product than they reasonably could to hit short-term sales targets, (5) pushing product out to customers in violation of PSG's customer credit limits, and (6) using consignment contracts, right-of-return contracts, and other non-final contract terms, in a deficient internal control environment, to push more PSG-branded product out into the marketplace. Defendants thus concealed the true drivers of PSG's sales and revenue growth and the substantial risks associated with the methods to achieve that growth (discussed above).

172.    Defendants knew or recklessly disregarded that these statements were false and misleading. In particular, and in addition to the foregoing allegations: (1) Edward Kinnaly had warned Davis and Rosenthal as early as mid-2013 that their "gun to head" practices and focus on pushing out as much product as possible to get sales by any means necessary (*e.g.*, the emphasis on "Q2 go-get, Q3 go-get, bookings, more, more, more") had made the market and the business "[u]nhealthy" and "bloated," and would continue to expand that risk without changing PSG's sales practices (in response to which Davis and Rosenthal fired him); (2) KPMG had already issued a significant deficiency in August 2014 to Davis and Rosenthal for PSG's deteriorated customer credit limits, placing them on notice that there were issues with the internal controls and creating a duty for them to ensure that PSG's representations regarding its growing sales were not concealing substantial credit and collectability risks; and (3) Roustan had warned Davis, Rosenthal, and the Board of Directors in May and June 2015 that he had learned that PSG was engaged in "extreme discounting . . . on some orders simply to make quarterly numbers," that PSG was perhaps "dumping products at below cost to make quarterly numbers," and that a majority of the retailers he had surveyed said that they had "been asked by Performance Sports Group Ltd. to

move orders forward into an earlier quarter" (in response, Davis and Rosenthal blocked Grant Thornton from releasing the survey results to Roustan and threatened all involved with litigation).

### 4.      August 26, 2015

173.      After the market closed on August 26, 2015, the Company issued a press release announcing its fourth quarter and full year 2015 financial results, which it again described as "record setting" ("August 26 Press Release").

174.      Explaining the "***record setting***" figures, the Management Commentary stated: "'Our fourth quarter and full year revenue results were ***record‑setting*** and contributed to ***market share gains in all of the sports we serve***,' said Kevin Davis, CEO of Performance Sports Group." Davis further stated that **"**[t]hese results reinforce that ***the fundamental building blocks of our shareholder value are continuing to perform quite strongly. Our Company continues to outpace the growth of the markets in which we participate by growing market share and profitability. We also continue to leverage our performance sports platform, which is driving cost efficiencies and, on a currency neutral basis, profit growth rates that exceed our revenue growth.*** We remain very well positioned to continue our momentum into fiscal 2016 and beyond."

175.      PSG's and Defendants' August 26, 2015 public statements – that PSG's "fundamental building blocks" were performing "quite strongly," that the Company's "platform" was "driving . . . growth rates," and that the Company's "record-setting" growth numbers were being driven by "market share gains in all of the sports we serve" and were "outpac[ing] the growth of the markets in which we participate by growing market share and profitability" – were false and misleading: those statements concealed that the true drivers for PSG's consistent "record-setting" sales growth were not market share gains across all sports and growing profitability, but instead the use of certain high-risk sales practices, including (1) using discounts punitively to pressure

retailers to buy progressively more PSG-branded product, (2) using high-volume sales of discounted product (referred to as "closeouts" at PSG) to drive sales growth, (3) routinely pushing and pulling orders into quarters to meet short-term sales targets and maintain the appearance of consistent quarterly growth, (4) using wildly extended payment terms with retailers to enable them to take more PSG-branded product than they reasonably could to hit short-term sales targets, (5) pushing product out to customers in violation of PSG's customer credit limits, and (6) using consignment contracts, right-of-return contracts, and other non-final contract terms, in a deficient internal control environment, to push more PSG-branded product out into the marketplace. Defendants thus concealed the true drivers of PSG's sales and revenue growth and the substantial risks associated with the methods used to achieve that growth (discussed above).

176.    Defendants knew or recklessly disregarded that these statements were false and misleading. In particular, and in addition to the foregoing allegations: (1) Edward Kinnaly had warned Davis and Rosenthal as early as mid-2013 that their "gun to head" practices and focus on pushing out as much product as possible to get sales by any means necessary (*e.g.*, the emphasis on "Q2 go-get, Q3 go-get, bookings, more, more, more") had made the market and the business "[u]nhealthy" and "bloated," and would continue to expand that risk without changing PSG's sales practices (in response to which Davis and Rosenthal fired him); (2) KPMG had already issued a significant deficiency in August 2014 to Davis and Rosenthal for PSG's deteriorated customer credit limits, placing them on notice that there were issues with the internal controls and creating a duty for them to ensure that PSG's representations regarding its growing sales were not concealing substantial credit and collectability risks; (3) Roustan had warned Davis, Rosenthal, and the Board of Directors in May and June 2015 that he had learned that PSG was engaged in "extreme discounting . . . on some orders simply to make quarterly numbers," that PSG was

perhaps "dumping products at below cost to make quarterly numbers," and that a majority of the retailers he had surveyed said that they had "been asked by Performance Sports Group Ltd. to move orders forward into an earlier quarter" (in response, Davis and Rosenthal blocked Grant Thornton from releasing the survey results to Roustan and threatened all involved with litigation); and (4) KPMG notified Davis and Rosenthal, in issuing its significant deficiency for PSG's internal controls in August 2015, that PSG was entering into consignment and right-of-return agreements with retailers that violated revenue recognition accounting rules, and that PSG's internal controls for contract management and record-keeping designed to accurately identify those contracts and protect against accounting violations were failing and needed remediation.

