UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
                                                      :
JUAN FRANCISCO GONZALEZ NIEVES AS                     :
TRUSTEE OF THE GONZALEZ CORONADO                      :
TRUST, individually and on behalf of all others       :
similar situated,                                      :
                                                      :
                              Plaintiff,              :        Case No. 1:16-cv-03591-GHW
                                                      :
              - against -                             :
                                                      :
KEVIN DAVIS and AMIR ROSENTHAL,                       :
                                                      :
                              Defendants.             :
---------------------------------------------------------------x

# DEFENDANTS' MEMORANDUM OF LAW
# IN SUPPORT OF MOTION TO DISMISS
# THE THIRD AMENDED COMPLAINT

FRIEDMAN KAPLAN SEILER &
ADELMAN LLP

Edward A. Friedman
Jason C. Rubinstein
Timothy M. Haggerty
7 Times Square
New York, New York 10036-6516

*Attorneys for Defendant Amir Rosenthal*

COVINGTON & BURLING LLP

Alan Vinegrad
David L. Kornblau
Fatmata S. Kabia
The New York Times Building
620 Eighth Avenue
New York, New York 10018

*Attorneys for Defendant Kevin Davis*

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ...................................................................................... iii

PRELIMINARY STATEMENT ................................................................................... 1

PRIOR PROCEEDINGS ........................................................................................... 4

ALLEGATIONS OF THE COMPLAINT ..................................................................... 6

      A.     The Parties ........................................................................................... 6

      B.     The Claims in the TAC ........................................................................ 7

ARGUMENT ........................................................................................................... 9

    I.      THE FUND HAS FAILED TO STATE A CLAIM FOR SECURITIES
          FRAUD ......................................................................................................... 9

      A.     The Fund Has Failed to Plead an Actionable Misstatement or
            Omission .............................................................................................. 10

          1.     The TAC Fails to Allege Any Omission of Information
               that Defendants Had a Duty to Disclose ...................................... 10

               a.     PSG Had No Duty To Disclose Legitimate Sales
                    Practices ............................................................................ 11

               b.     The Fund Fails to Allege Any Internal Control
                    Deficiency That Defendants Were Required to
                    Disclose ............................................................................. 16

               c.     The Fund Fails to Allege Any Violation of
                    GAAP, Let Alone One that Defendants Were
                    Required to Disclose ......................................................... 18

               d.     The Fund Fails to Allege a Violation of Item 303
                    of Regulation S-K .............................................................. 19

           2.     The TAC Fails to Allege Any Affirmative Misstatement ............. 20

               a.     Defendants' Description of PSG's "Organic"
                    Growth Accorded with Common Parlance and
                    Was Not Misleading ......................................................... 20

                b.     The Fund Fails To Allege That Defendants Made
                    False or Misleading Statements Regarding
                    PSG's Internal Controls ..................................................... 22

      B.     The Fund Has Failed To Plead Materiality ............................................... 23

Page

       1.     The TAC Fails To Allege that PSG's "Aggressive" Sales Practices Were Material ......................................................25

       2.     The Fund Fails To Allege Materiality as to any Purported Internal Control Deficiency.............................................26

       3.     The TAC Improperly Challenges Defendants' Non-Actionable Optimistic, Forward-Looking Statements ..................28

    C.    The Fund Has Failed To Plead Scienter .....................................28

    D.    The Fund Has Failed To Plead Loss Causation .........................35

II.     THE "CONTROL PERSON" CLAIM FAILS .....................................36

III.    THE CLAIM TO EXPAND THE PLAINTIFF CLASS IS TIME-BARRED ........................................................................................37

IV.    THE DISMISSAL OF THE TAC SHOULD BE WITH PREJUDICE................38

CONCLUSION.........................................................................................................39

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amorosa v. Ernst & Young LLP,*
    682 F. Supp. 2d 351 (S.D.N.Y. 2010)................................................................27

*Andropolis v. Red Robin Gourmet Burgers, Inc.,*
    505 F. Supp. 2d 662 (D. Colo. 2007).....................................................16, 23, 26

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)..................................................................................9

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,*
    493 F.3d 87 (2d Cir. 2007)...............................................................9, 29, 36

*In re Axis Capital Holdings Ltd., Sec. Litig.,*
    456 F. Supp. 2d 576 (S.D.N.Y. 2006)..........................................................12, 32

*In re Bank of Am. AIG Disclosure Sec. Litig.,*
    980 F. Supp. 2d 564 (S.D.N.Y. 2013)................................................................11

*In re Barrick Gold Corp. Sec. Litig.,*
    341 F. Supp. 3d 358 (S.D.N.Y. 2018)................................................................38

*Basic Inc. v. Levinson,*
    485 U.S. 224 (1988)..................................................................................23

*In re Bausch & Lomb, Inc. Sec. Litig.,*
    592 F. Supp. 2d 323 (W.D.N.Y. 2008)................................................................31

*Billhofer v. Flamel Techs., S.A.,*
    No. 07 Civ 9920, 2012 WL 3079186 (S.D.N.Y. July 30, 2012) ...........................................11

*Blackmoss Invs. Inc. v. ACA Capital Holdings, Inc.,*
    No. 07 Civ. 10528, 2010 WL 148617 (S.D.N.Y. Jan. 14, 2010)...........................................19

*Boca Raton Firefighters and Police Pension Fund v. Bahash,*
    506 F. App'x 32 (2d Cir. 2012) ....................................................... *passim*

*In re Bristol-Myers Squibb Sec. Litig.,*
    312 F. Supp. 2d 549 (S.D.N.Y. 2004).................................................... *passim*

*Caiafa v. Sea Containers Ltd.,*
    525 F. Supp. 2d 398 (S.D.N.Y. 2007)................................................................18

**Page(s)**

*Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*,
  750 F.3d 227 (2d Cir. 2014)..................................................................................10, 35

*Chu v. Sabratek Corp.*,
  100 F. Supp. 2d 827 (N.D. Ill. 2000) ...................................................................15

*Coronel v. Quanta Capital Holdings Ltd.*,
  No. 07 Civ. 1405(RPP), 2009 WL 174656 (S.D.N.Y. Jan. 26, 2009) ....................34

*Decker v. Massey-Ferguson, Ltd.*,
  681 F.2d 111 (2d Cir. 1982)..................................................................................24

*In re Deutsche Bank Aktiengesellschaft Sec. Litig.*,
  No. 16 Civ. 3495 (AT) (BCM), 2017 WL 4049253 (S.D.N.Y. June 28, 2017) .....................17

*Dobina v. Weatherford Int'l Ltd.*,
  909 F. Supp. 2d 228 (S.D.N.Y. 2012)...................................................................16

*DoubleLine Capital LP v. Odebrecht Fin., Ltd.*,
  323 F. Supp. 3d 393 (S.D.N.Y. 2018)..........................................................2, 6, 12

*In re Duke Energy ERISA Litig.*,
  281 F. Supp. 2d 786 (W.D.N.C. 2003) .................................................................27

*In re Eaton Corp. Sec. Litig.*,
  No. 16-CV-5894 (JGK), 2017 WL 4217146 (S.D.N.Y. Sept. 20, 2017) ...............37

*In re Ebix, Inc. Sec. Litig.*,
  898 F. Supp. 2d 1325 (N.D. Ga. 2012) .................................................................21

*ECA and Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase
  Co.*,
  553 F.3d 187 (2d Cir. 2009)........................................................................23, 28, 31

*Ellis v. Spectranetics Corp.*,
  No. 15-cv-01857-KLM, 2018 WL 1583837 (D. Colo. Apr. 2, 2018) ....................15

*Emps.' Ret. Sys. of Gov't of the Virgin Is. v. Blanford*,
  794 F.3d 297 (2d Cir. 2015)..................................................................................24

*Garfield v. NDC Health Corp.*,
  466 F.3d 1255 (11th Cir. 2006) .......................................................................30, 31

*Gavish v. Revlon, Inc.*,
  No. 00-cv-7291 (SHS), 2004 WL 2210269 (S.D.N.Y. Sept. 30, 2004) ........................ *passim*

**Page(s)**

*In re Gentiva Sec. Litig.*,
    932 F. Supp. 2d 352 (E.D.N.Y. 2013) ............................................................22

*In re GeoPharma, Inc. Sec. Litig.*,
    399 F. Supp. 2d 432 (S.D.N.Y. 2005) ..........................................................33

*Gillis v. QRX Pharma Ltd.*,
    197 F. Supp. 3d 557 (S.D.N.Y. 2016) ..........................................................33

*Greebel v. FTP Software, Inc.*,
    194 F.3d 185 (1st Cir. 1999) .................................................................14, 15

*Harris v. AmTrust Fin. Servs., Inc.*,
    135 F. Supp. 3d 155 (S.D.N.Y. 2015) .....................................................31, 32

*In re IAC/InterActiveCorp Sec. Litig.*,
    695 F. Supp. 2d 109 (S.D.N.Y. 2010) ..........................................................19

*In re ICN Pharm., Inc. Sec. Litig.*,
    299 F. Supp. 2d 1055 (C.D. Cal. 2004) ........................................................34

*In re Int'l Bus. Machs. Corp. Sec. Litig.*,
    163 F.3d 102 (2d Cir. 1998) ........................................................................28

*Janbay v. Canadian Solar, Inc.*,
    No. 10 Civ. 4430(RWS), 2012 WL 1080306 (S.D.N.Y. Mar. 30, 2012) ...................17, 22, 37

*In re Jumei Int'l Holding Ltd. Sec. Litig.*,
    No. 14cv9826, 2017 WL 95176 (S.D.N.Y. Jan. 10, 2017) .......................................9

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001) ........................................................................29

*KBC Asset Mgmt. NV v. 3D Sys. Corp.*,
    No. 15-cv-02393-MGL, 2016 WL 3981236 (D.S.C. July 25, 2016) ......................................21

*Lefkowitz v. Synacor, Inc.*,
    No. 18 Civ. 2979 (LGS), 2019 WL 4053956 (S.D.N.Y. Aug. 28, 2019) .............................33

*In re Lions Gate Entm't Corp. Sec. Litig.*,
    165 F. Supp. 3d 1 (S.D.N.Y. 2016) .........................................................10, 11

*Local 731 I.B. of T. Excavators and Pavers Pension Trust Fund v. Diodes, Inc.*,
    810 F.3d 951 (5th Cir. 2016) .......................................................................15

*In re Longtop Fin. Techs. Ltd. Sec. Litig.*,
    939 F. Supp. 2d 360 (S.D.N.Y. 2013)............................................................39

Page(s)

*Lopez v. Ctpartners Exec. Search Inc.*,
    173 F. Supp. 3d 12 (S.D.N.Y. 2016) ...................................................................10

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
    513 F.3d 702 (7th Cir. 2008) ..................................................................... *passim*

*In re Marsh & McLennan Cos., Inc. Sec. Litig.*,
    501 F. Supp. 2d 452 (S.D.N.Y. 2006) ................................................................18

*Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*,
    164 F. Supp. 3d 568 (S.D.N.Y. 2016) ................................................................12

*In re MoneyGram Int'l Inc. Sec. Litig.*,
    626 F. Supp. 2d 947 (D. Minn. 2009) .................................................................32

*In re Oak Tech. Sec. Litig.*,
    No. 96-cv-20552-SW, 1997 WL 448168 (N.D. Cal. Aug. 1, 1997) .......................24

