USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  4/14/2020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
PLUMBERS & PIPEFITTERS NATIONAL          :
PENSION FUND and JUAN FRANCISCO          :
NIEVES, As trustee of the Gonzalez Coronado    :
Trust, Individually and on behalf of all others    :
similarly situated,                                              :
                                                                          :          1:16-cv-3591-GHW
                                              Plaintiffs,    :
                                                                          :          MEMORANDUM OPINION
                                                                          :          AND ORDER
                         -against-                                 :
                                                                          :
KEVIN DAVIS and AMIR ROSENTHAL,      :
                                                                          :
                                              Defendants.   :
------------------------------------------------------------------X

GREGORY H. WOODS, United States District Judge:

Defendants Kevin Davis and Amir Rosenthal were high-level corporate managers at

Performance Sports Group ("PSG").  Lead Plaintiff, the Plumbers & Pipefitters National Pension

Fund (the "Fund"), alleges that Defendants led PSG to engage in sales tactics designed to inflate its

short-term sales figures at the expense of the long-run viability of PSG's business.  For example, the

Fund alleges that PSG offered customers deep discounts to hit quarterly sales numbers, predictably

cannibalizing future sales.  A major PSG shareholder and former Chair of its Board of Directors

compared PSG's sales tactics to a "Ponzi scheme."

The Fund alleges that Defendants made misleading public statements to conceal the fact that

their revenue was the result of these unsustainable tactics.  Eventually, the Fund alleges that

Defendants' chickens came home to roost; PSG missed its revenue target and slashed its earnings

expectations and entered a downward spiral toward bankruptcy.  Because the Fund has plausibly

alleged that Defendants failed to disclose an adverse material trend, made misleading statements

regarding the nature and sources of PSG's sales growth, and failed to make adequate risk disclosures

in documents filed with the SEC, Defendants' motion to dismiss is largely DENIED.  However,

because some of Defendants' statements are not actionable, the motion is GRANTED in part.

## I. BACKGROUND

### A. Facts[1]

PSG was a developer and manufacturer of sports equipment and apparel that it sold to independent retailers under different brand names, the largest of which were Easton and Bauer hockey.  TAC ¶¶ 2-4.  After its initial public offering in June of 2014, PSG's stock traded on the New York Stock Exchange.  *Id.* ¶ 2.  On October 31, 2016, PSG filed for Chapter 11 bankruptcy.  *Id.* ¶ 141.  Because it is now defunct, PSG is no longer a defendant in this case.

#### 1. Allegedly Problematic Practices Within PSG

The TAC alleges that PSG pursued numerous strategies to artificially inflate its short-term sales figures.  For example, PSG allegedly pressured retailers to increase the size of their orders or risk losing wholesale discounts.  *Id.* ¶¶ 53-54.  One retailer told a reporter that PSG "jam[med] orders down our throat" and pressured the retailer "to take orders early," such that the retailer was "overstock[ed], oversuppl[ied], [and] over-inventor[ied]."  *Id.* ¶ 59.

The TAC also alleges that PSG flooded the market with discounted inventory to increase its short-run sales figures.  In June 2015, Graeme Roustan, a major PSG shareholder and former Chair of the Company's Board, alerted Defendants that he had "received credible information" that PSG was engaged in "extreme discounting" and may be "dumping products at below cost to make quarterly numbers."  *Id.* ¶ 65.

The Fund alleges that PSG manipulated the timing of orders to meet quarterly sales targets. *Id.* ¶ 72.  PSG allegedly requested that retailers accept shipments up to a year early.  *Id.* ¶¶ 74, 76. Internal company documents allegedly confirm that "pulling" orders, as PSG referred to this practice, was routine.  *Id.* ¶¶ 77-79.  The TAC alleges that an "executive-level" PSG presentation in

---

[1] The facts are drawn from Plaintiff's Third Amended Complaint ("TAC"), Dkt No. 148, and are accepted as true for the purposes of this motion to dismiss.  *See, e.g., Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002). However, "[t]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

July of 2016 acknowledged that "[q]uarter end pull forwards as a strategy to meet financial targets [were] not sustainable." *Id.* ¶ 73.

In addition, PSG allegedly inflated short-run sales numbers by allowing PSG's customers to delay payment, even when those customers posed an obvious credit risk. This included offering retailers consignment and right-of-return agreements. *Id.* ¶¶ 107-08. PSG's then-CFO Mark Vendetti observed that PSG was "using extended terms to help drive sales to financially troubled accounts." *Id.* ¶ 90.

Relatedly, PSG allegedly ignored customer credit limits to artificially drive up sales figures. An October 2015 presentation to PSG's Audit Committee noted that PSG's top twenty customers had collectively exceeded their customer credit limits by over $36 million. *Id.* ¶ 96. Rosenthal allegedly referred to the slide in the presentation disclosing this fact as "the 'punch me' slide." *Id.* ¶ 16. Four of the twenty customers that had exceeded their credit limits—Team Express, Sports Chalet, Total Hockey, and The Sports Authority—declared bankruptcy within months of that presentation, allegedly rendering the outstanding balances uncollectible. *Id.* ¶ 27.

In addition to these strategies designed to inflate PSG's short-run sales numbers, the TAC alleges that PSG had inadequate internal controls to ensure that it reported accurate sales figures. In August 2014, PSG's external auditor KPMG informed PSG that it "did not maintain appropriate credit limits for certain customers" in a letter addressed to Davis. *Id.* ¶ 95. In January 2016, KPMG noted that PSG's credit limit policy lacked a consistent method for evaluating when and whether customers should be permitted to exceed their limits. *Id.* ¶ 99. However, as of July 2016, PSG's Internal Audit Unit allegedly admitted that the credit control issues had not been remediated. *Id.* ¶ 100. Moreover, the TAC alleges that Defendants did not provide adequate resources to the Internal Audit Unit. *Id.* ¶¶ 111-12. Despite warnings from KPMG, Defendants allegedly permitted PSG to operate with inadequate internal controls. *Id.* ¶¶ 110-11.

