**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| PLUMBERS & PIPEFITTERS NATIONAL PENSION FUND and JUAN FRANCISCO NIEVES, as Trustee of the Gonzalez Coronado Trust, Individually and on Behalf of All Others Similarly Situated,<br><br>      Plaintiffs,<br><br> v.<br><br>KEVIN DAVIS and AMIR ROSENTHAL,<br><br>      Defendants. | Case No.: 1:16-CV-3591-GHW<br><br>**LEAD PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR CLASS CERTIFICATION** |

# <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ................................................................................................ 1

II.     PROCEDURAL HISTORY................................................................................ 4

III.    STATEMENT OF FACTS COMMON TO THE CLASS ................................ 5

IV.     LEGAL ARGUMENT........................................................................................ 7

       A.     The Proposed Class Satisfies the Standards for Class Certification Under
           Rule 23. ......................................................................................................... 7

       B.     The Proposed Class Here Readily Satisfies the Rule 23(a) Requirements. ........... 8

           1.     The Proposed Class Is So Numerous That Joinder Is Impracticable. ........ 8

           2.     The Action Raises Common Questions of Law and Fact. ......................... 9

           3.     The Class Representative's Claims Are Typical of the Class.................... 9

           4.     Lead Plaintiff Will Fairly and Adequately Protect the Interests of
              the Class. ......................................................................................... 10

       C.     The Proposed Class Meets the Requirements of Rule 23(b)(3)............................ 11

           1.     Common Questions of Law and Fact Predominate Over Individual
              Questions................................................................................................ 12

              a.     The Proposed Class Is Entitled to a Presumption of
                  Reliance Under the Fraud-on-the-Market Theory. ...................... 13

                   (1)     High Weekly Trading Volume (*Cammer* Factor 1).......... 15

                   (2)     Financial Analysts' Coverage (*Cammer* Factor 2). .......... 15

                   (3)     Numerous Market Makers (*Cammer* Factor 3)................. 16

                   (4)     S-3 Registration Statements (*Cammer* Factor 4). ............. 16

                   (5)     Reaction of PSG Stock to News (*Cammer* Factor 5)....... 17

                   (6)     High Market Capitalization (*Krogman* Factor 1)............. 18

                   (7)     Narrow Bid-Ask Spread (*Krogman* Factor 2).................. 19

                   (8)     Public Float (*Krogman* Factor 3). .................................... 19

                   (9)     Institutional Investors..................................................... 19

                   (10)   Lack of Autocorrelation .................................................. 20

                 b.     The Affiliated Ute Presumption of Reliance Applies. ................. 21

                 c.     Damages Will be Calculated on a Class-Wide Basis................... 21

            2.     A Class Action Is the Superior Means of Resolving This Dispute.......... 23

       D.     The Court Should Appoint Lead Plaintiff's Choice of Counsel as Class
           Counsel Under Rule 23(g). .......................................................................... 24

V.      CONCLUSION................................................................................................. 25

i

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Affiliated Ute Citizens of the State of Utah v. United States*,
406 U.S. 128 (1972)......................................................................................................21

*In re Alstom SA Sec. Litig.*,
253 F.R.D. 266 (S.D.N.Y. 2008) ..............................................................15, 16, 18

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997).................................................................................................3, 12

*In re AMF Bowling Sec. Litig.*,
No. 99 Civ. 3023 (DC), 2002 WL 461513 (S.D.N.Y. Mar. 26, 2002) .....................................8

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
568 U.S. 455 (2013)......................................................................................... *passim*

*In re Arakis Energy Corp. Sec. Litig.*,
No. 95-CV-3431 (ARR), 1999 WL 1021819 (E.D.N.Y. Apr. 27, 1999) .............................10

*Arkansas Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.*,
955 F.3d 254 (2d Cir. 2020), *cert. granted*, 2020 WL 7296815 (Dec. 11, 2020)...................13

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988).................................................................................12, 13, 14, 21

*Billhofer v. Flamel Techs., S.A.*,
281 F.R.D. 150 (S.D.N.Y. 2012) .............................................................13, 16, 19

*Cammer v. Bloom*,
711 F. Supp. 1264 (D.N.J. 1989) ................................................................. *passim*

*Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*,
310 F.R.D. 69 (S.D.N.Y. 2015) .......................................................................14, 16

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
No. 17 Civ. 1580 (LGS), 2020 WL 1329354 (S.D.N.Y. Mar. 23, 2020) .................................2

*City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*,
No. 12-CV-0256, 2017 WL 3608298 (S.D.N.Y. Aug. 22, 2017)..............................................2

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013)........................................................................................................22

*In re Computer Sci. Corp. Sec. Litig.*,
    288 F.R.D. 112 (E.D. Va. 2012) ....................................................................13

*Denney v. Deutsche Bank AG*,
    443 F.3d 253 (2d Cir. 2006)............................................................................3

*In re Deutsche Bank AG Sec. Litig.*,
    328 F.R.D. 71 (S.D.N.Y. 2018) ..............................................................10, 11

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005)........................................................................................2

*Erica P. John Fund. Inc. v. Halliburton Co.*,
    563 U.S. 804 (2011)..................................................................................3, 12

*In re Facebook, Inc., IPO Sec. & Deriv. Litig.*,
    986 F. Supp. 2d 428 (S.D.N.Y. 2013).........................................................21

*In re Facebook, Inc. IPO Sec. & Deriv. Litig.*,
    312 F.R.D. 332 (S.D.N.Y. 2015) ......................................................7, 10, 11

*In re Gaming Lottery Sec. Litig.*,
    No. 96 Civ. 5567 RPP, 2001 WL 204219 (S.D.N.Y. Mar. 1, 2001) .........20

*Gruber v. Gilbertson*,
    No. 16CV9727, 2019 WL 4439415 (S.D.N.Y. Sept. 17, 2019) ......8, 9, 10, 11

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    573 U.S. 258 (2014)..........................................................................9, 13, 18

*In re IndyMac Mortgage-Backed Sec. Litig.*,
    286 F.R.D. 226 (S.D.N.Y. 2012) ................................................................12

*In re Initial Public Offering Sec. Litig.*,
    260 F.R.D. 81 (S.D.N.Y. 2009) ..................................................................16

*Kaplan v. S.A.C. Cap. Advisors, L.P*,
    311 F.R.D. 373 (S.D.N.Y. 2015) ................................................................22

*Katz v. Image Innovations Holdings, Inc.*,
    No. 06 Civ. 3707 (JGK), 2010 WL 2926196 (S.D.N.Y. July 22, 2010) ..................2

*Krogman v. Sterritt*,
    202 F.R.D. 467 (N.D. Tex. 2001) ..........................................14, 17, 18, 19

*Lapin v. Goldman Sachs & Co.*,
    254 F.R.D. 168 (S.D.N.Y. 2008) ................................................................23

*In re Livent*,
   210 F.R.D. 512 (S.D.N.Y. 2002) ........................................................................................24

*McIntire v. China MediaExpress Holdings, Inc.*,
   38 F. Supp. 3d 415 (S.D.N.Y. 2014)..........................................................................14, 15, 19

*Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*,
   328 F.R.D. 86 (S.D.N.Y. 2018) ........................................................................................18

*In re MF Glob. Holdings Ltd. Inv. Litig.*,
   310 F.R.D. 230 (S.D.N.Y. 2015) ................................................................................. *passim*

