UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                  :

PLUMBERS & PIPEFITTERS NATIONAL   :
PENSION FUND, Individually and on Behalf of  :
All Others Similarly Situated,             :

                  Plaintiff,    :

     - against –              :

KEVIN DAVIS and AMIR ROSENTHAL,   :

                 Defendants.   :

------------------------------------------------------------x

|  |  |
|---|---|
| | No. 1:16-cv-3591-GHW |
| | **<u>ORAL ARGUMENT REQUESTED</u>** |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO
EXCLUDE CHAD COFFMAN'S OPINION REGARDING DAMAGES**

FRIEDMAN KAPLAN SEILER
  & ADELMAN LLP

7 Times Square
New York, NY 10036-6516

*Attorneys for Defendant Amir Rosenthal*

BAKER & HOSTETLER LLP

11601 Wilshire Boulevard | Suite 1400
Los Angeles, CA 90025-0508

*Attorneys for Defendant Kevin Davis*

3571034.1

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. ii

PRELIMINARY STATEMENT ........................................................................... 1

LEGAL STANDARD........................................................................................... 3

ARGUMENT ........................................................................................................ 6

I.     MR. COFFMAN'S OPINION IS IRRELEVANT, UNRELIABLE AND
UNHELPFUL, AND IT SHOULD BE EXCLUDED ...................................... 6

     A.     "Out-of-Pocket" Damages Is Not a "Methodology" Under *Comcast* ..................... 7

     B.     The Court Should Reject Mr. Coffman's Bare Assertion That There Is a
Class-Wide Methodology for Measuring Damages Consistent with the
Fund's Theory of Liability...................................................................... 10

     C.     Mr. Coffman's Opinion About Methodologies Used Elsewhere Is
Irrelevant and Unhelpful Because He Has Not Opined That Any of Those
Techniques Can Reliably Measure Damages in This Case ................................ 13

     D.     The Damages Techniques Referred to by Mr. Coffman Are Unsuited to
Measuring Out-of-Pocket Losses in This Case...................................................... 15

CONCLUSION.................................................................................................... 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acticon AG v. China N.E. Petrol. Holdings Ltd.*,
  692 F.3d 34 (2d Cir. 2012)...............................................................................................7

*Am. Honda Motor Co. v. Allen*,
  600 F.3d 813 (7th Cir. 2010) ...........................................................................................5

*In re Amla Litig.*,
  328 F.R.D. 127 (S.D.N.Y. 2018) ...................................................................................1, 6

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
  303 F.3d 256 (2d Cir. 2002)..............................................................................................4

*Astra Aktiebolag v. Andrx Pharm., Inc.*,
  222 F. Supp. 2d 423 (S.D.N.Y. 2002)...............................................................................5

*In re Blood Reagents Antitrust Litig.*,
  783 F.3d 183 (3d Cir. 2015)..............................................................................................5

*In re BP P.L.C. Sec. Litig.*,
  No. 10-MD-2185, 2013 WL 6388408 (S.D. Tex. Dec. 6, 2013)..........................................13

*Chen-Oster v. Goldman, Sachs & Co.*,
  114 F. Supp. 3d 110 (S.D.N.Y. 2015)................................................................................5

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013)..............................................................................................*passim*

*Daubert v. Merrell Dow Pharm., Inc.*,
  43 F.3d 1311 (9th Cir. 1995) ............................................................................................6

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993)............................................................................................*passim*

*Ebbert v. Nassau Cty.*,
  No. CV 05-5445 FB AKT, 2008 WL 4443238 (E.D.N.Y. Sept. 26, 2008)............................3

*Elcock v. Kmart Corp.*,
  233 F.3d 734 (3d Cir. 2000)..............................................................................................5

*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997)..........................................................................................................4

**Page(s)**

*In re: Gen. Motors LLC Ignition Switch Litig.*,
   No. 14-MD-2543 (JMF), 2016 WL 4077117 (S.D.N.Y. Aug. 1, 2016) ...................................3

*Estate of Jaquez v. Flores*,
   No. 10 CIV. 2881 (KBF), 2016 WL 1060841 (S.D.N.Y. Mar. 17, 2016) ...............................4

*Moody v. CSX Transp., Inc.*,
   271 F. Supp. 3d 410 (W.D.N.Y. 2017) ...............................................................................5

*Ohio Public Emps' Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
   No. 4:08CV0160, 2018 WL 3861840 (N.D. Ohio Aug. 14, 2018) ................................11, 12

*Scentsational Techs., LLC v. Pepsi, Inc.*,
   No. 13-CV-8645 (KBF), 2018 WL 1889763 (S.D.N.Y. Apr. 18, 2018) .................................4

*In re U.S. Foodserv. Inc. Pricing Litig.*,
   729 F.3d 108 (2d Cir. 2013) ..............................................................................................5

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) ..........................................................................................................5

*Ward v. Apple Inc.*,
   784 F. App'x 539 (9th Cir. 2019) ............................................................................2, 12, 14

*Weiner v. Snapple Beverage Corp.*,
   No. 07 CIV. 8742 DLC, 2010 WL 3119452 (S.D.N.Y. Aug. 5, 2010) ......................10, 12, 15

*Weisgram v. Marley Co.*,
   528 U.S. 440 (2000)...........................................................................................................3

**Statutes & Rules**

Fed. R. Evid. 702 ..................................................................................................... *passim*

