UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
:
PLUMBERS & PIPEFITTERS NATIONAL :
PENSION FUND, individually and on behalf of :
all others similar situated, :
:
                        Plaintiff, :
:      Case No. 1:16-cv-03591-GHW
        - against - :
:
KEVIN DAVIS and AMIR ROSENTHAL, :
:
                        Defendants. :
:
------------------------------------------------------------x

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT
OF MOTION FOR ISSUANCE OF LETTER OF REQUEST
TO SUBPOENA FOREIGN NONPARTIES
W. GRAEME ROUSTAN AND GRANT THORNTON LLP**

3543705.9

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................................... ii

PRELIMINARY STATEMENT ..............................................................................................2

RELEVANT FACTUAL BACKGROUND..............................................................................4

      A.      The Fund's Allegations Rely on Information Purportedly Provided by Roustan ...................................................................................................................4

      B.      Factual Background Regarding Roustan, His Engagement of Grant Thornton, and His Allegations as Incorporated in the TAC ...................................5

ARGUMENT .............................................................................................................................9

      A.      Legal Standard ...........................................................................................9

      B.      Roustan and Grant Thornton Possess Evidence That Is Directly Relevant to This Litigation.............................................................................................11

      C.      The Discovery Sought from Roustan and Grant Thornton Is Not Available from Any Other Sources or Means ........................................................13

CONCLUSION.........................................................................................................................16

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Blagman v. Apple, Inc.*,
  No. 12 CIV. 5453 ALC JCF, 2014 WL 1285496 (S.D.N.Y. Mar. 31, 2014) ...................... 3, 10

*In re Bristol-Myers Squibb Sec. Litig.*,
  312 F. Supp. 2d 549 (S.D.N.Y. 2004) ................................................................................ 12

*Elliott Assocs. v. Republic of Peru*,
  No. 96 CIV. 7916 (RWS), 1997 WL 436493 (S.D.N.Y. Aug. 1, 1997) .................................. 11

*Re Friction Division Products, Inc v EI Du Pont de Nemours & Co Inc.*
  (1986), 56 OR (2d) 722 (Ont HC) ..................................................................................... 13

*Goldberg v. Dufour*,
  No. 16-21301, 2020 WL 373206 (D. Vt. Jan. 23, 2020) ..................................................... 9, 10

*Lantheus Med. Imaging, Inc. v. Zurich Am. Ins. Co.*,
  841 F. Supp. 2d 769 (S.D.N.Y. 2012) ................................................................................ 10

*In re Marsh & McLennan Companies, Inc. Sec. Litig.*,
  No. 04 CV. 8144, 2008 WL 2941215 (S.D.N.Y. July 30, 2008) .............................................. 11

*Netherby Ltd. v. Jones Apparel Grp., Inc.*,
  No. 04 CIV. 7028 (GEL), 2005 WL 1214345 (S.D.N.Y. May 18, 2005) .......................... 10, 11

*Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Tr. Fund v.
  Arbitron, Inc.*,
  278 F.R.D. 335 (S.D.N.Y. 2011) ....................................................................................... 11

*Villella v. Chem. & Mining Co. of Chile Inc.*,
  No. 15 CIV. 2106 (ER), 2019 WL 171987 (S.D.N.Y. Jan. 11, 2019) ................................ 9, 10

**Statutes, Rules, and Regulations**

22 C.F.R. § 92.54 ...................................................................................................................... 9

28 U.S.C. § 1781 .................................................................................................................. 1, 9

Canada Evidence Act, R.S.C. 1985, c. C–5, § 46(1) ............................................................... 10

FED. R. CIV. P. 9(b) .................................................................................................................. 1

FED. R. CIV. P. 12(b)(6) ........................................................................................................... 1

|  | **Page(s)** |
|---|---|
| FED. R. CIV. P. 26 | 3, 10, 11 |
| FED. R. CIV. P. 28 | 9 |
| FED. R. CIV. P. 37(a)(1) | 2 |