### 5.    August 27, 2015

177.    The following day, on August 27, 2015, the Company filed its annual report on Form 10-K with the SEC for the fiscal year ending May 31, 2015 (the "2015 Form 10-K"). Defendants Rosenthal and Davis each signed the 2015 Form 10-K and internal Company documents show that they played a critical part in crafting it.

178.    The 2015 Form 10-K reported record PSG sales and revenue growth, stating that "*[w]e continued to outpace the growth of the markets in which we participate by growing market share and profitability and we continue to leverage our performance sports platform, which is improving efficiency and driving constant currency profit growth that exceeds revenue growth*[.]" (2015 Form 10-K at 50-51.) Defendants Rosenthal and Davis also stated that "*[i]n recent years, we have experienced strong revenue and profit growth through innovation, product development, marketing and acquisitions that have driven market share gains in all of our sports.*" (*Id.* at 14.)

179.    The 2015 Form 10-K also continued to tout as a cause of the Company's growth

Defendants' ability to integrate its recently-acquired brands, like Easton and Combat: "We have repeatedly used our world-class performance sports product platform to grow our business into new performance equipment and apparel categories and sports markets. ***Our successful acquisition and integration of seven businesses since 2008 has demonstrated our ability to identify targets and integrate acquired businesses.*** We are continuing to explore a number of potential near-term opportunities to complement our organic growth." (2015 Form 10-K at 20.)

180.   Relatedly, the 2015 Form 10-K's risk factors warned investors that:

- "***[o]ur competitors may overproduce or face financial or liquidity difficulties which may lead them to release their products at lower prices into the market or offer discounts to clear their inventory***, resulting in decreased demand for our products," (2015 Form 10-K at 26);

- "[a]lthough our booking orders give us some visibility into our future financial performance, ***there may not be a direct relationship between our booking orders and our future financial performance given several factors, among which are: (i) the timing of order placement compared to historical patterns, (ii) our ability to service demand for our product, (iii) the willingness of our customers to commit to purchasing our product, and (iv) the actual sell-through of our products at retail driving changes in repeat orders***," (*id.* at 30);

- "[o]ur business is affected by seasonality, which could result in fluctuations in our operating results and the trading price of the Common Shares," and specifically stated that "***our customers may cancel orders, change delivery schedules or change the mix of products ordered with minimal notice. We may also make strategic decisions to deliver and invoice product at certain dates in order to lower costs or improve supply chain efficiencies***," (*id.*);

- "[t]he loss of one or more key customers could result in a material loss of revenues," specifically providing that "our customers in the retail industry continue to experience consolidation and some may face financial difficulties from time to time. A large portion of our sales are to specialty and 'big box' sporting goods retailers, certain of whom are not strongly capitalized. ***Adverse conditions in the sporting goods retail industry can adversely impact the ability of retailers to purchase our products, or could lead retailers to request credit terms that would adversely affect our cash flow and involve significant risks of nonpayment. As a result, we may experience a loss of customers or the un-collectability of accounts receivable in excess of amounts against which we have reserved, which could adversely affect our business and financial condition***," (*id.* at 32);

77

- "[p]roblems with [PSG's] distribution system could harm our ability to meet customer expectations, manage inventory, complete sales, and achieve objectives for operating efficiencies," and specifically stated that "*[i]f we encounter problems with our distribution system, our ability to meet customer expectations, manage inventory, complete sales and achieve objectives for operating efficiencies could be harmed, which could adversely affect our business and financial condition*," (*id.*);

- PSG's "results of operations may suffer if we are not able to accurately forecast demand for our products," and specifically stated the following: "To reduce purchasing costs and ensure supply, we place orders with our suppliers in advance of the time period we expect to deliver our products. However, a large portion of our products are sold into consumer markets that are difficult to accurately forecast. *If we fail to accurately forecast demand for our products, we may experience excess inventory levels or inventory shortages.* Factors that could affect our ability to accurately forecast demand for our products include, among others: . . . *changes in consumer demand for our products or the products of our competitors*," "*failure to accurately forecast consumer acceptance of our products*," "*inability to realize revenues from booking orders*," "*unanticipated changes in general market conditions or other factors,* which may result in cancellations of advance orders or a reduction or increase in the rate of reorders placed by retailers," and that "*[i]nventory levels in excess of consumer demand may result in inventory write-downs and the sale of excess inventory at discounted prices, which could significantly harm our operating results and impair the value of our brands. Inventory shortages may result in unfulfilled orders, negatively impact customer relationships, diminish brand loyalty and result in lost revenues, any of which could adversely affect our business and financial condition*," (*id.* at 34).

181.   The 2015 Form 10-K also provided the following rules governing PSG's recognition of revenue: "*[s]ales are recognized, in general, as products are shipped to customers, net of an allowance for sales returns and sales programs in accordance with Accounting Standards Codification ("ASC") Topic 605,* **Revenue Recognition.** . . . The criteria for recognition of revenue are met when persuasive evidence that an arrangement exists and both title and risk of loss have passed to the customer, the price is fixed or determinable and collectability is reasonably assured. Sales returns are estimated based upon historical returns, current economic trends, changes in customer demands and sell-through of products." (2015 Form 10-K at 89.)