*In re Omnicom Group, Inc. Sec. Litig.*,
    No. 02 Civ. 4483(RCC), 2005 WL 735937 (S.D.N.Y. Mar. 30, 2005) ..................21

*In re Open Joint Stock Co. Vimpel-Commc'ns*,
    No. 04 CIV. 9742 (NRB), 2006 WL 647981 (S.D.N.Y. Mar. 14, 2006) ................38

*Pearlstein v. BlackBerry Ltd.*,
    93 F. Supp. 3d 233 (S.D.N.Y. 2015) ..................................................................19

*In re PetroChina Co. Ltd. Sec. Litig.*,
    120 F. Supp. 3d 340 (S.D.N.Y. 2015) ................................................................23

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004) ..............................................................................10

*Salvani v. ADVFN PLC*,
    50 F. Supp. 3d 459 (S.D.N.Y. 2014) ..................................................................35

*In re Satyam Comput. Servs. Ltd. Sec. Litig.*,
    915 F. Supp. 2d 450 (S.D.N.Y. 2013) ................................................................37

*In re Scholastic Corp. Sec. Litig.*,
    252 F.3d 63 (2d Cir. 2001) ................................................................................24

*Shields v. Citytrust Bancorp., Inc.*,
    25 F.3d 1124 (2d Cir. 1994) ..............................................................................33

*In re Sierra Wireless, Inc. Sec. Litig.*,
    482 F. Supp. 2d 365 (S.D.N.Y. 2007) ................................................................14

**Page(s)**

*Slayton v. Am. Express Co.*,
  604 F.3d 758 (2d Cir. 2010) ................................................................29

*Steckman v. Hart Brewing, Inc.*,
  143 F.3d 1293 (9th Cir. 1998) .............................................................34

*Tabak v. Canadian Solar Inc.*,
  549 F. App'x 24 (2d Cir. 2013) ...........................................................23

*In re Take-Two Interactive Sec. Litig.*,
  551 F. Supp. 2d 247 (S.D.N.Y. 2008) ..................................................36

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ...................................................................... *passim*

*In re The Hain Celestial Grp. Inc. Sec. Litig.*,
  No. 2:16-cv-04581 (ADS)(SIL), 2019 WL 1429560 (E.D.N.Y. Mar. 29, 2019) ...................14

*Tracinda Corp. v. DaimlerChrysler AG*,
  197 F. Supp. 2d 42 (D. Del. 2002) .......................................................16

*TSC Indus., Inc. v. Northway, Inc.*,
  426 U.S. 438 (1976) .............................................................................23

*In re Twinlab Corp. Sec. Litig.*,
  103 F. Supp. 2d 193 (E.D.N.Y. 2000) ..................................................31

*Zoumboulakis ex rel. VeriFone Sys., Inc. v. McGinn*,
  No. 5:13-CV-02379-EJD, 2014 WL 3926565 (N.D. Cal. Aug. 7, 2014) ..............21

*In re Wachovia Equity Sec. Litig.*,
  753 F. Supp. 2d 326 (S.D.N.Y. 2011) ..................................................37

*Wilson v. Merrill Lynch & Co.*,
  671 F.3d 120 (2d Cir. 2011) ................................................................10

**Statutes & Rules**

17 C.F.R. § 229.303 ......................................................................................19

17 C.F.R. § 240.10b–5 ...................................................................... *passim*

11 U.S.C. tit. 11 ..............................................................................................6

15 U.S.C. § 78j ........................................................................................7, 37

15 U.S.C. § 78t .................................................................................. *passim*

**Page(s)**

15 U.S.C. § 78u-4(b)(1) ..................................................................................................10

15 U.S.C. § 78u-4(b)(2)(A)..........................................................................................29

28 U.S.C. § 1658(b) ......................................................................................................37

Fed. R. Civ. P. 8 .............................................................................................................9

Fed. R. Civ. P. 9(b) ..............................................................................................1, 10, 23

Fed. R. Civ. P. 12(b)(6) ..................................................................................................1

**Other Authorities**

*Hess & Kazanjian*, The Search for Organic Growth, Cambridge Univ. Press
     (2006)......................................................................................................................21

Defendants Kevin Davis ("**Davis**") and Amir Rosenthal ("**Rosenthal**") respectfully submit this consolidated memorandum of law in support of their motion, pursuant to Fed. R. Civ. P. 9(b) and 12(b)(6), to dismiss the Third Amended Complaint ("**TAC**") [ECF No. 144] of Lead Plaintiff Plumbers & Pipefitters National Pension Fund (the "**Fund**").

## PRELIMINARY STATEMENT

The TAC is the fourth complaint filed against Defendants and the third attempt by the Fund, as lead Plaintiff, at asserting legally viable claims arising out of the stock price decline and bankruptcy of Performance Sports Group Ltd. ("**PSG**" or the "**Company**").  While the Fund has re-characterized its claim from complaint to complaint, at bottom it remains the same:  when Defendants accurately reported financial information of PSG, they allegedly committed securities fraud by failing to disclose that PSG achieved its sales by employing so-called "aggressive," "high-pressure," "high-risk" sales practices.  These alleged sales practices, as described by the TAC, were lawful and standard means of maximizing sales—*e.g.*, providing discounts to retailers for volume purchases, extending credit terms, and selling close-out or end-of-season inventory at larger discounts—that Defendants neither misrepresented nor unlawfully failed to disclose.  The governing law confirms that Defendants' accurate representations as to financial information do not become misleading for failing to disclose the specifics of the Company's alleged sales practices.  In addition, the Fund fails to plead facts indicating that such alleged sales practices accounted for any material part of PSG's sales, that Defendants had any duty to disclose them, that they acted with scienter, or that any alleged misstatement or omission caused any loss to the Fund.  Each of these pleading defects is fatal.  Thus, after its repeated failed attempts at articulating a valid claim, the Fund's case should be dismissed once and for all.

The analysis of the legal sufficiency—or insufficiency—of the pleading must begin with the Fund's allegations as to Defendants' specific statements or omissions that the

Fund claims are misleading.  Starting at page 65 of the TAC, the Fund sets forth each of the statements allegedly made by Defendants that are claimed to be "false and misleading," and that form the basis for its claim of securities fraud.

The statements consist almost entirely of reporting on PSG's performance for a quarter or a year that had just ended, typically reciting data such as revenue and growth for the relevant period, *see, e.g.*, TAC ¶ 161 ("[r]evenues in the second quarter of FY15 increased 47% to $172.3 million compared to the same year ago period . . ."), together with general commentary such as, we are "very pleased with our quarterly and year-to-date performance," and "revenue results are record-setting."  *See, e.g.*, *id.* ¶¶ 167, 170.

The Fund alleges that these statements were false and misleading because Defendants were concealing that PSG was achieving growth and revenue through "high-risk, aggressive sales tactics" (*e.g.*, *id.* ¶¶ 162, 168) that were "not sustainable" (*e.g., id.* ¶ 201).  This theory is devoid of legal support.  The Fund has not alleged that the financial results reported by Defendants were inaccurate by even an immaterial amount, and it is settled law that an issuer that accurately reports its financial results has no duty to disclose the nature of its sales practices or the supposed unsustainability of its revenues.  *See Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 38–39 (2d Cir. 2012) ("It is clear that a violation of federal securities law cannot be premised upon a company's disclosure of accurate historical data.") (citation and quotation marks omitted); *see also DoubleLine Capital LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 449 (S.D.N.Y. 2018) (claim that representations as to financial results were misleading due to failure to disclose that such financial results were "unsustainable"; this Court ruled, "Plaintiffs fail to allege any duty to disclose, nor is the Court aware of one.") (Woods, J.).

The TAC also fatally fails to allege materiality.  Despite its access to millions of pages of Company documents, the Fund does not quantify (or even approximate) the financial

impact of any of the conduct alleged in the TAC.  Instead, it merely alleges, in conclusory form, that Defendants' representations were "statements of material fact" and that Defendants "omitted to state material facts."  TAC ¶ 221.  The TAC does not even allege that any of Defendants' statements of fact as to sales, revenue, and the like were inaccurate, much less materially inaccurate, as would be required to state a securities fraud claim.  As to alleged omissions, the Fund never alleges any facts or figures suggesting that PSG's so-called aggressive sales tactics were responsible for generating a material part of PSG's substantial revenues ($655 million in 2015, for example).  Even supposing PSG somehow forced retailers "to take more PSG-branded product than they reasonably could," *see id.* ¶¶ 50, 162, 168, 171, 175, the TAC does not attempt to quantify the alleged effect of PSG's sales tactics on retailer inventory or on PSG's short-term or long-term revenues.

The Fund's scienter allegations are equally insufficient.  The Fund alleges that Defendants knew that PSG was pursuing "aggressive" sales practices and that some other executives disagreed with their strategy.  But a difference of opinion is not scienter, and the TAC fails to allege any facts indicating the Defendants lacked an honest, reasonable belief in the truth of their public statements concerning the Company's financial performance.

As to loss causation, the TAC's allegations belie any contention that investors' losses were caused by Defendants' alleged failure to disclose PSG's "aggressive" sales tactics or by alleged deficiencies in PSG's internal controls.  The allegations at pages 50-59 of the TAC (¶¶ 118-145) show that PSG's stock price declined and that PSG eventually filed for bankruptcy due to factors such as the bankruptcies of major customers, foreign exchange issues, and a soft market for baseball gear—and that these factors led to adverse publicity, public airing of disagreements with PSG's former non-executive chairman, and SEC and audit committee investigations (which the TAC conspicuously does not claim reached any findings supporting the

Fund's claims).  As alleged by the Fund, these events cannot plausibly be described as the materialization of the risks created by PSG's undisclosed, "aggressive" sales practices.

Unable to adequately plead any of the elements of securities fraud, the Fund devotes the bulk of the TAC to attacking Defendants' business strategy and sales tactics.  But the TAC's strident criticisms of Defendants' strategy are irrelevant to, and do not support, a claim of securities fraud.  Even supposing that Defendants did pursue an inadvisable strategy and caused a "glut" in "the U.S. sporting goods market overall," as alleged (*see id.* ¶ 10), that would not provide a basis for a securities fraud claim.  PSG's sales were real sales, resulting in real revenue, and real growth.  There are no allegations that, if true, would indicate that a material part (if any) of the transactions were conducted on terms designed to allow PSG to recognize revenue before the products had been sold (the *sine qua non* of fraudulent sales).

For these reasons, and those set forth below, the Court should dismiss the TAC with prejudice.

## PRIOR PROCEEDINGS

The TAC is the fourth complaint filed against the Defendants in this action.  The initial complaint was filed on May 13, 2016, on behalf of a putative class of individuals who purchased or sold PSG stock between January 15, 2015 and March 14, 2016 [ECF No. 1].

Following its appointment as lead plaintiff, the Fund filed its First Amended Complaint on August 15, 2016 ("**FAC**") [ECF No. 62], which the Defendants moved to dismiss [ECF No. 81].  Defendants explained in their motion to dismiss that the Fund's allegations of "channel stuffing" did not provide a basis for a securities fraud claim because the supposed stuffing resulted in real sales and revenue, as opposed to situations like those described by the Seventh Circuit in *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, where a material part of a company's supposed sales were subject to, *inter alia*, a right of return for full credit in later

4

periods and other characteristics inconsistent with revenue recognition accounting rules, and thus caused material false statements of revenue figures and other financial data.  513 F.3d 702, 709 (7th Cir. 2008) ("[c]hannel stuffing becomes a form of fraud only when it is used . . . to book revenues on the basis of goods shipped but not really sold").