KPMG also allegedly identified problems with PSG's contract management and revenue recognition controls. In August 2015, KPMG allegedly "expressed concern" about how PSG recognized revenue associated with orders involving rights-of-return and consignment agreements. *Id.* ¶ 108. After PSG struggled to locate these contracts for review, KPMG informed Defendants that PSG had a "significant deficiency" in its control system for identifying customer contracts and that this deficiency had resulted in "passed entries to correct revenue" in each of the three prior fiscal years. *Id.* ¶ 109. KPMG suggested that there might be "a material weakness in the amount of resources available to pull" together the information necessary to conduct an audit. *Id.* ¶ 112. In April 2016, KPMG informed PSG that its controls were inadequate, *id.* ¶ 113, and KPMG continued to find consignment contracts and returns with improper revenue recognition in the summer of 2016. *Id.* ¶¶ 114-15. The TAC alleges that Defendants were aware of these deficiencies because they discussed them in an August 25, 2015 email thread. *Id.* ¶ 149. However, Defendants allegedly dissuaded PSG employees from reining in PSG's poor sales practices. *Id.* ¶¶ 85-87, 111-12.

The TAC alleges that Defendants knew about PSG's abusive sales practices and inadequate internal controls because these practices were disclosed to them in emails, presentations, and board meetings and because, in some instances, they were personally involved in the abusive practices. *Id.* ¶¶ 41, 47, 56, 69, 77, 86, 93, 107, 150-52. Defendants were also involved in drafting, signing, and issuing PSG's public statements and SEC filings. *Id.* ¶ 41.

The TAC alleges that Defendants ignored warnings from PSG stakeholders about their practices. Edward Kinnaly, the Executive Vice President of Bauer Hockey, warned in the spring of 2013 that the hockey market was "[u]nhealthy" and "bloated" as a result of Defendants' "gun to head" sales tactics. *Id.* ¶ 19. Davis allegedly fired Kinnaly in 2013 for raising a concern that pulling orders into earlier quarters would cannibalize future sales. *Id.* ¶¶ 18, 81. Similarly, in June 2015, Roustan warned that several retailers he surveyed had been asked by PSG "to move orders into an earlier quarter" in addition to other aggressive sales tactics solely aimed at meeting quarterly

4

numbers. *Id.* ¶¶ 20, 82. Roustan warned that these practices were akin to a "Ponzi scheme." *Id.* ¶ 148. Defendants allegedly responded by suppressing the results of Roustan's survey and threatening litigation against Roustan and the accounting firm from which he commissioned the survey. *Id.* ¶ 21.

### 2. Defendants' Allegedly False and Misleading Public Statements

The TAC alleges that Defendants made false and misleading statements about PSG's sales performance. For example, Davis and Rosenthal told investors that PSG's sales results were "driven by the continued strong performance" of its brands, its "innovative products," the "strong demand" for those products, and the "organic sales growth" of PSG's products. *Id.* ¶¶ 158, 160. Defendants made similar statements throughout the class period; these statements attributed PSG's growth to consumer demand, growing market share and increased efficiency via a new product platform. *Id.* ¶¶ 165-67, 170, 174, 178, 183, 190-92, 195-96.

Defendants' public statements allegedly contradicted PSG's negative internal assessments. In January 2015, Davis told investors that PSG "experienced another record quarter" and that its "Q2 results were driven by the continued strong performance of the EASTON baseball/softball business and another quarter of more than 10% organic sales growth." *Id.* ¶ 158. Rosenthal likewise claimed that PSG "grew sales . . . organically . . . 10% in the [second] quarter." *Id.* ¶ 161. Davis claimed that this "organic performance" was powered by sales of hockey equipment because of that division's "brand improvement and continued strong demand." *Id.* ¶ 160. Davis also represented that "overall inventory levels at retail" were "normalized." *Id.* ¶ 159.

Despite these reassuring statements to investors, Defendants allegedly continued to receive internal red flags. On February 2, 2015, Easton executives told Defendants that the division faced a shortfall in the third quarter and thus that the brand was "working to understand what orders can be pulled in from March [the next financial quarter] to reduce the overall Q3 risk." *Id.* ¶ 78. Similarly, on May 19, 2015, an Easton employee told Rosenthal that "pull forwards" into the second quarter

were jeopardizing sales targets.  *Id.* ¶ 78 n.2.  And Roustan informed PSG's Board in June of 2015 that he had evidence that PSG was engaging in "extreme discounting," by "dumping products at below cost to make quarterly numbers," and asking customers to move orders into earlier quarters. *Id.* ¶ 20.

Defendants did not share these alleged problems with investors.  In April 2015, Davis told investors that Easton "continued to experience solid demand for its products."  *Id.* ¶ 166.  He stated that PSG was "pleased with [its] organic growth profile," which he attributed to "the strength of the brand" and growing market share.  *Id.* ¶ 167.  Likewise, on an earnings call in July 2015, Davis told investors that PSG "continue[d] to outpace the growth of the markets . . . by growing market share and profitability and we continue to leverage our Performance Sports platform which is improving efficiency."  *Id.* ¶ 170.  Davis also claimed that PSG was "very well-positioned to continue our momentum into 2016 and beyond" and that PSG's earnings resulted from "the same fundamental growth drivers that attracted our current investors."  *Id.*

Defendants continued to take steps that allegedly jeopardized PSG's long-term viability and ignored warnings from KPMG about the sustainability of its sales figures.  On August 4, 2015, Rosenthal allegedly told an Easton employee that he was considering offering retailer Team Express a further extension of its payment terms past an already extended payment schedule, although he acknowledged that PSG might "have revenue recognition issues" if it again extended Team Express' payment terms.  *Id.* ¶ 150.  On August 24, KPMG identified a "significant deficiency" in PSG's sales contract management controls, which Defendants allegedly discussed the next day.  *Id.* ¶ 110.

Still, however, Defendants continued to represent to investors that PSG was experiencing healthy sales growth.  When PSG released its fourth quarter and annual results in August 2015, PSG again stated that its growth was attributable to "growing market share and profitability" and its "performance sports platform."  *Id.* ¶ 174.  PSG asserted that these "fundamental building blocks of our shareholder value [were] continuing to perform quite strongly."  *Id.*  PSG's 2015 Form 10-K,

which each Defendant signed, included a list of risk factors such as overproduction and excessive inventory in the market. *Id.* ¶ 180. However, Defendants downplayed these risks and described them as merely theoretical and driven by external market forces. *Id.* The 2015 Form 10-K also contained certifications attesting to the adequacy of PSG's internal controls. *Id.* ¶ 182.