*In re Old BPSUSH Inc. et al.*,
   Case No. 16-12373 (KJC) (Bankr. D. Del.)...........................................................................4

*In re Omnicom Grp., Inc. Sec. Litig.*,
   No. 02 CIV. 4483 (RCC), 2007 WL 1280640 (S.D.N.Y. Apr. 30, 2007) .............................24

*Pa. Pub. Sch. Emps.' Ret. Sys. v. Morgan Stanley & Co.*,
   772 F.3d 111 (2d Cir. 2014).................................................................................................8

*In re Petrobras Sec.*,
   862 F.3d 250 (2d Cir. 2017)...............................................................................................18

*In re Petrobras Sec. Litig.*,
   312 F.R.D. 354 (S.D.N.Y. 2016), *aff'd in part, vacated in part sub nom. In re*
   *Petrobras Sec.*, 862 F.3d 250 (2d Cir. 2017) ..................................................................20, 22

*Pub. Emps.' Ret. Sys. of Miss. v. Goldman Sachs Grp., Inc.*,
   280 F.R.D. 130 (S.D.N.Y. 2012) ......................................................................................24

*Roach v. T.L. Cannon Corp.*,
   778 F.3d 401 (2d Cir. 2015)...............................................................................................21

*In re Signet Jewelers Ltd. Sec. Litig.*,
   No. 16 Civ. 6728, 2019 WL 3001084 (S.D.N.Y. July 10, 2019) ...............................19, 20, 22

*Stoneridge Inv. Partners, LLC v. Sci. Atlanta*,
   552 U.S. 148 (2008)..........................................................................................................12

*Strougo v. Barclays PLC*,
   312 F.R.D. 307 (S.D.N.Y. 2016), *aff'd sub nom. Waggoner v. Barclays PLC*,
   875 F.3d 79 (2d Cir. 2017)............................................................................................15, 21

*In re SunEdison, Inc. Sec. Litig.*,
   329 F.R.D. 124 (S.D.N.Y. 2019) ......................................................................................12

*Sykes v. Mel S. Harris & Assocs. LLC*,
    780 F.3d 70 (2d Cir. 2015)...................................................................................22

*Teachers Ret. Sys. v. ACLN Ltd.*,
    No. 01 CV 11814 (LAP), 2004 WL 2997957 (S.D.N.Y. Dec. 27, 2004)...............................10

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*,
    546 F.3d 196 (2d Cir. 2008)...................................................................................17

*Tsereteli v. Residential Asset Securitization Trust 2006-A8*,
    283 F.R.D. 199 (S.D.N.Y. 2012) ........................................................................3, 12

*UFCW Local 1776 v. Eli Lilly & Co.*,
    620 F.3d 121 (2d Cir. 2010)...................................................................................12

*In re Visa Check/MasterMoney Antitrust Litig.*,
    280 F.3d 124 (2d Cir. 2001), *abrogated on other grounds*, *In re Initial Public
    Offering Sec. Litig.*, 471 F.3d 24 (2d Cir. 2006) .........................................................8

*In re Vivendi Universal S.A. Sec. Litig.*,
    242 F.R.D. 76 (S.D.N.Y. 2007) .........................................................................7, 8

*In re Vivendi, S.A. Sec. Litig.*,
    838 F.3d 223 (2d Cir. 2016)...................................................................................18

*Waggoner v. Barclays PLC*,
    875 F.3d 79 (2d Cir. 2017)...........................................................................13, 17, 23

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011)..............................................................................................9

*Wallace v. IntraLinks*,
    302 F.R.D. 310 (S.D.N.Y. 2014) ............................................................................11

*In re Winstar Commc'ns Sec. Litig.*,
    290 F.R.D. 437 (S.D.N.Y. 2013) .................................................................7, 15, 16, 17

*Zivkovic v. Laura Christy LLC*,
    329 F.R.D. 61 (S.D.N.Y. 2018) .........................................................................9, 23

### OTHER AUTHORITIES

17 C.F.R. § 239.13 ...................................................................................................17

Fed. R. Civ. P. 23 ............................................................................................ *passim*

Herbert Newberg & Alba Conte, *Newberg on Class Actions* § 3.26 .................................3

Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Lead Plaintiff Plumbers & Pipefitters National Pension Fund ("Lead Plaintiff") respectfully submits this Memorandum of Law in support of its motion to: (i) certify a class of all persons and entities that purchased or acquired the common stock of Performance Sports Group ("PSG" or the "Company") on the New York Stock Exchange ("NYSE") from January 15, 2015 through October 28, 2016, inclusive, and who were damaged thereby (the "Class"); (ii) appoint Lead Plaintiff as Class Representative; and (iii) appoint Lead Counsel Cohen Milstein Sellers & Toll PLLC ("Cohen Milstein") as Class Counsel.

## I.    INTRODUCTION

This securities fraud class action (the "Action"), brought pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, arises out of Defendants Kevin Davis's[1] and Amir Rosenthal's[2] ("Defendants") material misstatements and omissions during the Class Period concerning the nature and sources of PSG's growth and attendant risks and adverse material trends. Lead Plaintiff now seeks class certification on behalf of a proposed Class consisting of:

> All persons and entities that purchased or acquired the common stock of Performance Sports Group ("PSG" or the "Company") on the New York Stock Exchange from January 15, 2015 through October 28, 2016, inclusive (the "Class Period), and were damaged thereby. Excluded from the Class are Defendants; the officers and directors of the Company, at all relevant times; members of their immediate families; their legal representatives, heirs, successors or assigns; and any

---

[1] The Class Period begins on January 15, 2015 and extends through October 28, 2016. From the beginning of the Class Period through March 22, 2016, when he was terminated by the Company's Board of Directors, Davis was the Company's Chief Executive Officer ("CEO") and a member of its Board. Third Amended Complaint ("TAC"), Dkt. No. 148, ¶ 38.

[2] From the beginning of the Class Period through March 2016, Rosenthal was the Company's Chief Financial Officer ("CFO") and Executive Vice President of Finance and Administration; from May 28, 2015, he was also President of PSG Brands. Upon Davis's termination, Rosenthal became interim CEO, and he served in that role until June 2016. He left the Company on October 31, 2016, the same day that it declared bankruptcy. ¶ 39.

entity in which Defendants or PSG have or had a controlling interest.

Courts have recognized that cases of this nature deter fraud and maintain public confidence in the marketplace. *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005). Because of securities fraud class actions' utility, "the class certification requirements of Rule 23 are to be construed liberally." *Katz v. Image Innovations Holdings, Inc.*, No. 06 Civ. 3707 (JGK), 2010 WL 2926196, at *3 (S.D.N.Y. July 22, 2010)[3]; *see also In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, No. 17 Civ. 1580 (LGS), 2020 WL 1329354, at *2 (S.D.N.Y. Mar. 23, 2020) ("The Second Circuit has directed district courts to interpret Rule 23 liberally, to maximize the benefits to both private parties and to the public provided by class actions."). As explained herein, the requirements of Rule 23(a) (numerosity, commonality, typicality, and adequacy), as well as the requirements of Rule 23(b)(3) (predominance and superiority), are all met. Likewise, Lead Plaintiff's choice of counsel to serve as Lead Counsel, Cohen Milstein, is qualified under Rule 23(g).