**Other Authorities**

*Class Certification Strategy—Demonstrating Classwide Damages*, 11 Bus. &
   Com. Litig. Fed. Cts. § 112:74 (4th ed.) .............................................................................6

3571034.1

**Page(s)**

"Measure," MERRIAM-WEBSTER.COM DICTIONARY, https://www.merriam-webster.com/dictionary/measure (last visited Feb. 16, 2021)....................................................8

"Methodology," MERRIAM-WEBSTER.COM DICTIONARY, https://www.merriam-webster.com/dictionary/methodology (last visited Feb. 16, 2021)............................................8

*The Supreme Court Rules in Comcast Corporation v. Caroline Behrend: To Prove Common Questions of Law or Fact Under Rule 23(b)(3), Plaintiffs' Damages Models Must be Consistent with Liability Theories*, available at https://www.cohenmilstein.com/sites/default/files/media.1311.pdf (last visited Feb. 16, 2021) ........................................................................................................6

iv

Defendants Kevin Davis and Amir Rosenthal (together, "**Defendants**") respectfully submit this memorandum of law in support of their motion, pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), to exclude the opinion of Chad Coffman, Lead Plaintiff Plumbers & Pipefitters National Pension Fund's (the "**Fund**") proffered expert witness, that damages in this case can be measured under a common methodology consistent with the Fund's theory of liability.[1]

## PRELIMINARY STATEMENT

A plaintiff seeking class certification must demonstrate that class members' damages can be measured under a common methodology that includes *only* legally cognizable damages resulting from the class's asserted theory of liability, and not other losses. *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013). That showing is quintessentially the province of experts, *In re Amla Litig.*, 328 F.R.D. 127, 137 (S.D.N.Y. 2018), but the opinion offered by the Fund's expert, Mr. Coffman, utterly fails to satisfy the requirements of *Comcast*. The relevant portion of Mr. Coffman's opinion—the product of "probably a couple of hours" of work, Coffman Dep. at 52:16-20—consists of nothing more than five boilerplate paragraphs cut-and-pasted from earlier reports that Mr. Coffman submitted in factually and legally distinct cases. *See* Coffman Rep. ¶¶ 80-85.[2] Those five paragraphs are devoid of any facts, data, calculations,

---

[1] The report of Chad Coffman [ECF No. 204-1], the transcript of his deposition, and the Fund's memorandum of law in support of its motion for class certification [ECF No. 203] are referred to as the "**Coffman Rep.**," "**Coffman Dep.**," and "**Pl. Class Cert. Br.**," respectively. The Coffman Rep. and Coffman Dep. are attached to the accompanying Declaration of Elizabeth Bierut ("**Bierut Decl.**") as Exhibits A and B, respectively. Defendants' memorandum of law in opposition to the Fund's motion for class certification, and the supporting expert report of Professor Douglas Skinner (Bierut Decl. Ex. C), are referred to as the "**Class Cert. Opp.**" and "**Skinner Rep.**," respectively. This memorandum of law incorporates the factual background set forth in the Class Cert. Opp., which is not repeated here.

[2] Mr. Coffman offers two opinions. This motion seeks to exclude his opinion that damages in this case can be measured by a common methodology that is consistent with the Fund's theory of liability. *See* Coffman Rep. ¶¶ 80-85. His other opinion—that Performance Sports Group Ltd.'s ("**PSG**") common stock traded in an efficient market—is not at issue in this motion. *See id.* ¶¶ 14-79.

principles, methods, or analysis specific to *this case* and fail to describe a methodology for measuring class-wide damages arising from—and only from—the Fund's theory of liability.

Mr. Coffman opines that there is a "standard and well-accepted method for calculating class-wide damages in cases under Section 10(b) of the Exchange Act," and refers to this "method" as the "out of pocket method." *Id.* ¶ 80. But, at his deposition, Mr. Coffman conceded the obvious: "out of pocket" refers to a *measure* of damages that a plaintiff may seek, Coffman Dep. at 145:1-3. Critically, Mr. Coffman does not explain *how* he will conduct this measurement. Instead, he gestures vaguely to a grab bag of techniques that experts sometimes use in Section 10(b) cases to measure out-of-pocket damages, without committing to using any of those techniques here or explaining how he would use them. To the contrary, Mr. Coffman repeatedly volunteered that he has not been asked to opine on how (if at all) those techniques would work here. *Id.* at 143:8-144:22.

The Court need not address the suitability of these techniques—although even Mr. Coffman admitted that some of them might be unsuited to measuring out-of-pocket damages in the circumstances presented by this case, *see id.* at 220:16-224:8, 228:9-230:7, 238:17-239:18, 260:15-261:5, 266:7-22—because the law does not permit Mr. Coffman to "wait and see" whether he might be able to select a methodology at some later stage of the case. *See Ward v. Apple Inc.*, 784 F. App'x 539, 541 (9th Cir. 2019) (affirming denial of class certification where "[i]nstead of providing an imperfect model, [plaintiffs] have provided only a promise of a model to come"). Mr. Coffman must disclose a reliable methodology that fits the Fund's theory of liability *now*.