Defendants Kevin Davis ("**Davis**") and Amir Rosenthal ("**Rosenthal**," and together with Davis, "**Defendants**") respectfully submit this memorandum of law in support of their motion, pursuant to FED. R. CIV. P. 28(b) and 28 U.S.C. § 1781(b)(2), requesting that this Court issue letters of request for assistance from the Superior Court of Justice (Ontario, Canada) to aid in securing discovery from W. Graeme Roustan ("**Roustan**") and Grant Thornton LLP ("**Grant Thornton**"), nonparties that possess information that is relevant to the claims and defenses at issue in this action. The proposed letters of request seeking discovery from Roustan and Grant Thornton are attached hereto as Exhibits A and B, respectively.[1]

The discovery sought through the proposed letters of request consists of (a) the production of certain relevant documents in the possession, custody, or control of Roustan and Grant Thornton, and (b) oral testimony from Roustan regarding matters relevant to this action.[2]

Defendants move the Court for the issuance of letters of request because discovery from Roustan and Grant Thornton cannot be obtained within the territorial jurisdiction of the United States. Defendants understand that Roustan is a dual U.S.-Canada citizen, and believe he is currently located in Ontario, Canada. Defendants understand that Grant Thornton is

---

[1] Defendants previously moved for the issuance of a letter of request seeking assistance in securing discovery from Roustan. *See* ECF No. 205. Defendants withdrew that motion to address, through a renewed motion, certain issues raised by the Court during a January 19, 2021 conference. *See* ECF No. 211. While Defendants were modifying the motion to address those issues, they became aware for the first time that discovery from Grant Thornton could not be obtained in the United States and would need to be pursued in Canada. Accordingly, this renewed motion now seeks the issuance of letters of request seeking assistance in securing discovery from Roustan and Grant Thornton.

[2] Copies of the proposed subpoenas *duces tecum* and subpoena *ad testificandum* to Roustan are attached to the Declaration of Timothy M. Haggerty in Support of Defendants' Motion for the Issuance of a Letter of Request to Subpoena Foreign Nonparties ("**Haggerty Decl.**") as Exhibits 1 and 2, respectively. A copy of the proposed subpoena *duces tecum* to Grant Thornton is attached to the Haggerty Decl. as Exhibit 3.

an accounting and business advisory firm organized as a limited liability partnership registered in Ontario, Canada. Defendants have attempted to obtain discovery from Roustan and Grant Thornton in the United States, but have been unsuccessful.

Pursuant to Individual Rule 2(C)(ii) and FED. R. CIV. P. 37(a)(1), counsel for Defendants have conferred with counsel for Lead Plaintiff Plumbers & Pipefitters National Pension Fund ("**Lead Plaintiff**" or the "**Fund**") regarding this motion. Defendants provided the Fund's counsel with copies of the proposed letters of request and proposed subpoenas, and the Fund's counsel indicated that it does not oppose the motion. Thus, the proposed letters of request and subpoenas are in forms that we understand are acceptable to all parties. The Fund has not reviewed this memorandum of law.

## PRELIMINARY STATEMENT

This action arises out of the 2016 stock price decline and subsequent bankruptcy of Performance Sports Group Ltd. ("**PSG**" or the "**Company**"). Until its bankruptcy filing on October 28, 2016, PSG was a leading developer and manufacturer of sporting goods, which it sold to thousands of worldwide retail stores under the Bauer (hockey) and Easton (baseball/softball and hockey) brands, among others.

Davis and Rosenthal were, for most of the period preceding PSG's bankruptcy, the Company's CEO and CFO, respectively. Roustan was the non-executive chairperson of PSG's Board of Directors (the "**Board**") for over four years (from 2008 to 2012); a few years after his tenure ended, during late 2015 and early 2016, Roustan pursued a proxy contest on behalf of his own (unsuccessful) effort to be reelected to the Company's Board. The accusations that he aimed at PSG in connection with his efforts to rejoin the Board are now a focus of the Fund's complaint (the Third Amended Complaint, or "**TAC**"), and Roustan is identified by name in the TAC as a "source" for its allegations. Among other things, the TAC alleges that Roustan

2

engaged Grant Thornton to conduct a "survey"[3] of PSG customers, that this survey's results "would have revealed" that PSG was using certain "high-risk sales practices," and that the Defendants "suppressed" those results.