182.   The 2015 Form 10-K was signed by Defendants Davis and Rosenthal. Attached to

the 2015 Form 10-K were certifications pursuant to the Sarbanes-Oxley Act ("SOX certifications") signed by Defendants Davis and Rosenthal attesting to the accuracy of financial reporting and effectiveness of the Company's internal controls. In their certifications, Davis and Rosenthal both stated that the 2015 Form 10-K "*does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading*," that they had "[d]esigned [PSG's] disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, *to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities*, particularly during the period in which this report is being prepared," that they had "[d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, *to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements* for external purposes in accordance with generally accepted accounting principles," that they had "[e]valuated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation," and that they had "[d]isclosed in this report *any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter* (the registrant's fourth fiscal quarter in the case of an annual report) *that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting*[.]" (2015 Form 10-K, Exs. 31.1, 31.2.)

183.   On the same day, the Company held a conference call to discuss PSG's first quarter 2016 financial results. On the call, Davis stated that "*the growth of our brand continues to outpace*

*the growth of the markets in which we participate, resulting in growing market share each year, and while also growing our profitability.*" He stated that "[h]ockey grew 17% in the fourth quarter and 13% for the year on a constant-currency basis. This is an incredible performance and I want to again thank our hard-working Bauer team for another outstanding year." Davis further stated that an analyst's analysis of "high single-digit rate" growth in hockey sales was "directionally correct," and he attributed that growth to "*growth in the sport, particularly in the U.S., from participation*," and "improved innovation" in PSG's product development.

184.    Davis also stated that "we believe in general that *the inventory situation is relatively healthy, particularly in hockey. Outside of hockey, there's been a lot of changes in the baseball marketplace with acquisitions and brand movements and new product launches. There's probably a bit of excess inventory out there as a result of some of those actions in the baseball market in the U.S. Nothing alarming, but there's probably some excess inventory there that retailers need to work through. But otherwise we consider the businesses that we're in to be – and at retail – to be relatively healthy inventory levels.* We can't speak to what our competitors have in their warehouses to ship, but certainly for us and for the retail partners, we believe that the inventory position is healthy."

185.    These representations in the 2015 Form 10-K and accompanying earnings call were false and misleading. *First*, PSG's and Defendants' representations about PSG's sales growth – that the Company was "outpac[ing] the growth of the markets in which we participate by growing market share and profitability," and that PSG's growth was attributable to its "performance sports platform," "innovation, product development, [and] marketing," "growth in the sport [of hockey]," or to Defendants' "successful acquisition and integration of seven businesses since 2008" – were false and misleading because they concealed that those factors were not driving PSG's continued

growth, and that instead the growth was being driven by PSG's high-risk sales practices, including (1) using discounts punitively to pressure retailers to buy progressively more PSG-branded product, (2) using high-volume sales of discounted product (referred to as "closeouts" at PSG) to drive sales growth, (3) routinely pushing and pulling orders into quarters to meet short-term sales targets and maintain the appearance of consistent quarterly growth, (4) using wildly extended payment terms with retailers to enable them to take more PSG-branded product than they reasonably could to hit short-term sales targets, (5) pushing product out to customers in violation of PSG's customer credit limits, and (6) using consignment contracts, right-of-return contracts, and other non-final contract terms, in a deficient internal control environment, to push more PSG-branded product out into the marketplace. Moreover, PSG's ability to integrate its acquired brands was (as discussed above) dismal, particularly with respect to Easton baseball/softball and Combat, as demonstrated by the repeated internal control significant deficiencies that KPMG issued to Davis and Rosenthal.

186.   *Second*, PSG's and Defendants' representations about PSG's business risks and marketplace inventory – *i.e.*, that "competitors may overproduce or face financial or liquidity difficulties which may lead them to" stuff the market with cheaper or more inventory, that "booking orders" may not directly relate to "future financial performance, that "fail[ure] to accurately forecast demand for our products" could cause "excess inventory levels or inventory shortages," that "[i]nventory levels in excess of consumer demand may result in inventory write-downs and the sale of excess inventory at discounted prices," and that "[t]here's probably a bit of excess inventory out there as a result of some of those actions in the baseball market in the U.S.," but that it was "[n]othing alarming" – were false and misleading because they concealed that those risks and trends were not hypothetical but then-present and actively occurring; further, they

concealed that those risks and trends were not being caused by outside market forces or competitors, but rather by PSG's and Defendants' own use of the high-risk sales practices enumerated above.

187.   *Third*, PSG's and Defendants' representations about the nature of certain of PSG's business practices or operations – *i.e.*, that PSG "may also make strategic decisions to deliver and invoice product at certain dates in order to lower costs or improve supply chain efficiencies," that "[a]dverse conditions in the sporting goods retail industry can adversely impact the ability of retailers to purchase our products, or could lead retailers to request credit terms that would adversely affect our cash flow and involve significant risks of nonpayment," or that "problems with our distribution system . . . could adversely affect our business and financial condition" – were false and misleading. They concealed that PSG was using these practices to drive growth and sales (not for the reasons identified), that these practices were not hypothetical responses to adverse market conditions, but instead were then-present tools to drive sales growth, that these practices (particularly strategic timing of deliveries and invoices, the "pulls") were causing higher costs and supply chain *inefficiencies*, and that PSG was using credit terms with "significant risks of nonpayment" to drive sales growth (not in response to adverse, uncontrolled market conditions).