The Fund mooted Defendants' motion to dismiss the FAC on November 3, 2016 by filing its Second Amended Complaint ("**SAC**") [ECF No. 86], in which it shifted its focus from Defendants' supposed "channel stuffing" to Defendants' supposed misleading use of the term "organic" to describe PSG's growth.  According to the SAC, a company's growth is misleadingly described as "organic" if it is the result of "aggressive" sales tactics.  Defendants moved to dismiss the SAC [ECF No. 114], explaining that the term "organic," when used to describe a company's sales and growth, means that such sales and growth reflect the performance of the existing business rather than the result of acquisitions.

While Defendants' motion to dismiss the SAC was *sub judice*, the Fund obtained substantial discovery from PSG and its bankruptcy trustee; the document production received by the Fund amounted to over 20.4 million pages [*see* ECF No. 128].  The Fund then informed the Court and Defendants by letter dated June 14, 2019, that it would like to amend its complaint again, and supplement its allegations with information gleaned from discovery.  *Id.*  Defendants consented to the filing of the TAC without the need for the Fund to file, or the Court to resolve, a motion for leave to amend, subject to the understanding that the sufficiency of the TAC would be tested via a motion to dismiss rather than a motion to amend [ECF No. 143].[1]

---

[1]  The Stipulation and Order, dated September 6, 2019, governing the filing of the TAC, further provides that Lead Plaintiff would not seek further leave to amend its complaint "other than to seek leave to cure any pleading deficiencies in the TAC identified by the Court in a decision dismissing the TAC, and in such event, any proposed amendment will be limited to curing such deficiencies."  [ECF No. 143 ¶¶ 2, 7.] Defendants have reserved the right to oppose any such application.  *Id.* ¶ 7.

The TAC, filed on September 6, 2019 [ECF No. 144], de-emphasizes, but does not abandon the Fund's allegations relating to "channel stuffing" and "organic" growth.  At bottom, as explained below, although the Fund has had repeated opportunities to plead its case— now with the benefit of pre-complaint extensive discovery from PSG—its core allegations are the same, and are insufficient to state a claim.

**ALLEGATIONS OF THE COMPLAINT**

The allegations of fact in the Complaint are presumed to be true only for the purposes of this motion to dismiss, and only to the extent they are not contradicted by judicially noticeable material.  *See, e.g.*, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).  To the extent the TAC incorporates documents by reference, the Court may consider them on this motion.  *See DoubleLine Capital*, 323 F. Supp. 3d at 434.  In setting forth the principal allegations of the TAC, Defendants are in no way agreeing to the accuracy of any of the allegations.

**A.**      **The Parties**

The Fund held stock in PSG from August 28, 2015 to March 10, 2016 (TAC Schedule A).  The TAC alleges a class period from January 15, 2015 to October 28, 2016 (the "**Class Period**"), TAC ¶ 1.  The initial complaint, the FAC, and the SAC had defined a class period with the same January 15, 2015 start date, but ending seven and a half months earlier (on March 14, 2016).

PSG was a leading manufacturer of sports equipment and related apparel that it sold under various brand names, including Bauer Hockey ("**Bauer**") and Easton Baseball/Softball ("**Easton**").  *Id.* ¶¶ 2-3.  Following its initial public offering in June 2014, PSG's stock was traded on the New York Stock Exchange.  *Id.* ¶ 2.  On October 31, 2016, PSG, along with 17 of its affiliates, filed voluntary petitions pursuant to Chapter 11 of the Bankruptcy

Code.  *Id.* ¶ 141.  As a result of the bankruptcy, PSG's assets were sold and all secured and

unsecured creditors were fully paid.  *See* Ex. A to the accompanying Declaration of Jason C.

Rubinstein ("**Rubinstein Decl.**") [December 20, 2017 Form 8-K].  PSG's former businesses

have continued operating under new ownership.

 Defendant Davis served as PSG's CEO throughout the Class Period, until his

departure from PSG on March 22, 2016.  *Id.* ¶ 38.  Defendant Rosenthal had various positions at

PSG during his tenure, including CFO (from the start of the Class Period to December 14, 2015),

President of PSG Brands (starting on May 28, 2015, until his departure from PSG, announced on

October 31, 2016), and interim CEO (from March 22, 2016 to June 8, 2016).  *Id.* ¶ 39.

**B.**    **The Claims in the TAC**

 The TAC asserts two claims.  Count I alleges violations of Section 10(b) of the

Securities Exchange Act of 1934 (the "**Exchange Act**") and Rule 10b-5 promulgated thereunder.

*Id.* ¶¶ 219-25.  Count II alleges control person liability against Defendants pursuant to Section

20(a) of the Exchange Act, for the same violations alleged in Count I.  *Id.* ¶¶ 226-29.

 According to the TAC, Defendants misled the investing public by failing to

disclose that PSG's revenue growth was fueled by sales practices that were "unsustainable" and

"risky."  *See, e.g.*, *id.* ¶¶ 14, 48, 62, 155.  Those sales practices, which the Fund repeatedly called

"channel stuffing" in its first amended complaint, *see* FAC ¶ 7, allegedly included the use of

"strong-arm tactics" such as the use of price discounts to coerce customers to purchase product

in quantities that exceeded their present need.  TAC ¶¶ 55, 76.  The TAC characterizes PSG's

sales practices as "aggressive," and also calls them "sometimes fraudulent" and "manipulative."

*See, e.g.*, *id.* ¶¶ 48, 155.  The Fund further contends that it was misleading for Defendants to

refer to PSG's growth as "organic."  *Id.* ¶¶ 154-56.  According to the Fund, the term "organic

growth" refers to sustainable growth through non-aggressive sales practices, and not growth that results from the sales practices that PSG employed. *Id*.

The TAC contends that "the concealed risks associated with the high-risk sales practices Defendants pursued during the Class Period foreseeably materialized" beginning in the first quarter of 2016. *Id*. ¶ 119.  On January 13, 2016, PSG reported that quarterly revenues, gross profit, and earnings had declined year-over-year, and it projected that its financial results would continue to underperform for the rest of the fiscal year. *Id*. ¶ 121.  Two months later, PSG announced that its forecasted results for the fiscal year would be even weaker than previously forecast. *Id*. ¶ 122.  Explaining the causes of the revenue decline, PSG cited numerous unfavorable business developments, including (i) the weakening of the Canadian dollar relative to the U.S. dollar; (ii) the December 2015 bankruptcy filing of Team Express, a large Easton customer; (iii) consolidation among significant Bauer customers; (iv) the March 2016 bankruptcy filing of The Sports Authority, one of Easton's largest customers; (v) general weakness in the baseball market; and (vi) financial difficulties at a significant Bauer customer that later filed for bankruptcy, creating significant losses for PSG. *Id*. ¶¶ 121-26.

The TAC does not contest the truth of PSG's above statements or deny that they constituted material adverse developments for PSG.  Instead, the Fund implausibly contends that PSG caused its own demise by oversupplying its retail customers and delivering product earlier than requested, and that this alleged practice—not the bankruptcy of major customers, market consolidation, unfavorable exchange rates, and market softening—was "the true cause" of PSG's decline in revenue. *Id*. ¶¶ 124-25.  But the TAC does not specify the frequency of PSG's alleged requests to customers to buy more product and accept its early delivery, whether customers complied with such requests, the volume of product involved, or the revenue tied to these sales. In total, the TAC identifies only one instance in which a customer actually agreed to PSG's

8

request to accept product early, and even in that instance, the TAC provides no specifics, stating merely that the order was "large." *Id.* ¶ 75. The TAC does not identify a single sham sale.

Finally, in support of its theory of scienter, the TAC relies on opinions, allegedly communicated to Defendants, that Defendants supposedly knew that PSG's aggressive sales strategy was unsustainable and would impair future earnings. For example, the TAC refers to an alleged recollection of an anonymous witness of an opinion of a PSG senior executive who "warned" PSG's Board of Directors in 2013 that "pulling orders forward . . . to make their numbers would catch up with PSG." *Id.* ¶¶ 18, 81. The TAC does not, however, allege any facts establishing that the Defendants agreed with any of these opinions when made, much less knew that they rendered any public statement of the Company materially false or misleading.

## ARGUMENT

## I.

## THE FUND HAS FAILED TO STATE A CLAIM FOR SECURITIES FRAUD

To state a securities fraud claim, a plaintiff must allege that defendants "(1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 105 (2d Cir. 2007). To avoid dismissal, a securities fraud complaint must clear the heightened pleading burdens imposed by FED. R. CIV. P. 9(b) and the Private Securities Litigation Reform Act ("**PSLRA**"). *In re Jumei Int'l Holding Ltd. Sec. Litig.*, No. 14cv9826, 2017 WL 95176, at \*5 (S.D.N.Y. Jan. 10, 2017). These requirements are in addition to satisfying FED. R. CIV. P. 8's requirement that a complaint "contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

**A.      The Fund Has Failed to Plead an Actionable Misstatement or Omission**

A plaintiff's most basic burden is to identify statements or omissions that are false or misleading.  15 U.S.C. § 78u-4(b)(1); *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 128-29 (2d Cir. 2011).  The PSLRA's heightened standards require that a plaintiff "demonstrate with specificity why and how" each statement or omission is false or misleading, and state with particularity all facts on which that belief is formed.  *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014) (quoting *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004)); *Wilson*, 671 F.3d at 128-29; 15 U.S.C. § 78u-4(b)(1); Fed. R. Civ. P. 9(b). The TAC does not satisfy this pleading burden.

**1.      The TAC Fails to Allege Any Omission of Information that Defendants Had a Duty to Disclose**

The Fund acknowledges that this is "primarily" an omissions case.  TAC ¶ 212. The Fund's central thesis is that Defendants failed to disclose to investors that PSG's sales and earnings figures were supposedly the result of legal but aggressive, high-risk sales practices. According to the TAC, by virtue of this "omission," Defendants' representations regarding PSG's financial and operating performance, albeit accurate, were misleading.  *Id.* ¶¶ 5-6.  The Fund's omission theory fails because Defendants had no legal duty to disclose the information about sales practices that the Fund alleges should have been disclosed.

Rule 10b-5 does not impose a generalized duty to disclose information.  *See, e.g.*, *Lopez v. Ctpartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 23 (S.D.N.Y. 2016) ("Disclosure of . . . information is not required . . . simply because it may be relevant or of interest to a reasonable investor.") (citation and quotation marks omitted).  *See also In re Lions Gate Entm't Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 11 (S.D.N.Y. 2016) ("[s]ilence, absent a duty to disclose, is not misleading under Rule 10b-5") (citation and quotation marks omitted).  Such a duty arises

10

when disclosure is "necessary . . . to make the statements [the issuer actually] made, in the light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b–5. The scope of this duty tracks the scope of the company's affirmative statements:  a company "only [has to reveal] such [facts], if any, that are needed so that what was revealed would not be so incomplete as to mislead."  *In re Lions Gate*, 165 F. Supp. 3d at 15 (citation and quotation marks omitted).