The TAC alleges that the pattern of Defendants jeopardizing future sales numbers to achieve short-run growth continued. On September 3, 2015, Rosenthal approved an extension on the payment terms of an order to a retailer that had excessive inventory. *Id.* ¶ 86. In October, Rosenthal received a "flogging" from the PSG's Audit Committee when he disclosed the extent to which PSG's customers had been permitted to exceed their credit limits. *Id.* ¶ 97. In November 2015, an internal Bauer presentation stated that it had missed its sales target because of "pull into FY15 and lower bookings/repeats due to high inventory levels at US key accounts[.]" *Id.* ¶ 79. Similarly, an Easton Executive Vice President warned on November 18 that it had pulled $11 million into the second quarter and that, consequently, "Q3 in particular is looking very challenging." *Id.* ¶ 78. On December 30, 2015, Rosenthal emailed a report to Davis that collected retailer complaints about PSG's aggressive sales practices, including that PSG's "buying program [was] terrible," and that "demand [was] not strong enough to dictate more dollars every year." *Id.* ¶ 56. Davis noted in response that "[n]et is not great. Many of the comments are anti-retail. Brand has taken a hit for sure." *Id.* ¶ 57.

Nonetheless, Defendants continued to present a rosy portrait to outside investors. In January 2016, Davis asserted that PSG "continued to take market share and demonstrate[] strong resilience." *Id.* ¶ 195. He specifically denied that inventory levels in the market were "excessive." *Id.* ¶ 196. And Davis likewise stated that PSG was "hearing positive things generally speaking across the entire spectrum of products that we offer." *Id.*

### 3. PSG's Performance Suffers

In January 2016, PSG began to reap what it had sowed:  The TAC alleges that PSG experienced weak sales as a result of its aggressive sales practices in prior quarters that cannibalized future sales.  In that month, PSG began to suffer declines in revenue, gross profits, and EBITDA and was forced to revise its financial guidance downward.  *Id.* ¶¶ 121, 122, 132.  Defendants represented to investors that these unfortunate circumstances were caused by "weakness" in certain markets and diminished consumer demand, *id.* ¶¶ 122, 24, bad debt write-offs and write downs caused by the bankruptcies of four of PSG's largest customers—Team Express, the Sports Authority, Total Hockey, and Sports Chalet, *id.* ¶¶ 121, 122, and "customer credit issues that exceed[ed] PSG's expectations" and led PSG to reduce its shipments, *id.* ¶ 132.

Plaintiff alleges that each of these factors that drove Defendants' financial problems was the result of Defendants' misconduct.  With respect to weak retailer demand, Rosenthal admitted that "one of the factors" causing weak sales was "the amount of close out inventory that is in the marketplace from ourselves and other brands."  *Id.* ¶ 123.  Moreover, on February 2, 2016, the Director of Sales at Easton stated in an internal company document that retailers were "not in need of inventory" and that "it seems that all the close outs we've built and shipped into the market, and all the pull forwards we've done are catching up to us."  *Id.* ¶ 67.

With respect to customer bankruptcies, the TAC alleges that the four retailers that had exceeded their credit limits by at least $11.9 million in the months before each declared bankruptcy, exacerbating the effect of the bankruptcies on PSG's bottom line.  *Id.* ¶¶ 70, 90.  Indeed, in August 2015, Rosenthal allegedly contemplated offering Team Express extended payment terms specifically because the retailer was in financial "trouble."  *Id.* ¶ 94.  Consequently, when Team Express filed for bankruptcy, it had exceeded its customer credit limit at two of PSG's divisions by a total of $3.5 million.  Similarly, the Sports Authority had exceeded its credit limit by at least $428,293 when it filed for bankruptcy.  *Id.* ¶ 25.  Finally, with respect to the "customer credit issues," a July 2016

presentation completed after Defendants left PSG concluded that PSG's problems with "[c]redit" were the result of "[b]ad habits created by topline push."  *Id.* ¶ 102.

PSG also allegedly suffered negative market reactions as a result of other developments during the class period.  The TAC alleges that investors reacted negatively when they learned about Roustan's surveys of PSG's customers, which allegedly began to reveal PSG's manipulative sales practices.  *Id.* ¶¶ 120, 128.  In addition, both Davis and Rosenthal left the Company during the class period, and the TAC alleges that the market reacted negatively to each departure.  *Id.* ¶¶ 129, 142.

Eventually, PSG entered a downward spiral toward bankruptcy.  On August 17, 2016, PSG announced that securities regulators in the United States and Canada had opened regulatory investigations concerning PSG's sales practices and investigations by its Audit Committee.  *Id.* ¶ 138.  Subsequently, the TAC alleges that KPMG refused to certify PSG's audited financial statements as a result of Defendants' aggressive sales practices and lax internal controls.  *Id.* ¶¶ 133-36.  Consequently, PSG's Audit Committee initiated an internal investigation and PSG was forced to delay filing its 2016 Annual Report and audited financial statements.  *Id.*  By failing to file its financial statements and its 2016 Annual Report, PSG allegedly breached the terms of two of its loan agreements with creditors.  *Id.* ¶ 117.  Those breaches allegedly forced PSG into bankruptcy.  *Id.*  During the class period, PSG's stock price climbed as high as $21.65.  *Id.* ¶ 32.  However, by November 1, 2016—the first trading day after PSG announced its bankruptcy filing—its share price had fallen to $1.67.  *Id.*

### B. Procedural History

Plaintiffs initiated this action on May 16, 2016.  Dkt No. 1.  The Fund was appointed as Lead Plaintiff on June 7, 2016.  Dkt No. 24.  Following its appointment as Lead Plaintiff, the Fund filed the first amended complaint on August 15, 2016, Dkt No. 62, and the second amended complaint on November 3, 2016.  Dkt No. 86.  After PSG filed for bankruptcy, the Fund entered into a settlement agreement with PSG on behalf of itself and the class.  Dkt No. 128.  As part of

that settlement, the Fund obtained over 20.4 million pages of documents from PSG.  *Id.*  The parties

then stipulated that the Fund could file a third amended complaint, Dkt No. 143, and the Fund did

so on September 13, 2019.  Dkt No. 148.

The TAC alleges a class period running from January 15, 2015 to October 28, 2016, *id.* ¶ 1,

and asserts two claims for relief.  First, the TAC alleges violations of section 10(b) of the Securities

Exchange Act of 1934, 15 U.S.C. § 78j(b), ("Section 10(b)") and rule 10b-5 promulgated thereunder,

17 C.F.R. § 240.10b-5 ("Rule 10b-5").  TAC ¶¶ 219-25.  Second, the TAC alleges control person

liability against Defendants under section 20(a) of the Exchange Act, 15 U.S.C. § 78t, ("Section

20(a)") for the same violations alleged in the first cause of action.  TAC ¶¶ 226-29.