*First*, the numerosity requirement is satisfied because millions of shares of PSG common stock traded during the Class Period, and there are likely thousands of Class members who were harmed by Defendants' conduct. *See, e.g.*, *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, No. 12-CV-0256, 2017 WL 3608298, at *4-5 (S.D.N.Y. Aug. 22, 2017) (numerosity established by at least 40 class members and a large number of shares outstanding and trading during the relevant period). *Second*, the commonality requirement is met because there are numerous questions of law and fact at issue that will be proven on a class-wide basis, including whether the federal securities laws were violated by PSG's and Defendants' conduct; whether statements made by PSG and Defendants to the investing public during the Class Period omitted

---

[3] Citations, alterations, and internal quotations are omitted from quoted authority unless otherwise indicated.

or misrepresented material facts about the business, operations, known trends, and prospects of PSG; and to what extent Class members have sustained damages and the proper measure of damages. *See, e.g.*, *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 459, 475 (2013). *Third*, the typicality requirement is met because each proposed Class member's claims arise from the same "course of events," namely Defendants' misstatements and omissions, and each Class member will make "similar legal arguments to prove [Defendants'] liability." *See Tsereteli v. Residential Asset Securitization Trust 2006-A8*, 283 F.R.D. 199, 207 (S.D.N.Y. 2012). *Fourth*, the adequacy requirement is met because Lead Plaintiff "possess[es] the same interest and suffer[ed] the same injury as the class members," *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 594-95 (1997), will vigorously prosecute this case and protect the Class's interests, and suffers no non-speculative, disabling "fundamental" conflicts. *Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006); *see also* Herbert Newberg & Alba Conte, *Newberg on Class Actions* § 3.26, at 3-143 to -144; *id.* at § 3.25, at 3-136 (3d ed. 1992).

*Fifth*, the predominance requirement of Rule 23(b)(3) is met because issues of fact and law regarding falsity, materiality, scienter, loss causation, and damages predominate over any individual issues and are subject to the same proof. *See Amgen*, 568 U.S. at 474-75; *Erica P. John Fund. Inc. v. Halliburton Co.* ("*Halliburton I*"), 563 U.S. 804, 809 (2011). In support of its motion, Lead Plaintiff submits the expert report of Chad Coffman, CFA ("Coffman Report") (attached as Exhibit A). Mr. Coffman is the President of Global Economics Group, a firm that specializes in the application of economics, finance, statistic, and valuation principles in a variety of contexts. He is an expert in the financial markets. After analyzing the market for PSG common stock under the *Cammer* factors and additional factors described herein, Mr. Coffman concluded that the market for PSG's common stock was efficient during the Class Period, and that damages could be

measured for all Class members using a common methodology that is consistent with Lead Plaintiff's theory that PSG's stock price was artificially inflated due to Defendants' misstatements and omissions. Coffman Report ¶¶ 24-85.

*Sixth*, as required by Rule 23(b)(3), a class action is the superior method to adjudicate this controversy, because it will provide recourse to shareholders who otherwise would likely have none and would serve as the most efficient vehicle for resolution of claims against Defendants. *See In re MF Glob. Holdings Ltd. Inv. Litig.*, 310 F.R.D. 230, 239 (S.D.N.Y. 2015).

*Finally*, Lead Plaintiff's choice of counsel, Cohen Milstein, qualifies under the analysis required by Rules 23(a)(4) and 23(g) because it will fairly and adequately protect the interests of the proposed Class and because Cohen Milstein has successfully litigated securities class actions of this nature in the past.

For the foregoing reasons, Lead Plaintiff respectfully submits that its motion for class certification should be granted.

## II.    PROCEDURAL HISTORY

On June 7, 2016, the Court appointed the Plumbers and Pipefitters National Pension Fund as Lead Plaintiff and Cohen Milstein as Lead Counsel. On August 15, 2016, Lead Plaintiff filed its first amended complaint, against PSG, Davis, and Rosenthal. On November 1, 2017, after extensive briefing in the federal bankruptcy and Canadian bankruptcy courts, the United States Bankruptcy Court for the District of Delaware approved a settlement among Lead Plaintiff, PSG, and its creditors. *See In re Old BPSUSH Inc. et al.*, ECF No. 1466, Case No. 16-12373 (KJC) (Bankr. D. Del.). As part of the settlement, Lead Plaintiff received a production of documents relevant to this Action, which totaled over 20.4 million pages. Davis and Rosenthal also received the production. Upon review of this massive and revealing production, Lead Plaintiff sought and obtained leave to amend its then-pending complaint, filing the operative Complaint (the "TAC").

Dkt. 148. On October 28, 2019, Defendants moved to dismiss the TAC. Dkt. 149, 150. On April 14, 2020, this Court denied Defendants' motion with respect to all but a few of the alleged misstatements and omissions at issue.[4] Dkt. 158, 159.

## III.   STATEMENT OF FACTS COMMON TO THE CLASS

Until its bankruptcy, PSG was a developer and manufacturer of sports equipment and apparel that sold its products under well-known brand names such as Bauer (hockey) and Easton (baseball/softball/hockey).[5] TAC ¶¶ 2-4, 141. PSG's brands sold their goods to retail customers in the United States, Canada, and around the world. *Id.* at ¶¶ 2-4. PSG entered the Class Period having recently acquired several of these brands, including Easton, for hundreds of millions of dollars. *Id.* at ¶ 3. To prove to investors that its acquisition and integration strategy was bearing fruit, PSG's most senior executives, Davis and Rosenthal, repeatedly touted PSG's record of strong sales growth and the reasons for that growth, claiming PSG had strong "customer demand," "fundamental growth drivers," and growing market share, all while assuring investors that PSG was well-positioned for sustained success and that risks to its business were properly controlled. *Id.* at ¶¶ 22, 158-61, 165-67, 170, 174, 178, 180, 182 183, 190-92, 195-96. In truth, however, the Company depended on the use of high-risk sales practices, and the deficient internal controls that allowed those practices to flourish, to create a false appearance of healthy growth. *Id.* at ¶¶ 6, 7, 10-12, 23, 50.

For instance, to meet quarterly goals, Defendants used "closeout" sales, whereby PSG pushed out excess product and generated some revenue but at a lower margin and sometimes at a

---

[4] The Court dismissed claims related to Defendants' statements concerning certain risk disclosures in PSG's 2015 Form 10-K.

[5] On June 20, 2014, PSG launched its United States initial public offering ("IPO") at $15.50 per share on the New York Stock Exchange ("NYSE"), raising $125 million.

loss. *Id.* at ¶¶ 20, 47, 61-63, 67. PSG also pressured retailers to increase the size of their orders and to accept shipments early. *Id.* at ¶¶ 52-54, 59, 71, 73-79. Customers who posed an obvious credit risk were permitted to delay payment and enter into consignment and right-of-return agreements. ¶¶ 84-90, 103-08. In many instances, Defendants and PSG ignored credit limits altogether. *Id.* at ¶¶ 16, 27, 91-102. These high-risk sales practices were enabled by an intentionally inadequate internal controls system, which PSG refused to take seriously or remediate. *Id.* at ¶¶ 85-87, 95, 99, 108-15, 149-50.