He has not done so. Denuded of its obfuscating, technical verbiage, Mr. Coffman's opinion is that he will be able to use the "out of pocket method" to measure "out of

pocket damages," all while refusing to explain how.[3]  This is as unilluminating as an arborist proposing to measure the height of a tree by using the "tree height method," without revealing which techniques the arborist intends to use or how the arborist would use them.  Mr. Coffman's invocation of the "out of pocket method" tells the Court nothing about *how* Mr. Coffman will solve the problem of measuring the artificial inflation (if any) in PSG's stock price on every day of the proposed class period, or even *if* the problem is solvable.  Having failed to offer any "methodology" within the meaning of *Daubert* and *Comcast*, Mr. Coffman's opinion that there is a class-wide methodology for measuring damages that counts only losses attributable to the Fund's theory of liability, and not other market losses, is based on nothing but his "say so." Such *ipse dixit* does not meet *Daubert*'s "exacting standards."  *Weisgram v. Marley Co.*, 528 U.S. 440, 455 (2000).  Mr. Coffman's naked, conclusory opinion on damages is so devoid of analysis that it is neither reliable nor helpful to the Court.  *Daubert* and Rule 702 require that it be excluded.  *See Daubert*, 509 U.S. at 590-91.

## LEGAL STANDARD

The Supreme Court in *Daubert* held that courts have a "gatekeeping responsibility" to determine whether an expert's testimony is both (1) reliable and (2) relevant (*i.e.*, that it "fits" the facts of the case).  509 U.S. at 580.[4]  Rule 702 and *Daubert* require the

---

[3]  Mr. Coffman should not be permitted to offer new opinions on reply.  *See Ebbert v. Nassau Cty.*, No. CV 05-5445 FB AKT, 2008 WL 4443238, at *13 (E.D.N.Y. Sept. 26, 2008) (excluding new opinions in expert rebuttal report).  If the Fund is permitted to submit any further opinions from Mr. Coffman, Defendants would seek the opportunity to re-depose him and respond with a sur-rebuttal report from Prof. Skinner.  *See In re: Gen. Motors LLC Ignition Switch Litig.*, No. 14-MD-2543 (JMF), 2016 WL 4077117, at *5 n.6 (S.D.N.Y. Aug. 1, 2016).

[4]  Under Rule 702, expert testimony offered by a qualified expert is admissible only if:

    (a)    The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

    (b)    The testimony is based on sufficient facts or data;

Court to "undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002).

"Reliability" requires that an expert's opinions be based on "more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590. "[F]or the Court to evaluate the reliability of the data and methodology and the grounding of the expert's opinion therein, that data and methodology must be disclosed." *Estate of Jaquez v. Flores*, No. 10 CIV. 2881 (KBF), 2016 WL 1060841, at *13 (S.D.N.Y. Mar. 17, 2016). "[C]onclusory opinions—often referred to as *ipse dixit* . . . fail to provide a methodology that would allow a court to assess reliability." *Scentsational Techs., LLC v. Pepsi, Inc.*, No. 13-CV-8645 (KBF), 2018 WL 1889763, at *3 (S.D.N.Y. Apr. 18, 2018) (citing *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008)); *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."). When an expert's purported "methodology" is "simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate [] exclusion[.]" *Amorgianos*, 303 F.3d at 266.

"Relevance" requires that an expert's opinion is "sufficiently tied to the facts of the case." *Daubert*, 509 U.S. at 591. "Where an expert opinion is based upon assumptions that are not present in the case, the opinion 'cannot be said to assist the trier of fact as Rule 702

---

(c)     The testimony is the product of reliable principles or methods; and

(d)     The expert has reliably applied the principles and methods to the facts of the case.
FED. R. EVID. 702.

requires.'"  *Moody v. CSX Transp., Inc.*, 271 F. Supp. 3d 410, 418 (W.D.N.Y. 2017) (quoting

*Elcock v. Kmart Corp*., 233 F.3d 734, 756 n.13 (3d Cir. 2000)); *Astra Aktiebolag v. Andrx*

*Pharm., Inc.*, 222 F. Supp. 2d 423, 488 (S.D.N.Y. 2002) ("[E]xpert[] testimony will . . . fail to

meet the 'fit' requirement . . . if the data relied upon by the expert is materially different from the

data relevant to the facts of the case.").

　　　　　　　　Where a class certification motion relies on expert testimony, *Daubert* governs

the admissibility of that testimony.  *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 354

(2011) ("The District Court concluded that *Daubert* did not apply to expert testimony at the

certification stage of class-action proceedings.  We doubt that is so . . . ."); *In re U.S. Foodserv.*

*Inc. Pricing Litig.*, 729 F.3d 108, 129 (2d Cir. 2013) (explaining that "a *Daubert* analysis may be

required at least in some circumstances" at the class certification stage).[5]  Indeed, an evidentiary

standard more relaxed than *Daubert* would fall short of the "rigorous analysis" required by Rule

23.  *See Chen-Oster v. Goldman, Sachs & Co.*, 114 F. Supp. 3d 110, 114-15 (S.D.N.Y. 2015);

*see also Comcast*, 569 U.S. at 35 (requiring a "rigorous analysis" to determine whether a

plaintiff's damages model is "consistent with its liability case") (internal citations omitted).

Under *Daubert*, the proponent of evidence—including expert evidence—must prove its

admissibility by a "preponderance of the proof."  509 U.S. at 592 n.10.  The Fund has not met

this burden.

---

[5]  *See also Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 816 (7th Cir. 2010) ("[T]he district court must perform a full *Daubert* analysis before certifying the class if the situation warrants."); *In re Blood Reagents Antitrust Litig.*, 783 F.3d 183, 187 (3d Cir. 2015) ("Expert testimony that is insufficiently reliable to satisfy the *Daubert* standard cannot 'prove' that the Rule 23(a) prerequisites have been met 'in fact,' nor can it establish 'through evidentiary proof' that Rule 23(b) is satisfied.").