Defendants bring this motion so that they may obtain discovery necessary to evaluate and respond to allegations of the TAC that relate to Roustan's conduct—including the survey that he hired Grant Thornton to conduct—and the information that he supplied to the Fund. The legal standard to obtain cross-border discovery pursuant to a letter of request is the same as that under Rule 26: the application must seek the discovery of evidence "that is relevant to any claim or defense of any party . . . as well as information reasonably calculated to lead to the discovery of admissible evidence, even if such information is not admissible itself." *Blagman v. Apple, Inc.*, No. 12 CIV. 5453 ALC JCF, 2014 WL 1285496, at *4 (S.D.N.Y. Mar. 31, 2014).

That burden is met here, where Roustan is identified in the TAC as a "source" for its allegations, *see* TAC ¶ 44, and his engagement of Grant Thornton is alleged to have revealed "credible evidence" of improper sales practices at PSG, *see id.* ¶ 20. Indeed, all parties agree that Roustan and Grant Thornton possess information that is relevant to the claims and defenses in this litigation; both sides have identified Roustan and Grant Thornton in their Rule 26(a) initial disclosures, and, as noted above, Lead Plaintiff does not oppose this application for the issuance of letters of request.

---

[3] As discussed further below, Defendants dispute that Roustan's informal inquiry to a handful of PSG customers may be properly characterized as a "survey." Defendants refer to it as such only for consistency with the terminology of the TAC.

Accordingly, and for the reasons below, Defendants respectfully submit that the issuance of letters of request is appropriate and necessary to permit the discovery of information that is relevant to the claims and defenses at issue in this litigation.

## RELEVANT FACTUAL BACKGROUND

**A.   The Fund's Allegations Rely on Information Purportedly Provided by Roustan**

In this action, the Fund alleges that Defendants violated Section 10(b) and 20(a) of the Securities Exchange Act of 1934 by making certain allegedly false or misleading statements during the one-year period from January 2015 to January 2016 preceding the Company's bankruptcy.  TAC ¶¶ 157-98.  More specifically, the Fund alleges that the Defendants failed to make truthful disclosures of the sales practices that PSG used to achieve its revenues.  *Id.* ¶¶ 5-6.  The Fund alleges that the Company employed "aggressive," "high-pressure," and "high-risk" sales practices, and that these practices and their attendant risks should have been disclosed to shareholders.  *Id.* ¶¶ 8, 48-49.  The Fund has not alleged that PSG's financial results were misstated (and the Company never restated any of its financial statements), but instead has asserted that Defendants should have disclosed the risk that its sales and growth were "unsustainable" as the result of its "aggressive" sales strategies, as well as a supposed "trend" of accumulating inventory at retail customers.  *Id.* ¶¶ 52, 155, 186.

The TAC places Roustan front and center as a "source" of its allegations.  *Id.* ¶ 44 ("The sources for Lead Plaintiff's allegations regarding Defendants' fraudulent conduct were derived from the investigation of Lead Counsel, which included, among other things:  (1) an interview of W. Graeme Roustan, the former Chairman of the Board of Bauer and shareholder of

4

PSG . . . .").[4]  In at least two dozen paragraphs of the TAC, including the Fund's allegation regarding Defendants' scienter—*i.e.*, state of mind—Lead Plaintiff appears to rely on information it allegedly gleaned from Roustan.  *See id.* ¶ 148.  In particular, the Fund alleges that during a series of alleged face-to-face and written communications in 2015, Roustan "warned" Defendants of the risks associated with the challenged sales practices, and that based on these supposed "warnings," "Defendants knew or recklessly disregarded that [their public] statements were false and misleading."  *See, e.g.*, *id.* ¶ 172.

**B.    Factual Background Regarding Roustan, His Engagement of Grant Thornton, and His Allegations as Incorporated in the TAC**

It is not surprising that Roustan figures so prominently in the TAC:  having been unsuccessful in his efforts to rejoin the Company's Board, Roustan became a public and hostile critic of PSG's management, including the Defendants.  *See, e.g.*, Haggerty Decl. Ex. 9 at 7-8 & Ex. 10 at 3-4.[5]  As discussed further below, at the same time Defendants and the Company were navigating an onslaught of unforeseeable challenges—including the weakening of the Canadian dollar (in which much of PSG's revenues were denominated), the bankruptcies of some of its largest customers, and a softening sporting goods market, among others—Roustan was leveling inflammatory accusations that ultimately made their way into the TAC in this litigation.