188.   *Finally*, PSG's and Defendants' representations regarding PSG's internal controls and accounting policies – that "[s]ales are recognized, in general, as products are shipped to customers, net of an allowance for sales returns and sales programs in accordance with" accounting rules, that the 2015 Form 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading," that Davis and Rosenthal had designed (or caused to be designed) PSG's internal controls "to ensure that material information relating to the

82

registrant, including its consolidated subsidiaries, is made known to us by others within those entities" and "to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements," and that they had disclosed "any change in [PSG'] internal control over financial reporting that . . . is reasonably likely to materially affect" that control – were false and misleading. Those statements concealed that PSG's internal controls involving its credit limits and contract management/recordkeeping were deficient to such a degree that they would ultimately cause KPMG's and the Audit Committee's internal investigation to trigger PSG's default and bankruptcy – and further concealed that PSG had violated accounting rules governing revenue recognition so often and to such a degree that KPMG and the Audit Committee could not complete or sign-off on PSG's fiscal year 2016 annual report, triggering PSG's default and bankruptcy.

189.    Defendants knew or recklessly disregarded that these statements were false and misleading. In particular, and in addition to the foregoing allegations: (1) Edward Kinnaly had warned Davis and Rosenthal as early as mid-2013 that their "gun to head" practices and focus on pushing out as much product as possible to get sales by any means necessary (*e.g.*, the emphasis on "Q2 go-get, Q3 go-get, bookings, more, more, more") had made the market and the business "[u]nhealthy" and "bloated," and would continue to expand that risk without changing PSG's sales practices (in response to which Davis and Rosenthal fired him); (2) KPMG had already issued a significant deficiency in August 2014 to Davis and Rosenthal for PSG's deteriorated customer credit limits, placing them on notice that there were issues with the internal controls and creating a duty for them to ensure that PSG's representations regarding its growing sales were not concealing substantial credit and collectability risks; (3) Roustan had warned Davis, Rosenthal, and the Board of Directors in May and June 2015 that he had learned that PSG was engaged in

"extreme discounting . . . on some orders simply to make quarterly numbers," that PSG was perhaps "dumping products at below cost to make quarterly numbers," and that a majority of the retailers he had surveyed said that they had "been asked by Performance Sports Group Ltd. to move orders forward into an earlier quarter" (in response, Davis and Rosenthal blocked Grant Thornton from releasing the survey results to Roustan and threatened all involved with litigation); and (4) KPMG notified Davis and Rosenthal, in issuing its significant deficiency for PSG's internal controls in August 2015, that PSG was entering into consignment and right-of-return agreements with retailers that violated revenue recognition accounting rules, and that PSG's internal controls for contract management and record-keeping designed to accurately identify those contracts and protect against accounting violations were failing and needed remediation.

### 6. October 14 and 15, 2015

190.    On October 14, 2015, PSG filed its financial results on Form 10-Q for the first quarter of the 2016 fiscal year ending August 31, 2015 ("Q1 2016 10-Q"). Like the 2015 Form 10-K, the Q1 2016 10-Q was accompanied by identical SOX certifications signed by Defendants Davis and Rosenthal which represented that the information included therein was true and correct and that the Company's internal controls were effective. These SOX certifications were false and misleading for the reasons described above at paragraph 182.

191.    Davis stated on the October 15, 2015 earnings call that PSG "***continue[d] to see solid growth across our brand, including continued market share gains in the recently-completed back-to-hockey season***[.]" In response to an analyst's question regarding sales performance, Davis said that "[t]here has been a little of consolidation in the U.S. hockey retail market over the past several months with two of the top three retailers in the U.S. hockey market making acquisitions of two other retailers who are in the top seven. To say it in another [way] the

top seven are now the top five. I think also, there has been some remix of where our lacrosse product is being sold between specialty and mass retailers with [indiscernible] starting to take a little bit more share in the lacrosse base, as they dedicate more and more space to selling that product. ***But otherwise, we don't see any sort of decline in demand from consumers for those products.***"

192.   Davis also touted Easton's continued "market share expansion" in baseball, and stated that "COMBAT had a very strong first quarter, growing constant currency revenues by 80%." Davis further stated that PSG's "gains . . . over the past couple of years, ***have been primarily share based and you have obviously seen the growth in market share we have had in hockey and lacrosse. We are certainly growing each of those sports over the past several years at a faster rate than the underlying growth rates of the sports themselves.*** But I would not conclude that the underlying growth rates for the sports themselves as a demand from consumers is weak."

193.   These statements were false and misleading because they failed to disclose that PSG's purported growth over the prior few years was not due to "share based" gains in the market or growth in consumer demand, *i.e.*, "growing each of these sports," but rather was the result of PSG's high-risk, aggressive sales tactics, including (1) using discounts punitively to pressure retailers to buy progressively more PSG-branded product, (2) using high-volume sales of discounted product (referred to as "closeouts" at PSG) to drive sales growth, (3) routinely pushing and pulling orders into quarters to meet short-term sales targets and maintain the appearance of consistent quarterly growth, (4) using wildly extended payment terms with retailers to enable them to take more PSG-branded product than they reasonably could to hit short-term sales targets, (5) pushing product out to customers in violation of PSG's customer credit limits, and (6) using consignment contracts, right-of-return contracts, and other non-final contract terms, in a deficient

internal control environment, to push more PSG-branded product out into the marketplace.