Moreover, "a corporation is not required to reveal all facts on a subject just because it reveals a single fact."  *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 581-82 (S.D.N.Y. 2013).  Applying this rule, courts have repeatedly rejected attempts to parlay "[b]road statements about a company's business" into actionable omissions.  *Billhofer v. Flamel Techs., S.A.*, No. 07 Civ. 9920, 2012 WL 3079186, at *10 (S.D.N.Y. July 30, 2012).

### a.      PSG Had No Duty To Disclose Legitimate Sales Practices

The Fund insists that by discussing PSG's "strong results," "record" revenues, and "double-digit growth," *see, e.g.*, TAC ¶¶ 157-58, Defendants undertook a duty to disclose the particular sales practices that allegedly contributed to those revenues and growth.  *See id.* ¶ 162.  The Fund does *not* dispute that PSG had, in fact, achieved the growth and earnings that it reported.  Instead, it argues that PSG's reporting of its accurate financial results was misleading in the absence of additional information regarding the Company's specific sales practices.  The Second Circuit rejected this theory in *Boca Raton Firefighters and Police Pension Fund v. Bahash*:

> [T]he Fund argues that McGraw-Hill's statements about its earnings were actionable, ***even though literally true, because they did not acknowledge the long-term unsustainability of its business model.  This argument is easily rejected***.  Whatever the scope of the responsibility not to make statements that constitute "half-truths," that surely does not apply to the reporting of unmanipulated corporate earnings.

11

506 F. App'x at 38 (emphasis added).  Since *Boca Raton*, courts have repeatedly confirmed that

there is no omission claim based on <u>literally true statements</u> that are allegedly based on

"unsustainable" business practices.  In *DoubleLine Capital*, this Court applied this principle to

dismiss that aspect of a securities fraud claim premised on a company's supposed failure to

disclose the "unsustainability" of its financial results, *even where it was alleged that (unlike*

*here) the company was achieving those results through illegal conduct*.  323 F. Supp. at 449

("Plaintiffs' theory that CNO breached a duty to disclose that its revenues were 'unsustainable'

does not pass muster.  Plaintiffs fail to allege any duty to disclose, nor is the Court aware of

one.").  *See also In re Axis Capital Holdings Ltd., Sec. Litig.*, 456 F. Supp. 2d 576, 586-87

(S.D.N.Y. 2006) ("As a matter of law, no statements regarding AXIS's accurately reported

revenue and income have been rendered materially misleading by failing to disclose that such

income was 'unsustainable.'").

        Here too, as in the cases cited above, the Fund has not alleged that any of PSG's

reported financials were inaccurate *by even a penny*.  The law is clear that a company's accurate

reporting of its revenues does not create a duty to disclose the particular sales practices used to

generate those revenues or the alleged unsustainability of those practices.  Accordingly, as a

matter of law, PSG's accurate financial reporting is not rendered misleading merely because it

omitted the description of PSG's allegedly aggressive sales practices.  *See, e.g.*, *In re Axis*

*Capital Holdings*, 456 F. Supp. 2d at 586.

        *DoubleLine Capital* and *Axis Capital* confirm that, even if PSG's "aggressive"

sales practices were *illegal*, which they were not, PSG would not be required to disclose them.

*See also Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 580 (S.D.N.Y.

2016) ("Corporations do not, as a general matter, have a duty to disclose uncharged,

unadjudicated wrongdoing.") (citations and quotation marks omitted).  *A fortiori*, Defendants

were not required to disclose the specifics of the *lawful* sales practices they allegedly employed to generate the real sales and real revenue that PSG accurately reported.

The Supreme Court's holding in *Tellabs*, 551 U.S. at 325, demonstrates that regardless of what pejorative label the Fund applies to them (*e.g.*, "coercive," "manipulative," "channel stuffing"), aggressive sales practices are not fraudulent unless they involve an element of deception, *i.e.*, they are used to generate fake revenue.  In *Tellabs*, the Court noted that "offering customers discounts as an incentive to buy" was a "legitimate kind" of channel stuffing, while "writing orders for products customers had not requested" was "illegitimate."  *Id.* On remand, the Seventh Circuit ruled that channel stuffing "could be innocent," and that "[c]hannel stuffing becomes a form of fraud only when it is used . . . ***to book revenues on the basis of goods shipped but not really sold*** because the buyer can return them."  *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 709 (7th Cir. 2008) (emphasis added).

In this District, courts have ruled that the sort of activities alleged here— aggressive sales practices that offer customers incentives for the purpose of meeting sales and earnings goals—are not actionable under the securities laws when they generate genuine sales and real revenues.  In *In re Bristol-Myers Squibb Sec. Litig.*, the plaintiffs claimed that the defendants violated Rule 10b-5 by recognizing revenue generated by offering incentives to customers, such as discounts and extended payment terms, at the end of fiscal quarters to meet earnings estimates.  312 F. Supp. 2d 549, 566 (S.D.N.Y. 2004).  The court dismissed those claims, holding that the following facts were *insufficient* to plead that the defendant had committed securities fraud through its undisclosed use of "aggressive" sales tactics: "(i) management set aggressive targets, (ii) incentives were given to wholesalers to buy product before they actually needed it, (iii) in order to meet earnings estimates, (iv) it was known that wholesaler inventories were higher than usual, and (v) real products were shipped to real

13

customers who paid real money." *Id.* at 568.  In *Gavish v. Revlon, Inc.*, the plaintiffs had alleged

that the defendants inflated their revenue through undisclosed sales practices, such as offering

discounts to induce larger orders and shipping products early.  No. 00 Civ. 7291(SHS), 2004 WL

2210269, at *12 (S.D.N.Y. Sept. 30, 2004). The Court dismissed these allegations as "unspecific,

innocuous, or both," reasoning that "there may [have been] any number of legitimate reasons"

behind the alleged channel stuffing practices.  *Id.* at *17-19 (quoting *Greebel v. FTP Software,

Inc.*, 194 F.3d 185, 202 (1st Cir. 1999)).  *See also In re Sierra Wireless, Inc. Sec. Litig.*, 482 F.

Supp. 2d 365, 375-76 (S.D.N.Y. 2007) (differentiating between the legitimate application of

pressure to purchase an oversupply of product from improper coercion and premature revenue

recognition); *In re The Hain Celestial Grp. Inc. Sec. Litig.*, No. 2:16-cv-04581 (ADS)(SIL), 2019

WL 1429560, at *14-*17 (E.D.N.Y. Mar. 29, 2019) (where plaintiffs' "allegations amount to a

claim that the Defendants offered incentives to distributors to take extra product, and improperly

recognized revenue early," holding that plaintiffs had "not alleged sufficient facts in support of

their contention that [defendant] engaged in a fraudulent channel stuffing scheme").

   In light of these precedents, the TAC's entirely conclusory allegation that PSG's

sales practices were "sometimes fraudulent" does not establish a duty to disclose.  TAC ¶¶ 6, 48,

155.  The TAC fails to identify any deceptive sales practices by PSG that might be sufficient to

create a duty to disclose—*e.g.*, booking material sham sales or intentionally misreporting

material revenues.  Courts have often noted the legitimacy of each of the various sales practices

the Fund attacks:

- The TAC alleges that PSG "used the threat of the loss of steep discounts as a penalty to force retailers to accept progressively greater amounts of product over time."  TAC ¶¶ 52-60.  *But see Tellabs*, 551 U.S. at 325 (holding that "offering customers discounts as an incentive to buy" is a legitimate practice and that legitimate conduct cannot a support strong inference that defendant acted with intent to mislead investors).

14

- The TAC alleges that PSG "shipped [goods to customers] earlier than originally planned, and often so that PSG could hit a quarterly sales target."  TAC ¶¶ 71-83.  *But see Local 731 I.B. of T. Excavators and Pavers Pension Trust Fund v. Diodes, Inc.*, 810 F.3d 951, 959-60 n.3 (5th Cir. 2016) (holding that shipping orders early, without prior customer authorization, was a "legal practice" and would not support securities fraud claim where it did not "deceive investors by ***artificially*** pushing forward its earnings" because plaintiff had "not alleged that the early shipments at issue were fabricated") (emphasis added).

- The TAC alleges that PSG offered its retail customers "wildly extended payment terms."  TAC ¶¶ 84-90.  *But see Bristol-Myers*, 312 F. Supp. 2d at 566 (observing that "[o]ffering incentives to meet sales or earnings goals is a common practice" and not an actionable premise for securities fraud where "real products [were] shipped to real customers who then paid with real money").

- The TAC alleges that PSG's "retailers used payment plans" under which it recorded "revenue when inventory shipped, but would effectively provide the retailer with a credit line in exchange for a promise to pay over time."  TAC ¶¶ 91-102.  *But see Ellis v. Spectranetics Corp.*, No. 15-cv-01857-KLM, 2018 WL 1583837, at *12 (D. Colo. Apr. 2, 2018) (dismissing securities fraud claims despite allegation of undisclosed extended payment terms).

- The TAC alleges that PSG sold goods to some customers under "consignment" or "quasi-consignment" contracts that "*risk* violating accounting rules governing the recognition of revenue."  TAC ¶¶ 103-17 (emphasis added).  "***There is nothing inherently suspect with consignment . . . sales***."  *Chu v. Sabratek Corp.*, 100 F. Supp. 2d 827, 838 (N.D. Ill. 2000) (citation omitted; emphasis added).  Indeed, despite the Fund's vague, unsupported innuendo that consignment sales "risk" a violation of generally accepted accounting principles ("**GAAP**"), the Fund has not identified any *actual*, *material* revenue recognition error.  *See Greebel v. FTP Software, Inc.*, 194 F.3d 185, 205 (1st Cir. 1999) ("The granting of a right of return in a particular transaction, or even a general policy of granting return rights, does not per se mean that revenue cannot be recognized at the time of sale.").[2]

    In sum, the Fund has failed to allege that any of the business practices that it criticizes were, in fact, improper or used to generate fake revenues.  That the Fund, with the benefit of hindsight, has portrayed these alleged practices as bad for business does not save its

---

[2]  *Greebel* elaborated on the plaintiff's failure to plead an actionable omission or misstatement based on the consignment sales alleged there:  "Plaintiffs merely make an allegation that FTP failed to adequately reserve and materially overstated FTP's revenues.  Without any information on FTP's experience with past return rates, the size of its reserve for returns, or how the reserve changed over time, it is difficult to infer that FTP's revenue recognition decisions were unreasonable enough to violate GAAP, or that they give rise to a strong inference of scienter."  194 F.3d at 205.  The TAC suffers from the same infirmities.

claim.  *See Tracinda Corp. v. DaimlerChrysler AG*, 197 F. Supp. 2d 42, 81-82 (D. Del. 2002)

(allegation of channel stuffing amounts to "inactionable allegation of corporate mismanagement"

where plaintiff fails "to support their conclusion that the incentive program was a sham").  Even

if the Fund were correct that the risks posed by Defendants' business practices materialized, "any

omission by [PSG] in disclosing its internal mismanagement is not actionable, because Plaintiff

may not bootstrap [an] internal mismanagement claim into a federal securities action by alleging

[that] . . . the statute obligates Defendants to reveal their managerial deficiencies."  *Andropolis v.*

*Red Robin Gourmet Burgers, Inc.*, 505 F. Supp. 2d 662, 683–84 (D. Colo. 2007).