Defendants filed this motion to dismiss on October 28, 2019.  Dkt Nos. 149-51.  Lead

Plaintiff subsequently filed an opposition, Dkt No. 153, and Defendants filed a reply, Dkt Nos. 154-

55.

## II. LEGAL STANDARD

A complaint must contain "a short and plain statement of the claim showing that the pleader

is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  A defendant may nonetheless move to dismiss a

plaintiff's complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P.

12(b)(6).  For a complaint to survive a motion to dismiss under Rule 12(b)(6), it "must allege

sufficient facts, taken as true, to state a plausible claim for relief."  *Johnson v. Priceline.com, Inc.*, 711

F.3d 271, 275 (2d Cir. 2013) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)).  Courts

follow a "two-pronged approach" in determining plausibility.  *Ashcroft v. Iqbal*, 556 U.S. 662, 679

(2009).  "First, although a court must accept as true all of the allegations contained in a complaint,

that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of

action, supported by mere conclusory statements, do not suffice."  *Harris v. Mills*, 572 F.3d 66, 72

(2d Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678) (brackets and quotations omitted).  Second, a court

determines "whether the 'well-pleaded factual allegations,' assumed to be true, 'plausibly give rise to

an entitlement to relief.'" *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010) (quoting *Iqbal*, 556 U.S. at 679).  This analysis is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679 (citation omitted).

In the securities context, a court may consider not only the complaint itself, but also "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Comm'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir. 2007).

Securities fraud claims are also subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA").  Rule 9(b) requires that "in alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).  To satisfy this requirement, the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI*, 493 F.3d at 99 (citation omitted).  "Allegations that are conclusory or unsupported by factual assertions are insufficient." *Id.* (citation omitted).  Furthermore, under the PSLRA, securities fraud plaintiffs alleging an untrue statement of material fact or an omission of a material fact necessary to make statements not misleading must specify "each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).  A plaintiff must therefore "do more than say that the statements . . . were false and misleading; [she] must demonstrate with specificity why and how that is so." *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004).

## III. DISCUSSION

### A. Section 10(b) and Rule 10b-5 Claim

The Fund has plausibly alleged numerous violations of Section 10(b) and Rule 10b-5.  Under Section 10(b) and Rule 10b-5, it is unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading[.]"  17 C.F.R. § 240.10b–5(b); *see also* 15 U.S.C. § 78j(b).  To succeed on a Section 10(b) claim, a plaintiff must show "(1) a material misrepresentation or omission; (2) scienter, *i.e.*, a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation."  *Kleinman v. Elan Corp., plc*, 706 F.3d 145, 152 (2d Cir. 2013) (quoting *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005)) (alterations omitted).  Defendants challenge the sufficiency of the complaint with respect to the first, second, and sixth elements of Plaintiffs' Section 10(b) and Rule 10b-5 claims.

#### 1. Material Misrepresentations or Omissions

##### a. Legal Standard

Both affirmative misrepresentations and omissions can serve as the basis for liability under Section 10(b).  A defendant's statement is actionable if it "affirmatively created an impression of a state of affairs that differed in a material way from the one that actually existed."  *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 453 (S.D.N.Y. 2005) (citation and brackets omitted).  Even where a company does not have an obligation to speak but chooses to do so anyway, it assumes "a duty to be both accurate and complete."  *Caiola v. Citibank, N.A., N.Y.*, 295 F.3d 312, 331 (2d Cir. 2002); *see also In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 366 (2d Cir. 2010) (explaining that once a corporation makes "a disclosure about a particular topic, whether voluntary or required, the representation must be complete and accurate" (quotation omitted)).  Ultimately, companies "can control what they have to disclose under [Section 10(b) and Rule 10b-5] by controlling what they say to the market."  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 (2011).

"Courts employ this principle to triangulate when disclosure is required." *DoubleLine Capital LP v. Construtora Norberto Odebrecht, S.A.*, 413 F. Supp. 3d 187, 206 (S.D.N.Y. 2019). For example, a defendant may be liable when she "puts the reasons for [a corporation's] success at issue, but fails to disclose that a material source of its success is the use of improper or illegal business practices." *Id.* (quotation omitted;) *see also S.E.C. v. Gabelli*, 653 F.3d 49, 57 (2d Cir. 2011) ("The law is well settled . . . that so-called 'half-truths'—literally true statements that create a materially misleading impression—will support claims for securities fraud." (citation omitted)), *rev'd on other grounds*, 568 U.S. 442 (2013). On the other hand, the disclosure of a company's violations of its internal code of conduct is generally not required unless its absence renders any particular statement false or misleading. *See In re Pfizer Inc. S'holder Derivative Litig.*, 722 F. Supp. 2d 453, 463-65 (S.D.N.Y. 2010).

Omissions can also be actionable under Section 10(b). A plaintiff can state a claim for Section 10(b) liability based on an omission when the omission is "in contravention of an affirmative legal disclosure obligation" or the information that is not disclosed is "necessary to prevent existing disclosures from being misleading." *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 715-16 (2d Cir. 2011) (citation omitted). A claim for violation of item 303 of Regulation SK, 17 C.F.R. § 228.303(a)(3)(ii) ("Item 303") falls into the first category because Item 303 creates an affirmative disclosure obligation. With respect to the second category, the key is the "presence of a prior statement that otherwise is or will become materially misleading" as a result of the omission; without such a statement, "a corporation need not affirmatively disclose" negative facts to the market. *DoubleLine Capital*, 413 F. Supp. 3d at 206 (citing *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014)).

To incur liability, misrepresentations or omissions must also be material. "At the pleading stage, a plaintiff satisfies the materiality requirement of Rule 10b-5 by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions." *Caiola*, 295 F.3d at 329. "To be actionable, a misrepresentation must be one of existing

fact, and not merely an expression of opinion, expectation, or declaration of intention." *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 507 (S.D.N.Y. 2009) (quotation omitted). "Statements of hope, opinion, or belief about the company's future performance are not actionable." *Id.* (quotation and brackets omitted). However, optimistic statements "may be actionable upon a showing that the defendants did not genuinely or reasonably believe the positive opinions they touted . . ., or that the opinions imply certainty." *Lapin v. Goldman Sachs Grp., Inc.*, 506 F. Supp. 2d 221, 239 (S.D.N.Y. 2006).