Defendants, who were responsible for drafting, signing, and issuing PSG's public statements and filings with the U.S. Securities and Exchange Commission ("SEC"), were made aware of and discussed these practices and conditions in emails, presentations, and board meetings. *Id.* at ¶¶ 13, 41, 47, 55-58, 64-69, 77-79, 86, 88, 93, 97, 107, 147-53. PSG employees and a major shareholder warned Defendants that the sales tactics were cannibalizing sales, and, in response, Defendants retaliated by firing one executive and threatening litigation. *Id.* at ¶¶ 17-21, 81-82, 148. Likewise, PSG's auditor, KPMG, and the Company's internal auditors warned Defendants about deficiencies in internal controls, which Defendants ignored or belittled. *Id.* at ¶¶ 16, 26, 99-100, 108-14.

Defendants' aggressive sales practices, coupled with their intentionally lax internal controls over those practices, contributed to a glut of PSG inventory in the marketplace. *Id.* at ¶¶ 8, 15, 27, 68, 70, 80, 83, 102. That self-inflicted situation destroyed customer demand, cannibalized PSG's future sales, and exposed PSG to the ramifications of the bankruptcies of customers to whom it had recklessly extended millions of dollars of credit. *Id.* at ¶¶ 25, 70, 90, 102, 115-17, 121-24, 132. The truth was revealed to the market through disclosures and materializations of the risks posed by Defendants' undisclosed sales tactics and deficient internal controls. *Id.* at ¶¶ 24,

118-45. The market began to learn of these problems in early 2016, and by the end of October 2016, PSG's demise – a direct result of these high-risk practices – culminated in the announcement of PSG's bankruptcy and Rosenthal's termination. *Id.* By November 1, 2016, the first trading day after PSG announced its bankruptcy filing, its share price had cratered to $1.67, a 92% decrease from its peak price of $21.65 during the Class Period.

## IV.   LEGAL ARGUMENT

### A.   The Proposed Class Satisfies the Standards for Class Certification Under Rule 23.

For a class to be certified, plaintiffs must meet the requirements of Rule 23(a): numerosity, commonality, typicality, and adequacy. *See* Fed. R. Civ. P. 23(a). Plaintiffs must also meet one of the requirements of Rule 23(b), in this case, that "questions of law or fact common to class members predominate over any questions affecting only individual members" and "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The requirements of Rule 23 must be met by a preponderance of the evidence. *See In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 442 (S.D.N.Y. 2013).

While this Court's analysis must be "rigorous," "the Second Circuit has directed district courts to apply Rule 23 according to a liberal rather than a restrictive interpretation," and noted that "[i]f there is to be an error made, let it be in favor and not against the maintenance of the class action . . . ." *In re Facebook, Inc. IPO Sec. & Deriv. Litig.*, 312 F.R.D. 332, 340 (S.D.N.Y. 2015). The Court must "assure that a class certification motion does not become a pretext for a partial trial of the merits." *See In re Vivendi Universal S.A. Sec. Litig.*, 242 F.R.D. 76, 83 (S.D.N.Y. 2007); *see also Amgen*, 568 U.S. at 466 ("Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage."). The question at hand is whether the "evidence is sufficient to demonstrate common questions of fact warranting certification of the proposed class, not whether

the evidence will ultimately be persuasive." *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 135 (2d Cir. 2001), *abrogated on other grounds*, *In re Initial Public Offering Sec. Litig.*, 471 F.3d 24 (2d Cir. 2006). Because all of the requirements are met in this case, the Court should certify the proposed Class.

**B.     The Proposed Class Here Readily Satisfies the Rule 23(a) Requirements.**

**1.     The Proposed Class Is So Numerous That Joinder Is Impracticable.**

A class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "Numerosity is presumed for classes larger than forty members," though plaintiffs need not provide evidence of an exact class size to establish numerosity. *Gruber v. Gilbertson*, No. 16CV9727, 2019 WL 4439415, at *2 (S.D.N.Y. Sept. 17, 2019) (quoting *Pa. Pub. Sch. Emps.' Ret. Sys. v. Morgan Stanley & Co.*, 772 F.3d 111, 120 (2d Cir. 2014)). In securities actions involving nationally listed public companies, numerosity is satisfied by showing that a large number of shares were outstanding and traded during the time period. *In re Vivendi Universal, S.A. Sec. Litig.*, 242 F.R.D. at 84.

The proposed Class here consists of all persons who purchased or acquired the millions of shares of PSG common stock that traded during the Class Period on the NYSE. ¶¶ 7, 28-30, 121, 126, 128, 131, 137, 215; Coffman Report ¶ 68 (42.85 million shares of PSG stock were outstanding during the Class Period). Although the exact number of class members has yet to be determined, based on the millions of shares issued and their trading on the NYSE, Class members likely number in the thousands and are geographically dispersed. Joinder of parties so numerous and widespread would be burdensome, expensive, and impracticable for both the parties and the judicial system, confirming that Rule 23(a)(1) is satisfied. *See, e.g.*, *In re AMF Bowling Sec. Litig.*, No. 99 Civ. 3023 (DC), 2002 WL 461513, at *3 (S.D.N.Y. Mar. 26, 2002) (numerosity satisfied where 15.5 million shares of stock traded).

### 2.    The Action Raises Common Questions of Law and Fact.

Rule 23(a)(2) requires that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The commonality requirement is a "low hurdle," *Gruber*, 2019 WL 4439415, at *3, requiring only that class members' claims depend upon at least one "common contention . . . capable of classwide resolution – which means that determination of [their] truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

The commonality requirement is satisfied here "because the class proceeding will generate common answers to several key questions, including whether Defendants engaged in deceptive conduct and omitted the disclosure of material facts" regarding sales practices, risks, and internal controls; "whether there was scienter"; whether Defendants' misstatements were material; whether the price of PSG's stock was artificially inflated during the Class Period; and whether damages exist. *See Gruber*, 2019 WL 4439415, at *3; *see also Amgen*, 568 U.S. at 459, 475 (holding that "[b]ecause materiality is judged according to an objective standard, the materiality of [an issuer's] alleged misrepresentations and omissions is a question common to all members of the class" and "the falsity or misleading nature of the defendants' alleged statements or omissions are common questions"); *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 282 (2014) ("*Halliburton II*") ("materiality is an objective issue susceptible to common, classwide proof"); *Zivkovic v. Laura Christy LLC*, 329 F.R.D. 61, 70 (S.D.N.Y. 2018) (Woods, J.) ("The fact that the amount of damages class members can recover—if any—may differ does not bear weight in the commonality inquiry.").

### 3.    The Class Representative's Claims Are Typical of the Class.

Typicality under Rule 23(a)(3) requires "only that the disputed issues of law or fact occupy essentially the same degree of centrality to the named plaintiff's claim as to that of other members

of the proposed class." *MF Glob. Holdings*, 310 F.R.D. at 236. The "claims only need to share the same essential characteristics, and need not be identical." *Gruber*, 2019 WL 4439415, at *3. When determining whether the claims are typical, "'the focus must be on the defendants' behavior and not that of the plaintiffs.'" *Teachers Ret. Sys. v. ACLN Ltd.*, No. 01 CV 11814 (LAP), 2004 WL 2997957, at *4 (S.D.N.Y. Dec. 27, 2004). Courts in this District have emphasized that the typicality requirement is "not demanding." *In re Deutsche Bank AG Sec. Litig.*, 328 F.R.D. 71, 80 (S.D.N.Y. 2018).