## ARGUMENT

## I.

## MR. COFFMAN'S OPINION IS IRRELEVANT, UNRELIABLE AND UNHELPFUL, AND IT SHOULD BE EXCLUDED

An expert's opinion may be "helpful" to the trier of fact only if "it logically advances a material aspect of the proposing party's case." *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1315 (9th Cir. 1995) (on remand from *Daubert*, 509 U.S. 579).  Here, the Fund relies on Mr. Coffman to show, as *Comcast* and Rule 23(b) require, that class members' damages can be measured under a common methodology that is consistent with the Fund's theory of liability.  Pl. Class Cert. Br. at 22-23.  The Fund admits that it must "propose a methodology for calculating damages that corresponds to its theory of liability." *Id.* (quoting *In re Signet Jewelers Ltd. Sec. Litig.*, No. 16 Civ. 6728, 2019 WL 3001084, at *20 (S.D.N.Y. July 10, 2019)).[6]  This, in turn, requires expert testimony.  *In re Amla*, 328 F.R.D. at 137 ("[Expert] report and testimony is crucially important.  *Without it, there would be no evidence of record supporting classwide damages and the class action might have to be discontinued*.") (emphasis added); *see also Class Certification Strategy—Demonstrating Classwide Damages*, 11 BUS. & COM. LITIG. FED. CTS. § 112:74 (4th ed.) ("The importance of expert testimony concerning classwide damages has become increasingly apparent in the wake of . . . *Comcast*.").

Mr. Coffman has not proposed a methodology for calculating damages that corresponds to the Fund's theory of liability, or any methodology at all.  His bare opinion that

---

[6] Attorneys from the Fund's proposed lead counsel, Cohen Milstein Sellers & Toll PLLC, have explained that *Comcast* demands "that liability must give rise to a model that measures injury – a model seeking to measure the injury from defendants' misconduct cannot be presented without corresponding to plaintiffs' theory of the case."  *The Supreme Court Rules in* Comcast Corporation v. Caroline Behrend: *To Prove Common Questions of Law or Fact Under Rule 23(b)(3), Plaintiffs' Damages Models Must be Consistent with Liability Theories*, available at https://www.cohenmilstein.com/sites/default/files/media.1311.pdf (last visited Feb. 16, 2021).

such a methodology exists is neither reliable, relevant, nor helpful to the Court, and it therefore

falls short of the "rigorous analysis" required by *Daubert* and Rule 702 and should be excluded.

A. **"Out-of-Pocket" Damages Is Not a "Methodology" Under *Comcast***

Mr. Coffman insists that what he refers to as the "out-of-pocket method" is a

methodology:

> There is a standard and well-accepted method for calculating class-
> wide damages in cases under Section 10(b)[.]  This method,
> typically referred to as the "out-of-pocket" method, states that
> damages are equal to the artificial inflation in the share price at the
> time of purchase minus the artificial inflation per share at the time
> of sale[.]

Coffman Rep. ¶ 80; Coffman Dep. at 62:17-63:9, 141:18-143:9.  But this is not a

"methodology."  It is a restatement, in equation form (*i.e.*, artificial inflation at time of purchase

*less* artificial inflation at time of sale) of the "traditional . . . *measure*" of damages sought by

plaintiffs in Section 10(b) cases.  *Acticon AG v. China N.E. Petrol. Holdings Ltd.*, 692 F.3d 34,

38 (2d Cir. 2012) (emphasis added); *see also* Ninth Circuit Pattern Civil Jury Instructions § 18.7

(2007) (describing out-of-pocket losses as a "measure" equal to the "difference between the

value of what the plaintiff gave up and the value of what the plaintiff received").

Mr. Coffman's "model," *see* Coffman Dep. at 80:11-81:8, merely restates the

thing the Fund needs to measure, the artificial inflation in PSG's stock price (*i.e.*, the variables in

his equation) throughout the proposed class period, without shedding light on how he would do

the measurement.  *Id.* at 143:10-18.  As a matter of plain English and basic logic, a

"methodology" and a "measure" are not the same thing.  Indeed, Mr. Coffman conceded that a

methodology is the "particular procedure or set of procedures" used to solve a problem, while the

7

measure is the "amount of something ascertained by measuring."[7]  Mr. Coffman's opinion that

he will use the "out-of-pocket" methodology to measure "out-of-pocket" damages is akin to

saying that he would use the "find the area under a curved line methodology" (as opposed to,

*e.g.*, integral calculus) to measure the area under a curved line or the "heartrate methodology" (as

opposed to, *e.g.*, arterial palpation and a stopwatch) to measure someone's heartrate.  *See*

Coffman Dep. at 126:16-129:21.  It tells the Court nothing at all.