After serving as the non-executive chairperson of the PSG Board, Roustan departed the Board in October 2012 in the midst of the Company's evolution from a privately

---

[4]  *See also id.* at 1 ("Lead Plaintiff's allegations are based on . . . the investigation conducted by and under the supervision of its counsel, which included, among other things: . . . interviews with . . . W. Graeme Roustan ('Roustan'), the former Chairman of PSG's Board of Directors.").

[5]  Pinpoint page references for exhibits filed with the U.S. Securities and Exchange Commission ("**SEC**"), including Exhibits 9 and 10, refer to the pagination as endorsed on the materials in the form that they were filed with the SEC (which appears at the bottom of the printed pages).  In many cases, these numbers may be different than the pagination endorsed by the ECF system in these exhibits' headers.

held hockey-centric company towards a publicly traded company with a multi-sport portfolio. *Id.* Ex. 9 at 7 & Ex. 10 at 1-3. Roustan had lost the trust and confidence of other Board members, had no experience in the management or governance of public companies, and his relevant background was limited to hockey-focused activities (principally as a former player in the NHL). *Id.* Ex. 10 at 3. He was replaced by a seasoned business professional with public company experience and a background across a wide variety of industries. *Id.* Ex. 9 at 17.

In January 2015, Roustan petitioned PSG to reappoint him to the Company's Board. *Id.* Ex. 9 at 7. The Board considered and rejected his request. *Id.* Then, in what the Board believed at the time—and Defendants continue to believe—was an effort to advance his bid for Board membership, Roustan engaged Grant Thornton to conduct a supposed "survey" of some of PSG's retail customers. The "survey" ostensibly related to the Company's strategic initiative to open several flagship retail stores of its own (historically, PSG's products were sold exclusively through third-party retailers). *Id.* But rather than seek any actionable information, Roustan posed highly suggestive and biased questions designed to stoke fear among PSG's retail customers that the sales at PSG-owned stores would come at the expense of the retail customers. For example, the survey asked "Do you believe that Bauer can be trusted now that they are both a supplier and a competitor?" and "Do you believe that you will lose sales to Bauer?" *Id.* Exs. 19-21.

PSG's Board responded by demanding that Roustan and Grant Thornton desist in the project, on the basis that it was unauthorized by PSG and that it would adversely affect the Company's relationships with its customers. *Id.* Ex. 9 at 7-8. While Grant Thornton respected PSG's demand, Roustan proceeded with a second "survey," this time using a "do-it-yourself" online tool, SurveyMonkey.com, which he circulated to only a handful of PSG's retail customers. *Id.* Ex. 17 ¶ 16. Then, ostensibly relying on the results of what he himself referred to

6

as his "informal survey," *id.* Ex. 11, Roustan wrote to PSG's Board to allege that he possessed "credible information" that "led [him] to believe that extreme discounting is taking place on some orders simply to make quarterly numbers," and that "several retailers have been asked by [PSG] to move orders forward into an earlier quarter." *Id.* Ex. 11; TAC ¶¶ 20, 65.  He alleged, without providing any corroboration or support, that this conduct somehow "emulate[d] a Ponzi scheme of sorts." Haggerty Decl. Ex. 11; TAC ¶ 65.

Shortly after delivering these incendiary, unsupported allegations to PSG's Board, Roustan offered to stand down from his threatened proxy contest if PSG would pay him a demanded sum of money. Haggerty Decl. Ex. 9 at 8.  When the Company rejected Roustan's demand for payment, he became an outspoken public critic of the Company's management, including Defendants.  The Company's Board opposed his proxy bid, and issued a letter to shareholders setting forth the reasons that it deemed Roustan "not qualified or appropriate for election to the Board," and that his election "would not be in the best interests of our shareholders." *Id.* Ex. 10.  The letter specifically noted that Roustan's communications with customers, including through the "survey," were contrary to "the Company's best interests" and "could have sown confusion in the market and, at worst, could have imperiled the Company's relationships with some of its most important customers." *Id.*