194.    Defendants knew or recklessly disregarded that these statements were false and misleading. In particular, and in addition to the foregoing allegations: (1) Edward Kinnaly had warned Davis and Rosenthal as early as mid-2013 that their "gun to head" practices and focus on pushing out as much product as possible to get sales by any means necessary (*e.g.*, the emphasis on "Q2 go-get, Q3 go-get, bookings, more, more, more") had made the market and the business "[u]nhealthy" and "bloated," and would continue to expand that risk without changing PSG's sales practices (in response to which Davis and Rosenthal fired him); (2) KPMG had already issued a significant deficiency in August 2014 to Davis and Rosenthal for PSG's deteriorated customer credit limits, placing them on notice that there were issues with the internal controls and creating a duty for them to ensure that PSG's representations regarding its growing sales were not concealing substantial credit and collectability risks; (3) Roustan had warned Davis, Rosenthal, and the Board of Directors in May and June 2015 that he had learned that PSG was engaged in "extreme discounting . . . on some orders simply to make quarterly numbers," that PSG was perhaps "dumping products at below cost to make quarterly numbers," and that a majority of the retailers he had surveyed said that they had "been asked by Performance Sports Group Ltd. to move orders forward into an earlier quarter" (in response, Davis and Rosenthal blocked Grant Thornton from releasing the survey results to Roustan and threatened all involved with litigation); (4) KPMG notified Davis and Rosenthal, in issuing its significant deficiency for PSG's internal controls in August 2015, that PSG was entering into consignment and right-of-return agreements with retailers that violated revenue recognition accounting rules, and that PSG's internal controls for contract management and record-keeping designed to accurately identify those contracts and protect against accounting violations were failing and needed remediation; and (5) Davis and

Rosenthal themselves had been "flogged" in October 2015 by the Board of Directors' Audit Committee when it began to ask questions about how recklessly PSG had treated its customer credit limits.

### 7.     January 14, 2016

195.     On the January 14, 2016 earnings call, Davis stated that "*our brands continued to take market share, and demonstrated strong resilience in some very challenging markets.*" Davis revised the estimated adjusted earnings per share downward by 50%, or $0.12 compared to the second quarter of fiscal year 2015, and stated that the adjusted earnings per share on a year-to-date basis was down 66%. He attributed 2/3 of the decline to "change in currency rate," and the remaining 1/3 "to the change in launch timing of new products in baseball and hockey."

196.     Further, in response to several questions about the amount of hockey inventory in the market (the state of the "channel"), Davis stated that while consolidation in the hockey market contributed to "inefficiencies," *he did not "know that I'd call the inventory levels excessive, as much as they are not as efficient as you would expect once this consolidation occurred*. That's our view of the driver . . . impacting the U.S. market, and not the Canadian or the European markets." In response to a follow-up question about "actual numbers" for inventory in the channel, Davis said the information was not available to him and declined to share any additional information: "[w]hat we do is we rely on discussions with our customers to try and get a sense of inventory levels in the market place." When an analyst asked about how retailers work through excess inventory, Davis stated that "it's a combination of price and other promotional activity that you would expect," and volunteered that with respect to *"sell-through for our brands, we're hearing positive things generally speaking across the entire spectrum of products that we offer. I think that's a statement about the quality of our products, the strength of our brand, and the*

demand creation that we do at every level in the sport."

197.   These statements – that PSG's "brands continued to take market share and demonstrated strong resilience," and that Defendants were "hearing positive things" about the sell-through for the Company's brands – were false and misleading because they failed to disclose that inventory levels *were* excessive, that "sell-through" for PSG's brands was not positive, and that the high levels of inventory were the result of PSG's high-risk, aggressive sales tactics, including (1) using discounts punitively to pressure retailers to buy progressively more PSG-branded product, (2) using high-volume sales of discounted product (referred to as "closeouts" at PSG) to drive sales growth, (3) routinely pushing and pulling orders into quarters to meet short-term sales targets and maintain the appearance of consistent quarterly growth, (4) using wildly extended payment terms with retailers to enable them to take more PSG-branded product than they reasonably could to hit short-term sales targets, (5) pushing product out to customers in violation of PSG's customer credit limits, and (6) using consignment contracts, right-of-return contracts, and other non-final contract terms, in a deficient internal control environment, to push more PSG-branded product out into the marketplace.

198.   Defendants knew or recklessly disregarded that these statements were false and misleading. In particular, and in addition to the foregoing allegations: (1) Edward Kinnaly had warned Davis and Rosenthal as early as mid-2013 that their "gun to head" practices and focus on pushing out as much product as possible to get sales by any means necessary (*e.g.*, the emphasis on "Q2 go-get, Q3 go-get, bookings, more, more, more") had made the market and the business "[u]nhealthy" and "bloated," and would continue to expand that risk without changing PSG's sales practices (in response to which Davis and Rosenthal fired him); (2) KPMG had already issued a significant deficiency in August 2014 to Davis and Rosenthal for PSG's deteriorated customer

credit limits, placing them on notice that there were issues with the internal controls and creating

a duty for them to ensure that PSG's representations regarding its growing sales were not

concealing substantial credit and collectability risks; (3) Roustan had warned Davis, Rosenthal,

and the Board of Directors in May 2015, June 2015, and then again in December 2015 that he had

learned that PSG was engaged in "extreme discounting . . . on some orders simply to make

quarterly numbers," that PSG was perhaps "dumping products at below cost to make quarterly

numbers," and that a majority of the retailers he had surveyed said that they had "been asked by

Performance Sports Group Ltd. to move orders forward into an earlier quarter" (in response, Davis

and Rosenthal blocked Grant Thornton from releasing the survey results to Roustan and threatened

all involved with litigation); (4) KPMG notified Davis and Rosenthal, in issuing its significant

deficiency for PSG's internal controls in August 2015, that PSG was entering into consignment

and right-of-return agreements with retailers that violated revenue recognition accounting rules,

and that PSG's internal controls for contract management and record-keeping designed to

accurately identify those contracts and protect against accounting violations were failing and

needed remediation; (5) Davis and Rosenthal themselves had been "flogged" in October 2015 by

the Board of Directors' Audit Committee when it began to ask questions about how recklessly

PSG had treated its customer credit limits; and (6) KPMG issued *another* significant deficiency in

January 2016 to PSG regarding its customer credit limits.