   **b.**  **The Fund Fails to Allege Any Internal Control Deficiency That**
       **Defendants Were Required to Disclose**

    The Fund alleges that Defendants failed to make appropriate disclosure of PSG's

"failing internal controls" over financial reporting.  *See, e.g.*, TAC ¶¶ 7, 182, 188, 212.

Specifically, it asserts that "Defendants concealed that PSG's internal controls regarding the

detection and management of [the company's] high-risk sales practices were shoddy or non-

existent, regularly violated, and left to crumble."  *Id.* ¶ 7.  This theory fails because the supposed

deficiencies described in the TAC—even if true—would not require disclosure.

    Companies are not required to disclose every defect in their internal controls.  The

duty to disclose applies only to known deficiencies that rise to the level of a "material

weakness"—*i.e.*, "a deficiency, or combination of deficiencies, in [internal controls] such that

there is a reasonable possibility that a material misstatement of the company's . . . financial

statements will not be prevented or detected on a timely basis."  SEC Financial Reporting

Manual, at 4320.8 (*available at* https://www.sec.gov/corpfin/ cf-manual/topic-4); *Dobina v.*

*Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 238 n.19 (S.D.N.Y. 2012) (same).  Companies have

no duty to disclose "deficiencies" or "significant deficiencies" in their internal controls because

such deficiencies do not rise to the level of "material weakness."[3]  For this reason, courts routinely reject securities fraud claims premised on a company's failure to disclose "significant," as distinguished from "material," deficiencies.  *See, e.g.*, *In re Deutsche Bank Aktiengesellschaft Sec. Litig.*, No. 16 Civ. 3495 (AT) (BCM), 2017 WL 4049253, at *7 (S.D.N.Y. June 28, 2017), *aff'd sub nom. Sfiraiala v. Deutsche Bank Aktiengesellschaft*, 729 F. App'x 55 (2d Cir. 2018).  Courts also reject securities fraud claims based on allegedly deficient controls when the plaintiff fails "to allege specific facts concerning the purportedly deficient internal controls, including how they were deficient, when and why."  *See, e.g.*, *Janbay v. Canadian Solar, Inc.*, No. 10 Civ. 4430(RWS), 2012 WL 1080306, at *9 (S.D.N.Y. Mar. 30, 2012).

   The TAC's allegations concerning PSG's controls are insufficient.  The Fund fails to (and cannot) allege that any of the deficiencies identified by PSG's auditors (KPMG) were or became a "material weakness."  Moreover, the TAC repeatedly (and incorrectly) alleges that "KPMG had already issued a significant deficiency in August 2014 . . . placing [Defendants] on notice that there were issues with the internal controls."  *See, e.g.*, TAC ¶¶ 169, 172.  In fact, according to a letter from KPMG to PSG (*id.* ¶ 16), KPMG found no "significant deficiency" in August 2014:  "***[n]one of the deficiencies identified are believed to be a significant deficiency individually or in the aggregate***."  Rubinstein Decl. Ex. B (emphasis added.)  Similarly, the TAC describes an August 2016 assessment by PSG's internal audit team as having "admitted . . .

---

[3]  The SEC's guidance on Management's Report on Internal Control Over Financial Reporting and Certification of Disclosure in Exchange Act Periodic Reports explains:

> **Q:**  Must identified significant deficiencies be disclosed either as part of management's report on internal control over financial reporting or elsewhere in a registrant's periodic reports?
>
> **A:**  A registrant is obligated to identify and publicly disclose all material weaknesses. ***If management identifies a significant deficiency it is not obligated by virtue of that fact to publicly disclose the existence or nature of the significant deficiency.***

*Available at* https://www.sec.gov/info/accountants/controlfaq1004.htm (emphasis added).

that the deficiencies in PSG's credit limit internal controls . . . would result in another significant deficiency or potentially a material weakness."  TAC ¶ 100.  In fact, the document that the TAC quotes concludes that "Management has determined that the aggregation of the deficiencies ***does not result in a material weakness***."  Rubinstein Decl. Ex. C (emphasis added).

> ### c.    The Fund Fails to Allege Any Violation of GAAP, Let Alone One that Defendants Were Required to Disclose

The TAC's allegations about PSG's accounting practices provide no support for its securities fraud claim because the Fund fails to plead with particularity that *any* of PSG's financial statements or accounting policies violated GAAP, much less that PSG materially violated GAAP with fraudulent intent, or failed to disclose such a violation.  *See In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 477 (S.D.N.Y. 2006) (ruling that plaintiff had failed to plead securities fraud based on alleged GAAP violations where the complaint lacked "specific examples of fraudulent accounting practices" used by defendant, "citations to GAAP provisions prohibiting [defendant's] accounting practices," "or reference to any cases finding violations of GAAP on the basis of actions similar to those alleged"); *Caiafa v. Sea Containers Ltd.*, 525 F. Supp. 2d 398, 411 (S.D.N.Y. 2007) (ruling that undisclosed violations of GAAP, without corresponding intent to mislead, are insufficient to state a claim for securities fraud).  The Fund baldly asserts that PSG's description of its accounting policies in its 2015 10-K was misleading because it "concealed that PSG had" frequently "violated accounting rules governing revenue recognition. . . ."  TAC ¶ 188.  But the TAC fails to specify how PSG allegedly violated GAAP, much less plead any facts sufficient to demonstrate that such violations were intended to mislead investors.  By the TAC's own admission, PSG's auditors at KPMG vetted the only *potential* GAAP issues that they had identified as of the 2015 10-K (*see*

*id.* ¶¶ 108-11), and then issued a clean audit opinion for PSG (*see* Rubinstein Decl. Ex. E & infra

Pt. I.B.2).  The Fund's claims based on PSG's accounting practices are therefore without merit.

> ### d.   The Fund Fails to Allege a Violation of Item 303 of Regulation S-K

The Fund argues that, under Item 303 of Regulation S-K, PSG and the Defendants

were under a duty to disclose the "known trend" or "uncertainty" that "the Company's sales

practices were not sustainable and . . . reasonably likely to catch up with PSG and/or trigger

accounting violations."  TAC ¶¶ 199-205.  This conclusory contention fails because the TAC

lacks factual allegations showing that the Defendants had ***actual knowledge*** of any existing trend

that was "reasonably likely to have material effects" on PSG's financial condition, and thus

required disclosure.  *In re IAC/InterActiveCorp Sec. Litig.*, 695 F. Supp. 2d 109, 118 (S.D.N.Y.

2010) ("Defendants' actual knowledge of the trend is an essential allegation . . . .") (citation and

quotation marks omitted); 17 C.F.R. § 229.303 (Instruction #3); SEC Release Nos. 33-6835; 34-

26831 (May 18, 1989).

In fact, the TAC does not even explain what "trend" disclosure the Defendants

should have made.  Such specificity is plainly required to sustain an omission claim based on an

alleged violation of Item 303.  For example, in both *Pearlstein v. BlackBerry Ltd.*, 93 F. Supp. 3d

233, 245 (S.D.N.Y. 2015), and *Blackmoss Invs. Inc. v. ACA Capital Holdings, Inc.*, No. 07 Civ.

10528, 2010 WL 148617, at *10 (S.D.N.Y. Jan. 14, 2010), the plaintiffs pointed to specific data

demonstrating the existence of the supposed "trends" they argued should have been disclosed

(declining smartphone sales and increasing foreclosure rates, respectively), but the courts in

those cases nonetheless concluded that no disclosure was necessary because the plaintiffs' data,

albeit specific, only went back two to five months, and thus did not provide sufficient evidence

to support the allegation of reportable "trends."

Here, where the Fund offers no specific data *at all*, the same result follows.  At most, the TAC speculates that PSG's future sales could have been at risk because there was a possibility that customers might be unable to sell existing inventory and might be unwilling to purchase new inventory.  The Fund offers no data demonstrating that Defendants had actual knowledge of any trend.  Nevertheless, PSG disclosed the inherent uncertainty of future sales: that it "may not be successful in converting booking orders into realized sales," that its "results of operations may suffer if [PSG is] not able to accurately forecast demand for [its] products," and that "[i]nventory levels in excess of consumer demand may result in inventory write-downs and the sale of excess inventory at discounted prices, which could significantly harm [its] operating results and impair the value of [the] brand."  Rubinstein Decl. Ex. E [2015 Form 10-K at 30, 34].

## 2.    The TAC Fails to Allege Any Affirmative Misstatement

As a back-up to its primary omission theory, the Fund peppers the TAC with a hodge-podge of allegedly affirmative misstatements relating to Defendants' descriptions of (a) PSG's "organic growth," and (b) PSG's internal controls.  Because the Fund has failed to allege with specificity that any of these statements were actually false (much less materially so), its affirmative misstatement theory fails as well.

### a.    Defendants' Description of PSG's "Organic" Growth Accorded with Common Parlance and Was Not Misleading

The TAC does not identify a single statement of historical fact that is even alleged to be false.  Indeed, the TAC concedes that when Defendants reported that PSG had achieved "record-setting" sales growth, the Company had, in fact, achieved that growth, *see* TAC ¶¶ 174-75, and that when Defendants reported PSG's "record-setting" revenue results, the Company had, in fact achieved those results as well, *see id.* ¶¶ 170, 171, 175.  The Fund instead quibbles

with a single word—"organic"—that the Defendants used from time to time to characterize PSG's growth.  In particular, the Fund alleges that Defendants' use of "organic" to describe PSG's growth was deceptive because the market understands "organic" growth to mean "sustainable" growth, not growth arising from "aggressive" sales practices (even if those sales practices are used by the existing business).  *Id.* ¶¶ 154-56.  The Fund has conjured this definition of "organic" out of whole cloth.

In the financial markets, the term "organic growth" is well understood to mean growth from all sources other than mergers and acquisitions (it is thus sometimes referred to as "non-acquisitive growth").  *See In re Omnicom Group, Inc. Sec. Litig.*, No. 02 Civ. 4483(RCC), 2005 WL 735937, at *1 (S.D.N.Y. Mar. 30, 2005) ("[O]rganic growth . . . is a measure of a company's growth from existing operations.").[4]  Indeed, the TAC acknowledges this common understanding of "organic growth," noting that the term, as it is "generally used, refers to growth based on increased output, customer base expansion, or new product development, *as opposed to mergers and acquisitions*."  TAC ¶ 155 (emphasis added).  The TAC cites an academic manuscript, *Hess & Kazanjian*, THE SEARCH FOR ORGANIC GROWTH, Cambridge Univ. Press (2006) ("***Hess & Kazanjian***") (quoted in TAC ¶ 155), which it blatantly mischaracterizes.  *See* Rubinstein Decl. Ex. D (annexing relevant excerpts).  Contrary to its depiction in the TAC, *Hess & Kazanjian* confirms that "organic growth" is commonly understood to mean all non-

---

[4]  *See also KBC Asset Mgmt. NV v. 3D Sys. Corp.*, No. 15-cv-02393-MGL, 2016 WL 3981236, at *1 (D.S.C. July 25, 2016) (defining "organic growth" as "growth not resulting from mergers and acquisitions"); *Zoumboulakis ex rel. VeriFone Sys., Inc. v. McGinn*, No. 5:13-CV-02379-EJD, 2014 WL 3926565, at *1 (N.D. Cal. Aug. 7, 2014) (distinguishing growth "attributed to . . . acquisitions" from "'organic' growth"); *In re Ebix, Inc. Sec. Litig.*, 898 F. Supp. 2d 1325, 1343 (N.D. Ga. 2012) ("Defendants consistently represented in filings . . . that Ebix was growing organically, not just through acquisitions.").

acquisitive growth.  *Id.* at 104 ("Organic growth was defined as the opposite of acquisitive

growth.").