### b. Application

The Fund has plausibly alleged that some of Defendants statements were false or misleading. The Fund argues that "Defendants' false and misleading statements and omissions fall into four categories: "the failure to disclose a known, material trend, as required under Item 303[;] . . . statements regarding the sources and nature of PSG's growth; . . . statements regarding the risks associated with the practices Defendants used to achieve that growth; . . . [and] statements regarding the Defendants' and PSG's ability to manage those grave risks with effective internal controls[.]" Memorandum of Law in Opposition to Motion to Dismiss ("Opp."), Dkt No. 153, at 20.

### i. Failure to Disclose a Known Material Trend in Violation of Item 303

The Fund has alleged a plausible securities fraud claim premised on a violation of Item 303. The Fund alleges that Defendants violated Item 303 of Regulation S-K, 17 C.F.R. § 229.303. If such a violation is adequately alleged, it can "give rise to liability under Section 10(b)" because Item 303 creates a legal disclosure obligation with which a regulated company must comply. *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 102 (2d Cir. 2015). Item 303 requires a public company to describe in its Forms 10-K or 10-Q "known trends or uncertainties" that the company "reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii); *see also id.* ("If the registrant knows of events that will

cause a material change in the relationship between costs and revenues (such as known future increases in . . . inventory adjustments), the change in the relationship shall be disclosed.").  "Item 303 requires not only a discussion but also an analysis of known material trends."  *Stratte-McClure*, 776 F.3d at 105 (quotation omitted).  The Fund argues that PSG's practice of "flooding the market with inventory far in excess of demand" was a trend that required disclosure.  Opp. at 32.

The Fund has adequately alleged that PSG's sales practices created a trend of increasing inventory of PSG products at PSG retailers and that Defendants should have disclosed this trend. The Fund has further alleged that, partially as a result of Defendants' sales practices, there was a marked increase in inventory of unsold PSG goods at PSG retailers.  *See* TAC ¶ 200.  It was both reasonably foreseeable and material to PSG's future performance that a buildup of inventory would lead to a decline in PSG's future sales.  *See Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 35 (S.D.N.Y. 2019) (holding that plaintiffs had adequately alleged an Item 303 violation where defendants failed to disclose "an increasing glut of distributor and reseller inventory [that] would inevitably require a drawdown in future quarters"); *cf. Novak v. Kasaks*, 216 F.3d 300, 312 (2d Cir. 2000) ("When managers deliberately make materially false statements concerning inventory with the intent to deceive the investment community, they have engaged in conduct actionable under the securities laws.").  And the Fund has alleged circumstances that create a plausible inference that Defendants had actual knowledge of this trend because they received repeated warnings that PSG's sales tactics were cannibalizing future sales.  *See, e.g.*, TAC ¶¶ 77-82. Accordingly, the Fund has adequately pleaded a violation of Item 303.

### ii. Statements Regarding the Sources and Nature of PSG's Growth

The Fund has plausibly alleged that Defendants' statements regarding the sources of PSG's sales growth were false or misleading.  The Fund points to public statements by Defendants about "fundamental growth drivers" such as "'strong demand,' a 'well-defined strategy,' 'brand

improvement,' 'new, innovative products' and positive feedback from customers as the sources of PSG's quarterly sales growth."  Opp. at 21 (citing TAC ¶¶ 158-60, 165-67, 170, 174, 178, 183, 191, 196).  The Fund has plausibly pleaded that each of these statements was false or misleading.

The Fund has plausibly alleged that Defendants' statement that it was experiencing "strong demand" was false or misleading.  The TAC alleges that Defendants stated that they were experiencing "strong demand," *see, e.g.*, TAC ¶ 160 ("[C]ontinued strong demand from hockey players at all levels is driving share gains. . . .  [T]he macro feedback from the holiday season is very strong demand for Bauer.").  However, the Fund argues that this statement was misleading because Defendants' private statements and information available to them at the time showed that "demand [for PSG's products] was faltering" because of Defendants' "'gun to head,' shakedown-style sales tactics." *Id.* ¶ 163.  Therefore, the Fund has adequately alleged that Defendants made a specific, factual statement about the level of demand PSG perceived for its products in the market and that this statement was false or misleading.  The Fund has also adequately alleged that Defendants' statements about the demand PSG was experiencing were material; a reasonable investor might have relied on the statement that PSG was experiencing robust demand for its products in deciding to invest in PSG.

The Fund has also plausibly alleged that Defendants' statements regarding the positive feedback they were receiving from consumers were false or misleading.  The TAC alleges that Defendants stated that customers were making positive comments about PSG's products.  *See, e.g.*, *id.* ¶ 196 (alleging that Davis stated that "sell-through for our brands, we're hearing positive things generally speaking across the entire spectrum of products that we offer").  However, the TAC alleges that, in fact, customers were expressing dissatisfaction with PSG's products.  *See, e.g.*, *id.* ¶ 56 (detailing customer complaints such as "I do my best to support and sell all other brands because of bauers [sic] horrible programs").  And the Fund has plausibly alleged that Defendants were aware of these reports because they discussed them before Defendants made their public statements

16

regarding the feedback they were receiving from Defendants' consumers.  *See, e.g.*, *id.*  Again, Defendants' statements that they were receiving positive feedback from customers were specific, factual statements, and the Fund has plausibly pleaded that these statements were false when made. These statements were also material.  If PSG was receiving positive feedback from its customers, a reasonable investor may have concluded that PSG was a more attractive investment opportunity.

The Fund has plausibly alleged that Defendants' statements regarding PSG's strategy were false or misleading.  The Fund has alleged that Defendants' touted their strategy—including, for example, statements about PSG's strategy to gain market share through "leverag[ing]" its "Performance Sports platform," *see, e.g.*, *id.* ¶ 170—as a key source of PSG's success.  However, the Fund has pleaded that those statements were incomplete at best.  The Court has already held that the TAC plausibly alleges that Defendants had actual knowledge of an adverse material trend regarding increasing inventories at PSG's customers.  And the Fund alleges that Defendants knew that their sales strategy "had a 'Ponzi Scheme'-like quality." *Id.* ¶ 148.  Because Defendants specifically cited their strategy as a source of their success, they were obligated to "to tell the whole truth" with respect to that strategy by disclosing that their sales growth was, at least in part, the result of short-run sales tactics that led to a buildup of inventory at PSG's customers.  *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 258 (2d Cir. 2016) (quotation omitted).[2]  The Fund has sufficiently alleged by failing to disclose that increase in inventory, Defendants rendered their partial disclosures about their "well-defined strategy" false or misleading.  The Fund has also adequately alleged that these statements were material; a reasonable investor might have relied on the representation that PSG had a well-defined strategy in deciding whether to invest in PSG.