Lead Plaintiff's claims are typical of the claims of all other proposed Class members. Lead Plaintiff and the proposed Class all purchased PSG stock during the Class Period, all allege Defendants misstated and omitted the same material facts, and all bring the same claims against the same Defendants as a result. Given that each Class member's claims turn upon the very same facts and legal theories, and will be proven by the same evidence, typicality is satisfied, as courts regularly find under similar circumstances. *In re Deutsche Bank AG Sec. Litig.*, 328 F.R.D. at 81 (finding typicality where the "Court has found that all class members' claims arise from a single, common course of conduct committed against all members of the class"); *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 312 F.R.D. at 341 (S.D.N.Y. 2015) (same). Nor are there any defenses unique to Lead Plaintiff. *See MF Glob. Holdings*, 310 F.R.D. at 236-37. The length of the Class Period, and the fact that Lead Plaintiff and members of the proposed Class purchased and sold stock at different times and in different amounts throughout the Class Period, does not alter this conclusion. *See Gruber*, 2019 WL 4439415, at *3; *In re Arakis Energy Corp. Sec. Litig.*, No. 95-CV-3431 (ARR), 1999 WL 1021819, at *6 (E.D.N.Y. Apr. 27, 1999).

### 4. Lead Plaintiff Will Fairly and Adequately Protect the Interests of the Class.

"Rule 23(a)(4) requires that the representative of the parties will fairly and adequately protect the interests of the class." *MF Glob. Holdings*, 310 F.R.D. at 235. A determination of adequacy asks

10

whether: "1) plaintiff's interests are antagonistic to the interests of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." *In re Deutsche Bank AG Sec. Litig.*, 328 F.R.D. at 81. Like typicality, the "adequacy requirement is not demanding," *Wallace v. IntraLinks*, 302 F.R.D. 310, 316 (S.D.N.Y. 2014), and both elements of Rule 23(a)(4) are met here.

*First*, for Defendants to defeat a motion for class certification, Lead Plaintiff must have a "fundamental" conflict with the proposed Class. *Gruber*, 2019 WL 4439415, at *4. Where all claims arise from the same wrongful conduct, "[a]ny conflict that may exist is not fundamental." *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 312 F.R.D. at 344 (S.D.N.Y. 2015). Here, Lead Plaintiff's interests are aligned with those of the proposed Class because its claims arise from the same misconduct and involve the same legal theories, and it will fairly and adequately protect the interests of the proposed Class.

*Second*, Lead Plaintiff has also satisfied the second element by selecting counsel, Cohen Milstein, that has vigorously prosecuted the Action, including by defeating Defendants' motion to dismiss, and possesses extensive experience representing investors in securities class actions. Further details regarding Lead Counsel's relevant experience are set forth in its firm resume, attached as Exhibit B, and in Section IV.D below. Lead Counsel therefore satisfies the adequacy requirement. *See MF Glob. Holdings*, 310 F.R.D. at 237.

## C.    The Proposed Class Meets the Requirements of Rule 23(b)(3).

In addition to meeting the requirements of Rule 23(a), a class action must satisfy at least one of the three Rule 23(b) requirements. Here, Lead Plaintiff moves for class certification under Rule 23(b)(3), which authorizes certification where: (i) "the questions of law or fact common to class members predominate over any questions affecting only individual members"; and (ii) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R.

Civ. P. 23(b)(3). This Action satisfies both of those conditions.

### 1.    Common Questions of Law and Fact Predominate Over Individual Questions.

"Predominance is a test readily met in certain cases alleging . . . securities [claims]." *Amchem Prods.*, 521 U.S. at 625; *see also Basic Inc. v. Levinson*, 485 U.S. 224 (1988). A plaintiff is not required to show that there are *no* individual issues. *In re IndyMac Mortgage-Backed Sec. Litig.*, 286 F.R.D. 226, 236 (S.D.N.Y. 2012). "'Class-wide issues predominate if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof.'" *UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 131 (2d Cir. 2010). In assessing predominance, "a court's inquiry is directed primarily toward whether the issue of liability is common to members of the class." *Tsereteli*, 283 F.R.D. at 210.

Under Section 10(b), plaintiffs must prove: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Sci. Atlanta*, 552 U.S. 148, 157 (2008). Materiality, loss causation, and "the falsity or misleading nature of the defendant's alleged statements or omissions are common questions that need not be adjudicated before a class is certified." *Amgen*, 568 U.S. at 474-75; *Halliburton I*, 563 U.S.at 809. The same is true of scienter. *See In re SunEdison, Inc. Sec. Litig.*, 329 F.R.D. 124, 147 (S.D.N.Y. 2019). These elements are also common as to Lead Plaintiff's Section 20(a) claim because Defendants' liability as control persons does not vary among proposed Class members. As explained below, the remaining elements of a Section 10(b) claim—reliance and damages—will also be established with common proof on a class-wide basis.

### a.   The Proposed Class Is Entitled to a Presumption of Reliance Under the Fraud-on-the-Market Theory.

Under *Basic*, "courts may presume reliance on a classwide basis if the plaintiffs establish certain prerequisites—namely, that the defendants' misstatements were publicly known, their shares traded in an efficient market, and the plaintiffs purchased the shares at the market price after the misstatements were made but before the truth was revealed [*i.e.*, the so-called "market timing" requirement]." *Arkansas Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.*, 955 F.3d 254, 260-61 (2d Cir. 2020), *cert. granted*, 2020 WL 7296815 (Dec. 11, 2020). The theory underlying *Basic* "is that investors presume that theoretically efficient markets, such as the New York Stock Exchange . . . incorporate all public information—including material misstatements—into a share price." *Id.* at 261; *see also* Coffman Report ¶ 14. Therefore, a plaintiff may prove reliance by invoking the presumption that "a public, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation" for purposes of a Rule 10b-5 action. *Halliburton II*, 573 U.S. at 283-84.

The Second Circuit has "declined to adopt a particular test for market efficiency," and the burden to demonstrate market efficiency "is not an onerous one." *Waggoner v. Barclays PLC*, 875 F.3d 79, 94, 97 (2d Cir. 2017). Courts in this Circuit presume that the NYSE, upon which PSG stock was widely traded prior to and during the Class Period, is an efficient market. *See, e.g.*, *Billhofer v. Flamel Techs., S.A.*, 281 F.R.D. 150, 159 (S.D.N.Y. 2012); *see also In re Computer Sci. Corp. Sec. Litig.*, 288 F.R.D. 112, 119-20 (E.D. Va. 2012) ("It is not surprising that no other federal courts have concluded that common shares traded on the NYSE are not traded in an efficient market.").

Courts also consider a non-exhaustive list of factors to further analyze whether a security

13

is efficiently traded, commonly referred to as the *Cammer* factors, which are: (1) a large weekly trading volume of the security; (2) the existence of a significant number of analyst reports regarding the company; (3) the existence of market makers and arbitrageurs in the security; (4) the eligibility of the company to file a Form S-3 registration statement with the SEC; and (5) a history of immediate movement of stock price caused by unexpected corporate events or financial releases. *See Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989). None of these is dispositive of market efficiency. *See Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 83 (S.D.N.Y. 2015) (explaining that the Second Circuit "has not required [the *Cammer* factors'] use or held that any one of them is dispositive"). Courts in this Circuit may also look to what are known as the *Krogman* factors: "(1) the company's market capitalization; (2) the relative size of the bid-ask spread for the security; and (3) the company's float, or the degree to which shares of the security are held by the public, rather than insiders." *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 431 (S.D.N.Y. 2014) (citing *Krogman v. Sterritt*, 202 F.R.D. 467, 477-78 (N.D. Tex. 2001)).