> Mr. Coffman's restatement of the problem to be solved (the measure of "out of

pocket damages") as his methodology for solving the problem (the "out of pocket method") also

offends the Supreme Court's holdings in *Daubert* and *Comcast* (neither of which Mr. Coffman

cites in his report).  *See* Coffman Dep. at 145:16-23; Coffman Rep. at App. A.  In *Comcast*, the

Court held that a class was wrongly certified under Rule 23(b)(3) because the plaintiff's expert's

"*methodology*" for measuring damages failed to "establish[] that damages are capable of

measurement on a classwide basis."  569 U.S. at 34 (emphasis added).  The expert in *Comcast*

had done far more than Mr. Coffman:  he had developed an econometric model comparing actual

prices to hypothetical prices that would have existed absent the antitrust violations alleged in that

case to "calculate[] damages resulting from 'the alleged anticompetitive conduct'" at issue.  *Id.* at

36.  The Supreme Court nevertheless deemed the expert's *methodology* deficient because it could

not be used to isolate the damages associated with any one of the plaintiff's multiple theories of

---

[7]  Coffman Dep. at 128:19-130:22 (accepting definitions of "Methodology," MERRIAM-WEBSTER.COM DICTIONARY, https://www.merriam-webster.com/dictionary/methodology (last visited Feb. 16, 2021) ("a body of methods, rules, and postulates employed by a discipline:  a particular procedure or set of procedures"); and "Measure," MERRIAM-WEBSTER.COM DICTIONARY, https://www.merriam-webster.com/dictionary/measure (last visited Feb. 16, 2021) ("amount of something ascertained by measuring")).

Prior decisions where courts have used the phrase "out-of-pocket methodology" are inapposite because the distinction between "methodology" and "measure" were not at issue in those cases.  *See* Class Cert. Opp. at Pt. II.A.1.

antitrust liability, and thus could not exclude losses caused by non-actionable conduct.  On this basis, the Supreme Court held that the plaintiff could not satisfy Rule 23(b)(3) "*[w]ithout presenting another methodology*."  *Id.* at 34 (emphasis added).  This holding would be rendered meaningless if, as Mr. Coffman suggests, a plaintiff could meet its burden by simply asserting that its methodology for measuring class-wide damages is to measure the class's legally compensable damages.[8]  The plaintiff's expert in *Comcast* did that (and much more) when he developed a model to calculate damages caused by the defendants' "alleged anticompetitive conduct," but the Supreme Court still deemed this insufficient.

The Supreme Court's use of the term "methodology" in *Comcast* was neither accidental nor inexact.  *Daubert* refers repeatedly to an expert's "methodology" as a rigorous, scientific endeavor that can be tested and found to be scientifically valid (and thus reliable) or not.[9]  Against this backdrop, there is no basis for Mr. Coffman's characterization of the "out of pocket method" as a "methodology."

Finally, Mr. Coffman admits that his characterization of the "out of pocket method" as a methodology is not based on his education, *see* Coffman Dep. at 15:18-16:11; professional training, *id.*; any peer-reviewed literature, *id.* at 78:6-17; judicial authorities, *id.* at

---

[8]  Mr. Coffman admitted that what he refers to as the "out of pocket method" is applicable to "virtually every [Section 10(b)] case [he's] come across."  Coffman Dep. at 69:9-17.  If a securities plaintiff can satisfy *Comcast* merely by stating that its methodology for measuring out-of-pocket losses—the damages measure in virtually every Section 10(b) case—is the out-of-pocket method, then *Comcast* would have no practical application in such cases.

[9]  In *Daubert*, the Supreme Court cited numerous scientific journals, textbooks, and related authorities to explain what a "methodology" entails.  *See Daubert*, 509 U.S. at 593 (citing E. Green & C. Nesson, PROBLEMS, CASES, AND MATERIALS ON EVIDENCE 649, 645 (1983) (explaining that "[s]cientific methodology today is based on generating hypotheses and testing them to see if they can be falsified"); C. Hempel, PHILOSOPHY OF NATURAL SCIENCE 49 (1966) ("[T]he statements constituting a scientific explanation must be capable of empirical test."); K. Popper, CONJECTURES AND REFUTATIONS: THE GROWTH OF SCIENTIFIC KNOWLEDGE 37 (5th ed. 1989) (explaining that the status of a scientific theory depends on its ability to be falsified, refuted, or tested)).

9

61:5-63:25; or any authorities at all, Coffman Rep. ¶¶ 80-85 (citing no authorities in support of opinion that the "out of pocket method" is a "methodology"). He acknowledges that he gave *de minimis* attention to the damages portion of his opinion in this case, Coffman Dep. at 56:13-15 ("maybe a couple of hours"), and leans into the fact that he recycled that discussion from the same boilerplate submission that he now makes as a matter of routine, *id.* at 70:23-71:8 ("this methodology can be used on a class-wide basis . . . in virtually every case of this type"). This is exactly the sort of foundation-less testimony that *Daubert* and Rule 702 forbid:

> If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply "taking the expert's word for it."

Rule 702 (Committee Notes on 2000 Amendment) (quoting *Daubert*, 43 F.3d at 1319).

### B.    The Court Should Reject Mr. Coffman's Bare Assertion That There Is a Class-Wide Methodology for Measuring Damages Consistent with the Fund's Theory of Liability

Mr. Coffman's opinion is fundamentally defective because he fails to identify a methodology that could be used to measure class-wide damages in this case in a manner consistent with the Fund's theory of liability and instead tries to satisfy this burden with conclusory assurances.