Ultimately, Roustan withdrew his proxy contest, *id.* Ex. 12 at 1, but persisted in his criticism of the Company and its management in the press and elsewhere.  In early 2016, Roustan sued Grant Thornton in the Canadian courts, alleging that the firm wrongfully terminated the survey before it was completed.[6]  *Id.* Exs. 13-17.  That litigation was resolved

---

[6] The litigation between Roustan and Grant Thornton was captioned *RINC Consulting Inc. v. Grant Thornton LLP*, No. CV-16-544206 (Ontario Superior Court of Justice) and is referred to here as the "**Canadian Litigation**."

7

3543705.9

against Roustan in 2020, with Grant Thornton awarded fees and costs. *Id.* Exs. 14-17. In the course of the Canadian Litigation, the Canadian courts made a series of findings that the Defendants believe cast serious doubts on Roustan's credibility, the merits of his allegations against PSG, and the reliability of his surveys. For example, the Canadian court expressly rejected the conclusion—since adopted by Lead Plaintiff here—that Roustan's survey revealed a practice of "improper channel stuffing." The court observed:

> I do not find that affirmative answers to Question 17 ["Have you ever been asked by anyone at PSG in the past two years to move any orders forwarded to an earlier quarter?"] lead to the conclusion Roustan suggests. There is nothing in Question 17 that asks PSG's major retailers whether they were offered deep product discounts. There is nothing in Question 17 that confirms that any of the major retailers in fact moved any purchase orders into earlier quarters, let alone for the promise of deep product discounts. Even if the major retailers had acceded to PSG's request, there is nothing in Question 17 which establishes that this was in fact a "practice" on the part of PSG, as the question could only have been asked (or complied with) on one occasion.

*Id.* Ex. 14 ¶¶ 101, 103.

Casting further doubt on Roustan's credibility and motivations, the Canadian court noted that over the same period that he was directing his allegations of alleged mismanagement and supposed "channel stuffing" at PSG's Board and management, Roustan was actually *buying* additional PSG stock—over 160,000 shares. The Canadian court characterized Roustan's opportunistic purchases as "taking advantage of a small decline in PSG's share price . . . . for his own investing strategic goals." *Id.* Ex. 14 ¶¶ 105, 109.

Roustan's allegations were cited in the initial complaint filed in the litigation in this Court, *see* ECF No. 2 ¶ 43, and enlarged upon in the First Amended Complaint filed in August 2015, which for the first time revealed that the Fund's counsel had interviewed Roustan to develop the complaint. They remained a centerpiece of the Second Amended Complaint and

8

the TAC, which is the now-operative complaint.  Among other things, the TAC alleges that (1) Roustan's "survey" established that PSG's sales practices posed risks to the Company's ability to make future sales and earn revenues, *see* TAC ¶ 20; (2) Roustan's correspondence to PSG's Board was a "warning" of the risks of PSG's sales practices, *id.* ¶ 21; (3) the Defendants tried to "silence" Roustan by demanding that he and Grant Thornton withdraw their "survey," *id.*; and (4) certain press articles discussing Roustan's disputes with PSG and Grant Thornton triggered declines in the price of PSG's stock, *id.* ¶¶ 120, 128.

In its Memorandum Opinion and Order denying in substantial part Defendants' motion to dismiss the TAC, the Court cited multiple allegations relating to Roustan, including in the first paragraph of the decision.  *See* ECF No. 159, at 1, 2, 4, 5, 6, 9.

## ARGUMENT

Roustan and Grant Thornton possess information relevant to the Fund's claims and Defendants' defenses, and Defendants therefore satisfy the standard applicable to this motion.