### E.   Defendants and PSG violated Item 303 of Regulation S-K by failing to disclose unfavorable known trends or uncertainties.

199.    Item 303 of Regulation S-K, 17 C.F.R. 229.303, requires public companies, in their

Form 10-K filings, to "*[d]escribe any known trends or uncertainties that have had or that the

registrant reasonably expects will have a material favorable or unfavorable impact on net sales

or revenues or income from continuing operations.* If the registrant knows of events that will

cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed."

200.    PSG and its senior executives, Davis and Rosenthal, knew PSG's success was due, at least in substantial part, to PSG's high-risk sales practices, including pressuring customers to accept orders before they were needed, placing orders earlier and earlier, penalizing customers that did not increase their PSG bookings by removing existing discounts regardless of whether market demand could support such increases, flooding the market with "closeouts" to meet growth targets, using extended payment terms with financially troubled accounts, pushing product out to customers in violation of Company credit limits, and using consignment contracts in a deficient internal control environment.

201.    PSG and the Defendants further knew that the Company's sales practices were not sustainable and that they were reasonably likely to catch up with PSG and/or trigger accounting violations, especially in light of the fact that Roustan, Kinnaly, KPMG, and customers (including CW3) repeatedly told PSG so in face-to-face meetings, in reports, and in direct correspondence – and would thus result in a significant drop in sales and revenue as PSG adjusted its financial outlook to accurately reflect true market demand or cause the marketplace to stop accepting PSG branded product.

202.    These trends and circumstances were known to PSG and Defendants at the time when PSG filed its 2015 Annual Report on Form 10-K during the Class Period, which failed to disclose these known trends. As a result, Defendants caused PSG to violate Item 303 of Regulation S-K by failing to disclose this known trend and uncertainty to the marketplace.

203.    Rather than disclosing any known trend, Defendants and PSG offered pretextual

reasons for the failure of PSG's business, attempting to conceal the adverse trends they should have disclosed behind explanations of purportedly unpredictable, unforeseen, and act-of-God-like changes in the marketplace. But these explanations were false and misleading, as revealed by contemporaneous comparisons with PSG's competitors. According to PSG's 2015 Annual Report, PSG's primary competitors in the baseball and softball space were Amer Sports (owners of the Wilson and Louisville Slugger baseball brands), Newell Brands (owner of Rawlings), and Mizuno. Nike was not listed in PSG's Annual Report as a primary competitor, but only as competitive in some "specific categories such as batting gloves." (2015 Form 10-K at 9.) Contrary to PSG's and Defendants' claims of market conditions as the cause of the Company's poor performance in late calendar year 2015, the CEO of Amer Sports stated on February 3, 2016 at Amer's own Q4 2015 earnings conference call that its "pipeline is strong and momentum is good behind Louisville Slugger. As for our baseball overall, [ ] its fine. And we expect the year to be good."

204.    In its Q1 2016 earnings presentation, Amer also reported that its footwear revenue was up 16%, its apparel revenue was up 19%, its sports instruments revenue (including baseball bats) was up 14%, and overall net sales were up 11%. In summary, Amer told the market that they were observing "broad-based growth in team sports further supported by Louisville Slugger." Similarly, Michael Polk, Newell Brand's CEO, in that company's own Q1 2016 earnings release, stated, "We are extremely pleased with our growth and financial results this quarter."

205.    In the hockey space, PSG competed with Reebok-CCM Hockey, which is owned by Adidas AG. In Adidas' fiscal year 2015 Annual Report, dated March 3, 2016, Adidas also explained that it was experiencing "high single-digit increases at Reebok-CCM Hockey and double-digit sales increases in other centrally managed businesses." This was reported at the same time that PSG was reporting its own decreases as alleged herein.

## LOSS CAUSATION

206.   During the Class Period, as detailed herein, PSG and Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated and/or maintained the price of PSG's common stock and operated as a fraud or deceit on Class Period purchasers of PSG's common stock by failing to disclose, misrepresenting, and concealing the true reasons for the growth of the Company's sales, the risks associated with the methods Defendants used to achieve that growth, and the deteriorated internal control environment that Defendants needed to manage those risks. As the risks of PSG's and Defendants' fraudulent scheme materialized and the falsity of their prior misrepresentations and fraudulent conduct began to leak out and become apparent to the market, the artificial inflation embedded in the price of PSG common stock began to dissipate, the price of PSG common stock declined significantly, and the Company was ultimately forced into bankruptcy.

207.   As a result of their purchases of PSG common stock during the Class Period, Lead Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws. PSG's and Defendants' false and misleading statements and omissions had their intended effect and caused PSG common stock to trade at artificially-inflated and/or maintained levels throughout the Class Period, reaching as high as $21.65 per share on May 18, 2015.

208.   By concealing from investors the adverse facts detailed herein, PSG and Defendants presented a misleading picture of PSG's business, products, operations, and risks. As the truth about the Company materialized and began to be revealed to the market, the price of PSG common stock began to fall significantly. These declines removed the artificial inflation from the price of PSG common stock, causing real economic loss to investors who had purchased PSG common stock during the Class Period.

209.    The declines in the price of PSG common stock after the truth came to light were a direct result of the nature and extent of Defendants' fraudulent misrepresentations and omissions being revealed to investors and the market. The timing and magnitude of the price decline in PSG common stock indicate that the losses suffered by Lead Plaintiff and Class members was not exclusively caused by changed market conditions, overall stock market and/or industry-specific factors, or Company-specific information unrelated to PSG's and Defendants' fraudulent conduct.