> ### b.   The Fund Fails To Allege That Defendants Made False or Misleading Statements Regarding PSG's Internal Controls

The Fund alleges that PSG misrepresented the sufficiency of its internal controls,

citing exclusively Defendants' Sarbanes-Oxley Act ("**SOX**") certifications in PSG's 2015 10-K,

where Defendants certified that the 10-K:

- "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading"; and

- "[d]isclosed . . . any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter . . . that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting";

and further certified that PSG's internal controls were effective:

- "to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities"; and

- "to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements."

TAC ¶ 182.  These allegations fall far short of pleading an actionable misrepresentation.

Courts routinely reject securities fraud claims premised on the contention that

such generic, boilerplate SOX certification language is false or misleading.  *See, e.g.*, *In re*

*Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 371 (E.D.N.Y. 2013) ("Plaintiff's allegations of lack of

controls . . . [are] conclusory assertion[s] without any factual support, and they cannot survive

this motion to dismiss") (citation and quotation marks omitted); *Janbay,* 2012 WL 1080306, at

*9 ("Plaintiffs have failed to allege specific facts concerning the purportedly deficient internal

controls, including how they were deficient, when and why.").

Similarly, courts uniformly reject efforts to "bootstrap" allegations of corporate mismanagement into assertions of internal control failures and related misstatements.  *See, e.g.*, *In re PetroChina Co. Ltd. Sec. Litig.*, 120 F. Supp. 3d 340, 359 (S.D.N.Y. 2015), *aff'd sub nom. Klein v. PetroChina Co.*, 644 F. App'x 13, 15 (2d Cir. 2016) ("Even if PetroChina officials were engaging in bribery, the [complaint] does not make any allegations that would imply that the Company had flawed internal controls over *financial reporting*.") (emphasis in original).  *See also Andropolis*, 505 F. Supp. 2d at 683–84 ("any omission by [defendant] in disclosing its internal mismanagement is not actionable, because Plaintiff may not bootstrap his internal mismanagement claim into a federal securities action by alleging [that] . . . the statute obligates Defendants to reveal their managerial deficiencies").

Here, the Fund has failed to allege specific facts sufficient to demonstrate that any of the Defendants' statements in the SOX certifications were false or misleading.

**B.**     **The Fund Has Failed To Plead Materiality**

To avoid dismissal, a plaintiff must plead facts showing that the alleged misstatements or omissions were material.  *See, e.g.*, *ECA and Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009).  In claims involving omissions, the materiality requirement is satisfied if there is a "substantial likelihood that the disclosure of the omitted fact[s] would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

Materiality cannot be pleaded in a conclusory manner.  To satisfy the PSLRA and FED. R. CIV. P. 9(b), a complaint must demonstrate materiality by placing the alleged omission within the context of a defendant's "overall financial picture."  *Tabak v. Canadian Solar Inc.*,

549 F. App'x 24, 26-27 (2d Cir. 2013) (citing *Decker v. Massey-Ferguson, Ltd.*, 681 F.2d 111, 116 (2d Cir. 1982)).  In addition, plaintiffs must provide at least some measure of the impact of the allegedly problematic practice on a corporation's financials.  *See, e.g.*, *In re Oak Tech. Sec. Litig.*, No. 96-cv-20552-SW, 1997 WL 448168, at *8 (N.D. Cal. Aug. 1, 1997) ("To adequately plead financial fraud based on improper revenue recognition, Plaintiffs must allege, at a minimum, some particular transactions where revenues were improperly recorded, including the names of the customers, the terms of specific transactions, when the transactions occurred, and the approximate amount of the fraudulent transactions.").

The Second Circuit has insisted on a significant level of detail to avoid dismissal. In *Employees' Retirement System of the Government of the Virgin Islands v. Blanford*, the plaintiffs alleged that the defendants fraudulently concealed their overproduction of products by, among other things, making phantom shipments to customers.  794 F.3d 297, 301-02 (2d Cir. 2015).  Accepting the allegations as sufficient to plead materiality, the Second Circuit noted that the plaintiffs had specified the <u>name</u> of a customer who was allegedly shipped phantom orders, the <u>timing</u> and <u>amount</u> of product tied to those orders, and the <u>percentage</u> of the orders that were ultimately returned by the customer, thus providing sufficient detail for the court to evaluate the impact of the phantom sales on the defendant's overall financial picture.  *Id.* at 302, 307. Similarly, in *In re Scholastic Corp. Sec. Litig.*, the Second Circuit indicated that the plaintiffs satisfied the materiality requirement by quantifying the total amount of product returned during certain periods and providing detailed information about the total decline in sales, expressed both as a percentage and in terms of the quantity of product sold.  252 F.3d 63, 70-72 (2d Cir. 2001).

Absent this level of specificity, courts reject plaintiffs' claims on materiality grounds.  In *Revlon*, for example, the plaintiffs challenged sales practices similar to those at issue here.  2004 WL 2210269, at *2-4.  But they failed to establish materiality because they provided

no context to show the impact of the challenged sales practices on Revlon's "total financial picture." *Id.* at *16. The *Revlon* court found that the plaintiffs did not make any effort to estimate the degree of the allegedly misleading financial statements, as "[n]one of the . . . allegations of improper sales practices contain a specific allegation of monetary consequence at all, let alone one large enough to have been reflected in Revlon's financial statements." *Id.*

### 1. The TAC Fails To Allege that PSG's "Aggressive" Sales Practices Were Material

Despite the Fund's access to over 20 million pages of PSG documents, the TAC sheds no light on the impact of PSG's alleged sales practices on its revenues or earnings. There is no allegation reflecting or even estimating how many sales resulted from these practices, how much revenue they generated, or what percentage of PSG's revenue was attributable to them. Absent any such demonstration of the impact of these practices on PSG's "total financial picture," the TAC must be dismissed for failure to plead materiality. *See Revlon*, 2004 WL 2210269, at *16.

For example, none of the Company records cited in the TAC even suggests that any of the challenged sales practices, individually or collectively, made a material contribution to PSG's revenues (or any other reportable financial metric). To the contrary, the TAC relies upon a series of incomplete, anecdotal accounts involving transactions that, by any measure, are immaterial to a company with over $650 million in annual revenue.[5] In addition, the Fund relies

---

[5] For example, the TAC describes the return of $250,000 in products from a retailer as effectively turning a series of prior sales to this retailer into "consignment or right-of-return sales." TAC ¶ 114. However, this conclusory assertion is contradicted by the very "memo" that the TAC relies on. *Id.* That document explained that "[t]hese sales . . . *were actual sales*, and not part of any consignment program." Rubinstein Decl. Ex. F (emphasis added). Similarly, the TAC points to an alleged consignment agreement with Dunham's involving a $513,400 sale of inventory in late 2015. TAC ¶ 114. Whatever the terms, and regardless of the appropriate accounting treatment, the TAC itself acknowledges that the revenue involved was "*not material*." *Id.* ¶ 115 (emphasis added).

on two customer surveys purportedly conducted by Graeme Roustan[6] or at his request, which

allegedly found that a majority of the PSG customers that were sampled received at least one

request within the two preceding years to move orders to an earlier quarter.  *Id.* ¶ 20.  But the

TAC does not even attempt to estimate how much, if any, of PSG's business with these

unidentified customers or how much of PSG's overall business was affected by its alleged

pulling of orders.  Likewise, the alleged testimony of four confidential witnesses and one named

witness, *see id.* ¶¶ 45, 53-54, 59, 74-76, fails to specify the extent or financial impact of PSG's

allegedly improper sales.[7]  And finally, the TAC states that PSG's earnings guidance was revised

downward during the Class Period, because (at least in part) of PSG's aggressive sales practices,

*see id.* ¶ 24, but has not attempted to identify what, if any, percentage of the decline even *might*

be attributable to the challenged sales practices.

        Accordingly, even if the Fund had sufficiently alleged that PSG had made some

false or misleading statement about its sales practices, the Fund's securities fraud claim would

still fail because it has not alleged that those practices had any material impact on PSG.

## 2.    The Fund Fails To Allege Materiality as to any Purported Internal Control Deficiency

        "SEC regulations which mandate certain corporate disclosures are persuasive

authority as to the materiality of those disclosures."  *Andropolis*, 505 F. Supp. 2d at 684.  As

noted above, the TAC does not allege facts sufficient to establish that PSG (or the Defendants)

had a duty to disclose any internal control issues beyond the disclosures that did occur in public

---

[6]  Roustan served as chairman of PSG's Board of Directors from 2008 to 2012.  *See* TAC ¶ 65.  After leaving its board, Roustan became an outspoken critic of PSG.

[7]  For example, one of the confidential witnesses allegedly stated that he or she agreed on one occasion to accept early shipment of a "large order" in return for free shipping, but the TAC does not provide any specifics about the size of this order or its potential impact on PSG.  TAC ¶ 75.

filings.  Thus, the TAC has failed to allege facts that would show the materiality of any purported omission as to this subject.

Similarly, the Fund has failed to plead any facts that would allow the Court to conclude that any supposed internal control failures were connected *in any way* to *any* material misstatement made by PSG or the Defendants.  *See In re Duke Energy ERISA Litig.*, 281 F. Supp. 2d 786, 792 (W.D.N.C. 2003) (dismissing securities fraud claim where plaintiffs failed to relate alleged control deficiencies to any allegedly erroneous statement made by [defendant] in its public filings or explain why the "lack of internal controls" would be material").  Despite the TAC's repeated allegation that KPMG "warned" the Defendants about supposed internal control issues, *see, e.g.*, TAC ¶¶ 11-13, 16, it fails to allege that these supposed issues caused PSG to materially misreport any financial metric during the Class Period.  And, even more remarkably, the Fund ignores the illogic of its assertion that KPMG's "warnings" put the Defendants on notice of a material misstatement in PSG's financial reports:  KPMG gave PSG a "clean unqualified" audit opinion in August 2015, confirming that PSG's 2015 10-K "present[ed] fairly, *in all material respects*, the financial position of [PSG] and subsidiaries as of May 31, 2015 and 2014, and the results of its operations and its cash flows for each of the years in the three-year period ended May 31, 2015, in conformity with U.S. generally accepted accounting principles." Rubinstein Decl. Ex. E (emphasis added).  *See Amorosa v. Ernst & Young LLP*, 682 F. Supp. 2d 351, 354 (S.D.N.Y. 2010) ("A 'clean unqualified opinion' indicates that the auditor has reviewed a company's financial statements in keeping with Generally Accepted Auditing Standards . . . and that the financial statements themselves comport with Generally Accepted Accounting Principles.").