Finally, the Fund has plausibly alleged that Defendants' statements that its "brand improvement" was a significant source of its success was false or misleading.  The Fund has alleged

---

[2] The Court may have reached a different conclusion on this point if the Fund had not adequately alleged a violation of Item 303.

that Defendants specifically cited its "brand improvement" as a source of its success.  TAC ¶ 160.
The Fund has also alleged that Defendants received information suggesting that customer opinions
of its brands was not, in fact, improving.  *See, e.g., id.* ¶ 56.  Hence, the Fund has plausibly alleged
that Defendants' statement touting PSG's "brand improvement" was false or misleading.

The Fund has plausibly alleged that statements about its "brand improvement" were not
inactionable puffery and thus were material.  As a general matter, "certain kinds of statements are
inactionable as a matter of law because they are 'too general to cause a reasonable investor to rely
upon them.'"  *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 647 (S.D.N.Y. 2017) (quoting
*City of Pontiac*, 752 F.3d at 183); *see also City of Pontiac*, 752 F.3d at 183 ("It is well-established that
general statements about reputation, integrity, and compliance with ethical norms are inactionable
puffery[.]") (quotation omitted).  Statements about a company's "strategy" or "brand" have been
held to fall into this category.  *See, e.g., Gissin v. Endres*, 739 F. Supp. 2d 488, 511-12 (S.D.N.Y. 2010)
(holding the defendant's statement that the company "continues to maintain a strong balance sheet"
was mere puffery because it did not "offer any of the 'long-term guarantees' or specifics which
would convert an opinion or projection into a factual misrepresentation" (citations omitted)).

However, "[w]hether a representation is 'mere puffery' depends, in part, on the context in
which it is made."  *In re Banco Bradesco*, 277 F. Supp. 3d at 647 (quoting *In re Petrobras Sec. Litig.*, 116 F.
Supp. 3d 368, 381 (S.D.N.Y. 2015); *see also Arkansas Teacher Ret. Sys. v. Bankrate, Inc.*, 18 F. Supp. 3d
482, 485 (S.D.N.Y. 2014) ("[W]hile a term like 'high quality' might be mere puffery or insufficiently
specific to support liability in some contexts, it is clearly a material misrepresentation when applied
to assets that are entirely worthless[.]").  Hence, a reviewing court must evaluate the context in
which a statement is made to evaluate whether a statement is inactionable puffery.

Although statements about a company's "brand" may be inactionable as puffery in some
circumstances, Defendants' alleged statements about its brand were not puffery on the facts alleged
by the Fund in this case.  Notwithstanding the general principle that "statements that are too general

18

to cause a reasonable investor to rely upon them" are not actionable, "more definite statements about a company's business practices may invoke reasonable reliance by investors, particularly if the statements relate to aspects of a company's brand or reputation that are touted as sources of its success." *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 611 (S.D.N.Y. 2017) (citations omitted). Here, Defendants touted its brand as a source of PSG's success. Reasonable investors might have relied on those statements when choosing whether to invest in PSG and thus the statement that its brand reputation was improving, when Plaintiffs have alleged it was deteriorating, was false.

### iii. Statements Regarding PSG's Risk Disclosures

The Fund has adequately alleged that some of PSG's risk disclosures in its 2015 Form 10-K were false or misleading. The Fund argues that "[i]n PSG's 2015 Form 10-K, issued on August 27, 2015, Defendants described several potential risks to the Company, which they attributed to the possible actions of other market participants and forces outside of PSG's control." Opp. at 27. However, according to the Fund, these risks were already being realized and were the "result of PSG's own undisclosed sales practices." *Id.*

Corporations are generally shielded from liability for risk disclosures by the "bespeaks caution" doctrine or the closely related PSLRA safe harbor for forward-looking statements. "Under the bespeaks caution doctrine, alleged misrepresentations in a stock offering are immaterial as a matter of law if it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same offering." *Rombach*, 355 F.3d at 173 (quotation and brackets omitted).

> When there is cautionary language in the disclosure, the Court analyzes the allegedly fraudulent materials in their entirety to determine whether a reasonable investor would have been misled. The touchstone of the inquiry is not whether isolated statements within a document were true, but whether defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered.

*Id.* (quotation omitted).  The PSLRA's "safe-harbor provision" is "a counterpart" to the bespeaks

caution doctrine.  *Id.*  Under the PSLRA's safe-harbor provision,

> an issuer or underwriter "shall not be liable with respect to any forward-looking
> statement if and to the extent that (A) the forward-looking statement is (i) identified
> as a forward-looking statement, and is accompanied by meaningful cautionary
> statements identifying important factors that could cause actual results to differ
> materially from those in the forward-looking statement; or (ii) immaterial."

*Id.* (quoting 15 U.S.C. §§ 77z-2(a) & (c)(1), 78u-5(a) & (c)(1)) (ellipses omitted).

There is an exception to the rule that statements accompanied with meaningful cautionary

language are exempt from liability under the bespeaks caution doctrine or the PSLRA's safe harbor

provision.  The Second Circuit has warned that "[t]he bespeaks caution doctrine does not serve if it

is abused or gamed.  Cautionary words about future risk cannot insulate from liability the failure to

disclose that the risk has transpired."  *Id.* (citing *In re Prudential Secs. Inc. Ltd. P'ships Litig.*, 930 F.

Supp. 68, 72 (S.D.N.Y. 1996) ("The doctrine of bespeaks caution provides no protection to

someone who warns his hiking companion to walk slowly because there might be a ditch ahead

when he knows with near certainty that the Grand Canyon lies one foot away.")).  To offer a

different analogy, the bespeaks caution doctrine will not protect a defendant from liability for a

disclosure that a house may be at an increased risk of fire damage if the house is already on fire.

The Fund has plausibly alleged that some of Defendants' statements in the Form 2015 10-K

regarding excess inventories at PSG's customers are actionable.  As an initial matter, the risk

disclosures in the 2015 Form 10-K would generally be covered by the bespeaks caution doctrine and

the PSLRA safe harbor.  However, the Fund has plausibly alleged that some of these statements fall

into the exception identified by the Second Circuit in *Rombach*.

The Fund argues that the statements that "'if we fail to accurately forecast demand for our

products, we may experience excess inventory levels or inventory shortages'; and that 'inventory

levels in excess of consumer demand may result in inventory write-downs and the sale of excess

inventory at discounted prices, which could significantly harm our operating results," Opp. at 27 (citing TAC ¶ 180) (alterations omitted), were misleading because PSG was "already and routinely flooding the market with closeouts[.]"  *Id.* at 28 (citing TAC ¶¶ 63, 65) (emphasis omitted).