The *Basic* requirements are met here. *First*, it cannot be reasonably disputed that Defendants' alleged misrepresentations and omissions were disseminated publicly to investors, in SEC filings and on earnings calls. *See, e.g.*, ¶¶ 157-61, 165-67, 170, 174, 177-84, 190-92, 195-96, 199-205. *Second*, the market timing requirement is met because Lead Plaintiff and the proposed Class members acquired PSG stock during the Class Period at artificially inflated prices and suffered losses before the truth had fully emerged. *See* ¶¶ 118-44, 206-09; Dkt. 148, Schedule A (Lead Plaintiff's transactions in PSG common stock during the Class Period). *Third*, as demonstrated herein and in the Coffman Report, the fact that PSG stock traded on the NYSE, as well as an analysis of the *Cammer* and *Krogman* factors, supports a finding that the market for

14

PSG common stock was efficient during the Class Period. *See, e.g.*, *Strougo v. Barclays PLC*, 312 F.R.D. 307, 318 (S.D.N.Y. 2016), *aff'd sub nom. Waggoner v. Barclays PLC*, 875 F.3d 79 (2d Cir. 2017); Coffman Report ¶¶ 6-9, 24-79. In light of this showing, the proposed Class is entitled to the fraud-on-the-market presumption here.

### (1)   High Weekly Trading Volume (*Cammer* Factor 1).

The high trading volume for PSG's publicly traded common stock supports a finding of efficiency. *See* Coffman Report ¶¶ 26-31. "Turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one." *McIntire*, 38 F. Supp. 3d at 431 (quoting *Cammer*, 711 F. Supp. at 1293). The average weekly trading volume of PSG stock was 6.69% – well above the standard benchmark for market efficiency. *See* Coffman Report ¶ 28.

### (2)   Financial Analysts' Coverage (*Cammer* Factor 2).

A finding of market efficiency is also supported by the fact that PSG stock was extensively covered by securities analysts during the Class Period, which implies that there was an active market for information regarding PSG and its securities, and that the information was widely distributed. Coffman Report ¶ 33. The analyst-coverage factor is met where analyst reports concerning a company's financial condition were generated and made publicly available during the Class Period "by a significant number of brokerage firms." *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 280 (S.D.N.Y. 2008). As described in Mr. Coffman's expert report, PSG was covered by approximately 23 securities analyst firms, including well-known firms such as Morgan Stanley, RBC Capital Markets, and Roth Capital Partners, which issued at least 273 reports covering PSG during the Class Period. *See* Coffman Report ¶ 34. This level of coverage demonstrates market efficiency. *See In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D at 446 (finding market efficient

where three analysts followed security at issue); *Billhofer*, 281 F.R.D. at 160 (eight analysts).[6]

### (3) Numerous Market Makers (*Cammer* Factor 3).

A market maker is an entity that agrees to purchase or sell securities on demand, to support a liquid market for the shares. *See In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. at 446-47. "Market makers promote efficiency by reacting quickly to new information by buying or selling securities in order to drive their price to the market-clearing level." *Id.* at 446. This factor is not particularly relevant in this case, because the NYSE is a major, centralized stock exchange with continuous public price and volume reporting and high liquidity, not an over-the-counter market that relies on decentralized market makers to provide liquidity. Coffman Report ¶¶ 40-41. Nonetheless, there were 104 market makers for PSG common stock throughout the Class Period. *Id.* at ¶ 42. That is sufficient to support a finding of efficiency. *See In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. at 446 (six market makers supported market efficiency finding); *In re Initial Public Offering Sec. Litig.*, 260 F.R.D. 81, 100 (S.D.N.Y. 2009) (14 market makers supported market efficiency finding). The many institutional investors (over 280) transacting in PSG common stock during the Class Period also demonstrates market efficiency. *See In re Alstom SA Sec. Litig.*, 253 F.R.D. at 280 (finding that institutional investors facilitated the efficiency of the market); Coffman Report ¶ 73.

### (4) S-3 Registration Statements (*Cammer* Factor 4).

PSG's eligibility to file a Form S-3 registration statement further supports a finding of

---

[6] Extensive and regular coverage of PSG by the ordinary press, and the availability of other public information about PSG, further demonstrates that PSG stock traded in an efficient market. *See Carpenters*, 310 F.R.D. at 92 (explaining that news coverage of company supported finding of market efficiency). Mr. Coffman located 687 articles from various news sources related to PSG and numerous SEC filings by the Company, which were available to the public during the Class Period at no cost. Coffman Report ¶ 36. This led Mr. Coffman to conclude that there was a substantial amount of news about and public interest in PSG throughout the Class Period. *Id.* ¶ 37.

market efficiency. Eligibility indicates that a company's stock trades on an efficient market because the SEC has reserved eligibility for companies that have met all reporting requirements for twelve consecutive months and have a market capitalization of at least $75 million held by non-affiliates. *See In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. at 447 ("The ability to file this form indicates that the company is easily able to issue new securities"); 17 C.F.R. § 239.13. These requirements are based on the SEC's belief that the market operates efficiently for such companies. *Cammer*, 711 F. Supp. at 1284.

Until it failed to timely file its annual report on Form 10-K on August 15, 2016, PSG consistently filed its requisite SEC reports during the Class Period. Coffman Report ¶ 45; TAC ¶ 117. PSG also maintained an average market capitalization well over $75 million during the Class Period. *See* Coffman Report ¶ 68. The fact that PSG was ineligible to file a Form S-3 for a portion of the Class Period as a result of timing factors does not affect the conclusion that PSG stock traded in an efficient market. *See Cammer*, 711 F. Supp. at 1287; Coffman Report ¶ 45.

### (5)    Reaction of PSG Stock to News (*Cammer* Factor 5).

The fifth *Cammer* factor ("*Cammer* 5") looks to whether plaintiffs can make a *prima facie* showing that, during the Class Period, PSG's stock price quickly responded to the release of Company-specific news events (a "cause and effect relationship"). *Cammer*, 711 F. Supp. at 1287, 1291. "An event study that correlates the disclosures of unanticipated, material information about a security with corresponding fluctuations in price has been considered *prima facie* evidence of the existence of such a causal relationship." *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 207-08 (2d Cir. 2008); *see also* Coffman Report ¶¶ 47-48. A plaintiff seeking to demonstrate market efficiency under *Cammer* 5, however, "need not always present direct evidence of price impact through event studies," particularly where, as here, the other four *Cammer* factors and the *Krogman* factors are satisfied. *See Waggoner*, 875 F.3d at 97;

17

*Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 328 F.R.D. 86, 97 (S.D.N.Y. 2018); *see also In re Petrobras Sec.*, 862 F.3d 250, 277 (2d Cir. 2017) (market efficiency analysis is a "holistic analysis based on the totality of the evidence presented"). Regardless, *Cammer* 5 supports a finding here that PSG stock traded in an efficient market.