*Weiner v. Snapple Beverage Corp.* is instructive. No. 07 CIV. 8742 DLC, 2010 WL 3119452, at *7 (S.D.N.Y. Aug. 5, 2010). There, the plaintiffs alleged that Snapple had misleadingly labeled its beverages as "All Natural" because the beverages included high fructose corn syrup. *Id.* at *1. On class certification, the plaintiffs' expert submitted a "bare-bones" report that proposed two generic "approaches" for calculating the supposed price premium resulting from the labeling. *Id.* at *6. The court ruled that the expert had failed to "demonstrate

10

. . . how his proposed 'approaches' would be used to develop an empirical algorithm to determine, on a class-wide basis, whether there was a price premium . . . and, if so, how such a premium could be quantified." *Id.* at *7. The court thus ruled that the expert's *ipse dixit* opinions were unreliable "[g]iven the paucity of detail" in his report. *Id*. at *8.

The decision in *Ohio Public Employees' Retirement System v. Federal Home Loan Mortgage Corp.* applies these same principles in a Section 10(b) case. No. 4:08CV0160, 2018 WL 3861840, at *19-20 (N.D. Ohio Aug. 14, 2018) ("***Freddie Mac***"). There, the court ruled that the plaintiff's expert's report regarding the methodology that would be used to measure class-wide damages was so "vague, indefinite, and unspecific" that the "model amount[ed] to 'no damages model at all,'" and denied class certification. *Id.* (internal citations omitted).

Mr. Coffman's testimony is materially indistinguishable from the opinion that the court found unhelpful and insufficient in *Freddie Mac* (and is far more skeletal than the opinion excluded in *Snapple*). Like the experts in those cases, Mr. Coffman has refused, or is unable, to commit to the use of any particular methodology to calculate class-wide damages. In fact, Mr. Coffman has gone out of his way to make clear that he has assumed no responsibility for identifying procedures that would be used in this case: "I do discuss in my report some of the steps along the way that would be necessary to do that quantification [of damages], *but I don't provide [] very specific detail on exactly how one would do it*." Coffman Dep. at 140:13-141:2 (emphasis added); *see also id.* at 144:20-25 ("my report does not define the precise techniques by which you would actually measure the artificial inflation"), 145:9-15 ("I mean my report does take a couple of steps down the path of describing the types of analyses that are generally

employed, but you are right, my report does not specify the specifics or all the different

procedures that would be necessary to compute artificial inflation for this case.").

Like the experts in *Freddie Mac* and *Snapple*, Mr. Coffman's vague, indefinite,

and unspecific discussion of various generic techniques falls short of explaining whether, and

how, any proposed methodology could account for the specific circumstances *of this case*. *See*

*Freddie Mac*, 2018 WL 3861840, at *19; *Snapple*, 2010 WL 3119452, at *8. His opinion that

some (unspecified) methodology can be used to measure class-wide damages rests not on facts,

data, methods, or principles applied to this case, but rather on nothing but his "say so." *See*

*Ward*, 784 F. App'x at 541 ("The plaintiffs here have done even less than the *Comcast* plaintiffs:

Instead of providing an imperfect model, they have provided only a promise of a model to

come.").

Finally, the Fund cannot rescue Mr. Coffman's deficient opinion by arguing, as he

did at his deposition, that he was under no obligation to identify a methodology to measure

artificial inflation at this stage of the case. *See* Coffman Dep. at 146:15-147:17.[10] Mr. Coffman

*admitted* that determining the amount of artificial inflation (if any) in the price of PSG stock at

the time of investors' purchases is a "necessary element" of calculating out-of-pocket damages,

*id.* at 137:8-17, yet he has not explained how he would do this. While the actual calculation need

---

[10] Mr. Coffman conceded that his basis for this view is his "understanding of how courts have ruled in cases I have been involved in." Coffman Dep. at 143:19-144:10. But he also admitted that he is "not a lawyer," and said that he was "not going to try . . . to say what's appropriate or not appropriate" to address at class certification. *Id.* As shown above, Mr. Coffman's understanding of the showing required at class certification, and his assertion that the identification of a suitable damages methodology is a "loss causation," not class certification, question are both wrong as a matter of law. *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 408 (2d Cir. 2015) ("[D]amages questions should be considered at the certification stage when weighing predominance issues[.]"); *Ward*, 784 F. App'x at 541 (9th Cir. 2019) (affirming denial of class certification where "Plaintiffs' expert did not provide a workable method for classwide determination of the impact of the alleged antitrust violation" and instead promised to develop a model "at some point in the future").

not be performed at class certification, Mr. Coffman nonetheless must show that there is a

reliable methodology—tailored to the facts and circumstances of this case, and fitted to the

Fund's theory of liability—that the Fund can use to perform that measurement at the merits

phase.

### C.   Mr. Coffman's Opinion About Methodologies Used Elsewhere Is Irrelevant and Unhelpful Because He Has Not Opined That Any of Those Techniques Can Reliably Measure Damages in This Case

Mr. Coffman recites a laundry list of techniques that have been used to calculate

class members' damages in some Section 10(b) cases, Coffman Rep. ¶¶ 83-84, but his opinion is

irrelevant and unhelpful to the Court because he refuses to opine that he would use any of those

techniques here, let alone explain how.  The use of a given technique in other Section 10(b) cases

involving different facts or theories of liability does not resolve the essential question here:

whether damages (if any) suffered by members of the proposed class can be measured by a

common methodology that is consistent with the Fund's theory of liability in this case.  Because

Mr. Coffman's opinion is devoid of any case-specific analysis and fails to apply any "principles

and methods *to the facts of the case*," it should be excluded.  Rule 702(d) (emphasis added).