### A.   Legal Standard

Letters of request[7] are the appropriate mechanism for parties to U.S. litigation to obtain evidence from nonparties in foreign jurisdictions.  *See Villella*, 2019 WL 171987, at *3.  They are authorized under FED. R. CIV. P. 28 and 28 U.S.C. § 1781, and are commonly used to obtain discovery from nonparties in Canada.  *See, e.g.*, *Goldberg v. Dufour*, No. 16-21301, 2020

---

[7] "The term 'letters rogatory' is synonymous with the term 'letter[s] of request.'"  *Villella v. Chem. & Mining Co. of Chile Inc.*, No. 15 CIV. 2106 (ER), 2019 WL 171987, at *2 (S.D.N.Y. Jan. 11, 2019).  "[T]he term letters rogatory denotes a formal request from a court in which an action is pending, to a foreign court to perform some judicial act."  22 C.F.R. § 92.54.

9

WL 373206, at *4 (D. Vt. Jan. 23, 2020) (citing cases).[8]  Indeed, Canadian law expressly contemplates such applications; the Canada Evidence Act authorizes Canadian courts to "command the attendance of [a] party or witness for the purpose of being examined" when "any court or tribunal outside Canada, before which any civil, commercial or criminal matter is pending, is desirous of obtaining the testimony in relation to that matter of a party or witness within the jurisdiction of the first mentioned court[.]"  Canada Evidence Act, R.S.C. 1985, c. C–5, § 46(1) (cited in *Goldberg*, 2020 WL 373206, at *4).  The evidence that may be obtained by letters of request includes document discovery and depositions.  *See, e.g.*, *Villella*, 2019 WL 171987, at *3.

The determination of whether to grant a letter of request is within the Court's discretion, subject to the "extremely permissive" discovery standards of Rule 26.  *Blagman*, 2014 WL 1285496, at *4 (noting that discovery in this context "is an **extremely broad concept**") (internal citation & quotation marks omitted) (emphasis added); *Goldberg*, 2020 WL 373206, at *4.  Thus, the burden on a party seeking the issuance of a letter of request "is not heavy," and the movant need only satisfy the well-established test of Rule 26:  "Information that is relevant to any claim or defense of any party is discoverable, as well as information reasonably calculated to lead to the discovery of admissible evidence, even if such information is not admissible itself."  *Id.* (internal citation & quotation marks omitted); *see also Goldberg*, 2020 WL 373206, at *4 (observing that issuance of letter of request is appropriate "regarding *any* matter, not privileged, that is relevant to the claim or defense of *any* party") (internal citation & quotation marks omitted) (emphasis in original).

---

[8]  *See also Villella*, 2019 WL 171987, at *3; *Lantheus Med. Imaging, Inc. v. Zurich Am. Ins. Co.*, 841 F. Supp. 2d 769, 796 (S.D.N.Y. 2012); *Netherby Ltd. v. Jones Apparel Grp., Inc.*, No. 04 CIV. 7028 (GEL), 2005 WL 1214345, at *2 (S.D.N.Y. May 18, 2005).

Applying these permissive standards, courts "routinely issue letters [of request] where the movant makes a reasonable showing that the evidence sought may be material or may lead to the discovery of material evidence." *Netherby*, 2005 WL 1214345, at *1; *see also Elliott Assocs. v. Republic of Peru*, No. 96 CIV. 7916 (RWS), 1997 WL 436493, at *2 (S.D.N.Y. Aug. 1, 1997) (issuing letter of request for discovery from nonparty that "may" have information that "may shed light" on defendants' defenses).

B. **Roustan and Grant Thornton Possess Evidence That Is Directly Relevant to This Litigation**

As discussed above, Roustan is a key figure in the TAC, and the allegations that he leveled against PSG and the Defendants are integral to the Fund's theory of the case. Indeed, Roustan is described as a "source" of the very allegations at issue here, TAC ¶ 44. *See In re Marsh & McLennan Cos., Inc. Sec. Litig.*, No. 04 CV. 8144 (SWK), 2008 WL 2941215, at *3 (S.D.N.Y. July 30, 2008) ("*Because* Lead Plaintiffs relied upon the [nonparties] in drafting the SAC, the [nonparties] possess discoverable information.") (emphasis added). Thus, it is essential that Defendants have the opportunity to "assess whether there were reasons to credit, discredit, or view in a different context particular allegations attributed to" him. *See Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Tr. Fund v. Arbitron, Inc.*, 278 F.R.D. 335, 339 n.2 (S.D.N.Y. 2011). On this basis alone, the discovery sought from Roustan is appropriately within the scope of Rule 26.