## RELIANCE

210.    At all relevant times, the market for PSG's common stock was an efficient market for the following reasons, among others: (1) PSG common stock met the requirements for listing and was listed and actively traded on the NYSE during the Class Period, a highly efficient and automated market; (2) as a regulated issuer during the Class Period, PSG filed periodic public reports with the SEC and the NYSE; (3) PSG regularly communicated with public investors via established market communications mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and (4) PSG was followed by several securities analysts employed by major brokerage firms who wrote the reports that were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

211.    As a result of the foregoing, the market for PSG common stock promptly digested current information regarding PSG from all publicly available sources, including nationally circulated newspapers, and reflected such information in PSG's stock price. Under these circumstances, all purchasers of PSG common stock during the Class Period suffered similar injury through their purchases of PSG common stock at artificially inflated and/or maintained prices and

a presumption of reliance applies to Lead Plaintiff's allegations.

212.   Lead Plaintiff and the Class are also entitled to a presumption of reliance under *Affiliated Ute v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are primarily predicated upon the omission of material facts that PSG and Defendants had a duty to disclose, namely that PSG's financial results during the Class Period were the result of undisclosed high-risk sales practices and failing internal controls that had the effect of inflating the Company's performance.

## NO SAFE HARBOR

213.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those purportedly forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of PSG who knew that those statements were false when made.

## CLASS ACTION ALLEGATIONS

214.   Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3) on behalf of a class consisting of all persons and entities that purchased or acquired PSG common stock on the New York Stock Exchange ("NYSE") during

the Class Period, seeking to pursue remedies under the Exchange Act. Excluded from the Class are Defendants; the officers and directors of the Company, at all relevant times; members of their immediate families and their legal representatives, heirs, successors, or assigns; and any entity in which any of the Defendants have or had a controlling interest.

215. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, PSG common stock was actively traded on the NYSE. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Millions of PSG shares were traded publicly during the Class Period on the NYSE. Record owners and other members of the Class may be identified from records maintained by PSG or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

216. Lead Plaintiff's claims are typical of the claims of Class members, who were all similarly affected by Defendants' wrongful conduct in violation of the federal securities laws that is complained of herein. Further, Lead Plaintiff will fairly and adequately protect the interests of Class members and has retained counsel competent and experienced in class and securities litigation.

217. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a) whether the federal securities laws were violated by PSG's and Defendants' conduct alleged herein;

b) whether statements made by PSG and Defendants to the investing public during the

Class Period omitted or misrepresented material facts about the business, operations, known trends, and prospects of PSG; and

c)       to what extent Class members have sustained damages and the proper measure of damages.

218.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Further, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for Class members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## CAUSES OF ACTION

### COUNT I

**(Against Defendants for Violation of Section 10(b) of the Exchange Act and
Rule 10b-5 of the Securities and Exchange Commission)**

219.     Lead Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

220.     This Count is asserted against both Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder.

221.     During the Class Period, Defendants, singularly and in concert, directly made various deceptive and untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading to Lead Plaintiff and the other members of the Class, including statements in SEC filings and other public statements that falsely touted the financial strength of the Company and strength and growth of the Company's sales and revenue streams. The purpose and effect of said scheme, plan, and unlawful course of conduct was, among other things, to induce

96

Lead Plaintiff and the other members of the Class to purchase PSG common stock during the Class Period at artificially inflated and/or maintained prices.

222.   During the Class Period, PSG and Defendants knowingly and/or recklessly issued, caused to be issued, or participated in the issuance of, the preparation and issuance of deceptive and materially false and misleading statements to the investing public as particularized above.

223.   As a result of the dissemination of the false and misleading statements set forth above, the price of PSG common stock was artificially inflated and/or maintained during the Class Period. In ignorance of the false and misleading nature of the statements described above and the deceptive and manipulative devices and contrivances employed by PSG and Defendants, Lead Plaintiff and the other members of the Class relied, to their detriment, on the integrity of the price of the common stock of PSG. Had Lead Plaintiff and the other members of the Class known the truth, they would not have purchased said shares or would not have purchased them at the inflated prices that were paid.

224.   Lead Plaintiff and the other members of the Class have suffered substantial damages as a result of the wrongs alleged herein in an amount to be proven at trial.

225.   By reason of the foregoing, Defendants directly violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading during the Class Period.

## COUNT II

**(Against Defendants for Violation of Section 20(a) of the Exchange Act)**

226.   Lead Plaintiff repeats and realleges each and every allegation contained in each of the foregoing paragraphs as if set forth fully herein.

227.    Defendants Davis and Rosenthal, by virtue of their positions and specific acts described above, were, at the time of the wrongs alleged herein, controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act.

228.    Defendants had the power and influence and exercised the same to cause the Company to engage in the illegal conduct and practices complained of herein.

229.    By reason of the conduct alleged in Count I of this Complaint which also applies to the Company and for which the Company would be liable had it been named as a Defendant herein, Defendants are liable for the aforesaid wrongful conduct as control persons of the Company, and are liable to Lead Plaintiff and to the other members of the Class for the substantial damages which they suffered in connection with their purchases of PSG common stock during the Class Period.

WHEREFORE, Lead Plaintiff prays for relief and judgment, as follows:

(a)    determining that this action is a proper class action and certifying Lead Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure;

(b)    awarding compensatory damages in favor of Lead Plaintiff and the other Class members against both Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    such other and further relief as the Court may deem just and proper.