3.      **The TAC Improperly Challenges Defendants' Non-Actionable Optimistic, Forward-Looking Statements**

Many of the affirmative statements (as opposed to omissions) that the TAC brands as fraudulent—consisting primarily of statements during earnings calls or PSG press releases[8]—are statements of corporate optimism that are immaterial as a matter of law.  *In re Int'l Bus. Machs. Corp. Sec. Litig.*, 163 F.3d 102, 110 (2d Cir. 1998).  Examples include:

- "We are seeing continued strong results. . . . what we can say anecdotally is we certainly expect these results are generating share gains for us and that Bauer products continue to resonate with kids . . . ."  TAC ¶ 160;

- "[W]e continue to outpace the growth of the markets . . . .  [W]e remain very well-positioned to continue our momentum into 2016 and beyond."  *Id.* ¶ 170;

- "[We] continue to see solid growth across our brand . . . ."  *Id.* ¶ 191;

- "But otherwise, we don't see any sort of decline in demand from consumers for those products."  *Id.*

As a matter of law, none of these statements is material because they are "too general to cause a reasonable investor to rely upon them."  *JP Morgan Chase Co.*, 553 F.3d at 206.

C.      **The Fund Has Failed To Plead Scienter**

A securities fraud plaintiff must plead specific facts that give rise to a "strong inference" of a defendant's fraudulent intent with respect to allegedly misleading statements or omissions—*i.e.,* the intent "to deceive, manipulate, or defraud."  *Tellabs*, 551 U.S. at 313-14

---

[8]  The TAC identifies only one such statement by Defendant Rosenthal.  *See* TAC ¶ 161 (setting forth Rosenthal's statement that, "Excluding this impact [of the effects of foreign exchange rates], as well as the results of EASTON, organically we grew sales 10% in the quarter").  The Fund does not allege that there was anything factually inaccurate about this statement.  Rather, the Fund alleges that reasonable investors would have understood "organic" growth to exclude growth from aggressive sales practices.  *Id.* ¶ 162.  However, as noted above, the Fund's assertion that "organic" growth excludes growth from aggressive sales practices is not the commonly understood meaning of organic, *i.e.*, internally-generated growth as opposed to growth due to acquisitions.  Rosenthal's statement itself (explaining that the growth figure was "***excluding***" the "results of Easton," which had been recently acquired) made clear that he was using the term "organic" as it is commonly understood by investors.

(citation omitted); *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001); 15 U.S.C. § 78u-4(b)(2)(A). Applying that standard, the Supreme Court has held that an "inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. Courts "must take into account plausible opposing inferences" of nonfraudulent intent, *ATSI Communications, Inc.*, 493 F.3d at 99 (quoting *Tellabs*, 551 U.S. at 323), and if a fraudulent inference is not "at least as compelling" as a nonfraudulent one, it must be rejected, even in a "close case." *Slayton v. Am. Express Co.*, 604 F.3d 758, 777 (2d Cir. 2010).

Here, the Fund contends that scienter can be inferred from Defendants' alleged knowledge of PSG's "high-risk sales practices," even while claiming that Defendants never "assess[ed] just how much the Company was relying on [them]." *See, e.g.*, TAC ¶¶ 150-52, 12. These allegations fail as a matter of law because they do not establish knowledge or recklessness with regard to any allegedly fraudulent public statement or omission by Defendants.

Moreover, Defendants' attendance at internal meetings at which PSG's alleged sales practices were discussed, or their review of documents describing such practices, does not support an inference of scienter because those sales practices are neither fraudulent nor wrongful. *Supra* Pt. I.A.1.a. Courts have repeatedly confirmed that there are valid reasons for pursuing aggressive sales tactics and persuading customers to increase the size and frequency of their orders, such as meeting earnings goals, incenting distributors to sell more products, and gaining market share over competitors. *See, e.g.*, *Bristol-Myers*, 312 F. Supp. 2d at 566 ("Offering incentives to meet sales or earnings goals is a common practice, and, without additional allegations not present here, the allegation that the sales at issue were made pursuant to incentives to meet goals set by management is an insufficient basis on which to infer conscious misbehavior or recklessness."); *Makor Issues*, 513 F.3d at 709. In light of the plausible and

lawful motivations for allegedly aggressive sales practices, it is unreasonable to infer fraudulent intent from Defendants' alleged knowledge of PSG's sales practices. *See also Revlon*, 2004 WL 2210269, at *17, 19 (deeming scienter allegations deficient where defendants knew of aggressive sales practices, such as offering discounts and shipping products early); *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1265 (11th Cir. 2006) (same, where defendant "promoted channel stuffing at a series of meetings"); *Trex*, 212 F. Supp. 2d at 608-09 (collecting cases ruling that knowledge of or involvement in channel stuffing does not support a finding of scienter).

      Indeed, courts have found allegations of scienter deficient even when the corporate officer knew that the use of aggressive sales practices was harmful to the corporation's business. In *Garfield*, the plaintiffs sought to plead scienter by alleging that the defendants attended meetings where "mounting problems with accounts receivable" were detailed, but "decided to continue" with the aggressive practices "because the company had to make its numbers." 466 F.3d at 1264-65. The Eleventh Circuit found scienter lacking because the plaintiffs failed to allege what was actually discussed at the meeting and based their conclusion about the defendants' alleged channel stuffing on multiple inferences, which the court determined was too speculative and conclusory. *Id.* at 1265. In *Bristol-Myers*, the plaintiffs asserted that scienter could be inferred because (1) management set aggressive targets, (2) the company gave incentives to customers to buy product before they needed it, (3) this was done to meet earnings estimates, and (4) the officers knew that customer inventories were high. *Bristol-Myers*, 312 F. Supp. 2d at 568. The court deemed these allegations insufficient, noting that "[o]ffering incentives to meet sales or earnings goals is a common practice," and the plaintiff had not alleged that the reported sales were fictitious. *Id.* at 566, 568.

      The scienter allegations here are even weaker than those deemed insufficient in *Garfield* and *Bristol-Myers*. Unlike *Garfield*, there is no allegation that Defendants *knew* that

30

PSG's sales practices were creating problems with the company's accounts receivable.  The TAC merely alleges that Defendants attended meetings where the sales practices were discussed or otherwise knew of the practices, and that Defendants were notified of the accounts receivable. Scienter cannot be inferred from these allegations because the sales practices themselves are consistent with legitimate conduct (including, as found in both *Garfield* and *Bristol-Myers*, the desire to meet earnings objectives).  Similarly, scienter cannot be inferred from allegations that PSG set "stretch" sales targets, TAC ¶ 17, offered incentives to customers (*e.g.*, volume discounts and free shipping) to buy product before they needed it, *id.* ¶¶ 52-60, or saturated the market with inventory in a manner that could erode future sales, *id.* ¶¶ 61-70.  These are weaker versions of the allegations found deficient in *Bristol-Myers*.

The Fund's vague allegations that Defendants "knew that PSG had consignment arrangements with at least some retailers, and they knew that PSG had recognized revenue improperly," *id.* ¶ 107, also do not support an inference of scienter.  Even if the TAC included a well-pleaded allegation of a material revenue recognition error (it does not, *see supra* Pt. I.B.1), "allegations of accounting violations, without more, are insufficient to" plead scienter.  *See, e.g., In re Twinlab Corp. Sec. Litig.*, 103 F. Supp. 2d 193, 207 (E.D.N.Y. 2000); *In re Bausch & Lomb, Inc. Sec. Litig.*, 592 F. Supp. 2d 323, 345 (W.D.N.Y. 2008) ("[V]iolations of GAAP, even ones that lead to restatement of financials, do not suffice to raise a strong inference of scienter without particularized allegations of fraudulent intent."); *JP Morgan Chase Co.*, 553 F.3d at 200 (same).  The TAC contains no well-pleaded allegation that Defendants knew of any supposed GAAP violation, much less that they had "corresponding fraudulent intent" as to any such violation.  *See Harris v. AmTrust Fin. Servs., Inc.*, 135 F. Supp. 3d 155, 162 (S.D.N.Y. 2015) ("A plaintiff alleging a GAAP violation when a restatement did not occur . . . faces a high hurdle

to allege a GAAP violation (as opposed to mere error in judgment) . . . ."), *aff'd*, 649 F. App'x 7

(2d Cir. 2016).

Nor can the Fund's allegations about Roustan's surveys, which purport to show

that PSG asked certain retailers to move an order into an earlier quarter, support an inference of

scienter.  *See* TAC ¶ 148.  Moving sales into earlier quarters to meet targets—which is what

Roustan alleged was happening at PSG, *see id.*—is legitimate and not fraudulent.  *See supra* Pt.

I.A.1.a.  Knowledge of such alleged practices is not evidence of scienter.

The mere existence of regulatory or internal investigations, *see* TAC ¶¶ 92, 104,

111, 116-19, 133-34, 138, 140-41, 151-53, 188, also does not support an inference of scienter—

especially where, as here, it is not even alleged that any investigation resulted in findings of

fraudulent activity or any improper conduct by Defendants.  *See In re MoneyGram Int'l Inc. Sec.

Litig.*, 626 F. Supp. 2d 947, 981 (D. Minn. 2009) ("[W]here . . . an ongoing SEC investigation

does not result in hearings or adverse findings, an inference 'that the SEC investigation

uncovered no evidence of fraud,' is more compelling than an inference of fraud.").

This legal principle precludes the TAC's effort to create an inference of scienter

on the part of Defendant Davis from the alleged existence of a FINRA inquiry concerning

"suspiciously timed trades" by individuals including "three people with whom Davis had

personal and financial ties."  TAC ¶ 153.  The TAC does not (and cannot) allege that FINRA

made any finding that Davis or any other individual engaged in insider trading or any other

unlawful conduct.  In any event, the alleged FINRA inquiry is irrelevant to the omissions and

misstatements alleged in the TAC relating to PSG's financial performance.  *See generally In re

Axis Capital Holdings Ltd., Sec. Litig.*, 456 F. Supp. 2d 576, 595 (S.D.N.Y. 2006) ("The mere

allegation of insider sales during the Class Period does not, without more, properly allege

motive.").

Moreover, the Fund's theory that Defendants intentionally pursued a dead-end sales strategy is not plausible, and does not support an inference of scienter.  It is implausible for anyone, let alone the leaders of a publicly traded company, to pursue a scheme they know is doomed.  *See Shields v. Citytrust Bancorp., Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994) (allegations that defendants concealed facts and inflated stock price could not show scienter because adverse facts would be uncovered anyway); *In re GeoPharma, Inc. Sec. Litig.*, 399 F. Supp. 2d 432, 449 (S.D.N.Y. 2005) (scienter allegations insufficient where the "alleged scheme could not possibly have succeeded"); *Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 600 (S.D.N.Y. 2016) (same, where "the scheme . . . lack[ed] a coherent rational objective . . . [and] by its nature . . . could not have continued in perpetuity").  The TAC pleads no facts that indicate why Defendants would have pursued a futile strategy.  *See QRX Pharma*, 197 F. Supp. 3d at 600-01 (finding that where "there would be no concrete benefit to defendants to justify these risks," "[c]ourts regularly refuse to infer scienter . . . when confronted with [such] illogical allegations").

Finally, the TAC fails to plead scienter as to Defendants' statements regarding PSG's internal controls or KPMG's so-called "warnings."  KPMG's 2014 and 2015 letters to PSG's management, which stated that KPMG had found no "material weakness," do not support an inference that Defendants knew that any of the statements in PSG's financial statements were false or misleading.  Rubinstein Decl. Exs. B & G.  Based on the substance of KPMG's letters, it is far more plausible that Defendants believed that no supplemental disclosure was necessary.  *See, e.g.*, *Lefkowitz v. Synacor, Inc.*, No. 18 Civ. 2979 (LGS), 2019 WL 4053956, at *10 (S.D.N.Y. Aug. 28, 2019) ("The allegations that Defendants were aware that the Company was understaffed and lacked personnel in internal controls does not raise an actionable inference that Defendants knew that the SOX certifications were false; an equally plausible inference is that

Defendants believed that any deficiencies were not so acute as to rise to the level of an internal control weakness.").