The Fund has plausibly pleaded that Defendants' statements that PSG "*may* experience excess inventory levels or inventory shortages" and that "inventory levels in excess of consumer demand *may* result in inventory write-downs" were misleading and fall within the *Rombach* exception. TAC ¶ 180 (emphasis added).  As the Court previously noted in its discussion of Defendants' alleged violation of Item 303, the Fund has plausibly alleged that Defendants had actual knowledge that PSG's customers already had excessive levels of inventory.  Therefore, the Fund has plausibly alleged that when Defendants made the statements in the Form 2015 10-K regarding excessive inventory levels, Defendants already knew that PSG's customers would likely experience a buildup of PSG inventory, if they had not already begun to do so.  Hence, the statements that PSG might experience these problems in the future in the Form 2015 10-K were misleading.

The Fund has also plausibly alleged that some of Defendants statements about its internal controls were false or misleading.  Defendants' only public statements about its internal controls were certifications pursuant to the Sarbanes-Oxley Act ("SOX") "attesting to the accuracy of [PSG's] financial reporting and [the] effectiveness of [its] internal controls." TAC ¶ 182.  The Court has already held that the Fund has adequately alleged that Defendants had actual knowledge of an adverse material trend and that their failure to disclose that trend to investors was a violation of Item 303.  It follows that PSG's financial reporting was deficient because PSG failed to report that adverse material trend.  And PSG's internal controls failed to arrest, or at least require disclosure of, the same material trend.  Accordingly, Defendants' SOX certifications are plausibly alleged to have been false or misleading.  The SOX certifications were also material, as investors may have relied on Defendants' certifications in deciding whether to invest in PSG.

The other statements in PSG's 2015 Form 10-K were not misleading, however.  The Fund argues that the statement "our competitors may overproduce or face financial or liquidity difficulties which may lead them to release their products at lower prices into the market or offer discounts to clear their inventory" was misleading.  Opp. at 28 (citing TAC ¶ 180).  However, this statement is not actionable because it is a statement about the behavior of PSG's competitors and is not contradicted by the allegation that PSG was allegedly flooding the market with closeouts.

The Fund also argues that Defendants' statement in the 2015 Form 10-K that PSG "may make strategic decisions to deliver and invoice product at certain dates in order to lower costs or improve supply chain inefficiencies," *id.* at 28 (citing TAC ¶ 180), was misleading because "PSG was already and routinely delivering products early[.]"  *Id.* (citing TAC ¶¶ 71-78, 83) (emphasis and ellipsis omitted).  But the Fund has not alleged that Defendants' statement that the Fund might make strategic decisions to deliver products early to lower its costs or to improve inefficiencies in its supply chain was false or misleading.  The allegation that PSG was shipping products early to hit its quarterly sales targets does not contradict the statement in the Form 2015 10-K that PSG might, at some future point, ship products early for other reasons.  Hence, this statement in the 2015 Form 10-K was not false or misleading.

The Fund argues that the statement in the 2015 Form 10-K that "[a]dverse conditions in the sporting goods retail industry could lead retailers to request credit terms that would adversely affect our cash flow and involve significant risks of nonpayment.  As a result, we may experience a loss of customers or the un-collectability of accounts receivable in excess of amounts against which we have reserved, which could adversely affect our business and financial condition," *id.* (citing TAC ¶ 180) (ellipsis omitted) was misleading because "PSG was already and routinely offering credit terms to retailers that involved significant risks of nonpayment."  *Id.* (citing TAC ¶¶ 10, 16, 63, 86, 90-100, 149-50) (emphasis omitted).  However, the allegation that PSG was offering credit terms that involved significant risk of nonpayment does not conflict with the statement in the 2015 Form 10-K

such that the statement is either false or misleading.  The statement in the Form 2015 10-K is about "[a]dverse conditions in the sporting goods retail industry[.]"  TAC ¶ 180.  The allegation that PSG was offering generous terms to its customers for a different reason—namely, to achieve quarterly sales targets—does not render false or misleading the statement that adverse market conditions might also have the effect of requiring PSG to offer more favorable credit terms to its customers.  Moreover, the Fund has not alleged that Defendants knew that any of its customers faced an imminent risk of default when it made this statement in the 2015 Form 10-K.  Accordingly, these statements were not misleading and thus cannot serve as the basis for Section 10(b) liability.  However, as noted above, some of Defendants' statements in PSG's 2015 Form 10-K were misleading.

### 2. Scienter

#### a. Legal Standard

No defendant may be held liable for securities fraud unless Plaintiff has stated "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A).  The Supreme Court has explained that the "PSLRA requires plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, i.e., the defendant's intention to deceive, manipulate, or defraud."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) (quotation omitted).  "In addition to intent, recklessness is a sufficiently culpable mental state for securities fraud in this circuit."  *ECA & Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009) (citation omitted).

Therefore, a plaintiff may plead scienter either "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (quotation omitted).  A plaintiff alleging scienter via recklessness must allege

"conscious recklessness—*i.e.*, a state of mind approximating actual intent, and not merely a heightened form of negligence." *Stratte-Mcclure*, 776 F.3d at 106 (citation omitted).  To meet the scienter requirement for alleging a violation of Item 303, the Fund "must allege that Defendants were at least consciously reckless regarding whether their failure to provide adequate Item 303 disclosures . . . would mislead investors about material facts." *Id.* (citation omitted).

An "inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs,* 551 U.S. at 314.  If an inference of fraudulent intend is not "at least as compelling" as a nonfraudulent one, it must be rejected, even in a "close case." *Slayton v. Am. Express Co.*, 604 F.3d 758, 777 (2d Cir. 2010) (citation omitted).  However, an inference of scienter need not be "irrefutable, i.e., of the 'smoking-gun' genre, or even the most plausible of competing inferences." *Tellabs*, 551 U.S. at 324 (quotation omitted).  Indeed, "at the motion to dismiss stage, a tie on scienter goes to the plaintiff." *City of Pontiac Gen. Emps. Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012). In sum, "[t]he inquiry on a motion to dismiss is as follows:  'When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?'" *In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 383 (S.D.N.Y. 2007) (quoting *Tellabs*, 551 U.S. at 326).