Mr. Coffman conducted an event study to examine the reaction of PSG's stock price to PSG-related news versus its movement on days with no PSG-related news. Coffman Report ¶ 49; *see also In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 253 (2d Cir. 2016) (event studies that distinguish between information specific to the issuer and information likely to affect stock prices market-wide are "standard operating procedure in federal securities litigation"). Mr. Coffman performed a regression analysis to evaluate the relationship between PSG's share price, PSG-specific news, and broad market factors, and found a statistically significant cause-and-effect relationship between news about PSG and changes in the market price for PSG common stock. Coffman Report ¶¶ 49-66. Specifically, Mr. Coffman found that PSG's share price was approximately 8.8 times more likely to change on PSG-news days than on non-news days. *Id.* at ¶ 62. This demonstrates that PSG's share price reacted rapidly to new publicly-released information and indicates that PSG stock traded in an efficient market. *See Halliburton II*, 573 U.S. at 280; *In re Alstom*, 253 F.R.D. at 280 (finding *Cammer* 5 satisfied where "Alstom was over 6 times more likely to have a statistically significant stock return on a day with news than on a day with no news").

### (6) High Market Capitalization (*Krogman* Factor 1).

Market capitalization, or the number of shares multiplied by the prevailing share price, is another quantitative indicator of market efficiency. *Krogman*, 202 F.R.D. at 478; Coffman Report ¶ 67. The considerable demand for investment in highly capitalized companies tends to result in an active market for the securities they issue, leading courts to conclude that the market for such

securities is efficient. *See* Coffman Report ¶ 67. During the Class Period, PSG's market capitalization averaged $479.5 million. Coffman Report ¶ 68. This figure supports a finding of market efficiency. *See McIntire*, 38 F. Supp. 3d at 433 (finding that first *Krogman* factor was satisfied where company's market capitalization "ranged from $292 million to $585 million during the Class Period").

### (7)     Narrow Bid-Ask Spread (*Krogman* Factor 2).

The bid-ask spread is the difference between the prices at which investors are willing to buy shares and the prices at which current stockholders are willing to sell. *See Krogman*, 202 F.R.D. at 478. Smaller bid-ask spreads are associated with more efficient markets. *See id.*; Coffman Report ¶ 70. During each month of the Class Period, the average bid-ask spread for PSG common stock was between 0.12% and 0.42%. Coffman Report ¶ 71. During August 2016, when PSG's ask-bid spread was at its highest average point (0.42%), the spread was still well below the average ask-bid spread of 100 other random stocks sampled by Mr. Coffman. *Id.* This range supports a finding of market efficiency. *See In re Signet Jewelers Ltd. Sec. Litig.*, No. 16 Civ. 6728, 2019 WL 3001084, at *12 (S.D.N.Y. July 10, 2019) (finding that average bid-ask spread of 0.3% "strongly indicates that the stock traded in an efficient market").

### (8)     Public Float (*Krogman* Factor 3).

A company's float is "the degree to which shares of the security are held by the public, rather than insiders." *Billhofer*, 281 F.R.D. at 160. A higher float is associated with greater market efficiency. *See Krogman*, 202 F.R.D. at 478. During the Class Period, the average float of PSG's common stock was over 99%. Coffman Report ¶ 72. This supports a finding of market efficiency. *See Signet*, 2019 WL 3001084, at *12 (float of 99.4% to 99.8% "weigh[s] heavily in favor of a finding of market efficiency").

### (9)     Institutional Investors

19

Institutional investors are sophisticated, well-informed, and known to engage in detailed analysis of the securities in their portfolios. Coffman Report ¶ 73. Such investors include mutual funds, pension funds, investment banks, and other types of large financial institutions that have substantial resources to devote to such analysis. *Id*. During the proposed Class Period, 283 institutions held, on average, 91% of the public float. It is Mr. Coffman's opinion that this high level of institutional ownership coupled with high trading volumes further supports a conclusion of market efficiency. *Id*.; *see In re Petrobras Sec. Litig.*, 312 F.R.D. 354, 366 (S.D.N.Y. 2016) (efficiency supported where more than 214 mutual funds held Petrobras bonds), *aff'd in part, vacated in part sub. nom. In re Petrobras Sec.*, 862 F.3d 250 (2d Cir. 2017).

### (10)    Lack of Autocorrelation

Autocorrelation is the degree to which previous price movements have the ability to predict future price movements. Coffman Report ¶¶ 74-75. Autocorrelation is relevant to market efficiency because if the autocorrelation is persistent and sufficiently large that a trader could profit from taking advantage of the autocorrelation, it means that past price movements are not fully reflected in the current price, which would suggest market inefficiency. *Id.* Here, Mr. Coffman found that there is no evidence of statistically significant autocorrelation for PSG common stock. *Id.* ¶¶ 76-77. Therefore, this factor also supports the conclusion that PSG common stock traded in an efficient market throughout the Class Period. *See In re Gaming Lottery Sec. Litig.*, No. 96 Civ. 5567 RPP, 2001 WL 204219, at *17 (S.D.N.Y. Mar. 1, 2001) (market efficiency supported by the fact that the stock "did not exhibit autocorrelation").[7]

---

[7] As explained by Mr. Coffman, there are yet additional factors that support a finding of market efficiency. There was considerable option trading in PSG common stock during the Class Period, which indicates market efficiency. Coffman Report ¶ 78. There was also a lack of arbitrage opportunity given that there was little divergence between the price of PSG common stock trading on the NYSE and TSX during the Class Period. Coffman Report ¶ 79.

***

In sum, there can be no dispute that the market for PSG common stock was efficient throughout the Class Period. *See* Coffman Report ¶ 86. Accordingly, the members of the proposed Class are entitled to a presumption that they relied upon each of the false and misleading statements and omissions on which this Action is based. *See Basic*, 485 U.S. at 247. As a result, there is no requirement for individual proof of reliance. Common issues will predominate, and the proposed Class properly can and should proceed with this case as a class action. *Id.*

### b.   The *Affiliated Ute* Presumption of Reliance Applies.

Where, as here, "a plaintiff's fraud claims are based on omissions, reliance may be satisfied so long as the plaintiff shows that defendants had an obligation to disclose the information and the information withheld is material." *See Strougo v. Barclays PLC*, 312 F.R.D.307, 313 (SDNY 2013) (citing *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 154 (1972)). Because materiality itself is a common question, a plaintiff need not prove materiality in order to invoke the *Affiliated Ute* presumption at the class certification stage; it need only be alleged. *See Amgen*, 568 U.S. at 467. The *Affiliated Ute* presumption reflects the reality that where information is omitted, "reliance as a practical matter is impossible to prove." *In re Facebook, Inc., IPO Sec. & Deriv. Litig*., 986 F. Supp. 2d 428, 469-70 (S.D.N.Y. 2013). Here, where Lead Plaintiff has alleged material omissions of information that Defendants had an obligation to disclose, the *Affiliated Ute* presumption applies.

### c.   Damages Will be Calculated on a Class-Wide Basis.

To certify the proposed Class, this Court need not find that damages are capable of measurement on a class-wide basis. *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 402 (2d Cir. 2015); *see also Amgen*, 568 U.S. at 475 (loss causation is a common question that need not be adjudicated

for a class to be certified).[8] Nor does Lead Plaintiff need to produce a class-wide damages model at the class certification stage. *In re Petrobras Sec. Litig.*, 312 F.R.D. at 372. Any damages model that is submitted at this stage "need not be exact." *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013). All that is required here is that Lead Plaintiff show that its damages arise from its theory of liability. *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 88 (2d Cir. 2015); *see also Signet*, 2019 WL 3001084, at *20 ("Plaintiff's burden at this stage is simply to propose a methodology for calculating damages that corresponds to its theory of liability.").