In assessing whether a plaintiff has met its burden under *Comcast*, courts have

held that simply gesturing to various techniques without case-specific analysis is not helpful to

the trier of fact.  For example, in *In re BP P.L.C. Securities Litigation*, the court found that an

"event study methodology" proffered by Mr. Coffman was insufficient under *Comcast* because it

failed to match the plaintiffs' theory of liability:

> Simply invoking the event study methodology may have . . .
> satisfie[d] the first half of *Comcast*'s test: that damages be
> measurable on a class-wide basis.  But it does not satisfy the
> second half of that test.  It does not assuage the Court that the
> class-wide damages methodology proposed will track Plaintiffs'

13

> theories of liability, as the Supreme Court expressly required in
> *Comcast* before a class may be certified.

No. 10-MD-2185, 2013 WL 6388408, at *17 (S.D. Tex. Dec. 6, 2013) (citing *Comcast*, 569 U.S.

at 35); *see also Ward*, 784 F. App'x at 540 ("[T]he court was 'unable to fulfill its obligation'

because plaintiffs gave the court little to analyze.  Plaintiffs' expert did not provide a workable

method for classwide determination of the impact of the alleged antitrust violation.  Instead, he

merely asserted that he would be able to develop a model at some point in the future.  *Comcast*

demonstrates why that is not enough.").  Thus, even if Mr. Coffman had selected a technique to

use here (he has not, *supra* Pt. I.B), it would have to "fit" the Fund's theory of liability and

"measure only those damages attributable to that theory."  *Comcast*, 569 U.S. at 35 ("If the

model does not even attempt to do that, it cannot possibly establish . . . [classwide] damages.").

Mr. Coffman's failure to identify a damages methodology that "fits" the Fund's

theory of liability is evident from the fact that his recitation of various generic tools that might be

used in Section 10(b) cases is cut-and-pasted from reports that he has offered in other Section

10(b) cases.  Coffman Rep. ¶¶ 83-84; Bierut Decl. Ex. D.  Mr. Coffman admitted to using this

boilerplate in many reports (and even pointed out that he does not mention the relevant

company's name in the damages section of his report, *see* Coffman Dep. at 164:12-24), and that

he has used this boilerplate in cases in which plaintiffs have presented fundamentally different

theories of liability than the Fund has advanced here.  *Id.* at 157:23-161:16 (admitting that he has

used the same language in reports submitted in cases involving different facts and theories of

liability, including cases that did not involve allegations about the materialization of concealed

risks, which Mr. Coffman conceded is "an important element" of the Fund's theory of liability

here, *id.* at 52:24-53:18).

14

Mr. Coffman's one-size-fits-all damages "analysis" is divorced from the Fund's

theory of liability.  As the court explained in *Snapple*:

> While plaintiffs assert that [the expert] has proposed a "suitable
> methodology," in reality, [the expert] has done nothing more than
> identify two possible approaches and assert that they will work in
> this case.  Plaintiffs essentially ask that [the expert] be taken at his
> word. . . .  [H]e has not performed any empirical analysis or
> identified any relevant data, he does not yet know whether his
> methodology will, in fact, be workable in this case.

*Snapple*, 2010 WL 3119452, at *9.  Accordingly, the Court should reject Mr. Coffman's

damages opinion as deficient under *Daubert* and Rule 702.

### D.    The Damages Techniques Referred to by Mr. Coffman Are Unsuited to Measuring Out-of-Pocket Losses in This Case

Mr. Coffman's refusal to opine that any of the generic techniques listed in his

report will be used to measure class-wide damages in this case was not just a matter of oversight.

As demonstrated by Prof. Skinner, those techniques are ill-suited to measuring damages

attributable to the Fund's theory of liability (without sweeping in market losses that are not

compensable as out-of-pocket losses).  Skinner Rep. ¶ 65 & n.83, 106.  Mr. Coffman thus cannot

rely on these techniques to flesh out his bare-bones opinion.

The Fund's theory is that Defendants concealed known risks about PSG's sales

practices and internal controls, and that PSG's stock price dropped when those "risks

materialized."  *See* TAC ¶ 125; Coffman Dep. at 50:5-18, 52:5-18, 52:24-53:18; Skinner Rep. ¶

16.  The inherent premise of this theory is that the information that PSG allegedly should have

revealed in a counterfactual, "but-for" disclosure (*e.g.*, that its sales practices created the *risk* of

customer bankruptcies) was different than what was actually revealed to the market when the

risks materialized (*e.g.*, that the customers had filed for bankruptcy).  Skinner Rep. ¶ 50.  As

Prof. Skinner explains, this fundamental characteristic of the Fund's theory of liability makes

15

two of the tools that Mr. Coffman identifies—event studies and constant dollar or percentage

inflation (also referred to as "backcasting," which assumes that the stock's price was inflated by

the same amount throughout the class period)—unsuitable to the "task at hand," *Daubert*, 509

U.S. at 597, and likely to systematically overstate class members' damages.  Skinner Rep. ¶¶ 65,

107.