The need for discovery is particularly acute with respect to the surveys that Roustan conducted, first with Grant Thornton's assistance and then through a do-it-yourself online tool. While the Fund alleges that these surveys developed "credible evidence" that PSG

was engaged in sales practices designed to meet quarterly objectives,[9] the TAC includes no further details about the questions that Roustan or Grant Thornton asked, the answers that customers supposedly provided, the methodology of the survey, or *any* of the other facts and circumstances necessary to evaluate whether the surveys themselves, far less their results, were "credible."  Similarly, the TAC alleges that "a majority" of the survey participants reported that they had been asked to move orders forward on at least one occasion, TAC ¶ 82, but does not provide any of the details necessary to evaluate the truth of this assertion, or any of the other details necessary for the Defendants to place this supposed finding in meaningful context (*i.e.*, how many survey participants reported such responses, how many did not, and how frequently (if at all) did "survey" participants in fact move orders based on a request from PSG, the volume of orders they moved in response to such requests, and whether such volumes were significant in the context of the retailers' or PSG's businesses).  As the Canadian court observed as to this issue in the Canadian Litigation, "There is nothing in [the survey] that confirms that any of the major retailers in fact moved any purchase orders into earlier quarters, let alone for the promise of deep product discounts.  Even if the major retailers had acceded to PSG's request, there is nothing in [the survey] which establishes that this was in fact a 'practice' on the part of PSG, as the question could only have been asked (or complied with) on one occasion."  Haggerty Decl. Ex. 14 ¶ 103.

Thus, the Defendants require discovery from Roustan and Grant Thornton to place the Fund's allegations regarding the surveys in the appropriate factual context.  Among

---

[9]  While Defendants believe that the law is well settled that such conduct would not amount to a violation of the securities laws, *see, e.g.*, *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 566 (S.D.N.Y. 2004), they nonetheless require discovery regarding the underlying facts of Roustan's supposed "surveys."

12

other things, the Fund alleges that these surveys provided the supposed factual predicate for Roustan's "warnings" to PSG's Board.  TAC ¶ 148.  Because the TAC alleges that these "warnings" are one of the few indicia of Defendants' scienter, *see id.*, Defendants require the opportunity to test their factual underpinnings.  Defendants believe that the evidence developed from Roustan, Grant Thornton, and others will demonstrate that the "warnings" had no factual foundation at all—among other reasons, because the "surveys" were biased, flawed, incomplete, and methodologically unsound—and thus could not legally or factually support any inference of scienter.

C. **The Discovery Sought from Roustan and Grant Thornton Is Not Available from Any Other Sources or Means**

Defendants are not able to obtain similarly probative evidence from any sources other than Roustan and Grant Thornton, and they are unable to obtain disclosure from Roustan and Grant Thornton except through the letter of request process.[10]

As to Roustan, his counsel in the U.S. has advised Defendants that Roustan is out of the country, that U.S. counsel is not authorized to accept service of a subpoena for Roustan, and that Roustan "has absolutely no interest in being involved in any way in this matter." *Id.* Exs. 24-25 & 28.[11]  Thus, Defendants have concluded that Roustan will not provide voluntary disclosure, is not currently subject to service in the United States, and that the issuance of a letter

---

[10] Counsel understands that Canadian courts considering a letter of request will give consideration to whether the evidence sought by the applicant may be obtainable through other means or sources.  *See Re Friction Division Products, Inc v. EI Du Pont de Nemours & Co Inc.*, (1986), 56 OR (2d) 722 (Ont HC).

[11] Defendants believe that Roustan's being out of the country likely means that he is in Ontario because his "twitter.com" page lists Ontario and Florida as where he is located.  Haggerty Decl. Ex. 31.  Defendants are continuing in their efforts to serve Roustan in Florida but do not believe those efforts can be successful in light of the information received from Roustan's counsel. Haggerty Decl. ¶ 32.