### JURY DEMAND

Lead Plaintiff demands a trial by jury.

Dated: September 6, 2019

Respectfully submitted,

**COHEN MILSTEIN SELLERS
    & TOLL PLLC**

*/s/ Carol V. Gilden*
Carol V. Gilden
190 South LaSalle Street
Suite 1705
Chicago, IL 60603
Tel. (312) 357-0370
Fax (312) 357-0369

Steven J. Toll
S. Douglas Bunch (SB-3028)
1100 New York Avenue N.W.
Suite 500, West Tower
Washington, D.C. 20005
Tel. (202) 408-4600
Fax (202) 408-4699

Alice R. Buttrick (5444120)
88 Pine Street
14th Floor
New York, NY 10005
Tel. (212) 838-7797
Fax (212) 838-7745

*Attorneys for the Plumbers & Pipefitters
National Pension Fund and Lead Counsel for
the Class*

**O'DONOGHUE & O'DONOGHUE LLP**
Mark W. Kunst
4748 Wisconsin Avenue N.W.
Washington, D.C. 20016
Tel. (202) 362-0041
Fax (202) 362-2640

*Additional Attorneys for the Plumbers &
Pipefitters National Pension Fund*

99

## CERTIFICATION

Toni C. Inscoe, Fund Administrator for the Plumbers & Pipefitters National Pension Fund ("Plumbers National Pension Fund"), declares, as to the claims asserted under the federal securities law, that:

1.    I am authorized to make this certification on behalf of Plumbers National Pension Fund.

2.    I have reviewed the third amended complaint to be filed in this matter and wish to continue to serve as lead plaintiff.

3.    Plumbers National Pension Fund did not purchase the securities that are the subject of this action at the direction of its counsel or to participate in this action.

4.    Plumbers National Pension Fund continues to be willing to serve as a lead plaintiff and class representative on behalf of the Class, including providing testimony at deposition and trial if necessary.

5.    Plumbers National Pension Fund's transactions in the securities of Performance Sports Group Ltd. that are the subject of this action are set forth in Schedule A, attached hereto.

6.    In the three years prior to the date of this certification, Plumbers National Pension Fund sought to serve as a representative party for a class under the federal securities laws in the following cases:

- *Plumbers and Pipefitters National Pension Fund v. Alta Mesa Resources, Inc. et al.*, No. 4:19-cv-02982 (S.D. Tex.); *Camelot Event Driven Fund, A Series of Frank Funds Trust v. Alta Mesa Resources, Inc. f/k/a Silver Run Acquisition Corporation II*, No. 4:19-cv-00957 (S.D. Tex.); *FNY Partners Fund LP et al v. Alta Mesa Resources, Inc. f/k/a Silver Run Acquisition Corporation II et al.*, 4:19-cv-01027 (S.D. Tex.);
- *Abarrientos v. Tableau Software, Inc. et al.*, No. 2:17-cv-01175 (W.D. Wash.); *Scheufele et al. v. Tableau Software, Inc. et. al.*, No. 1:17-cv-05753 (S.D.N.Y.); and
- *Luna v. Marvell Technology Group, Ltd. et al.*, Civ. No. 15-cv-07214 (S.D.N.Y.) (transferred to N.D. Cal. as Case No. 3:15-cv-05447).

7.    Plumbers National Pension Fund will not accept any payment for serving as a class representative on behalf of the class beyond its *pro rata* share of any recovery, except such reasonable costs and expenses (including lost wages) relating to representation of the class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this ___6___ day of September, 2019.

Toni C. Inscoe
Fund Administrator
*Plumbers & Pipefitters National Pension Fund*

2

# SCHEDULE A

**SCEHDULE A**

| Trade Date | Transaction Type | # Shares | Share Price ($) |
|------------|------------------|----------|-----------------|
| 8/28/2015 | PURCHASES | 8,700 | 12.94 |
| 8/28/2015 | PURCHASES | 5,000 | 12.88 |
| 8/31/2015 | PURCHASES | 6,800 | 12.93 |
| 9/1/2015 | PURCHASES | 4,900 | 12.52 |
| 9/2/2015 | PURCHASES | 1,400 | 12.15 |
| 9/2/2015 | PURCHASES | 1,000 | 12.15 |
| 9/3/2015 | PURCHASES | 2,095 | 12.95 |
| 9/8/2015 | PURCHASES | 7,473 | 13.81 |
| 9/25/2015 | PURCHASES | 11,300 | 13.97 |
| 9/29/2015 | PURCHASES | 1,800 | 13.89 |
| 10/1/2015 | PURCHASES | 2,900 | 12.58 |
| 11/3/2015 | PURCHASES | 6,450 | 11.87 |
| 11/4/2015 | PURCHASES | 10,049 | 11.87 |
| 11/10/2015 | PURCHASES | 7,825 | 11.1 |
| 11/30/2015 | PURCHASES | 8,700 | 11.62 |
| 12/7/2015 | PURCHASES | 4,300 | 11.46 |
| 12/8/2015 | PURCHASES | 7,700 | 11.18 |
| 12/9/2015 | PURCHASES | 4,740 | 10.96 |
| 1/20/2016 | PURCHASES | 1,650 | 5.83 |
| 3/8/2016 | SALES | 13,700 | 3.93 |
| 3/8/2016 | SALES | 49,700 | 3.18 |
| 3/9/2016 | SALES | 22,800 | 3.3 |
| 3/10/2016 | SALES | 18,582 | 3.8 |

2