Because Defendants' latest alleged misstatement or omission was on January 14, 2016, *id.* ¶¶ 195-98, the TAC's allegations about things Defendants learned *after* that date cannot support an inference of their scienter during the period prior to January 14, 2016.  Thus, the TAC's alleged account of all of the discussions about PSG's 2016 Fiscal Year that took place between KPMG and PSG during Summer and Fall 2016 are not at all informative of Defendants' state of mind when they made any statement relevant to the Fund's securities fraud claims months earlier.  *See Coronel v. Quanta Capital Holdings Ltd.*, No. 07 Civ. 1405(RPP), 2009 WL 174656, at *27 (S.D.N.Y. Jan. 26, 2009) (ruling that complaint's "attempt to plead fraud by hindsight" was "particularly meritless" where it alleged "no specific facts demonstrating that Defendants possessed—***at the time they made the allegedly false statements concerning the reserve amounts***—information contradicting their statements") (emphasis added).

In sum, the Fund's scienter allegations are insufficient and implausible.  As observed by the court in *In re ICN Pharm., Inc. Sec. Litig.*, "for channel stuffing to be improper logically it must be a short-lived scheme in which the wrongdoer attempts to capitalize on artificially increased sales *before* the resulting drop in sales." 299 F. Supp. 2d 1055, 1062 (C.D. Cal. 2004) (emphasis in original).  Far from alleging "a short-lived scheme," the TAC alleges that PSG was engaged in "aggressive" sales practices going back years, to "well before the Class Period" began.  *See* TAC ¶ 47.  The Fund's claim that it was foreseeable that these practices were "unsustainable" is both belied by their longevity and is the sort of "speculation made in hindsight" that courts uniformly find cannot demonstrate scienter or securities fraud.  *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1298 (9th Cir. 1998) (affirming dismissal of claim where

34

plaintiff alleged that defendant "oversuppl[ied] distributors in one quarter to artificially inflate

sales, which will then drop in the next quarter as the distributors no longer make orders").

### D.    The Fund Has Failed To Plead Loss Causation

"To plead loss causation, plaintiffs must allege that the subject of the fraudulent

statement or omission was the cause of the actual loss suffered."  *Carpenters Pension*, 750 F.3d

at 232 (citation and quotation marks omitted).  To meet this burden, the plaintiff must allege

"that the misstatement or omission concealed something from the market that, when disclosed,

negatively affected the value of the security."  *Lentell*, 396 F.3d 161, 173 (2d Cir. 2005).  Where,

as here, a plaintiff cannot trace the alleged fraudulent statements to the events that allegedly

prompted the company's stock price to decline, it cannot adequately plead loss causation.

The events that the Fund alleges caused PSG's stock price to decline are set forth

at TAC ¶¶ 118-145.  In sum, the TAC alleges that, from January to October 2016, "the truth

regarding Defendants' fraud . . . leak[ed] out to the public."  *Id.* ¶ 118.  This loss causation

allegation fails, however, because none of the events that the TAC describes as having caused

PSG's stock price decline revealed any of the information that the Fund alleges Defendants

fraudulently withheld.  *See Salvani v. ADVFN PLC*, 50 F. Supp. 3d 459, 475 (S.D.N.Y. 2014)

(loss causation "requires a direct connection between the risk that is hidden from investors and

the subsequent loss suffered by those investors").

The Fund alleges that PSG's stock price declined in response to the following

events:

- Roustan's lawsuit against Grant Thornton, which the Fund asserts was a response to
  Defendants' alleged *suppression* of information that "would have revealed the truth about
  PSG's high-risk sales practices," TAC ¶ 120, and a subsequent article about the
  company's dispute with Roustan that included the false suggestion (not advanced in the
  TAC) that PSG may have "misdated earnings," *id.* ¶ 128.

- PSG's announcement of its quarterly financial results, as well as announcements of downward adjustments to its forward-looking guidance, which PSG disclosed were caused largely by write-downs related to customer bankruptcies, weakening market conditions, and customer credit issues, *id.* ¶¶ 121-22, 132.

- The announcement of Davis's departure from PSG, which came at a time when PSG's supposedly "shoddy internal controls and aggressive and high-risk sales practices . . . ***continued to be concealed from investors***," *id.* ¶ 129 (emphasis added).

- A non-cash impairment of goodwill and intangible assets that PSG reported for its baseball/softball unit. The TAC baldly asserts, without support or explanation, that the impairment "was the direct result of [PSG's] high-risk sales practices," *id.* ¶ 131, but the announcement said nothing of the sort and Plaintiffs do not claim otherwise.

- PSG's inability to timely file its 2016 financial statements; announcement of an internal investigation, shareholder litigation, and certain regulatory investigations; and bankruptcy—***none*** of which revealed to investors anything that would suggest that any of the Defendants' challenged statements were false or misleading when made, *id.* ¶¶ 133-145.

      None of the foregoing disclosures revealed anything about PSG's "aggressive" sales practices or their supposed risks, and the TAC fails to allege, with particularity, *any* direct causal link between the stock price declines resulting from these disclosures and Defendants' alleged concealment of PSG's "aggressive" sales practices. *See In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 285 (S.D.N.Y. 2008) ("if a plaintiff relies upon a particular disclosure as the basis for his loss causation allegations, that disclosure must somehow reveal to the market some part of the truth regarding the alleged fraud"). This pleading failure compels dismissal.

## II.

## <u>THE "CONTROL PERSON" CLAIM FAILS</u>

      To state a claim for "control person" liability under Section 20(a) of the Exchange Act, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud. *ATSI Commc'ns, Inc.*, 493 F.3d at 108.

Where a plaintiff fails to state a primary violation under Section 10(b) of the Exchange Act, it cannot establish control person liability under Section 20(a).  *See, e.g., In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 379 (S.D.N.Y. 2011).

As shown in Part I, the TAC fails to state a claim for a primary violation of Section 10(b), meaning that the control person claim must fail as well.  In addition, for the same reasons that the TAC fails to plead facts giving rise to a strong inference of scienter, it has not alleged culpable participation by either Defendant.[9]  Because the TAC fails to establish at least two essential elements of control person liability, the Court should dismiss Count II.

## III.

## THE CLAIM TO EXPAND THE PLAINTIFF CLASS IS TIME-BARRED

If any portion of the TAC were to survive dismissal, the Fund would be time-barred from expanding the putative plaintiff class beyond the Class Period as it was defined in the original complaint, FAC, and SAC.  The statute of limitations for Exchange Act claims is the earlier of two years after the alleged fraud has been discovered and not more than five years after the alleged fraud has occurred.  28 U.S.C. § 1658(b).  Here, the Fund cannot deny that it had "discovered" the so-called fraud by no later than the date that it filed the FAC (August 15, 2016), in which it expressly claimed that Defendants had engaged in a "fraudulent scheme."  *See, e.g.*, FAC ¶ 13.  Using that date as a guidepost, the Fund was time-barred from adding new plaintiffs to the purported class by no later than August 15, 2018.  Its effort to expand the class to include purchasers or sellers outside of the original class period should be rejected based on the expiration of the statute of limitations as to these parties.  *See In re Eaton Corp. Sec. Litig.*, No.

---

[9]  *See, e.g.*, *In re Satyam Comput. Servs. Ltd. Sec. Litig.*, 915 F. Supp. 2d 450, 482-83 (S.D.N.Y. 2013) (ruling that for the same reasons that plaintiff failed to allege scienter, plaintiffs also failed to allege that any of the defendants were culpable participants); *Janbay*, 2012 WL 1080306, at *17 (same).

16-CV-5894 (JGK), 2017 WL 4217146, at *7 (S.D.N.Y. Sept. 20, 2017) (ruling that plaintiff was time-barred from expanding class, and that such expansion would be permitted only if plaintiff could show "there was a mistake concerning the proper party's identity") (quotation marks omitted).

## IV.

## THE DISMISSAL OF THE TAC SHOULD BE WITH PREJUDICE

The unusual circumstances of this case weigh in favor of a dismissal <u>with prejudice</u>.  The TAC is the fourth pleading against the Defendants, and the Fund filed it with the benefit of more than three years of hindsight and two separate previews of the Defendants' arguments for dismissal.  The Fund has had a full, fair, and complete opportunity to reformulate its pleading into its "best and final" form in light of the defects Defendants identified in their earlier motions to dismiss.  The Fund's efforts at rehabilitation have been ineffective, and fairness now requires that the Defendants—after three years of litigation and three motions to dismiss—have finality.  *See In re Barrick Gold Corp. Sec. Litig.*, 341 F. Supp. 3d 358, 381 (S.D.N.Y. 2018) ("This dismissal will operate with prejudice. . . .  [W]e conclude that leave to amend would be futile here given the fundamental substantive problems in plaintiffs' allegations."); *In re Open Joint Stock Co. Vimpel-Commc'ns*, No. 04 CIV. 9742 (NRB), 2006 WL 647981, at *9 (S.D.N.Y. Mar. 14, 2006) (same).  As in this case, the courts in both *In re Barrick Gold* and *In re Open Joint Stock Co.* had not previously ruled on any motions to dismiss.

Furthermore, the Fund developed the TAC after obtaining extraordinary access to over 20 million pages of internal PSG records.  As the Court is aware, this is highly unusual for a securities fraud case governed by the PSLRA, under which discovery is stayed pending the resolution of the motion to dismiss.  The Fund's access to these records further compels the conclusion that the TAC should be treated as the Fund's "best and final" effort at a viable

complaint, and that further amendment would be futile.  *See In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 939 F. Supp. 2d 360, 392 (S.D.N.Y. 2013) (dismissing with prejudice where "[u]nlike most plaintiffs subject to the PSLRA, the Plaintiffs have had access to copious discovery in crafting the Amended Complaint," but still failed to state a claim).

Accordingly, because further amendment would be both futile and unfair to the Defendants, the TAC should be dismissed with prejudice.

## CONCLUSION

For the foregoing reasons, the TAC should be dismissed without leave to replead.

Dated:   New York, New York
         October 28, 2019

Respectfully submitted,

FRIEDMAN KAPLAN SEILER & ADELMAN LLP

COVINGTON & BURLING LLP

s/ Edward A. Friedman
Edward A. Friedman
Jason C. Rubinstein
Timothy M. Haggerty
7 Times Square, 28th Floor
New York, New York 10036-6516
Tel.  (212) 833-1100
Fax  (212) 833-1250
efriedman@fklaw.com
jrubinstein@fklaw.com
thaggerty@fklaw.com

*Attorneys for Defendant Amir Rosenthal*

s/ Alan Vinegrad
Alan Vinegrad
David L. Kornblau
Fatmata S. Kabia
The New York Times Building
620 Eighth Avenue
New York, New York 10018
Tel.  (212) 841-1000
Fax  (212) 841-1010
avinegrad@cov.com
dkornblau@cov.com
fkabia@cov.com

*Attorneys for Defendant Kevin Davis*