### b. Application

The Fund has plausibly alleged that Defendants acted with scienter when they made the statements that the Court has identified above as false or misleading.  The Fund has adequately alleged that Defendants acted with scienter in failing to disclose a known material trend in violation of Item 303.  The Court has already held that the Fund has plausibly alleged that Defendants had actual knowledge of this trend.  It is therefore also true that the Fund has alleged sufficient facts to create a strong inference that Defendants were at least consciously reckless regarding whether their failure to provide an adequate Item 303 disclosure would mislead investors about the material risk to

PSG's future business of increasing inventories. That risk was obvious: PSG would be less able to sell products to retailers that possessed, and had not yet sold, a glut of PSG inventory. And the Fund has plausibly alleged that Defendants were aware of this risk because employees within the organization allegedly raised red flags about Defendants' sales practices that allegedly created the glut of inventory. Although Defendants may have hoped that PSG would uncover new sources of future revenue and thus that the risk of lower future sales associated with the rising inventory would not materialize, the Fund has plausibly alleged facts that give rise to a strong inference that the decision not to disclose this information was nonetheless reckless. *See Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008) ("The fact that a gamble—concealing bad news in the hope that it will be overtaken by good news—fails is not inconsistent with its having been a considered, though because of the risk a reckless, gamble. It is like embezzling in the hope that winning at the track will enable the embezzled funds to be replaced before they are discovered to be missing.") (citation omitted). Hence, the Fund have adequately alleged that Defendants recklessly failed to disclose this trend to investors.

The Fund has also adequately alleged scienter with respect to Defendants' statements about the sources of its growth. The Fund has alleged that Defendants' private statements were at odds with their public statements regarding the level of demand PSG was experiencing and the positive feedback they were allegedly receiving from customers. That is sufficient to create an inference of conscious misbehavior by Defendants. The Fund has also plausibly alleged scienter with respect to Defendants' statements regarding PSG's sales strategy because the Fund plausibly alleges that Defendants were told that their sales strategy "had a 'Ponzi Scheme'-like quality." TAC ¶ 148. That is sufficient to create a plausible inference of conscious misbehavior by Defendants when they described their strategy to investors as "well-defined." Finally, the Fund has plausibly alleged scienter with respect to Defendants' statement about the improvement of PSG's brand because, again, Defendants allegedly received private information that contradicted their public statements

and that contradiction creates a reasonable inference that Defendants' consciously chose to make false or misleading public statements with respect to PSG's brand. *See, e.g.*, *id.* ¶ 56.

Additionally, the Fund has plausibly alleged scienter with respect to Defendants' risk disclosures in its 2015 Form 10-K. The Fund has adequately pleaded that Defendants had actual knowledge of an adverse material trend in violation of Item 303. Thus, the Fund has plausibly alleged that Defendants already knew that their customers were likely to experience excessive inventory levels when they made statements regarding the hypothetical future risk of PSG's customers experiencing excessive inventory levels in PSG's 2015 Form 10-K. That is sufficient to raise an inference that Defendants acted with conscious recklessness as required to plead scienter at this stage. Finally, the Fund has plausibly pleaded that Defendants acted with scienter by attesting to the adequacy of their internal controls in the SOX certifications. Again, the Fund has adequately alleged that Defendants had actual knowledge of an adverse material trend that they failed to disclose. Consequently, Defendants acted either consciously or recklessly by attesting that PSG's financial reporting and its internal controls were adequate.

### 3. Loss Causation

#### a. Legal Standard

A plaintiff's burden to plead loss causation is "not a heavy one." *DoubleLine Capital*, 413 F. Supp. 3d at 212 (quoting *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 187 (2d Cir. 2015)). To plead loss causation, a plaintiff must allege "that the subject of the fraudulent statement or omission was the cause of the actual loss suffered." *Suez Equity Inv'rs, L.P. v. Toronto–Dominion Bank*, 250 F.3d 87, 95 (2d Cir. 2001). She may do so either by alleging (a) "the existence of cause-in-fact on the ground that the market reacted negatively to a corrective disclosure of the fraud;" or (b) that "that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement." *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511, 513 (2d

Cir. 2010) (quotation omitted).  In this case, Defendants rely on a materialization of risk theory.

Opp. at 46.

### b. Application

The Fund has adequately alleged that Defendants' false and misleading statements concealed

risks that materialized when the market learned the truth about PSG's sales practices.  These risks

materialized in the form of weak financial performance by PSG that eventually led PSG to enter a

downward spiral toward bankruptcy.  The Fund has plausibly alleged that PSG's weak sales

performance was partly caused by its sales practices that prioritized short-run sales targets at the

expense of sustainable long-run sales growth.  *See, e.g.*, TAC ¶ 121.  And the Fund has plausibly

alleged that Defendants concealed the risk associated with these sales practices by failing to disclose

them to investors.  For example, the Fund has adequately alleged that the failure to disclose the

trend of increasing inventories at PSG retailers concealed a risk that PSG was cannibalizing its future

sales.  The Fund has also alleged that the risk associated with this strategy partly materialized when

PSG was unable to continue selling its products to these retailers.  That is all that is required to

plausibly plead loss causation.  Accordingly, the Fund has adequately pleaded loss causation and,

because it has adequately alleged the other elements of a Section 10(b) and Rule 10b-5 claim, the

Fund's Section 10(b) and Rule 10b-5 claim.

### B. Section 20(a) Claim

The Fund has adequately alleged a Section 20(a) claim for control person liability.  To

plausibly allege a claim for control person liability, a plaintiff must allege "(1) a primary violation by

the controlled person, (2) control of the primary violator by the defendant, and (3) that the

defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud."

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014).  As discussed

above, the Fund has plausibly alleged a claim for a primary violation under Section 10(b).  The Fund

has also plausibly alleged that Defendants controlled PSG, which Defendants do not dispute.  And

the Fund has alleged that Defendants were intimately involved in the alleged fraud.  Consequently, the Fund has stated a plausible claim for control person liability under Section 20(a) based on the same failure to disclose under Item 303 that forms the basis for its Section 10(b) and Rule 10b-5 claim.

## IV. CONCLUSION

The Fund has plausibly alleged claims for violations of Section 10(b), Rule 10b-5, and Section 20(a).  Accordingly, Defendants' motion to dismiss is largely DENIED, although it is GRANTED as to some of Defendants' statements in PSG's 2015 Form 10-K.

The Clerk of Court is directed to terminate the motion pending at Dkt. No. 145.

SO ORDERED.

Dated:  April 14, 2020

_____
GREGORY H. WOODS
United States District Judge