Lead Plaintiff has met its burden here. Lead Plaintiff alleges that because of Defendants' fraudulent scheme to deceive the market through misstatements and omissions, PSG's share price was artificially inflated and maintained. *See* TAC ¶¶ 206-07. Shareholders of PSG were harmed as the concealed truth regarding PSG's sales practices, business risks, and internal controls leaked out and constructively disclosed Defendants' fraud, which caused the artificial inflation embedded in the price of PSG common stock to dissipate over time, resulting in a significant decline in the price of PSG common stock. TAC ¶¶ 118-44, 206-09. To compute the damages caused by that harm, Mr. Coffman's proposed methodology would calculate the artificial inflation in PSG's share price, caused by Defendants' misstatements and omissions, at the time of purchase, minus the artificial inflation per share at the time of sale or during the Private Securities Litigation Reform Act of 1995's "90-day lookback" period. Coffman Report ¶¶ 80-85. Mr. Coffman also describes the well-accepted methods that can be used to quantify the artificial inflation caused by

---

[8] Furthermore, it is "well-established that the fact that damages may have to be ascertained on an individual basis is not sufficient to defeat" predominance or class certification. *Kaplan v. S.A.C. Cap. Advisors, L.P*, 311 F.R.D. 373, 382 (S.D.N.Y. 2015); *see also In re Signet,* 2019 WL 3001084, at *20 ("[W]hile Plaintiff ultimately will need to disaggregate confounding factors to prove economic loss, it need not do so at this juncture [class certification] to establish that common issues relating to damages predominate.").

Defendants' false and misleading statements and omissions and how damages will be calculated based on individual Class members' trading activity according to a common formula. *See id.*[9] This proposed common methodology tracks Lead Plaintiff's theory of liability, which means that individualized damages issues will not predominate, and supports certification of the proposed Class. *See Waggoner*, 875 F.3d at 106.

### 2.    A Class Action Is the Superior Means of Resolving This Dispute.

Rule 23(b)(3) identifies four factors for assessing whether a class action is superior to other methods of adjudication: (1) the interests of the class members in "individually controlling the prosecution or defense of separate actions"; (2) "the extent and nature of any litigation concerning the controversy already begun by or against class members"; (3) "the desirability or undesirability of concentrating the litigation of the claims in the particular forum"; and (4) the difficulties likely to be encountered in the management of a class action. Fed. R. Civ. P. 23(b)(3). "Securities suits easily" satisfy Rule 23(b)(3)'s second element—that a class action is superior to other methods for adjudicating the controversy—"because the alternatives are either no recourse for thousands of stockholders or a multiplicity and scattering of suits with the inefficient administration of litigation which follows in its wake." *MF Glob. Holdings*, 310 F.R.D. at 239.

The same logic applies here. With thousands of geographically dispersed class members whose individual damages likely are too small to make individual litigation economically worthwhile, it is unlikely that the proposed Class members have an interest in asserting separate claims. *See Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 187 (S.D.N.Y. 2008). Lead Plaintiff is not aware of any other

---

[9] As explained by Mr. Coffman, the Class is ascertainable based on objective documentation, including brokerage statements and transaction records. Coffman Report ¶ 80. It therefore satisfies the Second Circuit's "additional implied Rule 23 requirement that there be an identifiable class" with definite boundaries. *Zivkovic*, 329 F.R.D. at 76.

securities fraud litigation commenced by any Class member regarding the scheme alleged in this Action. "Concentrating litigation in this Court is desirable because the Court is familiar with the history of this case, having ruled on earlier motions . . . ." *Pub. Emps.' Ret. Sys. of Miss. v. Goldman Sachs Grp., Inc.*, 280 F.R.D. 130, 141 (S.D.N.Y. 2012). Moreover, "in the absence of class certification . . . many putative class members – particularly, retail investors – would also be discouraged from even seeking legal relief as their potential recovery would be outweighed by the transaction costs of individual litigation." *In re Livent*, 210 F.R.D. 512, 518 (S.D.N.Y. 2002). That is particularly true here, where Lead Plaintiff and Lead Counsel have already negotiated a settlement with PSG, obtained significant discovery, and resolved a motion to dismiss. *See In re MF Global*, 310 F.R.D. at 239 (finding superiority requirement met where lead plaintiff and lead counsel had settled with other defendants, engaged in "significant discovery," and won the motion to dismiss). Nor is there any reason to expect difficulties in the management of this case as a class action. *See In re Omnicom Grp., Inc. Sec. Litig.*, No. 02 CIV. 4483 (RCC), 2007 WL 1280640, at *8 (S.D.N.Y. Apr. 30, 2007) ("[I]n Rule-23(b)(3) securities fraud cases, this Circuit has expressed a strong preference in favor of using judicial management tools, rather than refusing to certify a class for management reasons."). Thus, the class action device is superior to any other means to adjudicate this Action.

> **D.      The Court Should Appoint Lead Plaintiff's Choice of Counsel as Class Counsel Under Rule 23(g).**

In addition to Cohen Milstein's satisfaction of Rule 23(a)(4)'s requirement that it will "fairly and adequately represent the interests of the class," the factors enumerated in Rule 23(g) weigh in favor of appointing it as class counsel. Those factors are: "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing

the class." Fed. R. Civ. P. 23(g)(1)(A).

Cohen Milstein is well qualified to represent the Class here. Cohen Milstein has extensive experience in class action litigation, including securities class actions, and through its efforts has achieved billions of dollars in recoveries for investors. *See* Exhibit B. Since the Court's appointment of Cohen Milstein as Lead Counsel on June 7, 2016, Cohen Milstein has investigated the claims at issue, obtained a settlement with PSG on behalf of the proposed Class in bankruptcy court, drafted a detailed complaint that coupled with its opposition briefing survived Defendants' motion to dismiss, and is now further pursuing those claims in discovery. Moreover, as demonstrated by its track record in other securities class actions, Lead Counsel has the resources to effectively pursue and vigorously prosecute those claims on behalf of the Class. The requirements of Rule 23(a)(4) and 23(g) are therefore satisfied, and Lead Plaintiff respectfully submits that its choice of counsel should be appointed Class Counsel.

## V.   CONCLUSION

For the foregoing reasons, Lead Plaintiff respectfully requests that the Court: (i) certify this action as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure; (ii) certify Lead Plaintiff as representative of the proposed Class; and (iii) appoint Lead Counsel as Class Counsel.

Dated: December 18, 2020

Respectfully submitted,

/s/ *Carol V. Gilden*

Carol V. Gilden
**COHEN MILSTEIN SELLERS
   & TOLL PLLC**
190 South LaSalle St.
Suite 1705
Chicago, IL 60603
Tel.: (312) 357-0370
Fax: (312) 357-0369

Steven J. Toll (*pro hac vice*)
S. Douglas Bunch (SB-3028)
Megan Kinsella Kistler (MK-1983)
Joshua C. Handelsman (*pro hac vice*)
**COHEN MILSTEIN SELLERS
   & TOLL PLLC**
1100 New York Ave. N.W., Fifth Floor
Washington, D.C. 20005
Tel.: (202) 408-3640
Fax: (202) 408-4699

*Attorneys for Lead Plaintiff Plumbers &
Pipefitters National Pension Fund and Lead
Counsel for the Class*

Louis P. Malone III
**O'DONOGUE & O'DONOGHUE LLP**
4748 Wisconsin Ave. N.W.
Washington, D.C. 20016
Tel.: (202) 362-0041
Fax: (202) 362-2640

*Additional Attorneys for the Plumbers &
Pipefitters National Pension Fund*