> At most, event studies can be used to determine the price impact of PSG's actual
>
> disclosure of developments that reflected the materialization of previously concealed risks.  But
>
> that price impact is *not* a measure of the amount by which PSG's stock price was artificially
>
> inflated by its alleged concealment of risks when investors purchased PSG stock, and Mr.
>
> Coffman concedes that measuring the amount of artificial price inflation on these earlier dates is
>
> essential to measuring "out-of-pocket" damages.  Coffman Dep. at 181:11-183:7.[11]  He also
>
> admits that using backcasting—*i.e.*, using the price impact of a corrective disclosure, as
>
> determined by an event study, as the measure of inflation on every day of the Class Period—may
>
> overstate out-of-pocket losses:  "the price decline on the ultimate corrective disclosure might not
>
> be the best measure without some kind of adjustment as to how the price would have declined at
>
> some earlier point *and you would need some method to address that concern* . . . ."  Coffman
>
> Dep. at 182:15-23 (emphasis added).  Mr. Coffman conceded that this concern is particularly
>
> acute when there is not a fact-for-fact correspondence between the information conveyed by a

---

[11]  Prof. Skinner provides the example of an oil company that tells the market that it has discovered an oil field, only for the field to turn out dry.  *See* Skinner Rep. ¶¶ 54-62.  As Prof. Skinner explains, using the full decline in value of the oil company on the date that it announced the field was dry would "substantially overstate[] inflation attributable to the alleged undisclosed risk" of that potential outcome, when the odds that the field would be dry were less than 100%.  *Id.* ¶ 62; *see also* Class Cert. Opp. at Pt. II.A.2.b.

corrective disclosure and the information allegedly concealed from the market.  *Id.* at 206:22-209:23.

Such a mismatch is intrinsic to the Fund's theory of liability, which alleges that PSG fraudulently concealed risks (uncertainties) that later materialized (after becoming certainties).  The hypothetical disclosure that PSG's sales practices were placing retail customers in financial distress (an example of an allegedly concealed risk) is distinct from, and would have a lesser price impact than, the disclosure that the customer filed for bankruptcy.  Skinner Rep. ¶¶ 64, 77.  Mr. Coffman also acknowledged that the price impact of a corrective disclosure could not, without further analysis (the nature of which he declined to describe), be used to measure the artificial inflation in a stock's price on the dates investors purchased the stock if the company's business or market conditions changed between the purchase date and corrective disclosure date.  Coffman Dep. at 212:3-213:16.  Here, both PSG's business and its market changed.  For example, PSG became increasingly leveraged and the market for baseball and hockey goods deteriorated over the course of the proposed Class Period.  Skinner Rep. ¶¶ 94-96.  Mr. Coffman admitted that, in such circumstances, relying on the price impact of a corrective disclosure of a materialized risk to measure the amount by which PSG's stock was artificially inflated by its earlier alleged concealment of that risk could overcompensate investors for their out-of-pocket losses.  Coffman Dep. at 277:4-279:24.

In addition to demonstrating the fatal shortcomings of the event study and backcasting techniques, Prof. Skinner also demonstrates myriad other reasons why the damages "techniques" referred to by Mr. Coffman, including the  "valuation techniques" he mentions in

17

passing,[12] could not be used to reliably measure class-wide damages in this case, *see* Skinner Rep. ¶¶ 73-84.  For example, such techniques are likely to require detailed, contemporaneous projections of PSG's earnings that even Mr. Coffman acknowledged might not exist, Coffman Dep. at 236:4-6, 251:21-252:21.  Further, none of Mr. Coffman's proposed techniques provides a mechanism that can accommodate alternative liability findings with respect to the Fund's different categories of alleged misrepresentations (relating to sales practices and internal controls), Skinner Rep. ¶ 109.

For these reasons, even if Mr. Coffman had opined that one or more of these tools would be used in this case and described how he would use these tools—opinions he repeatedly declined to offer, Coffman Dep. at 195:5-19, 219:4-12, 262:6-18, 285:22-286:9—such an opinion could not survive the "rigorous scrutiny" that *Daubert* and Rule 702 require.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court exclude Mr. Coffman's opinion that damages in this case can be measured under a common methodology that is consistent with the Fund's theory of liability.

[SIGNATURES ON FOLLOWING PAGE]

---

[12] *See* Coffman Rep. ¶ 84 ("Examples of such techniques include, but are not limited to, fundamental valuation analysis such as discounted cash flow methods, valuation multiple methods (i.e., price to earnings multiples, price to EBITDA multiples, price to revenue multiples, etc.), use of academic studies regarding the value of certain types of information, and other available valuations whether from securities analysts or made available through discovery.").

18

Dated:   New York, New York
       February 19, 2021

FRIEDMAN KAPLAN SEILER &
  ADELMAN LLP

_s/ Edward A. Friedman_
Edward A. Friedman
Jason C. Rubinstein
Timothy M. Haggerty
Elizabeth Bierut
Walter A. Ciacci
7 Times Square
New York, New York 10036-6516
Tel.  (212) 833-1100
Fax  (212) 833-1250
efriedman@fklaw.com
jrubinstein@fklaw.com
thaggerty@fklaw.com
ebierut@fklaw.com
wciacci@fklaw.com

_Attorneys for Defendant Amir Rosenthal_

BAKER & HOSTETLER LLP

_s/ David. L. Aronoff_
David L. Aronoff
Scott J. Fishwick
11601 Wilshire Boulevard
Suite 1400
Los Angeles, CA 90025
Tel.  (310) 820-8800
Fax  (310) 820-8859
daronoff@bakerlaw.com
sfishwick@bakerlaw.com

Bari R. Nadworny
45 Rockefeller Plaza
New York, NY 10111
Tel.  (212) 589-4200
Fax.  (212) 589-4201
bnadworny@bakerlaw.com

_Attorneys for Defendant Kevin Davis_

19

3571034.1