13

3543705.9

of request is the appropriate mechanism by which to obtain disclosure from him. Defendants believe that the evidence sought from Roustan is not available from any alternative source or means. As discussed above, Roustan was both a participant in relevant events preceding the filing of this litigation, and a source relied upon by the Fund in formulating its complaint. As such, no alternative source could provide evidence regarding Roustan's personal knowledge, actions, motivations, biases, and related matters.[12] Defendants need such evidence to establish their defenses to allegations that they believe are entirely lacking in merit.

As to Grant Thornton, Defendants have attempted to obtain disclosure by serving a subpoena on the U.S.-based entity doing business as "Grant Thornton LLP," but that entity has advised Defendants that it is legally distinct from the Canadian "Grant Thornton" entity, that the U.S. and Canadian entities each maintain their own client relationships, and that the U.S. entity does not have legal or practical access to the Canadian entity's books and records. *Id.* Ex. 37. The U.S. entity has advised Defendants that neither Roustan nor PSG were its clients, and it has no records related to this matter. *Id.* Accordingly, Defendants believe that the information sought from Grant Thornton through the proposed letter of request is not available from any alternative source or means.

---

[12] For example, Defendants also require discovery regarding Roustan's personal motives behind his crusade against PSG and its former management, which are relevant to his credibility. The TAC alleges that Roustan's surveys revealed risks that should have been disclosed to investors, but Defendants expect that discovery from Roustan will reveal that he continued to purchase substantial amounts of PSG stock even after the "surveys" had been concluded. *See* Haggerty Decl. Ex. 17 ¶ 18. Likewise, Defendants expect that discovery from Roustan will illuminate the extent to which his allegations against PSG and the Defendants are driven by personal animus rather than fact. As the Canadian court concluded, Roustan's relationship with the Board "was adversarial, antagonistic and fractured at all material times." *See id.* Ex. 15 ¶ 24. Thus, Defendants will seek discovery regarding Roustan's motivations for leveling defamatory, public accusations against PSG and the Defendants, many of which have been incorporated in the TAC.

14

Finally, the information sought from Grant Thornton is not duplicative of the information sought from Roustan. Defendants expect that Grant Thornton will possess its own notes and records relating to the purposes, implementation, and findings of the survey, all of which may contradict Roustan's characterizations as to those matters. Given Roustan's demonstrated bias, Defendants would be prejudiced if they were required to rely exclusively upon his characterizations as to those matters. Disclosure from Grant Thornton—which litigated successfully against Roustan in the Canadian Litigation—is necessary so that the evidentiary record as to these matters may be complete.

[CONCLUSION ON FOLLOWING PAGE]

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court issue letters of request for assistance from a Canadian court to aid in securing relevant (i) documentary and testimonial evidence from Roustan, and (ii) documentary evidence from Grant Thornton. As noted above, the Fund has reviewed the proposed letters of request, and has indicated that it does not oppose this motion.

Dated:   New York, New York
         March 4, 2021

                              Respectfully submitted,

| FRIEDMAN KAPLAN SEILER & ADELMAN LLP | BAKER & HOSTETLER LLP |
|---|---|
| s/ Edward A. Friedman | s/ David L. Aronoff |
| Edward A. Friedman | David L. Aronoff |
| Jason C. Rubinstein | Scott J. Fishwick |
| Timothy M. Haggerty | 11601 Wilshire Boulevard \| Suite 1400 |
| Elizabeth Bierut | Los Angeles, CA 90025-0508 |
| Walter Ciacci | Tel. (310) 820-8800 |
| 7 Times Square | Fax (310) 820-8859 |
| New York, New York 10036-6516 | DAronoff@bakerlaw.com |
| Tel.  (212) 833-1100 | SFishwick@bakerlaw.com |
| Fax  (212) 833-1250 | |
| efriedman@fklaw.com | Bari R. Nadworny |
| jrubinstein@fklaw.com | 45 Rockefeller Plaza |
| thaggerty@fklaw.com | New York, NY 10111 |
| ebierut@fklaw.com | Tel.  (212) 589-4200 |
| wciacci@fklaw.com | Fax  (212) 589-4201 |
| | bnadworny@bakerlaw.com |
| *Attorneys for Defendant Amir Rosenthal* | |
| | *Attorneys for Defendant Kevin Davis* |

16

3543705.9